Matthew A. Feldman
Rachel C. Strickland
Jennifer J. Hardy
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| MPM Silicones, LLC, et al., [1] | : | Case No. 14-_____ (    ) |
| | : | |
| Debtors. | : | (Joint Administration Pending) |

-------------------------------------------------------x

**DEBTORS' STATEMENT IN SUPPORT OF THE MOTION FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§ 105, 361, 362, 363(c), 363(d), 364(c), 364(d), 364(e) AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) AUTHORIZING DEBTORS TO USE CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS; AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 2002, 4001 AND 9014**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

---

[1]   The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) Juniper Bond Holdings I LLC (9631); (ii) Juniper Bond Holdings II LLC (9692); (iii) Juniper Bond Holdings III LLC (9765); (iv) Juniper Bond Holdings IV LLC (9836); (v) Momentive Performance Materials China SPV Inc. (8469); (vi) Momentive Performance Materials Holdings Inc. (8246); (vii) Momentive Performance Materials Inc. (8297); (viii) Momentive Performance Materials Quartz, Inc. (9929); (ix) Momentive Performance Materials South America Inc. (4895); (x) Momentive Performance Materials USA Inc. (8388); (xi) Momentive Performance Materials Worldwide Inc. (8357); and (xii) MPM Silicones, LLC (5481).  The Debtors' executive headquarters are located at 260 Hudson River Road, Waterford, NY 12188.

The debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**"), by and through their proposed attorneys, Willkie Farr & Gallagher LLP, represent:

## BACKGROUND

1.      Pursuant to the *Debtors Motion for Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363(C), 363(D), 364(C), 364(D), 364(E) And 507 And Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing Debtors to Use Cash Collateral; (III) Granting Adequate Protection To Prepetition Secured Lenders; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 2002, 4001 and 9014*, dated as of April 13, 2014, the Debtors seek entry of an interim order (the "**Interim Order**"), and a final order (the "**Final Order**" and, together with the Interim Order, the "**Orders**"), pursuant to sections 105(a), 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"):  (a) authorizing the Debtors to enter into postpetition financing arrangements as provided in (i) that certain Senior Secured Debtor-in-Possession and Exit Amended and Restated Asset-Based Revolving Credit Agreement (as hereafter amended, supplemented or otherwise modified from time to time, the "**DIP ABL Agreement**" and, together with all agreements, documents and instruments executed and delivered in connection with the DIP ABL Agreement, as hereafter amended, supplemented or otherwise modified from time to time, the "**DIP ABL Documents**") and (ii) that certain Senior Secured Debtor-in-Possession Term Loan Agreement (the "**DIP Term Loan Agreement**" and, together with the DIP ABL Agreement, the "**DIP Credit Agreements**"); (b) authorizing the

Debtors to use collateral subject to liens and security interests, including cash collateral;

(c) granting adequate protection in respect thereof; (d) scheduling a final hearing pursuant to

Bankruptcy Rule 4001 with respect to the relief requested herein (the "**Motion**"); and

(e) granting related relief.[2]

2.       In support of the Motion, the Debtors attach hereto a true and correct copy

of that certain First Lien Intercreditor Agreement, dated as of November 16, 2012 among

JPMorgan Chase Bank, N.A. ("**JPM**"), as Collateral Agent, JPM, as Authorized Representative

under the Credit Agreement, The Bank of New York Mellon Trust Company, N.A. ("**BNY**"), as

the Initial Other Authorized Representative, and each additional Authorized Representative from

time to time party thereto (the "**First Lien Intercreditor**") as <u>Exhibit A</u>, and a true and correct

copy of that certain Intercreditor Agreement, dated as of May 25, 2012, among JPM, as

Intercreditor Agent and BNY, as Trustee and as Collateral Agent (the "**1.5 Lien Intercreditor**"),

as <u>Exhibit B</u>.

## <u>FIRST LIEN INTERCREDITOR</u>

3.       As set forth in the Motion, the holders of First Lien Notes are deemed to

consent to the priming of their liens on Prepetition Collateral pursuant to the terms of the Orders

and the DIP Credit Agreements in accordance with the terms of the First Lien Intercreditor.

4.       Section 2.05(b) of the First Lien Intercreditor provides that:

> If any Grantor shall become subject to a case (a "Bankruptcy Case") under
> the Bankruptcy Code and shall, as debtor(s)-in-possession, move for
> approval of financing ("DIP Financing") to be provided by one or more
> lenders (the "DIP Lenders") under Section 364 of the Bankruptcy Code

---

[2]       Capitalized terms not otherwise defined herein shall have the meanings set forth in the Motion and/or the
First Lien Intercreditor, as applicable.

or the use of cash collateral under Section 363 of the Bankruptcy Code, each First Lien Secured Party *(other than any Controlling Secured Party or any Authorized Representative of any Controlling Secured Party)* agrees that it will raise no objection to any such financing or to the Liens on the Shared Collateral securing the same ("DIP Financing Liens") or to any use of cash collateral that constitutes Shared Collateral, *unless any Controlling Secured Party, or an Authorized Representative of any Controlling Secured Party*, shall then oppose or object to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Secured Parties, each Non-Controlling Secured Party will subordinate its Liens with respect to such Shared Collateral on the same terms as the Liens of the Controlling Secured Parties (other than any Liens of any First Lien Secured Parties constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank *pari passu* with the Liens on any such Shared Collateral granted to secure the First Lien Obligations of the Controlling Secured Parties, each Non- Controlling Secured Party will confirm the priorities with respect to such Shared Collateral as set forth herein), in each case so long as (A) the First Lien Secured Parties of each Series retain the benefit of their Liens on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-a-vis all the other First Lien Secured Parties (other than any Liens of the First Lien Secured Parties constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the First Lien Secured Parties of each Series are granted Liens on any additional collateral pledged to any First Lien Secured Parties as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-a-vis the First Lien Secured Parties as set forth in this Agreement, (C) if any amount of such DIP Financing or cash collateral is applied to repay any of the First Lien Obligations, such amount is applied pursuant to Section 2.01(a) of this Agreement, and (D) if any First Lien Secured Parties are granted adequate protection, including in the form of periodic payments, in connection with such DIP Financing or use of cash collateral, the proceeds of such adequate protection is applied pursuant to Section 2.01(a) of this Agreement; provided that the First Lien Secured Parties of each Series shall have a right to object to the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the First Lien Secured Parties of such Series or its Authorized Representative that shall not constitute Shared Collateral; and provided further that the First Lien Secured Parties receiving adequate protection

- 4 -

shall not object to any other First Lien Secured Party receiving adequate protection comparable to any adequate protection granted to such First Lien Secured Parties in connection with a DIP Financing or use of cash collateral.

(emphasis added)

5.      The First Lien Intercreditor expressly provides that each First Lien Secured Party (other than any Controlling Secured Party or any Authorized Representative of any Controlling Secured Party) agrees that it will raise no objection to any DIP Financing or DIP Financing Liens unless any Controlling Secured Party objects.  See §2.05(b).  Pursuant to Article I of the First Lien Intercreditor, "Controlling Secured Party" is defined as "the First Lien Secured Part[y] whose Authorized Representative is the Applicable Authorized Representative[3] for such Shared Collateral."  See id. at Article I.  The Applicable Authorized Representative is the Administrative Agent until the earlier of the Discharge of the Credit Agreement Obligations[4] or the Non-Controlling Authorized Representative Enforcement Date[5], neither of which have

_____

[3]     "Applicable Authorized Representative" means, with respect to any Shared Collateral, (i) until the earlier of (x) the Discharge of Credit Agreement Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date, the Administrative Agent and (ii) from and after the earlier of (x) the Discharge of Credit Agreement Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date, the Major Non-Controlling Authorized Representative.  In the event of the Discharge of Credit Agreement Obligations, the Major Non-Controlling Authorized Representative shall become the Applicable Authorized Representative; provided that, if a Designated Credit Agreement, is subsequently entered into thereafter, the administrative agent such Designated Credit Agreement shall be the Applicable Authorized Representative.

[4]     "Discharge of Credit Agreement Obligations" means with respect to any Shared Collateral, the Discharge of the Credit Agreement Obligations with respect to such Shared Collateral; provided that the Discharge of Credit Agreement Obligations shall not be deemed to have occurred in connection with a Refinancing of such Credit Agreement Obligations or an incurrence of future Credit Agreement Obligations with additional First Lien Obligations secured by such Shared Collateral under an Other First Lien Agreement which has been designated in writing by Intermediate Holdings to the Collateral Agent and each other Authorized Representative as the "Credit Agreement" for purposes of this Agreement.

[5]     "Non-Controlling Authorized Representative Enforcement Date" means with respect to any Non-Controlling Authorized Representative, the date which is 180 days (throughout which 180 day period such Non-Controlling Authorized Representative was the Major Non-Controlling Authorized Representative) after the occurrence of both (i) an Event of Default (under and as defined in the Other First Lien Agreement

occurred here.  The Administrative Agent is defined in the introductory paragraph of the First

Lien Intercreditor and references JPM, as administrative agent for the Cash Flow Facility.  Thus,

the Controlling Secured Party for purposes of the First Lien Intercreditor is JPM.  Accordingly,

as JPM consented to the DIP Credit Facilities, the First Lien Noteholders are deemed to have

consented as well.[6]

## 1.5 LIEN INTERCREDITOR

6.       The 1.5 Lien Noteholders are also deemed to consent to the priming of

their Liens on the Prepetition Collateral pursuant to the terms of the Orders and the DIP Credit

Agreements in accordance with the 1.5 Lien Intercreditor.  Pursuant to section 6 of the

Intercreditor, the 1.5 Lien Noteholders have agreed that, among other things, (i) they will be

deemed to have consented and raise no objection to the DIP Credit Facilities, and (ii) they will

---

under which such Non-Controlling Authorized Representative is the Authorized Representative) and (ii) the
Collateral Agent's and each Authorized Representative's receipt of written notice from such Non-
Controlling Authorized Representative that (x) such Non-Controlling Authorized Representative is the
Major Non-Controlling Authorized Representative and that an Event of Default (under and as defined in the
Other First Lien Agreement under which such Non-Controlling Authorized Representative is the
Authorized Representative) has occurred and is continuing and (y) the First Lien Obligations of the Series
with respect to which such Non-Controlling Authorized Representative is the Authorized Representative
are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance
with the terms of the applicable Other First Lien Agreement; provided that the Non-Controlling Authorized
Representative Enforcement Date shall be stayed and shall not occur and shall be deemed not to have
occurred with respect to any Shared Collateral (1) at any time the Administrative Agent or the Collateral
Agent has commenced and is diligently pursuing any enforcement action with respect to such Shared
Collateral or (2) at any time the Grantor that has granted a security interest in such Shared Collateral is then
a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

[6]      The First Lien Noteholders may also attempt to argue that the Debtors' usage of the DIP Credit Facilities to
repay the Prepetition ABL Facility will trigger First Lien Note consent rights.  However, section 2.05(b)(C)
provides that such consent rights are triggered only if the DIP Credit Facilities are used to repay any of the
First Lien Obligations.  As defined in that certain Collateral Agreement, annexed hereto as Exhibit C, the
First Lien Obligations do not include any obligations in connection with the Prepetition ABL Facility as
such obligations are not secured "equitably and ratably" to the Cash Flow Facility or the First Lien Notes
(as the Prepetition ABL Obligations are secured by a different collateral package than the Cash Flow
Obligations and First Lien Note Obligations).

- 6 -

subordinate their liens on the domestic Prepetition Collateral to the DIP Liens and Adequate

Protection Liens provided to the First Lien Secured Parties.[7]

*Remainder of Page Intentionally Left Blank*

---

[7]      Section 6 of the 1.5 Lien Intercreditor provides that:

If the Company or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the Intercreditor Agent shall desire to permit the use of cash collateral or to permit the Company or any other Grantor to obtain financing under Section 363 or Section 364 of Title 11 of the United States Code or any similar provision in any Bankruptcy Law ("*DIP Financing*"), then each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, agrees that it will raise no (a) objection to (and will not otherwise contest) such use of cash collateral or DIP Financing and will not request adequate protection or any other relief in connection therewith (except to the extent permitted by the proviso in clause (ii) of Section 3.1(a) and Section 6.3) and, to the extent the Liens securing the Senior Lender Claims under the Credit Agreement or, if no Credit Agreement exists, under the other Senior Lender Documents are subordinated or pari passu with such DIP Financing, will subordinate its Liens in the Common Collateral to such DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second-Priority Claims are so subordinated to Liens securing Senior Lender Claims under this Agreement, (b) objection to (and will not otherwise contest) any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of Senior Lender Claims made by the Intercreditor Agent or any holder of Senior Lender Claims, (c) objection to (and will not otherwise contest) any lawful exercise by any holder of Senior Lender Claims of the right to credit bid Senior Lender Claims at any sale in foreclosure of Senior Lender Collateral, (d) objection to (and will not otherwise contest) any other request for judicial relief made in any court by any holder of Senior Lender Claims relating to the lawful enforcement of any Lien on Senior Lender Collateral or (e) objection to (and will not otherwise contest) any order relating to a sale of assets of any Grantor for which the Intercreditor Agent has consented that provides, to the extent the sale is to be free and clear of Liens, that the Liens securing the Senior Lender Claims and the Second-Priority Claims will attach to the proceeds of the sale on the same basis of priority as the Liens securing the Senior Lender Collateral rank to the Liens securing the Second-Priority Collateral in accordance with this Agreement.

## <u>CONCLUSION</u>

For the foregoing reasons, and for the reasons previously detailed in the Motion,

the Debtors respectfully request that the relief requested in the Motion be granted.

Dated:  April 13, 2014
New York, New York

WILLKIE FARR & GALLAGHER LLP
*Proposed Counsel for the Debtors and*
*Debtors in Possession*

By:  /s/ Jennifer J. Hardy
Matthew A. Feldman
Rachel C. Strickland
Jennifer J. Hardy

787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

**EXHIBIT A**

**Exhibit 4.3**
**EXECUTION VERSION**

## FIRST LIEN INTERCREDITOR AGREEMENT

dated as of

November 16, 2012

among

JPMORGAN CHASE BANK, N.A.,
as Collateral Agent,

JPMORGAN CHASE BANK, N.A.,
as Authorized Representative under the Credit Agreement,

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,
as the Initial Other Authorized Representative,

and

each additional Authorized Representative from time to time party hereto

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

TABLE OF CONTENTS

Page

ARTICLE I

Definitions

SECTION 1.01    Construction; Certain Defined Terms                                        1

ARTICLE II

Priorities and Agreements with Respect to Shared Collateral

SECTION 2.01    Priority of Claims                                                          8
SECTION 2.02    Actions with Respect to Shared Collateral; Prohibition on Contesting Liens  9
SECTION 2.03    No Interference; Payment Over                                              11
SECTION 2.04    Automatic Release of Liens; Amendments to First Lien Security Documents    12
SECTION 2.05    Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings    12
SECTION 2.06    Reinstatement                                                             13
SECTION 2.07    Insurance                                                                 14
SECTION 2.08    Refinancings                                                              14
SECTION 2.09    Possessory Collateral Agent as Gratuitous Bailee for Perfection           14

ARTICLE III

Existence and Amounts of Liens and Obligations

ARTICLE IV

The Collateral Agent

SECTION 4.01    Appointment and Authority                                                 15
SECTION 4.02    Rights as a First Lien Secured Party                                       16
SECTION 4.03    Exculpatory Provisions                                                     17
SECTION 4.04    Reliance by Collateral Agent                                               18
SECTION 4.05    Delegation of Duties                                                       18
SECTION 4.06    Resignation of Collateral Agent                                            19
SECTION 4.07    Non-Reliance on Collateral Agent and Other First Lien Secured Parties      20
SECTION 4.08    Collateral and Guaranty Matters                                            20

i

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

ARTICLE V

Miscellaneous

| | | |
|---|---|---|
| SECTION 5.01 | Notices | 20 |
| SECTION 5.02 | Waivers; Amendment; Joinder Agreements | 21 |
| SECTION 5.03 | Parties in Interest | 22 |
| SECTION 5.04 | Survival of Agreement | 22 |
| SECTION 5.05 | Counterparts | 22 |
| SECTION 5.06 | Severability | 22 |
| SECTION 5.07 | Governing Law | 22 |
| SECTION 5.08 | Submission to Jurisdiction; Waivers | 23 |
| SECTION 5.09 | WAIVER OF JURY TRIAL | 23 |
| SECTION 5.10 | Headings | 23 |
| SECTION 5.11 | Conflicts | 24 |
| SECTION 5.12 | Provisions Solely to Define Relative Rights | 24 |
| SECTION 5.13 | Integration | 24 |

Annexes

Annex A          Consent of Grantors

ii

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

[3.2.5.3] [11.16.2012 First Lien Intercreditor Agreement.pdf] [Page 4 of 33]

This FIRST LIEN INTERCREDITOR AGREEMENT (as amended, restated, modified or supplemented from time to time, this "*Agreement*"), dated as of November 16, 2012, is among JPMORGAN CHASE BANK, N.A., as collateral agent for the First Lien Secured Parties (in such capacity and together with its successors in such capacity, the "*Collateral Agent*"), JPMORGAN CHASE BANK, N.A., as Authorized Representative for the Credit Agreement Secured Parties (in such capacity and together with its successors in such capacity, the "*Administrative Agent*"), THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Authorized Representative for the Initial Other First Lien Secured Parties (in such capacity and together with its successors in such capacity, the "*Initial Other Authorized Representative*"), and each additional Authorized Representative from time to time party hereto for the Other First Lien Secured Parties of the Series with respect to which it is acting in such capacity, as consented to by the Grantors in the Consent of Grantors.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Collateral Agent, the Administrative Agent (for itself and on behalf of the Credit Agreement Secured Parties), the Initial Other Authorized Representative (for itself and on behalf of the Initial Other First Lien Secured Parties) and each additional Authorized Representative (for itself and on behalf of the Other First Lien Secured Parties of the applicable Series) agree as follows:

## ARTICLE I

### Definitions

SECTION 1.01 *Construction; Certain Defined Terms.*

(a) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (iii) the words "herein", "hereof and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) unless otherwise expressly stated herein, all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

(b) It is the intention of the First Lien Secured Parties of each Series that the holders of First Lien Obligations of such Series (and not the First Lien Secured Parties of any other Series) bear the risk of (i) any determination by a court of competent jurisdiction that (x) any of the First Lien Obligations of such Series are unenforceable under applicable law or are subordinated to any other obligations (other than another Series of First Lien Obligations), (y) any of the First Lien Obligations of such Series do not have an enforceable security interest in any of the Collateral securing any other Series of First Lien Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of First Lien Obligations and, without limiting the foregoing, after taking into account the effect of any applicable intercreditor agreements) on a basis ranking prior to the security interest of such Series of First Lien Obligations but junior to the security interest of any other Series of First Lien Obligations or (ii) the existence of any Collateral for any other Series of First Lien Obligations that is not Shared Collateral (any such condition referred to in the foregoing clauses (i) or (ii) with respect to any Series of First Lien Obligations, an "*Impairment*" of such Series). In the event of any Impairment with respect to any Series of First Lien Obligations, the results of such Impairment shall be borne solely by the holders of such Series of First Lien Obligations, and the rights of the holders of such Series of First Lien Obligations (including, without limitation, the right to receive distributions in respect of such Series of First Lien Obligations pursuant to Section 2.01) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such First Lien Obligations subject to such Impairment. Additionally, in the event the First Lien Obligations of any Series are modified pursuant to applicable law (including, without limitation, pursuant to Section 1129 of the Bankruptcy Code), any reference to such First Lien Obligations or the Secured Credit Documents governing such First Lien Obligations shall refer to such obligations or such documents as so modified.

(c) Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Credit Agreement. As used in this Agreement, the following terms have the meanings specified below:

"*Administrative Agent*" has the meaning assigned to such term in the introductory paragraph of this Agreement, together with its successors and assigns, including the administrative agent under any Designated Credit Agreement.

"*Agreement*" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"*Applicable Authorized Representative*" means, with respect to any Shared Collateral, (i) until the earlier of (x) the Discharge of Credit Agreement Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date, the Administrative Agent and (ii) from and after the earlier of (x) the Discharge of Credit Agreement Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date, the Major Non-Controlling Authorized Representative. In the event of

2

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012   |   Powered by Intelligize

the Discharge of Credit Agreement Obligations, the Major Non-Controlling Authorized Representative shall become the Applicable Authorized Representative; provided that, if a Designated Credit Agreement is subsequently entered into thereafter, the administrative agent under such Designated Credit Agreement shall be the Applicable Authorized Representative (subject to the preceding sentence).

"*Authorized Representative*" means (i) in the case of any Credit Agreement Obligations or the Credit Agreement Secured Parties, the Administrative Agent, (ii) in the case of the Initial Other First Lien Obligations or the Initial Other First Lien Secured Parties, the Initial Other Authorized Representative and (iii) in the case of any Series of Other First Lien Obligations or Other First Lien Secured Parties that become subject to this Agreement after the date hereof, the Authorized Representative named for such Series in the applicable Joinder Agreement.

"*Bankruptcy Case*" has the meaning assigned to such term in Section 2.05(b).

"*Bankruptcy Code*" means Title 11 of the United States Code, as amended.

"*Bankruptcy Law*" means the Bankruptcy Code and any similar Federal, state or foreign law for the relief of debtors.

"*Collateral*" means all assets and properties subject to Liens created pursuant to any First Lien Security Document to secure one or more Series of First Lien Obligations.

"*Collateral Agent*" has the meaning assigned to such term in the introductory paragraph hereof, together with its successors and assigns, including the collateral agent under any Designated Credit Agreement.

"*Collateral Agreement*" means that certain Amended and Restated U.S. Collateral Agreement, dated as of the date hereof, among Holdings, Intermediate Holdings, each Domestic Subsidiary of Intermediate Holdings from time to time identified therein as a party and JPMorgan Chase Bank, N.A, as Applicable First Lien Representative (as defined therein) for the First Lien Secured Parties, as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, including the collateral agreement securing any Designated Credit Agreement.

"*Consent of Grantors*" means the Consent of Grantors in the form of Annex A attached hereto.

"*Controlling Secured Parties*" means, with respect to any Shared Collateral, the Series of First Lien Secured Parties whose Authorized Representative is the Applicable Authorized Representative for such Shared Collateral.

"*Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of February 10, 2011, among Holdings, Intermediate Holdings,

3

Momentive Performance Materials USA Inc., as the U.S. Borrower, Momentive Performance Materials GmbH (formerly known as Blitz 06-103 GmbH), as the German Borrower, the lending institutions from time to time parties thereto, the Administrative Agent and the other parties thereto, as amended by the Incremental Assumption Agreement, dated as of April 2, 2012, as further amended by Amendment No. 1, dated as of November 16, 2012, and as further amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, including any Designated Credit Agreement.

"*Credit Agreement Obligations*" means the "Obligations" as defined in the Collateral Agreement (or the Equivalent Provision thereof) other than "Other First Lien Obligations" pursuant to clause (b) of such definition.

"*Credit Agreement Secured Parties*" means the "Secured Parties" as defined in the Credit Agreement (or the Equivalent Provision thereof).

"*Designated Credit Agreement*" means, initially, the Credit Agreement in effect on the date hereof and, in the event such Credit Agreement is terminated or replaced and Intermediate Holdings subsequently enters into any Credit Agreement (as defined in the Initial Other First Lien Agreement), the Credit Agreement designated by Intermediate Holdings to be the Designated Credit Agreement hereunder.

"*DIP Financing*" has the meaning assigned to such term in Section 2.05(b).

"*DIP Financing Liens*" has the meaning assigned to such term in Section 2.05(b).

"*DIP Lenders*" has the meaning assigned to such term in Section 2.05(b).

"*Discharge*" means, with respect to any Shared Collateral and any Series of First Lien Obligations, the date on which such Series of First Lien Obligations is no longer secured by such Shared Collateral. The term "*Discharged*" has a corresponding meaning.

"*Discharge of Credit Agreement Obligations*" means, with respect to any Shared Collateral, the Discharge of the Credit Agreement Obligations with respect to such Shared Collateral; provided that the Discharge of Credit Agreement Obligations shall not be deemed to have occurred in connection with a Refinancing of such Credit Agreement Obligations or an incurrence of future Credit Agreement Obligations with additional First Lien Obligations secured by such Shared Collateral under an Other First Lien Agreement which has been designated in writing by Intermediate Holdings to the Collateral Agent and each other Authorized Representative as the "Credit Agreement" for purposes of this Agreement.

"*Equivalent Provision*" means, with respect to any reference to a specific provision of an agreement in effect on the date hereof (the "original agreement"), if such agreement is amended, restated, supplemented, modified or replaced after the date hereof

4

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

in a manner permitted hereby, the provision in such amended, restated, supplemented, modified or replacement agreement that is the equivalent to such specific provision in such original agreement.

"***Event of Default***" has the meaning set forth in the Collateral Agreement.

"***First Lien Obligations***" means, collectively, (i) the Credit Agreement Obligations and (ii) each Series of Other First Lien Obligations.

"***First Lien Secured Parties***" means (a) the Credit Agreement Secured Parties and (ii) the Other First Lien Secured Parties with respect to each Series of Other First Lien Obligations.

"***First Lien Security Documents***" means the Collateral Agreement and each other agreement, instrument or document entered into in favor of the Collateral Agent for purposes of securing any Series of First Lien Obligations.

"***Grantors***" means Holdings, Intermediate Holdings and each Subsidiary of Intermediate Holdings which has granted a security interest pursuant to any First Lien Security Document to secure any Series of First Lien Obligations.

"***Holdings***" means Momentive Performance Materials Holdings Inc., a Delaware corporation.

"***Impairment***" has the meaning assigned to such term in Section 1.01(b).

"***Initial Other Authorized Representative***" has the meaning assigned to such term in the introductory paragraph to this Agreement.

"***Initial Other First Lien Agreement***" means that certain Indenture, dated as of the date hereof, among Intermediate Holdings, as issuer, the guarantors named therein, and The Bank of New York Mellon Trust Company, N.A., as trustee.

"***Initial Other First Lien Obligations***" means the Other First Lien Obligations arising under or pursuant to the Initial Other First Lien Agreement.

"***Initial Other First Lien Secured Parties***" means the holders of any Initial Other First Lien Obligations and the Initial Other Authorized Representative.

"***Insolvency or Liquidation Proceeding***" means:

(1) any case commenced by or against Intermediate Holdings or any other Grantor under any Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of Intermediate Holdings or any other Grantor, any receivership or assignment for the benefit of creditors relating to Intermediate Holdings or any other Grantor or any similar case or proceeding relative to Intermediate Holdings or any other Grantor or its creditors, as such, in each case whether or not voluntary;

5

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

(2) any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Intermediate Holdings or any other Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3) any other proceeding of any type or nature in which substantially all claims of creditors of the Intermediate Holdings or any other Grantor are determined and any payment or distribution is or may be made on account of such claims.

"*Intermediate Holdings*" means Momentive Performance Materials Inc., a Delaware corporation.

"*Intervening Creditor*" has the meaning assigned to such term in Section 2.01(a).

"*Joinder Agreement*" means the documents required to be delivered by an Authorized Representative to the Collateral Agent pursuant to Section 5.20 of the Collateral Agreement (or the Equivalent Provision thereof) in order to create an additional Series of Other First Lien Obligations or a Refinancing of any Series of First Lien Obligations.

"*Lien*" means any mortgage, pledge, security interest, hypothecation, assignment, lien (statutory or other) or similar encumbrance (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof).

"*Major Non-Controlling Authorized Representative*" means, with respect to any Shared Collateral, the Authorized Representative of the Series of Other First Lien Obligations that constitutes the largest outstanding principal amount of any then outstanding Series of First Lien Obligations with respect to such Shared Collateral.

"*New York UCC*" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"*Non-Controlling Authorized Representative*" means, at any time with respect to any Shared Collateral, any Authorized Representative that is not the Applicable Authorized Representative at such time with respect to such Shared Collateral.

"*Non-Controlling Authorized Representative Enforcement Date*" means, with respect to any Non-Controlling Authorized Representative, the date which is 180 days (throughout which 180 day period such Non-Controlling Authorized Representative was the Major Non-Controlling Authorized Representative) after the occurrence of both (i) an Event of Default (under and as defined in the Other First Lien Agreement under which such Non-Controlling Authorized Representative is the

6

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012   |   Powered by Intelligize

Authorized Representative) and (ii) the Collateral Agent's and each other Authorized Representative's receipt of written notice from such Non-Controlling Authorized Representative certifying that (x) such Non-Controlling Authorized Representative is the Major Non-Controlling Authorized Representative and that an Event of Default (under and as defined in the Other First Lien Agreement under which such Non-Controlling Authorized Representative is the Authorized Representative) has occurred and is continuing and (y) the First Lien Obligations of the Series with respect to which such Non-Controlling Authorized Representative is the Authorized Representative are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Other First Lien Agreement; provided that the Non-Controlling Authorized Representative Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred with respect to any Shared Collateral (1) at any time the Administrative Agent or the Collateral Agent has commenced and is diligently pursuing any enforcement action with respect to such Shared Collateral or (2) at any time the Grantor that has granted a security interest in such Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

"**_Non-Controlling Secured Parties_**" means, with respect to any Shared Collateral, the First Lien Secured Parties which are not Controlling Secured Parties with respect to such Shared Collateral.

"**_Other First Lien Agreement_**" has the meaning given to such term by the Collateral Agreement and includes the Initial Other First Lien Agreement.

"**_Other First Lien Obligations_**" has the meaning given to such term by the Collateral Agreement and includes the Initial Other First Lien Obligations.

"**_Other First Lien Secured Party_**" means the holders of any Other First Lien Obligations and any Authorized Representative with respect thereto and includes the Initial Other First Lien Secured Parties.

"**_Possessory Collateral_**" means any Shared Collateral in the possession of the Collateral Agent (or its agents or bailees), to the extent that possession thereof perfects a Lien thereon under the Uniform Commercial Code of any jurisdiction or otherwise. Possessory Collateral includes, without limitation, any Certificated Securities, Promissory Notes, Instruments, and Chattel Paper, in each case, delivered to or in the possession of the Collateral Agent under the terms of the First Lien Security Documents. All capitalized terms used in this definition and not defined elsewhere in this Agreement have the meanings assigned to them in the New York UCC.

"**_Proceeds_**" has the meaning assigned to such term in Section 2.01(a).

"**_Refinance_**" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness or enter alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part), including by adding

7

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "*Refinanced*" and "*Refinancing*" have correlative meanings.

"*Secured Credit Document*" means (i) the Credit Agreement and the Loan Documents (as defined in the Credit Agreement), (ii) the Initial Other First Lien Agreement and (iii) each Other First Lien Agreement.

"*Series*" means (a) with respect to the First Lien Secured Parties, each of (i) the Credit Agreement Secured Parties (in their capacities as such), (ii) the Initial Other First Lien Secured Parties (in their capacity as such) and (iii) the Other First Lien Secured Parties that become subject to this Agreement after the date hereof that are represented by a common Authorized Representative (in its capacity as such for such Other First Lien Secured Parties) and (b) with respect to any First Lien Obligations, each of (i) the Credit Agreement Obligations, (ii) the Initial Other First Lien Obligations and (iii) the Other First Lien Obligations incurred pursuant to any Other First Lien Agreement (other than the Initial Other First Lien Agreement), which pursuant to any Joinder Agreement, are to be represented hereunder by a common Authorized Representative (in its capacity as such for such Other First Lien Obligations).

