UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

In re                                          :          Chapter 11
                                               :
MPM Silicones, LLC, <u>et al.</u>,[1]          :          Case No. 14-22503 (RDD)
                                               :
                    Debtors.                   :          (Joint Administration Pending)

------------------------------------------------------x

### DECLARATION OF WILLIAM H. CARTER, CHIEF FINANCIAL OFFICER OF MOMENTIVE PERFORMANCE MATERIALS INC., IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, William H. Carter, declare, pursuant to 28 U.S.C. § 1746, under penalty of

perjury that:

1.    I am the Chief Financial Officer, Executive Vice President and a Director

of both Momentive Performance Materials Holdings Inc. ("**MPM Holdings**") and Momentive

Performance Materials Inc. ("**MPM**"), each corporations incorporated under the laws of

Delaware, and the ultimate parents of the other debtors and debtors in possession in the above-

captioned cases (collectively, with MPM Holdings and MPM, the "**Debtors**").  I have served as

an officer and director of MPM Holdings and MPM since October 1, 2010.  In such capacities, I

am familiar with the day-to-day operations, business and financial affairs of the Debtors.

2.    On the date hereof (the "**Petition Date**"), the Debtors each filed a

voluntary petition for relief under chapter 11 of title 11 of the United States Code (the

---

[1]    The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) Juniper Bond Holdings I LLC (9631); (ii) Juniper Bond Holdings II LLC (9692); (iii) Juniper Bond Holdings III LLC (9765); (iv) Juniper Bond Holdings IV LLC (9836); (v) Momentive Performance Materials China SPV Inc. (8469); (vi) Momentive Performance Materials Holdings Inc. (8246); (vii) Momentive Performance Materials Inc. (8297); (viii) Momentive Performance Materials Quartz, Inc. (9929); (ix) Momentive Performance Materials South America Inc. (4895); (x) Momentive Performance Materials USA Inc. (8388); (xi) Momentive Performance Materials Worldwide Inc. (8357); and (xii) MPM Silicones, LLC (5481).  The Debtors' executive headquarters are located at 260 Hudson River Road, Waterford, NY 12188.

"**Bankruptcy Code**").  The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession.

3.      Concurrently herewith, the Debtors have filed a Restructuring Support Agreement (the "**Restructuring Support Agreement**"), by and among the Debtors and certain noteholders who hold approximately 85% of the outstanding Second Lien Notes.  The Restructuring Support Agreement, attached hereto as <u>Appendix I</u>,  provides for a consensual balance-sheet restructuring of the Debtors, as discussed below.  The Debtors have also secured a commitment for postpetition debtor-in-possession credit facilities totaling $570 million that, if approved by the Court, will fund the Debtors' operations during these chapter 11 cases.  The same lenders have also committed, subject to certain conditions, to provide exit financing to the Debtors in connection with the consummation of a chapter 11 plan, consisting of a $270 million exit asset-based revolving credit facility and a $1 billion exit term loan.

4.      In order to enable the Debtors to operate effectively postpetition and to avoid adverse effects with respect to these chapter 11 cases, the Debtors have requested various types of relief in "first day" applications and motions (the "**First Day Motions**") filed with the Court, including a motion seeking to have the Debtors' chapter 11 cases consolidated for procedural purposes and jointly administered.

5.      I submit this declaration pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure and Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"):  (a) in support of the relief requested in the First Day Motions; (b) to explain to the Court and other interested parties the circumstances that compelled the Debtors to seek relief under the Bankruptcy Code; and (c) to provide certain information that I understand is required by Local Rule 1007-2.  Except as otherwise indicated, all facts set forth

in this declaration are based upon my personal knowledge and the knowledge I have acquired from those who report to me, consultation with other officers of the Debtors, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth herein.  I am duly authorized to submit this declaration.

6.     Venue of these cases is proper in this jurisdiction.  Lead Debtor, MPM Silicones, LLC, is a New York corporation which was initially incorporated in November 2000, and which owns and operates the Debtors' headquarters and a manufacturing facility in New York state.  In addition, MPM operates a more than 68,000 square foot research and development facility and warehouse pursuant to a long-term lease in Westchester County, New York located in Tarrytown, New York.

7.     Part I of this declaration provides background with respect to the Debtors' business, capital structure and reorganization efforts.  Part II sets forth the relevant facts in support of the Debtors' First Day Motions.  Part III provides the information that I understand is required by Local Rule 1007-2.

# I     BACKGROUND

## A.     General.

8.     MPM, together with its Debtor and non-debtor subsidiaries (collectively, the "**Company**"), is one of the world's largest producers of silicones and silicone derivatives, and is a global leader in the development and manufacture of products derived from quartz and specialty ceramics.

9.     The Company manufactures products which are used in thousands of applications and are sold into diverse markets, such as industrial, building and construction,

transportation, agriculture, electronics, healthcare and personal care, as well as higher growth markets, such as semiconductor and fiber optics.  Silicone products are generally used as additives in a wide variety of end products, in order to provide or enhance certain attributes of such products, such as resistance to heat, ultraviolet light or chemicals, or to add or enhance lubrication, adhesion or viscosity.  The Company's silicone products are used in applications as varied as the production of tires, hair care products, foam mattresses and adhesive labels, to name a few.  The Company's quartz and specialty ceramics products are used in high-technology industries such as semiconductor manufacturing and in lamp lenses for video projectors.  The Company currently maintains 22 production sites located around the world, which allows the Company to produce key products in the Americas, Europe and Asia, and efficiently deliver products to more than 4,500 customers in over 100 countries.  In 2013, approximately 68% of the Company's net sales originated outside the United States.

10.     The Company has a 70-year history, with its origins as the Advanced Materials business of General Electric Company ("**GE**").  In 2006, investment funds affiliated with Apollo Global Management, LLC (collectively "**Apollo**") acquired the Company from GE.  As discussed in further detail below, in 2010, Momentive Specialty Chemicals Holdings LLC (formerly known as Hexion Specialty Chemicals, Inc.) ("**MSC**"), which is not a debtor in these cases, was acquired by the same ultimate holding company as the Company.  MSC and the Company maintain separate capital structures; however, MSC is a party to a shared services agreement with the Company, whereby the Company and MSC provide to each other certain executive and senior management, administrative support, human resources, information technology support, accounting, finance, technology development, legal and procurement

services.  Pursuant to such agreement, I also act as a director, executive vice president and the chief financial officer of MSC.

11.     Since 2011, the Company has experienced significant deterioration in its financial performance, primarily attributable to a fundamental shift in industry dynamics, including industry-wide overcapacity, causing severe price pressure for the Company's basic products, and the commoditization of lower-end specialty products, which have collectively given rise to decreased profit margins industry-wide.  While the Company's competitors have also been affected by the changing industry, the Company's high net leverage has led to increasingly diminished liquidity for the Company, and the inability to properly fund operations. Since 2011, the Company has cumulatively paid $739 million in cash interest payments on its funded indebtedness, which gave rise to $437 million in negative free cash flow over such time period.  As discussed in more detail below, the Company's lack of liquidity and unsustainable capital structure ultimately gave rise to the Debtors' decision to commence these chapter 11 cases.

**B.      Key Product Lines and Applications.**

**i.      Silicones.**

12.     The Company had approximately $2,197 million in 2013 worldwide net silicone sales.  Product families within the Company's silicones business include fluids (used in applications relating to textiles, personal care, home care, agriculture and oil and gas), silanes and resins (used in tires, additives for coatings, masonry water repellents and protective coatings for plastics and rubber), elastomers (used in healthcare and automotive applications), intermediates, specialty coatings, room temperature vulcanizers, urethane additives (polyurethane foam additives) and consumer and construction sealants.

13.    Silicones are used in product formulations primarily due to two distinguishing factors: (i) their high degree of inertness (i.e., resistance to heat, electricity and chemical reactions); and (ii) their ability during manufacturing to greatly modify their viscosity, enabling production of end-products with a significant variation in levels of lubricity or adhesion.  The Company's various silicones products are developed using separate finishing processes to generate a wide variety of different performance characteristics and are typically used in applications where traditional materials cannot perform under required conditions. Entirely new applications for silicones continue to emerge as a result of their versatility and broad range of properties.

14.    The primary raw materials used in the production of silicones include silicon metal, siloxane and methanol.  Silicon metal is an inorganic material that is not derived from petrochemicals.  The Company purchases silicon metal from suppliers around the world under multi-year, one-year or short-term contracts and in the spot market.  Siloxane is a key intermediate product which is required to produce the silicones polymer used in the Company's products.  The Company meets the substantial majority of its siloxane requirements through the production of siloxane for its internal use in the Company's production plants located in Waterford, New York; Leverkusen, Germany and Ohta, Japan and from a joint venture in Jiande, China.  The Company also sources a portion of its siloxane needs from third parties.  Methanol, a key raw material needed for the production of chlorosilanes, is purchased by the Company from methanol suppliers pursuant to annual or quarterly contracts.

15.    The Company's silicones product portfolio primarily consists of (i) fluids, (ii) silanes and resins, (iii) intermediates, (iv) silicone elastomers, (v) specialty coatings,

(vi) room temperature vulcanizers, (vii) urethrane additives, and (viii) consumer and construction sealants.

*(a)     Silicone Fluids*

16.     The Company's silicone fluids products are used primarily in the personal care, home care, auto care, textiles, oil and gas, agriculture and industrial end-markets and are sold under the MPM-owned Magnasoft, Sagtex, Formasil, Silwet, Silsoft, Silshine, Tospearl and Velvesil brands.  The addition of the Company's silicone fluids to end use products, such as shower and bath products, provides benefits such as increasing the richness and creaminess of the lather in shower gels and soaps or enhancing the longevity of fragrances on the skin.  Certain of the Company's silicone fluid can be used as textile enhancers, providing protective coatings to textile and leather.  Certain other products may be added to laundry detergents and kitchen and bath cleaners, as well as polishes, waxes and automotive cleaning products in order to enhance properties such as fabric softening, shine and gloss enhancements and improved anti-soil properties.  Still others are used as additives for agrochemicals to improve spreading and lower surface tension of spray solutions.  Certain other silicone fluids may be added to products such as shampoos, conditioners, antiperspirants, sunscreens, skin lotions, lipsticks and other cosmetics to enhance shine, softening and conditioning, consistent spreading, and silkiness.

*(b)     Silane and Resin*

17.     Silane and resin products are used as components in a variety of specialty applications.  Resins are used as binders in the production of formulated products such as adhesives, laminates, paints and coatings, and sealants and caulks.  They are often used when characteristics such as paintability, high- temperature or harsh environmental resistance are beyond the scope of traditional materials.  The Company's Tospearl resins are also used as light diffusion aids in LCD/LED screens, and as slip agents in plastic packaging materials and paints

and coatings.  Silanes are used as high-performance coupling agents, adhesion promoters or as reactive intermediates.  Silane and resin products are sold into a diverse range of end-markets, including aerospace, construction, coatings and inks, paint, adhesives, electronics, motor vehicles, sealants, rubber and plastics.  The Company sells silane and specialty resins under MPM-owned brands including: Silblock, A-Link, Wetlink, Silquest, NXT, Pearlene, SPUR, Tospearl and CoatOSil.

(c)     *Intermediates*

18.     Intermediate products are a broad set of by-product materials produced in chemical operation, which are primarily used as inputs for other product portfolios.

(d)     *Silicone Elastomers*

19.     Silicone elastomers are blends of silicone polymers and various fillers. Characteristics of silicone elastomers include a broad temperature range, excellent resistance to weathering, low toxicity, good electrical insulation properties and acoustical damping qualities. Silicone elastomers are used in the production of a variety of goods, including gaskets, seals, hoses and tubing, as well as numerous consumer items.  Elastomers products are used primarily in the healthcare, consumer products, energy and automotive end-markets and are sold under the MPM-owned brand names Tufel, Ultra Tufel, Silplus, LSR / LIM, Silopren, and Addisil.

(e)     *Specialty Coatings*

20.     Attributes of Specialty Coatings products include high-temperature resistance, abrasion resistance, pressure sensitive adhesion or release and weatherability.  End-markets for Specialty Coatings products include the construction, tape and label, adhesives, electronics and automotive markets.  Specialty Coatings products are sold under the MPM-owned brands SilForce, Silgrip, Silblock, and Anchorsil, as well as the Baysilone brand that the Company uses under license from BayerAG.

*(f)      Room Temperature Vulcanizers*

21.     Room Temperature Vulcanization ("**<u>RTV</u>**") products include highly engineered gels, greases, adhesives, encapsulants and sealants.  RTV products are used primarily in micro- and macro-electronics assembly, consumer electronics, automotive, aerospace, consumer goods and industrial sealing applications.  The Company's RTV products are sold under the MPM-owned brand names TSE, SilCool, InvisiSil and SnapSil.  Certain of these products are used, for instance in various components of LED lights, including in the fabrication of optical lenses, as LED encapsulants, and as LED die attach, which offer high heat and UV resistant properties.

*(g)      Urethane Additives*

22.     Urethane Additive products are used essentially for stabilizing polyurethane foam.  Polyurethane applications include furniture, bedding, auto interior, appliances, construction, carpet backing, footwear and synthetic leather.  Urethane additive products are sold under the MPM-owned Niax and Geolite brands.  For example, Niax additives are used in the production of polyurethane foam in a variety of products, including the slab foam in furniture and bedding, rigid foam used in appliances, and molded foam for automotive interior uses, among others.  Application of the Company's products by foam manufacturers can enhance products by, for example, increasing softness or improving dimensional stability.

*(h)      Consumer and Construction Sealants*

23.     Consumer sealants are used by homeowners, builders and contractors for a variety of projects throughout the home including increasing energy efficiency, reducing damaging effects of moisture and protecting the home from pollen, pollution and pests.  Construction sealants are used in structural glazing, weather-sealing, and insulated glass applications in new and remedial large-scale commercial building projects.  The Company has an

exclusive right to use the GE brand for these products pursuant to a licensing arrangement with GE. The Company's consumer and construction sealant products are also sold under various private labels for a number of hardware and paint retailers.

### ii.     Quartz and Specialty Ceramics.

24.     With 2013 worldwide net sales of $201 million, the Company's Quartz and Specialty Ceramics business is a global leader in the development and manufacturing of fused quartz and ceramic materials. Fused quartz, a man-made glass manufactured principally from quartz sand, is used in processes requiring extreme temperature, high purity and other specific characteristics. Fused quartz and ceramic materials are used in a wide range of industries, including semiconductor, lamp tubing, manufacturing, packaging, cosmetics and fiber optics. The Company is a leading global producer of quartz tubing, ingots and crucibles and high-performance, non-oxide ceramic powders, coatings and solids.

25.     The Company's Quartz products are used as a superior substitute for glass. On a microscopic level, normal glass is filled with impurities, bubbles and other flaws. For this reason, applications that require transparency and a high level of purity or stress-resistance (such as process equipment for semiconductor manufacturing or lamp lenses for video projectors) require the use of quartz. A significant driver of the Company's Quartz volumes derives from microchip makers adding to or adjusting their manufacturing lines for newly developed products. The manufacture of quartz products for use in the production of semiconductors generated approximately 45% of the Company's Quartz business' revenue for the fiscal year ended December 31, 2013 compared to 41% in 2012 and 48% in 2011.

26.     Naturally occurring quartz sand is the key raw material for many of the products manufactured by the Quartz business, which is currently available from a limited number of suppliers. A single major producer of natural quartz sand controls a significant

portion of the market for this key raw material.  As a result, such producer exercises significant control over quartz sand prices, which have been steadily increasing.  In recent years, these increases have averaged approximately 3-5% per year.  The Company is currently negotiating the terms of a new long term supply agreement with such supplier, which the Company expects to enter into in 2014.  Other than Quartz sand, the majority of raw materials used to manufacture Quartz products are readily available in the open market.

### iii.    Customers.

27.    Through the Company's worldwide network of production facilities, it serves more than 4,500 customers in over 100 countries.  The Company markets an extensive product line to meet a wide variety of customer needs.  The Company focuses on customers who are, or have the potential to be, leaders in their industries and have growth objectives that support the Company's own growth objectives.  Many of the Company's customers are expanding internationally to serve developing areas in Asia, Eastern Europe, Latin America, India and Russia.  Maintaining close proximity to international customers allows the Company to serve them more quickly and efficiently and thus build strong relationships.  The Company's customers include leading companies in their respective industries, such as Procter & Gamble, Avery, Continental Tire, Saint Gobain, Unilever, BASF, The Home Depot and Lowe's.

28.    The Company takes a service-oriented approach to its customers, providing high-quality, reliable products backed by local sales support and technical expertise. An important component of the Company's strategy is to utilize its broad product capabilities to win high-end specialty business from customers, allowing the Company to become a supplier of choice, utilizing its ability to develop solutions to meet its customers precise needs.  In 2013, the Company's largest customer accounted for less than 3% of its net sales, and the Company's top twenty customers accounted for approximately 22% of net sales.

29.     As part of agreements with certain customers of the Debtors, and as a benefit to and at the request of such customers, the Debtors from time to time enter into accounts receivable sales whereby the Debtors sell the receivables relating to such customers to certain third-party financial institutions which provide extended payment terms to the Debtors' customers.  These transactions are beneficial both to the Debtors — because they receive payment on receivables sooner than they otherwise would — and the Debtors' customers, who receive extended payment terms from the financial institutions.  The Debtors expect to continue such transactions in the ordinary course pursuant to the relevant underlying documentation following the Petition Date.

### iv.     Research and Development.

30.     A key aspect of the Company's success relies on the continued development of new applications for its existing products and additional technologic advances leading to new products, allowing the Company to provide cutting-edge technology to their customers.  The Company maintains its own research and development facilities, and employs engineers and chemists to develop the Company's products in in-house laboratories.  For the year ended December 31, 2013, the Company spent $70 million on research and development, equaling approximately 3% of revenues.

### v.     Intellectual Property.

31.     The Company owns, licenses or has rights to over 3,600 patents, approximately 100 trademarks and various patent and trademark applications and technology licenses around the world.  The Company's current patents will expire between 2014 and 2031.  The Company's rights under such patents and licenses, particularly those relating to the MPM-owned Velvesil, Silwet, Silsoft, SPUR+, and NXT brands, technologies and products, are material assets of the Company.  The Company also relies on unpatented proprietary

manufacturing expertise, continuing technological innovation and other trade secrets to develop and maintain its competitive position.

## C.    Industry Regulatory Matters.

32.    Domestic and international laws regulate the production and marketing of chemical substances. Although almost every country has its own legal procedure for registration and import, laws and regulations in the European Union, the United States, and China are the most significant to the Company's business. These laws typically prohibit the import or manufacture of chemical substances unless the substances are registered or are on the country's chemical inventory list, such as the European inventory of existing commercial chemical substances and the U.S. Toxic Substances Control Act inventory. Chemicals that are on one or more of these lists can usually be registered and imported without requiring additional testing in countries that do not have such lists, although additional administrative hurdles may exist. Under such laws, countries may also require toxicity testing to be conducted on chemicals in order to register them or may place restrictions on the import, manufacture and/or use of a chemical.

## D.    Environmental Regulations.

33.    The Company's operations involve the use, handling, processing, storage, transportation and disposal of hazardous materials, and are therefore subject to extensive environmental regulation at the federal, state and international level. In 2013, the Company incurred capital expenditures of $18 million on an aggregate basis to comply with environmental laws and regulations and to make other environmental improvements. The Company estimates that its capital expenditures in 2014 for environmental controls at its facilities will be approximately $31 million.

E.      **Facilities.**

34.     The Company maintains twenty-two (22) production facilities and five (5) research and development facilities in the Americas, Europe and Asia, including production facilities in Waterford, New York; Sistersville, West Virginia; Leverkusen, Germany; Ohta, Japan; Termoli, Italy; and Nantong. China.  The Company's research and development facilities are located in Tarrytown, New York; Bangalore, India; Shanghai, China; Kobe, Japan; and Seoul, South Korea.

F.      **Employees.**

35.     As of December 31, 2013, the Company had approximately 4,500 employees worldwide, including employees of the Debtors' foreign non-debtor subsidiaries. Approximately 46% of the Company's employees are members of a labor union or are represented by workers' councils that have collective bargaining agreements.  In July 2013, the labor union representing the Willoughby, Ohio, and Waterford, New York facilities ratified a new three-year collective bargaining agreement.  In April 2013, the labor union representing the Sistersville, West Virginia facility ratified a one-year extension of the existing collective bargaining agreement, extending the agreement until July 2014.  The Company's success depends in large part on the managerial, scientific and technical qualified personnel, particularly research scientists, technical sales professionals and engineers who have specialized skills required by the Company's business.

36.     Further, the Company sponsors various pension and similar benefit plans worldwide for its employees.  The Debtors' U.S. defined benefit pension plans were underfunded in the aggregate by $59 million as of December 31, 2013, and certain pension plans sponsored by the Debtors' foreign non-debtor affiliates are also underfunded.  Annually, the Debtors make certain required contributions on a quarterly basis to their U.S. defined benefit pension plans.

The Debtors are required to make contributions of $18.3 million in 2014, with the next scheduled payment of approximately $2.5 million due on April 15, 2014. In addition to the Debtors' quarterly contributions to the Pension Plans, the Debtors make, on an annual basis, a "true-up" payment relating to the previous fiscal year. For fiscal year 2013, the Debtors are required to make a "true-up" payment in the amount of approximately $8 million by September 2014.

37. On March 31, 2014, Jack Boss was hired by Momentive Performance Materials Holdings LLC ("**Holdings LLC**") to serve as the new Division President of the Company's Silicones and Quartz Divisions, filling a vacancy that was open since August 2013. In connection with Mr. Boss's employment, the Company entered into an Employee Services Agreement with Holdings LLC and a subsidiary of Holdings LLC whereby, among other things, Holdings LLC has agreed to make payments to Mr. Boss to the extent MPM fails to pay such amounts. As allowed by such agreement, prior to the Petition Date, MPM funded the anticipated costs in connection with the initial seven months of Mr. Boss's employment to a non-Debtor subsidiary of Holdings LLC which is party to such agreement.

**G.    History of Company and Relationship with Momentive Specialty Chemicals Inc.**

38. MPM was incorporated in 2006, as a wholly owned subsidiary of MPM Holdings, for the purpose of acquiring the assets and stock of certain subsidiaries of GE that comprised GE's Advanced Materials business. The acquisition was completed in December 2006, which led to the majority of the Company's equity being ultimately held by affiliates of Apollo. On October 1, 2010, MPM Holdings became a subsidiary of Holdings LLC, a newly formed holding company. Contemporaneously therewith, Holdings LLC also acquired MSC. Apollo is the majority shareholder of Holdings LLC. In addition, representatives of Apollo comprise a majority of the directors of MPM and MPM Holdings. MPM also has two independent directors who have been kept apprised of, and have been involved in decisions

relating to, the Company's restructuring.  Neither Holdings LLC nor MSC or any subsidiaries of

MSC, are debtors in these cases.

**H.      Related Party Transactions.**

      **i.      Shared Services Agreement.**

      39.      In an effort to minimize costs and take advantage of synergies, the

Company entered into a Shared Services Agreement with MSC, as amended on March 17, 2011,

pursuant to which the Company provides to MSC and MSC provides to the Company, certain

services, including, but not limited to, executive and senior management, administrative support,

human resources, information technology support, accounting, finance, technology development,

legal and procurement services.  The Company has achieved significant cost savings under the

Shared Services Agreement with MSC, including savings related to shared services and logistics

optimization, best-of-source contractual terms, procurement savings, regional site rationalization,

administrative and overhead savings.  The Shared Services Agreement establishes certain criteria

upon which the costs of such services are allocated between the Company and MSC and requires

that a steering committee formed under the Shared Services Agreement meet no less than

annually to evaluate and determine an equitable allocation percentage of costs among the

Company and MSC.  The allocation percentage for 2013 was established as 43% for the

Company and 57% for MSC.  Pursuant to the terms of the Shared Services Agreement, MPM

pays to MSC, on a monthly basis, estimated invoices for MPM's portion of amounts expected to

be incurred by MSC on MPM's behalf.  On a quarterly basis, MPM pays to MSC a "true-up"

payment, reconciling the amounts paid under the Shared Services Agreement for such quarter

with the allocation percentages agreed under the Shared Services Agreement.  As of the Petition

Date, MPM estimates that it owes MSC approximately $10.5 million for prepetition amounts due

under the Shared Services Agreement.  As of December 31, 2013, the Company's total realized savings under the Shared Services Agreement was $64 million.

40.     Certain members of the Company's senior management team, including myself, Craig Morrison, the Company's Chief Executive Officer and President, and other individuals who provide substantial services to the Company, act in the same or similar capacities for MSC, and were historically employed by MSC prior to its acquisition by Holdings LLC.  Costs related to employees who provide substantial services to both MPM and MSC are allocated among MPM and MSC in accordance with the allocation mechanic described above. The Shared Services Agreement is subject to termination by either company, without cause, on not less than thirty days prior written notice subject to a one year transition assistance period, and expires in October 2015 (subject to one-year renewals every year thereafter, absent contrary notice from either party).

### ii.     Additional Transactions with Domestic Non-Debtor Affiliates.

41.     Prior to the Petition Date, the Company entered into certain additional transactions with its non-Debtor affiliates, including Holdings LLC and MSC in arms'-length transactions which were beneficial to the Company.  For example, as part of the Company's strategy to manage its declining liquidity immediately prior to the Petition Date, the Company entered into a transaction involving the sale of the receivables of certain Debtor entities to a non-Debtor subsidiary of Holdings LLC.  In the transaction, certain receivables of Debtors Momentive Performance Materials USA Inc. and Momentive Performance Materials Quartz, Inc. were sold to Superholdco Finance Corp., a non-Debtor affiliate and subsidiary of Holdings LLC. The Company believes that this transaction and all relevant agreements were negotiated in an arms'-length manner, with the Company and MSC each represented by separate advisors.

42.     In addition, as part of a cost-savings opportunity and to monetize an asset that would otherwise be unsalable in connection with the wind down of the Company's Canadian operations, in an all cash transaction, Momentive Performance Materials Worldwide Inc., a Debtor, sold the stock of one of its Canadian subsidiaries to Momentive Specialty Chemicals Holdings B.V., a subsidiary of MSC.  In connection with this transaction, an MSC subsidiary will act as a distributor for certain of the Company's products in Canada.  The Company believes that this transaction and all relevant agreements were negotiated in an arms'-length manner, with the Company and MSC each represented by separate advisors.

43.     Also, MSC and the Company are embarking on a project in Brazil, whereby an MSC entity will co-locate an epoxy manufacturing operation on a site in Itabiba, Brazil owned by a non-Debtor indirect subsidiary of MPM.  The project involves a lease of property and a site services agreement between subsidiaries of the Company and MSC.  The Company believes that this transaction and all relevant agreements were negotiated in an arms'-length manner, with the Company and MSC each represented by separate legal counsel.

44.     In addition, the Company is subject to a management consulting and advisory services agreement with certain affiliates of Apollo for the provision of management and advisory services for an initial term of up to twelve years.  These Apollo affiliates waived the annual management fee provided for by this agreement for 2013.

45.     The Company also sells products to, and purchases products from, MSC pursuant to a Master Buy/Sell Agreement dated as of September 6, 2012 (the "**Master Buy/Sell Agreement**").  Prices under the agreement are determined by a formula based upon certain third party sales of the applicable product, or in the event that no qualifying third party sales have taken place, based upon the average contribution margin generated by certain third party sales of

products in the same or a similar industry.  A subsidiary of MPM also acts as a non-exclusive distributor in India for certain of MSC's subsidiaries pursuant to Distribution Agreements dated as of September 6, 2012 (the "**Distribution Agreements**").  Prices under the Distribution Agreements are determined by a formula based on the weighted average sales price of the applicable product less a margin.  The Master Buy/Sell Agreement and Distribution Agreements have initial terms of 3 years and may be terminated for convenience by either party thereunder upon 30 days' prior notice in the case of the Master/Buy Sell Agreement and upon 90 days' prior notice in the case of the Distribution Agreements.  Pursuant to these agreements and other purchase orders, during the years ended December 31, 2013 and 2012, the Company sold $9 million and $3 million, respectively, of products to MSC and purchased less than $1 million of products from MSC.  As of December 31, 2013 and 2012, the Company had $1 million and less than $1 million, respectively, of accounts receivable from MSC and less than $1 million of accounts payable to MSC related to these agreements.

   **iii.**   **Transactions with Foreign Subsidiaries.**

     46.  As discussed above, the Company is a global business with an extensive foreign manufacturing footprint.  The Debtors' foreign operations are conducted by non-Debtor subsidiaries incorporated in a variety of jurisdictions in Canada, Europe, Asia and South America.  The Company's foreign and domestic operations are highly interdependent, making the Company's foreign operations essential to the Company's overall strategy.  The foreign operations allow the Company to provide products to its customers in many locations globally.  Further, certain foreign operations provide vital products to the Company's domestic facilities.  In the ordinary course of the Company's businesses prior to the Petition Date, the Company's domestic Debtor entities and its foreign non-Debtor entities maintained significant business and financial relationships which resulted in intercompany trade receivables and payables arising

from the purchase and sale of goods among the various Debtor and non-Debtor foreign entities.

In addition, as part of the Company's global management of cash, the Company maintains a

complex system of intercompany loans among Debtor and non-Debtor entities, allowing the

Company to transfer liquidity to where it is needed in the Company's global operations.  The

Company tracks each transaction and at any point in time can identify every amount due to and

due from in connection with such transactions.  In addition to such intercompany loans,

$840 million in notes were issued to certain Debtors by their non-Debtor Japanese affiliate,

Momentive Performance Materials Japan LLC, in connection with the acquisition of the

Company by Apollo.

47.    The Debtors have requested authority from the Court to continue to

provide financial support to their foreign subsidiaries during the course of these cases, including,

as necessary, the provision of cash support to foreign affiliates, as well as the discretion to refrain

from seeking cash payment from certain foreign affiliates on account of trade receivables or

interest or principal payments due to the Debtors under intercompany loan facilities.

## I.    Debtors' Prepetition Capital Structure.

48.    As of December 31, 2013, the Debtors had $4,114 million of consolidated

outstanding indebtedness, including payments due within the next twelve months and short-term

borrowings.  The Company's projected 2014 annualized cash interest expense on its fixed-rate

obligations, absent these cases, would be $288 million.  The components of the Debtors'

outstanding indebtedness are summarized below.

### i.    ABL Facility.

49.    Certain of the Debtors and their non-debtor foreign subsidiaries are

borrowers under a revolving credit facility with maximum aggregate availability of $270 million

(the "**ABL Facility**") pursuant to that certain Asset-Based Revolving Credit Agreement, dated as

of April 24, 2013, among MPM Holdings, MPM, Momentive Performance Materials USA Inc.,

as U.S. Borrower, Momentive Performance Materials GMBH, as Germany Silicone Borrower,

Momentive Performance Materials Quartz GMBH as Germany Quartz Borrower, Momentive

Performance Materials Nova Scotia ULC, as Canadian Borrower, the lenders party thereto, and

JPMorgan Chase Bank, N.A., as Administrative Agent.  Availability under the ABL Facility is

subject to a borrowing base based on a specified percentage of eligible accounts receivable and

inventory and, in certain foreign jurisdictions, machinery and equipment.  As of the Petition

Date, the borrowing base reflecting various reserves was determined to be approximately

$270 million, and the Company had $71 million of issued and outstanding letters of credit and

$166 million of revolver borrowings under the ABL Facility.  Additionally, as of the Petition

Date, 12.5% of the borrowing base, or $34 million, was unavailable because the Company did

not meet the fixed charge coverage ratio required to borrow the full amount of the facility.

ii.    **Cash Flow Facility.**

50.    Certain of the Debtors and their non-debtor foreign subsidiaries are also

borrowers under a revolving credit facility with maximum aggregate availability of $75 million

(the "**Cash Flow Facility**") pursuant to that certain Second Amended and Restated Credit

Agreement, dated as of April 24, 2013, among MPM Holdings, MPM, Momentive Performance

Materials USA Inc., as U.S. Borrower, Momentive Performance Materials GMBH, as Germany

Silicone Borrower, Momentive Performance Materials Nova Scotia ULC, as Canadian Borrower,

General Electric Capital Corporation as Designated Lender, and JPMorgan Chase Bank, N.A., as

Administrative Agent and Collateral Agent.  As of the Petition Date, approximately

$20.7 million was currently outstanding under the Cash Flow Facility.

### iii.    First Lien Notes.

51.    MPM is an issuer of $1.1 billion of 8.875% First-Priority Senior Secured Notes due 2020 (the "**First Lien Notes**") issued pursuant to an Indenture dated as of October 25, 2012, with The Bank of New York Mellon Trust Company, N.A., as indenture trustee and the other Debtors, other than MPM Holdings, as guarantor.

### iv.    1.5 Lien Notes.

52.    MPM is an issuer of $250 million of 10% Senior Secured Notes due 2020 (the "**1.5 Lien Notes**") issued pursuant to an Indenture dated as of May 25, 2012, with The Bank of New York Mellon Trust Company, N.A., as indenture trustee and the other Debtors, other than MPM Holdings, as guarantor.

### v.    Second Lien Notes.

53.    MPM is an issuer of approximately $1.161 billion of 9% Second-Priority Springing Lien Notes due 2021 and €133 million 9.5% Second-Priority Springing Lien Notes due 2021 (collectively, the "**Second Lien Notes**") issued pursuant to an Indenture dated as of November 5, 2010, with The Bank of New York Mellon Trust Company, N.A., as indenture trustee and the other Debtors, other than MPM Holdings, as guarantor.

### vi.    Senior Subordinated Notes.

54.    MPM is an issuer of $382 million in aggregate principal amount of unsecured 11.5% Senior Subordinated Notes due 2016 (the "**Subordinated Notes**") issued pursuant to an Indenture (the "**Subordinated Note Indenture**") dated as of December 4, 2006, with Wells Fargo Bank, National Association, as indenture trustee and the other Debtors, other than MPM Holdings, as guarantor.

### vii.    MPM Holdings PIK Note.

55.    In connection with the purchase of the Company from GE, on December 4, 2006, MPM Holdings issued a pay-in-kind unsecured 11% Senior Discount Note, due June 4, 2017, with an original principal amount of $400 million (the "**Holdings PIK Note**").  As of December 31, 2013, the aggregate principal amount outstanding on the Holdings PIK Note was $854 million.  No other Debtor or non-debtor entity is a guarantor on the Holdings PIK Note.

### viii.    Equity Ownership.

56.    Apollo owns approximately 90.4% of the outstanding common equity interests in Holdings LLC, the ultimate parent of the Debtors.  GE Capital Equity Investments, Inc. holds approximately 6.3% of the outstanding common equity interests in Holdings LLC, with the remainder held by certain institutional investors, as well as certain current or former employees, officers or directors of the Company, Holdings LLC or MSC.

### J.    Events Leading to Chapter 11 Cases.

57.    The Company's business is cyclical.  It is impacted by general economic and industrial conditions, such as the robustness of general industrial production, automotive builds, housing starts, construction activity, consumer spending and semiconductor capital equipment investment.  The continued slowdown of global economic growth and increasing over-capacity in the Company's industry have negatively impacted the results of both the silicones and quartz businesses. To cope with these industry-specific and macro-economic trends, the Company and its management team have aggressively focused on increasing productivity efficiencies to reduce material costs and improve margins, as well as on managing liquidity and optimizing resources in the Company's manufacturing footprint.  In response to the uncertain economic outlook, the Company undertook organizational restructuring and cost

reduction programs, and continues to evaluate additional actions, as well as productivity

measures, that could lead to further cost savings.

   58.  Further, as discussed above, the Debtors have substantial indebtedness,

leading them to be levered at approximately 16 times their 2013 EBITDA.  The nearly

$300 million in annual interest that the Debtors must pay on these obligations has meant that the

Debtors were free cash flow negative in 2013 by over $200 million, rapidly draining the cash

available to the Company.  Ultimately, due to a lack of available funds, the Debtors will be

unable to make interest payments totaling $62 million due April 14, 2014 on the First Lien Notes

and 1.5 Lien Notes, absent the additional liquidity available from debtor-in-possession financing.

Further, one additional potential source of liquidity, the Cash Flow Facility, matures at the end of

2014.  The Debtors' historic lack of available liquidity had already hampered the Company's

ability to fund needed capital expenditures and research and development costs for new products,

with the potential to erode the Company's position vis-a-vis its competitors.  Further, volatility in

the global markets, economic softness across the world, lack of consumer confidence and over-

capacity in the silicones industry has continued to negatively impact the results of the

Company's businesses.  Because of these factors and the Company's high amount of leverage, it

became apparent to the management and directors of the Debtors that the Debtors' balance sheet

must be significantly de-levered in order to create a competitive and sustainable company going

forward.

   59.  With this in mind, and an impending liquidity crisis at the Company, the

Debtors retained Moelis & Company ("**Moelis**") as investment banker in November 2013, and

Willkie Farr & Gallagher LLP as restructuring counsel in December 2013.  When it became clear

that an out-of-court restructuring was not feasible, the Debtors determined that seeking a

reorganization of their operations under chapter 11 protection might be in the best long-term interests of the Debtors and their stakeholders and in February 2014, the Debtors authorized Moelis to initiate the process of securing debtor-in-possession ("**DIP**") financing to fund a potential chapter 11 filing.

60.     The Debtors and Moelis reached out to three parties who were viewed as qualified to provide the Debtors with fully-committed DIP financing (the "**Potential Financing Parties**").  The Potential Financing Parties included institutions familiar with the Debtors and institutions that regularly provide financing in distressed situations.  In addition to the Potential Financing Parties, the Debtors requested and obtained an initial proposal for DIP financing from Apollo and held discussions with other current holders of debt regarding DIP financing.

61.     Following an extensive, multi-track negotiation process with each of the Potential Financing Parties, the Debtors ultimately determined that the terms proposed by JPMorgan Chase Bank, N.A. ("**JPM**") provided the most beneficial DIP financing to the Debtors.  Ultimately, the other two Potential Financing Parties, Citigroup Global Markets Inc. and Credit Suisse Securities (USA) LLC (collectively with JPM, the "**DIP Lenders**"), agreed to each commit to provide one-third of the DIP financing on the terms initially negotiated with JPM. [2]

62.     The negotiations with the DIP Lenders culminated in a commitment letter, dated April 7, 2014, to provide the proposed DIP facilities.  The proposed DIP facilities are comprised of a $270 million asset-based revolving loan and a $300 million term loan.  The DIP Lenders have also committed, subject to certain closing conditions, to convert the proposed DIP

---

[2]     Ultimately, other financial institutions may participate as lenders under the DIP Facility.

asset-based revolving loan into a $270 million exit asset-based revolving facility and to provide a

new $1 billion exit term loan facility.

**K.    The Restructuring Support Agreement.**

63.    In addition to commencing a process to obtain debtor-in-possession

financing, the Debtors and their advisors initiated a dialogue with certain significant holders of

Second Lien Notes and their advisors beginning in January 2014, in order to negotiate a

comprehensive financial restructuring of the Debtors.  Such holders of Second Lien Notes agreed

to sign confidentiality agreements with the Company and receive material non-public

information regarding the Company on February 18, 2014, on which date, I and other members

of management, along with the Company's advisors, met with such holders to discuss the

Company's operations and liquidity.  Subsequently, the Debtors' management, advisors and the

advisors and principals of holders of Second Lien Notes, including the Company's ultimate

equity holder, Apollo, who owns a significant portion of Second Lien Notes, began negotiating

the terms of a potential restructuring of the Debtors.

64.    Ultimately, those negotiations were fruitful, and the Debtors, Apollo and

other holders of Second Lien Notes who, together with Apollo (collectively, the "**Consenting**

**Noteholders**"), hold approximately 85% in dollar amount of Second Lien Notes, entered into the

Restructuring Support Agreement, which provides that the Consenting Noteholders will support,

and vote in favor of, a chapter 11 plan to be proposed by the Debtors (the "**Plan**").  In

accordance with the terms of the Restructuring Support Agreement, the Debtors have agreed to

propose the Plan which provides for (a) payment in full in cash to the Debtors' general unsecured

creditors and holders of claims arising from the Cash Flow Facility, First Lien Notes and 1.5

Lien Notes (including accrued interest, but not including any premium or "make-whole"

amount), (b) conversion of the Second Lien Notes into the new equity of the reorganized Debtors

(subject to dilution by a management incentive plan and the new equity to be issued by the rights

offering described herein), (c) provides for subscription rights to holders of Second Lien Notes in

a $600 million (the "**Rights Offering Amount**") rights offering, giving such holders the

opportunity to purchase a percentage of the new equity of the reorganized Debtors at a price per

share determined by using the pro forma capital structure and an enterprise value of $2.2 billion

and applying a 15% discount to the equity value thereto, (d) provides for a recovery to holders of

the Holdings PIK Note in the amount of the cash available at Holdings as of the effective date of

the Plan, after taking into account administrative expenses, and (e) provides for no recovery to

the holders of Subordinated Notes on account of the subordination provisions set forth in the

Subordinated Note Indenture.  The Consenting Noteholders have agreed, subject to definitive

documentation, to backstop the $600 million rights offering in exchange for a fee, payable in

new equity, of an additional 5% of the Rights Offering Amount.  This fee is payable in kind at

the closing of the rights offering, or in cash, if the Debtors terminate the backstop commitment.

The Plan also provides that the reorganized Debtors will hire a new chief executive officer, chief

financial officer and general counsel which will not be shared with MSC under the Shared

Services Agreement, and that the Shared Services Agreement will be amended to provide for

certain transition services in the event of a termination of the Shared Services Agreement.

65.     The Debtors anticipate that they will file the Plan and an accompanying

disclosure statement in the near term, and will promptly seek this Court's approval of a backstop

commitment agreement, the Restructuring Support Agreement, and subsequently, the disclosure

statement and confirmation of the Plan.

II  **SUMMARY OF FIRST DAY MOTIONS**[3]

   66.  To enable the Debtors to operate effectively and to avoid the adverse effects of the chapter 11 filings, the Debtors have filed, or will file upon scheduling of a further hearing by this Court, the motions and applications described below.

   67.  In connection with the preparation for these bankruptcy cases, I have reviewed each of the First Day Motions referenced below.  The First Day Motions were prepared with my input and assistance, or the input and assistance of employees working under my supervision.  I believe the information contained in the First Day Motions is accurate and correct.  As set forth more fully below, I believe that the entry of orders granting the relief requested in these motions and applications is critical to the Debtors' ability to preserve the value of their estates and will assist in their reorganization efforts.

**A.**  **Motions Related to Case Management.**

   **i.**  **Joint Administration Motion.**

   68.  The Debtors seek the joint administration of their chapter 11 cases, twelve in total, for procedural purposes only.  I believe that it would be far more practical and expedient for the administration of these chapter 11 cases if the Court were to authorize their joint administration.  Many of the motions, hearings, and other matters involved in these chapter 11 cases will affect all of the Debtors.  Hence, joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative hearings, notices, applications, and orders.  It is my understanding that no prejudice will befall any party by the joint administration of the Debtors' cases as the relief sought therein is solely procedural and is not intended to affect substantive rights.

---

[3]  Capitalized terms used but not defined in this section have the meanings given them in the relevant First Day Motion.

### ii.     Case Management Motion.

69.     To ease the administrative burden of these cases on the Debtors' estates and promote the efficient and orderly administration of these cases, the Debtors request entry of an order (a) establishing noticing, case management and administrative procedures in the Debtors' chapter 11 cases, (b) scheduling omnibus hearing dates; and (c) authorizing the Debtors to establish procedures for notifying creditors of the commencement of these cases.  I believe that the relief requested will reduce the administrative costs of these cases and is in the best interests of the Debtors' estates.

### iii.    Motion to Extend Deadline to File Schedules and Statements.

70.     Concurrently herewith, the Debtors filed a motion seeking a 46-day extension of time to file their Schedules of Assets and Liabilities (the "**Schedules**") and Statements of Financial Affairs (the "**Statements**").

71.     Due to the complexity of the Debtors' businesses, the number of Debtor entities, the substantial burden already imposed on the Debtors' management by the commencement of these chapter 11 cases, the limited number of employees available to collect the required information, and the fact that the Debtors have a substantial number of creditors, the Debtors will be unable to complete their Schedules and Statements by the deadline set forth pursuant to the Bankruptcy Code and Bankruptcy Rules.  Therefore, I believe that good cause exists for extending the deadline by which the Debtors must file their Schedules and Statements. I understand that granting this motion is in the best interest of the Debtors' estates as it will enable the Debtors and their professionals to concentrate their resources towards an efficient and timely reorganization process.

**B.      Applications and Motions Related to the Retention of Professionals.**

   **i.      Application to Employ and Retain Kurtzman Carson Consultants LLC.**

72.      Concurrently herewith, the Debtors filed an application to retain Kurtzman Carson Consultants LLC ("**KCC**") as this Court's notice and claims agent for the Debtors' chapter 11 cases.  I believe that the retention of KCC is critical because of the large number of creditors identified in these cases.

73.      I understand that KCC is a data processing firm with extensive experience in noticing, claims processing and other administrative tasks in chapter 11 cases.  The Debtors solicited bids from three prominent bankruptcy claims and noticing agents prior to selecting KCC and believe KCC's rates are reasonable given the quality of KCC's services and prior bankruptcy experience.  Given the need for the services described above and KCC's expertise in providing such services, I believe that retaining KCC will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus on their reorganization efforts.

74.      The Debtors have also filed a separate application to retain KCC as an administrative agent to provide, among other things, certain solicitation and balloting services.

   **ii.      Other Retention Applications.**

75.      The Debtors intend to file certain applications, upon the scheduling of a further hearing by the Court, to retain professionals who will assist the Debtors in the administration of these chapter 11 cases.  Among certain other professionals, the Debtors will seek to retain: Willkie Farr & Gallagher LLP as bankruptcy counsel with regard to the filing and prosecution of these chapter 11 cases; Sidley Austin LLP as special litigation counsel; Moelis & Company LLC as financial advisor and investment banker; AlixPartners, LLP as restructuring advisor; PricewaterhouseCoopers as auditor; and Crowe Horwath LLP as benefit plan auditor. The Debtors also intend to file a motion regarding interim compensation, seeking authorization

and establishing procedures for compensating and reimbursing professionals on a monthly basis, on terms comparable to the procedures established in other chapter 11 cases in this district.

76.     In addition, the Debtors expect to file a motion authorizing the Debtors to retain certain professionals utilized in the ordinary course of their business (the "**OCPs**") without the submission of separate retention applications and the issuance of separate orders approving the retention of each individual professional and authorizing the Debtors to pay each OCP in accordance with the terms set forth in the motion without application to the Court by such professional.

**C.     Motions Related to Financing of Operations.**

    **i.     Motion to Authorize Continued Use of the Debtors' Cash Management System, Bank Accounts and Business Forms.**

77.     In the ordinary course of their businesses prior to the Petition Date, and as is typical with business organizations of similar size and scope, the Debtors maintain a centralized cash management system to collect, transfer, and disburse funds generated through their operations efficiently and to record such transactions accurately (the "**Cash Management System**").

78.     It is my understanding that the U.S. Trustee Guidelines require chapter 11 debtors to, among other things, close all existing bank accounts and open new accounts which must be designated debtor-in-possession bank accounts and obtain, establish and maintain separate debtor-in-possession accounts.  The Debtors intend to request a waiver of such requirements.

79.     I believe that the Debtors' existing cash management and intercompany accounting procedures are essential to the orderly operation of the Debtors' businesses.  The cost and expense of changing bank accounts and related business forms and creating a new Cash

Management System could cause confusion, disrupt payroll, introduce inefficiency when efficiency is most essential, and strain the Debtors' relationships with critical third parties, each of which could diminish the prospects for a successful reorganization. Thus, the Debtors seek authorization to continue the management of their cash receipts and disbursements in the manner in which they were handled immediately prior to the Petition Date.

80.     In addition, I understand that section 345(b) of the Bankruptcy Code contains certain deposit, investment and reporting requirements. The Debtors believe their current Cash Management System meets those requirements as all of their bank accounts are maintained at banks that have been approved by the U.S. Trustee as an authorized bank depository in accordance with the U.S. Trustee Guidelines.

81.     The Debtors also seek authority to continue performing, in their discretion, under the Intercompany Transactions involving the Debtors and non-Debtors. The Debtors' businesses are operationally and functionally linked to those of their non-Debtor affiliates. The Intercompany Transactions ensure that cash and materials are available to support the operations of the Debtors and their non-Debtor affiliates. Among the different types of Intercompany Transactions that the Debtors seek to continue are the intercompany loans among the Debtors and their foreign non-Debtor subsidiaries which allow the Debtors, in the ordinary course of business, to infuse capital into certain of their foreign non-Debtor subsidiaries.

82.     Finally, the Debtors also seek authority to defer—as long as it is in the best interests of the Debtors—the repayment of due and payable intercompany debt owed to the Debtors by their foreign non-Debtor affiliates. Such relief is necessary to preserve the value of the Debtors' equity interest in such entities, to ensure that the foreign non-Debtor affiliates can continue to meet commitments to the Debtors' global customer network and to prevent the

Debtors from having to use their own cash or borrowings under their proposed debtor-in-possession facility to infuse cash in their subsidiaries (solely to allow such subsidiaries to refund such cash to the Debtors).  Such relief is particularly important in certain foreign jurisdictions where failure to meet a balance sheet solvency test or a cash flow insolvency test results in an immediate duty to file for insolvency under applicable law.

83.     I believe that allowing the Debtors to maintain their Cash Management System would be in the best interests of the Debtors' estates, creditors and other parties in interest.

**ii.    Motion to Approve Debtor-in-Possession Financing.**

84.     Concurrently herewith, the Debtors seek authority to enter into the debtor-in-possession financing facilities (the "**DIP Credit Facilities**"), grant to certain creditors senior liens, junior liens, and claims with superpriority administrative expense status, use cash collateral, provide "adequate protection" to prepetition secured lenders, and schedule a final hearing with respect to the relief requested, all as more fully described in the relevant motion.

85.     The DIP Credit Facilities consist of a $270 million asset-based revolving facility (the "**DIP ABL Facility**") and a $300 million term loan facility (the "**DIP Term Loan Facility**").  Further, the DIP Lenders have committed, upon the Debtors' exit from chapter 11 and subject to certain closing conditions, to convert the DIP ABL Facility into a $270 million exit asset-based revolving facility and to provide a new $1 billion exit term loan facility.  I understand that all of the Debtors' prepetition secured lenders, who have liens which will be primed by liens granted to secure the DIP Credit Facilities, have either explicitly consented or are deemed to have consented, pursuant to the terms of certain intercreditor agreements, to the priming of their liens and to the Debtors' use of cash collateral.  The Debtors conducted an extensive negotiation process with each of the DIP Lenders before determining that a

comprehensive DIP financing jointly arranged by the DIP Lenders provided the most cost-effective and beneficial DIP financing.

86.     On an interim basis, the Debtors are requesting access to $130 million out of the $270 million availability under the DIP ABL Facility and the full $300 million available under the DIP Term Loan Facility.  Such amounts will be used to pay off approximately $166 million in borrowings under the prepetition ABL Facility, to roll over approximately $71 million in letters of credit currently issued and outstanding under the ABL Facility, as well as to make $64 million in adequate assurance payments, including $61.8 million in interest payments to the holders of First Lien Notes and 1.5 Lien Notes which comes due on April 14, 2014.  The remainder of the interim availability will be used to fund fees under the DIP Credit Facilities, pay the Debtors' vendors and provide working capital in connection with the Debtors' operations.

87.     The reasons supporting the Debtors' request for authority to enter into the DIP Credit Facilities are compelling.  As explained in greater detail in the relevant motion, the DIP Credit Facilities will be used to provide liquidity for working capital and other general corporate purposes of the Debtors.  The usage of cash collateral and the funds available under the DIP Credit Facilities will provide the Debtors with funds necessary for the operation of their businesses, including meeting their payroll and other business obligations.  Without the immediate use of cash collateral and the funds available under the DIP Credit Facilities, the Debtors would be unable to fund their operations, which would be catastrophic for the Debtors' businesses.  I believe that access to cash collateral and the funds available under the DIP Credit Facilities is crucial to the Debtors' ability to maintain their businesses and to avoid immediate and irreparable harm to their estates, employees, customers, and creditors.  Further, the terms of

the DIP Credit Facilities are reasonable as they include favorable pricing terms, reasonable

adequate protection measures for the prepetition secured creditors' interests and reasonable fees

payable to the DIP Lenders.

88.     For the foregoing reasons, I believe that the DIP Credit Facilities embody

the best available financing under these circumstances and that entry into the DIP Credit

Agreements is in the best interest of the Debtors and their estates.

**D.      Motion for Authorization to Pay Certain Prepetition Claims of Employees.**

89.     Concurrently herewith, the Debtors have filed a motion seeking authority

to, among other things, satisfy certain of their prepetition obligations to their current employees

(the "**Employees**"), reimburse Employees for prepetition travel and other business expenses that

were incurred on behalf of the Debtors, pay prepetition payroll-related taxes and withholdings

associated with the Company's employee wage claims and the employee benefit obligations, and

other similar tax obligations, continue any severance policies for employees, and to continue any

employee benefit programs in place as of the Petition Date (including satisfying any prepetition

obligations associated with such programs).  This relief is critical to the Debtors' businesses and

reorganization efforts.

90.     In order to achieve a successful reorganization, it is essential that the

Employees work with the same or greater degree of commitment and diligence as they did prior

to the Petition Date.  The requested authority to continue to pay the Employees' prepetition

salaries and wages and to maintain the current employee benefits programs is critical to ensure

that:  (a) the Debtors can retain personnel knowledgeable about the Debtors' businesses; (b) the

Debtors' Employees continue to provide quality services to the Debtors at a time when they are

needed most; and (c) the Debtors remain competitive with comparable employers.

91.     If this motion were not granted, I believe that it would result in a significant deterioration in morale among Employees, which undoubtedly would have a devastating impact on the Debtors, their customers, the value of estate assets and the Debtors' ability to reorganize.  The total amount to be paid if the relief sought in the motion is granted is modest compared with the size of the Debtors' estates and the importance of the Employees to the restructuring effort.  I believe authorizing the Debtors to pay these obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors, their creditors, and all parties in interest, and will enable the Debtors to continue to operate their businesses without disruption in an economic and efficient manner.

92.     For the reasons set forth above, I believe that granting the requested relief is in the best interests of the Debtors, their creditors, and all parties in interest.

**E.      Certain Other Motions.**

**i.      Motion to Authorize Payment of Prepetition Claims of Critical Vendors, Foreign Vendors and Suppliers of Goods Entitled to Administrative Priority**

93.     In order to continue operating their businesses, the Debtors must rely on certain vendors and suppliers (the "**Critical Vendors**") that provide the Debtors with certain specialized materials and services that are critical to the Debtors' operations.  Moreover, given the size and global nature of their enterprise, the Debtors, in the ordinary course of their business, regularly transact with vendors outside of the United States that are critical to the Debtors' supply chain (the "**Foreign Vendors**").  The Debtors have also identified claims of certain critical vendors (the "**Critical 503(b)(9) Vendors**" and together with the Critical Vendors and the Foreign Vendors, the "**Trade Claimants**") entitled to priority treatment pursuant to section 503(b)(9) of the Bankruptcy Code for the value of goods received by the Debtors within the twenty (20) days prior to the Petition Date.  Absent the cooperation of these Trade Claimants,

the Debtors may be unable to continue their operations without materially inflated costs or substantial interruptions.

94.     In connection with determining which vendors are actually essential to the Debtors' business operations, the Debtors considered the following criteria: (a) whether the vendor in question is a sole source provider; (b) whether the Debtors receive advantageous pricing or other terms from a vendor such that replacing the vendor postpetition would result in significantly higher costs to the Debtors; (c) whether quality requirements, customer specifications, or other specifications prevent the Debtors from obtaining products or services from alternative sources within a reasonable timeframe, given the anticipated length of operations; (d) whether, if a vendor is not a sole source provider, the Debtors have sufficient product inventory or in-house capabilities to continue operations while a replacement vendor is found and put in place; (e) whether a vendor is otherwise contractually obligated to continue to provide goods or services to the Debtors; and (f) whether a vendor is likely to refuse to ship product or provide services to the Debtors postpetition if its prepetition balances are not paid.

95.     Based on the foregoing considerations, the Debtors identified Trade Claimants whose cessation of services or provision of goods could cripple in short order the Debtors' businesses and, therefore, result in irreparable harm.  The Debtors believe that the Trade Claimants will refuse to supply the Debtors postpetition unless some or all of these claims are paid, and that immediate replacement of the Trade Claimants would be impracticable or, in some cases, impossible.  Without authority to pay the Trade Claimants, the Debtors could be forced to suspend operations immediately, which would be highly destructive to the Debtors' efforts to maximize the value of their assets, and monetize as much as possible of their inventory

and work-in-process.  Accordingly, the Debtors seek authorization to pay the Trade Claimants in the ordinary course of business.

96.     For the reasons stated above, and explained more fully in the motion, I believe that the relief sought therein is necessary for a successful reorganization and is in the best interests of the Debtors and their estates.

    **ii.     Motion for Authorization to Pay Prepetition Common Carrier, Warehouse, Freight Forwarder, Toll Processor, Mechanic's Lien and Related Obligations.**

97.     In the ordinary course of operations, the Debtors' supply and delivery system depends upon the use of common carriers operated by third parties, including vessels, trucking services, air transport, and rail carriers (the "**Common Carriers**") to receive shipments of raw materials from their vendors and to transport materials, goods and products throughout the manufacturing process.  As a result, the Common Carriers regularly possess certain of the Debtors' raw materials, goods and equipment in the ordinary course of the Debtors' operations. The Debtors also supplement their own storage and distribution facilities with third-party warehouse facilities (the "**Warehouse Providers**") to store goods and inventory.  The Warehouse Providers regularly possess products and materials owned by the Debtors.  The Debtors also utilize, in the ordinary course of business, the services of certain third-party toll processors and manufacturers (the "**Toll Processors**") with respect to the Debtors' finished products.  The Debtors typically supply the formula, raw materials and, in certain cases, equipment to the Toll Processors, which the Toll Processors then use to blend, package and/or produce the Debtors' final products.  The Debtors also require significant maintenance and repair work with respect to their equipment.  Although the Debtors utilize their own employees to perform some of this work, in the ordinary course of business the Debtors heavily rely on outside mechanics and repairmen (collectively, the "**Mechanics**") to perform maintenance and repair

work.  Further, the Debtors utilize the services of certain freight forwarders and customs

processors (the "**Freight Forwarders**" and together with the Common Carriers, Warehouse

Providers, Toll Processors and Mechanics, the "**Service Providers**").  The Freight Forwarders

provide vital services that enable the Debtors to comply with the complex customs laws and

regulations of the United States when importing products and materials from outside the United

States.

98.     It is essential for the Debtors' continuing business viability and the

success of their restructuring efforts that they maintain the reliable and efficient flow of

materials, goods and products through their distribution system.  The Debtors' manufacturing

and customer service capabilities are dependent upon the storage and transportation of such

goods by the Service Providers.  Even a short delay in the Debtors' supply pipeline could

undermine the Debtors' ability to fulfill their customers' needs and adversely impact

relationships with their customers.  As a result, the Debtors' ability to effect a successful

restructuring may be jeopardized.  Therefore, the Debtors respectfully request authority to pay, in

their discretion, any claims of the Service Providers and the Debtors' logistics administrator

(described below) owing as of the Petition Date (collectively, the "**Service Claims**").

99.     Although the Debtors pay certain Service Providers directly, the Debtors,

in the ordinary course of business, rely substantially on the services of Odyssey Logistics &

Technology Corporation ("**Odyssey**"), a fourth-party logistics administrator in connection with

the Service Claims.  The Debtors' relationship with Odyssey governs the vast majority of the

Debtors' transportation and logistics activities with the Service Providers.  In its role as an

intermediary, Odyssey, among other things, administers all payments for carrier and freight

forwarding expenses.  The Debtors are obligated to reimburse Odyssey for all charges it incurs

on behalf of the Debtors prior to the remittance of payment to the Service Providers and to pay

Odyssey a management fee based upon the services it provides.  If Odyssey is not paid by the

Debtors for services performed by the Service Providers prior to the Petition Date, Odyssey is

not required to remit payment to the Service Providers.  To the extent they remain unpaid, such

Service Providers may assert a lien on the goods in their possession, refuse to deliver goods to

the Debtors or their customers, or refuse to continue to do business with the Debtors in the

future, which likely would cause irreparable harm to the Debtors' businesses.  Accordingly, the

Debtors hereby request that the Court authorize them to pay any prepetition amounts owed to

Odyssey and the Service Providers in the ordinary course of their business.

### iii.    Motion to Authorize Debtors to Honor Prepetition Customer Programs.

100.    Prior to the Petition Date and in the ordinary course of their businesses,

the Debtors seek to develop and sustain a positive reputation in the marketplace through the

implementation of certain customer programs (the "**Customer Programs**"), including honoring

accrued obligations under a warranty program, return policies, rebate programs, and a channel

marketing program.  The termination of the Customer Programs would undoubtedly have an

adverse effect on the Debtors' businesses and their ability to reorganize.  Therefore, I believe

that the continuation of the Customer Programs is necessary to preserve the Debtors' critical

customer relationships and is in the best interests of the Debtors and their estates.

### iv.    Motion for Authority to Pay Certain
### Prepetition Sales, Use and Other Taxes and Regulatory Fees.

101.    The Debtors seek entry of an order authorizing them to pay various

prepetition sales and use taxes (collectively, the "**Trust Fund Taxes**") and other taxes (the

"**Other Taxes**") to various federal, state and local authorities (collectively, the "**Taxing**

**Authorities**"), and certain licensing, permitting and regulatory fees (the "**Regulatory Fees**" and

together with the Trust Fund Taxes and the Other Taxes, the "**Taxes**") to certain federal, state and local government agencies (collectively, the "**Regulatory Authorities**" and together with the Taxing Authorities, the "**Applicable Authorities**") on a periodic basis, in each case, as and when such obligations become due. In the ordinary course of their businesses, the Debtors collected Trust Fund Taxes from customers and hold them for a period of time before remitting them to the appropriate Taxing Authorities. The Debtors are also required to pay Regulatory Fees, including, but not limited to, hazardous waste fees, radiation license fees and other business licensing and permit fees. The Debtors also pay certain Other Taxes, including, but not limited to, franchise taxes, property taxes and state and local income taxes, to certain Applicable Authorities on a periodic basis.

102.     Payment of the prepetition Taxes is critical to the Debtors' continued, uninterrupted operations. The Debtors' failure to pay these obligations may cause the Applicable Authorities to take precipitous action, including, but not limited to, seeking to lift the automatic stay, and imposing personal liability on the Debtors' officers and directors, which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates. Failure to pay the prepetition Taxes could also have a negative impact on the Debtors' existing permits and licenses. In addition, the Debtors believe that most of the prepetition Taxes are entitled to priority, and thus permitting the Debtors to pay prepetition Taxes would affect only the timing of the payments, and not the amount of the ultimate recovery.

103.     I believe that the authority to pay the Applicable Authorities in accordance with the Debtors' prepetition business practices is in the best interest of the Debtors and their estates.

v.       **Motion Enforcing the Protections of Sections 362 and 525 of the Bankruptcy Code and Approving Notice of the Debtors' Non-Debtor Global Affiliates.**

104.      To aid in the administration of the Debtors' bankruptcy cases and to further their reorganization prospects, the Debtors are seeking an order that confirms the application of two key protections provided by the Bankruptcy Code — the automatic stay provisions of section 362 and the anti discrimination provisions of section 525.  The global nature of the Debtors' businesses and their extensive dealings with non-U.S. creditors who are unfamiliar with the protections afforded chapter 11 debtors under sections 362 and 525 of the Bankruptcy Code require that an order implementing these protections be entered by this Court.

105.      In addition, to alleviate the confusion that likely will arise concerning the Debtors' non-Debtor global subsidiaries and affiliates (collectively, the "**non-Debtor Global Affiliates**"), the Debtors seek approval from this Court of a notice to the customers, suppliers, and other stakeholders of the non-Debtor Global Affiliates confirming that the non-Debtor Global Affiliates are not included in these U.S. chapter 11 cases and are not subject to (a) the supervision of this Court or (b) the provisions of the Bankruptcy Code.  The Debtors believe that many of the non-U.S. creditors affected by sections 362 and 525 of the Bankruptcy Code likely are not aware of the significant and necessary protection these sections provide to the Debtors.  Moreover, certain of the Debtors' assets are located around the globe, which may further confuse a non-U.S. creditor.  Further, the Debtors believe that the "automatic" and self-executing nature of these protections may not be recognized by foreign creditors or tribunals unless embodied in an order of this Court.  Accordingly, the Debtors respectfully request that this Court issue the Order which restates the applicable provisions of sections 362 and 525 of the Bankruptcy Code and approves a notice substantially in the form of the notice attached to the motion.  The Debtors believe that the existence of this order, which the Debtors will be able to

transmit to affected parties, will maximize the protections afforded by sections 362 and 525 of the Bankruptcy Code.

106.     Accordingly, I believe that the relief requested herein is in the best interests of the Debtors, their estates, and creditors and should be approved.

### III        INFORMATION REQUIRED BY LOCAL RULE 1007-2

107.     It is my understanding that Local Rule 1007-2 requires certain information related to the Debtors, which is set forth below.

108.     Appendix III is the corporate organizational chart of the Debtors and their non-Debtor affiliates.

109.     As noted on Exhibit A, an Ad Hoc Committee of Holders of Second Lien Notes was formed prior to the Petition Date.

110.     Exhibit B hereto provides the following information with respect to each of the holders of the Debtors' fifty (50) largest unsecured claims:  (a) each creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address) and telephone number; (b) the nature and approximate amount of such creditor's claim; and (c) an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

111.     Exhibit C hereto provides the following information with respect to the holders of the five (5) largest secured claims against the Debtors:  (a) the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address) and telephone number; (b) the amount of the claim; (c) a brief description of such creditor's claim; (d) if known, an estimate of the value of the collateral securing the claim; and (e) whether the claim or lien is contingent, unliquidated or disputed.

112.    <u>Exhibit D</u> hereto provides a summary of the Debtors' assets and liabilities.

113.    <u>Exhibit E</u> hereto provides the number and classes of shares of stock, debentures, and other public securities of the Debtors that are publicly held and the number of holders thereof.

114.    <u>Exhibit F</u> hereto sets forth a list of the property of the Debtors in the possession or custody of a custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or agent for any such entity.

115.    <u>Exhibit G</u> hereto sets forth a list of the owned or leased premises from which the Debtors operate their businesses.

116.    <u>Exhibit H</u> hereto sets forth the location of the Debtors' substantial assets and the location of their books and records.

117.    <u>Exhibit I</u> hereto sets forth the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment or seizure of their property may be imminent.

118.    <u>Exhibit J</u> hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors and a brief summary of their relevant responsibilities and experience.

119.    <u>Exhibit K</u> hereto sets forth the estimated amount to be paid to: (a) employees; (b) officers, stockholders and directors; and (c) financial and business consultants retained by the Debtors, for the thirty (30) day period following the Petition Date.

120.    <u>Exhibit L</u> hereto sets forth a list of the Debtors' estimated cash receipts and disbursements, net gain or loss, and obligations and receivables expected to accrue that

remain unpaid, other than professional fees for the thirty (30) day period following the Petition

Date.

121.    Attached hereto as <u>Appendix II</u> is certain additional information regarding

the Company.

## CONCLUSION

In furtherance of their reorganization efforts, the Debtors respectfully request that

orders granting the relief requested in the First Day Motions be entered.

Dated: April 13, 2014

Momentive Performance Materials Inc., et al.,
Debtors and Debtors in Possession
/s/ William H. Carter

William H. Carter
Director, Chief Financial Officer, and Executive
Vice President of Momentive Performance
Materials Inc. and Momentive Performance
Holdings Inc.

## <u>EXHIBIT A</u>

**Committees Organized Prior to the Order for Relief**

To the best of the Debtors' knowledge and pursuant to Local Rule 1007-2(a)(3), the following entities formed the following ad hoc committee prior to the Petition Date:

| Type of Committee[1] | Names of Committee Members[2] | Counsel for Committee |
|---|---|---|
| Ad Hoc Committee of Holders of Second Lien Notes | Ares Management LLC<br><br>Aristeia Capital, LLC<br><br>Carlson Capital, L.P.<br><br>GSO Capital Partners LP<br><br>Oaktree Capital Management, L.P., and certain affiliates<br><br>Pentwater Capital Management LP<br><br>Third Avenue Management LLC | Milbank, Tweed, Hadley & McCloy LLP<br>1 Chase Manhattan Plaza<br>New York, NY 10005<br>Attn:  Dennis F. Dunne, Esq.<br>          Samuel Khalil, Esq. |

---

[1]    The Debtors also understand that certain holders of First Lien Notes may have begun to organize prior to the Petition Date, and have selected Dechert LLP to serve as their counsel.  However, the Debtors do not have sufficient information regarding such group to disclose its members.

[2]    The members of the Ad Hoc Committee of Holders of Second Lien Notes are to the best of the Debtors' knowledge and are based on information provided to the Debtors by counsel to the Ad Hoc Committee of Holders of Second Lien Notes.

## EXHIBIT B

## 50 Largest Unsecured Claims[1]
### (on a consolidated basis)

| Name of creditor and complete mailing address, including zip code | Telephone number and fax number of employees, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Amount of claim as of April 10, 2014[2] |
|---|---|---|---|
| The Bank of New York Mellon Trust Company, N.A. 525 William Penn Place 38th Floor Pittsburgh, PA 15259 | Fax: 412-234-7535 | $1.16 Billion 9.0% Second-Priority Springing Lien Notes Due 2021 | $1,160,687,000.00[3] |
| GE Capital Equity Investments, Inc. 201 Merritt 7, 1st Floor P.O. Box 4800 Norwalk, CT 06856-4259 | Account Manager – Momentive Fax: 203-229-5097 | 11% Senior Discount Note | $876,955,326.00 |
| The Bank of New York Mellon 25 William Penn Place 38th Floor Pittsburgh, PA 15259 | Fax: 412-234-7535 | $500 Million 11.5% Senior Subordinated Notes Due 2016 | $381,869,000.00 |
| The Bank of New York Mellon Trust Company, N.A. 525 William Penn Place 38th Floor Pittsburgh, PA 15259 | Fax: 412-234-7535 | €150 Million 9.5% Second-Priority Springing Lien Notes Due 2021 | $182,945,280.00[4] |
| Odyssey Logistics & Technology Corp. 39 Old Ridgebury Rd Danbury, CT 06810 | Tel.: 704-529-6300 Fax: 704-973-0987 | Trade Debt | $3,685,324.77 |
| Globe Metalurgical Inc. Country Road 32 Beverly, OH 45715 | Tel.: 800-845-6238 Fax: 740-984-8691 | Trade Debt | $3,642,356.24 |
| Mitsubishi Gas Chemical America Inc. 655 3rd Ave, 24th Floor New York, NY 10017 | Tel.: 212-687-9030 Fax: 212-687-2810 | Trade Debt | $3,338,333.85 |
| Amerada Hess Inc. 126 N. Salina Street Syracuse, NY 13202 | Tel.: 315-234-5300 Fax: 315-423-0964 | Trade Debt | $2,500,510.35 |

---

[1]   The information herein shall not constitute an admission of liability by, nor is it binding on, any of the Debtors.

[2]   These claim amounts represent maximum potential liabilities.  Actual amounts owed, if any, may be significantly lower.

[3]   This amount represents the entire amount due and outstanding under these secured obligations.  The Debtors believe that such obligations are substantially undersecured, and will therefore give rise to a significant unsecured deficiency claim against the Debtors.  For the purposes of this creditor list, the Debtors have not attempted to calculate the amount of such deficiency claim.

[4]   This amount represents the entire amount due and outstanding under these secured obligations.  The Debtors believe that such obligations are substantially undersecured, and will therefore give rise to a significant unsecured deficiency claim against the Debtors.  For the purposes of this creditor list, the Debtors have not attempted to calculate the amount of such deficiency claim.

| Name of creditor and complete mailing address, including zip code | Telephone number and fax number of employees, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Amount of claim as of April 10, 2014[2] |
|---|---|---|---|
| Fischback USA Inc.<br>900 Peterson Drive<br>Elizabethtown, KY 42701 | Tel.: 270-769-9333<br>Fax: 270-505-1256 | Trade Debt | $2,428,175.76 |
| Unimin Corp<br>258 Elm St.<br>New Canaan, CT 06840 | Tel.: 203-966-8880<br>Fax: 203-972-1870 | Trade Debt | $2,248,247.21 |
| Auramet Trading LC<br>2 Executive Drive, Suite 645<br>Fort Lee, NJ 07024 | Tel.: 201-905-5000<br>Fax: 201-905-5001 | Trade Debt | $1,936,507.58 |
| Mauser USA LLC<br>219 Commercial Drive<br>Mount Vernon, OH 43050 | Tel.: 740-397-1762<br>Fax: 740-397-0302 | Trade Debt | $1,423,139.87 |
| Sea Lion Technology Inc.<br>5700 Century Blvd.<br>Texas City, TX 77592 | Tel.: 409-948-4351<br>Fax: 281-337-7758 | Trade Debt | $1,181,360.86 |
| Kao Specialties Americas LLC<br>1620 Belmar St.<br>High Point, NC 27261 | Tel.: 336-307-0112<br>Fax: 336-884-1069 | Trade Debt | $1,020,997.43 |
| Ungerer & Co.<br>110 N. Commerce Way<br>Bridgeville, PA 15017 | Tel.: 610-882-3869<br>Fax: 610-868-0530 | Trade Debt | $835,200.00 |
| General Electric<br>10 Riverview Drive<br>Danbury, CT 06810 | Tel.: 203-749-6000<br>Fax: 203-567-8486 | Trade Debt | $817,059.44 |
| Zhejiang Huanxin Fluoro Material Co. Lt.<br>No. 1007 Jiu Ling Xi Road<br>Yongkang 130<br>321300<br>China | Tel.: 86-579-7271585<br>Fax: 5797271599 | Trade Debt | $789,033.60 |
| Nippon Kasei Chemicals Co. Ltd.<br>188 Shinkawa Chuo-Ku<br>Tokyo 1040033<br>Japan | Tel.: 81 355405981<br>Fax: 355405898 | Trade Debt | $762,285.00 |
| Schuetz Container Systems Inc.<br>200 Aspen Hill Rd.<br>North Branch, NJ 08876 | Tel.: 908-526-6161<br>Fax: 908-526-5621 | Trade Debt | $609,732.20 |
| QSIP Canada ULC<br>6500 Yvon Trudeau<br>Becancour, QC G9h 2V8<br>Canada | Tel.: 819-294-6000<br>Fax: 819-294-9001 | Trade Debt | $538,822.19 |
| Unipex Solutions Canada<br>1570 Ampere Ste 106<br>Boucherville, QC J4B 7L4<br>Canada | Tel.: 450-449-6363<br>Fax: 450-449-5281 | Trade Debt | $410,046.55 |
| McJunkin Corporation<br>12 Parkway Place<br>Edison, NJ 08837 | Tel.: 732-225-4005<br>Fax: 732-220-1453 | Trade Debt | $408,414.90 |
| The B&B Albany Pallet Co. Inc.<br>Drawer T Solvay Road<br>Jamesville, NY 13078 | Tel.: 315-492-1786<br>Fax: 315-469-4946 | Trade Debt | $346,622.18 |
| Occidental Chemicals Corporation<br>5005 LBJ Freeway<br>Dallas, TX 75380 | Tel.: 800-752-5151<br>Fax: 713-985-1491 | Trade Debt | $343,988.95 |
| Packaging Corporation of America<br>212 Roelee St.<br>Trinity, NC 27370 | Tel.: 336-434-0600<br>Fax: 336-861-5601 | Trade Debt | $328,964.01 |

| Name of creditor and complete mailing address, including zip code | Telephone number and fax number of employees, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Amount of claim as of April 10, 2014[2] |
|---|---|---|---|
| American Chemistry Council<br>1300 Wilson Blvd.<br>Arlington, VA 22209 | Tel.: 703-741-5000<br>Fax: 703-741-6050 | Trade Debt | $317,356.00 |
| Imerys Ceramics<br>100 Mansell Court East Ste 300<br>Roswell, GA 30076 | Tel.: 770-594-0660<br>Fax: 770-645-3631 | Trade Debt | $316,453.70 |
| Applied Ceramics Inc.<br>5555 Pleasantdale Rd.<br>Doraville , GA 30340 | Tel.: 770-448-6888<br>Fax: 770-368-8261 | Trade Debt | $306,362.78 |
| RA Mueller, Inc.<br>11270 Cornell Park Dr.<br>Cincinnati, OH 45242 | Tel.: 513-247-5336<br>Fax: 713-996-6261 | Trade Debt | $302,316.65 |
| Bearing Distributors, Inc. (BDI)<br>8000 Hub Parkway<br>Cleveland, OH 44125 | Tel.: 216-642-9100<br>Fax: 216-642-9573 | Trade Debt | $302,149.77 |
| Addivant USA LLC<br>P.O. Box 8600<br>Philadelphia, PA 19178-6702 | Tel.: 203-573-2759<br>Fax: 317-667-1672 | Trade Debt | $296,805.30 |
| Xinyaqiang Silicon Chemistry<br>No.3 Jingwu Rd. Industrial Park<br>Suqian City 100<br>223809<br>China | Tel.: 86-527-882621...<br>Fax: 86-527-88262155 | Trade Debt | $296,509.56 |
| Calumet Penreco LLC<br>2780 Waterfront Pkwy E. Dr.<br>Indianapolis, IN 46214 | Tel.: 877-269-4711<br>Fax: 724-756-1050 | Trade Debt | $295,977.91 |
| Specialty Minerals Inc.<br>640 North 13th Street<br>Easton, PA 18042 | Tel.: 800-225-1156<br>Fax: 413-743-4527 | Trade Debt | $290,288.64 |
| Zircoa Inc.<br>31501 Solon Rd.<br>Solon, OH 44139 | Tel.: 440-349-7224<br>Fax: 440-248-8864 | Trade Debt | $285,735.98 |
| Praxair Inc.<br>39 Old Ridgebury Rd.<br>Danbury, CT 06810-5113 | Tel.: 203-837-2000<br>Fax: 203-837-2511 | Trade Debt | $263,346.01 |
| Transpek Industry Ltd.<br>6th Flr, Marble Arch<br>Race CourseCircle<br>Vadodara - 390 007<br>Gujarat-India | Tel.: +91-265-233-5444<br>Fax: +91-265-233-5758 | Trade Debt | $260,864.50 |
| Univar USA Inc.<br>17425 NE Union Hill Rd.<br>Redmond, WA 98052 | Tel.: 845-889-3621<br>Fax: 845-828-8515 | Trade Debt | $258,409.26 |
| BASF Corp.<br>100 Campus Dr.<br>Florham Park, NJ 07932 | Tel.: 800-443-6460<br>Fax: 800-634-9105 | Trade Debt | $255,236.76 |
| SCM Metal Products Inc.<br>2601 Weck Dr.<br>Durham, NC 27709 | Tel.: 919-287-9874<br>Fax: 919-544-0917 | Trade Debt | $249,594.13 |
| PSC<br>33 South Hyde Park Blvd.<br>Niagara Falls, NY 14303 | Tel.: 716-282-0514<br>Fax: 716-282-0592 | Trade Debt | $243,950.66 |
| OCI Melamine Americas Inc.<br>1209 Orange St.<br>Wilmington, DE 19801 | Tel.: 800-615-8284<br>Fax: 225-685-3003 | Trade Debt | $243,664.22 |
| Allegheny Power<br>P.O. Box 2809<br>Hagerstown, MD 21741-2809 | Tel.: 304-480-1271<br>Fax: 304-480-1254 | Trade Debt | $235,411.85 |

| Name of creditor and complete mailing address, including zip code | Telephone number and fax number of employees, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Amount of claim as of April 10, 2014[2] |
|---|---|---|---|
| Galata Chemicals, LLC<br>471 Highway 3142<br>Hahnville, LA 70057 | Tel: 800-428-7947<br>Fax: 877-721-9672 | Trade Debt | $232,389.30 |
| Airgas Inc.<br>611 Scott St.<br>Donora, PA 15033 | Tel: 800-682-3872<br>Fax: 724-379-7220 | Trade Debt | $225,684.68 |
| DXP Enterprises Inc.<br>7272 Pinemont Rd.<br>Houston, TX 77040 | Tel: 713-996-4700<br>Fax: 713-939-7257 | Trade Debt | $223,247.05 |
| CEVA Logistics U.S., Inc.<br>10751 Deerwood Park Blvd.<br>Suite 200<br>Jacksonville, FL 32256 | Tel: 904-928-1433<br>Fax: 904-680-1538 | Trade Debt | $222,567.05 |
| Albea Americas Inc.<br>191 Rte. 31 N.<br>Washington, NJ 07882 | Tel: 773-399-3262<br>Fax: 908-689-4767 | Trade Debt | $222,046.32 |
| Take Care Health Systems<br>205 Miller Springs Ct.<br>Franklin, TN 37064 | Tel: 615-665-7525<br>Fax: 615-468-3208 | Trade Debt | $221,644.64 |
| Greif Inc.<br>695 Louis Dr.<br>Warminster, PA 18974 | Tel: 800-338-3786<br>Fax: 215-956-2416 | Trade Debt | $201,714.36 |

## EXHIBIT C

## Holders of Five Largest Secured Claims Against the Debtors

| Creditor | Mailing Address and Phone Number | Approximate Amount of Claim[1] (in millions) | Description of Security Interest | Contingent, Unliquidated, Disputed (C/U/D) |
|---|---|---|---|---|
| The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent for the 9.0% and 9.5% Second-Priority Springing Lien Notes due 2021 | The Bank of New York Mellon Trust Company, N.A. 525 William Penn Place, 38th Floor Pittsburgh, PA 15259 Attn: Momentive Performance Materials Inc. Account Manager (412) 234-7535 | $1,344 | Substantially all of the Debtors' assets | No |
| The Bank of New York Mellon Trust Company, N.A., in its capacity as Indenture Trustee for the 8.875% Senior Secured Notes | The Bank of New York Mellon Trust Company, N.A. 525 William Penn Place, 38th Floor Pittsburgh, PA 15259 Attn: Momentive Performance Materials Inc. Account Manager (412) 234-7535 | $1,100 | Substantially all of the Debtors' assets | No |
| The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent for the 10% Senior Secured Notes | The Bank of New York Mellon Trust Company, N.A. 525 William Penn Place, 38th Floor Pittsburgh, PA 15259 Attn: Momentive Performance Materials Inc. Account Manager (412) 234-7535 | $250 | Substantially all of the Debtors' assets | No |

---

[1]    These figures are as of December 31, 2013 and are inclusive of principal and accrued interest.

| Creditor | Mailing Address and Phone Number | Approximate Amount of Claim[1] (in millions) | Description of Security Interest | Contingent, Unliquidated, Disputed (C/U/D) |
|---|---|---|---|---|
| JPMorgan Chase Bank, N.A., as administrative agent and collateral agent for the Asset-Based Revolving Credit Agreement, dated as of April 24, 2013 | JP Morgan Chase Bank, N.A. 500 Stanton Christiana Rd, 3/Ops2, Newark DE, 19713 Attn: Evan Zacharias and Demetrius Liston (302) 634-1405 | $236 | Substantially all of the Debtors' assets | No |
| JPMorgan Chase Bank, N.A., in its capacity as administrative agent and collateral agent for the Second Amended and Restated Credit Agreement, dated as of April 24, 2013 | JP Morgan Chase Bank, N.A. 500 Stanton Christiana Rd, 3/Ops2, Newark DE, 19713 Attn: Evan Zacharias and Demetrius Liston (302) 634-1405 | $20.7 | Substantially all of the Debtors' assets | No |

## EXHIBIT D

### Summary of Debtors' Assets and Liabilities
### on a consolidated basis, as of December 31, 2013

(Dollars amount in millions)

| ASSETS | |
|---|---:|
| Current Assets: | |
|   Cash and cash equivalents | 103 |
|   Accounts receivable (net of allowance for doubtful accounts of $3) | 326 |
|   Due from affiliates | 5 |
|   Inventories | 368 |
|   Deferred income taxes | 6 |
|   Other current assets | 61 |
|     Total Current Assets | 869 |
|   Property and Equipment | 954 |
|   Investment in unconsolidated entities | 8 |
|   Other long-term assets | 33 |
|   Deferred income taxes | 3 |
|   Intangible Assets | 455 |
| Goodwill | 381 |
| **Total Assets** | **$2,703** |
| | |
| **LIABILITIES** | |
| Current Liabilities: | |
|   Accounts payable | 250 |
|   Due to affiliates | 9 |
| Debt payable within one year | 4103 |
| Interest payable | 88 |
| Income taxes payable | 6 |
| Deferred income taxes | 12 |
| Accrued payroll and incentive compensation | 44 |
| Other current liabilities | 86 |
| Total current liabilities | 4598 |
| Long Term Debt | 7 |
| Other Liabilities | 66 |
| Pension liabilities | 280 |
| Deferred income taxes | 77 |
| **Total Liabilities** | **$5,028** |
| | |
| **COMMITMENTS AND CONTINGENCIES** | |
| Deficit | |
| Common Stock - $0.01 par value; 100 shares authorized, issued and outstanding at September 30, 2013 | - |
| Additional paid – in capital | 223 |
| Accumulated deficit | (2,750) |
| Accumulated other comprehensive income | 202 |
| | |
| Total deficit | (2,325) |
| | |
| Total liabilities and deficit | 2,703 |

## EXHIBIT E

### Publicly Held Securities

Local Bankruptcy Rule 1007-2(a)(7) requires the Debtors to identify the number and classes of shares of stock, debentures and other securities of the Debtors that are publicly held and the number of holders thereof, listing separately those held by each of the Debtors' officers and directors and the amounts so held.

The outstanding common stock of the Debtors is privately held, and there is no established public trading market for such common stock. The Debtors' publicly held debt securities are:

| Type of Security | Principal Amount Outstanding | Approximate Number of Record Holders |
|---|---|---|
| 8.875% First-Priority Senior Secured Notes | $1,100,000,000 | Unknown |
| 10% Senior Secured Notes | $250,000,000 | Unknown |
| 9% Second-Priority Springing Lien Notes and 9.5% Second-Priority Springing Lien Notes | $1,340,000,000 | Unknown |
| 11.5% Senior Subordinated Notes | $382,000,000 | Unknown |

## <u>EXHIBIT F</u>

**Debtors' Property Not in the Debtors' Possession**

   Local Bankruptcy Rule 1007-2(a)(8) requires the Debtors to list property in the possession or custody of any custodial, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or agent for any such entity.

   In the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including, vendors, distributors, warehousemen, common carriers, and other related service providers, or agents, where the Debtors' ownership interest is not affected.  Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting the property would be impractical.

## EXHIBIT G

### Debtors' Premises

Pursuant to Local Rule 1007-2(a)(9), the following lists the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

| Debtor/Lessee | Address | Type of Interest[1] |
|---|---|---|
| Momentive Performance Materials USA Inc. | 703 South Street<br>New Smyrna Beach, FL 32168 | Owned |
| Momentive Performance Materials Quartz Inc. | 24400 Highland Rd.<br>Richmond Heights, OH 44143 | Owned |
| Momentive Performance Materials Quartz Inc. | 611 O'Neill Dr. SE<br>Hebron, OH 43025 | Owned |
| Momentive Performance Materials Quartz Inc. | 22557 West Lunn Rd.<br>Strongsville, OH 44149 | Owned |
| Momentive Performance Materials Quartz Inc. | 4901 Campbell Rd.<br>Willoughby, OH 44094 | Owned |
| MPM Silicones, LLC | 3500 S. State<br>Route 2<br>Friendly, WV 26146 | Owned |
| MPM Silicones, LLC | 260 Hudson River Rd.<br>Waterford, NY 12188 | Owned |
| Momentive Performance Materials USA Inc. | 4045 Cheyenne Court<br>Chino, CA 91710 | Leased |

---

[1] The classification of the contractual agreements listed herein as real property leases or property held by other arrangements is not binding upon the Debtors.

| Debtor/Lessee | Address | Type of Interest[1] |
|---|---|---|
| Momentive Performance Materials USA Inc. | 1950 Continental Boulevard Charlotte, NC 28273 | Leased |
| Momentive Performance Materials USA Inc. | 420 N. Taylor Rd. Garrett, IN 46738 | Leased |
| Momentive Performance Materials USA Inc. | 500 N. Taylor Rd. Garrett, IN 46738 | Leased |
| Momentive Performance Materials USA Inc. | 9930 Kincey Ave. Huntersville, NC 28078 | Leased |
| Momentive Performance Materials USA Inc. | 769 Old Saw Mill River Road Tarrytown, NY 10591 | Leased |
| Momentive Performance Materials Quartz Inc. | 340 O'Neil Dr. Hebron, OH 43025 | Leased |
| Momentive Performance Materials Quartz Inc. | 2012 Zanker Rd. San Jose, CA 95131 | Leased |
| MPM Silicones, LLC | 5700 Century Blvd. Texas City, TX 77582 | Leased |
| MPM Silicones, LLC | 20 Solar Dr. Halfmoon, NY 12065 | Leased |

- 2 -

## EXHIBIT H

Pursuant to Local Rule 1007-2(a)(10), the following lists the location of the Debtors' substantial assets, books and records, and nature, location, and value of any assets held by the Debtors outside the United States:

### Location of Debtors' Substantial Assets

The Debtors' owned properties and leaseholds are provided in Exhibit G.

### Location of the Debtors' Books and Records

260 Hudson River Rd.
Waterford, NY 12188

22557 West Lunn Rd.
Strongsville, OH 44149

180 East Broad St.
Columbus, OH 43215

### Debtors' Assets Outside of the United States

Certain of the Debtors have fully-owned direct and indirect foreign subsidiaries which hold assets outside of the United States.

## <u>EXHIBIT I</u>

### Summary of Actions or Proceedings Pending Against the Debtors

       Pursuant to Local Rule 1007-2(a)(11), the Debtors are involved in multiple pending or threatened litigations in various jurisdictions.  However, judgment against any of the Debtors is not imminent in any such litigation.  The Debtors will provide information regarding pending or threatened litigations in the Debtors' Statement of Financial Affairs and/or Schedules of Liabilities, as applicable.

**EXHIBIT J**

**Senior Management of the Debtors**

| Name | Tenure | Position | Experience/Responsibilities |
|---|---|---|---|
| Craig O. Morrison | 2010 to Present | Chairman, President, and Chief Executive Officer of Momentive Performance Materials Inc. and Momentive Performance Materials Holdings Inc. | Mr. Morrison, as Chairman, President, and Chief Executive Officer, is responsible for overall operations and strategy for the Debtors. Mr. Morrison is also a director of Momentive Performance Materials Inc. ("**MPM**") and Momentive Performance Materials Holdings Inc. ("**MPM Holdings**") and was appointed to the board of directors on October 1, 2010.<br><br>He also serves as Chairman, President and Chief Executive Officer of Momentive Specialty Chemicals Inc. (formerly known as Hexion Specialty Chemicals, Inc. and Borden, Inc.) ("**MSC**") having been elected to those positions effective March 25, 2002. Prior to joining MSC, Mr. Morrison served as President and General Manager of Alcan Packaging's Pharmaceutical and Cosmetic Packaging business from 1999 to 2002. |
| William H. Carter | 2010 to Present | Chief Financial Officer and Executive Vice President of MPM Holdings | Mr. Carter, as Chief Financial Officer, is responsible for overseeing the financial activities of the Debtors. His specific responsibilities include financial planning and monitoring the cash flow of the Debtors. Mr. Carter was elected Executive Vice President, Chief Financial Officer, and a director of MPM and MPM Holdings on October 1, 2010.<br><br>He also serves as Executive Vice President and Chief Financial Officer of MSC, having been elected to those positions effective April 3, 1995, and as a director of MSC since November 20, 2001. Additionally, he has served as director of former affiliated entities, Elmer's Products, Inc., Borden Foods Corporation, and AEP Industries. He currently serves as a director of M/I Homes, Inc. Prior to 1995, Mr. Carter was a partner, and the engagement partner for Borden Chemical, with PriceWaterhouse LLP. |
| Jack Boss | 2014 to Present | Executive Vice President and Division President of MPM | Mr. Boss, as Division President, leads MPM's quartz and silicones businesses. Prior to joining shortly before the Petition Date, Mr. Boss was employed at Honeywell International in various leadership positions from 2003 to March 2014, including most recently at President of Honeywell Safety Products since February 2012. Prior to his employment with Honeywell, Mr. Boss served as Vice President and General Manager of the Specialty and Fine Chemicals business of Great Lakers Chemical Corporation from 2000 to 2003, and Vice President and Business Director at International Specialty Products (now Ashland Corporation) from 1996 to 2000. |
| Judith A. Sonnett | 2010 to Present | Executive Vice | Ms. Sonnet was elected Executive Vice President, Human Resources on October 1, 2010. She also serves as Executive Vice President – Human Resources of MSC, having been |

| Name | Tenure | Position | Experience/Responsibilities |
|---|---|---|---|
| | | | elected to that position in September 2007. She has served in various HR leadership roles for MSC and its predecessors since November 1998. From 1995 to 1998 Ms. Sonnett worked in Human Resources for W.L. Gore and Associates. |
| Douglas A. Johns | 2006 to Present | Executive Vice President, General Counsel and Secretary of MPM and MPM Holdings | Mr. Johns was elected General Counsel and Secretary on December 4, 2006. He was named Executive Vice President on October 1, 2010. He also serves as Executive Vice President and General Counsel of MSC since October 1, 2010. Prior to the Debtors' formation, Mr. Johns served as General Counsel for GE Advanced Materials, a division of General Electric Company, which was the predecessor to the Debtors. Mr. Johns began his career as at trial lawyer for the U.S. Department of Justice and was in private practice before joining General Electric Company. |
| Nathan E. Fisher | 2010 to Present | Executive Vice President, Procurement of MPM | Mr. Fisher was elected Executive Vice President, Procurement on October 1, 2010. He also serves as Executive Vice President-Procurement of MSC, having been elected to that position on June 1, 2005. Mr. Fisher joined MSC in March 2003 as Director of Strategic Sourcing and was promoted to Vice President, Global Sourcing in September 2004. |
| Anthony B. Greene | 2010 to Present | Executive Vice President, Business Development and Strategy of MPM | Mr. Greene was elected Executive Vice President, Business Development and Strategy on October 1, 2010, and serves in the same position with MSC. Mr. Greene joined the Debtors on December 4, 2006 as Global Financial Planning and Analysis Manager. Prior to joining the Debtors, he served as Global Financial Planning and Analysis Manager for GE Advanced Materials, a division of General Electric Company, which was the predecessor to the Debtors. He joined GE in 1981 and held numerous financial management roles in a wide variety of GE businesses in the U.S., Asia, and Europe. |
| Karen E. Koster | 2011 to Present | Executive Vice President, Environmental, Health & Safety of MPM | Ms. Koster was elected Executive Vice President, Environmental, Health & Safety on August 8, 2011. She serves in the same position with MSC. Prior to joining the Debtors, Ms. Koster held various environmental services and legal management roles at Cytec Industries from August 2002 to August 2011, including serving as Vice President of Safety, Health and Environment. |
| George F. Knight | 2010 to Present | Senior Vice President, Finance and Treasurer of MPM and MPM Holdings | Mr. Knight was elected Senior Vice President, Finance and Treasurer on October 1, 2010. Mr. Knight also serves in that capacity for MSC. He joined MSC's predecessor, Borden Inc. in 1997 as Director and then Vice President of Mergers and Acquisitions-Finance. From 1999-2001 he served as Vice President of Finance for Borden Foods Corporation. In July 2002, he was appointed Vice President-Finance and Treasurer of MSC and was promoted to his current position of Senior Vice President-Finance and Treasurer in June 2005. |

- 2 -

# EXHIBIT K

## Payroll

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of payroll to the Debtors' employees (excluding officers, directors, and stockholders) and the estimated amount to be paid to officers, directors, stockholders, and financial and business consultants for the thirty (30) day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors and Stockholders)[1]** | $10,134,636 |
| **Payments to Officers, Directors, and Stockholders[2]** | $178,521 |
| **Payments to Financial and Business Consultants** | $1,550,000[3] |

---

[1]     Amount includes estimated employee wages and salaries, payroll taxes and other various benefits.

[2]     Pursuant to the Shares Services Agreement with MSC, costs related to certain of the Company's Officers and Directors are allocated among the Company and MSC.

[3]     Amount includes estimated fees only, and does not include expenses, which may ultimately be passed through to the Debtors by such consultants.  Further, the amount does not include estimated payments to auditors or ordinary course professionals, or any payments to advisors retained by other parties who do not represent the Debtors whose costs may be passed along to the Debtors.

## <u>EXHIBIT L</u>

**Debtors' Estimated Cash Receipts and Disbursements for the
Thirty (30) Day Period Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the Debtors' chapter 11 petitions, the estimated cash receipts and disbursements, estimated net cash gain or loss, and estimated obligations and receivables expected to accrue that remain unpaid, other than professional fees.

*(Dollars amount in millions)*

| | |
|---|---|
| **Cash Receipts** | $34.4 |
| **Cash Disbursements** | $(196.4) |
| **Net Cash Gain/Loss** | $(162.0) |

| | |
|---|---|
| **Unpaid Obligations** | $16.6 |
| **Uncollected Receivables** | $69.1 |

**APPENDIX I**

EXECUTION COPY

## RESTRUCTURING SUPPORT AGREEMENT

Reference is made to: (i) the credit facility provided for by that certain Asset-Based Revolving Credit Agreement, dated as of April 24, 2013 (the "ABL Facility"), among Momentive Performance Materials Holdings Inc. ("MPM Holdings"), Momentive Performance Materials Inc. ("MPM"), Momentive Performance Materials USA Inc., as U.S. Borrower, Momentive Performance Materials GMBH, as Germany Silicone Borrower, Momentive Performance Materials Quartz GMBH as Germany Quartz Borrower, Momentive Performance Materials Nova Scotia ULC, as Canadian Borrower, the lenders party thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent, as further amended, supplemented or otherwise modified, together with ancillary documents; (ii) the credit facility provided for by that certain Second Amended and Restated Credit Agreement (the "Cash Flow Facility"), dated as of April 24, 2013, among MPM Holdings, MPM, Momentive Performance Materials USA Inc., as U.S. Borrower, Momentive Performance Materials GMBH, as Germany Silicone Borrower, Momentive Performance Materials Nova Scotia ULC, as Canadian Borrower, General Electric Capital Corporation as Designated Lender, and JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent, as further amended, supplemented or otherwise modified, together with ancillary documents; (iii) those certain 8.875% First-Priority Senior Secured Notes due 2020 (the "First Lien Notes") issued pursuant to an Indenture dated as of October 25, 2012 (as further amended, supplemented or otherwise modified, together with ancillary documents, the "First Lien Indenture"), with The Bank of New York Mellon Trust Company, N.A., as indenture trustee, and certain direct and indirect subsidiaries of MPM as guarantors thereto; (iv) those certain 10% Senior Secured Notes due 2020 (the "1.5 Lien Notes") issued pursuant to an Indenture dated as of May 25, 2012 (as further amended, supplemented or otherwise modified, together with ancillary documents, the "1.5 Lien Indenture"), with The Bank of New York Mellon Trust Company, N.A., as indenture trustee, and certain direct and indirect subsidiaries of MPM as guarantors thereto; (v) those certain 9% Second-Priority Springing Lien Notes due 2021 and 9.5% Second-Priority Springing Lien Notes due 2021 (collectively, the "Second Lien Notes") issued by MPM pursuant to an Indenture dated as of November 5, 2010 (as further amended, supplemented or otherwise modified, together with ancillary documents, the "Second Lien Indenture"), with The Bank of New York Mellon Trust Company, N.A., as indenture trustee, and certain direct and indirect subsidiaries of MPM as guarantors thereto; (vi) those certain 11.5% Senior Subordinated Notes due 2016 (the "Subordinated Notes") issued pursuant to an Indenture dated as of December 4, 2006 (as further amended, supplemented or otherwise modified, together with ancillary documents, the "Subordinated Indenture," and together with the First Lien Indenture, 1.5 Lien Indenture and Second Lien Indenture, the "Indentures"), with Wells Fargo Bank, National Association, as indenture trustee, and certain direct and indirect subsidiaries of MPM as guarantors thereto; and (vii) that certain pay-in-kind unsecured 11% Senior Discount Note, due June 4, 2017, issued by MPM Holdings, with an original principal amount of $400 million (the "PIK Note," and together with the First Lien Notes, 1.5 Lien Notes, Second Lien Notes and Subordinated Notes, the "Notes").

This RESTRUCTURING SUPPORT AGREEMENT is made and entered into as of April 13, 2014 (as amended, supplemented or otherwise modified, this "Support

Agreement") by each of MPM Holdings, MPM, and each of their direct and indirect domestic subsidiaries that are party hereto (all of the foregoing, collectively, the "Company"), the undersigned affiliates of Apollo Global Management, LLC (collectively, the "Apollo Entities") and the holders of the Second Lien Notes that are not Apollo Entities that are from time to time party hereto (the "Consenting Noteholders" and, together with the Apollo Entities, the "Plan Support Parties," as appropriate), with respect to a restructuring of the Company's outstanding obligations under the ABL Facility, the Cash Flow Facility, the Notes, the Indentures, all other claims (as defined in section 101(5) of the Bankruptcy Code) against and interests in the Company (the "Restructuring") contemplated by the restructuring term sheet attached hereto as Exhibit A (the "Term Sheet").  Each party to this Support Agreement may be referred to as a "Party" and, collectively, as the "Parties."

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Term Sheet, which Term Sheet and all annexes thereto are expressly incorporated by reference herein and made a part of this Support Agreement as if fully set forth herein.

**Section 1.  Restructuring, Term Sheet and Definitive Documentation.**

**1.1    Support of the Restructuring, Term Sheet and Definitive Documentation.**

(a)    Obligations of the Company.  Until the Termination Date (as defined below), the Company, jointly and severally, agrees to take any and all necessary and appropriate actions in furtherance of the Restructuring contemplated under this Support Agreement and the Term Sheet, including (i) to commence reorganization cases (the "Chapter 11 Cases") by filing voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York, White Plains (the "Bankruptcy Court"); (ii) to file and seek approval on an interim and final (to the extent applicable) basis of "first day" motions (including a motion seeking approval of a post-petition credit facility (the "DIP Facility") and use of cash pledged as collateral, all of which shall be in form and substance acceptable to the Requisite Investors (as defined below); (iii) to file with the Bankruptcy Court and seek approval of a joint chapter 11 plan of reorganization consistent with the terms of the Term Sheet (the "Plan"), and a related disclosure statement (the "Disclosure Statement"), the Plan and Disclosure Statement, including any amendments, modifications and supplements thereto, with the consent of the Requisite Investors, all of which shall be in form and substance satisfactory to the Requisite Investors; (iv) to the extent exigencies permit, to provide copies of any and all materials and pleadings to be filed in the Chapter 11 Cases to counsel for the Plan Support Parties  in advance of filing with the Bankruptcy Court and such materials and pleadings shall be in form and substance reasonably satisfactory to the Requisite Investors; (v) to provide copies of any financial reporting information or any other

information and materials about the Company's business, properties or operations that is provided to the lenders pursuant to the terms of the DIP Facility or to any of the Plan Support Parties, simultaneously with delivery of such information to those parties, to counsel for all Plan Support Parties, as applicable; (vi) to take any and all necessary and appropriate actions in furtherance of all of the restructuring transactions contemplated under this Support Agreement, the Plan (if applicable) and the Term Sheet; (vii) except as expressly permitted in Section 3 hereof, not to, directly or indirectly, take any action that is inconsistent with, or is intended or is reasonably likely to interfere with or impede or delay consummation of, this Support Agreement, the Restructuring or the transactions embodied in the Term Sheet, the Rights Offering, or the Plan, including, but not limited to, soliciting, or causing or allowing any of its agents or representatives to solicit, encourage or initiate, any offer or proposal from, or entering into any agreement with, any person or entity concerning any actual or proposed chapter 11 plan or restructuring transaction (including, for the avoidance of doubt, a transaction premised on one or more asset sales under section 363 of the Bankruptcy Code or pursuant to a plan) other than the Restructuring, or filing any pleading or document with respect to, or proposing, joining in, or participating in the formation of, any actual or proposed chapter 11 plan or restructuring transaction other than the Restructuring, including, without limitation, (a) any chapter 11 plan, reorganization, restructuring, or liquidation involving the Company or any of the Debtors, (b) the issuance, sale, or other disposition of any equity or debt interests, or any material assets, of the Company or any of the Debtors, or (c) a merger, sale, consolidation, business combination, recapitalization, refinancing, share exchange, rights offering, debt offering, equity investment, or similar transaction (including the sale of all or substantially all of the assets of the Company or the Debtors whether through one or more transactions) involving the Company or any of the Debtors (the foregoing, together, an "Alternative Transaction"); (viii) file with the Bankruptcy Court and obtain entry of an order approving this Support Agreement and its assumption by the Company, which order shall be in form and substance satisfactory to the Requisite Investors; (ix) file with the Bankruptcy Court and obtain entry of an order approving the Backstop Commitment Agreement, which order shall be in form and substance satisfactory to the Requisite Investors; (x) not to take any action or make any filing or commencing any action challenging the validity, enforceability, perfection or priority of or seeking avoidance of the liens securing the obligations of the Second Lien Notes, or otherwise seeking to restrict the rights of holders of the Second Lien Notes, other than as expressly contemplated by the Restructuring or herein; and (xi) subject to entry of the BCA Approval Order (as defined in the Term Sheet) and regardless of whether the Restructuring is consummated, pay all reasonable, actual and documented fees and expenses, incurred prior to the Termination Date of Akin Gump

- 3 -

Strauss Hauer & Feld LLP, Lazard Frères & Co. LLC, Milbank, Tweed, Hadley & McCloy LLP and Houlihan Lokey Capital, Inc. (and each other party set forth in the Expense Reimbursement section of the Term Sheet) incurred pursuant to their respective representation of the Apollo Entities and Consenting Noteholders in connection with the Restructuring and any ancillary efforts related thereto, in accordance with the terms of the fee arrangements agreed between the Company and each such advisor. For purposes of the Support Agreement, "Requisite Investors" shall have the meaning ascribed to that term in the Term Sheet; provided, further, that such defined term for purposes herein and the Term Sheet may not be modified or amended in any manner without the consent of the Apollo Entities and each Consenting Noteholder that was an original signatory hereto, still holding a Backstop Commitment as of such date of amendment. Further, for purposes herein (and the Term Sheet) the modifying phrase "original signatory hereto," "original party hereto" or any such similar or corollary phrase means a Consenting Noteholder or an Apollo Entity, as the case may be, that executed this Support Agreement on or prior to the Effective Date.

(b) <u>Obligations of Apollo Entities and Consenting Noteholders</u>. Until the Termination Date, each Apollo Entity and Consenting Noteholder, severally and not jointly, in its capacity as a holder of Second Lien Notes, or in any other capacity, hereby agrees to: (i) when, and to the extent, solicited, and subject to the acknowledgements set forth in Section 7 hereof, vote all Second Lien Notes, or any other Holdings (as defined below), now or hereafter beneficially owned by such holder or for which such holder now or hereafter serves as the nominee, investment manager or advisor for beneficial holders, if applicable, and for which such holder has voting power, in favor of the Plan and not change or withdraw (or cause to be changed or withdrawn) such vote; (ii) not object to, or support any other person's efforts to oppose or object to, in each case, directly or indirectly, confirmation of the Plan, this Support Agreement, the Restructuring or any of the transactions contemplated herein; (iii) not object to, directly or indirectly, the "first day" motions and other motions consistent with this Support Agreement and the Term Sheet, filed by the Company in furtherance of the Restructuring, including motions to preserve or extend exclusivity to dates consistent with the dates provided for in Section 2.1 hereof, if applicable; (iv) refrain from taking any action that is materially inconsistent with, or that would materially delay or impede approval, confirmation or consummation of the Restructuring or the Plan, or that is otherwise inconsistent with the terms of this Support Agreement and the Term Sheet or any of the transactions contemplated herein; and (v) not, directly or indirectly, propose, support, solicit, encourage, initiate or participate in any offer or proposal from, or enter into any agreement with, any person or entity concerning any actual or proposed Alternative Transaction. Notwithstanding anything else in this Support Agreement, in the event of a termination of this Support

Agreement for any reason, each Plan Support Party shall have the right to withdraw any vote in support of the Plan in its sole and absolute discretion and the Company agrees that it shall not oppose such withdrawal or revocation.

(c)     <u>Obligations of Each of the Parties</u>.  Until the Termination Date, the Company and the Plan Support Parties, severally and not jointly, agree: (i) to support and consummate the Restructuring contemplated by the Term Sheet and all of the transactions contemplated herein, including the Company's filing of the Chapter 11 Cases and granting of a first priority priming lien on its existing and after-acquired assets pursuant to the terms of the DIP Facility (as defined below); (ii) to negotiate in good faith each of the definitive agreements, documents, motions and other pleadings referenced in, or reasonably necessary or desirable to effectuate the transactions contemplated by, the Term Sheet, which may include, without limitation, the Plan, the Disclosure Statement, a DIP Facility, an exit term loan and exit revolving credit agreement, the Backstop Commitment Agreement, subscription agreement, rights offering procedures and all motions, including but not limited to the "first-days," and the Disclosure Statement motion, all of which shall be in form and substance satisfactory in their discretion to the Requisite Investors, and shall be consistent in all respects with and incorporate, as applicable, the terms of the Term Sheet (collectively, as amended, modified or supplemented, the "<u>Definitive Documentation</u>;" all such Definitive Documentation to be acceptable to the Requisite Investors); (iii) to timely deliver drafts of all such Definitive Documentation such that the other Parties shall have sufficient time to review and provide comments on the same; and (iv) not to take any action that would interfere with, delay, or postpone the effectuation of the Restructuring contemplated by this Support Agreement and the Term Sheet, including the approval of the Disclosure Statement and the confirmation and consummation of the Plan.

**Section 2.  <u>Termination Events</u>.**

**2.1     Noteholder Termination Events.**

The occurrence of any of the following shall be a "<u>Noteholder Termination Event</u>":

(a)     11:59 p.m. (Prevailing New York City Time) on April 13, 2014, unless prior thereto the Chapter 11 Cases have commenced;

(b)     three (3) calendar days after the date of the commencement of the Chapter 11 Cases (the "<u>Petition Date</u>"), unless prior thereto the Bankruptcy Court has entered an interim order, in form and substance mutually satisfactory to the Company and the Requisite Investors,

authorizing the Company to enter into the DIP Facility and use cash collateral, and scheduling a final hearing with respect to such matters;

(c)    11:59 p.m. (prevailing New York City time) on April 28, 2014, if the Backstop Commitment Agreement is not executed and filed with the Bankruptcy Court before such time and date;

(d)    sixty (60) calendar days after the Petition Date, unless prior thereto the Bankruptcy Court has entered a final order, in form and substance mutually satisfactory to the Company and the Requisite Investors , authorizing the Company to enter into the DIP Facility and use cash collateral;

(e)    sixty (60) calendar days after the Petition Date, unless prior thereto the Bankruptcy Court has entered an order or orders, in form and substance mutually satisfactory to the Company and the Requisite Investors, authorizing and approving (i) this Support Agreement and its assumption by the Company, (ii) the Backstop Commitment Agreement and (iii) procedures with respect to the Rights Offering;

(f)    seventy five (75) calendar days after the Petition Date, unless prior thereto the Bankruptcy Court has entered a final order, in form and substance mutually satisfactory to the Company and the Requisite Investors, approving the Disclosure Statement;

(g)    seventy five (75) calendar days after the Petition Date, unless prior thereto, the amendment to the SSA, as set forth in the Term Sheet, is agreed;

(h)    one hundred twenty (120) calendar days after the Petition Date, unless prior thereto the Bankruptcy Court has entered a final order, in form and substance mutually satisfactory to the Company and the Requisite Investors, approving the Plan (the "<u>Confirmation Order</u>");

(i)    one hundred eighty (180) calendar days from the Petition Date, unless prior thereto the effective date for the Plan has occurred and the Rights Offering has been consummated;

(j)    the Backstop Commitment Agreement is terminated in accordance with its terms;

(k)    the occurrence of any material breach of this Support Agreement by the Company (to the extent not otherwise cured or waived in accordance with the terms hereof), including any action by the Company that is inconsistent with the Company's obligations pursuant to Section 1.1 hereof;

(l)    one or more of the Apollo Entities materially breaches its obligations

herein or one or more of the Consenting Noteholders materially breaches its obligations herein, such that the non-breaching Consenting Noteholders and the non-breaching Apollo Entities at any time hold collectively less than 66 and 2/3% of the principal amount of all Second Lien Notes;

(m)     the amendment or modification of the Support Agreement, the DIP Facility, the Backstop Commitment Agreement, the Rights Offering procedures, the Plan, the Disclosure Statement or any documents related to the Plan, notices, exhibits or appendices, or any of the Definitive Documentation, without the consent of the Requisite Investors;

(n)     the occurrence of (i) an Event of Default under the DIP Facility (that is not otherwise cured or waived in accordance with the terms thereof) or (ii) an acceleration of the obligations or termination of commitments under the DIP Facility, cash collateral order entered in the Chapter 11 Cases;

(o)     any of the orders approving the Support Agreement, the DIP Facility (including the use of cash collateral), the Backstop Commitment Agreement, the Rights Offering procedures, the Plan or the Disclosure Statement, or the Confirmation Order are reversed, stayed, dismissed, vacated or reconsidered or modified or amended without the consent of the Requisite Investors or a motion for reconsideration, reargument or rehearing is granted;

(p)     any court of competent jurisdiction or other competent governmental or regulatory authority issues a final, non-appealable order making illegal or otherwise preventing or prohibiting the consummation of the transactions contemplated in the Term Sheet or any of the Definitive Documentation in a way that cannot be reasonably remedied by the Company subject to the satisfaction of the Requisite Investors;

(q)     any of the Chapter 11 Cases shall be dismissed or converted to a chapter 7 case, or a chapter 11 trustee with plenary powers, or an examiner with enlarged powers relating to the operation of the businesses of the Company (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases or the Company shall file a motion or other request for such relief; and

(r)     a filing by the Company of any motion, application or adversary proceeding challenging the validity, enforceability, perfection or priority of or seeking avoidance of the liens securing the obligations referred to in the Second Lien Indenture or the documents related thereto or, other than as contemplated by the Restructuring, any other cause of action against and/or seeking to restrict the rights of holders of Second Lien Notes in their capacity as such, or the prepetition liens securing the Second Lien

Notes (or if the Company supports any such motion, application or
adversary proceeding commenced by any third party or consents to the
standing of any such third party).

**2.2    Company Termination Events.**

The occurrence of any of the following shall be a "<u>Company Termination Event</u>"
and together with any Noteholder Termination Event, a "<u>Termination Event</u>":

(a)    one or more of the Apollo Entities materially breaches its obligations
herein or one or more of the Consenting Noteholders materially breaches
its obligations herein, such that the non-breaching Consenting
Noteholders and the non-breaching Apollo Entities at any time hold
collectively less than 66 2/3 % of the principal amount of all Second Lien
Notes;

(b)    11:59 p.m. prevailing New York City time) on April 28, 2014, if the
Backstop Commitment Agreement is not executed and filed with the
Bankruptcy Court before such time and date;

(c)    any court of competent jurisdiction or other competent governmental or
regulatory authority issues a final, non-appealable order making illegal or
otherwise preventing or prohibiting the consummation of the
Restructuring contemplated in the Term Sheet or any of the Definitive
Documentation in a way that cannot be  remedied by the Company
subject to the satisfaction of the Requisite Investors; and

(d)    one hundred eighty (180) calendar days from the Petition Date, unless
prior thereto the effective date for the Plan has occurred and the Rights
Offering has been consummated.

**2.3    Consensual Termination.**

In addition to any termination event otherwise set forth herein, this Support
Agreement shall terminate effective upon a written agreement of the Company and the
Requisite Investors to terminate this Support Agreement.

**2.4    Termination Event Procedures.**

(a)    <u>Company Termination Event Procedures</u>.  Upon the occurrence of any
Company Termination Event, the termination of this Support Agreement
shall be effective upon delivery of written notice to counsel to each of the
Plan Support Parties (that were original signatories hereto) by the
Company (the date of the effectiveness of such termination, the
"<u>Company Termination Date</u>").

(b)    <u>Noteholder Termination Event Procedures</u>.  Upon the occurrence of a
Noteholder Termination Event, this Support Agreement shall terminate

automatically without further action or notice by any party(the "Noteholder Termination Date"), unless (i) with respect to a Termination Event in Section 2.1(i) the Requisite Investors waive such Noteholder Termination Event in writing within seven days of the occurrence of such Noteholder Termination Event, provided further that any party that does not provide such waiver shall be deemed to be a Non-Consenting Investor who has elected to withdraw its Backstop Commitment in accordance with the terms and conditions set forth in the Term Sheet and shall be treated as such for all purposes, (ii) with respect to a Termination Event in Section 2.1(g) Consenting Noteholders holding a majority of all Second Lien Notes held by all Consenting Noteholders on the Effective Date waive such Noteholder Termination Event within three (3) days of its occurrence and (iii) with respect to any other Noteholder Termination Event, the Requisite Investors waive such Noteholder Termination Event within three days of its occurrence; provided, further, that with respect to any termination under section 2.1(l), only each non-breaching Apollo Entity and non-breaching Consenting Holders holding a majority of all Second Lien Notes by dollar amount held by all Consenting Noteholders on the Effective Date can waive such Noteholder Termination Event in writing within three days of its occurrence and any breaching Apollo Entity or breaching Consenting Noteholder shall be disregarded for such purposes. The automatic stay arising pursuant to section 362 of the Bankruptcy Code shall be deemed waived or modified for purposes of providing notice, if any, hereunder. Except as otherwise provided herein, upon termination of this Support Agreement, the Parties shall be released from their respective commitments, undertakings and agreements under or related to this Support Agreement and shall have the rights and remedies that they would have had and shall be entitled to take all actions that they would have been entitled to take had they not entered into this Support Agreement. For the avoidance of doubt, the Company hereby represents and warrants that (i) it is a sophisticated party with respect to the transactions described herein and in the Term Sheet and is capable of evaluating the merits and risks of the transactions, making an informed decision with respect thereto, and evaluating properly the terms and conditions of the transactions and in each case has done so with the assistance of counsel, (ii) in consideration for the promises and mutual covenants and agreements set forth herein, including, without limitation, the waiver of the automatic stay, each of the Plan Support Parties has consented to the other transactions as contemplated hereby, (iii) it has been represented and advised by legal and financial advisors in connection with the transactions described herein and in the Term Sheet, has independently and without reliance upon the Plan Support Parties or any officer, employee, agent, or representative thereof, and based on such information as the Company has deemed appropriate, made its own analysis and decision to enter into this Support Agreement, and has entered into this Support Agreement voluntarily and of its own choice

and not under coercion or duress, (iv) enforcement of this Support Agreement will further the legitimate public policy of encouraging consensual out of court restructurings and settlements, and (v) the Plan Support Parties would suffer substantial prejudice if the waiver of the automatic stay is not enforced.

**2.5    Limitation on Termination.**

Except with respect to a termination pursuant to section 3 below, no occurrence shall constitute a Termination Event if such occurrence is principally the result of the action or omission of the Party seeking to terminate this Support Agreement.

**Section 3.  The Company's Fiduciary Obligations.**

Notwithstanding anything to the contrary herein, (a) nothing herein requires the Company or its board of directors or officers to breach any fiduciary obligations they have under applicable law; and (b) to the extent that such fiduciary obligations, upon advice from external counsel, require the Company or its board of directors to terminate the Company's obligations under this Support Agreement and the Term Sheet, the Company may do so, upon advice from external counsel, without incurring any liability to any Plan Support Party under this Support Agreement or the Term Sheet.  In the event that the Company or its board of directors determine that their fiduciary duties require the Company to terminate this Support Agreement, the Company shall provide five (5) business days written notice to the respective counsel to the Plan Support Parties (that were original signatories hereto).  Upon termination of this Agreement pursuant to this Section 3, all obligations of each Plan Support Party hereunder shall immediately terminate without further action or notice.

**Section 4.  Conditions Precedent to Support Agreement.**

The obligations of the Parties and the effectiveness of the Support Agreement are subject to the execution and delivery of signature pages for this Support Agreement by (i) the Company, (ii) Apollo Entities and (iii) Consenting Noteholders that collectively hold, with the Apollo Entities, no less than 66 2/3% of the aggregate principal amount of the Second Lien Notes (the date upon which such condition is satisfied, the "Effective Date").

**Section 5.  Representations, Warranties and Covenants.**

**5.1    Power and Authority.**

Each Plan Support Party, severally and not jointly, represents, warrants and covenants to the Company, and the Company, jointly and severally, represents, warrants and covenants to each Plan Support Party, that, as of the date of this Support Agreement, (i) such Party has and shall maintain all requisite corporate, partnership, or limited liability company power and authority to enter into this Support Agreement and to carry out the transactions contemplated by, and perform its respective obligations under this Support Agreement and (ii) the execution and delivery of this Support Agreement and the

performance of its obligations hereunder have been duly authorized by all necessary action on its part.

**5.2    Enforceability.**

Each Plan Support Party, severally and not jointly, represents, warrants and covenants to the Company, and the Company, jointly and severally, represents, warrants and covenants to each Plan Support Party, that this Support Agreement is its legally valid and binding obligation, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability or ruling of the Bankruptcy Court.

**5.3    Governmental Consents.**

Each Plan Support Party, severally and not jointly, represents, warrants and covenants to the Company, and the Company, jointly and severally, represents, warrants and covenants to each Plan Support Party that, as of the date of this Support Agreement, its execution, delivery, and performance of this Support Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with, or by, any Federal, state, or other governmental authority or regulatory body, except (i) any of the foregoing as may be necessary and/or required for disclosure by the Securities and Exchange Commission and applicable state securities or "blue sky" laws, (ii) any of the foregoing as may be necessary and/or required in connection with the Chapter 11 Cases, including the approval of the Disclosure Statement and confirmation of the Plan, (iii) filings of amended certificates of incorporation or articles of formation or other organizational documents with applicable state authorities, and other registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the Company, and (iv) any other registrations, filings, consents, approvals, notices, or other actions, the failure of which to make, obtain or take, as applicable, would not be reasonably likely, individually or in the aggregate, to materially delay or materially impair the ability of any Party hereto to consummate the transactions contemplated hereby.

**5.4    Ownership.**

Each Apollo Entity and Consenting Noteholder, severally and not jointly, represents, warrants and covenants to the Company that, without limiting the ability to sell, transfer or assign the Notes, any obligations under the ABL Facility or Cash Flow Facility, or any other claims against or interests in the Company (collectively, the "Holdings"), subject to Section 8 below, (i) such Party is the legal and beneficial owner of the Holdings in the principal amounts indicated on such Party's signature page hereto, or has and shall maintain the power and authority to bind the legal and beneficial owner(s) of such Holdings to the terms of this Support Agreement, (ii) such Party (x) has and shall maintain full power and authority to vote on and consent to or (y) has received direction from the party having full power and authority to vote on and consent to such

matters concerning its pro rata share of the Holdings and to exchange, assign and transfer such Holdings, and (iii) other than pursuant to this Support Agreement, such Holdings are and shall continue to be free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would materially and adversely affect in any way such Party's performance of its obligations contained in this Support Agreement.

**5.5   Other Support Agreements.**

Without limiting the Company's obligations hereunder, until the Termination Date, the Company shall not enter into any other restructuring support agreement related to a partial or total restructuring of the Company's obligations unless such support agreement is consistent in all respects with the Term Sheet and is acceptable to the Requisite Investors.

**Section 6.   <u>Liability</u>**

**6.1   Remedies.**

It is understood and agreed by each of the Parties that any breach of this Support Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and accordingly the Parties agree that, in addition to any other remedies, each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief, without the necessity of posting a bond, for any such breach.  The Company and the Plan Support Parties agree that for so long as the Company and the Plan Support Parties have not taken any action to prejudice the enforceability of this Support Agreement (including without limitation, alleging in any pleading that this Support Agreement is unenforceable), and have taken such actions as are reasonably required or desirable for the enforcement hereof, then the Company and the Plan Support Parties shall have no liability for damages hereunder in the event a court determines that this Support Agreement is found by a court of competent jurisdiction, on a final and non-appealable basis, not enforceable.

**6.2   Limitation on Liability.**

Notwithstanding anything that may be expressed or implied in this Support Agreement, and notwithstanding the fact that certain of the Parties may be partnerships or limited liability companies, each Party hereto covenants, agrees and acknowledges that no recourse under this Support Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any Party's affiliates, or any of such Party's affiliates or respective former, current or future direct or indirect equity holders, controlling persons, stockholders, directors, officers, employees, agents, members, managers, general or limited partners or assignees (each a "Related Party" and collectively, the "Related Parties") in each case other than the Parties and each of their respective successors and permitted assignees under this Support Agreement, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue

of any applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Related Parties, as such, for any obligation or liability of any Party under this Support Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; provided, however, nothing in this Section 6.2 shall relieve or otherwise limit the liability of any Party hereto or any of their respective successors or permitted assigns, for any breach or violation of its obligations under such contracts.  For the avoidance of doubt, prior to the Effective Date, none of the Parties will have any recourse, be entitled to commence any proceeding or make any claim under this Support Agreement or in connection with the transactions contemplated hereby except against any of the Parties, as applicable. The limitation on liability provision in this Section 6.2 shall survive the termination of this Support Agreement.

**Section 7.  Acknowledgement.**

This Support Agreement and the Term Sheet and transactions contemplated herein and therein are the product of negotiations among the Parties, together with their respective representatives.  Notwithstanding anything herein to the contrary, this Support Agreement is not, and shall not be deemed to be, (i) a solicitation of votes for the acceptance of the Plan or any Chapter 11 plan for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (ii) an offer for the purchase, sale, exchange, hypothecation, or other transfer of securities for purposes of the Securities Act of 1933 and the Securities Exchange Act of 1934.  Notwithstanding anything herein to the contrary, the Company will not solicit acceptances of the Plan from any Plan Support Party until such Plan Support Party has been provided with a Disclosure Statement approved by the Bankruptcy Court.

**Section 8.  Miscellaneous Terms.**

**8.1    Assignment; Transfer Restrictions.**

(a)    Each Plan Support Party hereby agrees, severally and not jointly, for so long as this Support Agreement shall remain in effect, not to sell, assign, transfer, hypothecate or otherwise dispose of (including by participation) any Holdings unless, as a condition precedent to any such transaction, the transferee thereof executes and delivers a Joinder (as defined in Section 8.1(c) hereof) to the Company and the Plan Support Parties  within three (3) business days of the execution of an agreement (or trade confirmation) in respect of the relevant transfer..  Upon execution of a Joinder, the transferee shall be deemed to be a Plan Support Party for purposes of this Support Agreement, except as otherwise set forth or limited herein.

(b)    Any sale, assignment, transfer, hypothecation or other disposition (including by participation) of any Holdings that does not comply with the procedures set forth in subsection 8.1(a) hereof shall be deemed void

*ab initio*.

(c)      Any person that receives or acquires Holdings pursuant to a sale, assignment, transfer, hypothecation or other disposition (including by participation) of such Holdingsby a Plan Support Party hereby agrees to be bound by all of the terms of this Support Agreement (as the same may be hereafter amended, restated or otherwise modified from time to time) (a "Joining Party") by executing and delivering a joinder in the form of Exhibit B hereto (the "Joinder"). The Joining Party shall thereafter be deemed to be a Party for all purposes under this Support Agreement, except as otherwise set forth or limited herein.

(d)      With respect to the Holdings any Joining Party upon consummation of the sale, assignment, transfer, hypothecation or other disposition (including by participation) of such Holdings, the Joining Party hereby makes the representations and warranties of the Apollo Entities or Consenting Noteholders, as applicable, set forth in Section 5 hereof to the Company.

(e)      This Support Agreement shall in no way be construed to preclude any Plan Support Party from acquiring additional Holdings; provided that any such Holdings shall automatically be deemed to be subject to the terms of this Support Agreement.

**8.2      No Third Party Beneficiaries.**

Unless expressly stated herein, this Support Agreement shall be solely for the benefit of the Company and each Plan Support Party. No other person or entity shall be a third party beneficiary.

**8.3      Entire Agreement.**

This Support Agreement, including exhibits and annexes hereto, constitutes the entire agreement of the Parties with respect to the subject matter of this Support Agreement, and supersedes all other prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Support Agreement; provided, however, that any confidentiality agreement executed by any Party shall survive this Support Agreement and shall continue in full force and effect, subject to the terms thereof, irrespective of the terms hereof; provided further, that nothing in this Support Agreement shall affect, impair or supercede either the Backstop Commitment Agreement.

**8.4      Counterparts.**

This Support Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement. Delivery of an executed signature page of this Support Agreement by email

or facsimile transmission shall be as effective as delivery of a manually executed counterpart hereof.

**8.5     Settlement Discussions.**

This Support Agreement and the Term Sheet are part of a proposed settlement of disputes among the Parties hereto.  Nothing herein shall be deemed to be an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Support Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Support Agreement or in connection with the confirmation of the Plan.

**8.6     Reservation of Rights.**

(a)     Except as expressly provided in this Support Agreement or in any applicable confidentiality agreement, nothing herein is intended to, does or shall be deemed in any manner to limit (i) the ability of a Plan Support Party to consult with other Plan Support Parties or the Company, (ii) the rights of a Plan Support Party to be heard as a party in interest in the Chapter 11 Cases, or (iii) the rights of a Plan Support Party to defend against any objection to, or estimation of, any of its Holdings, in each case so long as such consultation, appearance or defense is consistent with the Plan Support Party's obligations under this Support Agreement.

(b)     If the transactions contemplated by this Support Agreement and in the Term Sheet are not consummated as provided herein, if a Termination Date occurs, or if this Support Agreement, or a Party's obligations under this Support Agreement, is otherwise terminated for any reason, each Party fully reserves any and all of its respective rights, remedies and interests (if any) under the ABL Facility, the Cash Flow Facility, the Indentures, the Notes, any other relevant Holdings, applicable law and in equity.

**8.7     Governing Law; Waiver of Jury Trial.**

(a)     The Parties waive all rights to trial by jury in any jurisdiction in any action, suit, or proceeding brought to resolve any dispute between the Parties arising out of this Support Agreement, whether sounding in contract, tort or otherwise.

(b)     This Support Agreement shall be governed by and construed in accordance with the laws of the State of New York and without regard to any conflicts of law provision or principle that would require or permit the application of the law of any other jurisdiction.  By its execution and delivery of this Support Agreement, each Party hereby irrevocably and unconditionally agrees for itself that, subject to Section 8.7(c) hereof, any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Support Agreement or for

recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in any federal court of competent jurisdiction in New York County, State of New York, and by execution and delivery of this Support Agreement, each of the Parties hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceedings.

(c)     Notwithstanding the foregoing, if the Chapter 11 Cases are commenced, nothing in Sections 8.7(a) or (b) hereof shall limit the authority of the Bankruptcy Court to hear any matter related to or arising out of this Support Agreement.

**8.8     Successors.**

This Support Agreement is intended to bind the Parties and inure to the benefit of the Plan Support Parties and the Company and each of their respective successors, assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 8.8 shall be deemed to permit any transfer, tender, vote or consent, of any claims or interests other than in accordance with the terms of this Support Agreement.

**8.9     Relationship Among Plan Support Parties**

Notwithstanding anything herein to the contrary, the duties and obligations of the Plan Support Parties under this Support Agreement shall be several, not joint. Furthermore, it is understood and agreed that no Plan Support Party, by virtue of executing this Support Agreement, has any duty of trust or confidence or any fiduciary obligation in any form with or to any other Plan Support Party, and there are no commitments among or between them.  For the avoidance of doubt, notwithstanding anything to the contrary herein, no Consenting Noteholder or Apollo Entity, each in their respective capacity as such, shall have fiduciary obligations of any kind to any other Consenting Noteholder, any holder of Notes, or Apollo Entity or other Plan Support Party or the Company.  In this regard, it is understood and agreed that any Plan Support Party may trade in the loans, Notes or other debt or equity securities of, or any other claims against or interests in, the Company without the consent of the Company or any other Plan Support Party, subject to applicable securities laws and Section 8.1 hereof.  No Plan Support Party shall have any responsibility for any such trading by any other entity by virtue of this Support Agreement.  No prior history, pattern or practice of sharing confidences among or between Plan Support Parties shall in any way affect or negate this understanding and agreement.

**8.10     Acknowledgment of Counsel.**

Each of the Parties acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Support Agreement and the transactions contemplated by this Support Agreement.  Accordingly,

any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Support Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.  The provisions of this Support Agreement shall be interpreted in a reasonable manner to effect the intent of the parties hereto.  No Party shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

**8.11    Amendments, Modifications, Waivers.**

(a)    Except as otherwise specified herein, this Support Agreement (including, without limitation, the Term Sheet) may only be modified, amended or supplemented, and any of the terms thereof may only be waived, by an agreement in writing signed by each of the Company and the Requisite Investors; provided further that any modification, amendment, supplement or waiver with respect to Section 2.1 (g) shall require an agreement in writing signed only by the Company and Consenting Noteholders  that hold a majority of all Second Lien Notes by amount that were held by all Consenting Noteholders on the Effective Date; provided, further, that any modification, amendment, supplement or waiver with respect to sections 2.1(l) or 2.2(a) shall require the agreement of the Company, each non-breaching Apollo Entity and non-breaching Consenting Holders  holding a majority of all Second Lien Notes by dollar amount held by all Consenting Noteholders on the Effective Date and any breaching Apollo Entity or breaching Consenting Noteholder shall be disregarded for such purposes; provided, further, that if the modification, amendment, supplement or waiver at issue adversely impacts the treatment or rights of any Consenting Noteholder differently than other Consenting Noteholders, the agreement in writing of such Consenting Noteholder whose treatment or rights are adversely impacted in a different manner than other Consenting Noteholders shall also be required for such modification, amendment, supplement, or waiver to be effective.

(b)    Notwithstanding anything to the contrary herein, to the extent that a Plan Support Party's commitments under the Backstop Commitment are terminated and such party disposes of all of its Second Lien Notes in accordance with the terms and conditions herein then it shall be deemed released from any and all obligations under this Support Agreement and the Backstop Commitment Agreement.

(c)    Notwithstanding anything to the contrary herein, if one or more Non-Consenting Investors elects to withdraw from the Backstop Commitment in accordance with the Term Sheet, then such Non-Consenting Investor(s) shall no longer be a party to the Backstop Commitment Agreement or the Restructuring Support Agreement and shall be released from any and all obligations herein and therein

**8.12    Severability of Provisions.**

If any provision of this Support Agreement for any reason is held to be invalid, illegal or unenforceable in any respect, that provision shall not affect the validity, legality or enforceability of any other provision of this Support Agreement.

**8.13    Notices.**

Unless otherwise set forth herein, all notices and other communications required or permitted hereunder shall be in writing and shall be deemed given when: (a) delivered personally or by overnight courier to the applicable addresses set forth below; or (b) sent by facsimile transmission or email to the parties listed below with a confirmatory copy delivered by overnight courier.

If to the Company, to:

> Momentive Performance Materials Inc.
> 260 Hudson River Road
> Waterford, New York 12188
> Attention:   Douglas A. Johns, Esq.
> Telecopy:   (614) 225-4127
> E-mail:       Douglas.Johns@momentive.com

with a copy to (for informational purposes only):

> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, New York 10019
> Attention:   Matthew Feldman, Esq.
>                     Rachel C. Strickland, Esq.
>                     Jennifer J. Hardy, Esq.
> Telecopy:   (212) 728-8111
> E-mail:       mfeldman@willkie.com
>                     rstrickland@willkie.com
>                     jhardy2@willkie.com

If to any Consenting Noteholder, to the email address set forth on its signature page, with a copy to (for informational purposes only):

> Milbank, Tweed, Hadley & McCloy LLP
> 1 Chase Manhattan Plaza
> New York, New York 10005
> Attention:   Dennis F. Dunne, Esq.
>                     Samuel A. Khalil, Esq.
>                     Eric K. Stodola, Esq.
> Telecopy:   (212) 822-5770
> E-mail:       ddunne@milbank.com

skhalil@milbank.com
estodola@milbank.com

If to any Apollo Entity, to the email address set forth on its signature page, with a copy to (for informational purposes only):

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10005
Attention:   Ira S. Dizengoff, Esq.
             Philip C. Dublin, Esq.
Telecopy:    (212) 872-1002
E-mail:      idizengoff@akingump.com
             pdublin@akingump.com


**8.14    Disclosure of Consenting Noteholder and Apollo Entity Information**

Unless required by applicable law or regulation, the Company and each Plan Support Party agrees to keep confidential the amount of all Holdings in the Company held (beneficially or otherwise) by any Consenting Noteholder and any Apollo Entity absent the prior written consent of such Consenting Noteholder or Apollo Entity; and if such announcement or disclosure is so required by law or regulation, the Company shall provide each Consenting Noteholder and Apollo Entity with advanced notice of the intent to disclose and shall afford each of the Consenting Noteholders or Apollo Entity a reasonable opportunity to (i) seek a protective order or other appropriate remedy or (ii) review and comment upon any such announcement or disclosure prior to the Company making such announcement or disclosure.  If the Company determines that it is required to attach a copy of this Support Agreement to any document in connection with the Restructuring, it will redact any reference to a specific Consenting Noteholder or Apollo Entity and such holder's holdings.  The foregoing shall not prohibit the Company from disclosing the aggregate claims or interests of all Consenting Noteholders and Apollo Entities as a group.  The Company's obligations under this Section 8.14 shall survive termination of this Support Agreement.

SUBJECT TO FRE 408
CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have caused this Support Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

MOMENTIVE PERFORMANCE MATERIALS
HOLDINGS INC.

By: _____

Name:  Douglas A. Johns

Title:  EVP, General Counsel and Secretary

MOMENTIVE PERFORMANCE MATERIALS
INC.

By: _____

Name:  Douglas A. Johns

Title:  EVP, General Counsel and Secretary

Juniper Bond Holdings I LLC

_____

By:

Name:  Douglas A. Johns

Title:  EVP, General Counsel and Secretary

Juniper Bond Holdings II LLC

_____

By:

Name:  Douglas A. Johns

Title:  EVP, General Counsel and Secretary

Juniper Bond Holdings III LLC

_____

By:

Name:  Douglas A. Johns

Title:  EVP, General Counsel and Secretary

SUBJECT TO FRE 408
CONFIDENTIAL

Juniper Bond Holdings IV LLC

By: _____
Name:  Douglas A. Johns
Title:  EVP, General Counsel and Secretary

Momentive Performance Materials China SPV Inc.

By: _____
Name:  Douglas A. Johns
Title:  EVP, General Counsel and Secretary

Momentive Performance Materials Quartz, Inc.

By: _____
Name:  Douglas A. Johns
Title:  EVP, General Counsel and Secretary

Momentive Performance Materials South America Inc.

By: _____
Name: Douglas A. Johns
Title:  EVP, General Counsel and Secretary

Momentive Performance Materials USA Inc.

By: _____
Name:  Douglas A. Johns
Title:  EVP, General Counsel and Secretary

Momentive Performance Materials Worldwide Inc.

By: _____
Name: Douglas A. Johns
Title:  EVP, General Counsel and Secretary

SUBJECT TO FRE 408
CONFIDENTIAL

MPM Silicones, LLC

By: _____
Name: Douglas A. Johns
Title:  EVP, General Counsel and Secretary

**SIGNATURE PAGES REDACTED**

## SCHEDULE 1

Juniper Bond Holdings I LLC
Juniper Bond Holdings II LLC
Juniper Bond Holdings III LLC
Juniper Bond Holdings IV LLC
Momentive Performance Materials China SPV Inc.
Momentive Performance Materials Quartz, Inc.
Momentive Performance Materials South America Inc.
Momentive Performance Materials USA Inc.
Momentive Performance Materials Worldwide Inc.
MPM Silicones, LLC

## EXHIBIT A

## TERM SHEET

## MOMENTIVE PERFORMANCE MATERIALS HOLDINGS INC.

### TERM SHEET

This term sheet (this "Term Sheet") is not an offer or a solicitation with respect to any securities of Momentive Performance Materials Holdings Inc. ("Holdings") or any of the Holdings' subsidiaries or affiliates. Any such offer or solicitation shall comply with all applicable securities laws and/or provisions of title 11 of the United States Code (as amended, the "Bankruptcy Code").

This Term Sheet is provided in confidence in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Term Sheet is entitled to the protections of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions. Further, nothing in this Term Sheet shall be an admission of fact or liability or deemed binding on that certain ad hoc group (the "Ad Hoc Group") of holders of Second Lien Notes (as defined below) represented by Milbank, Tweed, Hadley & McCloy LLP ("Milbank") or any of its members or their respective affiliates. Further, nothing in this Term Sheet shall be an admission of fact or liability or deemed binding on Apollo Global Management, LLC or any of its affiliates.

This Term Sheet is not binding and is subject to material change and is being distributed for discussion purposes only. This Term Sheet is not a commitment to provide financing or engage in any transaction. Moreover, the treatment set forth in this Term Sheet remains subject to ongoing discussions.

Capitalized terms used in this Term Sheet but not defined herein shall have the meanings set forth in the Restructuring Agreement to which this Term Sheet is attached (such agreement, the "RSA").

| RIGHTS OFFERING | |
|---|---|
| **Term** | **Description** |
| **Rights Offering**: | This Term Sheet describes, among other things, the proposed rights offering (the "Rights Offering") for [__]% of the shares (the "Rights Offering Shares") of New Common Stock (as defined below) issued and outstanding on the Effective Date (as defined below) for an aggregate purchase price of $600 million (the "Rights Offering Amount") at a price per share  (the "Per Share Price") to be determined using an enterprise value of $2.2 billion (the "Enterprise Value") and the pro forma restructured capital structure and applying a 15% discount (the "Discount to Equity Value") to the equity value thereto (after giving effect to the Rights Offering). |
| | The Rights Offering shall be implemented in connection with a plan of reorganization in chapter 11 cases to be filed by Holdings and certain of its affiliates (collectively, the "Debtors") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which plan of reorganization shall be consistent with this Term Sheet and otherwise in form and substance acceptable to the Requisite Investors (inclusive of the Plan Supplement referred to below, the "Plan of Reorganization"). |

| | |
|---|---|
| | The issuance of the Subscription Rights (as defined below) and the issuance of shares of New Common Stock upon the exercise thereof shall be exempt from the registration requirements of the securities laws as a result of section 1145 of the Bankruptcy Code or Section 4(a)(2) of the Securities Act of 1933. A shelf registration statement will be filed for the resale of such shares as described in the section titled "Registration of New Common Stock" herein. |
| **Backstop Commitments**: | Subject to the terms of the Backstop Commitment Agreement (as defined below), in connection with the Rights Offering, each Investor (as defined below) commits (such commitment, the "Backstop Commitment") to purchase (on a several and not joint basis) the Rights Offering Shares (based on the Per Share Price) that are not purchased by the Second Lien Noteholders (as defined below) as part of the Rights Offering based initially on a percentage to be set forth in the Backstop Commitment Agreement, which percentage shall be based on the amount of Second Lien Notes (as defined below) held by such Investor relative to the aggregate amount of Second Lien Notes held by all Investors on the date the RSA is executed by the Investors (such percentage, the "Backstop Commitment Percentage"). The amount of each Investor's Backstop Commitment may be adjusted in accordance with the terms herein. |
| **Investors**: | The "Investors" (individually, an "Investor") are the members of the Ad Hoc Group and certain of their affiliates, and Apollo Global Management, LLC and certain of its affiliated funds who hold Second Lien Notes (collectively, "Apollo"). <br><br> All amounts payable to the Investors in their capacities as such for the Backstop Commitment Premium (as defined below) shall be paid *pro rata* based on the amount of their respective Backstop Commitments on the Effective Date. |
| **Investor Consent**: | "Requisite Investors" means (a) members of the Ad Hoc Group holding at least a majority of the aggregate Backstop Commitments provided by all members of the Ad Hoc Group as of the date on which the consent of such members is solicited and (b) Apollo; provided that in the case of a consent to changes in respect of the Enterprise Value, the Discount to Equity Value, and the Backstop Commitment Premium, in each case, solely with respect to the Rights Offering (the "Specific Economic Terms"), "Requisite Investors" means solely members of the Ad Hoc Group holding at least a majority of the aggregate of the Backstop Commitments provided by all members of the Ad Hoc Group as of the date on which the consent of such members is solicited. <br><br> If there is a change to a Specific Economic Term or to the maturity of the Backstop Commitment, then any non-consenting Investor, including Apollo, if applicable, (a "Non-Consenting Investor") may elect, within 7 calendar days of such change being made, to withdraw from its Backstop Commitment. If one or more Non-Consenting Investors elect to withdraw from the Backstop Commitment, then such Non-Consenting Investor(s) shall no longer be a party |

| | |
|---|---|
| | to the Backstop Commitment Agreement or the RSA.<br><br>Each Investor that is a member of the Ad Hoc Group other than any Non-Consenting Investors shall assume the Backstop Commitment(s) of any Non-Consenting Investor(s) (on a *pro rata* basis based on the Backstop Commitments of all Investors that are members of the Ad Hoc Group other than such Non-Consenting Investor(s) at the time of such election to withdraw). |
| **New Common Stock:** | "New Common Stock" means the common stock to be issued by the reorganized Company pursuant to the Plan of Reorganization and outstanding upon the occurrence of the effective date of the Plan of Reorganization consistent with the terms hereof (the "Effective Date").  At the option of the Requisite Investors, the New Common Stock may be issued by Momentive Performance Materials, Inc. ("MPM"), Holdings or a newly formed standalone entity, which is unaffiliated with Momentive Specialty Chemicals Inc. ("MSC") (other than on account of any New Common Stock issued to Apollo pursuant to the Plan of Reorganization) and of which the reorganized Company (or reorganized MPM if so determined by the Requisite Investors) is a wholly owned subsidiary.  In any case, reorganized MPM, reorganized Holdings or the new holding entity (the entity issuing the New Common Stock, the "Reorganized Company") shall issue all of its equity interests in accordance with the terms herein and such entity shall directly or indirectly own 100% of each of the other Reorganized Debtors.<br><br>The Reorganized Company shall be a standalone entity that is unaffiliated with MSC (other than on account of any New Common Stock issued to Apollo pursuant to the Plan of Reorganization); provided, however, that the form of such entity shall be satisfactory to the Requisite Investors and the Debtors.<br><br>Upon consummation of the Plan of Reorganization, shares of New Common Stock will be issued (x) in connection with the Rights Offering, and (y) as distributions to creditors under the Plan of Reorganization, plus such additional shares of New Common Stock as may be required to be issued on the Effective Date in connection with the payment of the Backstop Commitment Premium, and as acceptable to the Requisite Investors, and in each case, only as specifically set forth herein. |
| **Implementation of the Rights Offering:** | The Debtors shall implement the Rights Offering through customary subscription documentation and procedures that are in form and substance acceptable to the Debtors and the Requisite Investors.  The offering period for the Rights Offering (the "Offering Period") shall be acceptable to the Requisite Investors.<br><br>The number of shares of New Common Stock issued to the Investors pursuant to the Backstop Commitments (the "Backstop Shares") will be determined by the rights agent (an agent appointed by the Debtors, and acceptable to the |

|  | Requisite Investors, to administer the Rights Offering) consistent with the terms hereof. |
|---|---|
|  | Subscription Rights for the Rights Offering will be exercisable during the Offering Period by completing and returning to the rights agent the applicable subscription form and paying the Per Share Price by wire transfer of immediately available funds to an account designated by the rights agent prior to the expiration of the Offering Period. |
|  | If the Rights Offering is terminated for any reason, the funded amounts will be refunded to the applicable participant, without interest, as soon as practicable following termination of the Rights Offering. |
|  | The exercise of a Subscription Right will be irrevocable unless the Rights Offering is not consummated by the date on which the Backstop Commitment Agreement is terminated.  There will be no oversubscription rights under the Rights Offering. |
| **Backstop Commitment Agreement**: | The Investors and the Debtors shall enter into an agreement, consistent with this Term Sheet and otherwise in form and substance acceptable to the Requisite Investors and the Debtors, setting forth the terms and conditions of the Backstop Commitments (the "Backstop Commitment Agreement"). |
| **Backstop Commitment Premium**: | The Debtors will pay the Investors a backstop premium equal to 5.0% of the Rights Offering Amount, without application of the Discount to Equity Value, which, so long as the Plan of Reorganization is consummated in accordance with the terms hereof, shall be paid in New Common Stock (the "Backstop Commitment Premium"), free and clear of all withholding or deduction for any applicable taxes; provided, that to the extent the Backstop Commitment Agreement is terminated in accordance with the terms thereof (other than as a result of a breach thereof by the Investors), the Backstop Commitment Premium shall be paid in cash. |
|  | The Backstop Commitment Premium (to the extent required to be paid in cash as set forth above) and the Expense Reimbursement (as defined below) shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code, by order of the Bankruptcy Court entered within 60 days of the Petition Date (as defined below). |
| **Expense Reimbursement**: | The Debtors will pay (i) the reasonable documented fees and expenses of the Ad Hoc Group related to counsel, financial advisor, and consultants and other professionals for specialized areas of expertise as circumstances warrant, retained by the Ad Hoc Group, that have been and are incurred in connection with negotiation, preparation and implementation of the Rights Offerings, the Plan of Reorganization and any related efforts, (ii) the reasonable documented fees and expenses of Apollo related to one counsel and one financial advisor, retained by Apollo, that have been and are incurred solely with respect to |

4

| | |
|---|---|
| | Apollo's capacity as an Investor, and (iii) the reasonable documented fees and expenses of each member of the Ad Hoc Group not to exceed $1 million in the aggregate for all such members, including the reasonable documented fees and expenses of professionals, including consultants, retained by each Investor, that have been incurred prior to April 1, 2014, in connection with performing diligence with respect to the Second Lien Notes (such payment obligations, collectively, the "Expense Reimbursement"). <br><br> The Expense Reimbursement accrued through the date on which the BCA Approval Order (as defined below) is entered shall be paid within one business day of such date. Thereafter, the Expense Reimbursement shall be payable by the Debtors as required by the Backstop Commitment Agreement. |
| **Registration of New Common Stock:** | As soon as reasonably practicable after the Effective Date and in any event within 75 days of the Effective Date, the Reorganized Company shall file, and shall use its reasonable best efforts to cause to be declared effective as promptly as practicable, a registration statement registering for resale all of the shares of New Common Stock issued to the Investors and the Second Lien Noteholders pursuant to the Plan of Reorganization and the Rights Offering. The Reorganized Company shall agree to use its reasonable best efforts to maintain continuously an effective resale registration statement until the second anniversary of the Effective Date. <br><br> On or following the second anniversary of the Effective Date, holders of not less than 25% of the outstanding shares of New Common Stock shall have the right to cause the Reorganized Company to file a registration statement registering for an initial public offering of shares of New Common Stock held by such Investors, to use its reasonable best efforts to consummate an initial public offering of such New Common Stock and to use its reasonable best efforts to cause the New Common Stock to be listed on the New York Stock Exchange or The Nasdaq Global Market or any successor exchange. <br><br> On the Effective Date, the Debtors will provide registration rights, including demand registration rights exercisable following the Reorganized Company's IPO, piggy-back registration rights and other customary rights, to each stockholder that owns a minimum percentage of the outstanding New Common Stock or that cannot sell all of its shares under Rule 144 of the Securities Act without restriction in a single sale, subject to restrictions and conditions to be in form and substance satisfactory to the Debtors and the Requisite Investors. <br><br> The number of demand registrations, the threshold and timing for exercising a demand registration, holdback and blackout provisions and other customary terms will be as negotiated between the Debtors and the Investors in connection with the execution of the Backstop Commitment Agreement, which terms shall be customary for this type of transaction and set forth in a term sheet attached to the Backstop Commitment Agreement. |

| | |
|---|---|
| | The Reorganized Company shall provide quarterly financials and hold quarterly earnings calls.<br><br>The Debtors shall file as part of the Plan Supplement a form of registration rights agreement (the "Registration Rights Agreement"), to which each holder of New Common Stock receiving control or restricted securities will be a party, governing such registration rights, which agreement shall be in form and substance consistent with such term sheet and otherwise acceptable to the Requisite Investors and the Debtors.  The Registration Rights Agreement will provide that no provision therein may be amended except in a written instrument signed by the holders of 66 2/3% of the shares held by the stockholders who are parties to the Registration Rights Agreement; provided, that the rights described in the first two paragraphs of this section cannot be limited or removed without the approval of (i) Apollo and (ii) holders of at least 50.1% of the shares of New Common Stock not held by Apollo. |
| **Transferability of Second Lien Note Claims:** | Second Lien Note Claims (as defined below) shall be freely transferable by the Investors, subject to the terms and conditions of the RSA.<br><br>If any Investor (the "Transferring Investor") transfers, directly or indirectly, any Second Lien Note Claims, whether through a derivative instrument or otherwise, then each other Investor that is a member of the Ad Hoc Group (a "Non-Transferring Investor") may elect, within 5 business days of receipt of written notice of such transfer, to assume its Assumable Share of the Assumable Amount of the Transferring Investor's Backstop Commitment.  To the extent that not all Non-Transferring Investors have elected to assume their Assumable Share of the Assumable Amount, each Non-Transferring Investor that elected to assume its Assumable Share of the Assumable Amount may elect to assume the remaining portion of the Assumable Amount on a *pro rata* basis by amount of Backstop Commitment at the time of such election with all other Non-Transferring Investors so electing to assume such remaining portion.  If, as a result of Non-Transferring Investors assuming the Assumable Share of the Transferring Investor's Backstop Commitment, the Transferring Investor no longer has any Backstop Commitment, then the Transferring Investor shall no longer be a party to the Backstop Commitment Agreement.<br><br>Each Transferring Investor shall provide notice of all transfers and acquisitions, whether direct or indirect, of Second Lien Note Claims, whether through a derivative instrument or otherwise, made by it and the aggregate principal amount of Second Lien Note Claims held by it immediately following such transfer or acquisition to the Company, Milbank, Tweed, Hadley & McCloy LLP, Houlihan Lokey Capital, Inc., Akin Gump Strauss Hauer & Feld LLP, and Lazard Frères & Co. LLC, in each case, within 2 business days of the date of such transfer or acquisition.<br><br>"Assumable Amount" means, with respect to any transfer of Second Lien Note Claims by a Transferring Investor, an amount equal to the applicable |

|  | Assumable Percentage multiplied by such Transferring Investor's Backstop Commitment. |
|---|---|
|  | "Assumable Percentage" means, with respect to any Transferring Investor, the ratio (expressed as a percentage) of (i) an amount equal to the difference between (A) the aggregate principal amount of Second Lien Note Claims held by such Transferring Investor on the Measuring Date and (B) the aggregate principal amount of Second Lien Note Claims held by such Transferring Investor immediately following such transfer to (ii) the aggregate principal amount of Second Lien Note Claims held by such Transferring Investor on the RSA Execution Date; provided, however, that (x) if, following any transfer of Second Lien Note Claims, a Transferring Investor holds more in aggregate principal amount of Second Lien Note Claims than the Trigger Amount, then such ratio shall be 0% and (y) if, following any transfer of Second Lien Note Claims, a Transferring Investor holds less in aggregate principal amount of Second Lien Note Claims than the Fall Away Amount, then such ratio shall be 100%. |
|  | "Assumable Share" means, with respect to any Non-Transferring Investor, the proportion that the amount of such Non-Transferring Investor's Backstop Commitment at the time of the applicable election bears to the aggregate Backstop Commitments of all Non-Transferring Investors at the time of the applicable election. |
|  | "RSA Execution Date" means the date of execution of the RSA by the Investors. |
|  | "Fall Away Amount" means, with respect to any Transferring Investor, an amount equal to the aggregate principal amount of Second Lien Note Claims held by such Transferring Investor on the RSA Execution Date less $20 million. |
|  | "Trigger Amount" means, with respect to any Transferring Investor, an amount equal to the aggregate principal amount of Second Lien Note Claims held by such Transferring Investor on the RSA Execution Date less $5 million. |
|  | "Measuring Date" means (i) on the RSA Execution Date and until immediately following the first time a Transferring Investor holds less in aggregate principal amount of Second Lien Note Claims than the Trigger Amount, the RSA Execution Date and (ii) thereafter, with respect to any transfer, the date following the RSA Execution Date but prior to the time of such transfer upon which such Transferring Investor held the least in aggregate principal amount of Second Lien Note Claims. |
| **Transferability of Subscription Rights:** | Subscription Rights are not directly or indirectly, separately transferable or detachable from the Second Lien Note Claims, whether through a derivative |

| | instrument or otherwise. |
|---|---|
| **Transferability of Backstop Commitment:** | Each Investor's Backstop Commitment shall be non-transferable; provided, however, that an Investor may transfer its Backstop Commitment between and among (i) its affiliated investment funds or (ii) any special purpose vehicle that is wholly-owned by such Investor or its affiliated investment funds, created for the purpose of holding such Backstop Commitment or holding debt or equity of the Debtors, and with respect to which the Investor either (i) has provided an equity support letter or a guarantee of such special purpose vehicle's Backstop Commitment or (ii) otherwise remains obligated to fund the applicable Backstop Commitment until the consummation of the Plan of Reorganization; provided further, however, that any such special purpose vehicle shall not be related to or affiliated with any portfolio company of such Investor or any of its affiliates or affiliated funds (other than solely by virtue of its affiliation with an Investor), and the sale of the equity of such special purpose vehicle shall be subject to the same transferability restrictions set forth herein. For the avoidance of doubt, an Investor may not transfer its Backstop Commitment to one or more of the portfolio companies of such Investor or any of its affiliates or affiliated funds. |
| **Failure to Fund Backstop Commitment:** | The Backstop Commitment Agreement shall provide that the Investors agree that any Investor that fails to timely fund its Backstop Commitment (a "Defaulting Investor") will be liable for the consequences of its breach and that the parties to the Backstop Commitment Agreement can enforce rights of damages and/or specific performance upon the failure to timely fund by the Defaulting Investor. |
| **State of Incorporation**: | On the Effective Date, the Reorganized Company shall be a Delaware corporation (or another jurisdiction or form of entity subject to approval by the Requisite Investors) and the Reorganized Company's constituent documents shall be in form and substance acceptable to the Requisite Investors and the Debtors. |
| **Debtors' Representations and Warranties**: | The Backstop Commitment Agreement shall contain customary representations and warranties on the part of the Debtors, including:<br><br>▪ Corporate organization and good standing;<br><br>▪ Requisite corporate power and authority with respect to execution and delivery of transaction documents;<br><br>▪ Due execution and delivery and enforceability of transaction documents;<br><br>▪ Due issuance and authorization of New Common Stock;<br><br>▪ No governmental consents (other than Bankruptcy Court approval); |

|  | ▪ No conflicts; and<br><br>▪ Other representations and warranties to be agreed upon by the Company and the Requisite Investors. |
|---|---|
| **Investors' Representations and Warranties**: | The Backstop Commitment Agreement shall contain customary representations and warranties on the part of the Investors, to be provided severally and not jointly, including:<br><br>▪ Corporate organization and good standing;<br><br>▪ Requisite corporate power and authority with respect to execution and delivery of transaction documents;<br><br>▪ Due execution and delivery and enforceability of transaction documents;<br><br>▪ Acknowledgement of no registration under the Securities Act;<br><br>▪ Acquiring Backstop Shares, if any, for investment purposes, and not with a view to distribution in violation of the Securities Act;<br><br>▪ No consents or approvals;<br><br>▪ Accredited investor or qualified institutional buyer;<br><br>▪ Due diligence has been performed; and<br><br>▪ Other representations and warranties to be agreed upon by the Company and the Requisite Investors. |
| **Interim Operating Covenant**: | Prior to and through the Effective Date, except as set forth in the Backstop Commitment Agreement, or with the written consent of the Requisite Investors, the Company (x) shall, and shall cause its subsidiaries to, carry on their businesses in the ordinary course and use their commercially reasonable efforts to preserve intact their current material business organizations, keep available the services of their current officers and employees and preserve their material relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company or its subsidiaries and (y) shall not, and shall not permit its subsidiaries to, enter into any transactions which are material to the Company, other than transactions in the ordinary course of business that are consistent with the parameters described in the Backstop Commitment Agreement.  Amendments to the SSA or modifications to the Allocation Percentage (as referred to below) shall not be considered to be in the ordinary course of business. |
| **Conditions** | The Backstop Commitments will be subject to customary conditions precedent (the "<u>Conditions Precedent</u>"), including: |

| Precedent: | |
|---|---|
| | (i)   the Bankruptcy Court shall have entered orders, in each case, in form and substance acceptable to the Requisite Investors, (x) approving a disclosure statement with respect to the Plan of Reorganization and approving the procedures with respect to the Rights Offering and the solicitation with respect to the Plan of Reorganization which are in form and substance acceptable to the Requisite Investors (the "<u>Solicitation Order</u>"), (y) authorizing the Company (on behalf of itself and the other Debtors) to execute and deliver the Backstop Commitment Agreement and authorizing and approving the payment of the Backstop Commitment Premium and the Expense Reimbursement and the indemnification provisions contained therein (the "<u>BCA Approval Order</u>"), and (z) authorizing and approving the RSA (the "<u>RSA Approval Order</u>") and its assumption by the Company; |
| | (ii)   the Bankruptcy Court shall have entered an order, in form and substance satisfactory to the Requisite Investors, confirming the Plan of Reorganization (the "<u>Confirmation Order</u>") and no order staying the Confirmation Order shall be in effect; |
| | (iii)   the effective date of the Plan of Reorganization shall have occurred in accordance with the terms and conditions therein and in the Confirmation Order; |
| | (iv)   (X) a CEO, CFO and General Counsel shall be employed, either on an interim or permanent basis, each of whom is an employee solely of the Reorganized Company and is not affiliated with or employed by any competitor of the Reorganized Company, including MSC, and the selection of whom is satisfactory to the Requisite Investors, and (Y) the Reorganized Company's charter shall provide that the Reorganized Company shall not be a party to a merger or other business combination transaction (whether effected by way of merger, sale of a majority of the equity, or the sale of all or substantially all of the assets of the Reorganized Company and its subsidiaries) until a permanent CEO has been appointed and who has reviewed the proposed terms and conditions of such transaction; |
| | (v)   the Registration Rights Agreement shall have been executed and shall be effective by its terms; the Backstop Commitment Agreement shall have been executed and shall be effective by its terms; |
| | (vi)   the Debtors shall have paid all Expense Reimbursements pursuant to, and in accordance with, the Backstop Commitment Agreement; |
| | (vii)   any applicable HSR waiting period shall have expired and all other |

|  | regulatory consents and notices shall have been obtained or filed; |
|---|---|
|  | (viii) there has been no Material Adverse Change (to be defined in the Backstop Commitment Agreement, which definition shall be in form and substance acceptable to the Company and the Requisite Investors, but will not include the bankruptcy filing or any events arising out of or related to the bankruptcy filing); and |
|  | (ix) other customary conditions precedent to be in form and substance satisfactory to the Requisite Investors and the Debtors. |
| **Termination of the Backstop Commitment Agreement**: | Upon the occurrence of a Termination Event (as defined below), all of the Investors' obligations under the Backstop Commitment Agreement and the RSA shall automatically terminate, unless such Termination Event is otherwise waived or extended by the Requisite Investors.<br><br>A "Termination Event" shall mean the occurrence of any of the following:<br><br>(i)  11:59 p.m. (New York City time) on April 13, 2014, unless the Debtors have commenced cases under chapter 11 of the Bankruptcy Code (the date of such commencement, the "Petition Date");<br><br>(ii)  3 days after the Petition Date, unless prior thereto the Bankruptcy Court enters an interim order authorizing the Debtors to enter into the DIP Financing (as defined below) and use cash collateral, and scheduling a final hearing with respect to such matters;<br><br>(iii)  11:59 p.m. (New York City time), April 28, 2014, unless the Backstop Commitment Agreement has been executed and filed with the Bankruptcy Court by such time and date;<br><br>(iv)  60 days after the Petition Date, unless prior thereto the Bankruptcy Court enters the RSA Approval Order, the BCA Approval Order, and procedures with respect to the Rights Offering, in each case in form and substance mutually satisfactory to the Debtors and the Requisite Investors;<br><br>(v)  60 days after the Petition Date, unless prior thereto the Bankruptcy Court enters a final order authorizing the Debtors to enter into the DIP Financing and use cash collateral;<br><br>(vi)  75 days after the Petition Date, unless prior thereto the Bankruptcy Court has entered the Solicitation Order, in form and substance mutually satisfactory to the Debtors and the Requisite Investors;<br><br>(vii)  75 days after the Petition Date, unless prior thereto, the amendment to the SSA contemplated under "Shared Services Agreement" below is agreed to with MSC, which amendment shall be assumed pursuant |

11

to the Plan of Reorganization, unless such date is waived or extended by Investors other than Apollo holding a majority of the Backstop Commitments by amount of Investors other than Apollo;

(viii)  120 days after the Petition Date, unless prior thereto the Bankruptcy Court enters the Confirmation Order;

(ix)   180 days after the Petition Date, unless prior thereto the effective date of the Plan of Reorganization has occurred and the Rights Offering has been consummated; provided, however, if any Investor fails to consent to a waiver or extension of such 180-day period within 7 calendar days of such request being made, such Investor shall be deemed to be a Non-Consenting Investor who has elected to withdraw from its Backstop Commitment in accordance with the terms and conditions set forth above and shall no longer be a party to the Backstop Commitment Agreement or the RSA.;

(x)    the Backstop Commitment Agreement is terminated in accordance with its terms or there is a material breach of the Backstop Commitment Agreement by the Debtors (to the extent not otherwise cured or waived in accordance with the terms thereof);

(xi)   the RSA to which the Debtors and the Investors are party is terminated in accordance with its terms;

(xii)  the Solicitation Order, the BCA Approval Order or the RSA Approval Order is reversed, stayed, dismissed, vacated or reconsidered or is modified or amended without the Requisite Investors' prior written consent;

(xiii) the Debtors, directly or indirectly, take any action that is inconsistent with, or is intended or is reasonably likely to interfere with or impede or delay consummation of, the RSA, the Restructuring (as defined in the RSA), the transactions embodied in this Term Sheet, the Rights Offering, or the Plan of Reorganization, including, but not limited to, soliciting or causing or allowing any of its agents or representatives to solicit, encouraging or initiating any offer or proposal from, or entering into any agreement with, any person or entity concerning any actual or proposed chapter 11 plan or restructuring transaction (including, for the avoidance of doubt, a transaction premised on one or more asset sales under section 363 of the Bankruptcy Code or pursuant to a plan) other than the Restructuring, or filing any pleading or document with respect to, or proposing, joining in, or participating in the formation of, any actual or proposed chapter 11 plan or restructuring transaction other than the Restructuring, including, without limitation, (a) any chapter 11 plan, reorganization, restructuring, or liquidation involving Holdings

12

or any of the Debtors, (b) the issuance, sale, or other disposition of any equity or debt interests, or any material assets, of Holdings or any of the Debtors, or (c) a merger, sale, consolidation, business combination, recapitalization, refinancing, share exchange, rights offering, debt offering, equity investment, or similar transaction (including the sale of all or substantially all of the assets of Holdings or the Debtors whether through one or more transactions) involving Holdings or any of the Debtors (an "Alternative Transaction") or the Bankruptcy Court approves or authorizes an Alternative Transaction at the request of any party in interest;

(xiv)   one or more of the Apollo Entities materially breaches its obligations under the RSA or one or more of the Consenting Noteholders materially breaches its obligations under the RSA, such that the non-breaching Consenting Noteholders and the non-breaching Apollo Entities at any time hold collectively less than 66 2/3% of the principal amount of all Second Lien Notes;

(xv)    the amendment or modification of the RSA, the DIP Financing, the Backstop Commitment Agreement, the Rights Offering procedures, the Plan of Reorganization, the Disclosure Statement or any documents related to the Plan of Reorganization, notices, exhibits or appendices, or any of the Definitive Documentation (as defined in the RSA), without the consent of the Requisite Investors;

(xvi)   (a) an Event of Default (as that term is defined in the DIP Financing) of the DIP Financing that is not waived by the lenders thereunder, (b) an acceleration of the obligations or termination of commitments under the DIP Financing, (c) the termination or revocation or other challenge of any interim or final debtor in possession financing and/or cash collateral order entered in the Debtors' chapter 11 cases, or (d) a modification or amendment of any interim or final debtor in possession financing and/or cash collateral order entered in the Debtors' chapter 11 cases that is not satisfactory, in their sole discretion, to the Requisite Investors;

(xvii)  any of the orders approving the RSA, the DIP Financing (including the use of cash collateral), the Backstop Commitment Agreement, the Rights Offering procedures, the Plan of Reorganization or the Disclosure Statement, or the Confirmation Order are reversed, stayed, dismissed, vacated or reconsidered or modified or amended without the consent of the Requisite Investors or a motion for reconsideration, reargument or rehearing is granted;

(xviii) any court of competent jurisdiction or other competent governmental or regulatory authority issues a final, non-appealable order making illegal or otherwise preventing or prohibiting the consummation of

13

|  | the transactions contemplated in this Term Sheet or any of the Definitive Documentation in a way that cannot be remedied by the Debtors subject to the satisfaction of the Requisite Investors; |
|--|--|
|  | (xix)  any of the chapter 11 cases shall be dismissed or converted to a chapter 7 case, or a chapter 11 trustee with plenary powers, or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the chapter 11 cases or the Debtors shall file a motion or other request for such relief or the Debtors' exclusivity period shall be terminated; |
|  | (xx)  a filing by the Debtors of any motion, application or adversary proceeding challenging the validity, enforceability, perfection or priority of or seeking avoidance of the liens securing the obligations referred to in the indenture for the Second Lien Notes or the documents related thereto or, other than as contemplated by the Restructuring, any other cause of action against and/or seeking to restrict the rights of holders of Second Lien Notes in their capacity as such, or the prepetition liens securing the Second Lien Notes (or if the Debtors support any such motion, application or adversary proceeding commenced by any third party or consents to the standing of any such third party); |
|  | (xxi)  the occurrence of a Material Adverse Change (to be defined in the "Backstop Commitment Agreement, , which definition shall be in form and substance acceptable to the Debtors and the Requisite Investors, but will not include the bankruptcy filing or any events arising out of or related to the bankruptcy filing); and |
|  | (xxii)  other termination events that are in form and substance acceptable to the Requisite Investors and the Debtors. |

## TREATMENT OF OTHER CLAIMS AND INTERESTS

| Term | Description |
|--|--|
| **Administrative Expense Claims:** | The Plan of Reorganization shall provide that all holders of allowed administrative expense claims are satisfied in full in cash, unless a holder thereof (with the consent of the Requisite Investors) agrees otherwise. |
| **Priority Tax Claims:** | The Plan of Reorganization shall provide that all holders of allowed priority tax claims are satisfied in full in cash, unless a holder thereof (with the consent of the Requisite Investors) agrees otherwise. |
| **Priority Non-Tax** | The Plan of Reorganization shall provide that all holders of allowed priority |

| | |
|---|---|
| **Claims:** | non-tax claims are satisfied in full in cash, unless a holder thereof (with the consent of the Requisite Investors) agrees otherwise. |
| **ABL and Cash Flow Facility:** | The Existing ABL will be refinanced as part of the DIP Financing (as defined below) which will be repaid as part of the Exit Financing (as defined below).<br><br>The Cash Flow Facility will be repaid in full on the Effective Date.<br><br>"Existing ABL" means the credit facility established by that certain Asset-Based Revolving Credit Agreement dated as of April 24, 2013, to which MPM is a party.<br><br>"Cash Flow Facility" means the credit facility established by that certain Second Amended and Restated Credit Agreement dated as of April 24, 2013, to which MPM is a party. |
| **First Lien Note Claims:** | The Plan of Reorganization shall provide each holder of First Lien Note Claims with (i) if the class of First Lien Note Claims votes to accept the Plan of Reorganization (or such class is presumed to have accepted the Plan of Reorganization), cash distributions on the Effective Date in an amount equal to such holder's First Lien Pro Rata Share of the First Lien Cash Pool or (ii) if such class votes to reject the Plan of Reorganization, replacement notes with a present value equal to the allowed amount of such holder's First Lien Note Claim (which may include any make-whole claim, prepayment penalty or "Applicable Premium" (as defined in the indenture for the First Lien Notes) allowed, if at all, by the Bankruptcy Court).<br><br>"First Lien Cash Pool" means an amount of cash equal to the aggregate allowable amount of First Lien Note Claims (excluding any make-whole claim, prepayment penalty, "Applicable Premium" or similar claim).<br><br>"First Lien Note Claims" means claims arising under the indenture, dated as of October 25, 2012, pursuant to which MPM has issued certain notes (such notes, "First Lien Notes").<br><br>"First Lien Pro Rata Share" means, with respect to any holder of First Lien Notes, the proportion that the principal amount of First Lien Notes held by such holder on the Record Date bears to the aggregate principal amount of all First Lien Notes outstanding on the Record Date.<br><br>"Record Date" means a date to be agreed on by the Debtors and the Requisite Investors. |
| **1.5 Lien Note Claims:** | The Plan of Reorganization shall provide each holder of 1.5 Lien Note Claims with (i) if the class of 1.5 Lien Note Claims votes to accept the Plan of Reorganization (or such class is presumed to have accepted the Plan of Reorganization), cash distributions on the Effective Date in an amount equal to such holder's 1.5 Lien Pro Rata Share of the 1.5 Lien Cash Pool or (ii) if such |

| | |
|---|---|
| | class votes to reject the Plan of Reorganization, replacement notes with a present value equal to the allowed amount of such holder's 1.5 Lien Note Claim (which may include any make-whole claim, prepayment penalty or "Applicable Premium" (as defined in the indenture for the 1.5 Lien Notes) allowed, if at all, by the Bankruptcy Court).<br><br>"1.5 Lien Cash Pool" means an amount of cash equal to the aggregate allowable amount of 1.5 Lien Note Claims (excluding any make-whole claim, prepayment penalty, "Applicable Premium" or similar claim).<br><br>"1.5 Lien Note Claims" means claims arising under the indenture, dated as of May 25, 2012, pursuant to which MPM has issued certain notes (such notes, "1.5 Lien Notes").<br><br>"1.5 Lien Pro Rata Share" means, with respect to any holder of 1.5 Lien Notes, the proportion that the principal amount of 1.5 Lien Notes held by such holder on the Record Date bears to the aggregate principal amount of all 1.5 Lien Notes outstanding on the Record Date. |
| **Treatment of Second Lien Note Claims:** | The Plan of Reorganization shall provide that all outstanding claims (the "Second Lien Note Claims" and the holders thereof, the "Second Lien Noteholders") arising under the indenture, dated as of November 5, 2010, pursuant to which the Company has issued certain second lien notes (such notes, the "Second Lien Notes") shall be allowed in full in accordance with the terms of such indenture without defense, offset, counterclaim or reduction.[1]<br><br>In addition, the Plan of Reorganization shall provide that:<br><br>    (a) each Second Lien Noteholder shall receive its Pro Rata Share of 100% of the New Common Stock issued and outstanding upon the occurrence of the Effective Date (the "Direct Distribution Shares") subject to dilution by New Common Stock issued under the Rights Offering (including the Backstop Commitment Premium) and any management incentive plan approved by the Board (as defined below) and as specifically set forth herein; and<br><br>    (b) in addition to the Direct Distribution Shares, each Second Lien Noteholder shall have the right to participate in the Rights Offering and receive its Pro Rata Share of the Rights Offering Shares (the "Subscription Rights").<br><br>"Pro Rata Share" means, with respect to any Second Lien Noteholder, the |

---

[1] The unsecured portion of the Second Lien Note Claims shall be preserved, allowed in an amount not less than $950 million (to be adjusted, if necessary, for the Reorganized Company's emergence sources and uses, ultimate participation in the rights offering and dilution from a management incentive plan) and not waived by the Second Lien Noteholders, and Second Lien Noteholders shall retain the right to receive the benefits of any turnover provisions, including with respect to the Subordinated Note Claims, and any turnovers related thereto.

| | proportion that the principal amount of the Second Lien Notes held by such Second Lien Noteholder on the Record Date bears to the aggregate principal amount of all Second Lien Notes outstanding on the Record Date. |
|---|---|
| **General Unsecured Trade Claims:** | The Plan of Reorganization shall provide that each holder of a trade or similar unsecured claim shall receive payment in full in cash in the ordinary course of business or on the Effective Date. |
| **Subordinated Note Claims:** | The Plan of Reorganization shall provide that holders of Subordinated Note Claims shall not receive any distributions on account thereof.<br><br>"Subordinated Note Claims" means claims arising under the indenture, dated as of December 4, 2006, pursuant to which MPM has issued certain notes. |
| **PIK Note Claims:** | The Plan of Reorganization shall provide that holders of PIK Note Claims shall receive their pro rata share of the cash at Holdco (after payment of expenses of Holdco), which amount shall not exceed $9 million in the aggregate (prior to payment of expenses of Holdco).<br><br>"PIK Note Claims" means claims arising under that certain 11.00% Senior Discount Note due June 4, 2017, issued by Holdings. |
| **Intercompany Claims:** | The Plan of Reorganization shall provide that no distribution shall be made on account of intercompany claims and such intercompany claims shall be reinstated or cancelled as of the Effective Date at the election of the Requisite Investors; provided that such cancellation or reinstatement, as applicable, shall have no adverse effect on the distributions to the holders of Second Lien Notes, and any such cancellation or reinstatement that has such an adverse effect shall be null and void ab initio. |
| **Equity Interests:** | The Plan of Reorganization shall provide that existing equity interests in Holdings or MPM, as the case may be, and allowed claims subordinated pursuant to section 510(b) of the Bankruptcy Code are cancelled on the Effective Date and that the holders thereof shall receive or retain no distributions on account thereof. |
| **Releases and Exculpations:** | The Plan of Reorganization shall contain customary release and exculpation provisions. |
| **CORPORATE GOVERNANCE, SHARED SERVICES AGREEMENT AND MANAGEMENT AGREEMENTS** | |
| **Term** | **Description** |
| **Board Representatives:** | Notwithstanding anything to the contrary in, or any amendment to, the Plan of Reorganization, the Backstop Commitment Agreement, the RSA or any of the Definitive Documentation (as defined in the RSA), or any supplement, exhibit, |

| | |
|---|---|
| | annex or other attachment to such documents, on the Effective Date, the Board of Directors of the Reorganized Company (the "Board") shall consist of:<br><br>    4 designees of Apollo (the "Apollo Designees");<br><br>    3 designees of the Ad Hoc Group (including 1 Oaktree designee, with all other designees selected by the vote of members of the Ad Hoc Group holding at the time of such vote a majority of the aggregate amount of the Backstop Commitments held by the Ad Hoc Group);<br><br>    The CEO (or acting CEO) of the Reorganized Company; and<br><br>    3 independent directors (one to be mutually agreed upon by Apollo and the Ad Hoc Group, one to be nominated by Apollo subject to the consent of the Ad Hoc Group (it being understood that if the Ad Hoc Group does not consent for two candidates, such consent will not be required) and one to be nominated by the Ad Hoc Group (it being understood that if Apollo does not consent for two candidates, such consent will not be required).<br><br>The initial members of the Board shall be identified as part of a supplement to the Plan of Reorganization in form and substance satisfactory to each Investor (the "Plan Supplement") and will each serve for a two year term (except that if an IPO is consummated or a stock exchange listing occurs before the end of the first year they shall have a one year term).  During such initial term, the size of the Board shall be fixed and directors can only be removed for cause. Following the end of such term, directors of the Reorganized Company will be elected in accordance with applicable law.  For the avoidance of doubt, (a) a director appointed, recommended or nominated by Apollo shall only be considered "independent" for purposes of this Term Sheet if he or she is not affiliated with Apollo and does not serve on the board of directors of, and is not employed by or affiliated with, any Apollo portfolio company and (b) a director appointed, recommended or nominated by a member of the Ad Hoc Group or the  members of the Ad Hoc Group, collectively, shall only be considered "independent" for purposes of this term sheet if he or she is independent from each member of the Ad Hoc Group pursuant to the standard for independence under NYSE rules.<br><br>The Reorganized Company's charter will provide that the provisions regarding the appointment of a permanent CEO and Board size and removal during the initial Board term cannot be amended prior to the consummation of a stock exchange listing or an IPO of the Reorganized Company. |
| **Affiliate Transactions:** | The Reorganized Company shall not be permitted to enter into, modify or terminate any agreement or transaction with any stockholder that, collectively with its affiliates, including any funds under management or portfolio |

18

| | |
|---|---|
| | companies of such stockholder or its affiliates, beneficially owns more than 20% of the Reorganized Company's common stock (each, a "<u>Related Party</u>") without the approval of a majority of the directors who are not appointed by or otherwise affiliated with such Related Party; <u>provided</u>, that independent directors appointed by such Related Party shall be entitled to vote in respect of such agreement or transaction so long as they remain independent of such Related Party; provided, further, that such approval shall not be required for any transaction between the Reorganized Company and a Related Party so long as such transaction is on arms' length terms, including with respect to market pricing, does not, collectively with any related transactions, involve aggregate payments or value in excess of $1,750,000, and all transactions undertaken pursuant to this proviso shall be regularly reported to the Board.<br><br>Notwithstanding the foregoing, for so long as the counterparty to the SSA is a Related Party, the amendment, termination, modification, or waiver of or enforcement or exercise of any rights under the SSA will be directed by management and require the approval of a majority of the directors who are not appointed by or otherwise affiliated with such Related Party or its affiliates; provided, that independent directors appointed by such Related Party or its affiliates shall be entitled to vote on such amendment, termination, modification, waiver, enforcement or exercise so long as they remain independent of such Related Party.<br><br>The Reorganized Company's charter, bylaws and any other constituent document with provisions relating to affiliate transactions will provide that such affiliate transactions provisions cannot be amended without the approval of all holders of New Common Stock, except that such provisions may be modified in connection with a stock exchange listing or IPO with the approval of both (i) a majority of the directors excluding the Apollo Designees and (ii) holders of a majority of the New Common Stock, disregarding any shares beneficially owned by Apollo or any of its affiliates, including any funds under management or portfolio companies of Apollo or its affiliates; provided, that independent directors appointed by Apollo shall be entitled to vote on such amendment so long as they remain independent of such Related Party. |
| **Preemptive Rights:** | Stockholders who hold more than 2.5% of the outstanding shares of New Common Stock will have preemptive rights with respect to the issuance of any new equity or convertible securities by the Reorganized Company or any of its subsidiaries, subject to customary exceptions, in order to maintain ownership percentage.  Preemptive rights shall automatically terminate upon an IPO or stock exchange listing and shall otherwise remain in existence. |
| **Shared Services Agreement:** | On the Effective Date, the following individuals, who shall have been identified on or prior to the start of the confirmation hearing, shall be appointed as executives of the Reorganized Company:<br><br>CEO – A person to be selected on either an interim or permanent basis |

by and acceptable to the Requisite Investors.

CFO – A person to be selected on either an interim or permanent basis by and acceptable to the Requisite Investors.

General Counsel – A person to be selected on either an interim or permanent basis by and acceptable to the Requisite Investors.

Others, if any, to be determined with the consent of the Requisite Investors and acceptable to the Requisite Investors

The compensation of such individuals (and other costs and expenses associated with the employment of such individuals), their respective counterparts at MSC, and their respective predecessors shall not, as of the Effective Date, be a cost to be allocated using the Allocation Percentage (as such concept is defined and applied in the Amended and Restated Shared Services Agreement dated as of March 17, 2011, between MPM and MSC (the "SSA")).

As of the Effective Date, the SSA shall be amended, with the agreement of MSC, such that (i) the notice period required to terminate the SSA for convenience shall be 30 days, (ii) the period of time for which each party as Service Provider shall be obligated to provide termination assistance shall be for a period designated by the Recipient, up to a maximum of 12 months, with a Recipient option to extend that termination assistance period by up to an additional 60 days, and (ii) the termination assistance provisions of the SSA obligate each Service Provider (as such term is defined in the SSA) to provide, at a minimum, the following termination support:

Continuing to provide the SSA services during the transition until the Recipient is ready to assume responsibility;

Cooperating with the Recipient and its designees by granting access to personnel providing the services and information about the resources utilized to provide the services (e.g., IT equipment, software licenses, subcontractors);

Formulating an exit plan (which the Recipient has a right to review and approve) to meet milestones required to transition services in the manner and on the timeline specified by the Recipient;

Transferring to the Recipient all data and other information relating to the Recipient's business; and

Supporting transition-related testing and parallel runs undertaken by the Recipient during the transition.

As of the Effective Date, the SSA shall be amended in a manner in form and

| | |
|---|---|
| | substance acceptable to the Requisite Investors to include an exhibit that sets forth a high-level termination assistance project plans to establish core support requirements, lines of communication, and work streams for use should the SSA or the SSA services be terminated. |
| **Management Incentive Plan:** | Up to 7.5% of New Common Stock shall be reserved for issuance under a new management incentive plan to be established by the Board and administered by the Reorganized Company.<br><br>New Common Stock issued pursuant to the Plan of Reorganization, in connection with the Rights Offering and in satisfaction of the Backstop Commitment Premium shall be subject to dilution by New Common Stock issued under such new management incentive plan established by the Board. |
| **Termination of Management Agreement:** | Any management agreement or similar agreement between any of the Debtors or their affiliates and Apollo shall terminate on the Petition Date or as soon thereafter as practicable by mutual agreement of the parties thereto.  Any entitlement to amounts owing thereunder shall be waived and no payments or distributions shall be made on account of such amounts. |
| <div align="center">**OTHER PLAN OF REORGANIZATION TERMS**</div> | |
| <div align="center">**Term**</div> | <div align="center">**Description**</div> |
| **DIP Financing:** | In connection with the commencement of the Chapter 11 Cases, the Debtors shall seek authority of the Bankruptcy Court to obtain DIP financing, which financing shall be in form and substance acceptable to the Requisite Investors (such financing, "<u>DIP Financing</u>"). |
| **Exit Financing:** | The Plan of Reorganization shall provide for exit financing in amounts, structure and upon other terms and conditions to be discussed and agreed upon and that is in form and substance acceptable to the Requisite Investors (such financing, "<u>Exit Financing</u>"). |

## EXHIBIT B

## JOINDER

This Joinder to the Restructuring Support Agreement, dated as of [_____ __,] 2014 by and among each of Momentive Performance Materials Holdings Inc., Momentive Performance Materials Inc. and each of their domestic direct and indirect subsidiaries party thereto (collectively, the "Company"), the Apollo Entities and Consenting Noteholders signatory thereto (as amended, supplemented or otherwise modified, the "Support Agreement), is executed and delivered by [    ] (the "Joining Party") as of _____ __, 2014.  Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Support Agreement.

1. __Agreement to be Bound__.  The Joining Party hereby agrees to be bound by all of the terms of the Support Agreement, attached to this Joinder as Annex I (as the same may be hereafter amended, restated or otherwise modified from time to time).  The Joining Party shall hereafter be deemed to be a "Plan Support Party," and a Party for all purposes under the Support Agreement.

2. __Representations and Warranties__.  With respect to the aggregate principal amount of  Holdings held by the Joining Party upon consummation of the sale, assignment, transfer, hypothecation or other disposition (including by participation) of such Holdings, listed on the signature page hereto, the Joining Party hereby makes the representations and warranties, as applicable, to the Company set forth in Section 5 of the Support Agreement.

3. __Governing Law__.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

* * * * *

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

Name of Institution: _____

By: _____

Name: _____

Title: _____

Telephone: _____

Facsimile: _____

E-mail: _____

Address: _____

_____

_____

[SIGNATURE PAGE TO JOINDER]

**Aggregate Principal Amount**

| | |
|---|---|
| First Lien Notes | |
| 1.5 Lien Notes | |
| Second Lien Notes | |
| Subordinated Notes | |
| PIK Notes | |
| Cash Flow Facility | |
| ABL Facility | |
| Other Claims or Interests (specify type and amount) | |

[SIGNATURE PAGE TO JOINDER]

# ANNEX I

Restructuring Support Agreement

**APPENDIX II**

**MOMENTIVE**

# Project Berzelius

## Release of Private Information

### April 14, 2014

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

# I. Project Berzelius Management Presentation (2.18.2014)

**MOMENTIVE**™

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

MOMENTIVE™

# Project Berzelius

Momentive Performance Materials Inc.
Management Discussion Materials

February 18, 2014

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved



# Disclaimer

These discussion materials contain selected information about Momentive Performance Materials Inc., and its subsidiaries (collectively, the "Company"). The sole purpose of these materials is to facilitate a discussion of a potential restructuring transaction (the "Transaction"). These materials are not intended to form the sole basis of any transaction or investment decision. These materials are not meant to be binding on the parties and do not constitute an offer or invitation for the sale or purchase of securities. Accordingly, the parties recognize that a full and complete agreement among the parties is not set forth herein and the parties do not intend to be bound unless and until they enter into definitive documentation regarding the subject matter of these materials. Nothing in these materials shall be deemed a waiver of any rights of the Company.

The information herein has been provided by the Company or obtained from public and other sources. Neither the Company nor its agents make any representation or warranty, express or implied, as to the accuracy or completeness of these materials and the Company and its agents expressly disclaim any liability with respect to these materials. Any projections, estimates and other forward looking statements with respect to the Company herein have been provided by the Company. No representation or warranty is given as to the achievability or reasonableness of any such projections, estimates or forward looking statements. Actual results may differ and such differences may be material. Only those representations and warranties by the Company which may be made in a definitive agreement if and when finally executed, and subject to such limitations and restrictions as may be agreed, shall have any legal effect.

These materials are strictly confidential and are subject to a confidentiality agreement between the recipient and the Company. These materials must not be disclosed by the recipient to any person and may not be copied for any purpose without the prior written consent of the Company. Each recipient acknowledges that some or all of such information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and each recipient undertakes not to use any such information for any unlawful purpose.

Any Transaction with the Company involves a high degree of risk. Any party to the Transaction should investigate, ask about and consider such risks in its due diligence investigation before entering into any Transaction. The Transaction has not been and will not be registered under the Securities Act of 1933 or any applicable state or foreign securities laws.

The Company and the recipient agree that any and all discussions, negotiations and communications during and relating to these materials, including, without limitation, information or documents disclosed, shared or exchanged in connection with the parties' discussions of these materials, as well as the mere fact that such discussions have occurred or are occurring, are and shall be confidential, and to the fullest extent provided by law, protected as settlement discussions under Federal Rule of Evidence 408 and any applicable similar state or foreign laws or rules.

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

MOMENTIVE™

# Momentive Performance Materials Inc. Representatives

## Craig Morrison
### President, Chief Executive Officer & Chairman

- Joined Momentive Performance Materials Holdings, LLC legacy company in 2002

- Previous roles include:
  – President and General Manager of Alcan Packaging (3 years)
  – President and General Manager for Van Leer Containers (5 years)

- Under Shared Services Agreement, acts in executive role for both Momentive Performance Materials & Momentive Specialty Chemicals

## William H. Carter
### Executive Vice President & Chief Financial Officer

- Joined Momentive Performance Materials Holdings, LLC legacy company in April 1995 as CFO of Borden Inc.

- Previous roles include:
  – Pricewaterhouse LLP, including role as Engagement Partner for Borden (20 years)

- Under Shared Services Agreement, acts in executive role for both Momentive Performance Materials & Momentive Specialty Chemicals

## George F. Knight
### Senior Vice President & Treasurer

- Joined Momentive Performance Materials Holdings, LLC legacy company in April 1997 as Director of Financial M&A Activities for Borden Inc.

- Previous roles include:
  – Duracell International (5 years)
  – Deloitte & Touche (11 years)

- Under Shared Services Agreement, acts in executive role for both Momentive Performance Materials & Momentive Specialty Chemicals

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

5

# Table of Contents

I.    Situation Overview

II.   Industry Fundamentals & Competitive Landscape

III.  Company & Business Overview

IV.   Long-Term Business Plan

  A.  Consolidated Overview

  B.  Silicones Business Unit Detail

V.    Balance Sheet & Liquidity

**Appendices**

A.  Silicones Materials Flow Schematic

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

6



Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

# Momentive Performance Materials Holdings LLC (MPMH LLC) Organizational Structure



## Summary

- Momentive Performance Materials Holdings LLC was formed in October 2010 through the merger of Momentive Performance Materials Inc. ("MPM") and Hexion Specialty Chemicals Inc. (now known as Momentive Specialty Chemicals Inc. or "MSC") under the Momentive banner (the "2010 Momentive Merger")

  – MPM was originally acquired by investment funds affiliated with Apollo Global Management ("Apollo") from General Electric in December 2006 in a corporate carve-out transaction

  – MSC was formed in May 2005 through the merger of Borden, RPP, RSM and Bakelite. Apollo originally acquired RPP in November 2000 and the other companies comprising MSC in the subsequent period prior to the MSC merger

- The legal and debt capital structures of MPM and MSC remain completely separate and in place following the 2010 Momentive merger

  – No cross guarantees or credit support provided between the two companies

  – Both companies report separately and file periodic reports with the SEC

- Arms-length shared services agreement in place to govern intercompany operations (e.g. finance / accounting and human resources, among others)

  – Total cost synergy program of $129 million as of September 30, 2013

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

8

# MPM Business Overview

## Overview

- One of the world's largest producers of silicones and silicone derivatives and a global leader in the development and manufacturing of products derived from quartz and specialty ceramics

- Operates in two major Segments: (i) Silicones; and (ii) Quartz

- <u>Silicones Segment</u>: manufactures a multi-functional family of materials used in a variety of products, serving as a critical ingredient in many construction, transportation, healthcare, personal care, electronic, consumer and agricultural uses

  - Products generally used as additives to a wide variety of end products; provide or enhance material attributes, such as resistance (heat, ultraviolet light and chemical), lubrication, adhesion and viscosity

  - Major end-use product applications include electronics, pressure-sensitive adhesive labels, cosmetics and tires

- <u>Quartz Segment</u>: manufactures quartz, specialty ceramics and crystal products for use in high-technology industries

  - Typically requires products made to precise specifications

- As of December 31, 2012, operates 22 production sites (15 Silicones, 7 Quartz) with locations in the Americas, Europe and Asia

  - One of two producers in the silicones market with global siloxane production capacity

- Serves more than 5,500 customers in over 100 countries

## Revenue & EBITDA by Segment



**Revenue**

Quartz 8%
Silicones 92%

*Total FY2013*: $2.4 billion

**EBITDA**

Quartz 13%
Silicones 87%

*Total FY2013*: $240 million

## Total Revenue By Geography & Industry

**By Geography[1]**

NA, 29%
Europe, 25%
BRIC, 24%
ROW, 12%
Japan, 10%

**By Industry[2]**

Consumer/ Durable Goods 23%
Industrial/ Marine 15%
Constr. 14%
Automotive 12%
Electronics 9%
Adhesives 7%
Furniture 7%
Repair/ Remodel 4%
Energy 4%
Healthcare, 2%
New Home Constr. 2%
Agriculture 1%

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

9

(1)   Based on YTD November 2013 revenue of $2.2 billion
(2)   Based on FY2012 revenue of $2.4 billion

**MOMENTIVE**

## Situation Overview

**1 WEAK OPERATING PERFORMANCE**

*Since 2010, MPM's financial performance has significantly deteriorated and remains under pressure*

- LTM EBITDA has declined 51% from $492 million (FY2010) to $240 million (FY2013)[1]
- EBITDA margins have declined ~900 bps from 19.0% (FY2010) to 10.0% (FY2013)
- Volumes have remained relatively flat (+3%), while price has come under significant pressure (~18%) in the face of meaningful direct material cost inflation (+10% as % of revenue)[2]

**2 FUNDAMENTAL SHIFT IN INDUSTRY DYNAMICS**

*MPM's weak financial performance has been primarily caused by a fundamental shift in industry dynamics, including industry overcapacity, new industry participants and product commoditization*

- 20% increase in global capacity during H2-2011 has created a structural supply / demand imbalance
- China continues to operate at low utilization levels and below cash cost
- "Commoditization" of lower-end specialty products and soft demand across most end markets
- Large competitors with cost advantages have accepted decreased margins to maintain volume

**3 EXTENDED RECOVERY AND STRUCTURAL LOSS IN PROFITABILITY**

*Extended path to recovery over medium- to long-term and unlikely to reach historical levels of profitability*

- Current financial decline driven by fundamentally different factors vs. 2008-09 banking crisis
- Overcapacity and shift in industry dynamics have structurally degraded industry profit margins

**4 UNSUSTAINABLE BALANCE SHEET & TIGHTENING LIQUIDITY**

*MPM's current balance sheet is unsustainable and liquidity is diminishing*

- Net leverage of 16.7x through HoldCo as of FYE2013 (17.1x gross of cash)
- Liquidity of $204 million[3] as of FYE2013 and negative free cash flow of over $200 million (implying <1 year of runway)
- Balance sheet and liquidity issues have constrained MPM's ability to make strategic capital expenditures and investments in new product development, resulting in a disadvantaged cost position and near-term need for "catch-up" investment to remain competitive

**5 BALANCE SHEET RESTRUCTURING**

*A balance sheet restructuring for MPM is a critical component of creating a competitive and sustainable company going forward*

- Need to deleverage significantly; MPM net leverage of 16.7x through HoldCo vs. 3.4x per industry median[4]
- Significant new equity needed to fund post-restructuring liquidity needs and reduce leverage to market levels

Source: Market Research
All FY2013 and FYE2013 amounts represent management's best estimate as of the presentation date. Q4 numbers have not been finalized
(1) Measured between Q1-2011 LTM to FY2013 for volumes and direct materials costs; based on Q1-2011 to Q4-2013 for average selling price
(2) Measured between Q1-2011 LTM to FY2013 for volumes and direct materials costs; based on Q1-2011 to Q4-2013 for average selling price
(3) Includes HoldCo cash of $9 million
(4) Based on Wall Street Research

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

10



**1** Weak Operating Performance
*Historical financials*

**Annual EBITDA Performance**

EBITDA has decreased ~50% since 2010 and margins have declined ~900 bps

**Recent Quarterly EBITDA Trends**

Slight improvement since late 2012; However, remains well below viable levels

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

11



# 1 Weak Operating Performance (cont'd)
*Historical financial performance versus budget*

**EBITDA Performance: Actual Versus Budget**

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

12



MOMENTIVE™

**2** Fundamental Shift in Industry Dynamics
*Supply & Demand Trends*



### Global Siloxane Industry Supply & Demand (Estimated)

*(000's MT)*

■ Effective Capacity[1]　── Actual Demand

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013E | 2014E | 2015E | 2016E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Effective Capacity | 1,004 | 1,103 | 1,152 | 1,170 | 1,265 | 1,318 | 1,444 | 1,533 | 1,802 | 1,867 | 1,996 | 2,167 | 2,304 | 2,345 |
| **Utilization (%)** | 81.2% | 86.7% | 93.5% | 99.4% | 96.9% | 92.8% | 76.7% | 86.0% | 73.1% | 76.3% | 75.4% | 75.1% | 73.1% | 76.1% |

**~20% INCREASE IN INDUSTRY CAPACITY IN H2-2011 DURING A WEAK ECONOMIC PERIOD HAS RESULTED IN LOW CAPACITY UTILIZATION RATES AND AN INABILITY TO DRIVE MARGINS HIGHER**

Source: "High Yield Chemicals Quarterly Review & Outlook" Bank of America Merrill Lynch (January 10, 2014),
Freedonia 2013 World Silicones Report, CEH Report, Management estimates
(1) Effective capacity represents 90% of nameplate

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

13



# 3 Extended Recovery & Structural Loss in Profitability

## Recovery in LTM EBITDA: '08-'09 Banking Crisis Recovery vs. Current Recovery

($ in millions)



| % of Previous Peak | T¹ | T + 1Q | T + 2Q | T + 3Q | T + 4Q | T + 5Q | T + 6Q | T + 7Q | T + 8Q | T + 9Q | T + 10Q | T + 11Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Current* | 100.0% | 97.4% | 91.7% | 76.7% | 61.9% | 49.6% | 40.3% | 43.3% | 47.4% | 47.0% | 47.8% | 48.6% |
| *'08-'09 Banking Crisis* | 100.0% | 98.0% | 92.7% | 90.8% | 72.1% | 51.6% | 44.2% | 40.4% | 59.0% | 84.5% | 102.8% | 110.8% |

(1)  "T" defined as FY2007 for '08-'09 Banking Crisis and Q1-2011 for Current recovery; based on peak EBITDA prior to recovery for each period

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

14



**MOMENTIVE™**

# 4 Unsustainable Balance Sheet & Tightening Liquidity

## Debt Capital Structure

### Debt Capital Structure

*($ in millions)*

| | Balance 12/31/2013 | Cumulative Leverage[1] |
|---|---|---|
| $270mm ABL Revolving Credit Facility | $135 | 0.6x |
| $75mm Cash Flow Revolver | – | 0.6x |
| Foreign Local Bank Debt | 46 | 0.8x |
| 8.875% First Lien Notes | 1,100 | 5.3x |
| 10.000% Senior Secured Notes | 250 | 6.4x |
| **Total First Lien Debt** | **$1,531** | **6.4x** |
| 9.000% Springing Lien USD Notes | $1,161 | 11.2x |
| 9.500% Springing Lien Euro Notes | 181 | 12.0x |
| **Total Second Lien Notes** | **$1,341** | **12.0x** |
| 11.500% Senior Subordinated Notes | $382 | 13.6x |
| **Total Subordinated Debt** | **$382** | **13.6x** |
| HoldCo 11% PIK Note | $854 | 17.1x |
| **Total Debt** | **$4,108** | **17.1x** |
| Cash (Incl. HoldCo Cash) | 97 | |
| *Net Debt* | *$4,010* | *16.7x* |

*MPM is 17x levered through the HoldCo and significantly free cash flow negative*

### Debt Maturity Profile



*($ in millions)*

*$75mm Cash Flow Revolver expires at the end of FY2014; Senior Sub. Notes in 2016 are next significant maturity*

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

15

(1) Based on FY2013 EBITDA of $240 million
(2) Other debt consists of Agricultural Bank of China Fixed Asset Loan, Agricultural Bank of China Working Capital Loan, JiangSu Bank of China Revolving Working Capital Loan, and Indian Bank Medium Term Loan
(3) $75 million Cash Flow Revolver undrawn as of 12/31/2013; facility matures in December 2014
(4) HoldCo PIK Note assumes continued capitalization of PIK interest to maturity in FY2017

MOMENTIVE

# 4 Unsustainable Balance Sheet & Tightening Liquidity

## Free Cash Flow

### FCF Profile[1]

| ($ in millions) | LTM as of 12/31/2013 |
|---|---|
| EBITDA | $240 |
| Less: Chg. in NTC | (32) |
| Less: CapEx | (92) |
| Less: Cash Taxes | (13) |
| Less: Other[3] | (56) |
| Unlevered FCF | $47 |
| Less: Cash Interest | (307) |
| Levered FCF | ($260) |

Effective Minimum Liquidity ~$100 million

### Historical Quarterly FCF[1]

| ($ in millions) | 2011 | | | | 2012 | | | | 2013 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4[2] |
| EBITDA | $121 | $126 | $97 | $35 | $48 | $65 | $51 | $50 | $68 | $63 | $55 | $54 |
| Less: Chg. in NTC | (91) | 23 | 21 | 48 | (15) | (6) | 14 | 3 | (21) | – | (42) | 31 |
| Less: CapEx | (18) | (27) | (26) | (45) | (20) | (25) | (24) | (29) | (12) | (19) | (20) | (41) |
| Less: Cash Taxes | (3) | (5) | (8) | (6) | 1 | (4) | (7) | (6) | (1) | (3) | (5) | (4) |
| Less: Other[3] | 17 | (23) | (33) | (14) | (12) | (6) | (18) | (17) | (25) | (12) | (9) | (10) |
| Unlevered FCF | $26 | $94 | $51 | $18 | $2 | $24 | $16 | $1 | $9 | $29 | ($21) | $30 |
| Less: Cash Interest | (33) | (47) | (76) | (47) | (73) | (66) | (67) | (76) | (63) | (94) | (64) | (86) |
| Levered FCF | ($7) | $47 | ($25) | ($29) | ($71) | ($42) | ($51) | ($75) | ($54) | ($65) | ($85) | ($56) |

### Total Liquidity[4]



$323 million decline in liquidity since the 2011 peak

**MPM has had negative free cash flow for the last 10 quarters; Current liquidity runway of <1 year**

(1) Excludes asset sales
(2) Cash flows based on initial estimates; subject to change once book closing process is complete
(3) Other cash flows include pension contributions, shared service billings, incentive compensation adjustments, cash payments on prepaid expenses and other cash charges
(4) For Q3 and Q4 FY2013, liquidity figure includes HoldCo cash of ~$9mm

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

16

**MOMENTIVE™**

**5** Balance Sheet Restructuring
*Summary Considerations*

- Significant deleveraging required to create a sustainable capital structure and viable company going forward
  - MPM net leverage of 16.7x through the HoldCo versus 3.4x industry median[1]
  - Need to target leverage and coverage levels that imply the business will be levered free cash flow positive in FY2014E

- Unsustainable cost of capital with "first dollar" cost of 8.875% on First Lien Notes

- Significant new equity required to fund:
  - Liquidity needs post-restructuring
  - Pay down of debt and reduction of leverage
  - Cost and time in bankruptcy, as well as transaction execution expenses
  - Recoveries required by impaired creditors

- Post-restructuring liquidity requirement increased by need for "catch-up" capital investment to compensate for under-investment over last several years
  - Balance sheet and liquidity concerns have limited MPM's ability to make strategic capital expenditures and investments in new product development over the last 5 years and resulted in disadvantaged cost position and margins relative to competitors

- Potential equity requirement assumes benefits of Shared Services Agreement remain in place; without this benefit, further delevering may be necessary

(1)    Based on Wall Street research

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

17

# II. Industry Fundamentals & Competitive Landscape

**MOMENTIVE**™

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

# Silicones Industry Overview

## Overview

- Manufacturing of silicones and silicone derivatives to produce a wide range of high-performing elastomers, engineered materials and fluids

- Products generally used as additives to a wide variety of end products; provide or enhance material attributes, such as resistance (heat, ultraviolet light and chemical), lubrication, adhesion and viscosity

  – Developed using separate finishing processes to generate specific performance characteristics

- Major end-use product applications include bath and shower caulk, pressure-sensitive adhesive labels, foam products, cosmetics and tires

- Approximately $16 billion[1] global industry

- Key raw materials include:

  – Silicon Metal – major suppliers include FerroAtlantica, Elkem and Globe Specialty Metals, among others

  – Siloxane - major suppliers include Momentive Performance Materials, Dow Corning and Wacker Chemie

  – Methanol – major suppliers include Methanex, MHTL and Saudi Basic Industries Corporation

## Major Applications



LEDs / OLEDs | RLCs / PSAs | Caulk | Foam Control

Hard coats / Weather-strip | UV Cure | Insulators | Tire

## Market Share[2]



- Dow Corning
- MPM
- Wacker
- ShinEtsu
- BlueStar
- Evonik
- Others

32% | 14% | 14% | 11% | 6% | 4% | 19%

Source: IBISWorld report titled "Semiconductor & Circuit Manufacturing in the US" - November 2013, 2013 AMAT
(1)   Management estimate
(2)   Based on 2012 results

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

19

**MOMENTIVE**

# Silicones Industry Fundamentals
## *Major Siloxane Supply & Demand Trends*

**1** Significant recent capacity additions have led to a structural supply / demand imbalance

   – 20% increase in siloxane capacity since 2011; additions primarily in Asia

**2** Overcapacity has put significant pressure on prices and led to both the commoditization of certain specialty products and increased overall competition

   – Driving significant declines in EBITDA margin across the industry

   – Sealants, elastomers, siloxane and siloxane derivatives have increasingly become commodity products

**3** Despite uneconomic operating conditions, marginal capacity has not come offline

   – Siloxane plants are generally large facilities and difficult to cycle

   – Significant number of high-cost Chinese manufacturers, some of which are state-owned, continue to produce below their cash cost of production

**4** Meaningful pipeline of capacity additions remains intact, further pressuring the supply / demand imbalance for the medium-term

   – Near-term capacity additions are low cost and primarily in Asia

**5** Change in industry dynamics and fundamentals has structurally degraded industry profit margins

---

**OVERCAPACITY AND SECULAR SHIFT IN CHINESE MARKET DYNAMICS HAVE STRUCTURALLY DEGRADED INDUSTRY PROFIT MARGINS**

---

Source:  Company data, CNCIC China Study (February 2013)

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

20

# Silicones Industry Fundamentals –
## Global "Effective" Siloxane Capacity Utilization[1]

*China capacity exceeds demand by 43%*

MOMENTIVE™



**AMR** — SHORT

| AMR | kMT | % Cap. |
|---|---|---|
| Eff. Capacity | 288 | -- |
| Production | 270 | 94% |
| Demand | 349 | 121% |

**EUR - MEA** — LONG

| EUR - MEA | kMT | % Cap. |
|---|---|---|
| Eff. Capacity | 558 | -- |
| Production | 440 | 79% |
| Demand | 383 | 69% |

**CHINA** — LONG

| CHINA | kMT | % Cap. |
|---|---|---|
| Eff. Capacity | 1,088 | -- |
| Production | 681 | 63% |
| Demand | 615 | 57% |

**APAC** — SHORT

| APAC | kMT | % Cap. |
|---|---|---|
| Eff. Capacity | 233 | -- |
| Production | 236 | 101% |
| Demand | 281 | 120% |

**GLOBAL** — LONG

| GLOBAL | kMT | % Cap. |
|---|---|---|
| Eff. Capacity | 2,167 | -- |
| Production | 1,627 | 75% |
| Demand | 1,627 | 75% |

## *540 kMT unutilized Siloxane capacity globally*

Source:  "High Yield Chemicals Quarterly Review & Outlook" Bank of America Merrill Lynch (January 10, 2014).
Freedonia 2013 World Silicones Report, CEH Report, Management estimates
Note:      Represents 2014E estimates
(1)       Effective capacity represents 90% of nameplate

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

21

# Silicones Industry Fundamentals – Global Siloxane Effective Capacity Model[1]

*New Chinese capacity has fundamentally changed the global landscape*

**Global Siloxane Balance**
*(in '000 MT)*



MOMENTIVE™

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

Source: "High Yield Chemicals Quarterly Review & Outlook" Bank of America Merrill Lynch (January 10, 2014),
Freedonia 2013 World Silicones Report, Management estimates
(1) Effective capacity represents 90% of nameplate

22

# Silicones Global Market Overview

| Company | % Market Share (2012) | Commentary | LTM Net Leverage[1] | Vertical Integration | |
|---|---|---|---|---|---|
| | | | | Sil Metal | Siloxane |
| DOW CORNING | 32% | • Joint venture between Dow Chemical and Corning; world's largest producer of silicones since materials were first commercialized in the 1940s | 2.0x | ✓ | ✓ |
| MOMENTIVE | 14% | • World's second largest producer of silicones; MPM was originally acquired by Apollo Global Management from General Electric in December 2006 in a corporate carve-out transaction | 16.7x | -- | ✓ |
| WACKER | 14% | • Primarily active in European market from production bases in Burghausen and Nunchritz, Germany; manufacturing sites also include Brazil, China, India, Japan, South Korea and U.S. | 1.7x | ✓ | ✓ |
| Shin-Etsu | 11% | • Shin-Etsu serves marketplace mainly from Japan; production sites also in China, South Korea, Taiwan, Thailand, U.S. and Netherlands; opened silicone elastomers plant in Nantong in January 2013. High margins driven by specialty mix and Japanese market. | (1.2x) | ✓ | ✓ |
| BLUESTAR 中国蓝星 | 6% | • Subsidiary of China National Bluestar Group, which acquired Rhodia's silicones business in 2007; focused on rapidly expanding in China and has production facilities in China, Brazil, France, Germany, Italy and Spain | NA | ✓ | ✓ |
| EVONIK INDUSTRIES | 4% | • Silicones represent relatively small portion of company's overall specialty chemicals business | 0.3x | -- | -- |
| Others | 19% | • Largely Chinese competitors | NA | -- | ✓ |

Source: Company filings, CapitalIQ
(1)    LTM as of 9/30/2013

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

23

# Silicones Industry Fundamentals – Raw Material Prices Remain Volatile



**Commentary**

- Macro economic uncertainty creates potential raw material cost volatility
  - Raw material indices remain well below FY2011 peak but have shown a recent upward trend
- Silicon metal prices have moderated slightly from FY2012 levels
  - Near-term sentiment remains mixed
- Methanol pricing remains high as a result of global demand and below-average inventories

(1) Based on Company data: internally developed raw material pricing index.
(2) Includes content supplied by CRU; Copyright © CRU 2013. All rights reserved; EUR foreign exchange rate = 1.30
(3) Includes content supplied by IHS Chemical; Copyright © IHS Chemical 2013. All rights reserved

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

24

MOMENTIVE™

# Quartz Industry Overview

## Overview

- Manufacturing of quartz, specialty ceramics and crystal products for use in high-technology industries, which typically require products made to precise specifications

- Approximately $1.2 billion[1] global industry

- End users include semi-conductor, lamp tubing, manufacturing, packaging, cosmetics and fiber optics industries, among others
  - Cost of products typically represents a small percentage of the overall cost of end-use products

- Primary supplier to the semiconductor manufacturing industry
  - Major semiconductor manufacturers include Intel, Samsung, TSMC, Global Foundries, SK Hynix and Toshiba, among others
  - Semiconductor end-markets include PC, communications, handsets, solar and auto/industrial

- Non-semi products provided to a diverse customer base

- Core raw material input is quartz sand
  - Concentrated supplier base with only two major providers

## Major Applications



**Quartz** — Lamp, Tubes & Rod, Crucibles, Boules

**Ceramics & Optics** — CVDs, Cosmetics, Powders & Shapes, Heater Assemblies

## Market Share[2]



- Momentive — 38%
- Hereaus — 21%
- JSQ — 8%
- Tosoh — 4%
- 3M — 3%
- Shin-Etsu — 3%
- Osram — 3%
- All Other — 20%

Source: IBISWorld report "Semiconductor & Circuit Manufacturing in the US" - November 2013, 2013 AMAT
(1) Management estimate
(2) Based on YTD November 2013 results

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

25

# Historical Integrated Circuit Growth Trends

## Commentary

- Semiconductor demand correlated to global GDP growth given engrained nature of consumer electronic spending

- In recent years, the US has played an increasingly large role in semi-conductor capital spend
  - From 2005 to 2012, percentage of capital spending in semi-conductors represented by US manufacturers increased from 29% to 40%

- Industry trends:
  - Quartz cyclicality driven by large capital expansion in the semi-conductor industry
  - New product development in mobile computing driving new capacity additions in 2014
  - Current outlook suggests that near-term volume growth will remain below historical growth rates

## Integrated Circuit Historical Volumes[1]



(1)  World Semiconductor Trade Statistics, ICInsights

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

26

# III. Company & Business Overview

**MOMENTIVE**

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved



# MPM Business Overview (cont'd)



(1)   Based on YTD November 2013 revenue of $2.2 billion
(2)   Based on FY2012 revenue of $2.4 billion

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

29

MOMENTIVE™

# Experienced and Highly Motivated Management Team with Proven Track Record



**MPM & MSC** *(Shared Oversight)*

- Finance **Bill Carter***
- Human Resources **Judy Sonnett***
- Legal **Doug Johns***
- Business Processes & IT **Dean Myer***
- EH&S **Karen Koster***
- Procurement **Nathan Fisher***
- Business Development & Strategy **Tony Greene***
- Six Sigma **Dalchand Laljit***
- Chief Marketing Officer **Marcello Boldrini***

Chief Executive Officer **Craig Morrison***

**MPM**

Silicones & Quartz Division **Brian Berger *(Acting)***

Quartz Segment **Joseph Reyes**
- Quartz
- Ceramics

Basics Sector **Eric Thaler**
- Basics

Additives Sector **Ian Moore**
- Specialty Fluids
- Silanes
- Urethane Additives

Formulated Products Sector **Ray Kolberg**
- Electronics
- Coatings
- Elastomers
- Sealants

**AVERAGE ~20 YEARS EXPERIENCE IN THE CHEMICAL INDUSTRY**

\* *Individuals have shared oversight responsibilities between MPM and MSC under Shared Services Agreement*

*Copyright © 2014 Momentive Performance Materials Inc. All rights reserved*

30

MOMENTIVE™

# MPM / MSC Relationship

## Commentary

- MPMH LLC was formed in October 2010 through the merger of MSC and MPM

  – Combination was compelled by strong industrial logic and opportunity to realize meaningful revenue and cost synergies

  – The legal and debt capital structures of MPM and MSC continue to remain completely separate and in place

- Shared service agreement has been put in place to govern intercompany operations

  – Shared services include finance / accounting, human resources and information technology, among other functions

- $129 million cost synergy program as of September 30, 2013

  – For MPM, $63 million realized to date and $1 million of in-process savings

  – Shared cost synergies are split between MPM and MSC 43% / 57%

- Significant technology cross-fertilization and revenue synergy opportunity

  – For example, in FY 2013 rolled out OilPlus™ product that leverages silicone and phenolic technologies and resulted in $50 million of revenue in its first year

## Cost Synergy Program

**Savings By Company**[1]



MPM 43%
MSC 57%

**Savings By Type**

SG&A 40%
Logistics 23%
Procur. 37%

**Total MPM & MSC Synergy Savings - $129mm**

## Significant Cross-Fertilization Opportunities



*Elastomers – Infrastructure*

*Oilfield Proppants*

*Boron Nitride - Brakes*

*Silanes - Coatings*

(1)    Represents split of Functional Service Costs under the Shared Services Agreement; as amended in January 2013

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

31

# Historical Financial Performance



**Revenue**

($ in millions; Volume in kMT)

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|
| Revenue | $2,342 | $2,414 | $2,538 | $2,639 | $2,083 | $2,588 | $2,637 | $2,257 | $2,398 |
| Y-o-Y Growth | -- | 3.1% | 5.1% | 4.0% | (21.1%) | 24.2% | 1.9% | (10.6%) | 1.7% |

- Total revenue has declined 9% from 2011
  - New capacity that came online in China in 2011 has reduced pricing power
- Revenue declines driven primarily by:
  - Industry-wide price reductions to protect market share
  - Average selling price for Silicones declined by 12% from FY2011 to FY2013 while volumes grew by 8%
  - Loss of market share in select product lines
- Quartz revenue has declined 38% from peak of $327 million in 2011

**EBITDA**

($ in millions)

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|
| EBITDA | $400 | $401 | $443 | $319 | $261 | $492 | $379 | $214 | $240 |
| EBITDA Margin % | 17.1% | 16.6% | 17.4% | 12.1% | 12.5% | 19.0% | 14.4% | 9.1% | 10.0% |

- EBITDA has declined 52% from the peak in 2010
  - Margins have declined by ~900bps
  - Driven by a combination of factors highlighted on the next page

(1)    For Silicones Segment only; volumes and average selling price not tracked for Quartz business

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

32

MOMENTIVE

# Historical CapEx & Working Capital

## Capital Expenditures

($ in millions)





- CapEx to Depreciation ratio in 4 out of the past 5 years has averaged approximately 50% – an unsustainable level of investment for a specialty chemicals company
  - Most competitors are spending at >100% CapEx to Depreciation ratio
- Significant underspend in CapEx for 2009-2013
  - Total investment for 2009-2013E was ~37% less than annual spend for 2005-2008 time period
  - Cumulative underinvestment in Maintenance CapEx of $134 million over the 5 year period, based on normalized spend of ~$60 million
- For 2009 – 2013, Other includes Growth, Productivity and Restructuring CapEx

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|
| CapEx | $131 | $170 | $177 | $140 | $77 | $95 | $116 | $98 | $92 |
| % of Revenue | 5.6% | 7.0% | 7.0% | 5.3% | 3.7% | 3.7% | 4.4% | 4.2% | 3.8% |

Period Average %: '05-'08 Average: 6.2%   '09-'13 Average: 4.0%

## Net Trading Capital

($ in millions)

Legend: ■ Accounts Receivable (Trade Only)   ■ Inventory   ■ Accounts Payable



- Due to inadequate planning systems and dispersed asset locations, MPM currently operates less efficiently than key competitors
- Sales and inventory operations planning systems are being installed to drive improved inventory performance

| | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| Accounts Receivable (Trade Only) | $328 | $340 | $323 | $293 | $329 |
| Inventory | $349 | $375 | $394 | $374 | $367 |
| Accounts Payable | $270 | $305 | $308 | $254 | $250 |
| Chg. in NTC | $1 | ($2) | $1 | ($4) | ($32) |

Source: Company model

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

33

# IV. Long-term Business Plan

**MOMENTIVE**™

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

# A. Consolidated Overview

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved



# Summary Overview of Financial Reporting Structure

*($ in millions)*

| Segment | Revenue | | FY2013E | EBITDA | |
|---|---|---|---|---|---|
| | $ | % of Total | | $ | % Margin |
| Silicones | $2,196 | 91.6% | | $246 | 11.2% |
| Quartz | $201 | 8.4% | | $36 | 18.0% |
| Corporate & Adjustments | – | – | | ($42) | (1.7%) |
| Company Total | $2,398 | 100.0% | | $240 | 10.0% |

Source: Company Model

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

36

**MOMENTIVE™**

# Key Consolidated Forecast Assumptions

| | |
|---|---|
| **Revenue** | • Long-term volume growth assumptions by business unit<br>  – Driven by Management's assessment of end market demand and competitive dynamics<br>  – Overall Silicones volume expected to grow at 2.3% CAGR from FY2013E – FY2018E<br>  – Consolidated 4.1% revenue CAGR for Silicones and 4.4% CAGR for Quartz for FY2013E – FY2018E<br>• Raw materials prices, increased at 1% per annum, are assumed to be passed through to the customers;<br>  – Inflation in raw material prices not projected to impact margins<br>• Foreign exchange assumed to be flat |
| **EBITDA** | • Margin over Material (MOM) per ton for most business lines is assumed to be flat with the exception of Basics, where slight recovery is expected<br>  – Overall changes in MOM/MT driven by recovery in Basics, as well as slight shift in mix towards higher margin Additives business<br>• Fixed manufacturing overhead assumed to increase annually between 2% - 2.5% after productivity gains, consistent with historical productivity gains and the result of growth and productivity investments<br>• SG&A costs assumed to increase at 2% – 3% annually<br>• Consolidated 6.8% EBITDA CAGR for Silicones and 8.7% EBITDA CAGR for Quartz from FY2013E – FY2018E |
| **Net Working Capital** | • Net Working Capital projected based on historical days sales outstanding (DSO), days inventory outstanding (DIO) and days payable outstanding (DPO), adjusting for increases in volume growth<br>  – DIO projection assumes 2-day improvement year-over-year as a result of sales and operations planning software and processes<br>  – DSO and DPO projection held flat across quarters throughout projection period; no assumed seasonality<br>  – DIO projection assumes seasonality consistent with historical trends |
| **Capital Expenditures** | • Initial step-up in capital spending in FY2014E to "catch-up" on recent under-spending; initial FY2014E investment targeted at increasing plant reliability<br>• For FY2015E – FY2018E, capital expenditures projected to remain at levels consistent with normalized pre-2009 spend, more in line with peers on % of depreciation basis |

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

# Long-term Business Plan – Consolidated Revenue



($ in millions)

## Revenue by Segment[1]

■ Silicones  ■ Quartz

| Y-o-Y Growth % | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014E | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Silicones | – | 2.4% | 5.6% | 5.3% | (19.7%) | 19.5% | 1.0% | (7.5%) | 2.8% | 5.2% | 4.4% | 3.9% | 3.9% | 4.0% |
| Quartz | – | 8.8% | 1.6% | (6.4%) | (33.3%) | 77.2% | 8.2% | (32.4%) | (8.9%) | 4.2% | 14.6% | 15.5% | (5.8%) | (3.9%) |
| **Revenue** | – | **3.1%** | **5.1%** | **4.0%** | **(21.1%)** | **24.2%** | **1.9%** | **(10.6%)** | **1.7%** | **5.1%** | **5.3%** | **5.0%** | **3.0%** | **3.2%** |

**Historicals**

**Projections**

- Global economic downturn in 2009 saw a temporary catch-up in 2010 and 2011, but the industry remains in a slow growth environment
- Quartz segment heavily dependent on semi-conductor industry improvement, which did not materialize as expected in 2012 - 2013
- Significant new capacity brought online in 2011 limited pricing power and contracted margins

- Modest improvements projected over the coming years as excess capacity in the market is absorbed gradually
- Growth likely to be more robust in specialty segments
- Sealants and Elastomers expected to be under pressure as commodity players move downstream
- Raw material price increases are expected to be passed through to customers

Source: Company Model
(1)   Corporate and other revenue included in total but not shown graphically; only applicable for historical periods

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

38

# Long-term Business Plan – Consolidated EBITDA

**MOMENTIVE**

## EBITDA by Segment[1]

($ in millions)

■ Silicones  ■ Quartz  ■ Corporate & Other



| Margin % | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014E | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Silicones | 16.3% | 15.8% | 16.9% | 11.3% | 13.2% | 18.9% | 12.6% | 9.6% | 11.2% | 11.0% | 11.5% | 11.8% | 12.2% | 12.6% |
| Quartz | 23.8% | 23.0% | 21.6% | 19.2% | 12.3% | 30.4% | 30.9% | 19.9% | 18.0% | 19.3% | 23.3% | 27.1% | 24.3% | 21.9% |
| Corporate & Other | – | – | – | – | (0.6%) | (1.3%) | (0.5%) | (1.5%) | (1.7%) | (1.4%) | (1.4%) | (1.4%) | (1.4%) | (1.3%) |
| **Total EBITDA** | **17.1%** | **16.6%** | **17.4%** | **12.1%** | **12.5%** | **19.0%** | **14.4%** | **9.1%** | **10.0%** | **10.3%** | **11.2%** | **12.0%** | **11.9%** | **12.0%** |

### Historicals

- After the crisis of 2008-2009, MPM saw a sharp rebound in results due to better demand, pricing power and favorable raw material costs; Led to significant margin expansion
- With new capacity coming on stream in late 2011 and early 2012, MPM was not able to maintain the high margins achieved in 2010
- Cost structure disadvantages compared to larger competitors and the entry of new Asian players have compressed margins

### Projections

- Profitability projected to increase as fixed costs are spread over marginal volume increases
- Margins are not projected to reach peak figures observed in prior periods as additional lower cost capacity in Asia is expected to come online as current capacity is absorbed
- The semi-conductor cycle is projected to peak in 2016, driving peak profitability in Quartz, with a gradual decline from the peak to 2018

Source:   Company Model
(1)   Classification of segment EBITDA different over the historical period; For FY2008 – FY2009, allocation of Corporate & Other included in segment EBITDA;
For FY2010 – FY2012, segments defined as Quartz, Silicones and "Other"; For FY2013 – FY2018E, segments defined as Quartz, Silicones and "Corporate";
Corporate and Other segments defined on different basis

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

39

# Long-term Business Plan – Working Capital

## Working Capital Accounts

($ in millions)



Legend: ■ Accounts Receivable (Trade Only) ■ Inventory ■ Accounts Payable

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014E | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|---|---|
| AR | $328 | $340 | $305 | $293 | $329 | $354 | $372 | $391 | $402 | $415 |
| Inventory | $349 | $375 | $323 | $374 | $367 | $384 | $389 | $394 | $393 | $393 |
| AP | $270 | $300 | $308/$394 | $254 | $250 | $269 | $280 | $291 | $300 | $309 |

**Net Trading Capital Days**

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014E | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|---|---|
| A/R | 49 | 46 | 50 | 48 | 49 | 49 | 49 | 49 | 49 | 49 |
| Inventory | 80 | 78 | 80 | 83 | 73 | 71 | 69 | 67 | 65 | 63 |
| A/P | 49 | 50 | 50 | 45 | 41 | 41 | 41 | 41 | 41 | 41 |

## Historicals

- Days sales outstanding have been generally consistent, showing modest improvement

- Inventory levels have historically been high relative to competitors due to lack of robust inventory planning systems and processes

- Days payable outstanding have decreased due to tightening of terms with ASM and other suppliers given concerns over MPM credit, offset by management actions to preserve cash

## Projections

- Days sales outstanding and days payable outstanding are projected to remain consistent with historical levels, with absolute levels increasing as a result of revenue growth

- Days inventory outstanding are projected to decrease 2 days each year due to the implementation of inventory planning systems and processes

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

40

MOMENTIVE

# Long-term Business Plan – Consolidated CapEx

**MOMENTIVE**

## Capital Expenditures by Use

*($ in millions)*



| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014E | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $131 | $170 | $177 | $140 | $77 | $95 | $116 | $98 | $92 | $120 | $125 | $135 | $140 | $145 |

**% of Revenue**
Total CapEx

| 5.6% | 7.0% | 7.0% | 5.3% | 3.7% | 3.7% | 4.4% | 4.2% | 3.8% | 4.8% | 4.7% | 4.8% | 4.9% | 4.9% |

### Historicals

- Recent capital expenditures have been well below historical average
- Under-investment in business has resulted in disadvantaged cost position versus competitors
- Decreased spending on maintenance resulted in significant expenses related to reactor outages in 2012

### Projections

- Company intends to increase capital expenditures to:
  - Address reliability issues
  - Improve cost position and drive margin expansion

Source: Company Model

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

**MOMENTIVE**

# Overview of Shared Services Agreement

*MPM could see significant degradation in EBITDA if the shared services agreement with MSC is terminated*

## Description

- Under the agreement, Functional Service Costs allocated between MSC and MPM include:
  - Management and other personnel compensation
  - Administrative support, human resources, information technology support, accounting, finance, legal, procurement, EHS and property management services
  - Capital expenditures
- Costs currently allocated 43% / 57% between MPM and MSC
  - Quarterly true-ups paid between MSC and MPM to maintain contractual splits

## Calculation of Potential Dis-synergies

| | |
|---|---|
| ***Run-rate Dis-synergies*** | |
| Total Annual Savings | $64 (4) |
| Less: Excluded Projects | (6) |
| Less: Retained Procurement Savings | |
| **Total Annual Dis-synergies** | **$54** |
| | |
| ***Other One-time Costs*** | |
| Recruiting (P&L) | (7) |
| Contingency Investment (Cash Flow) | (8) |
| **Total** | **($15)** |

- Projects excluded relate to IT & HR cost savings initiatives that would remain intact
- One-time recruiting expenses calculated as 30% of total comp & benefit savings
- Contingency investment includes expenditures on additional infrastructure, office space and other transitional cash outlays

## Historical Cumulative Cost Savings to MPM[1]

| ($ in millions) | 2010 | 2011 | 2012 | 2013E | 2014E | Total Cum. |
|---|---|---|---|---|---|---|
| IT/BPO | $0 | $2 | $8 | $11 | $11 | $11 |
| Finance | 0 | 4 | 7 | 8 | 8 | 8 |
| HR | 0 | 2 | 2 | 3 | 3 | 3 |
| Other SG&A | 0 | 4 | 10 | 12 | 12 | 12 |
| **Total SG&A** | **$1** | **$11** | **$27** | **$33** | **$34** | **$34** |
| Procurement | -- | $10 | $18 | $20 | $20 | $20 |
| Logistics | -- | 3 | 10 | 11 | 11 | 11 |
| **Total COGS** | **--** | **$13** | **$28** | **$30** | **$30** | **$30** |
| **Total Savings** | **$1** | **$24** | **$55** | **$64** | **$64** | **$64** |

## Adjusted EBITDA Projections[2]

Legend: ■ Adjusted EBITDA w/o SS    ⊓ Base Case EBITDA



| | 2013E | 2014E | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|
| Base Case EBITDA | $240 | $260 | $297 | $334 | $343 | $356 |
| Adjusted EBITDA w/o SS | $240 | $229 | $245 | $278 | $286 | $298 |

| *Margins* | | | | | | |
|---|---|---|---|---|---|---|
| Base Case | 10.0% | 10.3% | 11.2% | 12.0% | 11.9% | 12.0% |
| Adj. w/o SS | 10.0% | 9.1% | 9.2% | 10.0% | 10.0% | 10.1% |

Source:  Company Model, Company information
(1)  Based on internal reporting; varies from external reporting due to reporting adjustments
(2)  Certain costs phased-in over two-year period

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

42

# B. Silicones Business Unit Detail

MOMENTIVE™

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

# MOMENTIVE™

# Silicones | Business Unit Detail

| | Electronic Materials | Coatings | Elastomers | Sealants |
|---|---|---|---|---|
| **Revenue Trend** |  |  | |  |
| **EBITDA Trend** *(Margin Trend)* |  (Expansion) |  (Flat) | (Contraction) |  (Expansion) |
| **Revenue by Geography**[1] | 53% / 30% / 17% | 40% / 22% / 38% | 28% / 27% / 45% | 32% / 57% / 11% |
| **Applications** | • Appliances<br>• Lens<br>• LEDs<br>• OLEDs | • RLCs<br>• PSAs<br>• Hard coats<br>• Weather-strip | • UV cure<br>• Contact Lenses<br>• Insulators | • Construction<br>• Consumer |

Revenue by Geography legend: ■ Americas ■ Europe ■ Asia Pac

(1)   Based on YTD November 2013 revenue of $2.2 billion

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

44

# Silicones | Business Unit Detail (cont'd)



|  | **Specialty Fluids** | **Silanes** | **Urethane Additives** | **Basics** |
|---|---|---|---|---|
| **Revenue Trend** | (arrow) | (arrow) | (arrow) | (arrow) |
| **EBITDA Trend** *(Margin Trend)* | (arrow) *(Flat)* | (arrow) *(Flat)* | (arrow) *(Flat)* | (arrow) *(Expansion)* |
| **Revenue by Geography**[1] | Americas / Europe / Asia Pac — 27% / 40% / 32% | Americas / Europe / Asia Pac — 41% / 33% / 26% | Americas / Europe / Asia Pac — 38% / 33% / 29% | Americas / Europe / Asia — 27% / 34% / 39% |
| **Applications** | ▪ Personal Case<br>▪ Textiles<br>▪ Industrial / Oil<br>▪ Agriculture | ▪ Tire / Rubber<br>▪ LCD/LED screens<br>▪ Lighting applications<br>▪ Paints & Coatings | ▪ Rigid Foam<br>▪ Specialty Foam | ▪ Siloxane<br>▪ Siloxane derivatives |

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

45

(1)  Based on YTD November 2013 revenue of $2.2 billion

V. Balance Sheet & Liquidity

MOMENTIVE™

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

**MOMENTIVE**

# MPM Capital Structure as of 12/31/2013

| ($ in millions) | Maturity | Rate | Book Value | Price | Market Value | x FY2013 EBITDA Book | x FY2013 EBITDA Market | Trading CY | Trading YTM | Annual Interest $ | Annual Interest x EBITDA | Rating |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash (Incl. HoldCo Cash)** | -- | -- | $97 | -- | $97 | -- | -- | | | | | -- |
| $270mm ABL Revolving Credit Facility | 04/2018 | L + 225 bps | $135 | -- | $135 | 0.6x | 0.6x | -- | -- | 3 | 71.2x | B1/NR |
| $75mm Cash Flow Revolver | 12/2014 | L + 600 bps | -- | -- | -- | 0.6x | 0.6x | -- | -- | -- | 71.2x | B1/NR |
| Foreign Local Bank Debt | Various | 6.93% | 46 | -- | 46 | 0.8x | 0.8x | -- | -- | 3 | 36.7x | NA |
| 8.875% First Lien Notes | 10/2020 | 8.88% | 1,100 | 106.2 | 1,168 | 5.3x | 5.6x | 8.4% | 7.7% | 98 | 2.3x | B3/CCC |
| **Total First Lien** | | | **$1,281** | | **$1,349** | **5.3x** | **5.6x** | | | **$104** | **2.3x** | |
| *Net First Lien* | | | *1,183* | | *1,251* | *4.9x* | *5.2x* | | | | | |
| 10.000% Senior Secured Notes | 10/2020 | 10.00% | 250 | 106.3 | 266 | 6.4x | 6.7x | 9.4% | 8.7% | 25 | 1.9x | Caa1/C |
| **Total Through 1.5 Lien** | | | **$1,531** | | **$1,614** | **6.4x** | **6.7x** | | | **$129** | **1.9x** | |
| *Net Through 1.5 Lien* | | | *1,433* | | *1,517* | *6.0x* | *6.3x* | | | | | |
| 9.000% Springing Lien USD Notes | 01/2021 | 9.00% | 1,161 | 90.1 | 1,046 | 11.2x | 11.1x | 10.0% | 11.1% | 104 | 1.0x | Caa2/C |
| 9.500% Springing Lien Euro Notes[1] | 01/2021 | 9.50% | 181 | 87.6 | 158 | 12.0x | 11.7x | 10.8% | 12.2% | 17 | 1.0x | Caa2/C |
| **Total Through Second Lien** | | | **$2,872** | | **$2,819** | **12.0x** | **11.7x** | | | **$251** | **1.0x** | |
| *Net Through Second Lien* | | | *2,775* | | *2,722* | *11.6x* | *11.3x* | | | | | |
| 11.500% Senior Subordinated Notes | 12/2016 | 11.50% | 382 | 68.5 | 262 | 13.6x | 12.8x | 16.8% | 28.6% | 44 | 0.8x | Caa3/C |
| **Total OpCo Debt** | | | **$3,254** | | **$3,080** | **13.6x** | **12.8x** | | | **$295** | **0.8x** | |
| *Net OpCo Debt* | | | *3,157* | | *2,983* | *13.2x* | *12.4x* | | | | | |
| HoldCo 11% PIK Note | 06/2017 | 11.00% | 854 | -- | 854 | 17.1x | 16.4x | -- | -- | 94 | 0.6x | NA |
| **Total Debt** | | | **$4,108** | | **$3,934** | **17.1x** | **16.4x** | | | **$389** | **0.6x** | |
| *Net Debt* | | | *4,010* | | *3,837* | *16.7x* | *16.0x* | | | | | |

Source: Capital IQ, Bloomberg, S&P
Note:   Leverage multiples based on FY2013 EBITDA of $240 million; Floating rate interest calculated based on 3-Month LIBOR as of 12/31/2013
        Market prices as of 2/14/2014
(1)     Converted to USD based on 1.36 exchange ratio

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

47



# MPM Maturity Profile as of 12/31/2013

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

48

(1) Other debt consists of Agricultural Bank of China Fixed Asset Loan, Agricultural Bank of China Working Capital Loan, JiangSu Bank of China Revolving Working Capital Loan, and Indian Bank Medium Term Loan
(2) $75 million Cash Flow Revolver undrawn as of 12/31/2013; facility matures in December 2014
(3) HoldCo PIK Note assumes continued capitalization of PIK interest to maturity in FY2017

MOMENTIVE™

# MPM Liquidity Summary as of 12/31/2013

## Liquidity as of 12/31/2013

| | Amount | | Comments |
|---|---|---|---|
| **Cash** | **$97** | ┄┄► | Includes $9 million of HoldCo cash |
| | | | |
| ABL | $270 | | |
| Less: Drawn Amount | (135) | | |
| Less: Letters of Credit | (69) | | |
| Less: FCCR Reserve | (34) | ┄┄► | LTM FCCR of 0.4x; current blocker limit of 1.0x[1] |
| **Total ABL Availability** | **$32** | | |
| | | | |
| $75mm Cash Flow Revolver | $75 | ┄┄► | $75mm Cash Flow Revolver matures in December 2014 |
| Less: Drawn Amount | – | | |
| **Total Cash Flow Revolver Availability** | **$75** | | |
| | | | |
| Total Liquidity | $204 | | |
| Less: Minimum Cash Balance | (100) | ┄┄► | Based on minimum cash required to operate the business |
| **Excess Availability** | **$104** | | |
| *Memo: Excluding Cash Flow Revolver* | *29* | | |

(1)   Fixed charge calculation defined as EBITDA less capital expenditures, less cash taxes, divided by cash interest expense

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

49



# Long-Term Liquidity Projections

($ in millions)

## Levered Free Cash Flow




| Q1 2014E | Q2 | Q3 | Q4 | Q1 2015E | Q2 | Q3 | Q4 | Q1 2016E | Q2 | Q3 | Q4 | Q1 2017E | Q2 | Q3 | Q4 | Q1 2018E | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (77) | (100) | (16) | 5 | (34) | (60) | (82) | (39) | (58) | (75) | 13 | (31) | (51) | (73) | 15 | (29) | (55) | (69) | 18 | (25) |

## Commentary

- The Company is projected to produce annual negative levered free cash flow through FY2018
- With an average cost of debt of ~9.0%, the current leverage can not be supported by the cash flows of the business
  - As of Q4-2013, LTM cash interest expense is greater than LTM EBITDA

## Liquidity

Effective Minimum Liquidity: $100 million

December 2014 - $75 million Cash Flow Revolver matures

127  49  3  (194)  (174)  (256)  (251)  (290)  (347)  (423)  (410)  (441)  (491)  (564)  (550)  (579)  (633)  (703)  (685)  (711)

## Commentary

- Liquidity projections assume:
  - $75 million Cash Flow Revolver matures in Q4-2014, as scheduled
  - All other maturities roll at current terms
- Effective minimum liquidity of $100 million to operate the business
- Current projections show the Company dropping below the effective minimum liquidity in Q1-2014 and running out of cash in H2-2014

**The Company's capital structure needs significant downsizing to support debt service in light of long-term business prospects**

Source: Company Model



Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

50

**MOMENTIVE**

# Key Liquidity Considerations

 **Minimum liquidity required to operate the business**

- Total cash in the system versus cash available to fund business operations
- Liquidity cushion available to support potential downside EBITDA performance or spikes in net trading capital cash uses
- Need to increase investment in the business, including capital expenditures and R&D, to improve existing cost position and remain competitive in a changing environment
- ABL expected to be fully drawn in early 2014
- Cash flow revolver maturity in December 2014
- Ability to incur additional debt constrained by ABL credit agreement and First Lien indentures, as well as availability of collateral

 **Access to new equity to fund post-restructuring liquidity needs**

- Reinstatement of ABL may require conversion to term loan facility; unlikely able to replace ABL at current attractive terms
- Additional debt unattractive given:
  - Additional collateral limited to unencumbered foreign subsidiary assets, as well as $75 million Cash Flow Revolver basket (assuming maturity)
  - Additional leverage from exit financing creates additional balance sheet stress and incremental cash burn
- Likely to require additional equity to provide sufficient post-restructuring liquidity

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

**MOMENTIVE**

# Conclusions
## Situation Overview

| # | | |
|---|---|---|
| **1** | **WEAK OPERATING PERFORMANCE** | *Since 2010, MPM's financial performance has significantly deteriorated and remains under pressure* <br>▪ LTM EBITDA has declined 51% from $492 million (FY2010) to $240 million (FY2013)[1] <br>▪ EBITDA margins have declined ~900 bps from 19.0% (FY2010) to 10.0% (FY2013) <br>▪ Volumes have remained relatively flat (+3%), while price has come under significant pressure (~18%) in the face of meaningful direct material cost inflation (+10% as % of revenue)[2] |
| **2** | **FUNDAMENTAL SHIFT IN INDUSTRY DYNAMICS** | *MPM's weak financial performance has been primarily caused by a fundamental shift in industry dynamics, including industry overcapacity, new industry participants and product commoditization* <br>▪ 20% increase in global capacity during H2-2011 has created a structural supply / demand imbalance <br>▪ China continues to operate at low utilization levels and below cash cost <br>▪ "Commoditization" of lower-end specialty products and soft demand across most end markets <br>▪ Large competitors with cost advantages have accepted decreased margins to maintain volume |
| **3** | **EXTENDED RECOVERY AND STRUCTURAL LOSS IN PROFITABILITY** | *Extended path to recovery over medium- to long-term and unlikely to reach historical levels of profitability* <br>▪ Current financial decline driven by fundamentally different factors vs. 2008-09 banking crisis <br>▪ Overcapacity and shift in industry dynamics have structurally degraded industry profit margins |
| **4** | **UNSUSTAINABLE BALANCE SHEET & TIGHTENING LIQUIDITY** | *MPM's current balance sheet is unsustainable and liquidity is diminishing* <br>▪ Net leverage of 16.7x through HoldCo as of FYE2013 (17.1x gross of cash) <br>▪ Liquidity of $204 million[3] as of FYE2013 and negative free cash flow of over $200 million (implying <1 year of runway) <br>▪ Balance sheet and liquidity issues have constrained MPM's ability to make strategic capital expenditures and investments in new product development, resulting in a disadvantaged cost position and near-term need for "catch-up" investment to remain competitive |
| **5** | **BALANCE SHEET RESTRUCTURING** | *A balance sheet restructuring for MPM is a critical component of creating a competitive and sustainable company going forward* <br>▪ Need to deleverage significantly; MPM net leverage of 16.7x through HoldCo vs. 3.4x per industry median[4] <br>▪ Significant new equity needed to fund post-restructuring liquidity needs and reduce leverage to market levels |

Source: Market Research
(1) All FY2013 and FYE2013 amounts represent management's best estimate as of the presentation date. Q4 numbers have not been finalized
(2) Measured between Q1-2011 LTM to FY2013 for volumes and direct materials costs; based on Q1-2011 to Q4-2013 for average selling price
(3) Includes HoldCo cash of $9 million
(4) Based on Wall Street Research

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

52



Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

# A. Silicones Materials
## Flow Schematic

**MOMENTIVE**

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved



# Silicones Simplified Materials Flow

*Materials Flow of Selected Raw Materials to Major Finished Product Groups*



Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

(1) For external sale, Basics Segment primarily produces basic fluids through polymerisation process; Basics Segment also includes upstream intermediates and by-products that flow into other finished product groups

55



Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved



MOMENTIVE PERFORMANCE MATERIALS
EUROPE SUBSIDIARIES
CHART 2 OF 2

Tax Status for US tax purposes

2013 Q4_MPM.vsd



III. Raw Material Spend

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

**MOMENTIVE™**

# Key Raw Materials



| Key Material | Spend $MM |
|---|---|
| Silicon Metal | 180 |
| Methanol | 56 |
| Methyl Chloride | 16 |
| ASM | 93 |
| Xinan | 49 |
| Platinum | 45 |
| Total | 439 |

Copyright © 2013 Momentive Performance Materials Inc. All rights reserved.

128

[1.3.3.1] [Board Visit Aug'13 v4.pdf] [Page 128 of 150]



Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

**2013 Regional P&L**

($ in million, unless otherwise noted)

Preliminary Draft, Subject to Post Close Adjustments

**Summary P&L**

| | Consolidated | | | | | Asia | | | | | Europe | | | | | Latin America | | | | | North America | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | FY-13 | Q1 | Q2 | Q3 | Q4 | FY-13 | Q1 | Q2 | Q3 | Q4 | FY-13 | Q1 | Q2 | Q3 | Q4 | FY-13 | Q1 | Q2 | Q3 | Q4 | FY-13 |
| Total Revenue | 579 | 610 | 604 | 614 | 2,598 | 187 | 204 | 189 | 211 | 788 | 164 | 172 | 169 | 172 | 677 | 19 | 19 | 21 | 22 | 81 | 199 | 218 | 225 | 210 | 852 |

# IV. Input Pricing & Other

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

**MOMENTIVE**

# Silicon Metal Market



| Year | NA AVG USD/mt | EU AVG USD/mt | PAC AVG USD/mt |
|------|---------------|---------------|----------------|
| 2010 | 3,061 | 3,087 | 2,339 |
| 2011 | 3,453 | 3,288 | 2,510 |
| 2012 | 2,773 | 2,604 | 2,168 |
| 2013 | 2,697 | 2,602 | 1,937 |
| 2014 | 2,948 | 2,802 | 2,081 |

EU Silicon Metal Market Actual
EU Silicon Metal Market Forecast
NA Silicon Metal Market Forecast
NA Silicon Metal Market Actual
PAC Silicon Metal Market Actual
PAC Silicon Metal Market Forecast

a) NA market price and forecast source is CRU US Import Price ($/tonne)
b) EU market price and forecast source is CRU EU Spot Price ($/tonne)
c) AP market price and forecast source is CRU Japan Import Price ($/tonne)

**Total Momentive Volume purchased by region:  NA: 36 KMt, EU: 29 KMt, AP: 14 KMt**

March 14

# Methodol Market



| Year | NA AVG CPG | EU AVG CPG | PAC AVG CPG |
|------|------------|------------|-------------|
| 2010 | 110 | 101 | 106 |
| 2011 | 131 | 129 | 132 |
| 2012 | 135 | 130 | 133 |
| 2013 | 161 | 155 | 140 |
| 2014 | 171 | 178 | 159 |

Legend:
— EU Methanol Market Actual b)
— NA Methanol Market Forecast
— NA Methanol Market Actual a)
-- EU Methanol Market Forecast
-- PAC Methanol Market Forecast
— PAC Methanol Market Actual c)

a) NA Actual Market price is Industry Average using CMAI, Dewitt, JJ&A
b) EU Actual Market price is ICIS LOR Methanol Quarterly FOB R'dam converted to CPG; Forecast FX = $1.32 = 1 EU
c) PAC is Methanex's APCP for Au/Nz only.

**Total Momentive Volume purchased by region:  NA: 710 kT, EU: 254kT, AP: 74 kT, SA: 120 kT**

MOMENTIVE™

March 14

2

MOMENTIVE™

3

# Future Capex

|             | 2014  | 2015  | 2016  |
|-------------|-------|-------|-------|
| Maintenance | 54    | 54    | 57    |
| EH&S        | 31    | 31    | 33    |
| Growth      | 35    | 40    | 45    |
| **Total**   | **$120** | **$125** | **$135** |

MOMENTIVE™

4

# Pension

- 2014 pension contributions are expected to be $20 million.  2015 pension contributions are projected to be $11 million.  Out years approximately $15 -$20 million.

- MPM pension liabilities are as follows:

|  | 2013 | | 2012 | |
|---|---|---|---|---|
|  | <u>Domestic</u> | <u>Foreign</u> | <u>Domestic</u> | <u>Foreign</u> |
| – Unfunded liability | $(59) | $(129) | $(87) | $(126) |

# V. Internal NTC Summary 2013

**MOMENTIVE**™

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

**2013 Net Trading Capital Trends**

In $ millions

SQD : Silicones & Quartz

*Last Updated: 1/22/2014 at 10:45 AM*

| | 2010 Ending | 2011 Ending | 2012 Q1 | Q2 | Q3 | Q4 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Q4-13 | YTD | Dec-13 Forecast | Dec-13 Budget |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Month-End Balances** | | | | | | | | | | | | | | | | | | | | | | |
| Customer Receivables | 335 | 315 | 327 | 340 | 307 | 290 | 279 | 281 | 310 | 306 | 300 | 325 | 305 | 300 | 325 | 318 | 316 | 329 | 329 | | 310 | 305 |
| *DSO* | *44.5* | *43.5* | *42.8* | *43.9* | *45.2* | *45.4* | *48.4* | *47.4* | *44.1* | *46.8* | *45.5* | *46.0* | *47.4* | *47.8* | *46.6* | *47.1* | *47.3* | *48.7* | *48.7* | | | |
| Inventories | 376 | 394 | 411 | 398 | 399 | 374 | 414 | 425 | 401 | 433 | 417 | 405 | 423 | 425 | 406 | 419 | 413 | 367 | 367 | | 390 | 360 |
| *DIO* | *80.1* | *78.5* | *87.1* | *75.4* | *88.9* | *82.8* | *96.0* | *99.3* | *92.2* | *96.4* | *86.4* | *81.9* | *86.4* | *89.9* | *82.9* | *85.0* | *83.0* | *72.1* | *72.1* | | | |
| Payables | 298 | 306 | 309 | 305 | 290 | 255 | 227 | 232 | 276 | 257 | 237 | 296 | 255 | 257 | 254 | 231 | 248 | 250 | 250 | | 290 | 285 |
| *DPO* | *56.9* | *53.7* | *56.6* | *51.1* | *57.2* | *51.7* | *52.1* | *54.4* | *54.8* | *52.7* | *45.7* | *54.4* | *45.7* | *53.2* | *46.7* | *45.0* | *48.2* | *45.0* | *45.0* | | | |
| NTC | $ 413 | $ 404 | $ 429 | $ 433 | $ 415 | $ 410 | $ 465 | $ 474 | $ 435 | $ 481 | $ 480 | $ 434 | $ 473 | $ 467 | $ 477 | $ 506 | $ 482 | $ 445 | $ 445 | | $ 410 | $ 380 |
| *Trailing 12 months of Sales* | 2,588 | 2,637 | 2,571 | 2,471 | 2,389 | 2,359 | 2,368 | 2,359 | 2,335 | 2,346 | 2,346 | 2,317 | 2,338 | 2,344 | 2,350 | 2,373 | 2,390 | 2,398 | 2,398 | | | |
| *NTC % to Sales* | 16.0% | 15.3% | 16.7% | 17.5% | 17.4% | 17.4% | 19.6% | 20.1% | 18.6% | 20.5% | 20.5% | 18.7% | 20.2% | 19.9% | 20.3% | 21.3% | 20.2% | 18.6% | 18.6% | | | |
| **Cash Flow Changes** | | | | | | | | | | | | | | | | | | | | | | |
| Customer Receivables | 15 | (10) | (11) | (13) | 34 | 16 | 12 | (2) | (29) | 4 | 6 | (25) | 20 | 5 | (26) | 7 | 2 | (12) | (3) | (38) | | |
| Inventories | 23 | 79 | (16) | 12 | (0) | 24 | (39) | (11) | 24 | (32) | 16 | 13 | (18) | (2) | 19 | (14) | 6 | 46 | 38 | 7 | | |
| Accts & Drafts Payable | 9 | 12 | 3 | (4) | (15) | (35) | (28) | 5 | 44 | (19) | (21) | 59 | (41) | 2 | (4) | (23) | 17 | 3 | (3) | (5) | | |
| NTC | 47 | 80 | (25) | (5) | 18 | 5 | (56) | (8) | 39 | (46) | 1 | 47 | (39) | 5 | (10) | (29) | 24 | 36 | 32 | (36) | | |



Note: Presented on internal reporting basis; Varies from external SEC reporting

35

# VI. Borrowing Base Calculations (12.31.2013)

**MOMENTIVE**

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

## MPM
### Borrowing Base - Cover Page
As of December 31, 2013
(Amounts in USD)

| | US Silicone | US Quartz | Total US | Canada | Germany Silicone | Germany Quartz | Total Germany | Netherlands | UK [2] | Consolidated Total |
|---|---|---|---|---|---|---|---|---|---|---|
| A. Available Accounts Receivable | $ 55,874,431 | $ 18,352,091 | $ 74,226,522 | $ 4,603,374 | $ 45,398,507 | $ 5,536,149 | $ 50,934,656 | $ - | $ - | $ 129,764,552 |
| B. Available Inventory | 76,186,775 | 10,396,900 | 86,583,674 | 133,119 | 45,188,916 | 1,558,654 | 46,747,570 | - | - | 133,464,363 |
| C. Available Machinery and Equipment | $ - | $ - | $ - | $ - | $ 50,000,000 | $ - | $ 50,000,000 | $ - | $ - | $ 50,000,000 |
| D. Less: Total Borrowing Base Reserves | 564,600 | 71,372 | 615,972 | 421,068 | 31,213,888 | 1,067,881 | 32,281,769 | - | - | 33,318,809 |
| E. Borrower-Specific Borrowing Base, with German BB cap (Limit Germany BB to greater of (a) 50% of total BB B (b) max. ABL commitments) | $ 131,516,606 | $ 28,677,618 | $ 160,194,224 | $ 4,315,425 | $ 109,373,535 | $ 6,026,922 | $ 115,400,457 | $ - | $ - | $ 279,910,106 |
| Adjustment for suppressed availability, as applicable | | | | | | | | | | |
| Max Revolving Commitments | | | | | | | | | | |
| Suppressed availability, allocated as applicable [3] | | | | | $ 3,883,184 | $ 6,026,922 | $ 9,910,106 | $ - | $ - | $ 9,910,106 |
| Borrower-Specific Borrowing Base, after suppressed availability | $ 131,516,606 | $ 28,677,618 | $ 160,194,224 | $ 4,315,425 | $ 105,490,351 | $ - | $ 105,490,351 | $ - | $ - | $ 270,000,000 |

**Total Max BB available by Borrower:**

| | Total US | Canada | Germany Silicone | Germany Quartz | Netherlands | UK | Consolidated Total |
|---|---|---|---|---|---|---|---|
| US (Silicone + Quartz) | $ 160,194,224 | 160,194,224 | 160,194,224 | 160,194,224 | N/A | N/A | |
| Canada | N/A | 4,315,425 | 4,315,425 | 4,315,425 | N/A | N/A | |
| Germany Silicone | N/A | N/A | 105,490,351 | 105,490,351 | N/A | N/A | |
| Germany Quartz | N/A | N/A | N/A | - | N/A | N/A | |
| Netherlands | N/A | - | - | - | N/A | N/A | |
| UK | N/A | - | - | - | N/A | N/A | |
| | $ 160,194,224 | $ 164,509,649 | $ 270,000,000 | $ 270,000,000 | N/A | N/A | $ 270,000,000 |

**Revolving Exposure:**

| | US Silicone | Total US | Germany Silicone | Germany Quartz | Total Germany | Consolidated Total |
|---|---|---|---|---|---|---|
| Revolving Loans (Tranche B utilized first - $45mm limit) | $ - | $ - | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 |
| Revolving Loans (Tranche A utilized after (Tranche B - $225mm limit) | 88,000,000 | 88,000,000 | 22,000,000 | 22,000,000 | 22,000,000 | 110,000,000 |
| Letters of Credit (Tranche A only - $125mm L/C sublimit) | 49,233,118 | 49,233,118 | 20,004,770 | 20,004,770 | 20,004,770 | 69,237,888 |
| Swingline (Tranche A only - $50mm limit) | - | - | - | - | - | - |
| Total Revolving Exposure | $ 137,233,118 | $ 137,233,118 | 67,004,770 | 67,004,770 | $ 67,004,770 | $ 204,237,888 |

**Total Excess Availability** — $ 65,762,112

Footnote:
[1] Reduce for suppressed availability in following order: UK, Netherlands, Germany Quartz, Germany Silicone, US Quartz, US Silicone
[2] The UK is referenced as England and Wales in the Credit Agreement

**Officer's Certification:**
Pursuant to the Credit Agreement dated as of April 24, 2013, the undersigned Responsible Officer of Momentive Performance Materials Inc. certifies that the information provided in this Borrowing Base Certificate to JPMorgan Chase Bank, N.A., as Administrative Agent, is true and correct based on the accounting records of Momentive Performance Materials, Inc. and its subsidiaries

Momentive Performance Materials Inc.

*George T. Knight*    1/20/14

George Knight                         Date
Senior Vice President & Treasurer

**MPM**
**Borrowing Base - Eligible Receivables**
As of December 31, 2013
(Amounts in USD)

| | [1] | US Silicone | US Quartz | Total US | Canada | Germany Silicone | Germany Quartz | Total Germany | Consolidated Total |
|---|---|---|---|---|---|---|---|---|---|
| Gross A/R | | $ 69,134,649 | $ 20,816,912 | $ 89,951,562 | $ 5,636,368 | $ 74,066,716 | $ 6,654,357 | $ 80,721,073 | $ 176,309,002 |
| Ineligibles: | | | | | | | | | |
| Non Perfected Security Interest | a | - | - | - | - | - | - | - | - |
| Intercompany | b | - | - | - | - | - | - | - | - |
| Past Due > 60 PDD | b | 349,764 | 162,180 | 511,944 | 112,720 | 217,904 | 62,704 | 280,608 | 905,272 |
| > 120 day terms | b | 303,826 | - | 303,826 | - | 132,852 | (175) | 132,677 | 436,503 |
| Credits Past Due | b | 1,162,438 | 153,977 | 1,316,415 | 49,534 | 193,941 | 3,997 | 197,938 | 1,563,887 |
| Cross Age | c | 13,612 | 14,457 | 28,069 | (842) | (2,695) | - | (2,695) | 24,532 |
| Non conforming -covenants/reps/warrants | d | - | - | - | - | - | - | - | - |
| Contra | e | 2,770,632 | 58,181 | 2,828,812 | - | 1,065,716 | 12,239 | 1,077,955 | 3,906,768 |
| Discounts, rebates, returns, deposits, etc | f | - | - | - | - | 56,027 | 83,903 | 139,930 | 139,930 |
| Bankruptcy | g | - | - | - | - | - | - | - | - |
| Ineligible Jurisdiction >$25MM | h | - | - | - | - | 19,494,541 | 321,799 | 19,816,341 | 19,816,341 |
| Bill-and-hold, consignment, etc | i | 597,508 | 36,905 | 634,413 | 77,691 | 43,985 | 103 | 44,088 | 756,191 |
| Chargebacks, debit memos, etc | j | - | - | - | - | - | - | - | - |
| No invoice | k | - | - | - | - | 5,441 | - | 5,441 | 5,441 |
| Commissions, service charges etc | l | - | - | - | - | - | - | - | - |
| Goods/services not provided/FOB destination (Revenue Recognition) | m | - | - | - | - | 802,466 | - | 802,466 | 802,466 |
| Government (US) | n | - | - | - | - | - | - | - | - |
| Chattel paper, etc | o | - | - | - | - | - | - | - | - |
| Government (Foreign) | p | - | - | - | - | - | - | - | - |
| Concentration Cap @ 15% / 20% | q | - | - | - | - | - | - | - | - |
| Invalid, non-compliant to applicable laws | r | - | - | - | - | - | - | - | - |
| Subject to Foreign laws | s | - | - | - | - | - | - | - | - |
| Foreign Currency Exchange | t | - | - | - | - | - | - | - | - |
| Other ineligibles | | - | - | - | 35,775 | - | - | - | 35,775 |
| Total Ineligibles | | 5,197,779 | 425,700 | 5,623,479 | 274,879 | 22,010,178 | 484,570 | 22,494,749 | 28,393,107 |
| Eligible A/R | | 63,936,870 | 20,391,212 | 84,328,082 | 5,361,489 | 52,056,538 | 6,169,786 | 58,226,324 | 147,915,895 |
| Dilution % > 5% per most recent FE | | 2.9% | 0.0% | | 4.6% | 3.1% | 0.3% | | |
| Dilution Reserve | | 1,854,169 | - | 1,854,169 | 246,628 | 1,613,753 | 18,509 | 1,632,262 | 3,733,060 |
| Net Eligible A/R | | 62,082,701 | 20,391,212 | 82,473,913 | 5,114,860 | 50,442,785 | 6,151,277 | 56,594,062 | 144,182,835 |
| Advance Rate | | 90% | 90% | 90% | 90% | 90% | 90% | 90% | 90% |
| Available A/R, before Reserves | | $ 55,874,431 | $ 18,352,091 | $ 74,226,522 | $ 4,603,374 | $ 45,398,507 | $ 5,536,149 | $ 50,934,656 | $ 129,764,552 |

[1] Eligible Credit Agreement Reference

**NJPM**
**Borrowing Base - Eligible Inventory**
As of December 31, 2013
(Amounts in USD)

| | US Silicon | | | | | US Quartz | | | | | Total US | | | | Canada | | | | | Germany Silicon | | | | | Germany Quartz | | | | | Total Germany | | | | Consolidated Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | RM | WIP | FG | Total | | RM | WIP | FG | Total | | RM | WIP | FG | Total | RM | WIP | FG | Total | | RM | WIP | FG | Total | | RM | WIP | FG | Total | | Total Germany | | | |
| Gross Inventory | $16,225,026 | $16,553,260 | $91,000,026 | $125,263,515 | | $1,032,787 | $12,575,397 | $6,399,004 | $20,107,418 | | $146,129,753 | $28,991 | $5,972,449 | $223,816 | $5 | $5,58,355 | $182,223 | $11,257,730 | $24,469,722 | $47,412,436 | $53,243,561 | $348,180 | $705,335 | $22,002,214 | $3,255,550 | $26,480,000 | | $182,758,760 | | | | |
| Add-in Transit | 582,856 | | 4,508,555 | 5,491,782 | | | | 180,868 | 180,868 | | 5,972,449 | 13,397 | | 25,425 | 8,228 | | 13,397 | 499,095 | | 12,623,995 | | 292,422 | | 411,754 | 703,076 | | | 19,523,056 | | | | |
| Adjusted Gross Inventory | 16,811,885 | 16,553,260 | 95,509,552 | 131,256,697 | | 1,032,787 | 12,575,397 | 6,580,572 | 20,308,706 | | 151,779,402 | 29,241 | | 223,241 | 8,228 | | 202,620 | 11,756,798 | 24,469,722 | 60,041,427 | 76,267,947 | 649,605 | 705,335 | 2,513,468 | 3,709,306 | | | 202,259,756 | | | | |

**Inclusions:**

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Non-Perfected Security Interest | 782,951 | | | 782,951 | | 76,790 | | | 76,790 | | 859,742 | | | | | | | | | | | | | | | | | 859,742 | | | | |
| Adjustment for RM recorded in WIP | | | | | | | | | | | 829,742 | | | | | | | | | | | | | | | | | | | | | |
| Unshackled/not useable/Out of Spec | 979,556 | 668,287 | 6,255,832 | 6,173,677 | | | 4,382 | 1,891,183 | 1,891,183 | | 8,064,860 | | | 248,276 | | 372,730 | 829,402 | 3,274,702 | 4,467,834 | | | 4,115 | 1,170,756 | 1,170,756 | | 4,467,834 | | | | | |
| Slow moving/obsolete/defective etc. | | 37,120 | | | | | | 162,243 | 167,551 | | 1,499,712 | | | | | 165,188 | 112,661 | 913,349 | 1,195,197 | | | | 770,997 | 775,114 | | 1,305,473 | | | | | |
| Non-ordinary course of business | 1,028,008 | | 982,691 | 1,235,267 | | | | | | | 1,028,008 | | | | | | | | | | | | | | | | 3,746,862 | | | | | |
| Consigned | | | | 1,028,008 | | | | 162,243 | | | | | 2,556,179 | | | 272,516 | 1,415,067 | 2,991,050 | | | | | | | | 2,916,179 | | | | | |
| Purchase Price Variance | | | | 982,691 | | | | 2,380,414 | 2,389,414 | | 3,372,105 | | | | | | | 1,637,020 | | | | | | | | 1,687,609 | | | | | |
| Lower of Cost or Market | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Violation of IoR / RONC Standards Acct | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Not incurred | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Customer has possession | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Non-governmental standards | 1,506,294 | | 1,506,294 | 1,506,294 | | 39,615 | | 39,615 | 59,615 | | 2,547,909 | | | | | 1,200,324 | | 8,167,635 | 1,200,324 | | | | 659,080 | 659,080 | | 1,285,509 | | | | | |
| Non-conforming each credit agreement | | | | | | | | | | | | | | | | | | 703,028 | 12,850,169 | | | 1,215 | 659,080 | | 1,215 | 13,534,250 | | | 2,749,648 | | | |
| Failing Solutions/ Outside Processors | | | | | | | | | | | | | | | | 3,688,066 | | | | | | | | | | | 13,534,250 | | | | |
| Ineligible Jurisdiction | 2,691,078 | | 2,691,078 | 2,691,078 | | 54,819 | 209,757 | | 264,576 | | 2,956,554 | | | | | 705,250 | | | 705,250 | | | | | | | 705,250 | | | 3,461,804 | | | |
| Packaging, manifests, tooling | | | | | | | | | | | | | | | | 1,299,205 | | | 1,299,205 | | | | | | | 1,299,205 | | | 1,299,205 | | |
| Subject to IP rights of 3rd party | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Commingled/Mechanical Adjustment | | 90,310 | 90,310 | 90,310 | | | 14,000 | 14,000 | 14,000 | | 90,510 | | | | | | | | | | | | | | | | 90,510 | | | | |
| Slotting/Physical inventory reserve | | 1,647,534 | 1,647,534 | 1,647,534 | | | | | | | 1,661,534 | | | | | | | | | | | | | | | | 1,661,534 | | | | |
| Inter-Company Profit | | | | | | | | | | | | | | | | (1,294,544) | | (1,294,544) | | | | | | | | | (1,294,544) | | (1,294,544) | | |
| Parties of A/R due to FOB shipping terms | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Other ineligibles | 6,956,790 | 705,407 | 8,542,235 | 16,238,431 | | 371,224 | 214,139 | 4,657,549 | 4,842,903 | | 23,081,334 | 15,957 | | 38,276 | 8,228 | | 14,571,259 | 2,821,754 | 14,573,509 | 29,347,965 | | 479,387 | 4,115 | 1,400,636 | 1,400,636 | | 50,776,931 | | | |
| Total Ineligibles | 11,871,086 | 15,827,853 | 87,367,317 | 115,016,266 | | 861,563 | 12,711,258 | 15,007,883 | 15,007,883 | | 130,372,068 | 13,506 | | 295,565 | | | 21,644,608 | 464,470,168 | | 464,470,168 | | 579,387 | 205,020 | 1,012,832 | 2,553,040 | | | 202,042,050 | | | |
| Eligible Inventory before Advance Rate | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Lesser of (a) and (b) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| (a) Advance Rate | 70.0% | 70.0% | 70.0% | 70.0% | | 70.0% | 70.0% | 70.0% | 70.0% | | 70.0% | 70.0% | 70.0% | 70.0% | | 70.0% | 70.0% | 70.0% | 70.0% | | 70.0% | 70.0% | 70.0% | 70.0% | | 70.0% | | | | | |
| (b) NOLV% per most recent appraisal | 73.6% | | 73.6% | 73.6% | | 73.6% | 73.6% | 73.6% | 73.6% | | 73.6% | 73.6% | 73.6% | 73.6% | | 73.6% | 73.6% | 73.6% | 73.6% | | 73.6% | 73.6% | 73.6% | 73.6% | | | 73.6% | | | |
| (b) NOLV at NDPL | 66.2% | | 66.2% | 66.2% | | 66.2% | 66.2% | 66.2% | 66.2% | | 66.2% | 66.2% | 66.2% | 66.2% | | 66.2% | 66.2% | 66.2% | 66.2% | | 66.2% | 66.2% | 66.2% | 66.2% | | | 66.2% | | | |
| Available Inventory, before Reserves | | | $76,386,775 | | | | | $16,386,500 | | | $ 86,583,674 | | | $133,139 | | | | | $ 45,588,516 | | | | | $ 1,598,634 | | | $ 46,767,578 | | | | |

MPM
## Borrowing Base - Eligible Machinery and Equipment
As of December 31, 2013
(Amounts in USD)

| | Germany Silicone | Germany Quartz | Canada | Additional M&E Borrowing Base Netherlands | UK | Total Non-appraised M&E BB (3) | Total Consolidated |
|---|---|---|---|---|---|---|---|
| Appraised M&E NOLVIP (1) | 69,582,105 | | | | | | 69,582,105 |
| Ineligibles (to extent not included in appraisal): | | | | | | | |
| Non Perfected Security Interest     a | - | - | - | - | - | - | - |
| No valid, marketable title     b | - | - | - | - | - | - | - |
| Foreign     c | - | - | - | - | - | - | - |
| Tolling locations / Outside Processors     d | - | - | - | - | - | - | - |
| Obsolete, unmerchantable, etc     e | - | - | - | - | - | - | - |
| Damaged, defective     f | - | - | - | - | - | - | - |
| At 3rd party repair facilities     g | - | - | - | - | - | - | - |
| Non conforming -covenants/reps/warrants     h | - | - | - | - | - | - | - |
| Non-governmental standards     i | - | - | - | - | - | - | - |
| Not insured     j | - | - | - | - | - | - | - |
| England/Whales-Debtor Relief Law     k | - | - | - | - | - | - | - |
| England/Whales- non-connected pension scheme | - | - | - | - | - | - | - |
| Other ineligibles | - | - | - | - | - | - | - |
| Total Ineligibles | - | - | - | - | - | - | - |
| Eligible Appraised M&E before Advance Rate | 69,582,105 | - | - | - | - | - | 69,582,105 |
| Advance rate - 80% | | | | | | | |
| Available Appraised M&E | $ 55,665,684 | $ - | $ - | $ - | $ - | $ - | $ 55,665,684 |
| Additional M&E BB: | | | | | | | |
| NBV | - | - | - | - | - | - | - |
| Minimum NBV ($10mm in aggregate) [2] | - | - | - | - | - | - | - |
| Available Non-appraised M&E BB before $5mm cap | - | - | - | - | - | - | - |
| Available Non-appraised M&E BB subj to $5mm cap | - | - | - | - | - | - | - |
| Total Available M&E, before $50mm cap | | | | | | | 55,665,684 |
| Total Available M&E, subj to $50mm cap | | | | | | | $ 50,000,000 |

[1] Eligible Credit Agreement Reference

[2] Additional M&E has not been appraised as of the closing, but is capped at $5mm & is subject to $10mm aggregate NBV. This will be appraised at the next scheduled appraisal

[3] Non-appraised M&E will be appraised at the next scheduled appraisal subsequent to closing

**MPM**
**Borrowing Base - Reserves**
As of December 31, 2013
(Amounts in USD)

| | US Silicone | US Quartz | Total US | Canada | Germany Silicone | Germany Quartz | Total Germany | Netherlands | UK | Consolidated Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Reserve for ROT/ERODT: | | | - | | $8,829,926 | | $8,829,926 | | | 8,829,926 |
| | | | | | | | | | | |
| Reserve for German Trustee Admin Fee: | | | | | | | | | | |
| A/R Availability | | | - | | 45,398,507 | 5,536,149 | 50,934,656 | | | 50,934,656 |
| Inventory Availability | | | - | | 45,188,916 | 1,558,654 | 46,747,570 | | | 46,747,570 |
| M&E Availability | | | - | | 50,000,000 | - | 50,000,000 | | | 50,000,000 |
| 9% Trustee Admin Fee | | | - | | 12,652,868 | 638,532 | 13,291,400 | | | 13,291,400 |
| German Trustee Admin Fee Reserve | $ - | $ - | $ - | | $ 12,652,868 | $ 638,532 | $ 13,291,400 | $ - | $ - | $ 13,291,400 |
| | | | | | | | | | | |
| Priority Payables: | | | | | | | | | | |
| Accrued sales and VAT taxes (CAN & GER only) | | | | | | | | | | |
| Accrued pension and retirement liabilities (CAN only) | | | - | | | - | - | | | - |
| Accrued vacation/layoffs | | | - | | | - | - | | | - |
| Insolvency admin fee (UK) | | | | | | | | | | |
| Other Priority Payables | | | - | | | - | - | | | - |
| Subtotal Priority Payables Reserve | $ - | $ - | $ - | $ 421,068 | $ 2,705,042 | $ 429,349 | $ 3,134,391 | $ - | $ - | $ 3,555,459 |
| | | | | | | | | | | |
| Up to $30mm for pari passu hedge/cash mgt agr: | | | | | | | | | | |
| | | | | | | | | | | |
| Rent Reserve (2 months rent expense)[2] | 544,600 | 71,372 | 615,972 | | 7,026,051 | | 7,026,051 | | | 7,642,024 |
| | | | | | | | | | | |
| Other Reserves | | | - | | | - | - | | | - |
| | | | | | | | | | | |
| Total Borrowing Base Reserves | $ 544,600 | $ 71,372 | $ 615,972 | $ 421,068 | $ 31,213,888 | $ 1,067,881 | $ 32,281,769 | $ - | $ - | $ 33,318,809 |

[1] Not to exceed related inventory balance
[2] Rent reserve required unless landlord waiver received.

# VII. DIP Sizing Presentation (03.10.2014)

**MOMENTIVE**

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

# DIP Facility Sizing Analysis

## March 7, 2014

**MOMENTIVE**

1

## WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

The attached DIP sizing analysis has been developed by Momentive Performance Materials, Inc. ("MPM" or the "Company") to provide an estimate of the size of DIP financing needed by the Company in two scenarios. The two scenarios are highlighted below, and the major assumptions underlying each scenario are set forth on the following pages.

-A pre-arranged chapter 11 filing that lasts no longer than six months; and
-A pre-arranged chapter 11 filing that lasts no longer than one year.

The DIP sizing analysis is based on the Company's "Contingency Scenario" cash flow forecast (through May 16, 2014), coupled with the Company's operating plan for the balance of the forecast periods. The assumptions relating to chapter 11 contingencies, foreign operations and intercompany activity are consistent with the Company's aforementioned "Contingency Scenario," dated March 2, 2014.

MPM notes that the effort to better understand existing forecast methodologies (especially those of foreign operations) and to implement formalized cash flow forecasting efforts is ongoing. The Company anticipates that the "Contingency Scenario" cash flow forecast will be revised in the coming weeks as certain assumptions are further assessed and updated.

2

# WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

The following highlights the different assumptions in each pre-arranged chapter 11 filing scenario.

## Scenario A:  One Year

-Assumes an emergence date in early April 2015.

-Weighted average DPO for U.S. entities drops to approximately 15 days in the post-petition period, improving to approximately 20 days in January 2015.

-Weighted average DPO reduction applied to European entities in Scenario A assumed to reverse in January 2015 as vendors gain more confidence in viability of global enterprise.

-Payment of approximately $40 million in fees to professionals and UST in connection with restructuring during the forecast period.

-Payment of approximately $126 million of adequate assurance interest payments to 1st liens, 1.5 liens and cash flow revolver.

-DIP facility used to cash collateralize approximately $68 million worth of LCs at a 5.0% premium.

## Scenario B: 180 Days

-Assumes an emergence date in late September 2014.

-Weighted average DPO for U.S. entities drops to approximately 15 days in the post-petition period.

-Weighted average DPO for European region drops by 5 days in May 2014 to reflect potential impact of filing on perceived creditworthiness of non-debtor entities (impact to liquidity of approximately $9 million).

-Payment of approximately $19 million in fees to professionals and UST in connection with restructuring during the forecast period.

-Payment of approximately $64 million of adequate assurance interest payments to 1st liens, 1.5 liens and cash flow revolver.

-DIP facility used to cash collateralize approximately $68 million worth of LCs at a 5.0% premium.

3

**WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE**

## Summary of Liquidity Requirements by Scenario

| | Peak Need | Forecast Period |
|---|---|---|
| **Apr. '14 - Sep. '14** | | |
| Operating cash flows (1) | $ (120) | $ (70) |
| Financial cash flows | (75) | (81) |
| Restructuring cash flows | (7) | (23) |
| **Subtotal - Apr. '14 - Sep. '14** | **(202)** | **(174)** |
| Cash build needs | (45) | (45) |
| Contingency | (35) | (35) |
| *Liquidity needs – 180 days* | (281) | $ (254) |
| Add: Repayment of drawn ABL | (168) | |
| **Total Peak Facility Need** | $ (450) | |

| | Peak Need | Forecast Period |
|---|---|---|
| **Oct. '14 - Mar. '15** | | |
| Operating cash flows | $ 65 | $ 72 |
| Financial cash flows | (70) | (71) |
| Restructuring cash flows | (19) | (21) |
| **Subtotal - Oct. '14 - Mar. '15** | **(24)** | **(20)** |
| *Liquidity needs – One year* | (305) | $ (273) |
| Add: Repayment of drawn ABL | (168) | |
| **Total Peak Facility Need** | $ (473) | |

(1) Assumes cash collateralization of all pre-petition LCs (plus 5% premium) upon approval of final DIP order.

4



**WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE**

## Scenario A: One Year

Based on the Company's forecast, estimated peak borrowing needs in the one year pre-arranged scenario reach approximately [$305] million in early November, 2014. This estimate is calculated as following:

**One Year DIP Sizing**

*Proposed Debtors' post-petition liquidity needs*

| | Peak Need (1) | F'Cast Pd (2) |
|---|---|---|
| **Operating related** | | |
| Operating cash flow (3) | $ 144 | $ 264 |
| CapEx spend | (48) | (75) |
| Issued and outstanding LCs (4) | (71) | (69) |
| Interco financing (5) | (81) | (119) |
| **Subtotal operating** | **(55)** | **1** |
| **Financing related** | | |
| Interest on pre-petition debt | (126) | (126) |
| DIP cash interest / fees | (19) | (25) |
| **Subtotal financing** | **(144)** | **(152)** |
| **Restructuring related** | | |
| Restructuring prof. fees (incl. UST) | (22) | (40) |
| Util. deposits | (3) | (3) |
| **Subtotal restructuring** | **(26)** | **(43)** |
| *Subtotal liquidity needs* | *(226)* | $ *(194)* |
| **Cash balance re-build** | | |
| Global cash target | (100) | |
| Add back: Debtors' beginning cash | 5 | |
| Add back: Non-debtors' beg. cash | 50 | |
| **Needs for cash re-build** | **(45)** | |
| Contingency | (35) | |
| **Projected peak borrowing need (6)** | **$ (305)** | |
| Repayment of drawn ABL | (168) | |
| **Total Peak Facility Need** | **$ (473)** | |



### Debtors' Forecasted Liquidity Needs (One Year)

Adequate assurance interest payments.

—— Post-Petition Cash Burn

($50), ($100), ($150), ($200), ($250), ($226), ($194)

4/11/14, 4/25/14, 5/9/14, 5/23/14, 6/6/14, 6/20/14, 7/4/14, 7/18/14, 8/1/14, 8/15/14, 8/29/14, 9/12/14, 9/26/14, 10/10/14, 10/24/14, 11/7/14, 11/21/14, 12/5/14, 12/19/14, 1/2/15, 1/16/15, 1/30/15, 2/13/15, 2/27/15, 3/13/15, 3/27/15

(1) One year peak need point occurs in week ended 11/7/14.
(2) Assumes forecast period end date of 4/3/15.
(3) Operating cash flow includes impact of intercompany due to / due from activity (assumed to continue post-petition).
(4) Assumes cash collateralization of all pre-petition LCs (plus 5% premium) upon approval of final DIP order.
(5) Assumes that intercompany trade activity (and associated funding of foreign ops by U.S. entities) continues post-petition.
(6) Excludes funding needs required to address pre-petition drawn ABL balances (est O/S balance of $168 million).

6

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

## Appendix A: One Year Sizing Estimate

**One Year DIP Sizing**

*Proposed Debtors' post-petition liquidity needs*

| | | |
|---|---|---:|
| **Operating related** | | |
| Operating cash flow | $ | 264 |
| CapEx spend | | (75) |
| Issued and outstanding LCs | | (69) |
| Interco financing | | (119) |
| **Subtotal operating** | | **1** |
| | | |
| **Financing related** | | |
| Interest on pre-petition debt | | (126) |
| DIP cash interest / fees | | (25) |
| **Subtotal financing** | | **(152)** |
| | | |
| **Restructuring related** | | |
| Restructuring prof. fees (incl. UST) | | (40) |
| Util. deposits | | (3) |
| **Subtotal restructuring** | | **(43)** |
| | | |
| *Subtotal liquidity needs* | | *(194)* |
| | | |
| **Cash balance re-build** | | |
| Global cash target | | (100) |
| Add back: Debtors' beginning cash | | 5 |
| Add back: Non-debtors' beg. cash | | 50 |
| **Needs for cash re-build** | | **(45)** |
| | | |
| Contingency | | (35) |
| Coverage for peak liquidity need | | (32) |
| | | |
| ***Projected peak borrowing need*** | **$** | ***(305)*** |

7

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

**Project Eagle – DIP Facility Sizing Model (U.S. Entities Only)[a]**

*Updated as of 03/06/2014*

| (in millions of USD) | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 | Mar-15 | Total to Mar. 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | |
| **Cash Flow Summary** | | | | | | | | | | | | | |
| Trade Receivable Collections | $52 | $52 | $60 | $75 | $64 | $85 | $65 | $64 | $74 | $74 | $63 | $84 | $811 |
| Intercompany Receipts | 27 | 22 | 22 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 277 |
| Other Receipts | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Operating Receipts** | 79 | 74 | 83 | 98 | 86 | 108 | 87 | 87 | 97 | 97 | 85 | 107 | 1,089 |
| Vendor Payments | (42) | (29) | (25) | (38) | (32) | (27) | (26) | (32) | (27) | (40) | (38) | (42) | (398) |
| Payroll & Benefits | (19) | (20) | (24) | (23) | (20) | (36) | (22) | (20) | (21) | (26) | (20) | (25) | (276) |
| Utilities | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (47) |
| Insurance | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (7) |
| Intercompany Disbursements | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (42) |
| Shared Service Payments to MSC | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (24) |
| Other Disbursements | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (30) |
| **Total Operating Disbursements** | (74) | (61) | (61) | (73) | (65) | (75) | (61) | (65) | (60) | (78) | (71) | (80) | (825) |
| **Operating Cash Flow** | 5 | 13 | 21 | 25 | 22 | 33 | 26 | 22 | 37 | 19 | 15 | 27 | 264 |
| Capital Expenditures | (9) | (6) | (7) | (6) | (5) | (7) | (6) | (6) | (6) | (6) | (4) | (6) | (75) |
| Debt Svc. (Payments) / Proceeds | (63) | -- | (1) | (1) | -- | -- | (62) | -- | -- | -- | -- | -- | (126) |
| Inter-Co Financing Receipts | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Inter-Co Financing Disbursements | -- | (39) | (11) | (15) | (5) | (8) | (3) | (2) | (5) | (18) | (5) | (9) | (119) |
| Other | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Investing & Financing Activities** | (71) | (45) | (18) | (22) | (10) | (14) | (71) | (9) | (11) | (24) | (10) | (15) | (321) |
| **Net Cash Flow before Restr. Disb.** | (67) | (32) | 3 | 3 | 12 | 18 | (45) | 14 | 26 | (5) | 5 | 12 | (56) |
| **Restructuring Disbursements** | | | | | | | | | | | | | |
| Professional Fees | (0) | (4) | (4) | (4) | (3) | (4) | (3) | (3) | (4) | (3) | (3) | (3) | (40) |
| DIP Interest, Fees & Expenses | (7) | (4) | (1) | (3) | -- | (3) | -- | (2) | (1) | (1) | (2) | (2) | (25) |
| Other | (3) | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | (3) |
| **Total Restructuring Disbursements** | (11) | (7) | (5) | (7) | (3) | (7) | (3) | (5) | (5) | (4) | (5) | (7) | (69) |
| **Net Cash Flow** | ($77) | ($39) | ($3) | ($3) | $9 | $11 | ($48) | $9 | $20 | ($9) | $0 | $5 | ($125) |
| *Cumulative Net Cash Flow* | (77) | (117) | (119) | (123) | (114) | (103) | (153) | (142) | (122) | (131) | (130) | (125) | (125) |

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

**Project Eagle – DIP Facility Sizing Model (U.S. Entities Only)[4]**

*Updated as of 03/06/2014*

| (in millions of USD) | | For Month Ending | | | | | | | | | | | Total |
| Month | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 | Mar-15 | to Mar.15 |
| | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Liquidity Summary** | | | | | | | | | | | | | |
| Opening Bank Cash Balance | $5 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $5 |
| Adj. for Estimated Check Float | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LCs Cash Collateralized[1] | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Net Cash Flow | (77) | (39) | (3) | (4) | 9 | 11 | (48) | 9 | 20 | (9) | 0 | 5 | (125) |
| Net Proceeds from DIP Term Loan | 10 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 10 |
| Release of TL proceeds cash coll. LCs | 2 | -- | -- | 4 | -- | 11 | -- | -- | 15 | 12 | 20 | -- | 65 |
| Revolver Borrowing / (Repayment) | 85 | 39 | 3 | (1) | (9) | (22) | 48 | (9) | (35) | (3) | (20) | (5) | 70 |
| Ending Book Cash Balance | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Less Restricted Cash | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Ending Available Book Cash | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Beg. Avail. Under DIP Credit Facility | -- | 13 | 144 | 141 | 138 | 147 | 158 | 110 | 119 | 140 | 132 | 133 | -- |
| New Availability / (Issuance of LCs) | 98 | 170 | -- | (4) | -- | (11) | -- | -- | (14) | (12) | (19) | -- | 208 |
| (Borrowings) / Repayments | (85) | (39) | (3) | 1 | 9 | 22 | (48) | 9 | 35 | 3 | 20 | 5 | (70) |
| Ending DIP Availability | 13 | 144 | 141 | 138 | 147 | 158 | 110 | 119 | 140 | 132 | 133 | 138 | 138 |
| **Total Liquidity** | $38 | $169 | $166 | $163 | $172 | $183 | $135 | $144 | $165 | $157 | $158 | $163 | $163 |
| Post-Petition Liquidity Need | (149) | (189) | (191) | (194) | (186) | (174) | (222) | (213) | (192) | (201) | (199) | (194) | (194) |

9



**WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE**

## Scenario B: 180 Days

Based on the Company's forecast, estimated peak borrowing needs in the 180 day pre-arranged scenario reach approximately [$281] million in early June, 2014. This estimate is calculated as following;

**180 Day DIP Sizing**

*Proposed Debtors' post-petition liquidity needs*

| | Peak Need (1) | F'Cast Pd (2) |
|---|---|---|
| **Operating related** | | |
| Operating cash flow (3) | $  19 | $  118 |
| CapEx spend | (17) | (40) |
| Issued and outstanding LCs (4) | (72) | (71) |
| Interco financing (5) | (50) | (78) |
| **Subtotal operating** | **(120)** | **(70)** |
| **Financing related** | | |
| Interest on pre-petition debt | (63) | (64) |
| DIP cash interest / fees | (12) | (17) |
| **Subtotal financing** | **(75)** | **(81)** |
| **Restructuring related** | | |
| Restructuring prof. fees (incl. UST) | (4) | (19) |
| Util. deposits | (3) | (3) |
| **Subtotal restructuring** | **(7)** | **(23)** |
| *Subtotal liquidity needs* | *(202)* | *$ (174)* |
| **Cash balance re-build** | | |
| Global cash target | (100) | |
| Add back: Debtors' beginning cash | 5 | |
| Add back: Non-debtors' beg. cash | 50 | |
| **Needs for cash re-build** | **(45)** | |
| Contingency | (35) | |
| **Projected peak borrowing needs (6)** | **$  (281)** | |
| Repayment of drawn ABL | (168) | |
| **Total Peak Facility Need** | **$  (450)** | |



**Debtors' Forecasted Liquidity Needs (180 Days)**

Adequate assurance interest payments.

($50)

($202)

($174)

— Post-Petition Cash Burn

(1) 180 day peak need point occurs in week ended 6/13/14.
(2) Assumes forecast period end date of 10/3/14.
(3) Operating cash flow includes impact of intercompany due to / due from activity (assumed to continue post-petition).
(4) Assumes cash collateralization of all pre-petition LCs (plus 5% premium) upon approval of final DIP order.
(5) Assumes that intercompany trade activity (and associated funding of foreign ops by U.S. entities) continues post-petition.
(6) Excludes funding needs required to address pre-petition drawn ABL balances (est. O/S balance of $168 million).

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

## Appendix B: 180 Day Sizing Estimate

**180 Day DIP Sizing**

*Proposed Debtors' post-petition liquidity needs*

| | | |
|---|---|---|
| **Operating related** | | |
| Operating cash flow | $ | 118 |
| CapEx spend | | (40) |
| Issued and outstanding LCs | | (71) |
| Interco financing | | (78) |
| **Subtotal operating** | | **(70)** |
| | | |
| **Financing related** | | |
| Interest on pre-petition debt | | (64) |
| DIP cash interest / fees | | (17) |
| **Subtotal financing** | | **(81)** |
| | | |
| **Restructuring related** | | |
| Restructuring prof. fees (incl. UST) | | (19) |
| Util. deposits | | (3) |
| **Subtotal restructuring** | | **(23)** |
| | | |
| *Subtotal liquidity needs* | | *(174)* |
| | | |
| **Cash balance re-build** | | |
| Global cash target | | (100) |
| Add back: Debtors' beginning cash | | 5 |
| Add back: Non-debtors' beg. cash | | 50 |
| **Needs for cash re-build** | | **(45)** |
| | | |
| Contingency | | (35) |
| Coverage for peak liquidity need | | (28) |
| **Projected peak borrowing need** | **$** | **(281)** |

12

**Project Eagle – DIP Facility Sizing Model (U.S. Entities Only)[a]**
*Updated as of 03/06/2014*

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

| *(in millions of USD)* | For Month Ending | | | | | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Month** | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | to Sep-14 |
| | 4 | 5 | 6 | 7 | 8 | 9 | |
| **Cash Flow Summary** | | | | | | | |
| Trade Receivable Collections | $52 | $52 | $60 | $75 | $64 | $85 | $388 |
| Intercompany Receipts | 27 | 22 | 22 | 23 | 23 | 23 | 140 |
| Other Receipts | -- | -- | -- | -- | -- | -- | -- |
| **Total Operating Receipts** | 79 | 74 | 83 | 98 | 86 | 108 | 528 |
| Vendor Payments | (42) | (29) | (25) | (38) | (32) | (27) | (193) |
| Payroll & Benefits | (19) | (20) | (24) | (23) | (20) | (36) | (142) |
| Utilities | (4) | (4) | (4) | (4) | (4) | (4) | (24) |
| Insurance | (1) | (1) | -- | (1) | (1) | (1) | (3) |
| Intercompany Disbursements | (4) | (4) | (4) | (4) | (4) | (4) | (21) |
| Shared Service Payments to MSC | (2) | (2) | (2) | (2) | (2) | (2) | (12) |
| Other Disbursements | (3) | (3) | (3) | (3) | (3) | (3) | (15) |
| **Total Operating Disbursements** | (74) | (61) | (61) | (73) | (65) | (75) | (410) |
| **Operating Cash Flow** | 5 | 13 | 21 | 25 | 22 | 33 | 118 |
| Capital Expenditures | (9) | (6) | (7) | (6) | (5) | (7) | (40) |
| Debt Svc. (Payments) / Proceeds | (63) | -- | -- | (1) | -- | -- | (64) |
| Inter-Co Financing Receipts | -- | -- | -- | -- | -- | -- | -- |
| Inter-Co Financing Disbursements | -- | (39) | (11) | (15) | (5) | (8) | (78) |
| Other | -- | -- | -- | -- | -- | -- | -- |
| **Total Investing & Financing Activities** | (71) | (45) | (18) | (22) | (10) | (14) | (181) |
| **Net Cash Flow before Restr. Disb.** | (67) | (32) | 3 | 3 | 12 | 18 | (63) |
| **Restructuring Disbursements** | | | | | | | |
| Professional Fees | (0) | (4) | (4) | (4) | (3) | (4) | (19) |
| DIP Interest, Fees & Expenses | (7) | (4) | (1) | (3) | -- | (3) | (17) |
| Other | (3) | -- | -- | -- | -- | -- | (3) |
| **Total Restructuring Disbursements** | (11) | (7) | (5) | (7) | (3) | (7) | (40) |
| **Net Cash Flow** | ($77) | ($39) | ($2) | ($4) | $9 | $11 | ($103) |
| *Cumulative Net Cash Flow* | (77) | (117) | (119) | (123) | (114) | (103) | (103) |

13

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

**Project Eagle – DIP Facility Sizing Model (U.S. Entities Only)[a]**

*Updated as of 03/06/2014*

| *(in millions of USD)* | | For Month Ending | | | | | Total |
|---|---|---|---|---|---|---|---|
| **Month** | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | to Sep-14 |
| | 4 | 5 | 6 | 7 | 8 | 9 | |
| **Liquidity Summary** | | | | | | | |
| **Opening Bank Cash Balance** | $5 | $25 | $25 | $25 | $25 | $25 | $5 |
| Adj. for Estimated Check Float | -- | -- | -- | -- | -- | -- | -- |
| LCs Cash Collateralized | -- | -- | -- | -- | -- | -- | -- |
| Net Cash Flow | (77) | (39) | (3) | (4) | 9 | 11 | (103) |
| Net Proceeds from DIP Term Loan | 10 | -- | -- | -- | -- | -- | 10 |
| Release of TL proceeds cash coll. LCs | 2 | -- | -- | 4 | -- | 11 | 18 |
| Revolver Borrowing / (Repayment) | 85 | 39 | 3 | (1) | (9) | (22) | 95 |
| **Ending Book Cash Balance** | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Less Restricted Cash | -- | -- | -- | -- | -- | -- | -- |
| **Ending, Available Book Cash** | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| | | | | | | | |
| Beg. Avail. Under DIP Credit Facility | -- | 13 | 144 | 141 | 138 | 147 | -- |
| New Availability / (Issuance of LCs) | 98 | 170 | -- | -- | -- | (11) | 253 |
| (Borrowings) / Repayments | (85) | (39) | (3) | (4) | 9 | 22 | (95) |
| **Ending DIP Availability** | 13 | 144 | 141 | 138 | 147 | 158 | 158 |
| | | | | | | | |
| **Total Liquidity** | $38 | $169 | $166 | $163 | $172 | $183 | $183 |
| Post-Petition Liquidity Need | (149) | (189) | (191) | (194) | (186) | (174) | (174) |

14



## WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

<u>General Appendix:  Common Assumptions</u>

### 1. General Assumptions

-Assumes a petition date at the beginning of the week ending 4/11/14.

-Assumes a filing of 12 U.S. debtor entities (listed below).

  -Debtor entities include Momentive Performance Materials ("MPM") Holdings, Inc., MPM Inc., MPM Worldwide Inc., MPM USA Inc., MPM Quartz, Inc., MPM South America Inc., MPM China SPV Inc., MPM Silicones LLC, Juniper Bond Holdings I LLC, Juniper Bond Holdings II LLC, Juniper Bond Holdings III LLC and Juniper Bond Holdings IV LLC.

### 2. Payments Contemplated Prior to Chapter 11 Filing

-Payment of [$10.9] million of fees to professionals engaged in connection with restructuring prior to filing date.

-Payment of [$4.8] million of ordinary course professional fees to key law and consulting firms on or before 4/4/14.

-Payment of [$3.7] million of annual retirement contribution payments on or before 4/4/14.

-Payment of [$2.7] million of incentive compensation payments to employees on or before 4/4/14 (normally paid May 2014).

-Payment of [$2.5] million pension payment (due in mid-April) in week ending 4/4/14.

-Payment of [$1.6] million of commission payments to employees on or before 4/4/14 (normally paid April 2014).

-Payment of [$1.4] million special cash incentives to employees on or before 4/4/14 (vesting in the near-term).

-Payment of [$0.8] million of trust fund taxes for payroll on or before 4/4/14.

-Payment of [$0.3] million of relocation assistance payments to expats on or before 4/4/14.

-Payment of [$0.2] million of sales/use taxes on or before 4/4/14.

### 3. Foreign Operations [Subject to Further Review]

-No pre-petition funding of foreign operations contemplated.

-Assumes approval to fund post-petition foreign entity cash shortfalls in the normal course of business.

-Assumes deferral or waiver of both $48 million intercompany Eurobond interest payments due from Asia Pac to U.S. on June 1, 2014 and December 1, 2014 and, therefore, no intercompany funding is advanced.

-Assumes [$4] million increase in Asia Pac funding need to cover potential employee savings plan withdrawal risk.

**WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE**

## 4. Pre- and Post-Petition, Vendor-Related Payments

-Weighted average DPO for U.S. entities drops approximately 4 days during the pre-filing period (as compared to the Company's 13 week cash flow forecast), causing an unfavorable working capital impact of approximately [$8] million.

-Assumes that the Company scales back payments to vendors in the two weeks prior to the petition date (approximately 25% and 75% of vendor payments are held during the weeks of 3/28/14 and 4/4/14, respectively) resulting in a [$16] million increase in liquidity).

-All pre-petition trade A/P outstanding as of the filing date assumed stayed, _except_ for pre-petition amounts paid as authorized under certain first day motions (see below).

-Filing and approval of vendor-related first day motions contemplating payment of up to [$22] million of pre-petition payments, subject to vendor commitment to honor normal-course trade terms in post-petition period.

-Deposit of adequate assurance for utilities into an escrow account, in the total amount of approximately [$3.2 million, or four weeks' worth of normal course utility payments], assumed paid approximately 15 days after a filing date.

## 5. Post-Petition, Intercompany Activity

-Intercompany activity in the form of normal course trade operations between and among debtors and non-debtors is permitted to continue in the ordinary course post-petition.

-Intercompany non-trade activity will continue amongst the debtors post-petition (with the exception of the Eurobond interest payments).

-Shared services agreement between MPM and Momentive Specialty Chemicals, Inc. maintained and enforced both prior to and after the petition date.

# WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

## 6. Financing

-Total DIP financing commitment of [$520] million, as follows:

-[$250] million available in the form of a term loan, assumed available on a final basis in the week ending 5/9/14; and

-A [$270] million revolver, with [$100] million assumed available on an interim basis (week ending 4/11/14) and an incremental [$170] million assumed available of a final basis (week ending 5/9/14).

-Use of DIP financing proceeds to:

-Repay pre-petition borrowings under ABL facility;

-Cash collateralize pre-petition LCs;

-Renew expiring letters of credit or issue new letters of credit with the DIP's LC sublimit, if needed;

-Fund general working capital needs of the debtor entities; and

-Fund anticipated cash shortfalls at non-debtor entities.

-Rates and fees:

-Term loan interest at [L + 3.5%], with a LIBOR floor of [1.0%];

-Revolver interest at [L + 2.75%], with a LIBOR floor of [1.0%];

-Commitment fee on undrawn revolver balance of [0.375%];

-Closing fee equal to [2.0%] of total commitment, payable pro-rata upon receipt of interim and final orders; and

-Annual agency fee of [$0.1] million, assumed paid annually in May, following receipt of final approval.

-Debt service continues for cash flow revolver, first lien holders and 1.5 lien holders post-petition.

-Foreign local bank facilities remain in place throughout the forecast period.

## 7. Other Assumptions

-No impact on sales, volumes, margins or DSO as a result of the filing.

-No assumptions around potential success fees incorporated into professional fee estimates.

-No fees related to exit financing or payments related to a restructuring plan contemplated in the forecast period.

# VIII. Silicones Segment Relative Margins FY2013

**MOMENTIVE**™

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

Subject to Substantial Revisions
Prepared at the Request of Counsel
Subject to FRE 408

# Relative Silicones Revenue & EBITDA Margins By Business Unit

**Based on FY2013 financial performance**



**Relative EBITDA Margin** *(Size of Bubble Represents Relative Revenue for Each BU)*

Urethane Additives, 11.2x

Silanes, 8.7x

Specialty Fluids, 13.6x

Sealants, 1.0x

Elastomers, 6.6x

Coatings, 13.0x

Electronics, 23.7x

30.0x

25.0x

20.0x

15.0x

10.0x

5.0x

--

(5.0x)

*Approach*

- EBITDA margins for each Business Unit are expressed relative to FY2013 EBITDA margin for Sealants
  — As indicated above, 1.0x is equivalent to FY2013 EBITDA margin for Sealants *(expressed as percentage)*
- Relative revenue for each Business Unit represented by size of bubble
- Basics not included; loss-making business unit

# IX. 13-Week Cash Flow Model - Contingency Scenario (3.22.2014)

**MOMENTIVE™**

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved



# MPM 13-Week Cash Flow

## Contingency Planning Overlay
March 22, 2014

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

**WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE**

The attached cash flow and liquidity forecast has been developed by Momentive Performance Materials, Inc. ("MPM" or the "Company") to provide a near-term view of the cash flow generation capability of the Company assuming a pre-arranged chapter 11 filing that lasts no longer than one year.  The major assumptions underlying this forecast are set forth on the following pages.

MPM notes that the effort to better understand existing forecast methodologies (especially those of foreign operations) and to implement formalized cash flow forecasting efforts is ongoing.  The Company anticipates that the "Contingency Scenario" cash flow forecast will be revised in the coming weeks as certain assumptions are further assessed and updated.

**WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE**

## 1. General Assumptions

-Assumes filing of 12 debtor entities (listed below) at the beginning of the week ending 4/11/14.

   -Debtor entities include Momentive Performance Materials ("MPM") Holdings, Inc., MPM Inc., MPM Worldwide Inc., MPM USA Inc., MPM Quartz, Inc., MPM South America Inc., MPM China SPV Inc., MPM Silicones LLC, Juniper Bond Holdings I LLC, Juniper Bond Holdings II LLC, Juniper Bond Holdings III LLC and Juniper Bond Holdings IV LLC.

-Assumes a pre-arranged Chapter 11 filing that lasts no longer than one year.

## 2. Payments Contemplated Prior to Chapter 11 Filing

-Payment of [$9.2] million of fees to professionals engaged in connection with restructuring prior to filing date.

-Payment of [$3.8] million of ordinary course professional fees to key legal and consulting firms on or before 4/4/14.

-Payment of [$3.7] million of annual retirement contribution payments on or before 4/4/14.

-Payment of [$2.1] million of incentive compensation payments to employees on or before 4/4/14 (normally paid May 2014).

-Payment of [$1.9] million special cash incentives (namely key associate retention payments and sign-on bonuses) to employees on or before 4/4/14 (vesting in the near-term).

-Payment of [$1.4] million of trust fund taxes for payroll on or before 4/4/14.

-Payment of [$1.2] million to newly hired MPM President on or before 4/4/14.

-Payment of [$0.3] million of relocation assistance payments to expats on or before 4/4/14.

-Payment of [$0.2] million of sales/use taxes on or before 4/4/14.

-Payment of [$0.1] million of early retirement payments on or before 4/4/14.

-Payment of [$0.1] million to employees on account of wages in excess of priority cap 4/4/14.

## 3. Foreign Operations [Subject to Further Review]

-No pre-petition funding of foreign operations contemplated.

-Assumes approval to fund post-petition foreign entity cash shortfalls in the normal course of business.

-Assumes deferral or waiver of ~$48 million Eurobond interest payment due from Asia Pac to U.S. on June 1, 2014 and December 1, 2014.  Therefore, no intercompany funding is advanced.

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

## 4. Pre- and Post-Petition, Vendor-Related Payments

-Assumes that the Company scales back payments to vendors in the two weeks prior to the petition date, resulting in a [$12] million increase in liquidity.

-All pre-petition trade A/P outstanding as of the filing date assumed stayed, except for pre-petition amounts paid as authorized under certain first day motions (see below).

-Weighted average DPO for U.S. entities drops to ~10 days in the post-petition period.

-Assumes approximately 4 days of DPO contraction for both the European and Asia Pac entities in response to U.S. chapter 11 filings, an unfavorable liquidity impact of approximately [$16.0] million.

-Filing and approval of vendor-related first day motions contemplating payment of up to [$22.0] million of pre-petition payments, subject to vendor commitment to honor normal-course trade terms in post-petition period.

-Filing and approval of 503(b)(9) motion contemplating payment of up to [$17.0] million of payments on accounts of 503(b)(9) claims, subject to vendor commitment to honor normal-course trade terms in post-petition period.

-Adequate assurance payments to utilities in the amount of approximately [$1.6] million, or two weeks' worth of normal course utility payments, assumed paid approximately 15 days after a filing date.

## 5. Post-Petition, Intercompany Activity

-Intercompany activity in the form of normal course trade operations between and among debtors and non-debtors is permitted to continue in the ordinary course post-petition.

-Intercompany non-trade activity will continue amongst the debtors post-petition.

-Shared services agreement between MPM and Momentive Specialty Chemicals, Inc. maintained and enforced both prior to and after the petition date.

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

**WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE**

## 6. Financing

-Total DIP financing commitment of [$520.0] million, as follows:

-[$250.0] million term loan, the proceeds of which are used primarily to pay off the drawn portion of the existing ABL revolver (approximately [$168.0] million) and cash collateralize issued and outstanding LCs at a [5.0%] premium (approximately [$72.0] million including collateralization premium) in the week ending 4/11/14.

-[$150.0] million in the form of a revolver on an interim basis beginning in the week ending 4/11/14.

-An incremental [$120.0] million in the form of additional revolver availability is assumed to be available beginning in the week ending 5/9/14.

-Rates and fees:

-Term loan interest at [L + 3.5%], with a LIBOR floor of [1.0%];

-Revolver interest at [L + 2.75%] with a LIBOR floor of [1.0%];

-Commitment fee on undrawn revolver balance of [0.375%];

-Closing fee equal to [2.0%] of total commitment, payable pro-rata upon receipt of interim and final orders; and

-Admin fee equal to [$0.1] million paid in connection with closing.

-Debt service continues for revolvers, first lien holders and 1.5 lien holders post-petition.

-DIP facility used to issue standby letter of credit in favor of Traveler's Casualty and Surety in the amount of $2.25 million prior to May 1, 2014.

## 7. Other Assumptions

-Assumes no impact associated with a receivables factoring or similar financing transaction in advance of the chapter 11 filing. In the event such a transaction occurred pre-petition, the split between interim and final DIP availability may require adjustment.

-Assumes $10.0 million of proceeds resulting from sale of certain favorable tax attributes to MSC in the week ending 4/4/14.

-Assumes $4.0 million of increased liquidity need from Japanese savings plan withdrawals.

-No impact on sales, volumes, margins or DSO as a result of the filing.

-No payments related to the exit financing contemplated in the forecast period.

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE



WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

**Project Eagle - 13-Week Cash Flow Model (Proposed Debtor Entities Only) (a)**
BK Overlay
*Updated as of 03/20/2014*

| (in millions of USD) | | | | | | For Week Ending | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 13-Wk Total |
| | 3/21/14 | 3/28/14 | 4/4/14 | 4/11/14 | 4/18/14 | 4/25/14 | 5/2/14 | 5/9/14 | 5/16/14 | 5/23/14 | 5/30/14 | 6/6/14 | 6/13/14 | 13-Wk Total |
| **Cash Flow Summary** | | | | | | | | | | | | | | |
| Trade Receivable Collections | $14 | $17 | $14 | $14 | $12 | $12 | $14 | $14 | $14 | $15 | $15 | $15 | $18 | $185 |
| Intercompany Receipts | 3 | 0 | -- | -- | 22 | -- | -- | -- | 22 | -- | -- | -- | 22 | 70 |
| Other Receipts | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 2 | 2 |
| **Total Operating Receipts** | 16 | 18 | 14 | 14 | 35 | 12 | 14 | 14 | 36 | 15 | 15 | 15 | 42 | 257 |
| Vendor Payments | (12) | (9) | (8) | (7) | (21) | (21) | (17) | (8) | (6) | (9) | (13) | (7) | (9) | (147) |
| Payroll & Benefits | (5) | (6) | (14) | (3) | (9) | (6) | (4) | (6) | (6) | (6) | (4) | (7) | (4) | (79) |
| Utilities | (1) | (1) | -- | -- | (4) | -- | -- | -- | (4) | -- | -- | -- | (3) | (13) |
| Insurance | -- | -- | (1) | -- | -- | -- | (1) | -- | -- | -- | (1) | -- | -- | (2) |
| Intercompany Disbursements | (4) | -- | -- | -- | (4) | -- | -- | -- | (4) | -- | (1) | -- | (4) | (14) |
| Shared Service Payments to MSC | -- | (7) | -- | -- | -- | -- | -- | -- | -- | (3) | -- | -- | -- | (9) |
| Other Disbursements | (1) | -- | (4) | -- | (3) | (3) | -- | -- | -- | (3) | (3) | (5) | (3) | (16) |
| **Total Operating Disbursements** | (23) | (23) | (27) | (10) | (40) | (30) | (22) | (14) | (17) | (21) | (18) | (13) | (22) | (280) |
| **Operating Cash Flow** | (7) | (6) | (13) | 3 | (6) | (18) | (8) | (0) | 19 | (6) | (3) | 2 | 20 | (23) |
| Capital Expenditures | (2) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (12) |
| Debt Svc (Payments) / Proceeds | -- | (1) | (1) | (0) | (61) | (0) | (1) | -- | -- | -- | -- | -- | -- | (13) |
| Inter-Co Financing Receipts | 7 | 2 | 1 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Inter-Co Financing Disbursements | -- | -- | (4) | -- | -- | -- | -- | -- | (8) | -- | -- | -- | -- | -- |
| Other | -- | 5 | 10 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | (2) |
| **Total Investing & Financing Activities** | 6 | 7 | 9 | (5) | (62) | (1) | (1) | (1) | (9) | (1) | (1) | (1) | (1) | (27) |
| **Net Cash Flow before Restr. Disb.** | (1) | 1 | (4) | (2) | (68) | (19) | (9) | (2) | 10 | (7) | (4) | 0 | 19 | |
| **Restructuring Disbursements** | | | | | | | | | | | | | | |
| Professional Fees | -- | (1) | (8) | -- | -- | -- | -- | -- | -- | -- | -- | (3) | -- | (12) |
| DIP Interest, Fees & Expenses | -- | -- | -- | (3) | -- | -- | (5) | (3) | -- | -- | -- | (2) | -- | (13) |
| Other | -- | -- | -- | -- | -- | (2) | -- | -- | -- | -- | -- | -- | -- | (2) |
| **Total Restructuring Disbursements** | -- | (1) | (8) | (3) | -- | (2) | (5) | (3) | -- | (7) | -- | (5) | -- | (27) |
| **Net Cash Flow** | ($1) | ($0) | ($12) | ($5) | ($68) | ($21) | ($14) | ($4) | $10 | ($7) | ($4) | ($5) | $19 | ($11) |
| *Cumulative Net Cash Flow* | *(1)* | *(2)* | *(13)* | *(18)* | *(86)* | *(106)* | *(120)* | *(124)* | *(114)* | *(121)* | *(126)* | *(133)* | *(111)* | *(111)* |

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

7

**Project Eagle - 13-Week Cash Flow Model (Proposed Debtor Entities Only) (a)**

BK Overlay

*Updated as of 03/20/2014*

*(in millions of USD)*

| | | | | | | | | For Week Ending | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | 3/21/14 | 3/28/14 | 4/4/14 | 4/11/14 | 4/18/14 | 4/25/14 | 5/2/14 | 5/9/14 | 5/16/14 | 5/23/14 | 5/30/14 | 6/6/14 | 6/13/14 | 13-Wk Total |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | |
| **Liquidity Summary** | | | | | | | | | | | | | | |
| Opening Bank Cash Balance | $10 | $7 | $5 | $5 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $10 |
| Adj. for Estimated Check Float | (2) | | | | | | | | | | | | | (2) |
| LCs Cash Collateralized | | | | | | | | | | | | | | |
| Net Cash Flow | (1) | (0) | (12) | (5) | (68) | (21) | (14) | (4) | 10 | (7) | (4) | (5) | 19 | (11) |
| Net Proceeds from DIP Term Loan | | | | 250 | | | | | | | | | | 250 |
| Repayment of drawn ABL revolver | | | | (168) | | | | | | | | | | (168) |
| Cash collateralization of ABL LCs | | | | (72) | | | | | | | | | | (72) |
| Release of TL proceeds cash coll. LCs | | | | | | | | | 2 | | | | | 2 |
| Revolver Borrowing / (Repayment) (b) | 7 | (2) | 12 | 15 | 68 | 21 | 2 | 4 | (10) | 7 | 4 | 5 | (19) | 116 |
| Ending Book Cash Balance | 7 | 5 | 5 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Less: Restricted Cash | | | | | | | | | | | | | | |
| Ending Available Book Cash | 7 | 5 | 5 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| | | | | | | | | | | | | | | |
| Beg. Availability of Pre-Petition Revolvers | 25 | 25 | 27 | | | | | | | | | | | |
| Plus: Avail. Increase From LC Replacement | | | | | | | | | | | | | | |
| (Borrowings) / Repayments (b) | | 2 | (12) | | | | | | | | | | | |
| Ending Pre-Pet. Revolvers Avail. | 25 | 27 | 15 | | | | | | | | | | | |
| Ending Pre-Pet. Cash Flow Rev. Balance | 50 | 48 | 60 | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| Beg. Avail. Under DIP Credit Facility | | | | | 135 | 67 | 47 | 33 | 120 | 149 | 159 | 152 | 148 | 143 |
| New Availability / (Issuance of LCs) | | | | 150 | | | | 120 | | | | | | 143 |
| Draw to fund foreign operations | | | | | | | | | | | | | | |
| (Borrowings) / Repayments | | | | (15) | (68) | (21) | (12) | (4) | (10) | (7) | (4) | (5) | 19 | (19) |
| Ending DIP Availability | | | | 135 | 67 | 47 | 33 | 149 | 159 | 152 | 148 | 143 | 162 | |
| **Total Liquidity** | $32 | $32 | $20 | $160 | $92 | $72 | $58 | $58 | $174 | $184 | $177 | $173 | $168 | $187 |
| | | | | | | | | | | | | | | |
| **DIP Schedule** | | | | | | | | | | | | | | |
| **DIP Credit Facility and Interest Calculation** | | | | | | | | | | | | | | |
| Beginning Revolver Balance | | | | | $15 | $83 | $103 | $117 | $121 | $111 | $118 | $122 | $127 | |
| Interest | | | | 0.2 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.1 | 0.1 | 0.1 | 0.7 |
| Fees & Expenses | | | | | | | | | | | | | | 0.1 |
| Borrowings / (Repayments) | | | | 15 | 68 | 21 | 14 | 4 | (10) | 7 | 4 | 5 | (19) | 108 |
| Ending Revolver Balance | | | | 15 | 83 | 103 | 117 | 121 | 111 | 118 | 122 | 127 | 108 | 108 |
| Accrued Interest and Fees | | | | 0.2 | 0.0 | 0.1 | 0.2 | 0.3 | 0.4 | 0.4 | 0.5 | 0.1 | 0.2 | 0.2 |
| | | | | | | | | | | | | | | |
| Term Loan Balance (c) | | | | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Interest | | | | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 2.2 |
| Accrued Interest | | | | 0.2 | 0.4 | 0.7 | 0.9 | 1.1 | 1.3 | 1.5 | 1.8 | 0.2 | 0.4 | 0.4 |
| | | | | | | | | | | | | | | |
| Beginning Availability (c) | | | | | 135 | 67 | 47 | 33 | 149 | 159 | 159 | 152 | 148 | 143 |
| (Borrowings) / Repayments | | | | (15) | (68) | (21) | (12) | (4) | 10 | (7) | (4) | (5) | | (106) |
| LCs (Issued) / Retired | | | | | | (2) | (2) | | | | | | | 19 |
| Draw to fund foreign operations | | | | | | | | | | | | | | |
| Plus: New availability | | | | 150 | | | | 120 | | | | | 143 | 270 |
| Ending Availability | | | | 135 | 67 | 47 | 33 | 149 | 159 | 152 | 148 | 143 | 162 | 162 |

**Notes**
(a) Excludes activity of non-Debtor MPM AR LLC, a domestic entity with minimal associated activity.
(b) All borrowings in week of 4/4/14 assumed to occur prior to March EOM.
(c) Placeholder amount. Ultimate terms of DIP financing arrangement to be determined.

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

Consolidated Presentation

**MOMENTIVE**

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

**Project Eagle - 13-Week Cash Flow Model (Consolidated)**
Contingency Planning Scenario
*Updated as of 03/20/2014*

*(in millions of USD)*

| | | | | | | | For Week Ending | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | 3/21/14 | 3/28/14 | 4/4/14 | 4/11/14 | 4/18/14 | 4/25/14 | 5/2/14 | 5/9/14 | 5/16/14 | 5/23/14 | 5/30/14 | 6/6/14 | 6/13/14 | 13-Wk Total |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | |
| **Cash Flow Summary** | | | | | | | | | | | | | | |
| Trade Receivable Collections | $47 | $54 | $59 | $42 | $50 | $42 | $55 | $45 | $63 | $44 | $56 | $42 | $53 | $653 |
| Intercompany Receipts | 22 | 6 | 0 | -- | 34 | 14 | -- | -- | 38 | 15 | -- | -- | 27 | 156 |
| Other Receipts | 1 | 3 | 0 | -- | -- | 3 | 1 | -- | -- | 3 | 1 | -- | 2 | 14 |
| **Total Operating Receipts** | 69 | 64 | 59 | 42 | 84 | 59 | 56 | 45 | 101 | 62 | 57 | 42 | 83 | 823 |
| Vendor Payments | (34) | (26) | (54) | (22) | (53) | (35) | (59) | (26) | (39) | (28) | (36) | (31) | (26) | (469) |
| Payroll & Benefits | (10) | (13) | (16) | (5) | (17) | (14) | (7) | (8) | (5) | (15) | (7) | (9) | (6) | (130) |
| Utilities | (2) | (5) | (1) | (2) | (4) | (4) | (1) | (2) | (4) | -- | (4) | (1) | (4) | (34) |
| Insurance | -- | -- | (1) | -- | -- | -- | (1) | -- | -- | -- | (1) | -- | -- | (2) |
| Intercompany Disbursements | (22) | (6) | -- | -- | (34) | (14) | -- | -- | (38) | (15) | -- | -- | (27) | (156) |
| Shared Service Payments to MSC | -- | (7) | -- | -- | -- | -- | -- | -- | -- | (3) | -- | -- | -- | (9) |
| Other Disbursements | (2) | (0) | (5) | (1) | (4) | (5) | (4) | (2) | (3) | (3) | (1) | (3) | (3) | (35) |
| **Total Operating Disbursements** | (70) | (57) | (78) | (30) | (111) | (72) | (72) | (38) | (89) | (65) | (48) | (42) | (66) | (836) |
| **Operating Cash Flow** | (1) | 7 | (19) | 13 | (27) | (13) | (16) | 7 | 12 | (2) | 8 | (0) | 16 | (14) |
| Capital Expenditures | (2) | (1) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | |
| Debt Svc. (Payments) / Proceeds | 2 | (3) | (3) | 1 | (67) | 0 | 6 | 0 | -- | 0 | -- | 1 | -- | |
| Inter-Co Financing Receipts | 7 | -- | 1 | 4 | -- | -- | -- | -- | 8 | -- | -- | -- | -- | |
| Inter-Co Financing Disbursements | (7) | (2) | -- | (4) | -- | -- | -- | -- | (8) | -- | -- | -- | -- | |
| Other | 6 | 0 | 10 | (4) | -- | -- | -- | -- | -- | -- | -- | -- | -- | |
| **Total Investing & Financing Activities** | 5 | (5) | (8) | (5) | (69) | (2) | 4 | (2) | (2) | (2) | (2) | (4) | (2) | (27) |
| **Net Cash Flow before Restr. Disb.** | 4 | 2 | (13) | 8 | (96) | (14) | (12) | 5 | 10 | (4) | 7 | (4) | 14 | |
| Restructuring Disbursements | | | | | | | | | | | | | | |
| Professional Fees | -- | (1) | (8) | -- | -- | -- | -- | -- | -- | (1) | -- | (2) | -- | (12) |
| DIP Interest, Fees & Expenses | -- | -- | -- | (3) | -- | -- | (5) | (3) | -- | -- | -- | (3) | -- | (13) |
| Other | -- | -- | -- | -- | -- | (2) | -- | -- | -- | -- | -- | -- | -- | (2) |
| **Total Restructuring Disbursements** | -- | (1) | (8) | (3) | -- | (2) | (5) | (3) | -- | (1) | -- | (5) | -- | (27) |
| **Net Cash Flow** | $4 | $1 | ($21) | $5 | ($96) | ($16) | ($18) | $3 | $10 | ($5) | $7 | ($9) | $14 | ($120) |
| *Cumulative Net Cash Flow* | *4* | *5* | *(16)* | *(11)* | *(107)* | *(123)* | *(140)* | *(138)* | *(127)* | *(132)* | *(125)* | *(134)* | *(120)* | *(120)* |

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

**Project Eagle - 13-Week Cash Flow Model (Consolidated)**
Contingency Planning Scenario
*Updated as of 03/20/2014*

| (in millions of USD) | 3/21/14 | 3/28/14 | 4/4/14 | 4/11/14 | 4/18/14 | 4/25/14 | 5/2/14 | 5/9/14 | 5/16/14 | 5/23/14 | 5/30/14 | 6/6/14 | 6/13/14 | 13-Wk Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | |
| **Liquidity Summary** | | | | | | | | | | | | | | |
| Americas (U.S.) Opening Cash Balances | 10 | 7 | 5 | 5 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 10 |
| Americas (Non-U.S.) Opening Cash Balances | 3 | 4 | 5 | 6 | 8 | 9 | 7 | 7 | 8 | 11 | 7 | 7 | 9 | 3 |
| Europe Opening Cash Balances | 19 | 20 | 20 | 20 | 22 | 10 | 8 | 8 | 8 | 9 | 9 | 12 | 14 | 19 |
| Russia / India Opening Cash Balances | 4 | 5 | 7 | 6 | 8 | 5 | 6 | 7 | 7 | 4 | 5 | 6 | 6 | 4 |
| Asia Pac Opening Cash Balances | 62 | 64 | 61 | 53 | 56 | 42 | 52 | 45 | 50 | 50 | 55 | 61 | 54 | 62 |
| **Opening Bank Cash Balance** | $97 | $100 | $99 | $90 | $119 | $91 | $96 | $92 | $99 | $99 | $102 | $113 | $109 | $97 |
| Adjustment for estimated check float | (2) | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | (2) |
| Letter of Credit Cash Collateralization | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Net Cash Flow | 4 | 1 | (21) | 5 | (96) | (16) | (18) | 3 | 10 | (4) | 7 | (9) | 14 | (120) |
| Net Proceeds from DIP Term Loan | -- | -- | -- | 250 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 250 |
| Repayment of drawn ABL revolver | -- | -- | -- | (168) | -- | -- | -- | -- | -- | -- | -- | -- | -- | (168) |
| Cash collateralization of LCs | -- | -- | -- | (72) | -- | -- | -- | -- | -- | -- | -- | -- | -- | (72) |
| Release of TL proceeds cash coll. LCs | -- | -- | -- | -- | -- | -- | 2 | -- | -- | -- | -- | -- | -- | 2 |
| Revolver borrowing / (Repayment) | -- | (2) | 12 | 15 | 68 | 21 | 12 | 4 | (10) | 7 | 4 | 5 | (19) | 116 |
| **Ending Book Cash Balance** | 100 | 99 | 90 | 119 | 91 | 96 | 92 | 99 | 99 | 102 | 113 | 109 | 104 | 104 |
| Less: Restricted Cash | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| **Ending Available Book Cash** | 95 | 94 | 85 | 114 | 87 | 91 | 87 | 94 | 95 | 97 | 108 | 104 | 99 | 99 |
| Americas (U.S.) Ending Cash Balances | 7 | 5 | 5 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Americas (Non-U.S.) Ending Cash Balances | 5 | 5 | 6 | 8 | 9 | 6 | 7 | 9 | 11 | 7 | 9 | 10 | 13 | 10 |
| Europe Ending Cash Balances | 15 | 16 | 8 | 17 | 5 | 2 | 4 | 3 | 5 | 4 | 5 | 9 | 14 | 14 |
| Russia / India Ending Cash Balances | 5 | 7 | 8 | 8 | 5 | 6 | 7 | 7 | 4 | 5 | 6 | 6 | 6 | 6 |
| Asia Pac Ending Cash Balances | 64 | 61 | 53 | 56 | 42 | 52 | 45 | 50 | 50 | 55 | 61 | 54 | 43 | 43 |
| Beginning availability of Pre-Petition Revolver | 25 | 25 | | | | | | | | | | | | |
| Plus: Availability Increase Due to LC Replacem | -- | -- | 2 | | | | | | | | | | | |
| (Borrowings) / Repayments | -- | 2 | (12) | | | | | | | | | | | |
| **Ending Pre-Petition Revolver Availability (ALL)** | 25 | 27 | 15 | | | | | | | | | | | |
| Beg. Avail. Under DIP Credit Facility | 50 | 48 | -- | 150 | 135 | 67 | 47 | 33 | 149 | 159 | 152 | 148 | 143 | 268 |
| New Availability / (Issuance of LCs) | | | | | | | | 120 | | | | | | 120 |
| Draw to fund foreign operations | | | | | | | | | | | | | | |
| (Borrowings) / Repayments | | (27) | (48) | (15) | (68) | (21) | (12) | (4) | (10) | (7) | (4) | (5) | (19) | (106) |
| **Ending DIP Availability** | 50 | 27 | 135 | 135 | 67 | 47 | 33 | 149 | 159 | 152 | 148 | 143 | 162 | 162 |
| **Total Liquidity** | $120 | $121 | $100 | $249 | $154 | $138 | $120 | $243 | $253 | $249 | $256 | $247 | $261 | $261 |

11

# X. Reconciliation – Operating Plan to Working Cash Model (3.24.2014)

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

**MOMENTIVE™**

**Project Eagle**
**Operating Plan to 3/22/14 BK Overlay Presentation**
*(Amounts in millions of USD)*

| | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 | Notes |
|---|---|---|---|---|---|---|
| **Global EBITDA per operating plan** | $ 72 | $ 68 | $ 60 | $ 69 | $ 82 | |
| | | | | | | |
| <u>Operating cash disbursements not included in EBITDA</u> | | | | | | |
| Cash taxes | (6) | (6) | (6) | (6) | (6) | |
| Shared service billings, restr. charges and other | (8) | (6) | (4) | (4) | (5) | |
| Total cash items not included in EBITDA | (13) | (11) | (9) | (9) | (10) | |
| | | | | | | |
| <u>Working capital adjustments</u> | | | | | | |
| Decrease (increase) in A/R balance | (41) | 8 | (12) | 29 | (43) | |
| Decrease (increase) in inventory balance | (20) | 22 | 26 | (40) | (17) | |
| Increase (decrease) in accr. exp. balance | (8) | 3 | 3 | 3 | (9) | |
| Increase (decrease) in A/P balance | 29 | (5) | 14 | (28) | 30 | |
| Total working capital adjustments | (40) | 28 | 30 | (36) | (39) | |
| | | | | | | |
| <u>Additional adjustments</u> | | | | | | |
| Deferred / Pre-petition U.S. payables | 74 | - | - | - | - | |
| First day motion and 503(b)(9) payments | (39) | - | - | - | - | |
| U.S. vendor term changes | (59) | 2 | 2 | 4 | - | |
| European vendor term changes | (8) | 2 | 2 | 4 | - | |
| Asia Pac vendor term changes | (8) | 2 | 2 | 4 | - | |
| Shift in timing of normal course European cash flows | 16 | (8) | (8) | - | - | |
| All other | (4) | 7 | (15) | (3) | (4) | |
| Total additional adjustments | (28) | 5 | (17) | 9 | (4) | |
| | | | | | | |
| ***Global operating cash flow per underlying cash flow projection*** | ***(10)*** | ***90*** | ***64*** | ***32*** | ***28*** | *A* |
| Add back: Cash used (generated by) proposed non-debtor entities | (6) | (19) | (13) | 8 | 12 | |
| ***U.S. operating cash flow per underlying cash flow projection*** | ***$ (15)*** | ***$ 71*** | ***$ 50*** | ***$ 41*** | ***$ 40*** | *A* |

<u>**Notes:**</u>
(A) 2Q14 amounts include activity from week ended 4/4/14, currently contemplated as a "pre-filing" period.

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

# XI. Shared Service Agreement – Headcount Split

**MOMENTIVE**

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

**Incremental Year over Year Savings**

| | Total Program | 2010<br>Total 2010<br>Incremental<br>Savings | 2011<br>Total 2011<br>Incremental<br>Savings | 2012<br>Total 2012<br>Incremental<br>Savings | 2013<br>Total 2013<br>Incremental<br>Savings | 2014<br>Total 2014<br>Incremental<br>Savings |
|---|---|---|---|---|---|---|
| Headcount | 13,793,080 | 674,141 | 4,931,104 | 5,273,922 | 2,776,856 | 137,056 |
| Projects | 50,838,699 | (44,508) | 18,432,799 | 25,904,796 | 6,678,945 | 866,667 |
| **Total Productivity Incremental YoY** | **64,631,778** | **629,633** | **23,363,903** | **31,178,718** | **9,455,802** | **1,003,723** |

Project cost savings outside of procurement savings would include data center consolidations, elimination of outsourcing in favor of lower cost insourcing, wide area network consolidations, contractor elimination, reduction in cost due to aggregation of spend.

# XII. Shared Service Agreement – Overview (3.20.2014)

**MOMENTIVE™**

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

Shared Services Overview

MOMENTIVE™

MOMENTIVE

2

## Agenda

- History

- Savings to Date / Dis-synergies

- Governance

- 2012 Change in Allocation Percentage

- Growth Opportunities



MOMENTI∨E™

# Overview of MPMH LLC

*(in millions)*

## Momentive Performance Materials Holdings LLC
Craig Morrison

Revenue:        $7.1 bn [1]
Adj. EBITDA:    $685 mm [2]

---

### Momentive Specialty Chemicals Inc.
*Epoxy, Phenolic & Coating Resins Division*
Jody Bevilaqua

Revenue: $3,051 mm
EBITDA:    $336mm

- Base Epoxy Resins
- Specialty Epoxy Resins
- Versatic™ Acids & Derivatives
- Specialty Phenolic Resins
- Oilfield
- Powder Coatings
- Global Dispersions
- Acrylic Monomers




---

### Momentive Performance Materials Inc.
*Silicones & Quartz Division*
Craig Morrison (interim)

Revenue: $2,350 mm
EBITDA:    $236 mm

- Silicone Fluids
- Silanes and Resins
- Silicone Intermediates
- Silicone Elastomers
- Silicone Engineered Materials
- Urethane Additives
- Consumer Sealants and Adhesives
- Fused Quartz and Ceramic Materials




---

### Momentive Specialty Chemicals Inc.
*Forests Products Resins Division*
Dale Plante

Revenue: $1,724 mm
EBITDA:    $222 mm

- Forest Products Resins
- Formaldehyde
- Formaldehyde Derivatives
- Wax Additives




---

(1)     Revenue and Adjusted EBITDA is presented for LTM 6/30/13. Represents Adjusted  EBITDA and MSC MPM Adjusted EBITDA.

**MOMENTIVE**

# History

- Momentive Specialty Chemicals (MSC) and Momentive Performance Materials (MPM) have entered into the Shared Services Agreement (Agreement) in order to recognize economies of scale and generate cost savings for each that otherwise would be unavailable. Under the Shared Service Agreement, each may provide and/or receive certain services from the other, and the costs of such services are allocated between the two companies according to the methodology set forth in the Agreement. The Steering Committee formed under the Agreement reviews and monitors the services and costs.

- Services and costs included in the agreement are referred to as Functional Service Costs and include Finance (Audit, Tax, Treasury, Credit, Collections, Accounts Payable, etc), Legal, Executive/Senior Management, Administrative Support, IT, EHS, Payroll, HR, Procurement, Logistics, etc.

- The Agreement provides that services and costs will either be 100% direct billed or allocated according to the Allocation Percentage described later. Cash settlement will be necessary for all cash costs. No cash settlements will be done for non-cash cost or expenses.

MOMENTIVE™

# Savings Achieved / Dis-Synergies

9

**MOMENTIVE**

# Overview of Shared Services Agreement

*MPM could see significant degradation in EBITDA if the shared services agreement with MSC is terminated*

## Description

- Under the agreement, Functional Service Costs allocated between MSC and MPM include:
  - Management and other personnel compensation
  - Administrative support, human resources, information technology support, accounting, finance, legal, procurement, EHS and property management services
  - Capital expenditures
- Costs currently allocated 43% / 57% between MPM and MSC
  - Quarterly true-ups paid between MSC and MPM to maintain contractual splits

## Calculation of Potential Dis-synergies

| | | |
|---|---|---|
| ***Run-rate Dis-synergies*** | | |
| Total Annual Savings | $64 | (4) |
| Less: Excluded Projects | | |
| Less: Retained Procurement Savings | | |
| **Total Annual Dis-synergies** | **$54** | |
| | | |
| ***Other One-time Costs*** | | |
| Recruiting (P&L) | | (7) |
| Contingency Investment (Cash Flow) | | (8) |
| **Total** | **($15)** | |

- Projects excluded relate to IT & HR cost savings initiatives that would remain intact
- One-time recruiting expenses calculated as 30% of total comp & benefit savings
- Contingency investment includes expenditures on additional infrastructure, office space and other transitional cash outlays

## Historical Cumulative Cost Savings to MPM[1]

| ($ in millions) | 2010 | 2011 | 2012 | 2013E | 2014E | Total Cum. |
|---|---|---|---|---|---|---|
| IT/BPO | $0 | $2 | $8 | $11 | $11 | $11 |
| Finance | 0 | 4 | 7 | 8 | 8 | 8 |
| HR | 0 | 2 | 2 | 3 | 3 | 3 |
| Other SG&A | 0 | 4 | 10 | 12 | 12 | 12 |
| **Total SG&A** | **$1** | **$11** | **$27** | **$33** | **$34** | **$34** |
| Procurement | -- | $10 | $18 | $20 | $20 | $20 |
| Logistics | -- | 3 | 10 | 11 | 11 | 11 |
| **Total COGS** | **--** | **$13** | **$28** | **$30** | **$30** | **$30** |
| **Total Savings** | **$1** | **$24** | **$55** | **$64** | **$64** | **$64** |

## Adjusted EBITDA Projections[2]



Legend: ■ Adjusted EBITDA w/o SS   □ Base Case EBITDA

| | 2013E | 2014E | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|
| Base Case EBITDA | $240 | $260 | $297 | $334 | $343 | $356 |
| Adjusted EBITDA w/o SS | $240 | $229 | $245 | $278 | $286 | $298 |

| ***Margins*** | | | | | | |
|---|---|---|---|---|---|---|
| Base Case | 10.0% | 10.3% | 11.2% | 12.0% | 11.9% | 12.0% |
| Adj. w/o SS | 10.0% | 9.1% | 9.2% | 10.0% | 10.0% | 10.1% |

**Shared Service Dis-Synergies:**
SG&A Savings $34
Less: Excluded projects ($4)
Net Dis-Synergies $30

Source: Company Model, Company information
(1) Based on internal reporting; varies from external reporting due to reporting adjustments
(2) Certain costs phased-in over two-year period

7





**MOMENTIVE**™

# Required Approvals

- Momentive Performance Materials (MPM) and Momentive Specialty Chemicals (MSC) have entered into the Shared Services Agreement (Agreement) in order to recognize economies of scale and generate cost savings for each that otherwise would be unavailable.  Under the Shared Services Agreement, each may provide and/or receive certain services from the other, and the costs of such services are allocated between the two companies according to the methodology set forth in the Agreement.

- The Steering committee, which reviews and monitors the services and costs under the agreement, is composed of the following members:  William Carter, EVP & CFO of MPM and MSC; Colette Barricks, VP & General Controller of MPM and MSC; Anthony Greene, EVP, Business Development and Strategy of MPM and MSC (and interim MPM CFO) and Billie Jo Cuthbert, Controller of MPM.

- Services and costs included in the agreement are referred to as Functional Service Costs and include Finance (Audit, Tax, Treasury, Credit, Collections, Accounts Payable, etc.), Legal, Executive/Senior Management, Administrative Support, IT, EHS, Payroll, HR, Procurement, Logistics, etc.

- The Agreement provides that services and costs will either be 100% direct billed or allocated according to the Allocation Percentage described later.  Cash settlement will be necessary for all cash costs.  No cash settlements will be done for non-cash cost or expenses.

Copyright © 2013 Momentive Performance Materials Inc. All rights reserved.

9

**MOMENTIVE**™

## Required Approvals

- *Debt Covenants.* The covenants included in the various debt agreements of Momentive Performance Materials Inc. (the "Company" or "MPM") require that transactions involving consideration **in excess of $5 million** between the Company and any Affiliate (including Momentive Specialty Chemicals Inc. or its subsidiaries ("MSC"), Apollo and any other entity controlled by Apollo but excluding GE) be on **arm's length terms for fair value.** Such transactions are referred to herein as "Affiliate Transactions".

- *Audit Committee Charter / SEC Regs.* The Charter of the Audit Committee of the Company's Board of Directors (the "Board") also requires that the Audit Committee review and approve **all related party transactions required to be reported under SEC regulations.** Such transactions are referred to herein as "Related Party Transactions". SEC regulations require that the Company disclose in its annual report all transactions in which the Company or any of its subsidiaries is a participant and in which a related person has a direct or indirect material interest (as determined under SEC rules), where the amount involved **exceeds $120,000.** For purposes of SEC regulations, related persons include directors, executive officers and stockholders beneficially owning more than 5% of voting stock (e.g. GE Equity).

- *Conflicts Committee Charter.* The Conflicts Committee Charter provides that, **at the request of the Board,** the Conflicts Committee shall assist with the identification, investigation, review, evaluation and resolution of potential conflicts of interest between the Company and MSC, any stockholder or affiliate or any debt holder.

10

Copyright © 2013 Momentive Performance Materials Inc. All rights reserved.





**MOMENTIVE™**

## Allocation Percentage

- At the inception of the Agreement, the Allocation Percentage was set at 51% for MSC and 49% for MPM.

  – Effective January 1, 2013, in connection with its annual review of the services and costs under the Agreement and the refinement of MPM's ability to track costs described below, the Steering Committee revised the Allocation Percentage to 57% for MSC and 43% for MPM.

  – Accordingly, from 2010 to 2012, Functional Service Costs that were not Direct Billed Costs were allocated 51% to MSC and 49% to MPM. Thereafter, such costs are allocated 57% to MSC and 43% to MPM.

- From 2010 to 2012, Shared Service Agreement billings for MPM and MSC shared costs were based on all Division costs of MSC and MPM, including costs for the Admin function (e.g. corporate costs) and other Division functions, and all Admin costs outside of a Division. During 2013, MPM implemented a new SAP module, which gave it the capability to break out Division costs into Admin costs and other Division costs, like MSC. As a result, beginning in 2013, Shared Service Agreement billings for MPM and MSC shared costs are based only on Admin costs (excluding Division costs outside of the Admin function, which costs are not shared).

MOMENTIVE™

# Change in Allocation Percentage

13

|   |   | 2012 | | | | MSC | MPM |
|---|---|---|---|---|---|---|---|
|   |   | MSC | MPM | Total | | | |
| A | Total Costs of Admin+Division Resources* | 157.40 | 122.04 | 279.44 | | 56% | 44% |
| B | Total Costs of Admin Only Resources* | 129.96 | 79.37 | 209.32 | | 62% | 38% |
| C | Impact of Division Resources on Allocation Percentage (B-A) | | | | | 6% | -6% |
| D | Original Allocation Percentage based on Admin+Division Resources | | | | | 51% | 49% |
| E | Revised Allocation Percentage to exclude impact of Division Resources, which are not shared costs (D+C) | | | | | 57% | 43% |

*Does not reflect true-up payments.   Above the line costs included in costs.   Below the line and Direct Bill Costs excluded.

# Superstructure / Growth

**MOMENTIVE**

# Growth enabled by the combination

**Current Sales**

- Revenue is assigned to the business unit that manufactures the final end product.

**OilPlus**

- This product is produced by MSC with raw materials from MPM.  MPM sells the raw materials to MSC at a market price and the sales to third parties are recorded on MSC's books.

- OilPlus has been our biggest success to date.

**Future Growth**

- Growth from joint marketing efforts has been more difficult to track.

  – For example, both MPM and MSC have significant sales to the auto industry.  The joint marketing efforts have led to new introductions within the industry, but it is difficult to quantify true "growth synergies."

- Although there are products in the pipeline, successes through joint product development have been limited to date.

  – The lead time in the auto industry can be 30 months

16

# Broad Complementary Technology Portfolio

MOMENTIVE™

17

**Complementary Technology Portfolio**

| | Industrial/Marine | Consumer/Durable Goods | New Home Construction | Automotive | Graphic Arts | Repair/Remodel | Electronics/Electrical | Oil Field E&P | Construction | Architectural | Wind Energy | Healthcare/Personal Care | Furniture |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Thermoset Resins — Acrylic Monomers** | ■ | ■ | | ■ | ■ | ■ | | | ■ | ■ | | | |
| **Formaldehyde** | ■ | ■ | ■ | ■ | | ■ | | | ■ | | | | ■ |
| **Vinyl & Acrylic Lattices** | | | | ■ | | ■ | | | ■ | ■ | | | |
| **Amino Resins** | ■ | ■ | ■ | | | ■ | | | | ■ | | | ■ |
| **Phenolics** | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | | | | | |
| **Versatics** | | ■ | | ■ | | | | | ■ | ■ | | | |
| **Epoxy** | ■ | ■ | | ■ | | | ■ | | ■ | | ■ | | |
| **Silicones & Quartz — Quartz & Ceramics** | ■ | ■ | | | | | ■ | | | | | ■ | |
| **Sealants** | | ■ | ■ | | | | | | ■ | ■ | | | |
| **Urethane Additives** | | ■ | | ■ | | | | | ■ | | | | ■ |
| **Engineered Materials** | | | ■ | | ■ | ■ | ■ | | | | | | |
| **Elastomers** | ■ | | ■ | | | ■ | | | | | | ■ | |
| **Silanes** | ■ | ■ | | ■ | | | | | ■ | ■ | | | |
| **Fluids** | ■ | | | | | ■ | | ■ | ■ | | ■ | | |



# Corporate Chief Marketing Officer Role Created to Drive Growth Synergies

**MOMENTIVE™**

**Prioritized and focused effort**

CEO

Division Presidents — Division Presidents

Chief Marketing Officer

Platform Technologies and TG support | MDM Market Transportation / Auto | MDM Market Coatings | MDM Market Construction | MDM Market 4 | Division TGs | Division MDMs

**Under development**

Corporate Branding & Mkt. Communications

**Marketing Processes**

Summary:
- Organization created in late 2012;
- Exclusively focused on expediting, multiplying growth initiatives and creating a growth culture
- Draws on corporate and divisional resources to work on MDM and Transformational Growth (TG) areas
  - Automotive and Coatings initial focus for MDM
  - Construction Market is being assessed as next MDM area of focus
  - Platform technologies and TG marketing support
  - Develop and manage Growth Council and Marketing Council agendas

18



**MOMENTIVE™**

# CMO & Growth Council Accomplishments

- CMO structure installed and gaining traction
- India superstructure
  - Chenai site being leveraged by EPCD for installed capacity
  - SQD provided FPD GM
  - On the ground resources for JV assessment
  - India R&D site being leveraged across the company
- Oilfield superstructure
  - Oilfield contacts leveraged by FPD (26% YTD growth) and SQD (18% YTD growth)
  - Oilplus, a cross fertilization project, developed and commercialized
- Regional Growth Councils in place and slowly gaining traction
- BAME summit and project pipeline created. Next market specific BAME summit being planned.
- Marketing Council established and operational
  - Creates a cross-divisional forum to drive projects and discuss issues/opportunities
- Website project moving forward
- Initiated cross divisional Strategic Account Management (SAM) process for corporate accounts
- Common Growth Metrics developed

19



# Automotive Market Development Workgroups



Sample Super Structure (OTG)

# XIII. Shared Service Agreement – Additional Details (3.21.2014)

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

**MOMENTIVE**™



# Shared Service Details

3-21-14

Copyright © 2012 Momentive Specialty Chemicals Inc. All rights reserved.

MOMENTIVE™

# IT Asset Details

| | | Assets Recorded | |
| --- | --- | :---: | :---: |
| | | MSC | MPM |
| Data Center Networking Equipment | | X | |
| Data Center Servers* | | X | X |
| Site Equipment (servers, networking equipment) | | X | X |
| PCs | | X | X |
| Software Licenses | | | |
| SAP^ | | X | X |
| Microsoft | | X | |
| Zemeter (Planning) | | X | |
| Aspentech (Planning) | | X | |
| Aspen (Engineering) | | | X |
| Gensuite (EHS) | | | X |
| Infrastructure Management tools | | X | |
| Application Management tools | | X | |
| Security Management tools | | X | |

\* - Note: Utilization of VMWare and other footprint consolidation efforts has allowed some server consolidation at the data center.  MPM would likely need to purchase some additional servers if they were to be carved out.

MPM would need to spend $6-9m on hardware and software for carve out.

^ - Ownership denotes asset recorded on books.  Separate license agreement breakout would be necessary to transfer license to MPM.

Copyright © 2012 Momentive Specialty Chemicals Inc. All rights reserved.

**MOMENTIVE™**

# Shared Facilities

| Site | Shared Service Purpose | Lessor/Owner |
|------|------------------------|--------------|
| Columbus, OH | Corp HQ | MSC |
| Gahanna, OH | Commercial Services / HR Services site | MSC |
| Seattleweg, NL | EU HQ | MSC |
| Columbus data center | 3rd party location | MSC |
| European data center | 3rd party location | MSC |
| Bangkok, TH | Thailand SS HQ | MSC |
| Itatiba, BR | MPM LA HQ | MPM |
| Shanghai, CN | Asia HQ + Lab | MPM |
| Seoul, KR | Korea HQ | MPM |
| Kuala Lumpur, MY | Malaysia HQ | MPM |
| Tarrytown, NY | Select SS functions utilize | MPM |
| Waterford, NY | MPM HQ | MPM |
| Singapore, SG | Singapore HQ | MPM |
| Bangalore, IN | India HQ + Lab | MPM |
| Tokyo, JP | Japan HQ | MPM |

Note: Above represents sites where larger number of shared resources are housed

Copyright © 2012 Momentive Specialty Chemicals Inc. All rights reserved.



**MOMENTIVE™**

# Shared Service Costs, Billing and Synergies

| | YTD Net Shared Service Costs | | YTD Net Billing | YTD Synergies Achieved | |
|---|---|---|---|---|---|
| | MSC | MPM | | MSC | MPM |
| Life to date savings | | | | 60 | 63 |
| 9/30/2013 | 90 | 67 | 21 | 6 | 8 |
| 6/30/2013 | 61 | 46 | 14 | 5 | 6 |
| 3/31/2013 | 33 | 23 | 6 | 3 | 4 |
| 2012 | 155 | 148 | 22 | 24 | 31 |
| 9/30/2012 | 111 | 106 | 16 | 19 | 23 |
| 6/30/2012 | 79 | 75 | 9 | 12 | 13 |
| 3/31/2012 | 41 | 39 | 5 | 7 | 7 |
| 2011 | 163 | 158 | 11 | 29 | 23 |
| 9/30/2011 | 134 | 128 | 5 | 21 | 15 |
| 6/30/2011 | 90 | 86 | 3 | 14 | 9 |
| 3/31/2011 | 44 | 41 | 1 | 4 | 2 |
| 2010 | 43 | 42 | 1 | 1 | 1 |

Note: Synergies Achieved includes SG&A and Procurement savings.

Copyright © 2012 Momentive Specialty Chemicals Inc. All rights reserved.

# XIV. Weekly Cash Flow Model – Monthly Summary (3.31.2014)

**MOMENTIVE**™

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

**Project Eagle – Monthly Cash Flow Presentation (U.S. Entities Only)[a]**

*Updated as of 03/24/2014*

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

| (in millions of USD) | | For Month Ending | | | | | | | | | | | | | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Month | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | to Jun-15 |
| | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | |
| **Cash Flow Summary** | | | | | | | | | | | | | | | | |
| Trade Receivable Collections | $52 | $56 | $63 | $76 | $70 | $75 | $76 | $71 | $75 | $74 | $69 | $74 | $75 | $70 | $75 | $1,052 |
| Intercompany Receipts | 22 | 22 | 22 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 338 |
| Other Receipts | -- | -- | 2 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 2 |
| **Total Operating Receipts** | 74 | 79 | 88 | 98 | 93 | 98 | 99 | 93 | 98 | 97 | 92 | 96 | 98 | 93 | 97 | 1,393 |
| Vendor Payments | (66) | (36) | (35) | (47) | (35) | (31) | (48) | (46) | (39) | (56) | (50) | (40) | (56) | (50) | (40) | (674) |
| Payroll & Benefits | (23) | (20) | (24) | (22) | (19) | (26) | (30) | (19) | (20) | (25) | (19) | (20) | (25) | (19) | (20) | (329) |
| Utilities | (4) | (4) | (3) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (58) |
| Insurance | (1) | (1) | -- | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (9) |
| Intercompany Disbursements | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (53) |
| Shared Service Payments to MSC | -- | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (37) |
| Other Disbursements | (6) | (3) | -- | (3) | (3) | (3) | (3) | (1) | (3) | (1) | (1) | (3) | (3) | (3) | (3) | (33) |
| **Total Operating Disbursements** | (102) | (70) | (70) | (83) | (65) | (70) | (91) | (76) | (72) | (91) | (80) | (73) | (94) | (82) | (73) | (1,193) |
| **Operating Cash Flow** | (29) | 9 | 17 | 16 | 28 | 28 | 7 | 17 | 26 | 6 | 12 | 23 | 4 | 11 | 25 | 200 |
| Capital Expenditures | (3) | (4) | (5) | (9) | (7) | (7) | (7) | (6) | (6) | (5) | (4) | (4) | (7) | (6) | (6) | (85) |
| Debt Svc. (Payments) / Proceeds | (62) | -- | -- | (1) | -- | -- | (62) | -- | -- | -- | -- | -- | (62) | -- | -- | (187) |
| Inter-Co Financing Receipts | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Inter-Co Financing Disbursements | (4) | (8) | (8) | (7) | -- | -- | (1) | -- | (3) | (4) | (1) | (5) | (6) | (3) | (4) | (54) |
| Other | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Investing & Financing Activities** | (69) | (12) | (13) | (16) | (7) | (7) | (70) | (6) | (8) | (10) | (5) | (8) | (75) | (9) | (10) | (326) |
| **Net Cash Flow before Restr. Disb.** | (98) | (3) | 4 | (1) | 21 | 20 | (63) | 12 | 18 | (4) | 7 | 15 | (71) | 2 | 14 | (126) |
| **Restructuring Disbursements** | | | | | | | | | | | | | | | | |
| Professional Fees | -- | -- | -- | (3) | (5) | (4) | (3) | (3) | (4) | (3) | (3) | (4) | (3) | (3) | (6) | (46) |
| DIP Interest, Fees & Expenses | (8) | (3) | (2) | (3) | (2) | (2) | (1) | (2) | (1) | (1) | -- | (1) | (3) | -- | (2) | (30) |
| Other | (2) | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | (2) |
| **Total Restructuring Disbursements** | (10) | (3) | (2) | (6) | (6) | (6) | (4) | (5) | (5) | (4) | (3) | (5) | (6) | (3) | (8) | (78) |
| **Net Cash Flow** | (107) | (5) | 2 | (7) | 15 | 15 | (67) | 7 | 13 | (8) | 2 | 10 | (76) | (1) | 6 | (205) |
| Cumulative Net Cash Flow | (107) | (113) | (115) | (122) | (105) | (90) | (157) | (150) | (137) | (145) | (143) | (133) | (210) | (211) | (205) | (205) |

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

## Project Eagle – Monthly Cash Flow Presentation (U.S. Entities Only)[a]

Updated as of 03/24/2014

| (in millions of USD) | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Total to Jun-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | |
| **Liquidity Summary** | | | | | | | | | | | | | | | | |
| Opening Bank Cash Balance | $5 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $5 |
| Adj. for Estimated Check Float | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LCs Cash Collateralized | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Net Cash Flow | (107) | (5) | (3) | (7) | 18 | 15 | (67) | 7 | 13 | (8) | 2 | 10 | (76) | (1) | 6 | (205) |
| Net Proceeds from DIP Term Loan | 250 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 250 |
| Repayment of drawn ABL revolver | (168) | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | (168) |
| Cash collateralization of ABL LCs | (72) | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | (72) |
| Release of TL proceeds cash coll. LCs | 2 | -- | -- | 4 | -- | 11 | -- | -- | 15 | 12 | 20 | -- | -- | -- | -- | 65 |
| Revolver Borrowing / (Repayment) (b) | 115 | 5 | 3 | 3 | (18) | (26) | 67 | (7) | (22) | (4) | (22) | (10) | 76 | 1 | (6) | 150 |
| Ending Book Cash Balance | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Less Restricted Cash | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Ending Available Book Cash | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| | | | | | | | | | | | | | | | | |
| Beg. Avail. Under DIP Credit Facility | -- | 33 | 148 | 145 | 138 | 156 | 171 | 104 | 111 | 125 | 117 | 120 | 130 | 53 | 52 | -- |
| New Availability / (Issuance of LCs) | 148 | 120 | -- | (4) | -- | (11) | -- | (14) | -- | (12) | (19) | -- | -- | (1) | -- | 208 |
| Draw to fund foreign operations | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| (Borrowings) / Repayments | (115) | (5) | (3) | (2) | 18 | 26 | (67) | 7 | 27 | 4 | 22 | 10 | (76) | (1) | 6 | (150) |
| Ending DIP Availability | 33 | 148 | 145 | 138 | 156 | 171 | 104 | 111 | 125 | 117 | 120 | 130 | 53 | 52 | 58 | 58 |
| | | | | | | | | | | | | | | | | |
| **Total Liquidity** | $58 | $173 | $170 | $163 | $181 | $196 | $129 | $136 | $150 | $142 | $145 | $155 | $78 | $77 | $83 | $83 |
| Post-Petition Liquidity Need | (107) | (184) | (187) | (194) | (176) | (161) | (228) | (221) | (207) | (215) | (212) | (202) | (279) | (279) | (273) | (273) |

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

**Project Eagle - Extended Cash Flow Model (Proposed Debtor Entities Only) (a)**
BK Overlay

Updated as of 03/24/2014

| (in millions of USD) | 3/21/14 | 3/28/14 | 4/4/14 | 4/11/14 | 4/18/14 | 4/25/14 | 5/2/14 | 5/9/14 | 5/16/14 | 5/23/14 |
|---|---|---|---|---|---|---|---|---|---|---|
| Week | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| **Cash Flow Summary** | | | | | | | | | | |
| Trade Receivable Collections | $14 | $17 | $14 | $14 | $12 | $12 | $14 | $14 | $14 | $15 |
| Intercompany Receipts | 3 | 0 | -- | 22 | -- | -- | -- | -- | 22 | -- |
| Other Receipts | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Total Operating Receipts | 16 | 18 | 14 | 14 | 35 | 12 | 14 | 14 | 36 | 15 |
| | | | | | | | | | | |
| Vendor Payments | (12) | (9) | (8) | (7) | (21) | (21) | (17) | (8) | (6) | (9) |
| Payroll & Benefits | (5) | (6) | (14) | (3) | (9) | (6) | (4) | (6) | (4) | (6) |
| Utilities | (1) | -- | -- | (4) | -- | -- | (1) | -- | -- | (1) |
| Insurance | -- | -- | (1) | -- | -- | (1) | -- | -- | -- | -- |
| Intercompany Disbursements | (4) | -- | -- | -- | (4) | -- | -- | -- | (4) | -- |
| Shared Service Payments to MSC | -- | (7) | -- | -- | -- | -- | -- | -- | -- | -- |
| Other Disbursements | (1) | -- | (4) | -- | (3) | (3) | -- | -- | -- | (3) |
| Total Operating Disbursements | (23) | (23) | (27) | (10) | (40) | (30) | (22) | (14) | (17) | (21) |
| | | | | | | | | | | |
| Operating Cash Flow | (7) | (6) | (13) | 3 | (6) | (18) | (8) | (0) | 19 | (6) |
| | | | | | | | | | | |
| Capital Expenditures | (2) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |
| Debt Svc. (Payments) / Proceeds | -- | -- | (1) | (0) | (61) | (0) | -- | -- | -- | -- |
| Inter-Co Financing Receipts | 7 | 2 | 1 | -- | -- | -- | 1 | 1 | 1 | 1 |
| Inter-Co Financing Disbursements | -- | -- | -- | (4) | -- | -- | -- | -- | (8) | -- |
| Other | -- | 5 | 10 | -- | -- | -- | -- | -- | -- | -- |
| Total Investing & Financing Activities | 6 | 7 | 9 | (5) | (62) | (1) | (1) | (1) | (9) | (1) |
| | | | | | | | | | | |
| Net Cash Flow before Restr. Disb. | (1) | 1 | (4) | (2) | (68) | (19) | (9) | (2) | 10 | (7) |
| | | | | | | | | | | |
| Restructuring Disbursements | | | | | | | | | | |
| Professional Fees | -- | (1) | (6) | -- | -- | -- | -- | -- | -- | -- |
| DIP Interest, Fees & Expenses | -- | -- | -- | (3) | (3) | -- | (3) | (3) | -- | -- |
| Other | -- | -- | -- | -- | -- | (2) | -- | -- | -- | -- |
| Total Restructuring Disbursements | -- | (1) | (6) | (3) | (3) | (2) | (5) | (3) | -- | -- |
| | | | | | | | | | | |
| Net Cash Flow | ($1) | ($0) | ($12) | ($5) | ($68) | ($21) | ($14) | ($4) | $10 | ($7) |
| Cumulative Net Cash Flow | (1) | (2) | (13) | (18) | (86) | (106) | (120) | (124) | (114) | (121) |
| **Liquidity Summary** | | | | | | | | | | |
| Opening Bank Cash Balance | $10 | $7 | $5 | $5 | $25 | $25 | $25 | $25 | $25 | $25 |
| Adj. for Estimated Check Float | (2) | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LCs Cash Collateralized | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Net Cash Flow | (1) | (0) | (12) | (5) | (68) | (21) | (14) | (4) | 10 | (7) |
| Net Proceeds from DIP Term Loan | | | | 250 | -- | -- | -- | -- | -- | -- |
| Repayment of drawn ABL revolver | | | | (168) | -- | -- | -- | -- | -- | -- |
| Cash collateralization of ABL LCs | | | | (72) | -- | -- | -- | -- | -- | -- |
| Release of TL proceeds cash coll. LCs | | | | -- | -- | -- | 2 | -- | -- | -- |
| Revolver Borrowing / (Repayment) (b) | -7 | (2) | 12 | 15 | 68 | 21 | 12 | 4 | (10) | 7 |
| Ending Book Cash Balance | 7 | 5 | 5 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Less: Restricted Cash | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Ending Available Book Cash | 7 | 5 | 5 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| | | | | | | | | | | |
| Beg. Availability of Pre-Petition Revolvers | 25 | 25 | 27 | | | | | | | |
| Plus: Avail. Increase From LC Replacement | -- | -- | -- | | | | | | | |
| (Borrowings) / Repayments (b) | -- | 2 | (12) | | | | | | | |
| Ending Pre-Pet. Revolvers Avail. | 25 | 27 | 15 | | | | | | | |
| Ending Pre-Pet. Cash Flow Rev. Balance | 50 | 48 | 60 | | | | | | | |
| | | | | | | | | | | |
| Beg. Avail. Under DIP Credit Facility | | | | -- | 135 | 67 | 47 | 33 | 149 | 159 |
| New Availability / (Issuance of LCs) | | | | 150 | -- | -- | (2) | 120 | -- | -- |
| (Borrowings) / Repayments | | | | (15) | (68) | (21) | (12) | (4) | 10 | (7) |
| Ending DIP Availability | | | | 135 | 67 | 47 | 33 | 149 | 159 | 152 |
| | | | | | | | | | | |
| Total Liquidity | $32 | $32 | $20 | $160 | $92 | $72 | $58 | $174 | $184 | $177 |
| **DIP Schedule** | | | | | | | | | | |
| **DIP Credit Facility and Interest Calculation** | | | | | | | | | | |
| Beginning Revolver Balance | | | | -- | $15 | $83 | $103 | $117 | $121 | $111 |
| Interest | | | | -- | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Fees & Expenses | | | | -- | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Borrowings / (Repayments) | | | | 15 | 68 | 21 | 14 | 4 | (10) | 7 |
| Ending Revolver Balance | | | | 15 | 83 | 103 | 117 | 121 | 111 | 118 |
| Accrued Interest and Fees | | | | -- | 0.0 | 0.1 | 0.2 | 0.3 | 0.4 | 0.4 |
| | | | | | | | | | | |
| Term Loan Balance (c) | | | | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Interest | | | | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Accrued Interest | | | | 0.2 | 0.4 | 0.7 | 0.9 | 1.1 | 1.3 | 1.5 |
| | | | | | | | | | | |
| Beginning Availability (c) | | | | -- | 135 | 67 | 47 | 33 | 149 | 159 |
| (Borrowings) / Repayments | | | | (15) | (68) | (21) | (12) | (4) | 10 | (7) |
| LCs (Issued) / Retired | | | | -- | -- | -- | (2) | -- | -- | -- |
| Draw to fund foreign operations | | | | -- | -- | -- | -- | -- | -- | -- |
| Plus: New availability | | | | 150 | -- | -- | -- | 120 | -- | -- |
| Ending Availability | | | | 135 | 67 | 47 | 33 | 149 | 159 | 152 |

**Notes**
(a) Excludes activity of non-Debtor MPM AR LLC, a domestic entity with minimal associated activity.
(b) All borrowings in week of 4/4/14 assumed to occur prior to March EOM.
(c) Placeholder amount. Ultimate terms of DIP financing arrangement to determined.

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

**Project Eagle - Extended Cash Flow Model (Proposed Debtor Entities Only) (a)**
**BK Overlay**
*Updated as of 03/24/2014*

| (in millions of USD) | 5/30/14 | 6/6/14 | 6/13/14 | 6/20/14 | 6/27/14 | 7/4/14 | 7/11/14 | 7/18/14 | 7/25/14 | 8/1/14 |
|---|---|---|---|---|---|---|---|---|---|---|
| Week | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| **Cash Flow Summary** | | | | | | | | | | |
| Trade Receivable Collections | $15 | $15 | $18 | $16 | $15 | $11 | $17 | $15 | $15 | $17 |
| Intercompany Receipts | -- | -- | 22 | -- | -- | -- | -- | 23 | -- | -- |
| Other Receipts | -- | -- | 2 | -- | -- | -- | -- | -- | -- | -- |
| **Total Operating Receipts** | **15** | **15** | **42** | **16** | **15** | **11** | **17** | **38** | **15** | **17** |
| | | | | | | | | | | |
| Vendor Payments | (13) | (7) | (9) | (8) | (11) | (10) | (9) | (11) | (11) | (6) |
| Payroll & Benefits | (4) | (7) | (4) | (7) | (7) | (3) | (6) | (3) | (6) | (4) |
| Utilities | -- | -- | (3) | -- | -- | -- | -- | (4) | -- | -- |
| Insurance | (1) | -- | -- | -- | -- | -- | -- | -- | (1) | -- |
| Intercompany Disbursements | -- | -- | (4) | -- | -- | -- | -- | (4) | -- | -- |
| Shared Service Payments to MSC | -- | -- | -- | (3) | -- | -- | -- | -- | -- | -- |
| Other Disbursements | -- | -- | (3) | -- | -- | -- | -- | -- | (3) | -- |
| **Total Operating Disbursements** | **(18)** | **(13)** | **(22)** | **(18)** | **(18)** | **(14)** | **(14)** | **(22)** | **(23)** | **(10)** |
| | | | | | | | | | | |
| **Operating Cash Flow** | **(3)** | **2** | **20** | **(2)** | **(3)** | **(2)** | **3** | **16** | **(8)** | **7** |
| | | | | | | | | | | |
| Capital Expenditures | (1) | (1) | (1) | (2) | (2) | (2) | (2) | (2) | (2) | (2) |
| Debt Svc. (Payments) / Proceeds | -- | -- | -- | -- | -- | -- | (1) | -- | -- | -- |
| Inter-Co Financing Receipts | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Inter-Co Financing Disbursements | -- | -- | -- | (8) | -- | -- | -- | (7) | -- | -- |
| Other | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Investing & Financing Activities** | **(1)** | **(1)** | **(1)** | **(10)** | **(2)** | **(2)** | **(2)** | **(9)** | **(2)** | **(2)** |
| | | | | | | | | | | |
| **Net Cash Flow before Restr. Disb.** | **(4)** | **0** | **19** | **(11)** | **(4)** | **(4)** | **1** | **7** | **(9)** | **5** |
| | | | | | | | | | | |
| Restructuring Disbursements | | | | | | | | | | |
| Professional Fees | -- | (3) | -- | (0) | (1) | -- | (3) | -- | (0) | -- |
| DIP Interest, Fees & Expenses | -- | (2) | -- | -- | -- | (1) | -- | -- | -- | (1) |
| Other | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Restructuring Disbursements** | **--** | **(5)** | **--** | **(0)** | **(1)** | **(1)** | **(3)** | **--** | **(0)** | **(1)** |
| | | | | | | | | | | |
| **Net Cash Flow** | **($4)** | **($5)** | **$19** | **($12)** | **($5)** | **($5)** | **($2)** | **$7** | **($10)** | **$4** |
| *Cumulative Net Cash Flow* | *(126)* | *(131)* | *(111)* | *(123)* | *(128)* | *(134)* | *(136)* | *(129)* | *(139)* | *(135)* |
| **Liquidity Summary** | | | | | | | | | | |
| **Opening Bank Cash Balance** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** |
| Adj. for Estimated Check Float | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LCs Cash Collateralized | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Net Cash Flow | (4) | (5) | 19 | (12) | (5) | (5) | (2) | 7 | (10) | 4 |
| Net Proceeds from DIP Term Loan | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Repayment of drawn ABL revolver | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Cash collateralization of ABL LCs | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Release of TL proceeds cash coll. LCs | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Revolver Borrowing / (Repayment) (b) | 4 | 5 | (19) | 12 | 5 | 5 | 2 | (9) | 10 | (6) |
| **Ending Book Cash Balance** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** |
| Less: Restricted Cash | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Ending Available Book Cash** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** |
| | | | | | | | | | | |
| Beg. Availability of Pre-Petition Revolvers | | | | | | | | | | |
| Plus: Avail. Increase From LC Replacement | | | | | | | | | | |
| (Borrowings) / Repayments (b) | | | | | | | | | | |
| **Ending Pre-Pet. Revolvers Avail.** | | | | | | | | | | |
| Ending Pre-Pet. Cash Flow Rev. Balance | | | | | | | | | | |
| | | | | | | | | | | |
| Beg. Avail. Under DIP Credit Facility | 152 | 148 | 143 | 162 | 150 | 145 | 139 | 137 | 144 | 135 |
| New Availability / (Issuance of LCs) | -- | -- | -- | -- | -- | -- | -- | (2) | -- | (3) |
| Draw to fund foreign operations | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| (Borrowings) / Repayments | (4) | (5) | 19 | (12) | (5) | (5) | (2) | 9 | (10) | 6 |
| **Ending DIP Availability** | **148** | **143** | **162** | **150** | **145** | **139** | **137** | **144** | **135** | **138** |
| | | | | | | | | | | |
| **Total Liquidity** | **$173** | **$168** | **$187** | **$175** | **$170** | **$164** | **$162** | **$169** | **$160** | **$163** |
| **DIP Schedule** | | | | | | | | | | |
| **DIP Credit Facility and Interest Calculation** | | | | | | | | | | |
| **Beginning Revolver Balance** | $118 | $122 | $127 | $108 | $120 | $125 | $131 | $133 | $124 | $135 |
| Interest | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Fees & Expenses | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Borrowings / (Repayments) | 4 | 5 | (19) | 12 | 5 | 5 | 2 | (9) | 10 | (6) |
| **Ending Revolver Balance** | **122** | **127** | **108** | **120** | **125** | **131** | **133** | **124** | **135** | **129** |
| Accrued Interest and Fees | 0.6 | 0.1 | 0.2 | 0.3 | 0.4 | 0.1 | 0.2 | 0.3 | 0.4 | 0.1 |
| | | | | | | | | | | |
| **Term Loan Balance (c)** | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Interest | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| **Accrued Interest** | **1.8** | **0.2** | **0.4** | **0.7** | **0.9** | **0.2** | **0.4** | **0.7** | **0.9** | **0.2** |
| | | | | | | | | | | |
| **Beginning Availability (c)** | 152 | 148 | 143 | 162 | 150 | 145 | 139 | 137 | 146 | 135 |
| (Borrowings) / Repayments | (4) | (5) | 19 | (12) | (5) | (5) | (2) | 9 | (10) | 6 |
| LCs (Issued) / Retired | -- | -- | -- | -- | -- | -- | -- | (2) | -- | -- |
| Draw to fund foreign operations | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Plus: New availability | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Ending Availability** | **148** | **143** | **162** | **150** | **145** | **139** | **137** | **146** | **135** | **141** |

**Notes**
(a) Excludes activity of non-Debtor MPM AR LLC, a domestic entity with minimal associated activity.
(b) All borrowings in week of 4/4/14 assumed to occur prior to March EOM.
(c) Placeholder amount. Ultimate terms of DIP financing arrangement to determined.

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

**Project Eagle - Extended Cash Flow Model (Proposed Debtor Entities Only) (a)**
**BK Overlay**
*Updated as of 03/24/2014*

| *(in millions of USD)* | 8/8/14 | 8/15/14 | 8/22/14 | 8/29/14 | 9/5/14 | 9/12/14 | 9/19/14 | 9/26/14 | 10/3/14 | 10/10/14 |
|---|---|---|---|---|---|---|---|---|---|---|
| Week | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 |
| **Cash Flow Summary** | | | | | | | | | | |
| Trade Receivable Collections | $17 | $17 | $18 | $18 | $18 | $18 | $20 | $19 | $11 | $17 |
| Intercompany Receipts | -- | 23 | -- | -- | -- | 23 | -- | -- | -- | -- |
| Other Receipts | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Operating Receipts** | 17 | 39 | 18 | 18 | 18 | 41 | 20 | 19 | 11 | 17 |
| | | | | | | | | | | |
| Vendor Payments | (11) | (5) | (6) | (13) | (6) | (9) | (6) | (10) | (11) | (9) |
| Payroll & Benefits | (6) | (3) | (6) | (4) | (6) | (4) | (6) | (9) | (9) | (6) |
| Utilities | -- | (4) | -- | -- | -- | -- | -- | -- | -- | -- |
| Insurance | -- | -- | (1) | -- | -- | -- | -- | (1) | -- | -- |
| Intercompany Disbursements | -- | (4) | -- | -- | -- | (4) | -- | -- | -- | -- |
| Shared Service Payments to MSC | -- | -- | (3) | -- | -- | -- | (3) | -- | -- | -- |
| Other Disbursements | -- | -- | (1) | -- | -- | (3) | -- | -- | -- | -- |
| **Total Operating Disbursements** | (17) | (16) | (16) | (17) | (12) | (22) | (15) | (20) | (19) | (15) |
| | | | | | | | | | | |
| **Operating Cash Flow** | (0) | 24 | 3 | 2 | 6 | 18 | 5 | (2) | (8) | 3 |
| | | | | | | | | | | |
| Capital Expenditures | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (1) | (1) |
| Debt Svc. (Payments) / Proceeds | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Inter-Co Financing Receipts | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Inter-Co Financing Disbursements | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Other | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Investing & Financing Activities** | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (1) | (1) |
| | | | | | | | | | | |
| **Net Cash Flow before Restr. Disb.** | (2) | 22 | 1 | (0) | 4 | 17 | 3 | (3) | (9) | 1 |
| | | | | | | | | | | |
| Restructuring Disbursements | | | | | | | | | | |
| Professional Fees | (3) | -- | (0) | -- | (3) | -- | -- | (1) | -- | (3) |
| DIP Interest, Fees & Expenses | -- | -- | -- | (2) | -- | -- | -- | (1) | (1) | -- |
| Other | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Restructuring Disbursements** | (3) | -- | (0) | -- | (4) | -- | -- | (1) | (1) | (3) |
| | | | | | | | | | | |
| **Net Cash Flow** | ($5) | $22 | $1 | ($0) | $0 | $17 | $3 | ($5) | ($11) | ($1) |
| *Cumulative Net Cash Flow* | *(140)* | *(118)* | *(117)* | *(118)* | *(118)* | *(101)* | *(98)* | *(103)* | *(113)* | *(115)* |
| | | | | | | | | | | |
| **Liquidity Summary** | | | | | | | | | | |
| **Opening Bank Cash Balance** | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 |
| Adj. for Estimated Check Float | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LCs Cash Collateralized | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Net Cash Flow | (5) | 22 | 1 | (0) | 0 | 17 | 3 | (5) | (11) | (1) |
| Net Proceeds from DIP Term Loan | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Repayment of drawn ABL revolver | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Cash collateralization of ABL LCs | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Release of TL proceeds cash coll. LCs | -- | -- | -- | -- | -- | 1 | -- | 10 | -- | -- |
| Revolver Borrowing / (Repayment) (b) | 5 | (22) | (1) | 0 | (1) | (17) | (13) | 5 | 11 | 1 |
| **Ending Book Cash Balance** | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Less: Restricted Cash | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Ending Available Book Cash** | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| | | | | | | | | | | |
| Beg. Availability of Pre-Petition Revolvers | | | | | | | | | | |
| Plus: Avail. Increase From LC Replacement | | | | | | | | | | |
| (Borrowings) / Repayments (b) | | | | | | | | | | |
| **Ending Pre-Pet. Revolvers Avail.** | | | | | | | | | | |
| Ending Pre-Pet. Cash Flow Rev. Balance | | | | | | | | | | |
| | | | | | | | | | | |
| Beg. Avail. Under DIP Credit Facility | 138 | 133 | 156 | -- | -- | 156 | 156 | 173 | 176 | 171 | 161 |
| New Availability / (Issuance of LCs) | -- | -- | -- | (1) | -- | (10) | -- | -- | -- | -- |
| Draw to fund foreign operations | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| (Borrowings) / Repayments | (5) | 22 | 1 | (0) | 1 | 17 | 13 | (5) | (11) | (1) |
| **Ending DIP Availability** | 133 | 156 | 156 | 156 | 156 | 173 | 176 | 171 | 161 | 159 |
| | | | | | | | | | | |
| **Total Liquidity** | $158 | $181 | $181 | $181 | $181 | $198 | $201 | $196 | $186 | $184 |
| | | | | | | | | | | |
| **DIP Schedule** | | | | | | | | | | |
| **DIP Credit Facility and Interest Calculation** | | | | | | | | | | |
| **Beginning Revolver Balance** | $129 | $137 | $114 | $114 | $114 | $113 | $97 | $84 | $99 | $109 |
| Interest | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Fees & Expenses | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Borrowings / (Repayments) | 7 | (22) | (1) | 0 | (1) | (16) | (13) | 14 | 11 | 1 |
| **Ending Revolver Balance** | 137 | 114 | 114 | 114 | 113 | 97 | 84 | 99 | 109 | 111 |
| **Accrued Interest and Fees** | 0.2 | 0.3 | 0.4 | 0.5 | 0.1 | 0.2 | 0.3 | 0.3 | 0.1 | 0.2 |
| | | | | | | | | | | |
| **Term Loan Balance (c)** | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Interest | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| **Accrued Interest** | 0.4 | 0.7 | 0.9 | 1.1 | 0.2 | 0.4 | 0.7 | 0.9 | 0.2 | 0.4 |
| | | | | | | | | | | |
| **Beginning Availability (c)** | 141 | 133 | 156 | 156 | 156 | 157 | 173 | 186 | 171 | 161 |
| (Borrowings) / Repayments | (5) | 22 | 1 | (0) | 1 | 17 | 13 | (5) | (11) | (1) |
| LCs (Issued) / Retired | (3) | -- | -- | -- | -- | (1) | -- | (10) | -- | -- |
| Draw to fund foreign operations | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Plus: New availability | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Ending Availability** | 133 | 156 | 156 | 156 | 157 | 173 | 186 | 171 | 161 | 159 |

Notes
(a) Excludes activity of non-Debtor MPM AR LLC, a domestic entity with minimal associated activity.
(b) All borrowings in week of 4/4/14 assumed to occur prior to March EOM.
(c) Placeholder amount. Ultimate terms of DIP financing arrangement to determined.

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

**Project Eagle - Extended Cash Flow Model (Proposed Debtor Entities Only) (a)**
**BK Overlay**

*Updated as of 03/24/2014*

| | | | | | For Week Ending | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *(in millions of USD)* | 10/17/14 | 10/24/14 | 10/31/14 | 11/7/14 | 11/14/14 | 11/21/14 | 11/28/14 | 12/5/14 | 12/12/14 | 12/19/14 |
| Week | *35* | *36* | *37* | *38* | *39* | *40* | *41* | *42* | *43* | *44* |
| **Cash Flow Summary** | | | | | | | | | | |
| Trade Receivable Collections | $15 | $15 | $17 | $17 | $17 | $18 | $18 | $18 | $18 | $20 |
| Intercompany Receipts | 23 | -- | -- | -- | 23 | -- | -- | -- | 23 | -- |
| Other Receipts | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Operating Receipts** | **38** | **15** | **17** | **17** | **40** | **18** | **18** | **18** | **41** | **20** |
| | | | | | | | | | | |
| Vendor Payments | (11) | (11) | (7) | (11) | (9) | (11) | (14) | (7) | (10) | (9) |
| Payroll & Benefits | (3) | (6) | (6) | (6) | (3) | (6) | (4) | (6) | (4) | (6) |
| Utilities | (4) | -- | -- | -- | (4) | -- | -- | -- | (4) | -- |
| Insurance | -- | (1) | -- | -- | -- | (1) | -- | -- | -- | -- |
| Intercompany Disbursements | (4) | -- | -- | -- | (4) | -- | -- | -- | (4) | -- |
| Shared Service Payments to MSC | -- | (3) | -- | -- | -- | (3) | -- | -- | -- | (3) |
| Other Disbursements | -- | (3) | -- | -- | -- | (1) | -- | -- | -- | (1) |
| **Total Operating Disbursements** | **(22)** | **(22)** | **(13)** | **(17)** | **(20)** | **(21)** | **(18)** | **(14)** | **(24)** | **(17)** |
| | | | | | | | | | | |
| **Operating Cash Flow** | **16** | **(7)** | **4** | **(0)** | **20** | **(2)** | **0** | **5** | **17** | **2** |
| | | | | | | | | | | |
| Capital Expenditures | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |
| Debt Svc. (Payments) / Proceeds | (62) | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Inter-Co Financing Receipts | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Inter-Co Financing Disbursements | (1) | -- | -- | -- | -- | -- | -- | -- | -- | (3) |
| Other | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Investing & Financing Activities** | **(65)** | **(1)** | **(1)** | **(1)** | **(1)** | **(1)** | **(1)** | **(1)** | **(1)** | **(4)** |
| | | | | | | | | | | |
| **Net Cash Flow before Restr. Disb.** | **(49)** | **(9)** | **2** | **(2)** | **18** | **(4)** | **(1)** | **3** | **16** | **(1)** |
| | | | | | | | | | | |
| Restructuring Disbursements | | | | | | | | | | |
| Professional Fees | -- | (0) | -- | (3) | -- | -- | (0) | -- | (3) | -- |
| DIP Interest, Fees & Expenses | -- | -- | -- | (2) | -- | -- | -- | (1) | -- | -- |
| Other | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Restructuring Disbursements** | **--** | **(0)** | **--** | **(4)** | **--** | **--** | **(0)** | **(1)** | **(3)** | **--** |
| | | | | | | | | | | |
| **Net Cash Flow** | **($49)** | **($9)** | **$2** | **($6)** | **$18** | **($4)** | **($2)** | **$2** | **$13** | **($1)** |
| *Cumulative Net Cash Flow* | *(163)* | *(172)* | *(170)* | *(176)* | *(157)* | *(161)* | *(163)* | *(161)* | *(147)* | *(149)* |
| | | | | | | | | | | |
| **Liquidity Summary** | | | | | | | | | | |
| Opening Bank Cash Balance | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 | $25 |
| Adj. for Estimated Check Float | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LCs Cash Collateralized | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Net Cash Flow | (49) | (9) | 2 | (6) | 18 | (4) | (2) | 2 | 13 | (1) |
| Net Proceeds from DIP Term Loan | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Repayment of drawn ABL revolver | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Cash collateralization of ABL LCs | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Release of TL proceeds cash coll. LCs | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Revolver Borrowing / (Repayment) (b) | 49 | 9 | (2) | 6 | (18) | 4 | 2 | (6) | (13) | (1) |
| **Ending Book Cash Balance** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** |
| Less: Restricted Cash | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Ending Available Book Cash** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** |
| | | | | | | | | | | |
| Beg. Availability of Pre-Petition Revolvers | | | | | | | | | | |
| Plus: Avail. Increase From LC Replacement | | | | | | | | | | |
| (Borrowings) / Repayments (b) | | | | | | | | | | |
| **Ending Pre-Pet. Revolvers Avail.** | | | | | | | | | | |
| Ending Pre-Pet. Cash Flow Rev. Balance | | | | | | | | | | |
| | | | | | | | | | | |
| Beg. Avail. Under DIP Credit Facility | 159 | 111 | 102 | 104 | 98 | 116 | 113 | 111 | 113 | 127 |
| New Availability / (Issuance of LCs) | -- | -- | -- | -- | -- | -- | -- | (4) | -- | (2) |
| Draw to fund foreign operations | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| (Borrowings) / Repayments | (49) | (9) | 2 | (6) | 18 | (4) | (2) | 6 | 13 | 1 |
| **Ending DIP Availability** | **111** | **102** | **104** | **98** | **116** | **113** | **111** | **113** | **127** | **126** |
| | | | | | | | | | | |
| **Total Liquidity** | **$136** | **$127** | **$129** | **$123** | **$141** | **$138** | **$136** | **$138** | **$152** | **$151** |
| | | | | | | | | | | |
| **DIP Schedule** | | | | | | | | | | |
| **DIP Credit Facility and Interest Calculation** | | | | | | | | | | |
| **Beginning Revolver Balance** | $111 | $159 | $168 | $166 | $172 | $154 | $157 | $159 | $152 | $143 |
| Interest | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Fees & Expenses | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Borrowings / (Repayments) | 49 | 9 | (2) | 6 | (18) | 4 | 2 | (6) | (9) | (1) |
| **Ending Revolver Balance** | **159** | **168** | **166** | **172** | **154** | **157** | **159** | **152** | **143** | **142** |
| **Accrued Interest and Fees** | **0.3** | **0.4** | **0.5** | **0.1** | **0.3** | **0.4** | **0.5** | **0.1** | **0.2** | **0.4** |
| | | | | | | | | | | |
| **Term Loan Balance (c)** | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Interest | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| **Accrued Interest** | **0.7** | **0.9** | **1.1** | **0.2** | **0.4** | **0.7** | **0.9** | **0.2** | **0.4** | **0.7** |
| | | | | | | | | | | |
| **Beginning Availability (c)** | 159 | 111 | 102 | 104 | 98 | 116 | 113 | 111 | 118 | 127 |
| (Borrowings) / Repayments | (49) | (9) | 2 | (6) | 18 | (4) | (2) | 6 | 13 | 1 |
| LCs (Issued) / Retired | -- | -- | -- | -- | -- | -- | -- | (4) | -- | -- |
| Draw to fund foreign operations | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Plus: New availability | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Ending Availability** | **111** | **102** | **104** | **98** | **116** | **113** | **111** | **118** | **127** | **128** |

**Notes**
(a) Excludes activity of non-Debtor MPM AR LLC, a domestic entity with minimal associated activity.
(b) All borrowings in week of 4/4/14 assumed to occur prior to March EOM.
(c) Placeholder amount. Ultimate terms of DIP financing arrangement to determined.

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

**Project Eagle - Extended Cash Flow Model (Proposed Debtor Entities Only) (a)**
**BK Overlay**
*Updated as of 03/24/2014*

| (in millions of USD) | 12/26/14 | 1/2/15 | 1/9/15 | 1/16/15 | 1/23/15 | 1/30/15 | 2/6/15 | 2/13/15 | 2/20/15 | 2/27/15 |
|---|---|---|---|---|---|---|---|---|---|---|
| Week | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | 53 | 54 |
| **Cash Flow Summary** | | | | | | | | | | |
| Trade Receivable Collections | $19 | $11 | $17 | $15 | $15 | $17 | $17 | $17 | $18 | $18 |
| Intercompany Receipts | -- | -- | -- | 23 | -- | -- | -- | 23 | -- | -- |
| Other Receipts | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Operating Receipts** | **19** | **11** | **17** | **37** | **15** | **17** | **17** | **39** | **18** | **18** |
| | | | | | | | | | | |
| Vendor Payments | (13) | (12) | (10) | (13) | (12) | (8) | (13) | (10) | (12) | (15) |
| Payroll & Benefits | (4) | (3) | (6) | (3) | (6) | (6) | (6) | (6) | (6) | (4) |
| Utilities | -- | -- | -- | (4) | -- | -- | -- | (4) | -- | -- |
| Insurance | (1) | -- | -- | -- | (1) | -- | -- | (1) | -- | -- |
| Intercompany Disbursements | -- | -- | -- | (4) | -- | -- | -- | (4) | -- | -- |
| Shared Service Payments to MSC | -- | -- | -- | -- | (3) | -- | -- | (3) | -- | -- |
| Other Disbursements | -- | -- | -- | -- | (1) | -- | -- | (1) | -- | -- |
| **Total Operating Disbursements** | **(17)** | **(15)** | **(16)** | **(23)** | **(22)** | **(14)** | **(19)** | **(21)** | **(21)** | **(19)** |
| | | | | | | | | | | |
| **Operating Cash Flow** | **1** | **(4)** | **1** | **14** | **(7)** | **2** | **(2)** | **18** | **(3)** | **(1)** |
| | | | | | | | | | | |
| Capital Expenditures | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |
| Debt Svc. (Payments) / Proceeds | -- | -- | -- | (1) | -- | -- | -- | -- | -- | -- |
| Inter-Co Financing Receipts | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Inter-Co Financing Disbursements | -- | -- | -- | (4) | -- | -- | -- | (1) | -- | -- |
| Other | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Investing & Financing Activities** | **(1)** | **(1)** | **(1)** | **(6)** | **(1)** | **(1)** | **(1)** | **(2)** | **(1)** | **(1)** |
| | | | | | | | | | | |
| **Net Cash Flow before Restr. Disb.** | **(0)** | **(5)** | **(0)** | **8** | **(8)** | **1** | **(3)** | **16** | **(4)** | **(2)** |
| | | | | | | | | | | |
| Restructuring Disbursements | | | | | | | | | | |
| Professional Fees | (1) | -- | (3) | -- | (0) | -- | -- | (3) | -- | (0) |
| DIP Interest, Fees & Expenses | -- | (1) | -- | -- | -- | -- | -- | (2) | -- | -- |
| Other | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Restructuring Disbursements** | **(1)** | **(1)** | **(3)** | **--** | **(0)** | **--** | **--** | **(4)** | **--** | **(0)** |
| | | | | | | | | | | |
| **Net Cash Flow** | **($1)** | **($7)** | **($3)** | **$8** | **($8)** | **$1** | **($7)** | **$16** | **($4)** | **($2)** |
| *Cumulative Net Cash Flow* | *(150)* | *(157)* | *(160)* | *(151)* | *(160)* | *(159)* | *(166)* | *(150)* | *(154)* | *(156)* |

| **Liquidity Summary** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Opening Bank Cash Balance** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** |
| Adj. for Estimated Check Float | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LCs Cash Collateralized | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Net Cash Flow | (1) | (7) | (3) | 8 | (8) | 1 | (7) | 16 | (4) | (2) |
| Net Proceeds from DIP Term Loan | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Repayment of drawn ABL revolver | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Cash collateralization of ABL LCs | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Release of TL proceeds cash coll. LCs | 8 | -- | -- | 3 | -- | -- | -- | -- | 20 | -- |
| Revolver Borrowing / (Repayment) (b) | (7) | (2) | 3 | (12) | 8 | (1) | 7 | (16) | (16) | 2 |
| **Ending Book Cash Balance** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** |
| Less: Restricted Cash | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Ending Available Book Cash** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** |
| | | | | | | | | | | |
| Beg. Availability of Pre-Petition Revolvers | | | | | | | | | | |
| Plus: Avail. Increase From LC Replacement | | | | | | | | | | |
| (Borrowings) / Repayments (b) | | | | | | | | | | |
| **Ending Pre-Pet. Revolvers Avail.** | | | | | | | | | | |
| **Ending Pre-Pet. Cash Flow Rev. Balance** | | | | | | | | | | |
| | | | | | | | | | | |
| Beg. Avail. Under DIP Credit Facility | 126 | 125 | 118 | 116 | 124 | 115 | 117 | 109 | 125 | 122 |
| New Availability / (Issuance of LCs) | (8) | (9) | -- | (3) | -- | -- | -- | -- | (19) | -- |
| Draw to fund foreign operations | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| (Borrowings) / Repayments | 7 | 2 | (3) | 12 | (8) | 1 | (7) | 16 | 16 | (2) |
| **Ending DIP Availability** | **125** | **118** | **116** | **124** | **115** | **117** | **109** | **125** | **122** | **120** |
| | | | | | | | | | | |
| **Total Liquidity** | **$150** | **$143** | **$141** | **$149** | **$140** | **$142** | **$134** | **$150** | **$147** | **$145** |

| **DIP Schedule** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **DIP Credit Facility and Interest Calculation** | | | | | | | | | | |
| **Beginning Revolver Balance** | $142 | $137 | $143 | $154 | $143 | $155 | $153 | $161 | $145 | $129 |
| Interest | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Fees & Expenses | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Borrowings / (Repayments) | (5) | 6 | 11 | (12) | 12 | (1) | 7 | (16) | (16) | 21 |
| **Ending Revolver Balance** | **137** | **143** | **154** | **143** | **155** | **153** | **161** | **145** | **129** | **150** |
| **Accrued Interest and Fees** | **0.5** | **0.1** | **0.2** | **0.3** | **0.5** | **0.6** | **0.1** | **0.2** | **0.4** | **0.5** |
| | | | | | | | | | | |
| **Term Loan Balance (c)** | **250** | **250** | **250** | **250** | **250** | **250** | **250** | **250** | **250** | **250** |
| Interest | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| **Accrued Interest** | **0.9** | **0.2** | **0.4** | **0.7** | **0.9** | **1.1** | **0.2** | **0.4** | **0.7** | **0.9** |
| | | | | | | | | | | |
| **Beginning Availability (c)** | **128** | **133** | **127** | **116** | **127** | **115** | **117** | **109** | **125** | **141** |
| (Borrowings) / Repayments | 7 | 2 | (3) | 12 | (8) | 1 | (7) | 16 | 16 | (2) |
| LCs (Issued) / Retired | (2) | (8) | (9) | -- | (3) | -- | -- | -- | -- | (19) |
| Draw to fund foreign operations | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Plus: New availability | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Ending Availability** | **133** | **127** | **116** | **127** | **115** | **117** | **109** | **125** | **141** | **120** |

**Notes**
(a) Excludes activity of non-Debtor MPM AR LLC, a domestic entity with minimal associated activity.
(b) All borrowings in week of 4/4/14 assumed to occur prior to March EOM.
(c) Placeholder amount. Ultimate terms of DIP financing arrangement to determined.

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

**Project Eagle - Extended Cash Flow Model (Proposed Debtor Entities Only) (a)**
**BK Overlay**
*Updated as of 03/24/2014*

| (in millions of USD) | 3/6/15 | 3/13/15 | 3/20/15 | 3/27/15 | 4/3/15 | 4/10/15 | 4/17/15 | 4/24/15 | 5/1/15 | 5/8/15 |
|---|---|---|---|---|---|---|---|---|---|---|
| Week | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 63 | 64 |
| **Cash Flow Summary** | | | | | | | | | | |
| Trade Receivable Collections | $18 | $18 | $19 | $18 | $11 | $17 | $15 | $15 | $17 | $17 |
| Intercompany Receipts | -- | 23 | -- | -- | -- | -- | 23 | -- | -- | -- |
| Other Receipts | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Operating Receipts** | **18** | **41** | **19** | **18** | **11** | **17** | **38** | **15** | **17** | **17** |
| | | | | | | | | | | |
| Vendor Payments | (8) | (8) | (11) | (13) | (12) | (10) | (12) | (13) | (8) | (13) |
| Payroll & Benefits | (6) | (4) | (6) | (4) | (3) | (6) | (3) | (8) | (4) | (6) |
| Utilities | -- | (4) | -- | -- | -- | -- | (4) | -- | -- | -- |
| Insurance | -- | -- | -- | (1) | -- | -- | -- | (1) | -- | -- |
| Intercompany Disbursements | -- | (4) | -- | -- | -- | -- | (4) | -- | -- | -- |
| Shared Service Payments to MSC | -- | -- | (3) | -- | -- | -- | -- | (3) | -- | -- |
| Other Disbursements | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Operating Disbursements** | **(14)** | **(22)** | **(19)** | **(17)** | **(16)** | **(16)** | **(23)** | **(27)** | **(12)** | **(19)** |
| | | | | | | | | | | |
| **Operating Cash Flow** | **4** | **19** | **(0)** | **1** | **(4)** | **1** | **15** | **(12)** | **5** | **(2)** |
| | | | | | | | | | | |
| Capital Expenditures | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |
| Debt Svc. (Payments) / Proceeds | -- | -- | -- | -- | -- | -- | (62) | -- | -- | -- |
| Inter-Co Financing Receipts | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Inter-Co Financing Disbursements | -- | (5) | -- | -- | -- | -- | (6) | -- | -- | -- |
| Other | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Investing & Financing Activities** | **(1)** | **(5)** | **(1)** | **(1)** | **(1)** | **(1)** | **(69)** | **(1)** | **(1)** | **(1)** |
| | | | | | | | | | | |
| **Net Cash Flow before Restr. Disb.** | **3** | **13** | **(1)** | **(0)** | **(6)** | **(0)** | **(55)** | **(13)** | **4** | **(4)** |
| | | | | | | | | | | |
| Restructuring Disbursements | | | | | | | | | | |
| Professional Fees | -- | (3) | -- | (1) | -- | (3) | -- | (0) | -- | (3) |
| DIP Interest, Fees & Expenses | (1) | -- | -- | (1) | (1) | -- | -- | -- | (1) | -- |
| Other | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Restructuring Disbursements** | **(1)** | **(3)** | **--** | **(1)** | **(1)** | **(3)** | **--** | **(0)** | **(1)** | **(3)** |
| | | | | | | | | | | |
| **Net Cash Flow** | **$2** | **$10** | **($1)** | **($1)** | **($7)** | **($3)** | **($55)** | **($14)** | **$2** | **($6)** |
| *Cumulative Net Cash Flow* | *(155)* | *(144)* | *(145)* | *(147)* | *(154)* | *(157)* | *(211)* | *(225)* | *(223)* | *(229)* |
| | | | | | | | | | | |
| **Liquidity Summary** | | | | | | | | | | |
| **Opening Bank Cash Balance** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** |
| Adj. for Estimated Check Float | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LCs Cash Collateralized | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Net Cash Flow | 2 | 10 | (1) | (1) | (7) | (3) | (55) | (14) | 2 | (6) |
| Net Proceeds from DIP Term Loan | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Repayment of drawn ABL revolver | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Cash collateralization of ABL LCs | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Release of TL proceeds cash coll. LCs | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Revolver Borrowing / (Repayment) (b) | (2) | (10) | 1 | 1 | 7 | 3 | 55 | 14 | (2) | 6 |
| **Ending Book Cash Balance** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** |
| Less: Restricted Cash | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Ending Available Book Cash** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** |
| | | | | | | | | | | |
| Beg. Availability of Pre-Petition Revolvers | | | | | | | | | | |
| Plus: Avail. Increase From LC Replacement | | | | | | | | | | |
| (Borrowings) / Repayments (b) | | | | | | | | | | |
| **Ending Pre-Pet. Revolvers Avail.** | | | | | | | | | | |
| Ending Pre-Pet. Cash Flow Rev. Balance | | | | | | | | | | |
| | | | | | | | | | | |
| Beg. Avail. Under DIP Credit Facility | 120 | 122 | 132 | 131 | 130 | 123 | 119 | 65 | 51 | 53 |
| New Availability / (Issuance of LCs) | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Draw to fund foreign operations | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| (Borrowings) / Repayments | 2 | 10 | (1) | (1) | (7) | (3) | (55) | (14) | 2 | (6) |
| **Ending DIP Availability** | **122** | **132** | **131** | **130** | **123** | **119** | **65** | **51** | **53** | **47** |
| | | | | | | | | | | |
| **Total Liquidity** | **$147** | **$157** | **$156** | **$155** | **$148** | **$144** | **$90** | **$76** | **$78** | **$72** |
| | | | | | | | | | | |
| **DIP Schedule** | | | | | | | | | | |
| **DIP Credit Facility and Interest Calculation** | | | | | | | | | | |
| **Beginning Revolver Balance** | **$150** | **$148** | **$138** | **$139** | **$140** | **$147** | **$151** | **$205** | **$219** | **$217** |
| Interest | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 |
| Fees & Expenses | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Borrowings / (Repayments) | (2) | (10) | 1 | 1 | 7 | 3 | 55 | 14 | (2) | 6 |
| **Ending Revolver Balance** | **148** | **138** | **139** | **140** | **147** | **151** | **205** | **219** | **217** | **223** |
| **Accrued Interest and Fees** | **0.1** | **0.2** | **0.3** | **0.5** | **0.1** | **0.2** | **0.3** | **0.5** | **0.2** | **0.3** |
| | | | | | | | | | | |
| **Term Loan Balance (c)** | **250** | **250** | **250** | **250** | **250** | **250** | **250** | **250** | **250** | **250** |
| Interest | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| **Accrued Interest** | **0.2** | **0.4** | **0.7** | **0.9** | **0.2** | **0.4** | **0.7** | **0.9** | **0.2** | **0.4** |
| | | | | | | | | | | |
| **Beginning Availability (c)** | **120** | **122** | **132** | **131** | **130** | **123** | **119** | **65** | **51** | **53** |
| (Borrowings) / Repayments | 2 | 10 | (1) | (1) | (7) | (3) | (55) | (14) | 2 | (6) |
| LCs (Issued) / Retired | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Draw to fund foreign operations | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Plus: New availability | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Ending Availability** | **122** | **132** | **131** | **130** | **123** | **119** | **65** | **51** | **53** | **47** |

**Notes**
(a) Excludes activity of non-Debtor MPM AR LLC, a domestic entity with minimal associated activity.
(b) All borrowings in week of 4/4/14 assumed to occur prior to March EOM.
(c) Placeholder amount. Ultimate terms of DIP financing arrangement to determined.

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

**Project Eagle - Extended Cash Flow Model (Proposed Debtor Entities Only) (a)**          SUBJECT TO MATERIAL CHANGE
**BK Overlay**
*Updated as of 03/24/2014*

| (in millions of USD) | 5/15/15 | 5/22/15 | 5/29/15 | 6/5/15 | 6/12/15 | 6/19/15 | 6/26/15 | Pd. Total |
|---|---|---|---|---|---|---|---|---|
| Week | 65 | 66 | 67 | 68 | 69 | 70 | 71 | |
| **Cash Flow Summary** | | | | | | | | |
| Trade Receivable Collections | $17 | $18 | $18 | $18 | $18 | $20 | $19 | $1,097 |
| Intercompany Receipts | 23 | -- | -- | -- | 23 | -- | -- | 342 |
| Other Receipts | -- | -- | -- | -- | -- | -- | -- | 2 |
| **Total Operating Receipts** | **39** | **18** | **18** | **18** | **41** | **20** | **19** | **1,441** |
| | | | | | | | | |
| Vendor Payments | (10) | (12) | (15) | (8) | (8) | (11) | (13) | (704) |
| Payroll & Benefits | (3) | (6) | (4) | (6) | (4) | (6) | (4) | (354) |
| Utilities | (4) | -- | -- | -- | -- | -- | -- | (60) |
| Insurance | -- | (1) | -- | -- | -- | -- | (1) | (10) |
| Intercompany Disbursements | (4) | -- | -- | -- | (4) | -- | -- | (56) |
| Shared Service Payments to MSC | -- | (3) | -- | -- | -- | (3) | -- | (44) |
| Other Disbursements | -- | (3) | -- | -- | (3) | -- | -- | (38) |
| **Total Operating Disbursements** | **(21)** | **(23)** | **(19)** | **(14)** | **(22)** | **(19)** | **(17)** | **(1,266)** |
| | | | | | | | | |
| **Operating Cash Flow** | **18** | **(5)** | **(0)** | **4** | **19** | **0** | **1** | **175** |
| | | | | | | | | |
| Capital Expenditures | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (88) |
| Debt Svc. (Payments) / Proceeds | -- | -- | -- | -- | -- | -- | -- | (189) |
| Inter-Co Financing Receipts | -- | -- | -- | -- | -- | -- | -- | 10 |
| Inter-Co Financing Disbursements | (3) | -- | -- | -- | (4) | -- | -- | (54) |
| Other | -- | -- | -- | -- | -- | -- | -- | 15 |
| **Total Investing & Financing Activities** | **(4)** | **(1)** | **(1)** | **(1)** | **(6)** | **(1)** | **(1)** | **(305)** |
| | | | | | | | | |
| **Net Cash Flow before Restr. Disb.** | **14** | **(6)** | **(2)** | **3** | **13** | **(1)** | **(0)** | **(130)** |
| | | | | | | | | |
| Restructuring Disbursements | | | | | | | | |
| Professional Fees | -- | (0) | -- | (3) | -- | (0) | (4) | (56) |
| DIP Interest, Fees & Expenses | -- | -- | -- | (2) | -- | -- | -- | (30) |
| Other | -- | -- | -- | -- | -- | -- | -- | (2) |
| **Total Restructuring Disbursements** | **--** | **(0)** | **--** | **(4)** | **--** | **(0)** | **(4)** | **(88)** |
| | | | | | | | | |
| **Net Cash Flow** | **$14** | **($7)** | **($2)** | **($1)** | **$13** | **($2)** | **($4)** | **($218)** |
| *Cumulative Net Cash Flow* | *(215)* | *(222)* | *(224)* | *(225)* | *(212)* | *(214)* | *(218)* | *(218)* |
| | | | | | | | | |
| **Liquidity Summary** | | | | | | | | |
| **Opening Bank Cash Balance** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** | **$25** | **$10** |
| Adj. for Estimated Check Float | -- | -- | -- | -- | -- | -- | -- | (2) |
| LCs Cash Collateralized | -- | -- | -- | -- | -- | -- | -- | -- |
| Net Cash Flow | 14 | (7) | (2) | (1) | 13 | (2) | (4) | (218) |
| Net Proceeds from DIP Term Loan | -- | -- | -- | -- | -- | -- | -- | 250 |
| Repayment of drawn ABL revolver | -- | -- | -- | -- | -- | -- | -- | (168) |
| Cash collateralization of ABL LCs | -- | -- | -- | -- | -- | -- | -- | (72) |
| Release of T1. proceeds cash coll. LCs | -- | -- | -- | -- | -- | -- | -- | 65 |
| Revolver Borrowing / (Repayment) (b) | (14) | 7 | 2 | 1 | (13) | 2 | 4 | 160 |
| **Ending Book Cash Balance** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** |
| Less: Restricted Cash | -- | -- | -- | -- | -- | -- | -- | -- |
| **Ending Available Book Cash** | **25** | **25** | **25** | **25** | **25** | **25** | **25** | **25** |
| | | | | | | | | |
| Beg. Availability of Pre-Petition Revolvers | | | | | | | | |
| Plus: Avail. Increase From LC Replacement | | | | | | | | |
| (Borrowings) / Repayments (b) | | | | | | | | |
| **Ending Pre-Pet. Revolvers Avail.** | | | | | | | | |
| Ending Pre-Pet. Cash Flow Rev. Balance | | | | | | | | |
| | | | | | | | | |
| Beg. Avail. Under DIP Credit Facility | 47 | 61 | 54 | 52 | 51 | 64 | 62 | -- |
| New Availability / (Issuance of LCs) | -- | -- | -- | -- | -- | -- | -- | 208 |
| Draw to fund foreign operations | -- | -- | -- | -- | -- | -- | -- | -- |
| (Borrowings) / Repayments | 14 | (7) | (2) | (1) | 13 | (2) | (4) | (150) |
| **Ending DIP Availability** | **61** | **54** | **52** | **51** | **64** | **62** | **58** | **58** |
| | | | | | | | | |
| **Total Liquidity** | **$86** | **$79** | **$77** | **$76** | **$89** | **$87** | **$83** | **$83** |
| | | | | | | | | |
| **DIP Schedule** | | | | | | | | |
| **DIP Credit Facility and Interest Calculation** | | | | | | | | |
| **Beginning Revolver Balance** | $223 | $209 | $216 | $218 | $219 | $206 | $208 | $0 |
| Interest | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Fees & Expenses | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Borrowings / (Repayments) | (14) | 7 | 2 | 1 | (13) | 2 | 4 | 212 |
| **Ending Revolver Balance** | 209 | 216 | 218 | 219 | 206 | 208 | 212 | 212 |
| **Accrued Interest and Fees** | 0.5 | 0.6 | 0.8 | 0.2 | 0.3 | 0.5 | 0.6 | 0.6 |
| | | | | | | | | |
| Term Loan Balance (c) | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Interest | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 14.0 |
| **Accrued Interest** | 0.7 | 0.9 | 1.1 | 0.2 | 0.4 | 0.7 | 0.9 | 0.9 |
| | | | | | | | | |
| Beginning Availability (c) | 47 | 61 | 54 | 52 | 51 | 64 | 62 | -- |
| (Borrowings) / Repayments | 14 | (7) | (2) | (1) | 13 | (2) | (4) | (150) |
| LCs (Issued) / Retired | -- | -- | -- | -- | -- | -- | -- | (62) |
| Draw to fund foreign operations | -- | -- | -- | -- | -- | -- | -- | -- |
| Plus: New availability | -- | -- | -- | -- | -- | -- | -- | 270 |
| **Ending Availability** | **61** | **54** | **52** | **51** | **64** | **62** | **58** | **58** |

**Notes**
(a) Excludes activity of non-Debtor MPM AR LLC, a domestic entity with minimal associated activity.
(b) All borrowings in week of 4/4/14 assumed to occur prior to March EOM.
(c) Placeholder amount. Ultimate terms of DIP financing arrangement to determined.

# XV. Operating Model (1.24.2014)

MOMENTIVE™

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

Prepared Under Direction of Counsel
Subject to Substantial Revision
Subject to FRE 408

P&L Summary

($ in millions)

| | FY 2008 | | | | FY 2009 | | | | FY 2010 | | | | FY 2011 | | | | FY 2012 | | | | FY 2013 | | | | FY14E | FY15E | FY16E | FY17E | FY18E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*Revenue*
- Formulated Products
- Additives
- Basics
- Other Revenue
- Misc/non-Admin

*Silicones Revenue*
- % Growth

*Quartz Revenue*
- % Growth

*Silicones Segment EBITDA*
- % Growth
- % Margin

*Quartz Segment EBITDA*
- % Growth
- % Margin

*Total EBITDA*
- % Growth
- % Margin

*Additional P&L Line Items*
- Silicones SG&A
- % of Segment Revenue
- Quartz SG&A
- % of Segment Revenue

Note:
1. Results for Q4 FY2013 reflect actuals, subject to internal reporting and final closing adjustments.

Prepared Under Direction of Counsel
Subject to Substantial Revision
Subject to FRE 408

## Cash Flow Summary

| ($ in millions) | FY-14E | FY-15E | FY-16E | FY-17E | FY-18E |
|---|---|---|---|---|---|
| EBITDA | $260 | $297 | $334 | $343 | $356 |
| Less: Changes in Net Working Capital | (23) | (12) | (13) | (2) | (3) |
| Less: Capital Expenditures | (120) | (125) | (135) | (140) | (145) |
| Less: Cash Taxes | (24) | (24) | (24) | (24) | (24) |
| Less: Other Cash Expenses | (21) | (15) | (15) | (15) | (15) |
| Less: Cash Interest Expense | (299) | (297) | (298) | (300) | (301) |
| **Levered Free Cash Flow** | **(227)** | **(176)** | **(151)** | **(138)** | **(132)** |
| *Cumulative* | *(227)* | *(402)* | *(553)* | *(691)* | *(823)* |
| | | | | | |
| Beginning Cash Balance (excl. Restricted) | $97 | -- | -- | -- | -- |
| Less: Minimum Cash Balance | (100) | (100) | (100) | (100) | (100) |
| Plus: Levered Free Cash Flow | (227) | (176) | (151) | (138) | (132) |
| **Cash Available Before Debt Service** | **($230)** | **($276)** | **($251)** | **($238)** | **($232)** |
| | | | | | |
| Mandatory Amortization / Maturities | (8) | -- | -- | -- | -- |
| Repayment under ABL due to Borrowing Base Adjust. | (8) | -- | -- | -- | -- |
| **Cash Available After Mandatory Debt Service** | **($246)** | **($276)** | **($251)** | **($238)** | **($232)** |
| | | | | | |
| Required Borrowings under ABL Revolver | 32 | -- | -- | -- | -- |
| Required Borrowings under $75mm Cash Flow Revolver | -- | -- | -- | -- | -- |
| Incremental Funding Needs – Overflow Revolver Draws / (Repayments) | 114 | 176 | 151 | 138 | 132 |
| **Cash Available After Required Borrowings** | **($100)** | **($100)** | **($100)** | **($100)** | **($100)** |
| | | | | | |
| Beginning Cash Balance | $97 | -- | -- | -- | -- |
| Change in Cash | (97) | -- | -- | -- | -- |
| **Ending Cash Balance** | **--** | **--** | **--** | **--** | **--** |
| | | | | | |
| **Capital Expenditures** | | | | | |
| Total Capex | $120 | $125 | $135 | $140 | $145 |
| | | | | | |
| **Liquidity Summary** | | | | | |
| Total Cash (including Holdings) | -- | -- | -- | -- | -- |
| Total ABL Facility Size | 270 | 270 | 270 | 270 | 270 |
| Less: Amounts Outstanding | (159) | (159) | (159) | (159) | (159) |
| Less: Borrowing Base Adjustment | -- | -- | -- | -- | -- |
| Less: Letters of Credit Outstanding | (77) | (77) | (77) | (77) | (77) |
| Less: FCCR Reserve | (34) | (34) | (34) | (34) | (34) |
| **Total ABL Availability** | **--** | **--** | **--** | **--** | **--** |
| $75mm Cash Flow Revolver Availability | -- | -- | -- | -- | -- |
| **Total Liquidity** | **--** | **--** | **--** | **--** | **--** |
| *Memo: Liquidity shortfall funded by Overflow Revolver* | *114* | *290* | *441* | *579* | *711* |

Prepared Under Direction of Counsel
Subject to Substantial Revision
Subject to FRE 408

## Debt Schedule[2]

| ($ in millions) | FY-14E | FY-15E | FY-16E | FY-17E | FY-18E |
|---|---|---|---|---|---|
| ABL Revolver | $159 | $159 | $159 | $159 | $159 |
| $575mm Cash Flow Revolver | – | – | – | – | – |
| First Lien Senior Notes (8.875%) | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 |
| Foreign Local Debt | 37 | 37 | 37 | 37 | 37 |
| 1.5 Lien Senior Notes (10.000%) | 250 | 250 | 250 | 250 | 250 |
| Incremental Funding Needs - Overflow Revolver | 114 | 290 | 441 | 579 | 711 |
| **Total First Lien Debt** | **$1,660** | **$1,836** | **$1,987** | **$2,125** | **$2,257** |
| USD Springing Lien Notes (9.000%) | $1,161 | $1,161 | $1,161 | $1,161 | $1,161 |
| EUR Springing Lien Notes (9.500%) | 181 | 181 | 181 | 181 | 181 |
| **Total Second Lien Notes** | **$1,341** | **$1,341** | **$1,341** | **$1,341** | **$1,341** |
| Senior Subordinated Notes (11.500%) | $382 | $382 | $382 | $382 | $382 |
| **Total Subordinated Notes** | **$382** | **$382** | **$382** | **$382** | **$382** |
| HoldCo PIK Notes[1] | 952 | 1,061 | 1,182 | 1,318 | 1,469 |
| **Total Debt** | **$4,335** | **$4,620** | **$4,892** | **$5,166** | **$5,449** |
| Cash (Excl. Restricted) | – | – | – | – | – |
| Net Debt | 4,335 | 4,620 | 4,892 | 5,166 | 5,449 |
| *Credit Statistics* | | | | | |
| LTM EBITDA | $260 | $297 | $334 | $343 | $356 |
| LTM CapEx | 120 | 125 | 135 | 140 | 145 |
| LTM Cash Interest | 299 | 297 | 298 | 300 | 301 |
| *Leverage* | | | | | |
| Cumulative Leverage through First Lien | 6.4x | 6.2x | 5.9x | 6.2x | 6.3x |
| Total Leverage | 16.7x | 15.6x | 14.6x | 15.1x | 15.3x |
| Total Net Leverage | 16.7x | 15.6x | 14.6x | 15.1x | 15.3x |
| *Fixed Charge Coverage* | | | | | |
| EBITDA / Cash Interest | 0.9x | 1.0x | 1.1x | 1.1x | 1.2x |
| (EBITDA – CapEx) / Cash Interest | 0.5x | 0.6x | 0.7x | 0.7x | 0.7x |

Note:
1. HoldCo PIK Notes mature in Q2 FY2017, assumed to roll at maturity for illustrative purposes
2. Debt schedule assumes (i) $575mm Cash Flow Revolver expires in Q4 2014 and (ii) all other maturities roll at existing terms, including Subordinated Notes due 2016, HoldCo PIK Notes due 2017 and ABL Revolver due 2018

Prepared Under Direction of Counsel
Subject to Substantial Revision
Subject to FRE 408

**Historical Levered Free Cash Flow Summary**

| ($ in millions) | FY 2010 Q1 | Q2 | Q3 | Q4 | FY-10 | FY 2011 Q1 | Q2 | Q3 | Q4 | FY-11 | FY 2012 Q1 | Q2 | Q3 | Q4 | FY-12 | FY 2013 Q1 | Q2 | Q3 | Q4[1] | FY-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EBITDA | $119 | $139 | $125 | $109 | $492 | $121 | $126 | $97 | $35 | $379 | $48 | $65 | $51 | $50 | $214 | $68 | $63 | $55 | $54 | $240 |
| Less: Changes in Net Working Capital | (22) | (19) | (7) | 45 | (2) | (91) | 23 | 21 | 48 | 1 | (15) | (6) | 14 | 3 | (4) | (21) | – | (42) | 31 | (32) |
| Less: Capital Expenditures | (11) | (19) | (24) | (41) | (95) | (18) | (27) | (26) | (45) | (116) | (20) | (25) | (24) | (29) | (98) | (12) | (19) | (20) | (41) | (92) |
| Less: Cash Taxes | (1) | (2) | (3) | (2) | (8) | (6) | (5) | (5) | (6) | (22) | (1) | (4) | (7) | (4) | (16) | (1) | (3) | (3) | (6) | (13) |
| Less: Other Cash Expenses | (32) | (8) | 11 | 8 | (21) | 17 | (23) | (33) | (14) | (53) | (12) | (6) | (18) | (17) | (53) | (25) | (12) | (9) | (10) | (56) |
| Less: Cash Interest Expense | (6) | (93) | (9) | (100) | (208) | (30) | (47) | (79) | (47) | (203) | (71) | (66) | (67) | (78) | (282) | (63) | (94) | (66) | (84) | (307) |
| Levered Free Cash Flow | $47 | ($2) | $93 | $19 | $158 | ($7) | $47 | ($25) | ($29) | ($14) | ($71) | ($42) | ($51) | ($75) | ($239) | ($54) | ($65) | ($85) | ($56) | ($260) |
| Cumulative | 47 | 45 | 139 | 158 | 158 | 151 | 198 | 173 | 144 | 144 | 73 | 31 | (20) | (95) | (95) | (149) | (214) | (299) | (355) | (355) |

Notes:
1. Results for Q4 FY2013 reflect actuals, subject to external reporting and final closing adjustments

# XVI. Cash Balance Summary by Region (4.03.2014)

**MOMENTIVE**

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved

WORK IN PROCESS DOCUMENT - SUBJECT TO MATERIAL CHANGE

**Project Eagle – Forecasted Monthly Cash Balances by Region**

*(in millions of USD)*

| | | | | | | | | | For Month Ending | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 |
| | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| Americas (U.S.) Ending Cash Balances | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Americas (Non-U.S.) Ending Cash Balances | 7 | 9 | 11 | 12 | 13 | 12 | 13 | 13 | 13 | 13 | 14 | 13 | 14 | 14 | 14 |
| Europe Ending Cash Balances | 4 | 7 | 15 | 18 | 20 | 17 | 15 | 16 | 15 | 15 | 15 | 15 | 15 | 15 | 15 |
| Russia / India Ending Cash Balances | 7 | 6 | 7 | 7 | 6 | 7 | 7 | 6 | 7 | 7 | 6 | 7 | 7 | 6 | 8 |
| Asia Pac Ending Cash Balances | 45 | 61 | 62 | 56 | 71 | 70 | 64 | 71 | 71 | 60 | 72 | 65 | 52 | 62 | 55 |
| **Grand Total** | **87** | **108** | **120** | **118** | **134** | **132** | **124** | **131** | **131** | **120** | **131** | **125** | **112** | **122** | **116** |

# XVII. Shared Services – Additional Information

**MOMENTIVE**™

Copyright © 2014 Momentive Performance Materials Inc. All rights reserved



# Shared Services – Additional Information

- **Shared Services**
  - Certain MPM and MSC employees, assets and departments are utilized in providing services to both MPM and MSC
  - Services specifically exclude divisional-level activities, but include (in order of highest to lowest spend): IT, finance, HR / public relations, sourcing, environmental / safety, customer service, other SG&A, legal and executive / senior management
  - Resources are from legacy companies (i.e., there has been no consolidation of personnel or assets into a "shared services" company); some departments utilize the corresponding department from one of the two companies, while others use a combination of resources
  - Approximately 1,200 employees are considered shared

- **Costs**
  - Costs are funded by the legacy operator (MSC or MPM) – for example: the CEO and CFO are MSC employees, while the General Counsel is an MPM employee; IT hardware / software and operating costs are owned and incurred by both MSC and MPM
  - Methodology established at the inception of the SSA determined a global allocation of expenses between MSC and MPM (the "Allocation Percentages")
  - A monthly true-up is estimated and one company funds the other the difference between its allocated expense (based on the Allocation Percentages) and its actual shared services expenses incurred. Actual true-ups are conducted quarterly with an annual review.
  - Savings are generated from the avoidance of duplicative personnel / assets, as well as increased procurement leverage / econ. of scale

- **Initial Allocation (2010)**
  - The Allocation Percentages were set at 49% MPM / 51% MSC based on 2009 actual expenses and 2010 budgeted expenses
  - Based on each of MPM and MSC's stand-alone deemed shared services expenses as a percentage of the total MPM and MSC spend
    - MPM and MSC had 3rd-party fairness opinions; SSA provides for a Steering Committee to review the Allocation Percentages annually

- **Adjusted Allocation (2013)**
  - Following MPM's implementation of its new SAP module in 2013, the Steering Committee reviewed the impact of excluding divisional costs by comparing 2012 actual results to the allocation from 2010
    - Excluding divisional costs resulted in a revised Allocation Percentage of 43% MPM / 57% MSC
  - The Adjusted Allocation commenced Jan. 1, 2013 and no true-up was applied for prior periods

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

73

**MOMENTIVE™**

# Shared Services – Additional Information

- **Other / Est. Savings**
  - As noted above, actual shares service expenses (e.g., payroll, benefits, software) are split based on the Allocation Percentages
  - Savings (avoided expenses) related to procurement are not allocated, but are realized directly as a result of reduced

- **Term**
  - Either MPM or MSC may terminate the SSA, without cause, by written notice of not less than 30 days prior to an effective termination date

- **Dis-Synergies**
  - MPM estimates that failure to continue the SSA would cost MPM an incremental $54 million of annual expense and $15 million of one-time costs (recruiting and contingency costs)
  - Management has indicated that dis-synergies for MSC would be less than those of MPM, since MSC is (i) expected to have a greater ability to retain COGS savings for purchasing and logistics, and (ii) likely to experience lower one-time costs (there are more surviving legacy MSC shared services). No "dis-synergy" estimate has been provided for MSC.

- **Transition**
  - SSA contains a provision requiring MPM and MSC to provide reasonable assistance to the shared service recipient for a period of time post termination
  - An arms-length transition services agreement would likely be required, as there are a number of services that have been "fully-integrated" by one company, including certain elements of information technology and finance

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

# XVIII. Subsequent Events
## (Supplemental to information provided in the MSC 2013 10-K)

**MOMENTIVE**™

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

**MOMENTIVE™**

# Subsequent Events – Additional Information

*(Supplemental to information provided in the MSC 2013 10-K)*

- **RESTRICTED PURPOSE LOAN** *Per MSC 10-K: "In February 2014, [MSC] made a restricted purpose loan of $50 [million] to a newly formed subsidiary of Momentive [Performance Materials] Holdings [LLC]. The loan matures in February 2015, bears interest at LIBOR plus 3.75% per annum and is payable on a payment-in-kind basis. The loan is fully collateralized by the assets of the newly formed subsidiary.*
    - $50 million was loaned by MSC to Superholdco Finance Corp, a newly formed subsidiary ("A/R Sub") of Momentive Performance Materials Holdings LLC ("TopCo"), the ultimate MPM / MSC Holdco entity
    - A/R Sub was formed to purchase and monetize accounts receivable from MPM (i.e., the collateral)
    - [Approximately $50.9] million face value of A/R will be sold to A/R Sub by MPM
    - A/R includes US $ denominated export and domestic receivables not included in the current ABL borrowing base
        - Receivables sold include quartz and silicone US $ receivables from current active domestic customers and export receivables from customers in Brazil, China, Taiwan, Korea, Canada, Mexico and UK. Quartz receivables are first sold to MPM US Inc, MPM US Inc. contributes the receivables to MPM AR LLC who then sells the receivables to A/R Sub. As is customary in factoring transactions the sale includes a 5% hold back.  MPM AR LLC receives the remaining 5% when the receivables are collected
    - Proceeds to MPM will total approximately $47.3 million (95% of face value)
    - Proceeds will be used to reduce GE credit facility borrowings if an agreement on the DIP Financing can be reach and to increase liquidity
    - A/R Sub is expected to monetize the assets with a third-party or collect them to payback the MSC loan
    - If proceeds are used to reduce GE credit facility borrowings, the DIP Term Loan will be upsized by $50 million to account for the loss of future A/R collections from the sold portfolio
    - The Company will receive a true sale opinion and a fairness opinion and is expected to close on Monday April 6th.

- **CANADIAN TAX TRANSACTION** *Per MSC 10-K: "[MSC] anticipates closing in April on the purchase of 100% of the interests in MPM's Canadian subsidiary for a purchase price of approximately $12 [million]. As a part of the anticipated transaction the Company will also enter into a non-exclusive distribution agreement with a subsidiary of MPM, whereby the subsidiary of the Company will act as a distributor of certain of MPM's products in Canada. The agreement has a term of 10 years, and is cancelable by either party with 180 days' notice. The Company will be compensated for acting as distributor at a rate of 2% of the net selling price of the related products sold. Additionally, MPM will provide transitional services to the Company for a period of 6 months.*
    - Momentive Performance Materials Canada ULC ("MPM Canada"), a subsidiary of MPM, operated a manufacturing facility, a warehouse and a sales / administrative office in Canada until 2010 at which time the facilities were shut down
        - The majority of MPM Canada's equipment was moved to the U.S. facilities
    - On April [1], 2014, the equity in MPM Canada was sold to Momentive Specialty Chemicals Holdings B.V., a Netherlands-based subsidiary of MSC, for $12 million.

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

76

MOMENTIVE™

# Subsequent Events – Additional Information (cont'd)

*(Supplemental to information provided in the MSC 2013 10-K)*

- The difference between the $10 million assumed in the 13 week cash flow and the final purchase price of approximately $12 million was due to completion of final valuation of the tax attributes and final receivable values.
- MPM received a fairness opinion from Murray, Devine & Co., Inc. and the transaction consisted of the following assets:
    - Tangible assets of approximately $5 million, primarily consisting of accounts receivable
        - Excluded cash, inventory, intercompany receivables and payables, goodwill and other liabilities [what do we mean by "other liabilities – remember this is excluded so could be clearer
    - Tax related assets consisting of approximately $30 million of tax deductible goodwill with an amortizable tax basis over 20 years and $9 million of Canadian tax NOLs
- MPM no longer generates Canadian income so NOLs and goodwill would be lost if MPM Canada was liquidated
- Sale transactions to non-affiliated parties were not feasible due to restrictions on tax loss usage that would apply
- Additional agreements and terms of the transaction include:
    - Distribution Agreement: MPM Canada receives a margin equal to 2% for a non-exclusive distributor relationship for certain MPM products in Canada
    - Transition Services: Requires certain MPM subsidiaries to provide logistics and other background support services to support MSC

- **BRAZILIAN SUBSIDIARY GROUND LEASE**  *Per MSC 10-K: "In March 2014, the Company [MSC] entered into a ground lease with a Brazilian subsidiary of MPM to lease a portion of MPM's manufacturing site in Itatiba, Brazil for purposes of constructing and operating an epoxy production facility. In conjunction with the ground lease, the Company also entered into a site services agreement whereby MPM's subsidiary will provide to the Company various services such as environmental, health and safety, security, maintenance and accounting, amongst others, to support the operation of this new facility.*
    - Represents a co-location arrangement between Momentive Industria Commercio de Epoxy Ltda and Momentive Performance Materials Industria de Silicones Ltda, a Brazilian (non-Debtor) subsidiary of MPM
    - Amounts to be paid by MSC to MPM in connection with the lease are [~$0.3 million/month] which price was arrived at by analysis of MPM co-location arrangements with third parties
    - Lease covers 4 years and is extendable
    - The 10K states that documents are executed but MPM has said that the site may not be up and running until Q3'14 (Agreements executed 3/31/14)
    - No impact on MPM operations / transaction, positive cash flow / lease space note otherwise in use

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

**MOMENTIVE**

# Subsequent Events – Additional Information (cont'd)
*(Supplemental to information provided in the MSC 2013 10-K)*

- **Can you provide more detail on the split between active domestic and export receivables, silicones and quartz, etc.?** Silicones are $34.1 million, Quartz $16.8 million. Export receivables are $15.3 million and domestic receivables are $35.6 million.

- **Quartz receivables are first sold to MPM US Inc. then to MPM AR LLC, how are silicones receivables transferred and from which entities?** Silicone receivables belong to MPM US Inc. and are first contributed to MPM AR LLC and then sold to Super Holdco Finance Corp

- **Can you confirm that Superholdco Finance Corp is the obligor to MSC for the $50 million loan and associated PIK interest (and not MPM AR LLC)?** Confirmed

- **How will Superholdco Finance Corp fund interest payments to MSC if "MPM AR LLC receives the remaining 5% [hold back] when the receivables are collected" – is this 5% less an interest charge?** There is a LIBOR + 5.75% discount Superholdco Finance Corp. is charging MPM AR LLC on the initial purchase in addition to the 5% hold back

- **Has MPM historically completed factoring transactions and if so, what were the rates and hold back amounts on a comparative basis?** MPM has not done factoring transactions in the past. In factoring transactions that MSC has been involved with the holdback has been 10%. For these transaction discussed here, the hold back is to be paid to MPM within 10 days after collection of the full amount of receivables due.

- **For Brazil, what are the lease extension option terms and who has the option?** The term of this Lease (the "Term") shall commence as of the Effective Date (which may also be referred to herein as the "Commencement Date") and shall expire four (4) years thereafter unless sooner terminated as provided in this Lease. In the event either party desires to extend the Term after its expiration, such party shall notify the other party within six (6) months' of such expiration, and the parties shall negotiate such an extension in good faith. If the parties agree to extend the Term, they shall execute a written amendment setting forth the terms of such extension. To the extent any extension term has been or is then in effect, the phrase the "Term", as used herein, shall include any such extension term.

Copyright © 2014 Momentive Performance
Materials Inc. All rights reserved

**APPENDIX III**



CORPORATE STRUCTURE

Chart 1 of 2

= Non-Debtor Entities

= Debtor Entities



CORPORATE STRUCTURE
EUROPE SUBSIDIARIES
Chart 2 of 2

= Non-Debtor entities

= Debtor Entities