"*Shared Collateral*" means, at any time, Collateral in which the holders of two or more Series of First Lien Obligations (or their respective Authorized Representatives or the Collateral Agent on behalf of such holders) hold a valid and perfected security interest or Lien (including, without limitation, in respect of equity interests of Foreign Subsidiaries directly owned by any Grantor that have been pledged as Collateral) at such time. If more than two Series of First Lien Obligations are outstanding at any time and the holders of less than all Series of First Lien Obligations hold a valid and perfected security interest or Lien in any Collateral at such time, then such Collateral shall constitute Shared Collateral for those Series of First Lien Obligations that hold a valid and perfected security interest or Lien in such Collateral at such time and shall not constitute Shared Collateral for any Series which does not have a valid and perfected security interest or Lien in such Collateral at such time.

## ARTICLE II

### Priorities and Agreements with Respect to Shared Collateral

SECTION 2.01 *Priority of Claims.*

(a) Anything contained herein or in any of the Secured Credit Documents to the contrary notwithstanding (but subject to Section 1.01 (b)), if an Event of Default has occurred and is continuing, and the Collateral Agent or any First Lien Secured Party is taking action to enforce rights in respect of any Shared Collateral, or any distribution is made in respect of any Shared Collateral in any Bankruptcy Case of any Grantor or any First Lien Secured Party receives any payment pursuant to any intercreditor agreement (other than this Agreement) with respect to any Shared Collateral,

8

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

the proceeds of any sale, collection or other liquidation of any such Collateral by any First Lien Secured Party or received by the Collateral Agent or any First Lien Secured Party pursuant to any such intercreditor agreement with respect to such Shared Collateral and proceeds of any such distribution (subject, in the case of any such distribution, to the sentence immediately following) to which the First Lien Obligations are entitled under any intercreditor agreement (other than this Agreement) (all proceeds of any sale, collection or other liquidation of any Collateral and all proceeds of any such distribution being collectively referred to as "***Proceeds***"), shall be applied by the Collateral Agent in the order specified in Section 4.02 of the Collateral Agreement (or the Equivalent Provision thereof). Notwithstanding the foregoing, with respect to any Shared Collateral for which a third party (other than a First Lien Secured Party and, without limiting the foregoing, after taking into account the effect of any applicable intercreditor agreements) has a lien or security interest that is junior in priority to the security interest of any Series of First Lien Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the security interest of any other Series of First Lien Obligations (such third party an "***Intervening Creditor***"), the value of any Shared Collateral or Proceeds which are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Shared Collateral or Proceeds to be distributed in respect of the Series of First Lien Obligations with respect to which such Impairment exists.

(b) It is acknowledged that the First Lien Obligations of any Series may, subject to the limitations set forth in the then extant Secured Credit Documents, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, Refinanced or otherwise amended or modified from time to time, all without affecting the priorities set forth in Section 2.01(a) or the provisions of this Agreement defining the relative rights of the First Lien Secured Parties of any Series.

(c) Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing any Series of First Lien Obligations granted on the Shared Collateral and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the Secured Credit Documents or any defect or deficiencies in the Liens securing the First Lien Obligations of any Series or any other circumstance whatsoever (but, in each case, subject to Section 1.01(b) hereof), each First Lien Secured Party hereby agrees that the Liens securing each Series of First Lien Obligations on any Shared Collateral shall be of equal priority.

SECTION 2.02 *Actions with Respect to Shared Collateral; Prohibition on Contesting Liens.*

(a) With respect to any Shared Collateral, (i) notwithstanding Section 2.01, only the Collateral Agent shall act or refrain from acting with respect to the Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral), and then only on the instructions of the Applicable Authorized Representative, (ii) the Collateral Agent shall not follow any instructions with respect to such Shared Collateral (including with respect to any intercreditor agreement with respect

9

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012   |   Powered by Intelligize

to any Shared Collateral) from any Non-Controlling Authorized Representative (or any other First Lien Secured Party other than the Applicable Authorized Representative) and (iii) no Non-Controlling Authorized Representative or other First Lien Secured Party (other than the Applicable Authorized Representative) shall or shall instruct the Collateral Agent to, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral), whether under any First Lien Security Document, applicable law or otherwise, it being agreed that only the Collateral Agent, acting on the instructions of the Applicable Authorized Representative and in accordance with the applicable First Lien Security Documents, shall be entitled to take any such actions or exercise any such remedies with respect to Shared Collateral. Notwithstanding the equal priority of the Liens, the Collateral Agent (acting on the instructions of the Applicable Authorized Representative) may deal with the Shared Collateral as if such Applicable Authorized Representative had a senior Lien on such Collateral. No Non-Controlling Authorized Representative or Non-Controlling Secured Party will contest, protest or object to any foreclosure proceeding or action brought by the Collateral Agent, the Applicable Authorized Representative or the Controlling Secured Party or any other exercise by the Collateral Agent, the Applicable Authorized Representative or the Controlling Secured Party of rights and remedies relating to the Shared Collateral or to cause the Collateral Agent to do so. The foregoing shall not be construed to limit the rights and priorities of any First Lien Secured Party, Collateral Agent or any Authorized Representative with respect to any Collateral not constituting Shared Collateral.

(b) Each of the Authorized Representatives agrees that it will not accept any Lien on any Shared Collateral for the benefit of any Series of First Lien Obligations (other than funds deposited for the discharge or defeasance of any Other First Lien Agreement) other than pursuant to the First Lien Security Documents and, by executing this Agreement (or a Joinder Agreement), each Authorized Representative and the Series of First Lien Secured Parties for which it is acting hereunder agree to be bound by the provisions of this Agreement and the other First Lien Security Documents applicable to it.

(c) Each of the First Lien Secured Parties agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the First Lien Secured Parties in all or any part of the Collateral, or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair (i) the rights of any of the Collateral Agent or any Authorized Representative to enforce this Agreement or (ii) the rights of any First Lien Secured Party from contesting or supporting any other Person in contesting the enforceability of any Lien purporting to secure First Lien Obligations constituting unmatured interest pursuant to Section 502(b)(2) of the Bankruptcy Code.

10

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

SECTION 2.03 *No Interference; Payment Over.*

(a) Each First Lien Secured Party agrees that (i) it will not challenge or question in any proceeding the validity or enforceability of any First Lien Obligations of any Series or any First Lien Security Document or the validity, attachment, perfection or priority of any Lien under any First Lien Security Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any First Lien Secured Party from challenging or questioning the validity or enforceability of any First Lien Obligations constituting unmatured interest or the validity of any Lien relating thereto pursuant to Section 502(b)(2) of the Bankruptcy Code; (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Shared Collateral by the Collateral Agent, (iii) except as provided in Section 2.02, it shall have no right to (A) direct the Collateral Agent or any other First Lien Secured Party to exercise any right, remedy or power with respect to any Shared Collateral (including pursuant to any intercreditor agreement) or (B) consent to the exercise by the Collateral Agent or any other First Lien Secured Party of any right, remedy or power with respect to any Shared Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Collateral Agent or any other First Lien Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Shared Collateral, and none of the Collateral Agent, any Applicable Authorized Representative or any other First Lien Secured Party shall be liable for any action taken or omitted to be taken by the Collateral Agent, such Applicable Authorized Representative or other First Lien Secured Party with respect to any Shared Collateral in accordance with the provisions of this Agreement, (v) it will not seek, and hereby waives any right, to have any Shared Collateral or any part thereof marshaled upon any foreclosure or other disposition of such Collateral and (vi) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any of the Collateral Agent or any other First Lien Secured Party to enforce this Agreement.

(b) Each First Lien Secured Party hereby agrees that, if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any such Shared Collateral, pursuant to any First Lien Security Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement), at any time prior to the Discharge of each Series of First Lien Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other First Lien Secured Parties and promptly transfer such Shared Collateral, proceeds or payment, as the case may be, to the Collateral Agent, to be distributed by the Collateral Agent in accordance with the provisions of Section 2.01(a) hereof.

11

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012   |   Powered by Intelligize

SECTION 2.04 *Automatic Release of Liens; Amendments to First Lien Security Documents.*

(a) If at any time any Shared Collateral is transferred to a third party or otherwise disposed of, in each case, in connection with any enforcement by the Collateral Agent in accordance with the provisions of this Agreement, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of the Collateral Agent for the benefit of each Series of First Lien Secured Parties upon such Shared Collateral will automatically be released and discharged upon final conclusion of foreclosure proceeding; provided that any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to Section 2.01 hereof.

(b) Each First Lien Secured Party agrees that the Collateral Agent may enter into any amendment (and, upon request by the Collateral Agent, each Authorized Representative shall sign a consent to such amendment) to any First Lien Security Document (including, without limitation, to release Liens securing any Series of First Lien Obligations) so long as such amendment, subject to clause (d) below, is permitted by the terms of each then extant Secured Credit Document. Additionally, each First Lien Secured Party agrees that the Collateral Agent may enter into any amendment (and, upon request by the Collateral Agent, each Authorized Representative shall sign a consent to such amendment) to any First Lien Security Document solely as such First Lien Security Document relates to a particular Series of First Lien Obligations (including, without limitation, to release Liens securing such Series of First Lien Obligations) so long as (x) such amendment is in accordance with the Secured Credit Document pursuant to which such Series of First Lien Obligations was incurred and (y) such amendment does not adversely affect the First Lien Secured Parties of any other Series.

(c) Each Authorized Representative agrees to execute and deliver (at the sole cost and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Collateral Agent to evidence and confirm any release of Shared Collateral or amendment to any First Lien Security Document provided for in this Section.

(d) In determining whether an amendment to any First Lien Security Document is permitted by this Section 2.04, the Collateral Agent may conclusively rely on a certificate of an officer of Intermediate Holdings stating in good faith that such amendment is permitted by Section 2.04 (b) above.

SECTION 2.05 *Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.*

(a) This Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law by or against Intermediate Holdings or any of its subsidiaries.

12

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

(b) If any Grantor shall become subject to a case (a "**Bankruptcy Case**") under the Bankruptcy Code and shall, as debtor(s)-in-possession, move for approval of financing ("**DIP Financing**") to be provided by one or more lenders (the "**DIP Lenders**") under Section 364 of the Bankruptcy Code or the use of cash collateral under Section 363 of the Bankruptcy Code, each First Lien Secured Party (other than any Controlling Secured Party or any Authorized Representative of any Controlling Secured Party) agrees that it will raise no objection to any such financing or to the Liens on the Shared Collateral securing the same ("**DIP Financing Liens**") or to any use of cash collateral that constitutes Shared Collateral, unless any Controlling Secured Party, or an Authorized Representative of any Controlling Secured Party, shall then oppose or object to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Secured Parties, each Non-Controlling Secured Party will subordinate its Liens with respect to such Shared Collateral on the same terms as the Liens of the Controlling Secured Parties (other than any Liens of any First Lien Secured Parties constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank *pari passu* with the Liens on any such Shared Collateral granted to secure the First Lien Obligations of the Controlling Secured Parties, each Non-Controlling Secured Party will confirm the priorities with respect to such Shared Collateral as set forth herein), in each case so long as (A) the First Lien Secured Parties of each Series retain the benefit of their Liens on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-a-vis all the other First Lien Secured Parties (other than any Liens of the First Lien Secured Parties constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the First Lien Secured Parties of each Series are granted Liens on any additional collateral pledged to any First Lien Secured Parties as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-a-vis the First Lien Secured Parties as set forth in this Agreement, (C) if any amount of such DIP Financing or cash collateral is applied to repay any of the First Lien Obligations, such amount is applied pursuant to Section 2.01(a) of this Agreement, and (D) if any First Lien Secured Parties are granted adequate protection, including in the form of periodic payments, in connection with such DIP Financing or use of cash collateral, the proceeds of such adequate protection is applied pursuant to Section 2.01(a) of this Agreement; provided that the First Lien Secured Parties of each Series shall have a right to object to the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the First Lien Secured Parties of such Series or its Authorized Representative that shall not constitute Shared Collateral; and provided further that the First Lien Secured Parties receiving adequate protection shall not object to any other First Lien Secured Party receiving adequate protection comparable to any adequate protection granted to such First Lien Secured Parties in connection with a DIP Financing or use of cash collateral.

SECTION 2.06 *Reinstatement.* In the event that any of the First Lien Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement of a preference under Title 11 of the United States Code, or any similar law, or the settlement

13

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Article II shall be fully applicable thereto until all such First Lien Obligations shall again have been paid in full in cash.

SECTION 2.07 *Insurance.* As between the First Lien Secured Parties, the Collateral Agent, acting at the direction of the Applicable Authorized Representative, shall have the right to adjust or settle any insurance policy or claim covering or constituting Shared Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Shared Collateral.

SECTION 2.08 *Refinancings.* The First Lien Obligations of any Series may be Refinanced, in whole or in part, in each case without notice to, or the consent (except to the extent a consent is otherwise required to permit the refinancing transaction under any Secured Credit Document) of, any First Lien Secured Party of any other Series, including by the incurrence of a Designated Credit Agreement at any time after the termination of the Credit Agreement in effect on the date hereof, all without affecting the priorities provided for herein or the other provisions hereof; provided that the Authorized Representative of the holders of any such Refinancing indebtedness shall have executed a Joinder Agreement on behalf of the holders of such Refinancing indebtedness.

SECTION 2.09 *Possessory Collateral Agent as Gratuitous Bailee for Perfection.*

(a) The Collateral Agent agrees to hold any Shared Collateral constituting Possessory Collateral that is part of the Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for the benefit of each other First Lien Secured Party and any assignee solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable First Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09. Pending delivery to the Collateral Agent, each other Authorized Representative agrees to hold any Shared Collateral constituting Possessory Collateral, from time to time in its possession, as gratuitous bailee for the benefit of each other First Lien Secured Party and any assignee, solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable First Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09.

(b) The duties or responsibilities of the Collateral Agent and each other Authorized Representative under this Section 2.09 shall be limited solely to holding any Shared Collateral constituting Possessory Collateral as gratuitous bailee for the benefit of each other First Lien Secured Party for purposes of perfecting the Lien held by such First Lien Secured Parties therein.

14

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012   |   Powered by Intelligize

## ARTICLE III

### Existence and Amounts of Liens and Obligations

Whenever the Collateral Agent or any Authorized Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any First Lien Obligations of any Series, or the Shared Collateral subject to any Lien securing the First Lien Obligations of any Series, it may request that such information be furnished to it in writing by each other Authorized Representative and shall be entitled to make such determination on the basis of the information so furnished; provided, however, that, if an Authorized Representative shall fail or refuse reasonably promptly to provide the requested information, the requesting Collateral Agent or Authorized Representative shall be entitled to make any such determination or not make any determination by such method as it may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of Intermediate Holdings. The Collateral Agent and each Authorized Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any First Lien Secured Party or any other person as a result of such determination.

## ARTICLE IV

### The Collateral Agent

SECTION 4.01 *Appointment and Authority.*

(a) Each of the First Lien Secured Parties hereby irrevocably appoints JPMorgan Chase Bank, N.A. to act on its behalf as the Collateral Agent hereunder and under each of the other First Lien Security Documents and authorizes the Collateral Agent to take such actions on its behalf and to exercise such powers as are delegated to the Collateral Agent by the terms hereof or thereof, including for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any Grantor to secure any of the First Lien Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Collateral Agent and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to Section 4.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under any of the First Lien Security Documents, or for exercising any rights and remedies thereunder at the direction of the Applicable Authorized Representative), shall be entitled to the benefits of all provisions of this Article IV and Section 9.05 of the Credit Agreement and the equivalent provision of any Other First Lien Agreement (as though such co-agents, sub-agents and attorneys-in-fact were the "Collateral Agent" under the First Lien Security Documents) as if set forth in full herein with respect thereto.

(b) Each Non-Controlling Secured Party acknowledges and agrees that the Collateral Agent shall be entitled, for the benefit of the First Lien Secured Parties, to

15

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the First Lien Security Documents, without regard to any rights to which Non-Controlling Secured Parties would otherwise be entitled as a result of holding any First Lien Obligations. Without limiting the foregoing, each Non-Controlling Secured Party agrees that none of the Collateral Agent, the Applicable Authorized Representative or any other First Lien Secured Party shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the First Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any First Lien Obligations), in any manner that would maximize the return to the Non-Controlling Secured Parties, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Non-Controlling Secured Parties from such realization, sale, disposition or liquidation. Each of the First Lien Secured Parties waives any claim it may now or hereafter have against the Collateral Agent or the Authorized Representative of any other Series of First Lien Obligations or any other First Lien Secured Party of any other Series arising out of (i) any actions which the Collateral Agent, any Authorized Representative or any First Lien Secured Party takes or omits to take (including, actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the First Lien Obligations from any account debtor, guarantor or any other party) in accordance with the First Lien Security Documents or any other agreement related thereto or to the collection of the First Lien Obligations or the valuation, use, protection or release of any security for the First Lien Obligations, (ii) any election by any Applicable Authorized Representative or any holders of First Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to Section 2.05 of this Agreement, any borrowing or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code by Intermediate Holdings or any of its subsidiaries, as debtor-in-possession. Notwithstanding any other provision of this Agreement, the Collateral Agent shall not accept any Shared Collateral in full or partial satisfaction of any First Lien Obligations pursuant to Section 9-620 of the Uniform Commercial Code of any jurisdiction, without the consent of each Authorized Representative representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral.

SECTION 4.02 *Rights as a First Lien Secured Party.* The Person serving as the Collateral Agent hereunder shall have the same rights and powers in its capacity as a First Lien Secured Party under any Series of First Lien Obligations that it holds as any other First Lien Secured Party of such Series and may exercise the same as though it were not the Collateral Agent and the term "First Lien Secured Party" or "First Lien Secured Parties" or (as applicable) "Credit Agreement Secured Party", "Credit Agreement Secured Parties", "Other First Lien Secured Party" or "Other First Lien Secured Parties" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Collateral Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage

16

in any kind of business with Intermediate Holdings or any Subsidiary or other Affiliate thereof as if such Person were not the Collateral Agent hereunder and without any duty to account therefor to any other First Lien Secured Party.

SECTION 4.03 *Exculpatory Provisions*.

(a) The Collateral Agent shall not have any duties or obligations except those expressly set forth herein and in the other First Lien Security Documents. Without limiting the generality of the foregoing, the Collateral Agent:

(i) shall not be subject to any fiduciary or other implied duties of any kind or nature to any Person, regardless of whether an Event of Default has occurred and is continuing;

(ii) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other First Lien Security Documents that the Collateral Agent is required to exercise as directed in writing by the Applicable Authorized Representative; provided that the Collateral Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Collateral Agent to liability or that is contrary to any First Lien Security Document or applicable law;

(iii) shall not, except as expressly set forth herein and in the other First Lien Security Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Intermediate Holdings or any of its Affiliates that is communicated to or obtained by the Person serving as the Collateral Agent or any of its Affiliates in any capacity;

(iv) shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Applicable Authorized Representative or (ii) in the absence of its own gross negligence or willful misconduct or (iii) in reliance on a certificate of an authorized officer of Intermediate Holdings stating that such action is permitted by the terms of this Agreement. The Collateral Agent shall be deemed not to have knowledge of any Event of Default under any Series of First Lien Obligations unless and until notice describing such Event of Default is given to the Collateral Agent by the Authorized Representative of such First Lien Obligations or Intermediate Holdings;

(v) shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other First Lien Security Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other First Lien Security Document or any

17

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the First Lien Security Documents, (v) the value or the sufficiency of any Collateral for any Series of First Lien Obligations, or (v) the satisfaction of any condition set forth in any Secured Credit Document, other than to confirm receipt of items expressly required to be delivered to the Collateral Agent;

(vi) shall not have any fiduciary duties or contractual obligations of any kind or nature under any Other First Lien Agreement (but shall be entitled to all protections provided to the Collateral Agent therein);

(vii) with respect to the Credit Agreement, any Other First Lien Agreement or any First Lien Security Document, may conclusively assume that the Grantors have complied with all of their obligations thereunder unless advised in writing by the Authorized Representative thereunder to the contrary specifically setting forth the alleged violation; and

(viii) may conclusively rely on any certificate of an officer of Intermediate Holdings provided pursuant to Section 2.04(d) hereof.

(b) Each Secured Party acknowledges that, in addition to acting as the initial Collateral Agent, JPMorgan Chase Bank, N.A. also serves as Administrative Agent under the Credit Agreement and each First Lien Secured Party hereby agrees not to assert any claim (including as a result of any conflict of interest) against JPMorgan Chase Bank, N.A., or any successor, arising from the role of Administrative Agent under the Credit Agreement so long as JPMorgan Chase Bank, N.A. or any such successor is either acting in accordance with the express terms of such documents or otherwise has not engaged in gross negligence or willful misconduct.

SECTION 4.04 *Reliance by Collateral Agent.* The Collateral Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Collateral Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. The Collateral Agent may consult with legal counsel (who may include, but shall not be limited to counsel for Intermediate Holdings or counsel for the Administrative Agent), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 4.05 *Delegation of Duties.* The Collateral Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other First Lien Security Document by or through any one or more sub-agents appointed by the Collateral Agent. The Collateral Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Affiliates of the Collateral Agent and any such sub-agent.

18

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

SECTION 4.06 *Resignation of Collateral Agent*. The Collateral Agent may at any time give notice of its resignation as Collateral Agent under this Agreement and the other First Lien Security Documents to each Authorized Representative and Intermediate Holdings. Upon receipt of any such notice of resignation, the Applicable Authorized Representative shall have the right (subject, unless an Event of Default relating to a payment default or the commencement of an Insolvency or Liquidation Proceeding has occurred and is continuing, to the consent of Intermediate Holdings (not to be unreasonably withheld or delayed)), to appoint a successor, which shall be a bank or trust company with an office in the United States, or an Affiliate of any such bank or trust company with an office in the United States. If no such successor shall have been so appointed by the Applicable Authorized Representative and shall have accepted such appointment within 10 days after the retiring Collateral Agent gives notice of its resignation, then the retiring Collateral Agent may, on behalf of the First Lien Secured Parties, appoint a successor Collateral Agent meeting the qualifications set forth above; provided that, if the Collateral Agent shall notify Intermediate Holdings and each Authorized Representative that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Collateral Agent shall be discharged from its duties and obligations hereunder and under the other First Lien Security Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of the First Lien Secured Parties under any of the First Lien Security Documents, the retiring Collateral Agent shall continue to hold such collateral security solely for purposes of maintaining the perfection of the security interests of the First Lien Secured Parties therein until such time as a successor Collateral Agent is appointed but with no obligation to take any further action at the request of the Applicable Authorized Representative, any other First Lien Secured Parties or any Grantor) and (b) all payments, communications and determinations provided to be made by, to or through the Collateral Agent shall instead be made by or to each Authorized Representative directly, until such time as the Applicable Authorized Representative appoints a successor Collateral Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Collateral Agent hereunder and under the First Lien Security Documents, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Collateral Agent, and the retiring Collateral Agent shall be discharged from all of its duties and obligations hereunder or under the other First Lien Security Documents (if not already discharged therefrom as provided above in this Section). After the retiring Collateral Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article, Sections 8.07 and 9.05 of the Credit Agreement and the equivalent provision of any Other First Lien Agreement shall continue in effect for the benefit of such retiring Collateral Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Collateral Agent was acting as Collateral Agent. Upon any notice of resignation of the Collateral Agent hereunder and under the other First Lien Security Documents, Intermediate Holdings agrees to use commercially reasonable efforts to transfer (and maintain the validity and priority of) the Liens in favor of the retiring Collateral Agent under the First Lien Security Documents to the successor Collateral Agent as promptly as practicable.

19

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

SECTION 4.07 *Non-Reliance on Collateral Agent and Other First Lien Secured Parties.* Each First Lien Secured Party acknowledges that it has, independently and without reliance upon the Collateral Agent, any Authorized Representative or any other First Lien Secured Party or any of their Affiliates and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the other Secured Credit Documents. Each First Lien Secured Party also acknowledges that it will, independently and without reliance upon the Collateral Agent, any Authorized Representative or any other First Lien Secured Party or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Secured Credit Document or any related agreement or any document furnished hereunder or thereunder.

SECTION 4.08 *Collateral and Guaranty Matters.* Each of the First Lien Secured Parties irrevocably authorizes the Collateral Agent, at its option and in its discretion,

(a) to release any Lien on any property granted to or held by the Collateral Agent under any First Lien Security Document in accordance with Section 2.04 of this Agreement or upon receipt of a written request from Intermediate Holdings stating that the release of such Lien is permitted by the terms of each then extant Secured Credit Document; and

(b) to release any Grantor from its obligations under the First Lien Security Documents upon receipt of a written request from Intermediate Holdings stating that such release is permitted by the terms of each then extant Secured Credit Document.

## ARTICLE V

### Miscellaneous

SECTION 5.01 *Notices.* All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a) if to the Collateral Agent or the Administrative Agent, to it at:

JPMorgan Chase Bank, N.A.
500 Stanton Christiana Rd, 3/Ops 2
Newark, DE 19713
Attention: Investment Bank Loan Operations, Evan Zacharias
Telephone: 302-634-1405
Telecopier: 302-634-1417
E-mail: evan.zacharias@jpmorgan.com;

20

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

(b) if to the Initial Other Authorized Representative, to it at:

The Bank of New York Mellon Trust Company, N.A.
525 William Penn Place, 38th Floor
Pittsburgh, PA 15259
Attention: Momentive Performance Materials Inc. Account Manager
Telecopier: 412-234-7535;

(c) if to any additional Other Authorized Representative, to it at the address set forth in the applicable Joinder Agreement.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if a Business Day) and on the next Business Day thereafter (in all other cases) if delivered by hand or overnight courier service or sent by telecopy or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 5.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 5.01. As agreed to in writing among the Collateral Agent and each Authorized Representative from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person.

SECTION 5.02 *Waivers; Amendment; Joinder Agreements.*

(a) No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b) Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified (other than pursuant to any Joinder Agreement) except pursuant to an agreement or agreements in writing entered into by each Authorized Representative and the Collateral Agent. Each party to

21

this Agreement agrees that (i) none of Intermediate Holdings and the other Grantors shall have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent Intermediate Holdings' or any of such Grantors' rights are adversely affected, in which case Intermediate Holdings shall have the right to consent to or approve any such amendment, modification or waiver, and (ii) Intermediate Holdings shall be a beneficiary of this Section 5.02(b).

(c) Notwithstanding the foregoing, without the consent of any First Lien Secured Party, any Authorized Representative may become a party hereto by execution and delivery of a Joinder Agreement in accordance with Section 5.20 of the Collateral Agreement (or the Equivalent Provision thereof) and, upon such execution and delivery, such Authorized Representative and the Other First Lien Secured Parties and Other First Lien Obligations of the Series for which such Authorized Representative is acting shall be subject to the terms hereof and the terms of the other First Lien Security Documents applicable thereto.

SECTION 5.03 *Parties in Interest.* This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, as well as the other First Lien Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.

SECTION 5.04 *Survival of Agreement.* All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 5.05 *Counterparts.* This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile transmission or via electronic mail shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 5.06 *Severability.* Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 5.07 *Governing Law.* This Agreement and the rights and obligations of the parties hereto shall be construed in accordance with and governed by the laws of the State of New York.

22

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

SECTION 5.08 *Submission to Jurisdiction; Waivers.* The Collateral Agent and each Authorized Representative, on behalf of itself and the First Lien Secured Parties of the Series for whom it is acting, irrevocably and unconditionally:

(a) submits for itself and its property in any legal action or proceeding relating to this Agreement and the First Lien Security Documents, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the state and federal courts located in New York County and appellate courts from any thereof;

(b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Authorized Representative) at the address referred to in Section 5.01 hereof;

(d) agrees that nothing herein shall affect the right of any other party hereto (or any First Lien Secured Party) to effect service of process in any other manner permitted by law; and

(e) waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 5.08 any special, exemplary, punitive or consequential damages.

SECTION 5.09 *WAIVER OF JURY TRIAL.* EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 5.09.

SECTION 5.10 *Headings.* Article, Section and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

23

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012   |   Powered by Intelligize

SECTION 5.11 *Conflicts.*

(a) In the event of any conflict between the terms of this Agreement and the terms of any of the other Secured Credit Documents or First Lien Security Documents, the terms of this Agreement shall govern.

(b) Notwithstanding Section 5.11(a) above, in the event of any conflict between the terms of this Agreement and the terms of (i) the 1.5 Lien Intercreditor Agreement (as defined in the Initial Other First Lien Agreement) or (ii) the Second Lien Intercreditor Agreement (as defined in the Initial Other First Lien Agreement), the terms of such 1.5 Lien Intercreditor Agreement or such Second Lien Intercreditor Agreement, as applicable, shall govern.

SECTION 5.12 *Provisions Solely to Define Relative Rights.* The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Secured Parties in relation to one another. None of Intermediate Holdings, any other Grantor or any other creditor thereof shall have any rights or obligations hereunder, except as expressly provided in this Agreement (provided that nothing in this Agreement (other than Section 2.04, 2.05, 2.08, 2.09 or Article V) is intended to or will amend, waive or otherwise modify the provisions of the Credit Agreement or any Other First Lien Agreements), and none of Intermediate Holdings or any other Grantor may rely on the terms hereof (other than Sections 2.04, 2.05, 2.08, 2.09 and Article V). Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the First Lien Obligations as and when the same shall become due and payable in accordance with their terms.

SECTION 5.13 *Integration.* This Agreement, together with the other Secured Credit Documents and the First Lien Security Documents, represents the agreement of each of the Grantors and the First Lien Secured Parties with respect to the subject matter hereof and there are no promises, undertakings, representations or warranties by any Grantor, the Collateral Agent, any or any other First Lien Secured Party relative to the subject matter hereof not expressly set forth or referred to herein or in the other Secured Credit Documents or the First Lien Security Documents.

[*Remainder of this page intentionally left blank*]

24

IN WITNESS WHEREOF, the parties hereto have caused this First Lien Intercreditor Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**JPMORGAN CHASE BANK, N.A.,**
as Collateral Agent

By: _____ /s/ Peter Predun
    Name:                       Peter Predun
    Title:                     Executive Director

**JPMORGAN CHASE BANK, N.A.,**
as Authorized Representative under the Credit Agreement

By: _____ /s/ Peter Predun
    Name:                       Peter Predun
    Title:                     Executive Director

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,**
as Initial Other Authorized Representative

By: _____ /s/ Richard Tarnas
    Name:                       Richard Tarnas
    Title:                     Vice President

**[Form of]**
**CONSENT OF GRANTORS**

Dated: [ ]

Reference is made to the First Lien Intercreditor Agreement, dated as of [ ], among JPMorgan Chase Bank, N.A., as Collateral Agent, JPMorgan Chase Bank, N.A., as Administrative Agent, and The Bank of New York Mellon Trust Company, N.A., as Initial Other Authorized Representative (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "*Intercreditor Agreement*"). Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

Each of the Grantors party hereto has read the foregoing Intercreditor Agreement and consents thereto. Each of the Grantors party hereto agrees that it will not take any action that would be contrary to the express provisions of the foregoing Intercreditor Agreement, agrees to abide by the requirements expressly applicable to it under the foregoing Intercreditor Agreement and agrees that, except as otherwise provided therein, no First Lien Secured Party shall have any liability to any Grantor for acting in accordance with the provisions of the foregoing Intercreditor Agreement. Each of the Grantors party hereto confirms that the foregoing Intercreditor Agreement is for the sole benefit of the First Lien Secured Parties and their respective successors and assigns, and that no Grantor is an intended beneficiary or third party beneficiary thereof except to the extent otherwise expressly provided therein.

Each of the Grantors party hereto agrees to take such further action and to execute and deliver such additional documents and instruments (in recordable form, if requested) as the Collateral Agent may reasonably request to effectuate the terms of and the lien priorities contemplated by the Intercreditor Agreement.

This Consent of Grantors shall be governed and construed in accordance with the laws of the State of New York. Notices delivered to the Grantors pursuant to this Consent of Grantors shall be delivered in accordance with the notice provisions set forth in the Intercreditor Agreement.

*[Signatures follow.]*

IN WITNESS HEREOF, this Consent of Grantors is hereby executed by each of the Grantors as of the date first written above.

MOMENTIVE PERFORMANCE MATERIALS HOLDINGS
INC.

By _____
Name:
Title:

MOMENTIVE PERFORMANCE MATERIALS INC.

By _____
Name:
Title:

MOMENTIVE PERFORMANCE MATERIALS USA INC.

By _____
Name:
Title:

2

Source: Momentive Performance Materials Inc., EX-4.3, 11/20/2012  |  Powered by Intelligize

MOMENTIVE PERFORMANCE MATERIALS
WORLDWIDE INC.

By _____
Name:
Title:

MOMENTIVE PERFORMANCE MATERIALS CHINA
SPV INC.

By _____
Name:
Title:

MPM SILICONES, LLC

By _____
Name:
Title:

MOMENTIVE PERFORMANCE MATERIALS SOUTH
AMERICA INC.

By _____
Name:
Title:

MOMENTIVE PERFORMANCE MATERIALS QUARTZ,
INC.

By _____
Name:
Title:

3

JUNIPER BOND HOLDINGS I LLC

By _____
                                    Name:
                                    Title:

JUNIPER BOND HOLDINGS II LLC

By _____
                                    Name:
                                    Title:

JUNIPER BOND HOLDINGS III LLC

By _____
                                    Name:
                                    Title:

JUNIPER BOND HOLDINGS IV LLC

By _____
                                    Name:
                                    Title:

4

**EXHIBIT B**

Exhibit 10.1

## INTERCREDITOR AGREEMENT

INTERCREDITOR AGREEMENT dated as of May 25, 2012, among JPMORGAN CHASE BANK, N.A. ("***JPMCB***"), as Intercreditor Agent, THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Trustee and as Collateral Agent, MOMENTIVE PERFORMANCE MATERIALS INC. a Delaware corporation (the "***Company***") MOMENTIVE PERFORMANCE MATERIALS USA INC., a Delaware corporation (the "***U.S. Borrower***"), and each Subsidiary of the Company listed on Schedule I hereto.

A. Momentive Performance Materials Holdings Inc., a Delaware corporation, the Company, the U.S. Borrower, Momentive Performance Materials GmbH (f/k/a Blitz 06-103 GmbH), a company organized under the laws of Germany (together with the U.S. Borrower, the "***Borrowers***"), the lenders party thereto from time to time, JPMCB, as administrative agent, and J.P. Morgan Securities LLC, Citigroup Global Markets Inc. and Morgan Joseph Triartisan Finance LLC, as joint lead arrangers, are party to the Amended and Restated Credit Agreement dated as of February 10, 2011 (as amended, restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***"). The Credit Agreement is included in the definition of "Credit Agreement" under the 1-1/2 Lien Notes Indenture (as defined below), and the Obligations of the Borrowers, the Company and certain of the Company's Subsidiaries under the Credit Agreement and the Senior Lender Documents executed or delivered pursuant thereto constitute First-Lien Indebtedness and Senior Lender Claims hereunder.

B. The Company, certain of its Subsidiaries and the Trustee are party to the Indenture dated as of May 25, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "***1-1/2 Lien Notes Indenture***"), pursuant to which the Notes are governed. The Obligations of the Company, and certain of the Company's Subsidiaries under the 1-1/2 Lien Notes Indenture, the Notes, and the other Noteholder Documents constitute Noteholder Claims and Second-Priority Claims hereunder.

Accordingly, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section I. Definitions.**

1.1. ***Defined Terms.*** As used in this Agreement, the following terms have the meanings specified below:

"***1-1/2 Lien Notes Indenture***" shall have the meaning set forth in the recitals.

"***Agreement***" shall mean this Agreement, as amended, renewed, extended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"***Bankruptcy Law***" shall mean Title 11 of the United States Code and any similar Federal, state or foreign law for the relief of debtors.

"***Borrowers***" shall have the meaning set forth in the recitals.

"***Business Day***" shall mean any day other than a Saturday, a Sunday or a day that is a legal holiday under the laws of the State of New York or on which banking institutions in the State of New York are required or authorized by law or other governmental action to close.

"*Cash Management Obligations*" shall mean, with respect to any Person, all obligations, whether now owing or hereafter arising, of such Person in respect of overdrafts and related liabilities owed to any other Person that arise from treasury, depositary or cash management services, including any automated clearing house transfers of funds or any similar transactions.

"*Collateral Agent*" shall mean The Bank of New York Mellon Trust Company, N.A., in its capacity as collateral agent for the holders under the 1-1/2 Lien Notes Indenture.

"*Common Collateral*" shall mean all of the assets of any Grantor, whether real, personal or mixed, constituting both Senior Lender Collateral and Second-Priority Collateral.

"*Company*" shall have the meaning set forth in the preamble.

"*Comparable Second-Priority Collateral Document*" shall mean, in relation to any Common Collateral subject to any Lien created under any Senior Collateral Document, those Second-Priority Collateral Documents that create a Lien on the same Common Collateral, granted by the same Grantor.

"*Credit Agreement*" shall have the meaning set forth in the recitals.

"*Deposit Account*" shall have the meaning set forth in the Uniform Commercial Code.

"*Deposit Account Collateral*" shall mean that part of the Common Collateral (if any) comprised of or contained in Deposit Accounts or Securities Accounts.

"*DIP Financing*" shall have the meaning set forth in Section 6.1.

"*Discharge of Senior Lender Claims*" shall mean, except to the extent otherwise provided in Section 5.7, payment in full in cash (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of (a) all Obligations in respect of all outstanding First-Lien Indebtedness and, with respect to letters of credit or letter of credit guaranties outstanding thereunder, delivery of cash collateral or backstop letters of credit in respect thereof in compliance with the Senior Credit Agreement, in each case after or concurrently with the termination of all commitments to extend credit thereunder and (b) any other Senior Lender Claims that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid.

"*Existing Second Lien Intercreditor Agreement*" shall mean the Intercreditor Agreement, dated as of June 15, 2009, among JPMCB, as first priority representative, The Bank of New York Mellon Trust Company, N.A., as trustee and as collateral trustee, the Company, the U.S. Borrower and each subsidiary of the Company party thereto, as amended, restated, supplemented or otherwise modified from time to time, including pursuant to the Joinder and Supplement to Intercreditor Agreement dated as of May 25, 2012.

"*First-Lien Indebtedness*" shall mean (a) any Bank Indebtedness (as defined in the 1-1/2 Lien Notes Indenture on the date hereof), including all Indebtedness incurred by the Company and its Subsidiaries pursuant to the Credit Agreement and the other Senior Lender Documents, that is secured by a Permitted Lien (as defined in the 1-1/2 Lien Notes Indenture on the date hereof and incurred or deemed incurred pursuant to clause (8)(B) of the definition thereof), (b) all other Obligations (not constituting Indebtedness) of the Company and its Subsidiaries under the agreements governing such Bank Indebtedness and (c) all other Obligations of the Company and its Subsidiaries in respect of Hedging Obligations or Cash

2

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012  |  Powered by Intelligize

Management Obligations in connection with Indebtedness described in clause (a) or Obligations described in clause (b).

"*First Priority Representative*" shall mean, at any time, the Intercreditor Agent hereunder at such time.

"*Future First-Lien Indebtedness*" shall mean any First-Lien Indebtedness other than First-Lien Indebtedness incurred pursuant to the Credit Agreement and the Senior Lender Documents entered into in connection therewith.

"*Future Second Lien Indebtedness*" shall mean Indebtedness or Obligations (other than Noteholder Claims) of the Company and its Subsidiaries that is to be equally and ratably secured with the Noteholder Claims and is so designated by the Company as Future Second Lien Indebtedness hereunder; provided, however, that such Future Second Lien Indebtedness is permitted to be so incurred in accordance with any Senior Lender Documents and any Second-Priority Documents, as applicable.

"*Grantors*" shall mean the Company and each of the Subsidiaries that has executed and delivered a Second-Priority Collateral Document or a Senior Collateral Document.

"*Hedging Obligations*" shall mean, with respect to any Person, the obligations of such Person under (a) currency exchange, interest rate or commodity swap agreements, currency exchange, interest rate or commodity cap agreements, and currency exchange, interest rate or commodity collar agreements and (b) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange, interest rates or commodity prices.

"*Indebtedness*" shall mean and include all obligations that constitute "Indebtedness" within the meaning of the 1-1/2 Lien Notes Indenture or the Senior Credit Agreement.

"*Indenture Secured Parties*" shall mean the Persons holding Noteholder Claims, including the Trustee.

"*Insolvency or Liquidation Proceeding*" shall mean (a) any voluntary or involuntary case or proceeding under any Bankruptcy Law with respect to any Grantor, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to any of its assets, (c) any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

"*Intercreditor Agent*" shall mean JPMCB, in its capacity as administrative agent for the Senior Lenders under the Credit Agreement and the other Senior Lender Documents entered into pursuant to the Credit Agreement, together with its successors (or if there is more than one Senior Credit Agreement, such agent or trustee as is designated "Intercreditor Agent" by Senior Lenders holding a majority of the Senior Lender Claims then outstanding) and permitted assigns under the Senior Credit Agreement exercising substantially the same rights and powers.

"*JPMCB*" shall have the meaning set forth in the preamble.

"*Lien*" shall mean, with respect to any asset, any mortgage, deed of trust,, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset.

3

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012  |  Powered by Intelligize

"**Noteholder Claims**" shall mean all Obligations in respect of the Notes or arising under the Noteholder Documents or any of them, including all fees and expenses of the Trustee thereunder.

"**Noteholder Collateral**" shall mean all of the assets of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Noteholder Claim.

"**Noteholder Collateral Agreement**" shall mean the Collateral Agreement dated as of May 25, 2012, among the Company, certain other domestic Grantors and the Collateral Agent in respect of the 1-1/2 Lien Notes Indenture.

"**Noteholder Collateral Documents**" shall mean the Noteholder Collateral Agreement and any other document or instrument pursuant to which a Lien is granted by any Grantor to secure any Noteholder Claims or under which rights or remedies with respect to any such Lien are governed.

"**Noteholder Documents**" shall mean (a) the 1-1/2 Lien Notes Indenture, the Notes, the Noteholder Collateral Documents and (b) any other related document or instrument executed and delivered pursuant to any Noteholder Document described in clause (a) above evidencing or governing any Obligations thereunder.

"**Notes**" shall mean (a) the initial $250,000,000 in aggregate principal amount of senior secured notes due 2020 issued pursuant to the 1-1/2 Lien Notes Indenture, (b) the exchange notes issued in exchange therefor as contemplated by the Registration Rights Agreement dated as of May 25, 2012, among the Company, certain of the Company's Subsidiaries and the initial purchasers party thereto, and (c) any additional notes issued under the 1-1/2 Lien Notes Indenture by the Company, to the extent permitted by the 1-1/2 Lien Notes Indenture, the Credit Agreement, any other Senior Lender Documents and any Second-Priority Document, as applicable.

"**Obligations**" shall mean, with respect to any Indebtedness, any and all obligations, whether now owing or hereafter arising, with respect to the payment of (a) any principal of or interest (including interest accrued on or accruing after the commencement of any Insolvency or Liquidation Proceeding, whether or not a claim for post-filing interest is allowed in such proceeding) or premium on any Indebtedness, including any reimbursement obligation in respect of any letter of credit or letter of credit guaranty, (b) any fees, indemnification obligations, expense reimbursement obligations or other liabilities payable under the documentation governing such Indebtedness, (c) any obligation to post cash collateral in respect of letters of credit or letter of credit guaranties and any other obligations and (d) with respect to any Indebtedness constituting Senior Lender Claims, any Cash Management Obligations or Hedging Obligations owing to any of the Senior Lenders holding such Senior Lender Claims or any affiliates thereof.

"**Officers' Certificate**" shall have the meaning set forth in the 1-1/2 Lien Notes Indenture.

"**Person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, entity or other party, including any government and any political subdivision, agency or instrumentality thereof.

"**Pledged Collateral**" shall mean the Common Collateral in the possession of the Intercreditor Agent (or its agents or bailees), to the extent that possession thereof is necessary to perfect a Lien thereon under the Uniform Commercial Code.

4

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012 | Powered by Intelligize

"*Recovery*" shall have the meaning set forth in Section 6.4.

"*Required Lenders*" shall mean, with respect to any Senior Credit Agreement, those Senior Lenders the approval of which is required to approve an amendment or modification of, termination or waiver of any provision of or consent to any departure from such Senior Credit Agreement (or would be required to effect such consent under this Agreement if such consent were treated as an amendment of the Senior Credit Agreement).

"*Second-Priority Agents*" shall mean (a) the Collateral Agent as agent for the Indenture Secured Parties and (b) the collateral agent for any Future Second Lien Indebtedness.

"*Second-Priority Claims*" shall mean the Noteholder Claims and all other Obligations in respect of, or arising under, the Second-Priority Documents, including all fees and expenses of the collateral agent for any Future Second Lien Indebtedness.

"*Second-Priority Collateral*" shall mean the Noteholder Collateral and all of the assets of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Future Second Lien Indebtedness.

"*Second-Priority Collateral Agreements*" shall mean the Noteholder Collateral Agreement and any comparable agreement with respect to any Future Second Lien Indebtedness.

"*Second-Priority Collateral Documents*" shall mean the Noteholder Collateral Documents and any other agreement, document or instrument pursuant to which a Lien is now or hereafter granted securing any Second-Priority Claims or under which rights or remedies with respect to such Liens are at any time governed.

"*Second-Priority Documents*" shall mean the Noteholder Documents and any other document or instrument evidencing or governing any Future Second Lien Indebtedness.

"*Second-Priority Designated Agent*" shall mean such agent or trustee as is designated "Second-Priority Designated Agent" by Second-Priority Secured Parties holding a majority in principal amount of the Second-Priority Claims then outstanding; it being understood that as of the date of this agreement, the Collateral Agent shall be so designated Second-Priority Designated Agent.

"*Second-Priority Lien*" shall mean any Lien on any assets of the Company or any other Grantor securing any Second-Priority Claims.

"*Second-Priority Secured Parties*" shall mean the Indenture Secured Parties and all other Persons holding any Second-Priority Claims, including the collateral agent for any Future Second Lien Indebtedness.

"*Securities Account*" shall have the meaning set forth in the Uniform Commercial Code.

"*Senior Collateral Documents*" shall mean any agreement, document or instrument pursuant to which a Lien is now or hereafter granted securing any Senior Lender Claims or under which rights or remedies with respect to such Liens are at any time governed.

"*Senior Credit Agreement*" shall mean the Credit Agreement and any other agreement governing any Future First-Lien Indebtedness.

"*Senior Lender Cash Management Obligations*" shall mean any Cash

5

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012  |  Powered by Intelligize

Management Obligations secured by any Common Collateral under the Senior Collateral Documents.

"**Senior Lender Claims**" shall mean (a) all First-Lien Indebtedness outstanding, including any Future First-Lien Indebtedness, and (b) all other Obligations (not constituting Indebtedness under any such First-Lien Indebtedness) with respect to First-Lien Indebtedness, including all Senior Lender Hedging Obligations and Senior Lender Cash Management Obligations. Senior Lender Claims shall include all interest and expenses accrued or accruing (or that would, absent the commencement of an Insolvency or Liquidation Proceeding, accrue) after the commencement of an Insolvency or Liquidation Proceeding in accordance with and at the rate specified in the relevant Senior Lender Document whether or not the claim for such interest or expenses is allowed or allowable as a claim in such Insolvency or Liquidation Proceeding.

"**Senior Lender Collateral**" shall mean all of the assets of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Senior Lender Claim.

"**Senior Lender Documents**" shall mean the Senior Credit Agreement, the Senior Collateral Documents and each of the other agreements, documents and instruments (including each agreement, document or instrument providing for or evidencing a Senior Lender Hedging Obligation or Senior Lender Cash Management Obligation) providing for, evidencing or securing any Obligation under the Credit Agreement or any Future First-Lien Indebtedness and any other related document or instrument executed or delivered pursuant to any Senior Lender Document at any time or otherwise evidencing or securing any Indebtedness arising under any Senior Lender Document.

"**Senior Lender Hedging Obligations**" shall mean any Hedging Obligations secured by any Common Collateral under the Senior Collateral Documents.

"**Senior Lenders**" shall mean the Persons holding Senior Lender Claims, including the Senior-Priority Agents.

"**Senior-Priority Agents**" shall mean (a) the administrative agent under the Credit Agreement and (b) the collateral agent for any other First-Lien Indebtedness.

"**Subsidiary**" shall mean any "Subsidiary" of the Company as defined in the 1-1/2 Lien Notes Indenture.

"**Trustee**" shall mean The Bank of New York Mellon Trust Company, N.A., in its capacity as trustee under the 1-1/2 Lien Notes Indenture and collateral agent under the Noteholder Collateral Documents, and its permitted successors.

"**Uniform Commercial Code**" or "**UCC**" shall mean the Uniform Commercial Code as from time to time in effect in the State of New York.

"**U.S. Borrower**" shall have the meaning set forth in the recitals.

1.2. **Terms Generally.** The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement,

6

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012  |  Powered by Intelligize

instrument or other document as from time to time amended, supplemented or otherwise modified in accordance with this Agreement, (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections shall be construed to refer to Sections of this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

### Section 2. Lien Priorities.

2.1. *Subordination of Liens.* Notwithstanding the date, time, manner or order of filing or recordation of any document or instrument or grant, attachment or perfection of any Liens granted to the Second-Priority Secured Parties on the Common Collateral or of any Liens granted to the Intercreditor Agent or the Senior Lenders on the Common Collateral and notwithstanding any provision of the UCC, or any applicable law or the Second-Priority Documents or the Senior Lender Documents or any other circumstance whatsoever, each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, hereby agrees that: (a) any Lien on the Common Collateral securing any Senior Lender Claims now or hereafter held by or on behalf of the Intercreditor Agent or any Senior Lenders or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall have priority over and be senior in all respects and prior to any Lien on the Common Collateral securing any Second-Priority Claims, (b) any Lien on the Common Collateral securing any Second-Priority Claims now or hereafter held by or on behalf of the Trustee, the Collateral Agent or any Second-Priority Secured Parties or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Common Collateral securing any Senior Lender Claims and (c) with respect to any Second-Priority Claims (and as between the Second-Priority Agents and the Second-Priority Secured Parties), the Liens on the Common Collateral securing any Second-Priority Claims now or hereafter held by or on behalf of the Trustee, the Collateral Agent or any Second-Priority Secured Party or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall rank equally and ratably in all respects. All Liens on the Common Collateral securing any Senior Lender Claims shall be and remain senior in all respects and prior to all Liens on the Common Collateral securing any Second-Priority Claims for all purposes, whether or not such Liens securing any Senior Lender Claims are subordinated to any Lien securing any other obligation of the Company, any other Grantor or any other Person.

2.2. *Prohibition on Contesting Liens.* Each Second-Priority Agent, for itself and on behalf of each applicable Second-Priority Secured Party, and the Senior-Priority Agents, for itself and on behalf of each applicable Senior Lender, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, perfection, priority, validity or enforceability of (a) a Lien securing any Senior Lender Claims held (or purported to be held) by or on behalf of the Intercreditor Agent or any of the Senior Lenders or any agent or trustee therefor in any Senior Lender Collateral or (b) a Lien securing any Second-Priority Claims held (or purported to be held) by or on behalf of any Second-Priority Secured Party in the Common Collateral, as the case may be; provided, however, that nothing in this Agreement shall be construed to prevent or impair the rights of the Intercreditor Agent or any Senior Lender to enforce this Agreement (including the priority of the Liens securing the Senior Lender Claims as provided in Section 2.1) or any of the Senior Lender Documents.

7

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012  |  Powered by Intelligize

2.3. *No New Liens.* Subject to Section 11.04 of the 1-1/2 Lien Notes Indenture and the corresponding provision of any Second-Priority Document relating to Future Second Lien Indebtedness, so long as the Discharge of Senior Lender Claims has not occurred, the parties hereto agree that, after the date hereof, if any Second-Priority Agent shall hold any Lien on any assets of the Company or any other Grantor securing any Second-Priority Claims that are not also subject to the first-priority Lien in respect of the Senior Lender Claims under the Senior Lender Documents, such Second-Priority Agent shall notify the Intercreditor Agent promptly upon becoming aware thereof and, upon demand by the Intercreditor Agent or the Company, will assign or release such Lien to the Intercreditor Agent (and/or its designee) as security for the applicable Senior Lender Claims (in the case of an assignment, each Second-Priority Agent may retain a junior lien on such assets subject to the terms hereof). Subject to Section 11.04 of the 1-1/2 Lien Notes Indenture and the corresponding provision of any Second-Priority Document relating to Future Second Lien Indebtedness, each Second-Priority Agent agrees that, after the date hereof, if it shall hold any Lien on any assets of the Company or any other Grantor securing any Second-Priority Claims that are not also subject to the Lien in favor of the other Second-Priority Agent such Second-Priority Agent shall notify any other Second-Priority Agent promptly upon becoming aware thereof.

2.4. *Perfection of Liens.* Neither the Intercreditor Agent nor the Senior Lenders shall be responsible for perfecting and maintaining the perfection of Liens with respect to the Common Collateral for the benefit of the Second-Priority Agents and the Second-Priority Secured Parties. The provisions of this Intercreditor Agreement are intended solely to govern the respective Lien priorities as between the Senior Lenders and the Second-Priority Secured Parties and shall not impose on the Intercreditor Agent, the Second-Priority Agents, the Second-Priority Secured Parties or the Senior Lenders or any agent or trustee therefor any obligations in respect of the disposition of proceeds of any Common Collateral which would conflict with prior perfected claims therein in favor of any other Person or any order or decree of any court or governmental authority or any applicable law.

**Section 3. Enforcement.**

3.1. *Exercise of Remedies.*

(a) So long as the Discharge of Senior Lender Claims has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, (i) no Second-Priority Agent or any Second-Priority Secured Party will (x) exercise or seek to exercise any rights or remedies (including setoff) with respect to any Common Collateral in respect of any applicable Second-Priority Claims, institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), (y) contest, protest or object to any foreclosure proceeding or action brought with respect to the Common Collateral by the Intercreditor Agent or any Senior Lender in respect of the Senior Lender Claims, the exercise of any right by the Intercreditor Agent or any Senior Lender (or any agent or sub-agent on their behalf) in respect of the Senior Lender Claims under any lockbox agreement, control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which any Second-Priority Agent or any Second-Priority Secured Party either is a party or may have rights as a third party beneficiary, or any other exercise by any such party, of any rights and remedies relating to the Common Collateral under the Senior Lender Documents or otherwise in respect of Senior Lender Claims, or (z) object to the forbearance by the Senior Lenders from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Common Collateral in respect of Senior Lender Claims and (ii) except as otherwise provided herein, the Intercreditor Agent and the Senior Lenders shall have the exclusive right to enforce rights, exercise remedies (including setoff and the right to credit bid their debt) and make determinations regarding the

8

release, disposition or restrictions with respect to the Common Collateral without any consultation with or the consent of any Second-Priority Agent or any Second-Priority Secured Party; provided, however, that (A) in any Insolvency or Liquidation Proceeding commenced by or against the Company or any other Grantor, each Second-Priority Agent may file a claim or statement of interest with respect to the applicable Second-Priority Claims and (B) each Second-Priority Agent may take any action (not adverse to the prior Liens on the Common Collateral securing the Senior Lender Claims, or the rights of the Intercreditor Agent or the Senior Lenders to exercise remedies in respect thereof) in order to create, prove, perfect, preserve or protect (but not enforce) its rights in, and perfection and priority of its Lien on, the Common Collateral. In exercising rights and remedies with respect to the Senior Lender Collateral, the Intercreditor Agent and the Senior Lenders may enforce the provisions of the Senior Lender Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Common Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(b) So long as the Discharge of Senior Lender Claims has not occurred, each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, agrees that it will not, in the context of its role as secured creditor, take or receive any Common Collateral or any proceeds of Common Collateral in connection with the exercise of any right or remedy (including setoff) with respect to any Common Collateral in respect of the applicable Second-Priority Claims. Without limiting the generality of the foregoing, unless and until the Discharge of Senior Lender Claims has occurred, except as expressly provided in the proviso in clause (ii) of Section 3.1(a), the sole right of the Second-Priority Agents and the Second-Priority Secured Parties with respect to the Common Collateral is to hold a Lien on the Common Collateral in respect of the applicable Second-Priority Claims pursuant to the Second-Priority Documents, as applicable, for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of Senior Lender Claims has occurred.

(c) Subject to the proviso in clause (ii) of Section 3.1(a), (i) each Second-Priority Agent, for itself and on behalf of each applicable Second-Priority Secured Party, agrees that no Second-Priority Agent or any Second-Priority Secured Party will take any action that would hinder any exercise of remedies undertaken by the Intercreditor Agent or the Senior Lenders with respect to the Common Collateral under the Senior Loan Documents, including any sale, lease, exchange, transfer or other disposition of the Common Collateral, whether by foreclosure or otherwise, and (ii) each Second-Priority Agent, for itself and on behalf of each applicable Second-Priority Secured Party, hereby waives any and all rights it or any Second-Priority Secured Party may have as a junior lien creditor or otherwise to object to the manner in which the Intercreditor Agent or the Senior Lenders seek to enforce or collect the Senior Lender Claims or the Liens granted in any of the Senior Lender Collateral, regardless of whether any action or failure to act by or on behalf of the Intercreditor Agent or Senior Lenders is adverse to the interests of the Second-Priority Secured Parties.

(d) Each Second-Priority Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in any applicable Second-Priority Document shall be deemed to restrict in any way the rights and remedies of the Intercreditor Agent or the Senior Lenders with respect to the Senior Lender Collateral as set forth in this Agreement and the Senior Lender Documents.

3.2. *Cooperation.* Subject to the proviso in clause (ii) of Section 3.1(a), each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party,

9

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012 | Powered by Intelligize

agrees that, unless and until the Discharge of Senior Lender Claims has occurred, it will not commence, or join with any Person (other than the Senior Lenders and the Intercreditor Agent upon the request thereof) in commencing, any enforcement, collection, execution, levy or foreclosure action or proceeding with respect to any Lien held by it in the Common Collateral under any of the applicable Second-Priority Documents or otherwise in respect of the applicable Second-Priority Claims.

### Section 4. Payments.

4.1. ***Application of Proceeds.*** After an event of default under any First-Lien Indebtedness has occurred with respect to which the Intercreditor Agent has provided written notice to each Second-Priority Agent, and until such event of default is cured or waived, so long as the Discharge of Senior Lender Claims has not occurred, the Common Collateral or proceeds thereof received in connection with the sale or other disposition of, or collection on, such Common Collateral upon the exercise of remedies, shall be applied by the Intercreditor Agent to the Senior Lender Claims in such order as specified in the relevant Senior Lender Documents until the Discharge of Senior Lender Claims has occurred. Upon the Discharge of Senior Lender Claims, the Intercreditor Agent shall deliver promptly to the Second-Priority Designated Agent any Common Collateral or proceeds thereof held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct to be applied by the Second-Priority Designated Agent ratably to the Second-Priority Claims and, with respect to each class of Second-Priority Claims, in such order as specified in the relevant Second-Priority Documents.

4.2. ***Payments Over.*** Any Common Collateral or proceeds thereof received by any Second-Priority Agent or any Second-Priority Secured Party in connection with the exercise of any right or remedy (including setoff) relating to the Common Collateral in contravention of this Agreement shall be segregated and held in trust for the benefit of and forthwith paid over to the Intercreditor Agent (and/or its designees) for the benefit of the applicable Senior Lenders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The Intercreditor Agent is hereby authorized to make any such endorsements as agent for any Second-Priority Agent or any such Second-Priority Secured Party. This authorization is coupled with an interest and is irrevocable.

### Section 5. Other Agreements.

5.1. ***Releases.***

(a) If, at any time any Grantor or the holder of any Senior Lender Claim delivers notice to each Second-Priority Agent that any specified Common Collateral (including all or substantially all of the equity interests of a Grantor or any of its Subsidiaries) is sold, transferred or otherwise disposed of:

(i) by the owner of such Common Collateral in a transaction permitted under the Senior Credit Agreement, the 1-1/2 Lien Notes Indenture and each other Second-Priority Document (if any); or

(ii) during the existence of any Event of Default under (and as defined in) the Senior Credit Agreement to the extent the Intercreditor Agent has consented to such sale, transfer or disposition:

then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of the Second-Priority Secured Parties upon such Collateral will automatically be released and discharged as and when, but only to the extent, such Liens on such Collateral

10

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012  |  Powered by Intelligize

[3.2.5.2] [05.25.2012 Intercreditor Agreement JPMorgan and MPM.pdf] [Page 11 of 27]

securing Senior Lender Claims are released and discharged. Upon delivery to each Second-Priority Agent of a notice from the Intercreditor Agent stating that any release of Liens securing or supporting the Senior Lender Claims has become effective (or shall become effective upon each Second-Priority Agent's release), each Second-Priority Agent will promptly execute and deliver such instruments, releases, termination statements or other documents confirming such release on customary terms. In the case of the sale of all or substantially all of the equity interests of a Grantor or any of its Subsidiaries, the guarantee in favor of the Second-Priority Secured Parties, if any, made by such Grantor or Subsidiary will automatically be released and discharged as and when, but only to the extent, the guarantee by such Grantor or Subsidiary of Senior Lender Claims is released and discharged.

(b) Each Second-Priority Agent, for itself and on behalf of each applicable Second-Priority Secured Party, hereby irrevocably constitutes and appoints the Intercreditor Agent and any officer or agent of the Intercreditor Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of each Second-Priority Agent or such holder or in the Intercreditor Agent's own name, from time to time in the Intercreditor Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Section 5.1, including any termination statements, endorsements or other instruments of transfer or release.

(c) Unless and until the Discharge of Senior Lender Claims has occurred, each Second-Priority Agent, for itself and on behalf of each applicable Second-Priority Secured Party, hereby consents to the application, whether prior to or after a default, of Deposit Account Collateral or proceeds of Common Collateral to the repayment of Senior Lender Claims pursuant to the Senior Credit Agreement; provided that nothing in this Section 5.1(c) shall be construed to prevent or impair the rights of the Second-Priority Agents or the Second-Priority Secured Parties to receive proceeds in connection with the Second-Priority Claims not otherwise in contravention of this agreement.

5.2. **Insurance.** Unless and until the Discharge of Senior Lender Claims has occurred, the Intercreditor Agent and the Senior Lenders shall have the sole and exclusive right, subject to the rights of the Grantors under the Senior Lender Documents, to adjust settlement for any insurance policy covering the Common Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Common Collateral. Unless and until the Discharge of Senior Lender Claims has occurred, all proceeds of any such policy and any such award if in respect of the Common Collateral shall be paid (a) first, prior to the occurrence of the Discharge of Senior Lender Claims, to the Intercreditor Agent for the benefit of Senior Lenders pursuant to the terms of the Senior Lender Documents, (b) second, after the occurrence of the Discharge of Senior Lender Claims, to the Second-Priority Agents for the benefit of the Second-Priority Secured Parties pursuant to the terms of the applicable Second-Priority Documents and (c) third, if no Second-Priority Obligations are outstanding, to the owner of the subject property, such other person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct. If any Second-Priority Agent or any Second-Priority Secured Party shall, at any time, receive any proceeds of any such insurance policy or any such award in contravention of this Agreement, it shall pay such proceeds over to the Intercreditor Agent in accordance with the terms of Section 4.2.

5.3. *Amendments to Second-Priority Collateral Documents.*

(a) Without the prior written consent of the Intercreditor Agent and the Required Lenders, no Second-Priority Collateral Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms

11

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012  |  Powered by Intelligize

of any new Second-Priority Collateral Document, would be prohibited by or inconsistent with any of the terms of this Agreement. Each Second-Priority Agent agrees that each applicable Second-Priority Collateral Document shall include the following language (or language to similar effect approved by the Intercreditor Agent):

"Notwithstanding anything herein to the contrary, (i) the liens and security interests granted to the [applicable Second-Priority Agent] pursuant to this Agreement are expressly subject and subordinate to the liens and security interests granted to (a) JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (and its permitted successors) pursuant to the U.S. Collateral Agreement dated as of December 4, 2006 (as amended, restated, supplemented or otherwise modified from time to time), by and among Momentive Performance Holdings Inc., Momentive Performance Materials Inc., Momentive Performance Materials USA, Inc., JPMorgan Chase Bank, N.A., as administrative agent and collateral agent and the other parties party thereto, or (b) any agent or trustee for any other Senior Lenders (as defined in the Intercreditor Agreement referred to below), pursuant to, and (ii) the exercise of any right or remedy by the [applicable Second-Priority Agent] hereunder is subject to the limitations and provisions of, the Intercreditor Agreement dated as of May 25, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), by and among JPMorgan Chase Bank, N.A., as Intercreditor Agent, Momentive Performance Materials Inc., Momentive Performance Materials USA, Inc., and the other parties party thereto. In the event of any conflict between the terms of the Intercreditor Agreement and the terms of this Agreement, the terms of the Intercreditor Agreement shall govern."

(b) In the event that the Intercreditor Agent or the Senior Lenders under the Credit Agreement or, if there is no Credit Agreement, any other Senior Lenders, enter into any amendment, waiver or consent in respect of or replace any of the Senior Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any Senior Collateral Document or changing in any manner the rights of the Intercreditor Agent, the Senior Lenders, the Company or any other Grantor thereunder (including the release of any Liens in Senior Lender Collateral), then such amendment, waiver or consent shall apply automatically to any comparable provision of each Comparable Second-Priority Collateral Document without the consent of any Second-Priority Agent or any Second-Priority Secured Party and without any action by any Second-Priority Agent, Second-Priority Secured Party, the Company or any other Grantor; provided, however, that (A) such amendment, waiver or consent does not materially adversely affect the rights of the Second-Priority Secured Parties or the interests of the Second-Priority Secured Parties in the Second-Priority Collateral and not the Intercreditor Agent or the Senior Lenders, as the case may be, that have a security interest in the affected collateral in a like or similar manner, and (B) written notice of such amendment, waiver or consent shall have been given to each Second-Priority Agent.

5.4. ***Rights As Unsecured Creditors.*** Notwithstanding anything to the contrary in this Agreement, the Second-Priority Agents and the Second-Priority Secured Parties may exercise rights and remedies as an unsecured creditor against the Company or any Subsidiary that has guaranteed the Second-Priority Claims in accordance with the terms of the applicable Second-Priority Documents and applicable law. Nothing in this Agreement shall prohibit the receipt by any Second-Priority Agent or any Second-Priority Secured Party of the required payments of interest and principal so long as such receipt is not the direct or indirect result of the exercise by any Second-Priority Agent or any Second-Priority Secured Party of rights or remedies as a secured creditor in respect of Common Collateral or enforcement in contravention of this Agreement of any Lien in respect of Second-Priority Claims held by any of them. In the

12

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012 | Powered by Intelligize

event any Second-Priority Agent or any Second-Priority Secured Party becomes a judgment lien creditor in respect of Common Collateral as a result of its enforcement of its rights as an unsecured creditor in respect of Second-Priority Claims, such judgment lien shall be subordinated to the Liens securing Senior Lender Claims on the same basis as the other Liens securing the Second-Priority Claims are so subordinated to such Liens securing Senior Lender Claims under this Agreement. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the Intercreditor Agent or the Senior Lenders may have with respect to the Senior Lender Collateral.

### 5.5. *Intercreditor Agent as Gratuitous Bailee for Perfection.*

(a) The Intercreditor Agent agrees to hold the Pledged Collateral that is part of the Common Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for each Second-Priority Agent and any assignee solely for the purpose of perfecting the security interest granted in such Pledged Collateral pursuant to the Second-Priority Collateral Agreements, subject to the terms and conditions of this Section 5.5.

(b) The Intercreditor Agent agrees to hold the Deposit Account Collateral (if any) that is part of the Common Collateral and controlled by the Intercreditor Agent as gratuitous bailee for each Second-Priority Agent and any assignee solely for the purpose of perfecting the security interest granted in such Deposit Account Collateral pursuant to the Second-Priority Collateral Agreements, subject to the terms and conditions of this Section 5.5.

(c) In the event that the Intercreditor Agent (or its agent -or bailees) has Lien filings against Intellectual Property (as defined in the Noteholder Collateral Agreement) that is part of the Common Collateral that are necessary for the perfection of Liens in such Common Collateral, the Intercreditor Agent agrees to hold such Liens as gratuitous bailee for each Second-Priority Agent and any assignee solely for the purpose of perfecting the security interest granted in such Liens pursuant to the Second-Priority Collateral Agreements, subject to the terms and conditions of this Section 5.5.

(d) Except as otherwise specifically provided herein (including Sections 3.1 and 4.1), until the Discharge of Senior Lender Claims has occurred, the Intercreditor Agent shall be entitled to deal with the Pledged Collateral in accordance with the terms of the Senior Lender Documents as if the Liens under the Second-Priority Collateral Documents did not exist. The rights of the Second-Priority Agents and the Second-Priority Secured Parties with respect to such Pledged Collateral shall at all times be subject to the terms of this Agreement.

(e) The Intercreditor Agent shall have no obligation whatsoever to any Second-Priority Agent or any Second-Priority Secured Party to assure that the Pledged Collateral is genuine or owned by the Grantors or to protect or preserve rights or benefits of any Person or any rights pertaining to the Common Collateral except as expressly set forth in this Section 5.5. The duties or responsibilities of the Intercreditor Agent under this Section 5.5 shall be limited solely to holding the Pledged Collateral as gratuitous bailee for each Second-Priority Agent for purposes of perfecting the Lien held by the Second-Priority Secured Parties.

(f) The Intercreditor Agent shall not have by reason of the Second-Priority Collateral Documents or this Agreement or any other document a fiduciary relationship in respect of any Second-Priority Agent or any Second-Priority Secured Party and the Second-Priority Agents and the Second-Priority Secured Parties hereby waive and release the Intercreditor Agent from all claims and liabilities arising pursuant to the Intercreditor Agent's role under this Section 5.5, as agent and gratuitous bailee with respect to the Common Collateral.

13

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012   |   Powered by Intelligize

(g) Upon the Discharge of Senior Lender Claims, the Intercreditor Agent shall deliver to the Second-Priority Designated Agent, to the extent that it is legally permitted to do so, the remaining Pledged Collateral (if any) and the Deposit Account Collateral (if any) together with any necessary endorsements (or otherwise allow the Second-Priority Designated Agent to obtain control of such Pledged Collateral and Deposit Account Collateral) or as a court of competent jurisdiction may otherwise direct. The Company shall take such further action as is required to effectuate the transfer contemplated hereby and shall indemnify the Intercreditor Agent for loss or damage suffered by the Intercreditor Agent as a result of such transfer except for loss or damage suffered by the Intercreditor Agent as a result of its own willful misconduct, gross negligence or bad faith. The Intercreditor Agent has no obligation to follow instructions from any Second-Priority Agent in contravention of this Agreement.

(h) Neither the Intercreditor Agent nor the Senior Lenders shall be required to marshal any present or future collateral security for the Company's or its Subsidiaries' obligations to the Intercreditor Agent or the Senior Lenders under the Senior Credit Agreement or the Senior Collateral Documents or any assurance of payment in respect thereof or to resort to such collateral security or other assurances of payment in any particular order, and all of their rights in respect of such collateral security or any assurance of payment in respect thereof shall be cumulative and in addition to all other rights, however existing or arising.

5.6. *Second-Priority Designated Agent as Gratuitous Bailee for Perfection.*

(a) Upon the Discharge of Senior Lender Claims, the Second-Priority Designated Agent agrees to hold the Pledged Collateral that is part of the Common Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for the other Second-Priority Agents and any assignee solely for the purpose of perfecting the security interest granted in such Pledged Collateral pursuant to the applicable Second-Priority Collateral Agreement, subject to the terms and conditions of this Section 5.6.

(b) Upon the Discharge of Senior Lender Claims, the Second-Priority Designated Agent agrees to hold the Deposit Account Collateral (if any) that is part of the Common Collateral and controlled by the Second-Priority Designated Agent as gratuitous bailee for the other Second-Priority Agents and any assignee solely for the purpose of perfecting the security interest granted in such Deposit Account Collateral pursuant to the applicable Second-Priority Collateral Agreement, subject to the terms and conditions of this Section 5.6.

(c) In the event that the Second-Priority Designated Agent (or its agent or bailees) has Lien filings against Intellectual Property (as defined in the Noteholder Collateral Agreement) that is part of the Common Collateral that are necessary for the perfection of Liens in such Common Collateral, upon the Discharge of Senior Lender Claims, the Second-Priority Designated Agent agrees to hold such Liens as gratuitous bailee for the other Second-Priority Agents and any assignee solely for the purpose of perfecting the security interest granted in such Liens pursuant to the applicable Second-Priority Collateral Agreement, subject to the terms and conditions of this Section 5.6.

(d) The Second-Priority Designated Agent, in its capacity as gratuitous bailee, shall have no obligation whatsoever to the other Second-Priority Agents to assure that the Pledged Collateral is genuine or owned by the Grantors or to protect or preserve rights or benefits of any Person or any rights pertaining to the Common Collateral except as expressly set forth in this Section 5.6. The duties or responsibilities of the Second-Priority Designated Agent under this Section 5.6 upon the Discharge of Senior Lender Claims shall be limited solely to holding the Pledged Collateral as gratuitous bailee for the other Second-Priority Agents for purposes of perfecting the Lien held by the applicable Second-Priority Secured Parties.

14

(e) The Second-Priority Designated Agent shall not have by reason of the Second-Priority Collateral Documents or this Agreement or any other document a fiduciary relationship in respect of the other Second-Priority Agents (or the Second-Priority Secured Parties for which such other Second-Priority Agents is agent) and the other Second-Priority Agents hereby waive and release the Second-Priority Designated Agent from all claims and liabilities arising pursuant to the Second-Priority Designated Agent's role under this Section 5.6, as agent and gratuitous bailee with respect to the Common Collateral.

(f) In the event that the Second-Priority Designated Agent shall cease to be so designated the Second-Priority Designated Agent pursuant to the definition of such term, the then Second-Priority Designated Agent shall deliver to the successor Second-Priority Designated Agent, to the extent that it is legally permitted to do so, the remaining Pledged Collateral (if any) and the Deposit Account Collateral (if any) together with any necessary endorsements (or otherwise allow the successor Second-Priority Designated Agent to obtain control of such Pledged Collateral and Deposit Account Collateral) or as a court of competent jurisdiction may otherwise direct, and such successor Second-Priority Designated Agent shall perform all duties of the Second-Priority Designated Agent as set forth herein. The Company shall take such further action as is required to effectuate the transfer contemplated hereto and shall indemnify the Second-Priority Designated Agent for loss or damage suffered by the Second-Priority Designated Agent as a result of such transfer except for loss or damage suffered by the Second-Priority Designated Agent as a result of its own wilful misconduct, gross negligence or bad faith. The Second-Priority Designated Agent has no obligation to follow instructions from the successor Second-Priority Designated Agent in contravention of this Agreement.

5.7. **When Discharge of Senior Lender Claims Deemed to Not Have Occurred**

If, at any time after the Discharge of Senior Lender Claims has occurred, the Company incurs and designates any Future First-Lien Indebtedness, then such Discharge of Senior Lender Claims shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Discharge of Senior Lender Claims), and the applicable agreement governing such Future First-Lien Indebtedness shall automatically be treated as a Senior Credit Agreement for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Common Collateral set forth herein and the granting by the Intercreditor Agent of amendments, waivers and consents hereunder. Upon receipt of notice of such designation (including the identity of the new Intercreditor Agent), each Second-Priority Agent shall promptly (i) enter into such documents and agreements (at the expense of the Company), including amendments or supplements to this Agreement, as the Company or such new Intercreditor Agent shall reasonably request in writing in order to provide the new Intercreditor Agent the rights of the Intercreditor Agent contemplated hereby and (ii) to the extent then held by any Second-Priority Agent, deliver to the Intercreditor Agent the Pledged Collateral that is Common Collateral together with any necessary endorsements (or otherwise allow such Intercreditor Agent to obtain possession or control of such Pledged Collateral).

5.8. **No Release If Event of Default.** Notwithstanding any other provisions contained in this Agreement, if an Event of Default (as defined in the 1-1/2 Lien Notes Indenture or any other Second-Priority Document, as applicable) exists on the date on which all First-Lien Indebtedness is repaid in full and terminated (including all commitments and letters of credit thereunder), the second-priority Liens on the Second-Priority Collateral securing the Second-Priority Claims relating to such Event of Default will not be released, except to the extent such Collateral or any portion thereof was disposed of in order to repay the First-Lien Indebtedness secured by such Collateral, and thereafter the applicable Second-Priority Agent will have the right to direct the Intercreditor Agent to foreclose upon such Collateral (but in any such event,

15

the Liens on such Collateral securing the applicable Second-Priority Claims will be released when such Event of Default and all other Events of Default under the 1-1/2 Lien Notes Indenture or any other Second-Priority Document, as applicable, cease to exist).

### Section 6. Insolvency or Liquidation Proceedings.

6.1. ***Financing Issues.*** If the Company or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the Intercreditor Agent shall desire to permit the use of cash collateral or to permit the Company or any other Grantor to obtain financing under Section 363 or Section 364 of Title 11 of the United States Code or any similar provision in any Bankruptcy Law ("***DIP Financing***"), then each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, agrees that it will raise no (a) objection to (and will not otherwise contest) such use of cash collateral or DIP Financing and will not request adequate protection or any other relief in connection therewith (except to the extent permitted by the proviso in clause (ii) of Section 3.1(a) and Section 6.3) and, to the extent the Liens securing the Senior Lender Claims under the Credit Agreement or, if no Credit Agreement exists, under the other Senior Lender Documents are subordinated or pari passu with such DIP Financing, will subordinate its Liens in the Common Collateral to such DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second-Priority Claims are so subordinated to Liens securing Senior Lender Claims under this Agreement, (b) objection to (and will not otherwise contest) any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of Senior Lender Claims made by the Intercreditor Agent or any holder of Senior Lender Claims, (c) objection to (and will not otherwise contest) any lawful exercise by any holder of Senior Lender Claims of the right to credit bid Senior Lender Claims at any sale in foreclosure of Senior Lender Collateral, (d) objection to (and will not otherwise contest) any other request for judicial relief made in any court by any holder of Senior Lender Claims relating to the lawful enforcement of any Lien on Senior Lender Collateral or (e) objection to (and will not otherwise contest) any order relating to a sale of assets of any Grantor for which the Intercreditor Agent has consented that provides, to the extent the sale is to be free and clear of Liens, that the Liens securing the Senior Lender Claims and the Second-Priority Claims will attach to the proceeds of the sale on the same basis of priority as the Liens securing the Senior Lender Collateral rank to the Liens securing the Second-Priority Collateral in accordance with this Agreement.

6.2. ***Relief from the Automatic Stay.*** Until the Discharge of Senior Lender Claims has occurred, each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, agrees that none of them shall seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Common Collateral, without the prior written consent of the Intercreditor Agent and the Required Lenders.

6.3. ***Adequate Protection.*** Each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, agrees that none of them shall contest (or support any other Person contesting) (a) any request by the Intercreditor Agent or the Senior Lenders for adequate protection or (b) any objection by the Intercreditor Agent or the Senior Lenders to any motion, relief, action or proceeding based on the Intercreditor Agent's or the Senior Lenders' claiming a lack of adequate protection. Notwithstanding the foregoing, in any Insolvency or Liquidation Proceeding, (i) if the Senior Lenders (or any subset thereof) are granted adequate protection in the form of additional collateral in connection with any DIP Financing or use of cash collateral under Section 363 or Section 364 of Title 11 of the United States Code or any similar Bankruptcy Law, then each Second-Priority Agent, on behalf of itself and any applicable Second-Priority Secured Party, may seek or request adequate protection in the form of a replacement Lien on such additional collateral, which Lien is subordinated to the Liens securing the Senior Lender Claims and such DIP Financing (and all Obligations relating thereto) on the

16

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012   |   Powered by Intelligize

same basis as the other Liens securing the Second-Priority Claims are so subordinated to the Liens securing Senior Lender Claims under this Agreement and (ii) in the event any Second-Priority Agent, on behalf of itself or any applicable Second-Priority Secured Party, seeks or requests adequate protection and such adequate protection is granted in the form of additional collateral, then such Second-Priority Agent, on behalf of itself or each such Second-Priority Secured Party, agrees that the Senior-Priority Agents shall also be granted a senior Lien on such additional collateral as security for the applicable Senior Lender Claims and any such DIP Financing and that any Lien on such additional collateral securing the Second-Priority Claims shall be subordinated to the Liens on such collateral securing the Senior Lender Claims and any such DIP Financing (and all Obligations relating thereto) and any other Liens granted to the Senior Lenders as adequate protection on the same basis as the other Liens securing the Second-Priority Claims are so subordinated to such Liens securing Senior Lender Claims under this Agreement.

6.4. ***Preference Issues.*** If any Senior Lender is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the Company or any other Grantor (or any trustee, receiver or similar person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (a "***Recovery***"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, then the Senior Lender Claims shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the Senior Lenders shall be entitled to a Discharge of Senior Lender Claims with respect to all such recovered amounts. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.

6.5. ***Application.*** This Agreement shall be applicable prior to and after the commencement of any Insolvency or Liquidation Proceeding. All references herein to any Grantor shall apply to any trustee for such Person and such Person as debtor in possession. The relative rights as to the Collateral and proceeds thereof shall continue after the filing thereof on the same basis as prior to the date of the petition, subject to any court order approving the financing of, or use of cash collateral by, any Grantor.

6.6. ***506(c) Claims.*** Until the Discharge of Senior Lender Claims has occurred, each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, will not assert or enforce any claim under Section 506(c) of the United States Bankruptcy Code senior to or on a parity with the Liens securing the Senior Lender Claims for costs or expenses of preserving or disposing of any Common Collateral.

**Section 7. Reliance; Waivers; etc.**

7.1. ***Reliance.*** The consent by the Senior Lenders to the execution and delivery of the Second-Priority Documents to which the Senior Lenders have consented and all loans and other extensions of credit made or deemed made on and after the date hereof by the Senior Lenders to the Company or any Subsidiary shall be deemed to have been given and made in reliance upon this Agreement. Each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, acknowledges that it and the applicable Second-Priority Secured Parties have, independently and without reliance on the Intercreditor Agent or any Senior Lender, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the applicable Second-Priority Document, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decision in taking or not taking any action under the applicable Second-Priority Document or this Agreement.

17

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012  |  Powered by Intelligize

7.2. **No Warranties or Liability.** Each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, acknowledges and agrees that neither the Intercreditor Agent nor any Senior Lender has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Senior Lender Documents, the ownership of any Common Collateral or the perfection or priority of any Liens thereon. The Senior Lenders will be entitled to manage and supervise their respective loans and extensions of credit under the Senior Lender Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate, and the Senior Lenders may manage their loans and extensions of credit without regard to any rights or interests that any Second-Priority Agent or any of the Second-Priority Secured Parties have in the Common Collateral or otherwise, except as otherwise provided in this Agreement. Neither the Intercreditor Agent nor any Senior Lender shall have any duty to any Second-Priority Agent or any Second-Priority Secured Party to act or refrain from acting in a manner that allows, or results in, the occurrence or continuance of an event of default or default under any agreements with the Company or any Subsidiary thereof (including the Second-Priority Documents), regardless of any knowledge thereof that they may have or be charged with. Except as expressly set forth in this Intercreditor Agreement, the Intercreditor Agent, the Senior Lenders, the Second-Priority Agents and the Second-Priority Secured Parties have not otherwise made to each other, nor do they hereby make to each other, any warranties, express or implied, nor do they assume any liability to each other with respect to (a) the enforceability, validity, value or collectibility of any of the Second-Priority Claims, the Senior Lender Claims or any guarantee or security which may have been granted to any of them in connection therewith, (b) the Company's or any other Grantor's title to or right to transfer any of the Common Collateral or (c) any other matter except as expressly set forth in this Intercreditor Agreement.

7.3. **Obligations Unconditional.** All rights, interests, agreements and obligations of the Intercreditor Agent and the Senior Lenders, and the Second-Priority Agents and the Second-Priority Secured Parties, respectively, hereunder shall remain in full force and effect irrespective of:

(a) any lack of validity or enforceability of any Senior Lender Documents or any Second-Priority Documents;

(b) any change in the time, manner or place of payment of, or in any other terms of, all or any of the Senior Lender Claims or Second-Priority Claims, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of the Senior Credit Agreement or any other Senior Lender Document or of the terms of the 1-1/2 Lien Notes Indenture or any other Second-Priority Document;

(c) any exchange of any security interest in any Common Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the Senior Lender Claims or Second-Priority Claims or any guarantee thereof;

(d) the commencement of any Insolvency or Liquidation Proceeding in respect of the Company or any other Grantor; or

(e) any other circumstances that otherwise might constitute a defense available to, or a discharge of, the Company or any other Grantor in respect of the Senior Lender Claims, or of any Second-Priority Agent or any Second-Priority Secured Party in respect of this Agreement.

18

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012  |  Powered by Intelligize

**Section 8. Miscellaneous.**

8.1. *Conflicts.* Subject to Section 8.19:

(a) in the event of any conflict between the terms of this Agreement and the terms of any Senior Lender Document or any Second-Priority Document, the terms of this Agreement shall govern;

(b) in the event of any conflict between the terms of this Agreement and the terms of the Existing Second Lien Intercreditor Agreement relating to the relative priorities, rights or obligations of the parties holding the Senior Lender Claims and the holders of the "Second Priority Obligations" (as that term is defined in the Existing Second Lien Intercreditor Agreement), the terms of the Existing Second Lien Intercreditor Agreement shall govern.

8.2. *Continuing Nature of this Agreement; Severability.* Subject to Section 5.7 and Section 6.4, this Agreement shall continue to be effective until the Discharge of Senior Lender Claims shall have occurred or such later time as all the Obligations in respect of the Second-Priority Claims shall have been paid in full. This is a continuing agreement of lien subordination and the Senior Lenders may continue, at any time and without notice to each Second-Priority Agent or any Second-Priority Secured Party, to extend credit and other financial accommodations and lend monies to or for the benefit of the Company or any other Grantor constituting Senior Lender Claims in reliance hereon. The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding, any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.3. *Amendments; Waivers.* No amendment, modification or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each Second-Priority Agent (or its authorized agent) and each Senior-Priority Agent (or its authorized agent) and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. The Company and the other Grantors shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent their rights are affected. Notwithstanding anything in this Section 8.3 to the contrary, this Agreement may be amended from time to time at the request of the Company, at the Company's expense, and without the consent of any Second-Priority Agent, any Senior-Priority Agent, any Senior Lender or any Second-Priority Secured Party to (i) add other parties holding Future Second Lien Indebtedness (or any agent or trustee therefor) and Future First-Lien Indebtedness (or any agent or trustee therefor) in each case to the extent such Indebtedness is not prohibited by the Senior Credit Agreement, the 1-1/2 Lien Notes Indenture or any other Second-Priority Document governing Future Second Lien Indebtedness, (ii) in the case of Future Second Lien Indebtedness, (a) establish that the Lien on the Common Collateral securing such Future Second Lien Indebtedness shall be junior and subordinate in all respects to all Liens on the Common Collateral securing any Senior Lender Claims and shall share in the benefits of the Common Collateral equally and ratably with all Liens on the Common Collateral securing any Second-Priority Claims, and (b) provide to the holders of such Future Second Lien Indebtedness (or any agent or trustee thereof) the comparable rights and benefits (including any improved rights and benefits that have been consented to by the Intercreditor Agent) as are provided to the holders of Second-Priority Claims under this Agreement, and (iii) in the case of Future First-Lien Indebtedness, (a) establish that the Lien on the Common Collateral securing such Future First-Lien Indebtedness shall be superior in all respects to all Liens on the Common Collateral

19

securing any Second-Priority Claims and any Future Second Lien Indebtedness and shall share in the benefits of the Common Collateral equally and ratably with all Liens on the Common Collateral securing any Senior Lender Claims, and (b) provide to the holders of such Future First-Lien Indebtedness (or any agent or trustee thereof) the comparable rights and benefits as are provided to the holders of Senior Lender Claims under this Agreement, in each case so long as such modifications do not expressly violate the provisions of the Senior Credit Agreement, the 1-1/2 Lien Notes Indenture or any other Second-Priority Document governing Future Second Lien Indebtedness. Any such additional party and each Second-Priority Agent shall be entitled to rely on the determination of officers of the Company that such modifications do not violate the Senior Credit Agreement, the 1-1/2 Lien Notes Indenture or any other Second-Priority Document governing Future Second Lien Indebtedness if such determination is set forth in an Officers' Certificate delivered to such party, the Intercreditor Agent and each Second-Priority Agent; *provided, however,* that such determination will not affect whether or not the Company has complied with its undertakings in the Senior Credit Agreement, the Senior Collateral Documents, the 1-1/2 Lien Notes Indenture, any other Second-Priority Document governing Future Second Lien Indebtedness, the Second-Priority Collateral Documents or this Agreement.

8.4. ***Information Concerning Financial Condition of the Company and the Subsidiaries.*** The Intercreditor Agent, the Senior Lenders, each Second-Priority Agent and the Second-Priority Secured Parties shall each be responsible for keeping themselves informed of (a) the financial condition of the Company and the Subsidiaries and all endorsers and/or guarantors of the Second-Priority Claims or the Senior Lender Claims and (b) all other circumstances bearing upon the risk of nonpayment of the Second-Priority Claims or the Senior Lender Claims. The Intercreditor Agent, the Senior Lenders, each Second-Priority Agent and the Second-Priority Secured Parties shall have no duty to advise any other party hereunder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event that the Intercreditor Agent, any Senior Lender, any Second-Priority Agent or any Second-Priority Secured Party, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to any other party, it or they shall be under no obligation (w) to make, and the Intercreditor Agent, the Senior Lenders, the Second-Priority Agents and the Second-Priority Secured Parties shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (x) to provide any additional information or to provide any such information on any subsequent occasion, (y) to undertake any investigation or (z) to disclose any information that, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

8.5. ***Subrogation.*** Each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, hereby waives any rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of Senior Lender Claims has occurred.

8.6. ***Application of Payments.*** Except as otherwise provided herein, all payments received by the Senior Lenders may be applied, reversed and reapplied, in whole or in part, to such part of the Senior Lender Claims as the Senior Lenders, in their sole discretion, deem appropriate, consistent with the terms of the Senior Lender Documents. Except as otherwise provided herein, each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, assents to any such extension or postponement of the time of payment of the Senior Lender Claims or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security that may at any time secure any part of the Senior Lender Claims and to the addition or release of any other Person primarily or secondarily liable therefor.

20



Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012  |  Powered by Intelligize

8.7. *Consent to Jurisdiction; Waivers.* The parties hereto consent to the jurisdiction of any state or federal court located in New York County, New York, and consent that all service of process may be made by registered mail directed to such party as provided in Section 8.8 for such party. Service so made shall be deemed to be completed three days after the same shall be posted as aforesaid. The parties hereto waive any objection to any action instituted hereunder in any such court based on forum non conveniens, and any objection to the venue of any action instituted hereunder in any such court. Each of the parties hereto waives any right it may have to trial by jury in respect of any litigation based on, or arising out of, under or in connection with this Agreement, or any course of conduct, course of dealing, verbal or written statement or action of any party hereto in connection with the subject matter hereof.

8.8. *Notices.* All notices to the Second-Priority Secured Parties and the Senior Lenders permitted or required under this Agreement may be sent to the Trustee, the Intercreditor Agent or any Second-Priority Agent as provided in the 1-1/2 Lien Notes Indenture, the Credit Agreement, the other relevant Senior Lender Document or the relevant Second-Priority Document, as applicable. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or electronic mail or upon receipt via U.S. mail (registered or certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties. The Senior-Priority Agents hereby agree to promptly notify each Second-Priority Agent upon payment in full in cash of all Indebtedness under the applicable Senior Lender Documents (except for contingent indemnities and cost and reimbursement obligations to the extent no claim therefor has been made).

8.9. *Further Assurances.* Each of the Second-Priority Agents, on behalf of itself and each applicable Second-Priority Secured Party, and the Intercreditor Agent, on behalf of itself and each Senior Lender, agrees that each of them shall take such further action and shall execute and deliver to the Intercreditor Agent and the Senior Lenders such additional documents and instruments (in recordable form, if requested) as the Intercreditor Agent or the Senior Lenders may reasonably request to effectuate the terms of and the lien priorities contemplated by this Agreement.

8.10. *Governing Law.* This Agreement has been delivered and accepted at and shall be deemed to have been made at New York, New York and shall be interpreted, and the rights and liabilities of the parties bound hereby determined, in accordance with the laws of the State of New York.

8.11. *Binding on Successors and Assigns.* This Agreement shall be binding upon the Intercreditor Agent, the Senior Lenders, the Second-Priority Agents, the Second-Priority Secured Parties, the Company, the Company's Subsidiaries party hereto and their respective permitted successors and assigns.

8.12. *Specific Performance.* The Intercreditor Agent may demand specific performance of this Agreement. Each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action that may be brought by the Intercreditor Agent.

8.13. *Section Titles.* The section titles contained in this Agreement are and shall

21

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012  |  Powered by Intelligize

be without substantive meaning or content of any kind whatsoever and are not a part of this Agreement.

8.14. *Counterparts.* This Agreement may be executed in one or more counterparts, including by means of facsimile or in portable document format (pdf), each of which shall be an original and all of which shall together constitute one and the same document.

8.15. *Authorization.* By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement. The Intercreditor Agent represents and warrants that this Agreement is binding upon the Senior Lenders. The Trustee represents and warrants that this Agreement is binding upon the Indenture Secured Parties.

8.16. *No Third Party Beneficiaries; Successors and Assigns.* This Agreement and the rights and benefits hereof shall inure to the benefit of, and be binding upon, each of the parties hereto and their respective successors and assigns and shall inure to the benefit of each of, and be binding upon, the holders of Senior Lender Claims and Second-Priority Claims. No other Person shall have or be entitled to assert rights or benefits hereunder.

8.17. *Effectiveness.* This Agreement shall become effective when executed and delivered by the parties hereto. This Agreement shall be effective both before and after the commencement of any Insolvency or Liquidation Proceeding. All references to the Company or any other Grantor shall include the Company or any other Grantor as debtor and debtor-in-possession and any receiver or trustee for the Company or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding.

8.18. *Intercreditor Agent and Second-Priority Agents.* It is understood and agreed that (a) JPMCB is entering into this Agreement in its capacity as administrative agent under the Credit Agreement and the provisions of Article VIII of the Credit Agreement applicable to JPMCB as administrative agent thereunder shall also apply to JPMCB as Intercreditor Agent hereunder and (b) The Bank of New York Mellon Trust Company, N.A. is entering into this Agreement in its capacity as Trustee and as Collateral Agent, and the provisions of Article 7 of the 1-1/2 Lien Notes Indenture applicable to the Trustee thereunder shall also apply to the Trustee hereunder.

8.19. *Relative Rights.* Notwithstanding anything in this Agreement to the contrary (except to the extent contemplated by Section 5.3 (b)), nothing in this Agreement is intended to or will (a) amend, waive or otherwise modify the provisions of the Senior Credit Agreement, the 1-1/2 Lien Notes Indenture or any other Senior Lender Documents or Second-Priority Documents entered into in connection with the Senior Credit Agreement, the 1-1/2 Lien Notes Indenture or any other Senior Lender Document or Second-Priority Document or permit the Company or any Subsidiary to take any action, or fail to take any action, to the extent such action or failure would otherwise constitute a breach of, or default under, the Senior Credit Agreement or any other Senior Lender Documents entered into in connection with the Senior Credit Agreement, the 1-1/2 Lien Notes Indenture or any other Second-Priority Documents, (b) change the relative priorities of the Senior Lender Claims or the Liens granted under the Senior Lender Documents on the Common Collateral (or any other assets) as among the Senior Lenders, (c) otherwise change the relative rights of the Senior Lenders in respect of the Common Collateral as among such Senior Lenders or (d) obligate the Company or any Subsidiary to take any action, or fail to take any action, that would otherwise constitute a breach of, or default under, the Senior Credit Agreement or any other Senior Lender Document entered into in connection with the Senior Credit Agreement, the 1-1/2 Lien Notes Indenture or any other Second-Priority Documents.

22

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012  |  Powered by Intelligize

8.20. **References.** Notwithstanding anything to the contrary in this Agreement, any references contained herein to any Section, clause, paragraph, definition or other provision of the 1-1/2 Lien Notes Indenture (including any definition contained therein) shall be deemed to be a reference to such Section, clause, paragraph, definition or other provision as in effect on the date of this Agreement; provided that any reference to any such Section, clause, paragraph or other provision shall refer to such Section, clause, paragraph or other provision of the 1-1/2 Lien Notes Indenture, as applicable (including any definition contained therein), as amended or modified from time to time if such amendment or modification has been (1) made in accordance with the 1-1/2 Lien Notes Indenture, and (2) approved in writing by, or on behalf of, the requisite Senior Lenders as are needed under the terms of the Senior Credit Agreement to approve such amendment or modification.

8.21. **Intercreditor Agreements.** Each party hereto agrees that the Senior Lenders (as among themselves) and the Second-Priority Secured Parties (as among themselves) may each enter into intercreditor agreements (or similar arrangements) with the Intercreditor Agent governing the rights, benefits and privileges as among the Senior Lenders or the Second-Priority Secured Parties, as the case may be, in respect of the Common Collateral, this Agreement and the other Senior Collateral Documents or Second-Priority Collateral Documents, as the case may be, including as to application of proceeds of the Common Collateral, voting rights, control of the Common Collateral and waivers with respect to the Common Collateral, in each case so long as (A) the terms thereof do not violate or conflict with the provisions of this Agreement or the other Senior Collateral Documents or Second-Priority Collateral Documents, as the case may be, (B) in the case of any such intercreditor agreement (or similar arrangement) affecting any Senior Lenders, the Senior-Priority Agent acting on behalf of such Senior Lenders agrees in its sole discretion to enter into any such intercreditor agreement (or similar arrangement) and (C) in the case of any such intercreditor agreement (or similar arrangement) affecting the Senior Lenders holding Senior Lender Claims under the Credit Agreement, the Required Lenders authorize the applicable Senior-Priority Agent to enter into any such intercreditor agreement (or similar arrangement). Notwithstanding the preceding clauses (B) and (C), to the extent that the applicable Senior-Priority Agent is not authorized by the Required Lenders to enter into any such intercreditor agreement (or similar arrangement ) or does not agree to enter into such intercreditor agreement (or similar arrangement ), such intercreditor agreement (or similar arrangement ) shall not be binding upon the applicable Senior-Priority Agent but, subject to the immediately succeeding sentence, may still bind the other parties party thereto. In any event, if a respective intercreditor agreement (or similar arrangement) exists, the provisions thereof shall not be (or be construed to be) an amendment, modification or other change to this Agreement or any other Senior Collateral Document or Second-Priority Collateral Document, and the provisions of this Agreement and the other Senior Collateral Documents and Second-Priority Collateral Documents shall remain in full force and effect in accordance with the terms hereof and thereof (as such provisions may be amended, modified or otherwise supplemented from time to time in accordance with the terms thereof, including to give effect to any intercreditor agreement (or similar arrangement)).

[Remainder of page intentionally left blank]

23

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012 | Powered by Intelligize

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

INTERCREDITOR AGENT:

JPMORGAN CHASE BANK, N.A., as Intercreditor Agent

By: _____ /s/ Peter S. Predun
    Name:                Peter S. Predun
    Title:                Executive Director

TRUSTEE AND COLLATERAL AGENT:

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustee and Collateral Agent

By: _____ /s/ R. Tarnas
    Name:                R. Tarnas
    Title:                Vice President

MOMENTIVE PERFORMANCE MATERIALS INC.

By: _____ /s/ William H. Carter
    Name:                William H. Carter
    Title:   Executive Vice President and Chief Financial
                            Officer

MOMENTIVE PERFORMANCE MATERIALS USA INC.

By: _____ /s/ George F. Knight
    Name:                George F. Knight
    Title:     Senior Vice President and Treasurer

MOMENTIVE PERFORMANCE MATERIALS
WORLDWIDE, INC.

By: _____ /s/ George F. Knight
    Name:                George F. Knight
    Title:     Senior Vice President and Treasurer

JUNIPER BOND HOLDINGS I LLC

By: Momentive Performance Materials, Inc., its sole
member

By: _____ /s/ George F. Knight
    Name:                George F. Knight
    Title:                Treasurer

JUNIPER BOND HOLDINGS II LLC

By:      Momentive Performance Materials, Inc., its sole
member

By: _____ /s/ George F. Knight
    Name:                George F. Knight
    Title:                Treasurer

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012  |  Powered by Intelligize

JUNIPER BOND HOLDINGS III LLC

By: Momentive Performance Materials, Inc., its sole member

By: _____ /s/ George F. Knight
    Name:                            George F. Knight
    Title:                               Treasurer

JUNIPER BOND HOLDINGS IV LLC

By: Momentive Performance Materials, Inc., its sole member

By: _____ /s/ George F. Knight
    Name:                            George F. Knight
    Title:                               Treasurer

MOMENTIVE PERFORMANCE MATERIALS QUARTZ, INC.

By: _____ /s/ George F. Knight
    Name:                            George F. Knight
    Title:           Senior Vice President and Treasurer

MPM SILICONES, LLC

By: Momentive Performance Materials, Inc., its sole member

By: _____ /s/ George F. Knight
    Name:                            George F. Knight
    Title:                               Treasurer

MOMENTIVE PERFORMANCE MATERIALS SOUTH AMERICA INC.

By: _____ /s/ George F. Knight
    Name:                            George F. Knight
    Title:           Senior Vice President and Treasurer

MOMENTIVE PERFORMANCE MATERIALS CHINA SPV INC.

By: _____ /s/ George F. Knight
    Name:                            George F. Knight
    Title:           Senior Vice President and Treasurer

Source: MOMENTIVE PERFORMANCE MATERIALS, INC., EX-10.1, 6/1/2012  |  Powered by Intelligize

SCHEDULE I

Subsidiary Parties

- Momentive Performance Materials Worldwide Inc.
- Momentive Performance Materials USA Inc.
- Juniper Bond Holdings I LLC
- Juniper Bond Holdings II LLC
- Juniper Bond Holdings III LLC
- Juniper Bond Holdings IV LLC
- Momentive Performance Materials Quartz, Inc.
- MPM Silicones, LLC
- Momentive Performance Materials South America Inc.
- Momentive Performance Materials China SPV Inc.

**EXHIBIT C**

Exhibit 4.2

## SECOND AMENDED AND RESTATED COLLATERAL AGREEMENT

dated and effective as of

April 24, 2013

among

MOMENTIVE PERFORMANCE MATERIALS HOLDINGS INC.,

MOMENTIVE PERFORMANCE MATERIALS INC.,
as Issuer,

each Subsidiary Guarantor
party hereto

and

JPMORGAN CHASE BANK, N.A.,
as Collateral Agent

Notwithstanding anything herein to the contrary, (i) the liens and security interests granted to the Collateral Agent on the ABL Priority Collateral pursuant to this Agreement are expressly subject and subordinate to the liens and security interests on the ABL Priority Collateral granted to the ABL Facility Collateral Agent and (ii) the exercise of any right or remedy by the Collateral Agent hereunder is subject to the limitations and provisions of (x) the First Lien Intercreditor Agreement and (y) the ABL Intercreditor Agreement. In the event of any conflict between the terms of the First Lien Intercreditor Agreement and the terms of this Agreement or the terms of the ABL Intercreditor Agreement and the terms of this Agreement, the terms of the First Lien Intercreditor Agreement or the ABL Intercreditor Agreement, as applicable, shall govern.

# TABLE OF CONTENTS

Page

## ARTICLE I

### Definitions

| | | |
|---|---|---|
| SECTION 1.01. | Credit Agreement and ABL Intercreditor Agreement | 2 |
| SECTION 1.02. | Other Defined Terms | 3 |

## ARTICLE II

### Pledge of Securities

| | | |
|---|---|---|
| SECTION 2.01. | Pledge | 10 |
| SECTION 2.02. | Delivery of the Pledged Collateral | 12 |
| SECTION 2.03. | Representations, Warranties and Covenants | 13 |
| SECTION 2.04. | Registration in Nominee Name; Denominations | 15 |
| SECTION 2.05. | Voting Rights; Dividends and Interest, Etc | 16 |
| SECTION 2.06. | Unlimited Corporate Entities | 18 |

## ARTICLE III

### Security Interests in Other Personal Property

| | | |
|---|---|---|
| SECTION 3.01. | Security Interest | 19 |
| SECTION 3.02. | Representations and Warranties | 22 |
| SECTION 3.03. | Covenants | 24 |
| SECTION 3.04. | Other Actions | 27 |
| SECTION 3.05. | Covenants Regarding Patent, Trademark and Copyright Collateral | 27 |

## ARTICLE IV

### Remedies

| | | |
|---|---|---|
| SECTION 4.01. | Remedies Upon Default | 29 |
| SECTION 4.02. | Application of Proceeds | 31 |
| SECTION 4.03. | Securities Act, Etc | 32 |

## ARTICLE V

### Other First Lien Obligations

| | | |
|---|---|---|
| SECTION 5.01. | Other First Lien Obligations | 32 |

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013 | Powered by Intelligize

ARTICLE VI

Miscellaneous

| SECTION 6.01. | Notices | 33 |
|---|---|---|
| SECTION 6.02. | Security Interest Absolute | 34 |
| SECTION 6.03. | Limitation By Law | 34 |
| SECTION 6.04. | Binding Effect; Several Agreements | 34 |
| SECTION 6.05. | Successors and Assigns | 34 |
| SECTION 6.06. | Collateral Agent's Fees and Expenses; Indemnification | 35 |
| SECTION 6.07. | Collateral Agent Appointed Attorney-in-Fact | 36 |
| SECTION 6.08. | Governing Law | 37 |
| SECTION 6.09. | Waivers; Amendment | 37 |
| SECTION 6.10. | WAIVER OF JURY TRIAL | 38 |
| SECTION 6.11. | Severability | 38 |
| SECTION 6.12. | Counterparts | 39 |
| SECTION 6.13. | Headings | 39 |
| SECTION 6.14. | Jurisdiction; Consent to Service of Process | 39 |
| SECTION 6.15. | Termination or Release | 39 |
| SECTION 6.16. | Additional Subsidiary Guarantors | 41 |
| SECTION 6.17. | ABL Facility | 41 |
| SECTION 6.18. | General Authority of the Collateral Agent | 41 |
| SECTION 6.19. | Conflicts | 42 |
| SECTION 6.20. | Person Serving as Applicable First Lien Agent | 42 |
| SECTION 6.21. | Parallel Debt | 43 |

Schedules

| Schedule I | Subsidiary Guarantors |
|---|---|
| Schedule II | Commercial Tort Claims |
| Schedule III | Pledged Stock; Pledged Debt Securities |
| Schedule IV | Intellectual Property |
| Schedule V | Filing Offices |

Exhibits

| Exhibit I | Form of Supplement to the Second Amended and Restated Collateral Agreement |
|---|---|
| Exhibit II | Form of Additional Secured Party Consent |

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

[3.2.3.2] [04.24.13 2nd A_And_R Collateral Agreement.pdf] [Page 4 of 62]

This **SECOND AMENDED AND RESTATED COLLATERAL AGREEMENT**, dated and effective as of April 24, 2013 (as amended, restated, supplemented or otherwise modified from time to time, this "**Agreement**"), is among MOMENTIVE PERFORMANCE MATERIALS HOLDINGS INC., a Delaware corporation ("**Holdings**"), MOMENTIVE PERFORMANCE MATERIALS INC., a Delaware corporation (the "**Issuer**"), each Subsidiary of the Issuer party hereto and JPMORGAN CHASE BANK, N.A. ("**JPMorgan**"), as collateral agent (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**") for the Secured Parties.

<u>PRELIMINARY STATEMENTS</u>

This Agreement is an amendment and restatement of the Amended and Restated U.S. Collateral Agreement, dated as of November 16, 2012 (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "**Existing Collateral Agreement**"), among Holdings, the Issuer, each Subsidiary of the Issuer party thereto and JPMorgan, as Applicable First Lien Representative (as defined therein).

Reference is made to (i) the Second Amended and Restated Credit Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among Holdings, the Issuer, Momentive Performance Materials USA Inc., a Delaware corporation (the "**U.S. Borrower**"), Momentive Performance Materials GmbH, a company organized under the laws of Germany (the "**German Borrower**"), Momentive Performance Materials Nova Scotia ULC, an unlimited company incorporated under the laws of the Province of Nova Scotia (Canada) (the "**Canadian Borrower**", and the Canadian Borrower, together with the U.S. Borrower and the German Borrower, the "**Borrowers**"), the lenders from time to time party thereto (the "**Credit Agreement Lenders**"), JPMorgan, as administrative agent for the Credit Agreement Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Administrative Agent**") and as collateral agent, and the other parties named therein, (ii) the Indenture, dated as of October 25, 2012 (as supplemented by the Supplemental Indenture, dated as of November 16, 2012, and as further amended, restated, supplemented or otherwise modified from time to time, the "**Indenture**"), among the Issuer, certain Subsidiaries of the Issuer party thereto and The Bank of New York Mellon Trust Company, N.A. ("**BONY**"), as trustee (in such capacity, together with its successors and assigns in such capacity, the "**Trustee**"), (iii) the ABL Intercreditor Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "**ABL Intercreditor Agreement**"), among JPMorgan, as ABL Facility Collateral Agent, JPMorgan, as First-Lien Collateral Agent and Applicable First-Lien Agent, Holdings, the Issuer, the U.S. Borrower and the other parties party thereto, and (iv) the First Lien Intercreditor Agreement, dated as of November 16, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "**First Lien Intercreditor Agreement**"), among JPMorgan, as Collateral Agent (as defined therein), JPMorgan, as Authorized Representative under the Credit


Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

[3.2.3.2] [04.24.13 2nd A_And_R Collateral Agreement.pdf] [Page 5 of 62]

Agreement, BONY, as Initial Other Authorized Representative (as defined therein), and the other additional Authorized Representatives from time to time party thereto, as consented to by Holdings, the Issuer, the U.S. Borrower and the other Subsidiaries of the Issuer party thereto.

Pursuant to the terms and subject to the conditions set forth in the Credit Agreement, the Credit Agreement Lenders have agreed to extend credit to the Borrowers. The obligations of the Borrowers under the Credit Agreement are guaranteed by Holdings, the Issuer and the Subsidiary Guarantors.

Pursuant to the terms of the Indenture, the Issuer has issued 8.875% First-Priority Senior Secured Notes due 2020 (the "*Notes*"), and the Issuer's obligations under the Indenture and the Notes are guaranteed by the Subsidiary Guarantors.

Holdings, the Issuer and the Subsidiary Guarantors have derived and will continue to derive substantial benefits from the transactions contemplated by the Credit Agreement and the Indenture. Pursuant to each of the Credit Agreement and the Indenture, the Pledgors have agreed to grant a security interest in the Collateral for the benefit of the Collateral Agent (for the ratable benefit of the Credit Agreement Secured Parties and the Holders) to secure the payment and performance of the Obligations, subject to the terms hereof and of the Intercreditor Agreements, including with respect to the relative rights and priorities in respect of the Collateral.

This Agreement amends and restates the Existing Collateral Agreement. The obligations of the Pledgors under the Existing Collateral Agreement and the grant of security interest in the Collateral by the Pledgors under the Existing Collateral Agreement shall continue under this Agreement, and shall not in any event be terminated, extinguished or annulled, but shall hereafter be governed by this Agreement. All references to the "Collateral Agreement" or "U.S. Collateral Agreement" in any Indenture Document or Credit Agreement Document or other document or instrument delivered in connection therewith shall be deemed to refer to this Agreement and the provisions hereof.

Accordingly, the parties hereto agree as follows:

ARTICLE I

*Definitions*

SECTION 1.01. *Credit Agreement and ABL Intercreditor Agreement.* (a) Capitalized terms used in this Agreement and not otherwise defined herein have the respective meanings assigned thereto in the Credit Agreement or the ABL Intercreditor Agreement, as applicable. All terms defined in the New York UCC and not defined in this Agreement, the Credit Agreement or the ABL Intercreditor Agreement shall have the meanings specified therein. The term "instrument" shall have the meaning specified in Article 9 of the New York UCC.

2

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

(b) The rules of construction specified in Section 1.02 of the Credit Agreement also apply to this Agreement.

SECTION 1.02. *Other Defined Terms.* As used in this Agreement, the following terms have the meanings specified below:

"*ABL Facility Collateral Agent*" means JPMorgan, in its capacity as administrative agent under the ABL Facility, together with its successors and assigns in such capacity.

"*ABL Intercreditor Agreement*" has the meaning assigned to such term in the preliminary statements of this Agreement.

"*Account Debtor*" means any person who is or who may become obligated to any Pledgor under, with respect to or on account of an Account.

"*Additional Secured Party Consent*" means a completed additional secured party consent substantially in the form of <u>Exhibit II</u> hereto.

"*Administrative Agent*" has the meaning assigned to such term in the preliminary statements of this Agreement.

"*Agreement*" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"*Applicable Agent*" means, (i) with respect to the Notes Priority Collateral, the Collateral Agent and (ii) with respect to the ABL Priority Collateral, the ABL Facility Collateral Agent.

"*Applicable First Lien Agent*" means, at any time, the Authorized Representative that is the "Applicable Authorized Representative" under and as defined in the First Lien Intercreditor Agreement at such time. On the date hereof, the Administrative Agent is the Applicable First Lien Agent hereunder.

"*Article 9 Collateral*" has the meaning assigned to such term in Section 3.01.

"*Authorized Representative*" means (a) the Administrative Agent, with respect to the Credit Agreement Obligations, (b) the Trustee, with respect to the Notes Obligations, and (c) any duly authorized representative of holders of Other First Lien Obligations designated as an "Authorized Representative" pursuant to Section 5.01 with respect to such Other First Lien Obligations.

"*BONY*" has the meaning assigned to such term in the preliminary statements of this Agreement.

"*Borrowers*" has the meaning assigned to such term in the preliminary statements of this Agreement.

3

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

"***Canadian Borrower***" has the meaning assigned to such term in the preliminary statements of this Agreement.

"***Collateral***" means the Article 9 Collateral and the Pledged Collateral.

"***Collateral Agent***" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"***Commodity Exchange Act***" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"***Copyright License***" means any written agreement, now or hereafter in effect, granting any right to any Pledgor under any Copyright now or hereafter owned by any third party, and all rights of any Pledgor under any such agreement (including, without limitation, any such rights that such Pledgor has the right to license).

"***Copyrights***" means all of the following now owned or hereafter acquired by any Pledgor (or, as required in the context of the definition of "Copyright License", any third party licensor): (a) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise; (b) all registrations and applications for registration of any such Copyright in the United States or any other country, including registrations, supplemental registrations and pending applications for registration in the United States Copyright Office and the right to obtain all renewals thereof, including those listed on <u>Schedule IV</u>; (c) all claims for, and rights to sue for, past or future infringements of any of the foregoing; and (d) all income, royalties, damages and payments now or hereafter due and payable with respect to any of the foregoing, including damages and payments for past or future infringement thereof.

"***Credit Agreement***" has the meaning assigned to such term in the preliminary statements of this Agreement.

"***Credit Agreement Documents***" means the "Loan Documents" under and as defined in the Credit Agreement.

"***Credit Agreement Guarantee Agreement***" means the Amended and Restated Guarantee Agreement, dated as of the date hereof, among Holdings, the Issuer, the Borrowers and certain Subsidiaries of the Issuer party thereto, as guarantors, and JPMorgan, as Collateral Agent (as defined therein), as amended, restated, supplemented or otherwise modified from time to time.

"***Credit Agreement Lenders***" has the meaning assigned to such term in the preliminary statements of this Agreement.

"***Credit Agreement Obligations***" means (a) the Obligations (as defined in the Credit Agreement Guarantee Agreement) and (b) the obligations of the guarantors under the Credit Agreement Guarantee Agreement to guarantee the Guaranteed Obligations (as defined in the Credit Agreement Guarantee Agreement).

4

[3.2.3.2] [04.24.13 2nd A_And_R Collateral Agreement.pdf] [Page 8 of 62]

"*Credit Agreement Secured Parties*" means the "Secured Parties" as defined in the Credit Agreement Guarantee Agreement.

"*Designated Credit Agreement*" means at any time the Credit Agreement (as defined in the Indenture) that is the "Designated Credit Agreement" under and as defined in the First Lien Intercreditor Agreement at such time. On the date hereof, the Credit Agreement is the Designated Credit Agreement.

"*Designated Securities*" means any securities the granting of a security interest in which would require separate financial statements of a Subsidiary of the Issuer to be filed with the SEC (or any other government agency), pursuant to Rule 3-16 of Regulation S-X under the Securities Act and the Exchange Act (or any successor regulation or any other law, rule or regulation), but only for so long as, and only to the extent, necessary not to be subject to such requirement.

"*Discharge of Credit Agreement Obligations*" has the meaning assigned to such term in the First Lien Intercreditor Agreement.

"*Event of Default*" means an "Event of Default" under and as defined in the Credit Agreement, the Indenture or any Other First Lien Agreement, as applicable.

"*Excluded Swap Obligations*" means (as such definition may be modified from time to time as agreed by the Issuer and the Collateral Agent), with respect to any guarantor guaranteeing any of the Obligations, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of the Commodity Exchange Act or any rule, regulation or order thereunder (or the application or official interpretation of any thereof) (a "*CEA Swap Obligation*"), if, and to the extent that, all or a portion of the guarantee of such guarantor of, or the grant by such guarantor of a security interest to secure, as applicable, such CEA Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order thereunder (or the application or official interpretation of any thereof) by virtue of such guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder, at the time the guarantee of (or grant of such security interest by, as applicable) such guarantor becomes or would become effective with respect to such CEA Swap Obligation. If a CEA Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such CEA Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"*Existing Collateral Agreement*" has the meaning assigned to such term in the preliminary statements of this Agreement.

"*Federal Securities Laws*" has the meaning assigned to such term in Section 4.03.

"*First Lien Intercreditor Agreement*" has the meaning assigned to such term in the preliminary statements of this Agreement.

5

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

[3.2.3.2] [04.24.13 2nd A_And_R Collateral Agreement.pdf] [Page 9 of 62]

"*General Intangibles*" means all "General Intangibles" as defined in the New York UCC, including all choses in action and causes of action and all other intangible personal property of any Pledgor of every kind and nature (other than Accounts) now owned or hereafter acquired by any Pledgor, including corporate or other business records, indemnification claims, contract rights (including rights under leases, whether entered into as lessor or lessee, Swap Agreements and other agreements), Intellectual Property, goodwill, registrations, franchises, tax refund claims and any letter of credit, guarantee, claim, security interest or other security held by or granted to any Pledgor to secure payment by an Account Debtor of any of the Accounts.

"*German Borrower*" has the meaning assigned to such term in the preliminary statements of this Agreement.

"*Holders*" has the meaning assigned to such term in the Indenture.

"*Holdings*" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"*Indemnitee*" has the meaning assigned to such term in Section 6.06.

"*Indenture*" has the meaning assigned to such term in the preliminary statements of this Agreement.

"*Indenture Documents*" means (a) the Indenture, the Notes, this Agreement and each other Security Document which by its terms is for the benefit of holders of Notes Obligations and (b) any other related documents or instruments executed and delivered pursuant to the Indenture or any such Security Document, in each case, as such agreements may be amended, restated, supplemented or otherwise modified from time to time.

"*Insolvency or Liquidation Proceeding*" has the meaning assigned to such term in the First Lien Intercreditor Agreement.

"*Intellectual Property*" means all intellectual and similar property of every kind and nature now owned or hereafter acquired by any Pledgor, including, inventions, designs, Patents, Copyrights, Trademarks, Patent Licenses, Copyright Licenses, Trademark Licenses, trade secrets, domain names, confidential or proprietary technical and business information, know-how, show-how or other data or information and all related documentation.

"*Intercreditor Agreements*" means each of the ABL Intercreditor Agreement, the First Lien Intercreditor Agreement and any other intercreditor agreement entered into in compliance with the Indenture Documents, the Credit Agreement Documents and each Other First Lien Agreement.

"*Issue Date*" means October 25, 2012.

6

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

"*Issuer*" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"*Japan Acquisition Co.*" means Momentive Performance Materials Japan LLC and any successor thereto.

"*Japanese Intercompany Notes*" means, collectively, (i) the note issued by Japan Acquisition Co. to Juniper Bond Holdings I LLC in an original principal amount of $210,000,000, (ii) the note issued by Japan Acquisition Co. to Juniper Bond Holdings II LLC in an original principal amount of $210,000,000, (iii) the note issued by Japan Acquisition Co. to Juniper Bond Holdings III LLC in an original principal amount of $210,000,000 and (iv) the note issued by Japan Acquisition Co. to Juniper Bond Holdings IV LLC in an original principal amount of $210,000,000.

"*JPMorgan*" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"*New York UCC*" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"*Notes*" has the meaning assigned to such term in the preliminary statements of this Agreement.

"*Notes Obligations*" means the due and punctual payment of (a) all principal of and interest (including interest accruing during the pendency of any Insolvency or Liquidation Proceeding, regardless of whether allowed or allowable in such proceeding) and premium (if any) on all indebtedness under the Indenture, and (b) all other monetary obligations, including obligations to pay fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any Insolvency or Liquidation Proceeding, regardless of whether allowed or allowable in such proceeding), of the Pledgors or any of their subsidiaries to the Secured Parties under the Indenture Documents, and other amounts payable from time to time pursuant to the Indenture Documents, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding.

"*Obligations*" means (a) the Credit Agreement Obligations and (b) (i) the Notes Obligations and (ii) if any Other First Lien Obligations are incurred and designated by the Issuer as Obligations pursuant to Section 5.01, the due and punctual payment of (A) the unpaid principal of and interest (including interest accruing during the pendency of any Insolvency or Liquidation Proceeding) owing to any holder of Other First Lien Obligations under any Other First Lien Agreement, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (B) all other monetary obligations of any Pledgor to any holder of Other First Lien Obligations under any Other First Lien Agreement, including obligations to pay fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the

7

pendency of any Insolvency or Liquidation Proceeding, in each case whether or not allowed or allowable in such Insolvency or Liquidation Proceeding); *provided*, however, that the Obligations, with respect to any Guarantor, shall not include any Excluded Swap Obligations of such Guarantor. For the avoidance of doubt, all of the Obligations set forth in clause (b) of this definition shall constitute "Other First Lien Obligations" for purposes of the definition of "Credit Agreement Obligations" contained in the First Lien Intercreditor Agreement.

"***Officer***" has the meaning assigned to such term in the Indenture.

"***Other First Lien Agreement***" means any indenture, credit agreement or other agreement, document or instrument pursuant to which any Pledgor has or will incur Other First Lien Obligations; *provided* that, in each case, the Indebtedness thereunder has been designated as Other First Lien Obligations pursuant to and in accordance with Section 5.01.

"***Other First Lien Obligations***" means other Indebtedness of the Pledgors that is equally and ratably secured with the Credit Agreement Obligations and the Notes Obligations as permitted by the Credit Agreement, the Indenture and this Agreement and is designated by the Issuer as an Other First Lien Obligation pursuant to and in accordance with Section 5.01.

"***Patent License***" means any written agreement, now or hereafter in effect, granting to any Pledgor any right to make, use or sell any invention covered by a Patent, now or hereafter owned by any third party (including, without limitation, any such rights that such Pledgor has the right to license).

"***Patents***" means all of the following now owned or hereafter acquired by any Pledgor (or, as required in the context of the definition of "Patent License", any third party licensor): (a) all letters patent of the United States or the equivalent thereof in any other country, and all applications for letters patent of the United States or the equivalent thereof in any other country, including those listed on Schedule IV, (b) all reissues, continuations, divisions, continuations-in-part or extensions thereof, and the inventions disclosed or claimed therein, including the right to make, use and/or sell the inventions disclosed or claimed therein, (c) all claims for, and rights to sue for, past or future infringements of any of the foregoing and (d) all income, royalties, damages and payments now or hereafter due and payable with respect to any of the foregoing, including damages and payments for past or future infringement thereof.

"***Perfection Certificate***" means the Perfection Certificate with respect to Holdings, the Issuer and the other Pledgors delivered to the Collateral Agent.

"***Permitted Liens***" means any Liens (a) not prohibited by Section 6.02 of the Credit Agreement, (b) not prohibited by Section 4.12 of the Indenture and (c) not prohibited by the equivalent provision of any Other First Lien Agreement.

"***Pledged Collateral***" has the meaning assigned to such term in Section 2.01.

8

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

"*Pledged Debt*" has the meaning assigned to such term in Section 2.01.

"*Pledged Debt Securities*" has the meaning assigned to such term in Section 2.01.

"*Pledged Securities*" means any promissory notes, stock certificates or other certificated securities now or hereafter included in the Pledged Collateral, including all certificates, instruments or other documents representing or evidencing any Pledged Collateral.

"*Pledged Stock*" has the meaning assigned to such term in Section 2.01.

"*Pledgor*" means any of Holdings (only with respect to securing the Credit Agreement Obligations), the Issuer or any Subsidiary Guarantor.

"*Prior Agent*" has the meaning assigned to such term in Section 6.20.

"*Prior Collateral Agent*" has the meaning assigned to such term in Section 6.20.

"*Prior First Lien Agent*" has the meaning assigned to such term in Section 6.20.

"*Secured Parties*" means (a) the Applicable First Lien Agent and the Collateral Agent, (b) the Credit Agreement Secured Parties, (c) the Trustee and each Holder and (d) subject to compliance with Section 5.01, each holder of Other First Lien Obligations and its Authorized Representative.

"*Security Documents*" means this Agreement and each other agreement entered into in favor of the Collateral Agent for purposes of securing any of the Obligations, in each case as amended, restated, supplemented or otherwise modified from time to time.

"*Security Interest*" has the meaning assigned to such term in Section 3.01.

"*Series*" has the meaning assigned to such term in the First Lien Intercreditor Agreement.

"*Subsidiary*" has the meaning assigned to such term in the Credit Agreement.

"*Subsidiary Guarantor*" means any subsidiary set forth on Schedule I and any Subsidiary that becomes a party hereto pursuant to Section 6.16.

"*Successor Agent*" has the meaning assigned to such term in Section 6.20.

"*Successor Collateral Agent*" has the meaning assigned to such term in Section 6.20.

9

"*Successor First Lien Agent*" has the meaning assigned to such term in Section 6.20.

"*Trademark License*" means any written agreement, now or hereafter in effect, granting to any Pledgor any right to use any Trademark now or hereafter owned by any third party (including, without limitation, any such rights that such Pledgor has the right to license).

"*Trademarks*" means all of the following now owned or hereafter acquired by any Pledgor (or, as required in the context of the definition of "Trademark License", any third party licensor): (a) all trademarks, service marks, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, other source or business identifiers, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations thereof (if any), and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof (except for "intent-to-use" applications for trademark or service mark registrations filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, unless and until an Amendment to Allege Use or a Statement of Use under Sections 1(c) and 1(d) of Lanham Act has been filed, to the extent, if any, that any assignment of an "intent-to-use" application prior to such filing would violate the Lanham Act), and all renewals thereof, including those listed on Schedule IV, (b) all goodwill associated therewith or symbolized thereby, (c) all claims for, and rights to sue for, past or future infringements of any of the foregoing and (d) all income, royalties, damages and payments now or hereafter due and payable with respect to any of the foregoing, including damages and payments for past or future infringement thereof.

"*Trustee*" has the meaning assigned to such term in the preliminary statements of this Agreement.

"*ULC*" has the meaning assigned to such term in Section 2.06.

"*ULC Interests*" has the meaning assigned to such term in Section 2.06.

"*U.S. Borrower*" has the meaning assigned to such term in the preliminary statements of this Agreement.

ARTICLE II

*Pledge of Securities*

SECTION 2.01. *Pledge.* Subject to the last paragraph of Section 3.01(a), as security for the payment or performance, as the case may be, in full of the Obligations, each Pledgor hereby (except in the case of ULC Interests) assigns and pledges to the Collateral Agent, its successors and permitted assigns, for the ratable benefit of the Secured Parties, and hereby grants to the Collateral Agent, its successors and permitted assigns, for the ratable benefit of the Secured Parties, a security interest in all of such Pledgor's right, title and interest in, to and under:

10

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

(a) the Equity Interests directly owned by it (which such Equity Interests constituting Pledged Stock shall be listed on <u>Schedule III</u>) and any other Equity Interests obtained in the future by such Pledgor and any certificates representing all such Equity Interests (the "***Pledged Stock***"); *provided* that the Pledged Stock shall not include (i)(A) more than 65% of the issued and outstanding voting Equity Interests of any "first tier" Foreign Subsidiary directly owned by such Pledgor, (B) more than 65% of the issued and outstanding voting Equity Interests of any "first tier" Qualified CFC Holding Company directly owned by such Pledgor, (C) any issued and outstanding Equity Interests of any Foreign Subsidiary that is not a "first tier" Foreign Subsidiary, or (D) any issued and outstanding Equity Interests of any Qualified CFC Holding Company that is not a "first tier" Qualified CFC Holding Company, (ii) to the extent applicable law requires that a subsidiary of such Pledgor issue directors' qualifying shares, such shares or nominee or other similar shares, (iii) if any Designated Credit Agreement is outstanding, any Equity Interests not pledged as security for the Obligations under such Designated Credit Agreement, (iv) any Equity Interests in a person acquired after the Issue Date in accordance with the Indenture if, and to the extent that, (A) with respect to contractual obligations, such Equity Interests constitute less than 100% of all applicable Equity Interests of such person and the persons holding the remainder of such Equity Interests are not Affiliates, (B) granting a security interest in such Equity Interests would violate applicable law or a contractual obligation binding on such Equity Interests and (C) with respect to contractual obligations, such obligation existed at the time of the acquisition of such Equity Interests and was not created or made binding on such Equity Interests in contemplation of or in connection with the acquisition of such person, (v) any Equity Interests of a person that is not directly or indirectly a Subsidiary of Holdings, (vi) any Designated Securities or (vii) any Equity Interests, whether now owned or hereafter acquired, that constitute Excluded Property or otherwise with respect to which the Collateral and Guarantee Requirement or the other paragraphs of Section 5.10 of the Credit Agreement need not be satisfied by reason of Section 5.10(f) of the Credit Agreement;

(b) (i) the debt securities currently issued to any Pledgor (which such debt securities constituting Pledged Debt Securities shall be listed on <u>Schedule III</u>), (ii) any debt obligations in the future issued to such Pledgor having, in the case of each instance of debt securities, an aggregate principal amount in excess of $5.0 million, and (iii) the certificates, promissory notes and any other instruments, if any, evidencing such debt obligations (the "***Pledged Debt Securities***" and, together with the property described in clauses (b)(i) and (ii) above, the "***Pledged Debt***"); *provided* that the Pledged Debt shall exclude (1) the Japanese Intercompany Notes, (2) if any Designated Credit Agreement is outstanding, any debt obligations or instruments not pledged as security for the Obligations under such Designated Credit Agreement, (3) any Designated Securities and (4) any debt obligations or securities that constitute Excluded Property or otherwise with respect to which the Collateral and Guarantee Requirement or the other paragraphs of Section 5.10 of the Credit Agreement need not be satisfied by reason of Section 5.10(f) of the Credit Agreement;

11

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

[3.2.3.2] [04.24.13 2nd A_And_R Collateral Agreement.pdf] [Page 15 of 62]

(c) subject to Section 2.05, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other proceeds received in respect of the Pledged Stock and the Pledged Debt;

(d) subject to Section 2.05, all rights and privileges of such Pledgor with respect to the Pledged Stock, Pledged Debt and other property referred to in clause (c) above; and

(e) all proceeds of any of the foregoing (the Pledged Stock, Pledged Debt and other property referred to in clauses (c) through (e) being collectively referred to as the "**_Pledged Collateral_**").

TO HAVE AND TO HOLD the Pledged Collateral, together with all right, title, interest, powers, privileges and preferences pertaining or incidental thereto, unto the Collateral Agent, its successors and permitted assigns, for the ratable benefit of the Secured Parties, forever; subject, however, to the terms, covenants and conditions hereinafter set forth.

SECTION 2.02. **_Delivery of the Pledged Collateral._** (a) Each Pledgor agrees promptly to deliver or cause to be delivered to the Applicable Agent, for the ratable benefit of the Secured Parties, any and all Pledged Securities to the extent such Pledged Securities are either (i) Equity Interests in Subsidiaries of Holdings or (ii) in the case of promissory notes or other instruments evidencing Indebtedness, are required to be delivered pursuant to paragraph (b) of this Section 2.02. If any Pledged Stock that is uncertificated on the date hereof shall hereinafter become certificated, the applicable Pledgor shall promptly cause the certificate or certificates representing such Pledged Stock to be delivered to the Applicable Agent, together with accompanying stock powers or other documentation required by Section 2.02(c). None of the Pledgors shall permit any party other than the Applicable Agent to "control" (for purposes of Section 8-106 of the New York UCC (or any analogous provision of the Uniform Commercial Code in effect in the jurisdiction whose law applies)) any uncertificated securities that constitute Pledged Collateral.

(b) To the extent any Indebtedness for borrowed money constitutes Pledged Collateral (other than (i) intercompany current liabilities incurred in the ordinary course of business in connection with the cash management operations of the Issuer and its Subsidiaries and (ii) to the extent that a pledge of such promissory note or instrument would violate applicable law) owed to any Pledgor by the Issuer or any Subsidiary is evidenced by a promissory note, such Pledgor shall cause such promissory note to be pledged and delivered to the Applicable Agent, for the ratable benefit of the Secured Parties, pursuant to the terms hereof. To the extent any such promissory note is a demand note, each Pledgor party thereto agrees, if requested by the Applicable Agent, to immediately demand payment thereunder upon (i) an Event of Default specified under Section 7.01(b), (c), (f), (h) or (i) of the Credit Agreement, (ii) an Event of Default specified under Section 6.01(a), (b), (e), (f) or (g) of the Indenture or (iii) any equivalent provision under any Other First Lien Agreement, in each case, unless such demand would not be commercially reasonable or would otherwise expose Pledgor to liability to the maker.

12

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

(c) Upon delivery to the Applicable Agent, (i) any Pledged Securities required to be delivered pursuant to the foregoing paragraphs (a) and (b) of this Section 2.02 shall be accompanied by stock powers or note powers, as applicable, duly executed in blank or other instruments of transfer reasonably satisfactory to the Applicable Agent and by such other instruments and documents as the Applicable Agent may reasonably request and (ii) all other property comprising part of the Pledged Collateral delivered pursuant to the terms of this Agreement shall be accompanied to the extent necessary to perfect the security interest in or allow realization on the Pledged Collateral by proper instruments of assignment duly executed by the applicable Pledgor and such other instruments or documents (including issuer acknowledgements in respect of uncertificated securities) as the Applicable Agent may reasonably request. Each delivery of Pledged Securities shall be accompanied by a schedule describing the securities, which schedule shall be attached hereto under Schedule III (or a supplement to Schedule III, as applicable) and made a part hereof; *provided* that failure to attach any such schedule hereto shall not affect the validity of such pledge of such Pledged Securities. Each schedule so delivered shall supplement any prior schedules so delivered.

SECTION 2.03. *Representations, Warranties and Covenants.* The Pledgors, jointly and severally, represent, warrant and covenant to and with the Collateral Agent, for the ratable benefit of the Secured Parties, that:

(a) subject to the exclusions set forth in Sections 2.01(a) and (b), Schedule III correctly sets forth, as of the date hereof, the percentage of the issued and outstanding units of each class of the Equity Interests of the issuer thereof represented by the Pledged Stock and includes (i) all Equity Interests pledged hereunder and (ii) all debt securities and promissory notes or instruments evidencing Indebtedness, in each case under this clause (ii), pledged hereunder and in an aggregate principal amount in excess of $5.0 million;

(b) the Pledged Stock and Pledged Debt Securities (solely with respect to Pledged Debt Securities issued by a person that is not a Subsidiary of Holdings or an Affiliate of any such Subsidiary, to the best of each Pledgor's knowledge) have been duly and validly authorized and issued by the issuers thereof and (i) in the case of Pledged Stock, are fully paid and nonassessable (subject to the assessability of the shares of a ULC) and (ii) in the case of Pledged Debt Securities (solely with respect to Pledged Debt Securities issued by a person that is not a Subsidiary of Holdings or an Affiliate of any such Subsidiary, to the best of each Pledgor's knowledge) are legal, valid and binding obligations of the issuers thereof, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding at law or in equity) and an implied covenant of good faith and fair dealing;

13



Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

(c) except for the security interests granted hereunder (or otherwise permitted under the Indenture Documents, the Credit Agreement Documents and the Other First Lien Agreements), each Pledgor (i) is and, subject to any transfers made in compliance with the Indenture, the Credit Agreement and any Other First Lien Agreement, will continue to be the direct owner, beneficially and of record, of the Pledged Collateral indicated on Schedule III as owned by such Pledgor, (ii) holds the same free and clear of all Liens, other than Permitted Liens, (iii) will make no assignment, pledge, hypothecation or transfer of, or create or permit to exist any security interest in or other Lien on, the Pledged Collateral, other than pursuant to a transaction permitted by the Indenture, the Credit Agreement and any Other First Lien Agreement and other than Permitted Liens, and (iv) subject to the rights of such Pledgor under the Indenture Documents, the Credit Agreement Documents and any Other First Lien Agreement to dispose of Pledged Collateral, will use commercially reasonable efforts to defend its title or interest thereto or therein against any and all Liens (other than Permitted Liens), however arising, of all persons;

(d) other than as set forth in the Indenture, the Credit Agreement or in any Other First Lien Agreement or the schedules thereto, and except for restrictions and limitations imposed by the Indenture Documents, the Credit Agreement Documents, any Other First Lien Agreement, the ABL Facility or securities laws generally, or, in the case of shares of a ULC, any requirement that transfers of such shares be approved by the directors of the ULC, or otherwise permitted to exist pursuant to the terms of the Indenture, the Credit Agreement or any Other First Lien Agreement, the Pledged Stock (other than partnership interests) is and will continue to be freely transferable and assignable, and none of the Pledged Stock is or will be subject to any option, right of first refusal, shareholders agreement, charter, by-law or articles of association provisions or contractual restriction of any nature, other than restrictions on transfer in the articles of association of a ULC, that might prohibit, impair, delay or otherwise affect the pledge of such Pledged Stock hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Collateral Agent of rights and remedies hereunder;

(e) each Pledgor has the power and authority to pledge the Pledged Collateral pledged by it hereunder in the manner hereby done or contemplated;

(f) other than as set forth in the Credit Agreement, the Indenture, any Other First Lien Agreement or in the ABL Facility or the schedules thereto, no consent or approval of any Governmental Authority, any securities exchange or any other person was or is necessary to the validity of the pledge effected hereby (or the transfer of the Pledged Securities upon a foreclosure thereof (other than compliance with any securities law applicable to the transfer of securities, or, in the case of shares of a ULC, any requirement that transfers of such shares be approved by the directors of the ULC)), in each case other than such as have been obtained and are in full force and effect;

14



(g) by virtue of the execution and delivery by the Pledgors of this Agreement and the Intercreditor Agreements, when any Pledged Securities (including Pledged Stock of any Domestic Subsidiary or any Qualified CFC Holding Company) are delivered to the Applicable Agent, for the ratable benefit of the Secured Parties, in accordance with this Agreement and the Intercreditor Agreements, and a financing statement naming the Collateral Agent as the secured party and covering the Pledged Collateral to which such Pledged Securities relate is filed in the appropriate filing office, the Collateral Agent will obtain, for the ratable benefit of the Secured Parties, a legal, valid and perfected lien upon and security interest in such Pledged Collateral under the New York UCC, subject only to Permitted Liens, as security for the payment and performance of the Obligations;

(h) each Pledgor that is an issuer of the Pledged Collateral confirms that it has received notice of the security interest granted hereunder and consents to such security interest and, subject to the terms of the Intercreditor Agreements, agrees to transfer record ownership of the securities issued by it in connection with any request by the Applicable Agent; and

(i) each Pledgor consents to the grant by each other Pledgor of the security interests granted hereby and to the transfer of the Pledged Stock to the Applicable Agent or its designee following an Event of Default and to the substitution of the Applicable Agent or its designee or the purchaser upon any foreclosure sale as the holder and beneficial owner of such Pledged Stock.

SECTION 2.04. *Registration in Nominee Name; Denominations.* The Applicable Agent, on behalf of the Secured Parties, shall have the right (in its sole and absolute discretion) to hold the Pledged Securities (other than Pledged Securities that are ULC Interests) in the name of the applicable Pledgor, endorsed or assigned in blank or in favor of the Applicable Agent or, if an Event of Default shall have occurred and be continuing, following written instruction from the Applicable First Lien Agent, in its own name as pledgee or the name of its nominee (as pledgee or as sub-agent). Upon the occurrence and during the continuance of an Event of Default, each Pledgor will promptly give to the Applicable Agent copies of any notices or other communications received by it with respect to Pledged Securities registered in the name of such Pledgor. If an Event of Default shall have occurred and be continuing, the Applicable Agent shall have the right, following written instruction from the Applicable First Lien Agent, to exchange the certificates representing Pledged Securities (other than Pledged Securities that are ULC Interests) held by it for certificates of smaller or larger denominations for any purpose consistent with this Agreement. With respect to Pledged Securities that are ULC Interests, at any time at which an Event of Default has occurred and is continuing, the Applicable Agent shall have the right, following written instruction from the Applicable First Lien Agent, to require the Pledgors to cause the ULC Interests to be transferred and registered as the Applicable Agent may direct and each applicable Pledgor covenants that, at the time of any such transfer, it will provide all required consents and approvals. Each Pledgor shall use its commercially reasonable efforts to cause any Subsidiary of Holdings that is not a party to this Agreement to comply with a

15

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

request by the Applicable Agent, pursuant to this Section 2.04, to exchange certificates representing Pledged Securities of such Subsidiary for certificates of smaller or larger denominations.

SECTION 2.05. *Voting Rights; Dividends and Interest, Etc.* (a)Unless and until an Event of Default shall have occurred and be continuing and the Applicable Agent shall have given notice to the relevant Pledgors of the Applicable Agent's intention to exercise its rights hereunder:

(i) Each Pledgor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Collateral or any part thereof for any purpose consistent with the terms of this Agreement, the other Indenture Documents, the Credit Agreement Documents and any Other First Lien Agreement; *provided* that, except as permitted under the Indenture, the Credit Agreement and any Other First Lien Agreement, such rights and powers shall not be exercised in any manner that could materially and adversely affect the rights inuring to a holder of any Pledged Collateral, the rights and remedies of any of the Collateral Agent or the other Secured Parties under this Agreement, the other Indenture Documents, the Credit Agreement Documents or any Other First Lien Agreement or the ability of the Secured Parties to exercise the same. For the avoidance of doubt, nothing in this subparagraph (i) shall be read to suggest that a Pledgor holding ULC Interests does not have all of the rights described in Section 2.06.

(ii) Where any Pledged Collateral is registered in the name of the Applicable Agent, the Applicable Agent shall promptly execute and deliver to each Pledgor, or cause to be executed and delivered to such Pledgor, all such proxies, powers of attorney and other instruments as such Pledgor may reasonably request for the purpose of enabling such Pledgor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to subparagraph (i) above.

(iii) Each Pledgor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Collateral to the extent and only to the extent that such dividends, interest, principal and other distributions are permitted by, and otherwise paid or distributed in accordance with, the terms and conditions of the Indenture Documents, the Credit Agreement Documents, any Other First Lien Agreement and applicable laws; *provided* that (A) any non-cash dividends, interest, principal or other distributions, payments or other consideration in respect thereof, including any rights to receive the same to the extent not so distributed or paid, that would constitute Pledged Securities to the extent such Pledgor has the rights to receive such Pledged Securities if they were declared, distributed and paid on the date of this Agreement, whether resulting from a subdivision, combination or reclassification of the outstanding Equity

16



Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

Interests of the issuer of any Pledged Securities, received in exchange for Pledged Securities or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise or (B) any non-cash dividends and other distributions paid or payable in respect of any Pledged Securities that would constitute Pledged Securities to the extent such Pledgor has the rights to receive such Pledged Securities if they were declared, distributed and paid on the date of this Agreement, in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid in surplus, shall be and become part of the Pledged Collateral, and, if received by any Pledgor, shall not be commingled by such Pledgor with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of the Applicable Agent, for the ratable benefit of the Secured Parties, and shall be forthwith delivered to the Applicable Agent, for the ratable benefit of the Secured Parties, in the same form as so received (endorsed in a manner reasonably satisfactory to the Applicable Agent). For the avoidance of doubt, nothing in this subparagraph (iii) shall be read to suggest that a Pledgor holding ULC Interests does not have all of the rights described in Section 2.06.

(b) Upon the occurrence and during the continuance of an Event of Default and after notice by the Applicable Agent to the relevant Pledgors of the Applicable Agent's intention to exercise its rights hereunder, all rights of any Pledgor to receive dividends, interest, principal or other distributions with respect to Pledged Securities that are not ULC Interests that such Pledgor is authorized to receive pursuant to paragraph (a)(iii) of this Section 2.05 shall cease, and all such rights shall thereupon become vested, for the ratable benefit of the Secured Parties, in the Applicable Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions. All dividends, interest, principal or other distributions received by any Pledgor contrary to the provisions of this Section 2.05 shall not be commingled by such Pledgor with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of the Applicable Agent, for the ratable benefit of the Secured Parties, and shall be forthwith delivered to the Applicable Agent, for the ratable benefit of the Secured Parties, in the same form as so received (endorsed in a manner reasonably satisfactory to the Applicable Agent). Any and all money and other property paid over to or received by the Collateral Agent pursuant to the provisions of this paragraph (b) shall be retained by the Collateral Agent in an account to be established by the Collateral Agent upon receipt of such money or other property and shall be applied in accordance with the provisions of Section 4.02. After all Events of Default have been cured or waived and an Officer of the Issuer has delivered to the Collateral Agent a certificate to that effect, the Collateral Agent shall promptly repay to each Pledgor (without interest) all dividends, interest, principal or other distributions that such Pledgor would otherwise be permitted to retain pursuant to the terms of paragraph

17 

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

(a)(iii) of this Section 2.05 and that remain in such account. Nothing in this paragraph (b) shall limit any of the rights of any Pledgor holding Pledged Securities which are ULC Interests to receive dividends, interest, principal or other distributions, and no such dividends, interest, principal or other distributions shall become vested or held in trust for or on behalf of the Applicable Agent.

(c) Upon the occurrence and during the continuance of an Event of Default and after notice by the Applicable Agent to the relevant Pledgors of the Applicable Agent's intention to exercise its rights hereunder, all rights of any Pledgor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section 2.05 with respect to Pledged Securities that are not ULC Interests, and the obligations of the Applicable Agent under paragraph (a)(ii) of this Section 2.05, shall cease, and all such rights shall thereupon become vested in the Applicable Agent, for the ratable benefit of the Secured Parties, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers; *provided* that the Applicable Agent shall have the right from time to time following and during the continuance of an Event of Default to permit the Pledgors to exercise such rights. After all Events of Default have been cured or waived and an Officer of the Issuer has delivered to the Applicable Agent a certificate to that effect, each Pledgor shall have the right to exercise the voting and/or consensual rights and powers that such Pledgor would otherwise be entitled to exercise pursuant to the terms of paragraph (a)(i) above and the obligations of the Applicable Agent under paragraph (a)(ii) shall be in effect. Nothing in this paragraph (c) shall limit voting and/or other consensual rights and powers of any Pledgor holding Pledged Securities which are ULC Interests, and no such rights shall become vested in the Applicable Agent pursuant hereto.

SECTION 2.06. *Unlimited Corporate Entities.* Notwithstanding the grant of security interest made by a Pledgor in favor of the Collateral Agent, its successors and assigns, for the ratable benefit of the Secured Parties, of any or all of its Pledged Securities, any Pledgor that is the legal or beneficial holder of, or controls, any shares or other equity interests ("*ULC Interests*") in any unlimited company, unlimited liability company or unlimited liability corporation existing under the laws of any province of Canada (a "*ULC*") pledged hereunder shall remain the sole registered and/or beneficial owner of such ULC Interests (and continue, where applicable, to be registered as such) and will remain so until such time as such ULC Interests are effectively transferred into the name of the Collateral Agent or any other person on the books and records of such ULC. Accordingly, such Pledgor shall be entitled to receive and retain for its own account any dividend on or other distribution, if any, in respect of such ULC Interests and shall have the right to vote such ULC Interests and to control the direction, management and policies of the issuer of such ULC Interests to the same extent as such Pledgor would if such ULC Interests were not pledged to the Collateral Agent pursuant hereto. Nothing in this Agreement or any other document or agreement among all or some of the parties hereto is intended to, or shall, constitute the Collateral Agent or any other person as a shareholder of any ULC until such time as notice is given to such Pledgor and further steps are taken thereunder so as to register the Collateral Agent or

18

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

any other person as the holder of the ULC Interests upon the books of such ULC. To the extent any provision hereof would have the effect of constituting the Collateral Agent or any other person as a shareholder or member of a ULC prior to such time, such provision shall be severed herefrom and ineffective with respect to the ULC Interests of such ULC without otherwise invalidating or rendering unenforceable this Agreement or invalidating or rendering unenforceable such provision insofar as it relates to Pledged Stock which are not ULC Interests. Except upon the exercise of rights to sell or otherwise dispose of ULC Interests following the occurrence and during the continuance of an Event of Default hereunder and the giving of notice to which has not been withdrawn, no Pledgor shall cause or permit, or enable any ULC in which it holds ULC Interests to cause or permit, the Collateral Agent to: (a) be registered as a shareholder or member of such ULC; (b) have any notation entered in its favor in the share register or other equity register of such ULC; (c) be held out as a shareholder or member of such ULC; (d) receive, directly or indirectly, any dividends, property or other distributions from such ULC by reason of the Collateral Agent holding a security interest in such ULC; or (e) act as a shareholder or member of such ULC, or exercise any rights of a shareholder or member of such ULC, including the right to attend a meeting of, or to vote the shares or other ULC Interests of, such ULC.

ARTICLE III

**Security Interests in Other Personal Property**

SECTION 3.01. *Security Interest.* (a) Subject to the last paragraph of this Section 3.01(a), as security for the payment or performance when due (whether at the stated maturity, by acceleration or otherwise), as the case may be, in full of the Obligations, each Pledgor hereby assigns and pledges to the Collateral Agent, its successors and permitted assigns, for the ratable benefit of the Secured Parties, and hereby grants to the Collateral Agent, its successors and permitted assigns, for the ratable benefit of the Secured Parties, a security interest (the "*Security Interest*") in all right, title and interest in or to any and all of the following assets and properties now owned or at any time hereafter acquired by such Pledgor or in which such Pledgor now has or at any time in the future may acquire any right, title or interest (collectively, the "*Article 9 Collateral*"):

(i) all Accounts;

(ii) all Chattel Paper;

(iii) all cash, deposit accounts and securities accounts;

(iv) all Documents;

(v) all Equipment;

(vi) all General Intangibles, including Intellectual Property;

(vii) all Instruments;

19

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

(viii) all Inventory and all other Goods not otherwise described above;

(ix) all Investment Property (other than ULC Interests);

(x) all Letter of Credit Rights;

(xi) all Commercial Tort Claims as described on Schedule II hereto;

(xii) all other personal property not otherwise described above (except for ULC Interests and property specifically excluded from any defined term used in any of the foregoing clauses);

(xiii) all books and records pertaining to the Article 9 Collateral; and

(xiv) to the extent not otherwise included, all proceeds, Supporting Obligations and products of any and all of the foregoing, other than ULC Interests, and all collateral security and guarantees given by any person with respect to any of the foregoing.

Notwithstanding anything to the contrary in this Agreement, the other Indenture Documents, the Credit Agreement Documents or any Other First Lien Agreement, this Agreement shall not constitute a grant of a security interest (x) by Holdings in any of its Collateral to secure obligations other than the Credit Agreement Obligations or (y) by any Pledgor in (and the Article 9 Collateral shall not include) (a) any vehicle covered by a certificate of title or ownership, (b) any assets, whether now owned or hereafter acquired, that constitute Excluded Property or otherwise with respect to which the Collateral and Guarantee Requirement or the other paragraphs of Section 5.10 of the Credit Agreement need not be satisfied by reason of Section 5.10(f) of the Credit Agreement, (c) any assets owned on or acquired after the Issue Date, to the extent that, and for long as, granting a security interest in such assets would violate applicable law or a contractual obligation binding on such assets that existed at the time of the acquisition thereof and was not created or made binding on such assets in contemplation of or in connection with the acquisition of such assets; *provided* that, if any such contractual restrictions are waived or eliminated and any such assets are pledged as collateral to secure any Other First Lien Obligations, ABL Obligations or Junior Lien Obligations (as defined in the Indenture), such assets shall not be excluded pursuant to this clause (c), (d) any property excluded from the definition of Pledged Collateral pursuant to Section 2.01, including, without limitation, any Designated Securities, (e) any Letter of Credit Rights to the extent any Pledgor is required by applicable law to apply the proceeds of a drawing of such Letter of Credit for a specified purpose, (f) any Pledgor's right, title or interest in any license, contract or agreement to which such Pledgor is a party or any of its right, title or interest thereunder to the extent, but only to the extent, that such a grant would, under the terms of such license, contract or agreement, result in a breach of the terms of, or constitute a default under, or result in the abandonment, invalidation or

20



Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

unenforceability of, that license, contract or agreement to which such Pledgor is a party (other than to the extent that any such term would be rendered ineffective pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the New York UCC or any other applicable law (including, without limitation, Title 11 of the United States Code) or principles of equity); *provided* that, immediately upon the ineffectiveness, lapse or termination of any such provision, the Article 9 Collateral shall include, and such Pledgor shall be deemed to have granted a security interest in, all such rights and interests as if such provision had never been in effect, (g) any Equipment owned by any Pledgor that is subject to a purchase money lien or a Capital Lease Obligation if the contract or other agreement in which such Lien is granted (or the documentation providing for such Capital Lease Obligation) prohibits or requires the consent of any person other than the Pledgors as a condition to the creation of any other security interest on such Equipment, (h) any intent-to-use United States trademark applications for which an amendment to alleged use or statement of use has not been filed under 15 U.S.C. §1051(c) or 15 U.S.C. §1051(d), respectively, or, if filed, has not been deemed in conformance with 15 U.S.C. §1051(a) or examined and accepted by the United States Patent and Trademark Office, (i) if any Designated Credit Agreement is outstanding, all assets not pledged to secure obligations thereunder, (j) if any ABL Facility is outstanding, any assets that would otherwise constitute ABL Priority Collateral that are not pledged to secure obligations thereunder or (k) solely with respect to any Series of Other First Lien Obligations, any asset that is not intended to be collateral with respect to such Series pursuant to the terms of the Other First Lien Agreement governing such Series.

(b) Each Pledgor hereby irrevocably authorizes the Collateral Agent at any time and from time to time to file in any relevant jurisdiction any initial financing statements (including fixture filings) with respect to the Article 9 Collateral or any part thereof and amendments thereto that contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement or amendment, including (i) whether such Pledgor is an organization, the type of organization and any organizational identification number issued to such Pledgor, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which such Article 9 Collateral relates and (iii) a description of collateral that describes such property in any other manner as the Collateral Agent may reasonably determine is necessary or advisable to ensure the perfection of the security interest in the Article 9 Collateral granted under this Agreement, including describing such property as "all assets" or "all property". Each Pledgor agrees to provide such information to the Collateral Agent promptly upon request.

The Collateral Agent is further authorized to file with the United States Patent and Trademark Office or United States Copyright Office (or any successor office) such documents as may be reasonably necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest granted by any Pledgor, without the signature of such Pledgor, and naming any Pledgor or the Pledgors as debtors and the Collateral Agent as secured party.

(c) The Security Interest is granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Pledgor with respect to or arising out of the Article 9 Collateral.

21

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

(d) Notwithstanding anything to the contrary in this Agreement, the other Indenture Documents, the Credit Agreement Documents or any Other First Lien Agreement, the Collateral Agent shall not be obligated to file statements or documents necessary for perfection of a security interest and each Pledgor is hereby obligated and directed to make such filings on the Collateral Agent's behalf.

SECTION 3.02. *Representations and Warranties.* The Pledgors jointly and severally represent and warrant to the Collateral Agent and the Secured Parties that:

(a) Each Pledgor has good and valid rights in and title to the Article 9 Collateral with respect to which it has purported to grant a Security Interest hereunder and has full power and authority to grant to the Collateral Agent the Security Interest in such Article 9 Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other person other than any consent or approval that has been obtained and is in full force and effect or has otherwise been disclosed herein, in the Credit Agreement, the Indenture, in any Other First Lien Agreement or in any offering circular related thereto or the schedules thereto.

(b) The Perfection Certificate has been duly prepared, completed and executed and the information set forth therein, including the exact legal name of each Pledgor, is correct and complete, in all material respects, as of the date hereof. The Uniform Commercial Code financing statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations containing a description of the Article 9 Collateral that have been prepared for filing in each governmental, municipal or other office specified in Schedule V hereto constitute all the filings, recordings and registrations (other than additional filings required to be made in the United States Patent and Trademark Office and the United States Copyright Office in order to perfect the Security Interest in Article 9 Collateral consisting of United States Patents, United States registered Trademarks and United States registered Copyrights) that are necessary to publish notice of and protect the validity of and to establish a legal, valid and perfected security interest in favor of the Collateral Agent (for the ratable benefit of the Secured Parties) in respect of all Article 9 Collateral in which the Security Interest may be perfected by filing, recording or registration in the United States (or any political subdivision thereof) and its territories and possessions, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration is necessary in any such jurisdiction, except as provided under applicable law with respect to the filing of continuation statements or amendments. Each Pledgor represents and warrants that a fully executed agreement in the form hereof (or a short form hereof which form shall be reasonably acceptable to the Collateral Agent) containing a description of all Article 9 Collateral consisting of material Intellectual Property with respect to United States issued Patents (and Patents for which United States registration applications are pending), United States registered Trademarks (and Trademarks for which United States

22

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

registration applications are pending) and United States registered Copyrights (and Copyrights for which United States registration applications are pending) has been delivered to the Collateral Agent for recording with the United States Patent and Trademark Office and the United States Copyright Office pursuant to 35 U.S.C. § 261, 15 U.S.C. § 1060 or 17 U.S.C. § 205 and the regulations thereunder, as applicable, and otherwise as may be reasonably requested by the Collateral Agent, to protect the validity of and to establish a legal, valid and perfected security interest in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, in respect of all Article 9 Collateral consisting of such material Intellectual Property in which a security interest may be perfected by recording with the United States Patent and Trademark Office and the United States Copyright Office, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration with respect to the Security Interest in the Intellectual Property is necessary (other than the Uniform Commercial Code financing statements referred to above and other than such actions as are necessary to perfect the Security Interest with respect to any Article 9 Collateral consisting of Patents, Trademarks and Copyrights acquired or developed after the date hereof).

(c) The Security Interest constitutes (i) a legal and valid security interest in all the Article 9 Collateral securing the payment and performance of the Obligations, (ii) subject to the filings described in Section 3.02(b) (which filings have been made prior to the date hereof to the extent required by the Existing Collateral Agreement and shall continue (amended, as necessary) to apply to the Obligations under this Agreement), a perfected security interest in all Article 9 Collateral in which a security interest may be perfected by filing, recording or registering a financing statement or analogous document in the United States (or any political subdivision thereof) and its territories and possessions pursuant to the Uniform Commercial Code or other applicable law in such jurisdictions and (iii) subject to Section 3.02(b), a security interest that shall be perfected in all Article 9 Collateral in which a security interest may be perfected upon the receipt and recording of this Agreement (or a short form hereof) with the United States Patent and Trademark Office and the United States Copyright Office upon the making of such filings with such office, in each case, as applicable, with respect to Article 9 Collateral consisting of material Intellectual Property. Subject to the Intercreditor Agreements, the Security Interest is and shall be prior to any other Lien on any of the Article 9 Collateral other than Permitted Liens (excluding Second-Priority Liens and the Liens securing the ABL Obligations that are subordinated to the Liens securing the Obligations in respect of the Notes Priority Collateral) or Liens arising by operation of law.

(d) The Article 9 Collateral is owned by the Pledgors free and clear of any Lien, other than Permitted Liens. Subject to the Intercreditor Agreements, none of the Pledgors has filed or consented to the filing of (i) any financing statement or analogous document under the Uniform Commercial Code or any other applicable laws covering any Article 9 Collateral, (ii) any assignment in which any Pledgor assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9 Collateral with the United States Patent and Trademark Office or the United States Copyright Office or (iii) any assignment in which any Pledgor assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9

23

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

Collateral with any foreign governmental, municipal or other office, which financing statement or analogous document, assignment, security agreement or similar instrument is still in effect, except, in each case, for Permitted Liens.

(e) None of the Pledgors holds any Commercial Tort Claim individually in excess of $5.0 million as of the date hereof except as indicated on the Perfection Certificate.

(f) Except as set forth in the Perfection Certificate, as of the date hereof, all Accounts owned by the Pledgors have been originated by the Pledgors and all Inventory owned by the Pledgors has been produced or acquired by the Pledgors in the ordinary course of business.

SECTION 3.03. *Covenants.* (a) Each Pledgor agrees to notify the Collateral Agent promptly in writing of any change (i) in its corporate or organization name, (ii) in its identity or type of organization or corporate structure, (iii) in its federal taxpayer identification number or organizational identification number or (iv) in its jurisdiction of organization. Each Pledgor agrees to promptly provide the Collateral Agent with certified organizational documents reflecting any of the changes described in the immediately preceding sentence. Each Pledgor agrees not to effect or permit any change referred to in the first sentence of this paragraph (a) unless all filings have been made, or will have been made within any applicable statutory period, under the Uniform Commercial Code or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Article 9 Collateral in which a security interest may be perfected by filing, for the ratable benefit of the Secured Parties. Each Pledgor agrees to promptly notify the Collateral Agent if any material portion of the Article 9 Collateral owned or held by such Pledgor is damaged or destroyed.

(b) Subject to the rights of such Pledgor under the Indenture Documents, the Credit Agreement Documents or any Other First Lien Agreement to dispose of Collateral, each Pledgor shall, at its own expense, use commercially reasonable efforts to defend title to the Article 9 Collateral against all persons and to defend the Security Interest of the Collateral Agent, for the ratable benefit of the Secured Parties, in the Article 9 Collateral and the priority thereof against any Lien that is not a Permitted Lien and to defend the priority thereof against any Second-Priority Liens and any Liens securing the ABL Obligations that are subordinated to the Liens securing the Obligations in respect of the Notes Priority Collateral.

(c) Each Pledgor agrees, at its own expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents and take all such actions as the Collateral Agent may from time to time reasonably request to better assure, preserve, protect, defend and perfect the Security Interest and the rights and remedies created hereby, including, without limitation, the payment of any fees and taxes required in connection with the execution and delivery of this Agreement and the granting of the Security Interest and the filing of any financing statements (including fixture filings) or other documents in connection herewith or therewith, all in accordance

24



Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

with the terms hereof and of the Indenture, the Credit Agreement and any Other First Lien Agreement. If any Indebtedness payable under or in connection with any of the Article 9 Collateral that is in excess of $5.0 million shall be or become evidenced by any promissory note or other instrument, such note or instrument shall be promptly pledged and delivered to the Applicable Agent, for the ratable benefit of the Secured Parties, duly endorsed in a manner reasonably satisfactory to the Applicable Agent.

Without limiting the generality of the foregoing, each Pledgor hereby authorizes the Collateral Agent, with prompt notice thereof to the Pledgors, to supplement this Agreement by supplementing Schedule IV or adding additional schedules hereto to specifically identify any asset or item that constitutes material Copyrights, Patents, Trademarks, Copyright Licenses, Patent Licenses or Trademark Licenses; *provided* that any Pledgor shall have the right, exercisable within 30 days after such Pledgor has been notified by the Collateral Agent of the specific identification of such Article 9 Collateral, to advise the Collateral Agent in writing of any inaccuracy of the representations and warranties made by such Pledgor hereunder with respect to such Article 9 Collateral. Each Pledgor agrees that it will use its commercially reasonable efforts to take such action as shall be necessary such that all representations and warranties hereunder shall be true and correct in all material respects with respect to such Article 9 Collateral within 30 days after the date it has been notified by the Collateral Agent of the specific identification of such Article 9 Collateral.

(d) After the occurrence of an Event of Default and during the continuance thereof, the Applicable Agent shall have the right to verify under reasonable procedures the validity, amount, quality, quantity, value, condition and status of, or any other matter relating to, the Article 9 Collateral, including, in the case of Accounts or Article 9 Collateral in the possession of any third person, by contacting Account Debtors or the third person possessing such Article 9 Collateral for the purpose of making such a verification. The Applicable Agent shall have the right to share any information it gains from such inspection or verification with any Secured Party.

(e) The Applicable Agent may discharge any past due taxes, assessments, charges, fees, Liens, security interests or other encumbrances at any time levied or placed on the Article 9 Collateral and that is not a Permitted Lien and may pay for the maintenance and preservation of the Article 9 Collateral to the extent any Pledgor fails to do so as required by the Indenture Documents, the Credit Agreement Documents, this Agreement or any Other First Lien Agreement, and each Pledgor jointly and severally agrees to reimburse the Applicable Agent on demand for any reasonable payment made or any reasonable expense incurred by the Applicable Agent pursuant to the foregoing authorization; *provided*, however, that nothing in this Section 3.03(e) shall be interpreted as excusing any Pledgor from the performance of, or imposing any obligation on the Applicable Agent or any Secured Party to cure or perform, any covenants or other promises of any Pledgor with respect to taxes, assessments, charges, fees, Liens, security interests or other encumbrances and maintenance as set forth herein, in the other Indenture Documents, the Credit Agreement Documents or in any Other First Lien Agreement.

25



Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

(f) Each Pledgor (rather than the Collateral Agent or any Secured Party) shall remain liable for the observance and performance of all the conditions and obligations to be observed and performed by it under each contract, agreement or instrument relating to the Article 9 Collateral and each Pledgor jointly and severally agrees to indemnify and hold harmless the Collateral Agent and the Secured Parties from and against any and all liability for such performance.

(g) None of the Pledgors shall make or permit to be made an assignment, pledge or hypothecation of the Article 9 Collateral or shall grant any other Lien in respect of the Article 9 Collateral, except as permitted by the Indenture Documents and the Credit Agreement Documents and not prohibited by any Other First Lien Agreement. None of the Pledgors shall make or permit to be made any transfer of the Article 9 Collateral and each Pledgor shall remain at all times in possession of the Article 9 Collateral owned by it (unless delivered to the Applicable Agent in the case of Pledged Securities), except as permitted by the Indenture Documents, the Credit Agreement Documents or the Intercreditor Agreements and not prohibited by any Other First Lien Agreement.

(h) The Pledgors, at their own expense, shall maintain, or cause to be maintained, with financially sound and reputable insurance companies, insurance (subject to customary deductibles and retentions) in such amounts and against such risks as are customarily maintained by similarly situated companies engaged in the same or similar businesses operating in the same or similar locations and cause the Collateral Agent to be listed as a co-loss payee on property and casualty policies and as an additional insured on liability policies. Notwithstanding the foregoing, the Pledgors may self-insure with respect to such risks with respect to which companies of established reputation in the same general line of business in the same general area customarily self-insure.

(i) Each Pledgor irrevocably makes, constitutes and appoints the Applicable Agent (and all officers, employees or agents designated by the Applicable Agent) as such Pledgor's true and lawful agent (and attorney-in-fact) for the purpose, during the continuance of an Event of Default, of making, settling and adjusting claims in respect of Article 9 Collateral under policies of insurance, endorsing the name of such Pledgor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto. In the event that any Pledgor at any time or times shall fail to obtain or maintain any of the policies of insurance required by the Indenture Documents, the Credit Agreement Documents or any Other First Lien Agreement or to pay any premium in whole or part relating thereto, the Applicable Agent may, without waiving or releasing any obligation or liability of the Pledgors hereunder or any Event of Default, in its sole discretion, obtain and maintain such policies of insurance and pay such premium and take any other actions with respect thereto as the Applicable Agent reasonably deems advisable. All sums disbursed by the Applicable Agent in connection with this Section 3.03(i), including reasonable attorneys' fees, court costs, expenses and other charges relating thereto, shall be payable, upon demand, by the Pledgors to the Applicable Agent and shall be additional Obligations secured hereby.



26

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

SECTION 3.04. ***Other Actions.*** In order to further ensure the attachment, perfection and priority of, and the ability of the Collateral Agent to enforce, for the ratable benefit of the Secured Parties, the Collateral Agent's security interest in the Article 9 Collateral, each Pledgor agrees, in each case at such Pledgor's own expense, to take the following actions with respect to the following Article 9 Collateral:

(a) ***Instruments and Tangible Chattel Paper.*** If any Pledgor shall at any time own or acquire any Instruments (other than checks received and processed in the ordinary course of business) or Tangible Chattel Paper evidencing an amount in excess of $5.0 million, such Pledgor shall forthwith endorse, assign and deliver the same to the Applicable Agent, accompanied by such instruments of transfer or assignment duly executed in blank as the Applicable Agent may from time to time reasonably request.

(b) ***Investment Property.*** Except to the extent otherwise provided in *Article II*, if any Pledgor shall at any time hold or acquire any Certificated Security included in the Pledged Collateral, such Pledgor shall forthwith endorse, assign and deliver the same to the Applicable Agent, accompanied by such instruments of transfer or assignment duly executed in blank as the Applicable Agent may from time to time reasonably specify. If any security of a domestic issuer now owned or hereafter acquired by any Pledgor is uncertificated and is issued to such Pledgor or its nominee directly by the issuer thereof, such Pledgor shall promptly notify the Applicable Agent, of such uncertificated securities and upon the Applicable Agent's reasonable request following the occurrence and during the continuance of an Event of Default, pursuant to an agreement in form and substance reasonably satisfactory to the Applicable Agent, either (i) cause the issuer to agree to comply with instructions from the Applicable Agent as to such security, without further consent of any Pledgor or such nominee, or (ii) cause the issuer to register the Applicable Agent as the registered owner of such security.

(c) ***Commercial Tort Claims.*** If any Pledgor shall at any time hold or acquire a Commercial Tort Claim in an amount reasonably estimated to exceed $5.0 million, such Pledgor shall promptly notify the Collateral Agent thereof in a writing signed by such Pledgor, including a summary description of such claim, and grant to the Collateral Agent in writing a security interest therein and in the proceeds thereof, all under the terms and provisions of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Collateral Agent.

SECTION 3.05. ***Covenants Regarding Patent, Trademark and Copyright Collateral.*** Except as permitted by the Indenture, the Credit Agreement or any Other First Lien Agreement:

(a) Each Pledgor agrees that it will not knowingly do any act or omit to do any act (and will exercise commercially reasonable efforts to prevent its licensees from doing any act or omitting to do any act) whereby any Patent that is material to the normal conduct of such Pledgor's business may become prematurely invalidated, abandoned, lapsed or dedicated to the public, and agrees that it shall take commercially reasonable steps with respect to any material products covered by any such Patent as necessary and sufficient to establish and preserve its rights under applicable patent laws.

27

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

(b) Each Pledgor will, and will use its commercially reasonable efforts to cause its licensees or its sublicensees to, for each material Trademark necessary to the normal conduct of such Pledgor's business, (i) maintain such Trademark in full force free from any adjudication of abandonment or invalidity for non-use, (ii) maintain the quality of products and services offered under such Trademark, (iii) display such Trademark with notice of federal or foreign registration or claim of trademark or service mark as required under applicable law and (iv) not knowingly use or knowingly permit its licensees' use of such Trademark in violation of any third-party rights.

(c) Each Pledgor will, and will use its commercially reasonable efforts to cause its licensees or its sublicensees to, for each work covered by a material Copyright necessary to the normal conduct of such Pledgor's business that it publishes, displays and distributes, use copyright notice as required under applicable copyright laws.

(d) Each Pledgor shall notify the Collateral Agent promptly if it knows that any Patent, Trademark or Copyright material to the normal conduct of such Pledgor's business may imminently become abandoned, lapsed, lost or dedicated to the public, or of any materially adverse determination or development, excluding office actions and similar determinations or developments in the United States Patent and Trademark Office, United States Copyright Office or any court regarding such Pledgor's ownership of any such material Patent, Trademark or Copyright or its right to register or to maintain the same.

(e) Each Pledgor, either itself or through any agent, employee, licensee or designee, shall (i) inform the Collateral Agent on an annual basis of each application by itself, or through any agent, employee, licensee or designee, for any Patent with the United States Patent and Trademark Office and each registration of any Trademark or Copyright with the United States Patent and Trademark Office or the United States Copyright Office filed during the preceding twelve-month period, in each case to the extent such application or registration relates to Intellectual Property material to the normal course of such Pledgor's business and (ii) upon the reasonable request of the Collateral Agent, execute and deliver any and all agreements, instruments, documents and papers to evidence the Collateral Agent's security interest in such Patent, Trademark or Copyright.

(f) Each Pledgor shall exercise its reasonable business judgment consistent with the practice in any proceeding before the United States Patent and Trademark Office or the United States Copyright Office with respect to maintaining and pursuing each material application relating to any Patent, Trademark and/or Copyright (and obtaining the relevant grant or registration) material to the normal conduct of such Pledgor's business and to maintain (i) each issued Patent and (ii) the registrations of each Trademark and each Copyright that is material to the normal conduct of such Pledgor's business, including, when applicable and necessary in such Pledgor's reasonable business judgment, timely filings of applications for renewal, affidavits of use, affidavits of incontestability and payment of maintenance fees, and, if any Pledgor believes necessary in its reasonable business judgment, to initiate opposition, interference and cancellation proceedings against third parties.

28



Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

(g) In the event that any Pledgor knows or has reason to know that any Article 9 Collateral consisting of a Patent, Trademark or Copyright material to the normal conduct of its business has been or is about to be materially infringed, misappropriated or diluted by a third party, such Pledgor shall promptly notify the Collateral Agent and shall, if such Pledgor deems it necessary in its reasonable business judgment, sue and recover any and all damages, and take such other actions as are reasonable or appropriate under the circumstances.

ARTICLE IV

*Remedies*

SECTION 4.01. *Remedies Upon Default.* In accordance with, and to the extent consistent with, the terms of the Intercreditor Agreements, the Collateral Agent may, following written instruction from the Applicable First Lien Agent, take any action specified in this Section 4.01. Upon the occurrence and during the continuance of an Event of Default, each Pledgor agrees to deliver each item of Collateral to the Collateral Agent on demand, and it is agreed that the Collateral Agent shall have the right, following written instruction from the Applicable First Lien Agent, to take any of or all the following actions at the same or different times: (a) with respect to any Article 9 Collateral consisting of Intellectual Property, on demand, to cause the Security Interest to become an assignment, transfer and conveyance of any of or all such Article 9 Collateral by the applicable Pledgors to the Collateral Agent or to license or sublicense, whether general, special or otherwise, and whether on an exclusive or a nonexclusive basis, any such Article 9 Collateral throughout the world on such terms and conditions and in such manner as the Collateral Agent shall determine (other than in violation of any then-existing licensing arrangements to the extent that waivers thereunder cannot be obtained with the use of commercially reasonable efforts, which each Pledgor hereby agrees to use) and (b) with or without legal process and with or without prior notice or demand for performance, to take possession of the Article 9 Collateral and without liability for trespass to the applicable Pledgor to enter any premises where the Article 9 Collateral may be located for the purpose of taking possession of or removing the Article 9 Collateral and, generally, to exercise any and all rights afforded to a secured party under the applicable Uniform Commercial Code or other applicable law or in equity. Without limiting the generality of the foregoing, each Pledgor agrees that the Collateral Agent shall have the right, subject to the mandatory requirements of applicable law and following written instruction from the Applicable First Lien Agent, to sell or otherwise dispose of all or any part of the Collateral at a public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Collateral Agent shall deem appropriate. The Collateral Agent shall be authorized in connection with any sale of a security (if it deems it advisable to do so) pursuant to the foregoing to restrict the prospective bidders or purchasers to persons who represent and agree that they are purchasing such security for their own account, for investment, and not with a view to the distribution or sale thereof. Upon consummation of any such sale of Collateral pursuant to this Section 4.01, the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each such purchaser at any such sale shall hold the property sold absolutely, free from 

29

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

any claim or right on the part of any Pledgor, and each Pledgor hereby waives and releases (to the extent permitted by law) all rights of redemption, stay, valuation and appraisal that such Pledgor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

To the extent any notice is required by applicable law, the Collateral Agent shall give the applicable Pledgors ten (10) Business Days' written notice (which each Pledgor agrees is reasonable notice within the meaning of Section 9-611 of the New York UCC or its equivalent in other jurisdictions) of the Collateral Agent's intention to make any sale of Collateral. Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice (if any) of such sale. At any such sale, the Collateral, or the portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may (in its sole and absolute discretion) determine. The Collateral Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given. The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In the case of any sale of all or any part of the Collateral made on credit or for future delivery, the Collateral so sold may be retained by the Collateral Agent until the sale price is paid by the purchaser or purchasers thereof, but the Collateral Agent shall not incur any liability in the event that any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in the case of any such failure, such Collateral may be sold again upon notice given in accordance with provisions above. At any public (or, to the extent permitted by law, private) sale made pursuant to this Section 4.01, any Secured Party may bid for or purchase for cash, free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of any Pledgor (all such rights being also hereby waived and released to the extent permitted by law), the Collateral or any part thereof offered for sale and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property in accordance with Section 4.02 without further accountability to any Pledgor therefor. For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Collateral Agent shall be free to carry out such sale pursuant to such agreement and no Pledgor shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Collateral Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Obligations paid in full. As an alternative to exercising the power of sale herein conferred upon it, the Collateral Agent may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. Any sale pursuant to the provisions of this Section 4.01 shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610(b) of the New York UCC or its equivalent in other jurisdictions.

30

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

SECTION 4.02. *Application of Proceeds.* The Collateral Agent shall, following written instruction from the Applicable First Lien Agent and subject to the Intercreditor Agreements, promptly apply the proceeds, moneys or balances of any collection or sale of Collateral, as follows:

FIRST, to the payment of all costs and expenses incurred by the Collateral Agent in connection with such collection or sale or otherwise in connection with this Agreement, any other Indenture Document, any Credit Agreement Document, any Other First Lien Agreement or any of the Obligations secured by such Collateral, including, without limitation, all court costs and the fees and expenses of its agents and legal counsel, the repayment of all advances made by the Collateral Agent hereunder or under any other Indenture Document, any Credit Agreement Document or any Other First Lien Agreement on behalf of any Pledgor, any other costs or expenses incurred in connection with the exercise of any right or remedy hereunder, under any other Indenture Document, any Credit Agreement Document or any Other First Lien Agreement, and all other fees, indemnities and other amounts owing or reimbursable to the Collateral Agent under any Indenture Document, any Credit Agreement Document or any Other First Lien Agreement in its capacity as such;

SECOND, to the payment in full of the Obligations secured by such Collateral (the amounts so applied to be distributed among the Secured Parties *pro rata* in accordance with the respective amounts of such Obligations owed to them on the date of any such distribution); and

THIRD, to the Pledgors, their successors or assigns, or as a court of competent jurisdiction may otherwise direct.

Notwithstanding the foregoing, (i) no amount received from any guarantor, or from the proceeds of Collateral pledged by such guarantor, shall be applied to any Excluded Swap Obligations of such guarantor and (ii) in no event shall the proceeds of any collection or sale of any assets owned directly by Holdings or by any Subsidiary of Holdings other than the Issuer or any Subsidiary of the Issuer, in each case as included in the Collateral, be applied to the payment of any obligations other than the Credit Agreement Obligations.

Following written instruction from the Applicable First Lien Agent, the Collateral Agent shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement. Upon any sale of Collateral by the Collateral Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the purchase money by the Collateral Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Collateral Agent or such officer or be answerable in any way for the misapplication thereof.



31

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

SECTION 4.03. **Securities Act, Etc.** In view of the position of the Pledgors in relation to the Pledged Collateral, or because of other current or future circumstances, a question may arise under the Securities Act of 1933, as now or hereafter in effect, or any similar federal statute hereafter enacted analogous in purpose or effect (such Act and any such similar statute as from time to time in effect being called the "**Federal Securities Laws**") with respect to any disposition of the Pledged Collateral permitted hereunder. Each Pledgor understands that compliance with the Federal Securities Laws might very strictly limit the course of conduct of the Collateral Agent if the Collateral Agent were to attempt to dispose of all or any part of the Pledged Collateral, and might also limit the extent to which or the manner in which any subsequent transferee of any Pledged Collateral could dispose of the same. Similarly, there may be other legal restrictions or limitations affecting the Collateral Agent in any attempt to dispose of all or part of the Pledged Collateral under applicable Blue Sky or other state securities laws or similar laws analogous in purpose or effect. Each Pledgor acknowledges and agrees that, in light of such restrictions and limitations, the Collateral Agent, subject to the terms of the Intercreditor Agreements, in its sole and absolute discretion, (a) may proceed to make such a sale whether or not a registration statement for the purpose of registering such Pledged Collateral or part thereof shall have been filed under the Federal Securities Laws or, to the extent applicable, Blue Sky or other state securities laws and (b) may approach and negotiate with a single potential purchaser to effect such sale. Each Pledgor acknowledges and agrees that any such sale might result in prices and other terms less favorable to the seller than if such sale were a public sale without such restrictions. In the event of any such sale, the Collateral Agent shall incur no responsibility or liability for selling all or any part of the Pledged Collateral at a price that the Collateral Agent, subject to the terms of the Intercreditor Agreements, in its sole and absolute discretion, may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might have been realized if the sale were deferred until after registration as aforesaid or if more than a single purchaser were approached. The provisions of this Section 4.03 will apply notwithstanding the existence of a public or private market upon which the quotations or sales prices may exceed substantially the price at which the Collateral Agent sells.

ARTICLE V

**Other First Lien Obligations**

SECTION 5.01. **Other First Lien Obligations.** The Issuer may from time to time designate Other First Lien Obligations permitted by the Indenture and the Credit Agreement, and not prohibited by any Other First Lien Agreement, to be secured by a Lien on the Collateral as Obligations hereunder by delivering to the Collateral Agent (a) a certificate signed by an Officer of the Issuer (i) identifying the Other First Lien Obligations so designated and the aggregate principal amount or face amount thereof, (ii) stating that such Other First Lien Obligations are designated as Obligations for purposes hereof, (iii) representing that such designation complies with the

32

terms of the Indenture Documents, the Credit Agreement Documents and any Other First Lien Agreements and (iv) specifying the name and address of the Authorized Representative for the holders of such Other First Lien Obligations and (b) a fully executed Additional Secured Party Consent. The Collateral Agent agrees that, upon the satisfaction of all conditions set forth in the preceding sentence, the Collateral Agent shall act as collateral agent under and subject to the terms of this Agreement and the Intercreditor Agreements for the benefit of all Secured Parties, including, without limitation, any Secured Parties that hold any such Other First Lien Obligations. Each Authorized Representative that executes any Additional Secured Party Consent agrees to the appointment, and acceptance of the appointment, of the Collateral Agent as collateral agent for the holders of such Other First Lien Obligations and agrees, on behalf of itself and each Secured Party it represents, to be bound by the terms of this Agreement and the Intercreditor Agreements and, with respect to the rights, duties and immunities of the Collateral Agent, by the Indenture, the Credit Agreement and the Intercreditor Agreements. Upon the satisfaction of the conditions set forth in this Section 5.01, such Other First Lien Obligations shall become Obligations hereunder with the same force and effect as if originally included in the Obligations hereunder. The rights and obligations of each party to this Agreement shall remain in full force and effect notwithstanding the addition of any new Other First Lien Obligations to this Agreement.

ARTICLE VI

*Miscellaneous*

SECTION 6.01. **Notices.** All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 9.01 of the Credit Agreement, Section 13.02 of the Indenture or the equivalent provision of any Other First Lien Agreement; *provided* that notices to the Collateral Agent shall be effective only upon receipt and shall be made to the Collateral Agent at:

> JPMorgan Chase Bank, N.A.
> 500 Stanton Christiana Rd, 3/Ops2, Newark, DE 19713
> Attention: Evan Zacharias
> Telephone: (302) 634-1405
> Fax: (302) 634-1417
> e-mail: Evan.Zacharias@JPMorgan.com

> with a copy to:

> JPMorgan Chase Bank, N.A.
> 500 Stanton Christiana Rd, 3/Ops2, Newark, DE 19713
> Attention: Demetrius Liston
> Telephone: (302) 634-4139
> Fax: (302) 634-1417
> e-mail: Demetrius.Liston@jpmorgan.com

33

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

SECTION 6.02. **Security Interest Absolute.** To the extent permitted by law, all rights of the Collateral Agent hereunder, the Security Interest in the Article 9 Collateral, the security interest in the Pledged Collateral and all obligations of each Pledgor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of any Indenture Document, any Credit Agreement Document, any Other First Lien Agreement, the Intercreditor Agreements, any agreement with respect to any of the Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Indenture Document, any Credit Agreement Document, any Other First Lien Agreement, the Intercreditor Agreements or any other agreement or instrument, (c) any exchange, release or non-perfection of any Lien on other collateral, or any release or amendment or waiver of or consent under or departure from any guarantee, securing or guaranteeing all or any of the Obligations or (d) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Pledgor in respect of the Obligations or this Agreement (other than a defense of payment or performance).

SECTION 6.03. **Limitation By Law.** All rights, remedies and powers provided in this Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions of this Agreement are intended to be subject to all applicable mandatory provisions of law that may be controlling and to be limited to the extent necessary so that they shall not render this Agreement invalid, unenforceable, in whole or in part, or not entitled to be recorded, registered or filed under the provisions of any applicable law.

SECTION 6.04. **Binding Effect; Several Agreements.** This Agreement shall become effective as to any party to this Agreement when a counterpart hereof executed on behalf of such party shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed on behalf of the Collateral Agent, and thereafter shall be binding upon such party, the Applicable First Lien Agent and the Collateral Agent and their respective permitted successors and assigns, and shall inure to the benefit of such party, the Applicable First Lien Agent, the Collateral Agent and the other Secured Parties and their respective permitted successors and assigns, except that no party shall have the right to assign or transfer its rights or obligations hereunder or any interest herein or in the Collateral (and any such assignment or transfer shall be void) except as contemplated or permitted by this Agreement, the Indenture, the Credit Agreement or any Other First Lien Agreement. This Agreement shall be construed as a separate agreement with respect to each party and may be amended, modified, supplemented, waived or released with respect to any party without the approval of any other party and without affecting the obligations of any other party hereunder.

SECTION 6.05. **Successors and Assigns.** Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of any Pledgor, the Applicable First Lien Agent or the Collateral Agent that are contained in this Agreement shall bind and inure to the benefit of their respective permitted successors and assigns.

34

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

SECTION 6.06. *Collateral Agent's Fees and Expenses; Indemnification.* The parties hereto agree that the Collateral Agent shall be entitled to reimbursement of its expenses incurred hereunder as provided in the Indenture, the Credit Agreement and each Other First Lien Agreement.

(a) Without limitation of its indemnification obligations under the Indenture Documents, the Credit Agreement Documents and each Other First Lien Agreement, each Pledgor jointly and severally agrees to indemnify the Collateral Agent and its Affiliates, and each of their respective directors, trustees, officers, employees, agents and advisors (each such person being called an "*Indemnitee*") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees, charges and disbursements (except the allocated cost of in-house counsel), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of, (i) the execution, delivery or performance of this Agreement, any other Indenture Document, any Credit Agreement Document, any Other First Lien Agreement or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto and thereto of their respective obligations hereunder and thereunder or the consummation of the transactions contemplated hereby and thereby or (ii) any claim, litigation, investigation or proceeding relating to any of the foregoing, or to the Collateral, whether or not any Indemnitee is a party thereto and regardless of whether or not any of the foregoing is raised or initiated by a third party or any Pledgor or any Subsidiary of Holdings; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(b) Any such amounts payable as provided hereunder shall be additional Obligations secured hereby and by the other Security Documents. The provisions of this Section 6.06 shall remain operative and in full force and effect regardless of the termination of this Agreement, any other Indenture Document, any Credit Agreement Document or any Other First Lien Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Obligations, the invalidity or unenforceability of any term or provision of this Agreement, any other Indenture Document, any Credit Agreement Document or any Other First Lien Agreement, or any investigation made by or on behalf of the Collateral Agent or any other Secured Party. All amounts due under this Section 6.06 shall be payable on written demand therefor accompanied by reasonable documentation with respect to any reimbursement indemnification or other amount requested.

(c) In no event shall the Collateral Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

35



Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

(d) To the fullest extent permitted by applicable law, none of the parties hereto shall be responsible or liable to any other party or any other person or entity for any special, indirect, consequential or punitive damages arising out of, in connection with, or as a result of, this Agreement; *provided* that each Pledgor shall indemnify and reimburse any Indemnitee for any special, indirect, consequential or punitive damages that such Indemnitee may be liable for to the extent otherwise reimbursable pursuant to this Section 6.06.

(e) The agreements in this Section 6.06 shall survive the resignation of the Collateral Agent and the termination of this Agreement.

(f) For the avoidance of doubt, the provisions of Article VIII of the Credit Agreement and Article VII of the Indenture, in each case as applicable to the collateral agent or the trustee thereunder, as applicable, shall also apply to the Collateral Agent acting under or in connection with this Agreement. Notwithstanding anything to the contrary in this Agreement, the Collateral Agent shall be directed at all times by the Applicable First Lien Agent. No provision of this Agreement shall require the Collateral Agent to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers.

SECTION 6.07. *Collateral Agent Appointed Attorney-in-Fact.* Each Pledgor hereby appoints the Collateral Agent the attorney-in-fact of such Pledgor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof, which appointment is irrevocable and coupled with an interest. Except in the case of any matter relating to ULC Interests, the Collateral Agent shall have the right, upon the occurrence and during the continuance of an Event of Default (but subject to the Intercreditor Agreements), following written instruction from the Applicable First Lien Agent, with full power of substitution either in the Collateral Agent's name or in the name of such Pledgor, (a) to receive, endorse, assign or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Collateral or any part thereof, (b) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Collateral; (c) to ask for, demand, sue for, collect, receive and give acquittance for any and all moneys due or to become due under and by virtue of any Collateral; (d) to sign the name of any Pledgor on any invoice or bill of lading relating to any of the Collateral; (e) to send verifications of Accounts to any Account Debtor; (f) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise, realize on all or any of the Collateral or to enforce any rights in respect of any Collateral; (g) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral; and (h) to use, sell, assign, transfer, pledge, make any agreement with respect to or



36

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013 | Powered by Intelligize

otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Collateral Agent were the absolute owner of the Collateral for all purposes; *provided* that nothing herein contained shall be construed as requiring or obligating the Collateral Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby. The Collateral Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to any Pledgor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

SECTION 6.08. *Governing Law*. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

SECTION 6.09. *Waivers; Amendment*. (a) No failure or delay by the Collateral Agent or any other Secured Party in exercising any right, power or remedy hereunder, under any Indenture Document, any Credit Agreement Document or any Other First Lien Agreement, as applicable, shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy, or any abandonment or discontinuance of steps to enforce such a right, power or remedy, preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The rights, powers and remedies of the Applicable First Lien Agent, the Collateral Agent and the other Secured Parties hereunder, under the Indenture Documents, the Credit Agreement Documents and under any Other First Lien Agreement are cumulative and are not exclusive of any rights, powers or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any Pledgor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 6.09, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any Pledgor in any case shall entitle any Pledgor to any other or further notice or demand in similar or other circumstances.

(b) Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Pledgor or Pledgors with respect to which such waiver, amendment or modification is to apply, subject to any consent required in accordance with Section 9.08 of the Credit Agreement, Article IX of the Indenture and any similar provision of documentation relating to Other First Lien Obligations.

(c) For the purpose of Section 6.09(b) above, the Collateral Agent shall be entitled to rely upon (i) written confirmation from the agent managing the solicitation of consents and/or a certificate signed by two Officers of the Issuer as to the receipt of valid consents from the relevant Secured Parties to amend this Agreement, in

37

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

accordance with the requirements as to such amendment contained in the Indenture, the Credit Agreement and each Other First Lien Agreement, and (ii) any document believed by it to be genuine and to have been signed or presented by the proper Person and the Collateral Agent need not investigate any fact or matter stated in the document. At any time that the Issuer desires that this Agreement be amended as provided in Section 6.09(b) above, the Issuer shall deliver to the Collateral Agent a certificate signed by two Officers of the Issuer stating that the amendment of this Agreement is permitted pursuant to Section 6.09(b) above. If requested by the Collateral Agent (although the Collateral Agent shall have no obligation to make any such request), the Issuer shall furnish appropriate legal opinions (from counsel reasonably acceptable to the Collateral Agent) to the effect set forth in the immediately preceding sentence. Such officers' certificate and legal opinion will contain the statements required by Section 13.05 of the Indenture or, if applicable, the equivalent provision of the Credit Agreement and each Other First Lien Agreement. If requested by the Collateral Agent (although the Collateral Agent shall have no obligation to make any such request), the Issuer shall furnish to the Collateral Agent copies of officers' certificates and legal opinions delivered to the Trustee, the Administrative Agent or the Authorized Representative under any Other First Lien Agreement in connection with any amendment to the Indenture, the Credit Agreement or any Other First Lien Agreement, respectively, affecting the operation of this Section 6.09. The Collateral Agent shall not be liable for any action it takes or omits to take in good faith in reliance on such certificates or opinions.

SECTION 6.10. *WAIVER OF JURY TRIAL.* EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY OTHER INDENTURE DOCUMENT, ANY CREDIT AGREEMENT DOCUMENT OR ANY OTHER FIRST LIEN AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 6.10.

SECTION 6.11. *Severability.* In the event any one or more of the provisions contained in this Agreement, any other Indenture Document, any Credit Agreement Document or any Other First Lien Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

38

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

SECTION 6.12. ***Counterparts.*** This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute but one contract, and shall become effective as provided in Section 6.04. Delivery of an executed counterpart to this Agreement by facsimile or other electronic transmission shall be as effective as delivery of a manually signed original.

SECTION 6.13. ***Headings.*** Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 6.14. ***Jurisdiction; Consent to Service of Process.*** Subject to clause (e) of the following sentence, all judicial proceedings brought against any party arising out of or relating to this Agreement, any other Indenture Document, any Credit Agreement Document, any Other First Lien Agreement or any of the Obligations shall be brought in any state or federal court of competent jurisdiction in the State, County and City of New York. By executing and delivering this Agreement, each party hereto, for itself and in connection with its properties, irrevocably (a) accepts generally and unconditionally the exclusive jurisdiction and venue of such courts (other than with respect to actions by the Collateral Agent in respect of rights under any Security Document governed by laws other than the laws of the State of New York or with respect to any Collateral subject thereto); (b) waives any defense of forum non conveniens; (c) agrees that service of all process in any such proceeding in any such court may be made by registered or certified mail, return receipt requested, to the applicable parties at its address provided in accordance with Section 6.01; (d) agrees that service as provided in clause (c) above is sufficient to confer personal jurisdiction over the applicable party in any such proceeding in any such court, and otherwise constitutes effective and binding service in every aspect, and (e) agrees that the Collateral Agent and the other Secured Parties retain the right to serve process in any other manner permitted by law or to bring proceedings against any Pledgor in the courts of any other jurisdiction in connection with the exercise of any rights under any Security Document or the enforcement of any judgment.

SECTION 6.15. ***Termination or Release.*** (a) This Agreement, the pledges made herein, the Security Interest and all other security interests granted hereby, and all other Security Documents securing the Obligations, shall automatically terminate upon the Collateral Agent's receipt of a notice from (i) the Administrative Agent, stating that all the Credit Agreement Obligations (other than contingent or unliquidated obligations or liabilities not then due) have been paid in full in cash or immediately available funds and the Credit Agreement Lenders have no further commitment to lend under the Credit Agreement and the Revolving Facility Exposure has been reduced to zero, (ii) the Trustee pursuant to Section 11.07 of the Indenture, stating that the Trustee, on behalf of the Holders, disclaims and gives up any and all rights it has in or to the Collateral (as defined in the Indenture), and any rights it has under the Security Documents and (iii) each Authorized Representative with respect to the Other First Lien Obligations, stating that such Authorized Representative, on behalf of the holders of the



39

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

applicable Other First Lien Obligations, disclaims and gives up any and all rights it has in or to the Collateral (as defined in the applicable indenture or agreement governing such Other First Lien Obligations) and any right it has under the Security Documents. In connection with such termination, the Collateral Agent shall do or cause to be done all acts reasonably necessary to release all such security interests as soon as is reasonably practicable.

(b) A Subsidiary Guarantor shall automatically be released from its obligations hereunder and the security interests in the Collateral of such Subsidiary Guarantor shall be automatically released upon the consummation of any transaction permitted by the Indenture and the Credit Agreement and not prohibited by any Other First Lien Agreement as a result of which such Subsidiary Guarantor ceases to be a Subsidiary of the Issuer or otherwise ceases to be a Pledgor; *provided* that the requisite Secured Parties shall have consented to such transaction (to the extent such consent is required by the Indenture, the Credit Agreement or any Other First Lien Agreement, as applicable) and the terms of such consent did not provide otherwise.

(c) Upon any sale or other transfer by any Pledgor of any Collateral that is permitted under the Indenture and the Credit Agreement and not prohibited by any Other First Lien Agreement to any person that is not a Pledgor, or upon the effectiveness of any written consent to the release of the security interest granted hereby in any Collateral pursuant to the Indenture, the Credit Agreement and each Other First Lien Agreement, the security interest in such Collateral shall be automatically released.

(d) In the case of a Pledgor making a Transfer (as defined in the Indenture) that is permitted by clause (y) of the last paragraph of Article V of the Indenture and not prohibited by the Credit Agreement or any Other First Lien Agreement and such permitted Transfer is to a Restricted Subsidiary (as defined in the Indenture) that is not a Pledgor, the security interest in the Collateral of such Pledgor shall be automatically released.

(e) If any of the Collateral shall become subject to the release provisions set forth in Section 2.05 of the ABL Intercreditor Agreement, Section 2.04 of the First Lien Intercreditor Agreement, Section 9.18 of the Credit Agreement, Section 11.04 of the Indenture or the equivalent provision of each Other First Lien Agreement, such Collateral shall be automatically released from the security interest in such Collateral to the extent provided therein.

(f) There shall be an automatic release of the Lien hereunder on any property and assets of any Pledgor that would constitute ABL Priority Collateral but is at such time not subject to a Lien securing ABL Obligations, other than any assets or property that cease to be subject to a Lien securing ABL Obligations in connection with a release or discharge by or as a result of payment in full and termination of the ABL Obligations; *provided* that, if such property and assets are subsequently subject to a Lien securing ABL Obligations (other than Excluded Assets (as defined in the Indenture)), such property and assets shall subsequently constitute Collateral hereunder.

40



Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

(g) In connection with any termination or release pursuant to this Section 6.15, the Collateral Agent shall execute and deliver to any Pledgor, at such Pledgor's expense, all documents that such Pledgor shall reasonably request to evidence such termination or release (including Uniform Commercial Code termination statements), and will duly assign and transfer to such Pledgor such of the Pledged Collateral that may be in the possession of the Collateral Agent and has not theretofore been sold or otherwise applied or released pursuant to this Agreement; *provided* that the Collateral Agent shall not be required to take any action under this Section 6.15(g) unless such Pledgor shall have delivered to the Collateral Agent, together with such request, which may be incorporated into such request, (i) a reasonably detailed description of the Collateral, which in any event shall be sufficient to effect the appropriate termination or release without affecting any other Collateral, and (ii) a certificate of an Officer of the Issuer certifying that the transaction giving rise to such termination or release is permitted by the Indenture and the Credit Agreement, was consummated in compliance with the Indenture Documents and the Credit Agreement Documents, and is not prohibited under any Other First Lien Agreement. Any execution and delivery of documents pursuant to this Section 6.15 shall be without recourse to or warranty by the Collateral Agent.

For the avoidance of doubt, no Lien on any asset or property of a Pledgor created hereunder to secure the Obligations shall be released hereunder unless the release of such Lien is permitted by and pursuant to this Section 6.15.

SECTION 6.16. *Additional Subsidiary Guarantors.* Upon execution and delivery to the Collateral Agent and any Subsidiary that is required to become a party hereto by Section 5.10 of the Credit Agreement, Section 4.11 of the Indenture and the equivalent provision of any Other First Lien Agreement of an instrument in the form of <u>Exhibit I</u> hereto, such subsidiary shall become a Subsidiary Guarantor and a Pledgor hereunder with the same force and effect as if originally named as a Subsidiary Guarantor and a Pledgor herein. The execution and delivery of any such instrument shall not require the consent of any other party to this Agreement. The rights and obligations of each party to this Agreement shall remain in full force and effect notwithstanding the addition of any new Subsidiary Guarantor to this Agreement.

SECTION 6.17. *ABL Facility.* The Collateral Agent acknowledges and agrees, on behalf of itself and each other Secured Party, that (i) the ABL Facility is secured by liens on the ABL Priority Collateral that are senior in priority to the liens on such ABL Priority Collateral that secures the Obligations as provided in the ABL Intercreditor Agreement and (ii) any provision of this Agreement to the contrary notwithstanding, until the Discharge of ABL Obligations, the Pledgors shall not be required to act or refrain from acting pursuant to this Agreement or with respect to any ABL Priority Collateral in any manner that would result in a default under the terms and provisions of the ABL Facility.

SECTION 6.18. *General Authority of the Collateral Agent.* By acceptance of the benefits of this Agreement and any other applicable Security Documents, each Secured Party (whether or not a signatory hereto) shall be deemed irrevocably (a) to consent to the appointment of the Collateral Agent as its agent

41

hereunder and under such other Security Documents, (b) to confirm that the Collateral Agent shall have the authority to act as the exclusive agent of such Secured Party for the enforcement of any provision of this Agreement and such other Security Documents against any Pledgor, the exercise of remedies hereunder or thereunder and the giving or withholding of any consent or approval hereunder or thereunder relating to any Collateral or any Pledgor's obligations with respect thereto, (c) to agree that it shall not individually take any action to enforce any provisions of this Agreement or any other Security Document against any Pledgor, to exercise any remedy hereunder or thereunder or to give any consents or approvals hereunder or thereunder except as expressly provided in this Agreement, the Intercreditor Agreements or such other Security Document and (d) to agree to be bound by the terms of this Agreement, the Intercreditor Agreements and such other Security Documents.

SECTION 6.19. *Conflicts.* In the event of any conflict between the terms of the First Lien Intercreditor Agreement and the terms of this Agreement or the terms of the ABL Intercreditor Agreement and the terms of this Agreement, except insofar as this Agreement relates to ULC Interests (including, without limitation, Section 2.06), the terms of the First Lien Intercreditor Agreement or the ABL Intercreditor Agreement, as applicable, shall govern.

SECTION 6.20. *Person Serving as Applicable First Lien Agent.* The Applicable First Lien Agent shall have the sole authority hereunder to direct the Collateral Agent's exercise of remedies hereunder. Immediately upon the occurrence of the Discharge of Credit Agreement Obligations, the Applicable Authorized Representative (as defined in, and determined pursuant to the terms of, the First Lien Intercreditor Agreement) shall be deemed the Applicable First Lien Agent for all purposes under this Agreement. The Applicable First Lien Agent immediately prior to the Discharge of Credit Agreement Obligations (the "*Prior First Lien Agent*") shall be deemed to have assigned all of its rights, powers and duties hereunder to such Applicable Authorized Representative (the "*Successor First Lien Agent*") and such Successor First Lien Agent shall be deemed to have accepted, assumed and succeeded to such rights, powers and duties. In addition, effective upon any resignation of the Collateral Agent pursuant to the terms of the First Lien Intercreditor Agreement and the appointment of a new Collateral Agent thereunder, the resigning Collateral Agent (the "*Prior Collateral Agent*" and, together with the Prior First Lien Agent, to the extent applicable, the "*Prior Agent*") shall be deemed to have assigned all of its rights, powers and duties hereunder to such successor Collateral Agent (the "*Successor Collateral Agent*" and, together with the Successor First Lien Agent, to the extent applicable, the "*Successor Agent*") and such Successor Collateral Agent shall be deemed to have accepted, assumed and succeeded to such rights, powers and duties. The Prior Agent shall cooperate with the Pledgors and such Successor Agent to ensure that all actions are taken that are necessary or reasonably requested by such Successor Agent to vest in such Successor Agent the rights granted to the Prior Agent hereunder with respect to the Collateral, including (a) the filing of amended financing statements in the appropriate filing offices, (b) to the extent that the Prior Agent holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the New York UCC or the Uniform Commercial Code of any other applicable jurisdiction) (or any similar concept under foreign law) over Collateral

42

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

pursuant to this Agreement or any other Security Document, the delivery, to such Successor Agent, of the Collateral in its possession or control together with any necessary endorsements to the extent required by this Agreement, and (c) the execution and delivery of any further documents, financing statements or agreements and the taking of all such further action that may be required under any applicable law, or that such Successor Agent may reasonably request, all without recourse to, or representation or warranty by, the Prior Agent, and at the sole cost and expense of the Pledgors.

SECTION 6.21. *Parallel Debt.* Section 8.16 of the Credit Agreement is incorporated herein by reference.

[*Remainder of page intentionally left blank; signature pages follow.*]

43

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the day and year first above written.

**MOMENTIVE PERFORMANCE
MATERIALS HOLDINGS INC.**

By: _____    /s/ William H. Carter

Name:    William H. Carter
Title:    Executive Vice President and Chief
Financial Officer

**MOMENTIVE PERFORMANCE
MATERIALS INC.**

By: _____    /s/ William H. Carter

Name:    William H. Carter
Title:    Executive Vice President and Chief
Financial Officer

[Signature Page to Collateral Agreement (Cash Flow & First Lien Notes)]

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

[3.2.3.2] [04.24.13 2nd A_And_R Collateral Agreement.pdf] [Page 48 of 62]

**MOMENTIVE PERFORMANCE MATERIALS
USA INC.**

By: _____ /s/ George F. Knight
    Name:                     George F. Knight
    Title:     Senior Vice President and Treasurer

**MOMENTIVE PERFORMANCE MATERIALS
WORLDWIDE INC.**

By: _____ /s/ George F. Knight
    Name:                     George F. Knight
    Title:     Senior Vice President, Chief Financial
                               Officer and Treasurer

**MOMENTIVE PERFORMANCE MATERIALS
QUARTZ, INC.**

By: _____ /s/ George F. Knight
    Name:                     George F. Knight
    Title:     Senior Vice President and Treasurer

**MPM SILICONES, LLC**

By:           Momentive Performance Materials USA Inc.,
                          its sole member

    By: _____ /s/ George F. Knight
        Name:                George F. Knight
        Title:   Senior Vice President and Treasurer

**MOMENTIVE PERFORMANCE MATERIALS
SOUTH AMERICA INC.**

By: _____ /s/ George F. Knight
    Name:                     George F. Knight
    Title:     Senior Vice President and Treasurer

**MOMENTIVE PERFORMANCE MATERIALS
CHINA SPV INC.**

By: _____ /s/ George F. Knight
    Name:                     George F. Knight
    Title:     Senior Vice President, Chief Financial
                          Officer and Treasurer

[Signature Page to Collateral Agreement (Cash Flow & First Lien Notes)]

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

**JUNIPER BOND HOLDINGS I LLC**

By:        Momentive Performance Materials Inc.,
                its sole member

By:    _____    /s/ William H. Carter
        Name:        William H. Carter
        Title:        Executive Vice President and Chief
                        Financial Officer

**JUNIPER BOND HOLDINGS II LLC**

By:        Momentive Performance Materials Inc.,
                its sole member

By:    _____    /s/ William H. Carter
        Name:        William H. Carter
        Title:        Executive Vice President and Chief
                        Financial Officer

**JUNIPER BOND HOLDINGS III LLC**

By:        Momentive Performance Materials Inc.,
                its sole member

By:    _____    /s/ William H. Carter
        Name:        William H. Carter
        Title:        Executive Vice President and Chief
                        Financial Officer

**JUNIPER BOND HOLDINGS IV LLC**

By:        Momentive Performance Materials Inc.,
                its sole member

By:    _____    /s/ William H. Carter
        Name:        William H. Carter
        Title:        Executive Vice President and Chief
                        Financial Officer

[Signature Page to Collateral Agreement (Cash Flow & First Lien Notes)]

**JPMORGAN CHASE BANK, N.A.,**
as Collateral Agent

By: _____    /s/ Peter S. Predun

Name:    Peter S. Predun
Title:    Executive Director

[Signature Page to Collateral Agreement (Cash Flow & First Lien Notes)]

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013   |   Powered by Intelligize

[3.2.3.2] [04.24.13 2nd A_And_R Collateral Agreement.pdf] [Page 51 of 62]

Exhibit I to the
Second Amended and Restated Collateral Agreement

SUPPLEMENT NO. [•], dated as of [•], 20[•][•] (this "*Supplement*"), to the Second Amended and Restated Collateral Agreement, dated as of April 24, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "*Collateral Agreement*"), among MOMENTIVE PERFORMANCE MATERIALS HOLDINGS INC., a Delaware corporation ("*Holdings*"), MOMENTIVE PERFORMANCE MATERIALS INC., a Delaware corporation (the "*Issuer*"), each Subsidiary of the Issuer from time to time party thereto and JPMORGAN CHASE BANK, N.A. ("*JPMorgan*"), as collateral agent (in such capacity, together with its successors and assigns in such capacity, the "*Collateral Agent*") for the Secured Parties (as defined therein).

A. Reference is made to (i) the Second Amended and Restated Credit Agreement, dated as of April 24, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), among Holdings, the Issuer, Momentive Performance Materials USA Inc., a Delaware corporation, as U.S. Borrower (as defined therein), Momentive Performance Materials GmbH, a company organized under the laws of Germany, as German Borrower (as defined therein), Momentive Performance Materials Nova Scotia ULC, an unlimited company incorporated under the laws of the Province of Nova Scotia (Canada), as Canadian Borrower (as defined therein), the lenders from time to time party thereto, JPMorgan, as administrative agent for such lenders and as collateral agent, and the other parties named therein, and (ii) the Indenture, dated as of October 25, 2012 (as supplemented by the Supplemental Indenture, dated as of November 16, 2012, and as further amended, restated, supplemented or otherwise modified from time to time, the "*Indenture*"), among the Issuer, certain Subsidiaries of the Issuer party thereto and The Bank of New York Mellon Trust Company, N.A., as trustee.

B. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement or the Collateral Agreement, as applicable.

C. The Pledgors have entered into the Collateral Agreement pursuant to the requirements set forth in the Credit Agreement and the Indenture. Section 6.16 of the Collateral Agreement provides that additional Subsidiaries of the Issuer may become Pledgors under the Collateral Agreement by execution and delivery of an instrument in the form of this Supplement. The undersigned Subsidiary (the "*New Subsidiary*") is executing this Supplement in accordance with the requirements of the Credit Agreement, the Indenture and any Other First Lien Agreement to become a Pledgor under the Collateral Agreement.

1

Accordingly, the Collateral Agent and the New Subsidiary agree as follows:

SECTION 1. In accordance with Section 6.16 of the Collateral Agreement, the New Subsidiary by its signature below becomes a Pledgor under the Collateral Agreement with the same force and effect as if originally named therein as a Pledgor, and the New Subsidiary hereby (a) agrees to all the terms and provisions of the Collateral Agreement applicable to it as a Pledgor thereunder and (b) represents and warrants that the representations and warranties made by it as a Pledgor thereunder are true and correct in all material respects on and as of the date hereof. In furtherance of the foregoing, the New Subsidiary, as security for the payment and performance in full of the Obligations (as defined in the Collateral Agreement), does hereby create and grant to the Collateral Agent and its successors and assigns, for the ratable benefit of the Secured Parties and their successors and assigns, a security interest in and Lien on all of the New Subsidiary's right, title and interest in and to the Collateral (as defined in the Collateral Agreement) of the New Subsidiary. Each reference to a "Pledgor" in the Collateral Agreement shall be deemed to include the New Subsidiary. The Collateral Agreement is hereby incorporated herein by reference.

SECTION 2. The New Subsidiary represents and warrants to the Collateral Agent and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) implied covenants of good faith and fair dealing.

SECTION 3. This Supplement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Supplement shall become effective when the Collateral Agent shall have received counterparts of this Supplement that, when taken together, bear the signatures of each of the New Subsidiary and the Collateral Agent. Delivery of an executed signature page to this Supplement by facsimile or other electronic transmission shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 4. The New Subsidiary hereby represents and warrants that (a) subject to the exclusions set forth in Sections 2.01(a) and (b) of the Collateral Agreement, Schedule I attached hereto correctly sets forth, as of the date hereof, (i) the percentage of the issued and outstanding units of each class of the Equity Interests of the issuer thereof represented by the Pledged Stock now owned by the New Subsidiary and (ii) all debt securities and promissory notes or instruments evidencing Indebtedness now owned by the New Subsidiary, in each case under this clause (ii) pledged under the Collateral Agreement and in an aggregate principal amount in excess of $5.0 million; (b) set forth in Schedule II attached hereto is a true and correct schedule of any and all material Intellectual Property now owned by the New Subsidiary; and (c) set forth under its signature hereto is the true and correct legal name of the New Subsidiary, its jurisdiction of organization and the location of its chief executive office.

2

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

SECTION 5. Except as expressly supplemented hereby, the Collateral Agreement shall remain in full force and effect.

**SECTION 6. THIS SUPPLEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS SUPPLEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.**

SECTION 7. In the event any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and in the Collateral Agreement shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 8. All communications and notices hereunder shall (except as otherwise expressly permitted by the Collateral Agreement) be in writing and given as provided in Section 6.01 of the Collateral Agreement.

SECTION 9. The New Subsidiary agrees to reimburse the Collateral Agent for its reasonable out-of-pocket expenses in connection with this Supplement, including the reasonable documented fees, disbursements and other charges of counsel for the Collateral Agent.

[*Remainder of page intentionally left blank; signature pages follow.*]

3

**IN WITNESS WHEREOF**, the New Subsidiary and the Collateral Agent have duly executed this Supplement to the Second Amended and Restated Collateral Agreement as of the day and year first above written.

**[NAME OF NEW SUBSIDIARY]**

By: _____

Name:
Title

Legal name: _____
Jurisdiction of organization: _____
Location of chief executive office: _____

[Signature Page to Supplement to Second Amended and Restated Collateral Agreement]

**JPMORGAN CHASE BANK, N.A.,**
as Collateral Agent

By: _____

Name:
Title

[Signature Page to Supplement to Second Amended and Restated Collateral Agreement]

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

Schedule I
to Supplement No. _ to the
Second Amended and Restated Collateral Agreement

**PLEDGED STOCK; PLEDGED DEBT SECURITIES**

*Pledged Stock*

| Number of Issuer Certificate | Registered Owner | Number and Class of Equity Interest | Percentage of Equity Interests |
| --- | --- | --- | --- |

*Pledged Debt Securities*

| Securities | Issuer | Lender | Initial Principal Amount |
| --- | --- | --- | --- |

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

[3.2.3.2] [04.24.13 2nd A_And_R Collateral Agreement.pdf] [Page 57 of 62]

Schedule II
to Supplement No. _ to the
Second Amended and Restated Collateral Agreement

**INTELLECTUAL PROPERTY**

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

**Exhibit II to the**
**Second Amended and Restated Collateral Agreement**

**[FORM OF]**

**ADDITIONAL SECURED PARTY CONSENT**

[Name of Authorized Representative]
[Address of Authorized Representative]

[Date]

JPMORGAN CHASE BANK, N.A.
500 Stanton Christiana Rd, 3/Ops2
Newark, DE 19713
Attention: Evan Zacharias

      The undersigned is the Authorized Representative for persons wishing to become Secured Parties (the "***New Secured Parties***") under the Second Amended and Restated Collateral Agreement, dated as of April 24, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "***Collateral Agreement***"), among MOMENTIVE PERFORMANCE MATERIALS HOLDINGS INC., a Delaware corporation ("***Holdings***"), MOMENTIVE PERFORMANCE MATERIALS INC., a Delaware corporation (the "***Issuer***"), each Subsidiary of the Issuer from time to time party thereto and JPMORGAN CHASE BANK, N.A., as collateral agent (in such capacity, together with its successors and assigns in such capacity, the "***Collateral Agent***"). Capitalized terms in this Additional Secured Party Consent but not otherwise defined herein have the meanings set forth in the Collateral Agreement.

      In consideration of the foregoing, the undersigned hereby:

      (i) represents that it has been duly authorized by the New Secured Parties to become a party to the Collateral Agreement on behalf of the New Secured Parties under that [describe applicable Other First Lien Agreement] (the "***New Agreement***" and the obligations under the New Agreement, the "***New Secured Obligations***") and to act as the Authorized Representative for the New Secured Parties;

      (ii) appoints and authorizes the Collateral Agent to take such action as agent on its behalf and on behalf of all other Secured Parties and to exercise such powers under the Collateral Agreement as are delegated to the Collateral Agent by the terms thereof, together with all such powers as are reasonably incidental thereto; and

      (iii) accepts and acknowledges the terms of the Collateral Agreement applicable to it and the New Secured Parties and agrees to serve as Authorized Representative for the New Secured Parties with respect to the New Secured Obligations and agrees on its own behalf and on behalf of the New Secured Parties to be bound by the terms of the Collateral Agreement applicable to holders of Other First Lien Obligations,

1

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

with all the rights and obligations of a Secured Party thereunder and bound by all the provisions thereof as fully as if it had been a Secured Party on the effective date of the Collateral Agreement.

The Collateral Agent, by acknowledging and agreeing to this Additional Secured Party Consent, accepts the appointment set forth in clause (ii) above.

The name and address of the Authorized Representative for purposes of Section 6.01 of the Collateral Agreement are as follows:

**[Insert name and address of Authorized Representative.]**

THIS ADDITIONAL SECURED PARTY CONSENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

[*Remainder of page intentionally left blank; signature pages follow.*]

2

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013  |  Powered by Intelligize

**IN WITNESS WHEREOF**, the undersigned has caused this Additional Secured Party Consent to be duly executed by its authorized officer as of the ‗ day of ‗ 20‗.

**[NAME OF AUTHORIZED REPRESENTATIVE]**

By:_____

Name:

Title:

[Signature Page to Additional Secured Party Consent]

Acknowledged and Agreed:

**JPMORGAN CHASE BANK, N.A.,**
as Collateral Agent

By: _____
    Name:
    Title:

**MOMENTIVE PERFORMANCE MATERIALS INC.,**
as Issuer

By: _____
    Name:
    Title:

[Signature Page to Additional Secured Party Consent]

Source: Momentive Performance Materials Inc., EX-4.2, 4/30/2013   |   Powered by Intelligize