Kenneth N. Klee
Lee R. Bogdanoff (admitted *pro hac vice*)
Whitman L. Holt (admitted *pro hac vice*)
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Telephone:     (310) 407-4000
Facsimile:     (310) 407-9090

*Proposed Counsel to Official Committee of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| MPM Silicones, LLC, *et al.*,[1] | Case No. 14-22503 (RDD) |
| Debtors. | Jointly Administered |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
THE DEBTORS' MOTION TO OBTAIN POSTPETITION FINANCING, USE CASH
COLLATERAL, AND GRANT ADEQUATE PROTECTION TO THE PREPETITION
SECURED LENDERS**

The Official Committee of Unsecured Creditors (the "Committee") of the debtors (the

"Debtors") in the above-captioned bankruptcy cases (the "Chapter 11 Cases") hereby files this

objection (the "Objection") to (i) the Debtors' motion seeking final authorization to, among other

things, obtain postpetition financing, use cash collateral, and grant certain adequate protection

[Docket No. 13] (the "DIP Financing Motion")[2] and (ii) the Debtors' proposed form of final

order granting the DIP Financing Motion [Docket No. 198, Exhibit A] (the "Final Order").  In

support of the Objection, the Committee respectfully represents as follows:

---

[1]    The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses:  (i) Juniper
Bond Holdings I LLC (9631); (ii) Juniper Bond Holdings II LLC(9692); (iii) Juniper Bond Holdings III LLC
(9765); (iv) Juniper Bond Holdings IV LLC (9836); (v) Momentive Performance Materials China SPV Inc.
(8469); (vi) Momentive Performance Materials Holdings Inc. (8246); (vii) Momentive Performance Materials
Inc. (8297); (viii) Momentive Performance Materials Quartz, Inc. (9929); (ix) Momentive Performance
Materials South America Inc. (4895); (x) Momentive Performance Materials USA Inc. (8388); (xi) Momentive
Performance Materials Worldwide Inc. (8357); and (xii) MPM Silicones LLC (5481).  The Debtors' executive
headquarters are located at 260 Hudson River Road, Waterford, NY 12188.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to those terms in the
DIP Financing Motion or in the Final Order, as applicable.

## I.    PRELIMINARY STATEMENT[3]

1.        The Committee files this Objection reluctantly and only after more than two weeks of negotiations with counsel for the Debtors, the DIP Agents, and certain of the Prepetition Secured Parties.  Notwithstanding the Committee's good faith efforts to reach consensus, those negotiations have not provided a satisfactory resolution of many of the flaws in the Final Order.  The Committee intends to negotiate in good faith prior to the May 23, 2014 hearing in an effort to narrow the issues that remain for the Court's resolution.  To the extent that the Committee is able to narrow the disputes by reaching agreement on at least certain issues – an approach that the Committee has been attempting to convince the other affected parties to embrace – the Committee will notify the Court at or prior to the May 23, 2014 hearing.

2.        The Committee does not dispute that the Debtors have a legitimate business need to obtain postpetition financing.  With a few exceptions noted in this Objection, the Committee does not take issue with the benefits and protections that the Debtors propose to provide the DIP Agents and the DIP Lenders through the Final Order.  If the DIP Financing Motion involved only the proposed DIP financing itself, this would be an exceedingly short objection.[4]

3.        Unfortunately, the Debtors and their insiders have decided to use the DIP Financing Motion to advance other agendas.  The Debtors' Final Order is laden with provisions that would provide significant legal and economic advantages for the Debtors' prepetition equity sponsor, Apollo, and for the Prepetition Secured Lenders (particularly holders of Second Lien Notes, of which Apollo is a significant holder).  These provisions of the Final Order would begin

---

[3]    The Debtors continued the deadline for the Committee and its members to object to the DIP Financing Motion to May 15, 2014.

[4]    This is particularly the case given the Committee's understanding that the DIP Agents are amenable to accepting many of the changes that the Committee has proposed to the Final Order.  Unfortunately, that willingness is in several instances conditioned on the applicable Prepetition Secured Parties agreeing to the same modifications so as to preserve the relative seniority of the DIP facility.  As certain of the Prepetition Secured Parties have simply refused to agree (notwithstanding the provisions of prepetition intercreditor agreements that significantly limit their rights to complain in this context), the Committee's ability to reach a consensual resolution of certain issues has been stifled by a lowest-common-denominator dynamic.

to stack the deck against unsecured creditors from the onset of the Chapter 11 Cases and cannot

be justified under the guise of "adequate protection" or otherwise.

4.       There is no basis in law or fact for the Final Order to enhance the rights of Apollo.

Apollo is not just the Debtors' controlling equity holder.  Apollo owns and controls affiliates of

the Debtors, including Momentive Specialty Chemicals (or "MSC"), which shares the Debtors'

executives and other key personnel and is involved in a web of legal and contractual

arrangements that the Committee, through its professionals, is attempting to understand.  Some

of these transactions occurred shortly before the filing of these cases.  For example, in the days

preceding these Chapter 11 Cases, the Debtors effectuated a series of material transactions,

including the sale of various Canadian interests to a subsidiary of MSC.  *See* Momentive

Performance Materials, Inc. Form 10-K for year ending December 31, 2013, at p. 57.

5.       Apollo, as noted, also owns a substantial portion of the Second Lien Notes as well

as other debt.  In short, Apollo is all over the Debtors' capital structure.  Apollo also is a party to

the Restructuring Support Agreement ("RSA") executed by the Debtors, Apollo, and various

unidentified holders of the Second Lien Notes immediately prior to the commencement of these

cases.  The RSA, in turn, bears the earmarks of a "new value" plan, proposing to extinguish

Apollo's existing equity and confer on Apollo the exclusive right, along with other Second Lien

Noteholders, to participate in the receipt and purchase of new equity in the Debtors on favorable

terms.  Such a plan structure and approach raises concerns, about the Debtors' ability to confirm

such a plan without a market test, about whether there is improper disparate treatment of

uncertain unsecured creditors, and about the conduct of the Debtors in binding themselves to

pursue such a plan.[5]  To be clear, the Committee is evaluating both the RSA and the recently-filed plan of reorganization and needs to conduct its due diligence regarding that and other things.

6.      Acting on behalf of all unsecured creditors, and facing these circumstances, the Committee strongly believes that the Final Order should not be stacked with provisions to which the RSA participants are not legally entitled and which will leave unsecured creditors in a worse position if the plan the RSA parties have engineered fails.

7.      The provision of the Final Order governing payment of Apollo's professional fees is but one egregious example of what is wrong with the Final Order.  ***In this regard, it bears emphasizing that Apollo is not providing DIP financing or other value, and Apollo has no legal right to insist on or receive anything that advances its parochial interests***.  Yet the Final Order provides Apollo with an unqualified right to have all its professional fees paid from the Debtors' estates, which fees are layered on top of additional fees payable to the Second Lien Indenture Trustee and to an ad hoc group of Second Lien Noteholders.  The DIP Financing Motion never defends (or even mentions) this aspect of the Final Order.  The Court should not facilitate this gift to Apollo, particularly since the Debtors are seeking to provide the exact same relief through their proposed assumption of the RSA scheduled for hearing next month.

8.      Similarly, the Final Order confers gratuitous waivers and benefits on the Prepetition Secured Parties, who also are not providing any financing to the Debtors.[6]  For example, even though the Second Lien creditors are admittedly undersecured, the Final Order would provide real-time payment of substantial professional fees arising under prepetition contracts.  Although as shown below there is no legal basis for such payments, the Final Order

---

[5]     *See, e.g.*, *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 454-58 (1999); *In re Castleton Plaza, LP*, 707 F.3d 821, 821-24 (7th Cir. 2013); *Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 95-101 (2d Cir. 2010); *In re Innkeepers USA Trust*, 442 B.R. 227, 231-36 (Bankr. S.D.N.Y. 2010).  The Committee reserves all rights, claims, and defense on these and related fronts.

[6]     Indeed, counsel for the Debtors made a point of stressing to the Court that the proposed financing is "a true third-party DIP."  *See* Apr. 14, 2014 Hr'g Tr. [Docket No. 59] at 128:18 – 129:5.

goes even further by forcing the estates to bear a duplicative layer of expense to subsidize the professional fees of the Ad Hoc Committee of Second Lien Noteholders, which again duplicates benefits that would be provided under the RSA.  Nothing in the doctrine of adequate protection or otherwise justifies paying professional fees to a *subset* of Second Lien creditors comprised of sophisticated hedge funds capable of paying for their own professionals.  If those creditors make a proven substantial contribution to these cases, then they may seek reimbursement under Bankruptcy Code section 503(b), but there is no other basis for shifting these costs to the estates.

9.    Moreover, the Second Lien Noteholders are parties to an intercreditor agreement to which the Debtors are party and which provides their deemed consent to priming liens and cash collateral usage subject only to receiving replacement liens on additional collateral.  That agreement contains a broader consent to adequate protection than is contained in the First Lien intercreditor agreement, which was considered by the Court at the interim hearing.  There is no reason for the estates to waive important estate rights or to create unwarranted benefits for the Second Lien Noteholders.  The only effect of such provisions is to potentially prejudice unsecured creditors.

10.    Apollo and the Second Lien Noteholders would have the Court ignore their intercreditor agreement and focus instead on the RSA.  Yet the Court should reject any effort by Apollo or by any of the Second Lien Noteholders to use the RSA as a tool to justify the benefits provided by the Final Order.  The RSA will be considered at a later date, and, as noted, the plan described in that document may turn out to be unconfirmable.  What is relevant for purposes of the present motion is that although the DIP financing accommodates the plan contemplated by the RSA, that financing is not tethered to that plan as the DIP agreements (i) permit a range of options in their definition of "Approved Plan of Reorganization," including any plan "otherwise reasonably satisfactory in form and substance" to the DIP Agents; and (ii) include "Milestones" for plan confirmation that are significantly longer than those in the RSA.  Simply put, if the DIP

5

financing were inextricably linked with the RSA, then the Final Hearing would have been scheduled contemporaneously with a hearing regarding approval of the RSA (which did not occur). The Court should not allow Apollo or the Second Lien Noteholders to use the RSA's mere existence as a basis to bootstrap unwarranted provisions into the Final Order.

11.    The Final Order also tries to hamstring the Committee's ability to engage in a meaningful investigation and realization of the estates' rights against the Prepetition Secured Lenders and Apollo. This is a large, complex case, one characterized by numerous transactions involving Apollo and its affiliates. The Debtors provide no basis for these Chapter 11 Cases to proceed on a schedule that impedes the Committee's ability to perform its statutory duty to investigate the acts, conduct, assets, liabilities, and financial condition of the Debtors, as well as to pursue the rights and claims of the Debtors' estates against third parties. The imposition of an early deadline for the Committee to launch challenges to the secured creditors' liens and prepetition transfers makes *no sense* in these cases. The RSA parties maintain that if the plan of reorganization on the table is confirmed, it will confer broad estate releases on the RSA parties and will pay all unsecured creditors entitled to recovery in full. This may not turn out to be correct. If it is, litigation over the scope of liens would be irrelevant and be superseded by the plan releases. If, however, that plan is not confirmable, the Debtors will need to start from scratch and propose a new plan of reorganization, and there will be time in that scenario to sort out *actual* disputes over such matters as perfection, scope of collateral, and prepetition transfers, before litigation is commenced. The only reason to impose an impossibly short deadline here is the hope that in its haste to meet that deadline the Committee's advisors will miss something material. Regardless, the challenge deadline now proposed is too short for cross-border chapter 11 cases, and multiple layers of secured indebtedness, of this magnitude and complexity.

12.    The RSA parties tell us that the plan they are promoting will be confirmed in relatively short order, and all unsecured creditors entitled to payment will be paid in full. But if

those parties turn out to be wrong, the Final Order should not be a vehicle to prejudice unsecured

creditors after the fact.  In order to perform the Committee's function, it is critical that unsecured

creditors retain access to the rights, claims, and defenses that existed against the Second Lien

Noteholders and Apollo on the Petition Date.  The Final Order here does the opposite, however,

by improperly layering *additional* benefits for the Second Lien Noteholders and Apollo

throughout its text.  The provision of these benefits and concomitant injury to unsecured

creditors is improper.  The Court should require that the Final Order be revised to address each

of the issues raised by this Objection as a condition to granting the DIP Financing Motion;

attached hereto as **Exhibit A** is a "redlined" draft of the Final Order (run against the last Word

draft provided to the Committee) that includes the specific changes requested by the Committee.

## II.    BACKGROUND

13.    Although a robust historical discussion is not necessary for the Committee to

articulate its concerns with the Final Order, any analysis of the Final Order's provisions is

informed by the economic backdrop of these cases and by the agenda the Debtors hope to

advance through the RSA.

### A.    The Debtors' Capital Structure and the Intercreditor Agreements

14.    The Debtors' prepetition capital structure involved approximately $2.85 billion of

secured debt, woven together by several intercreditor agreements.  *See* First Day Declaration

¶¶ 49-53 (describing the ABL Facility, the Cash Flow Facility, the First Lien Notes, the 1.5 Lien

Notes, and the Second Lien Notes); *Debtors' Statement in Support of the [DIP Financing Motion]*

[Docket No. 15] (the "Debtors' Statement") (describing and attaching copies of the First Lien

Intercreditor and the 1.5 Lien Intercreditor).[7]  The Debtors' capital structure also includes $382

million of purportedly subordinated notes.  *See* First Day Declaration ¶ 54.

15.    As a result of a 2006 "leveraged buyout" transaction, Apollo is the ultimate owner

and entity in control of the Debtors.  *See* First Day Declaration ¶¶ 10 & 56.  Apollo also is a

substantial holder of the Second Lien Notes.  *See id.* ¶ 63.  Apollo further is the owner and in

control of the non-debtor MSC family of entities that is deeply intertwined with the Debtors,

including through a "Shared Services Agreement."  *See id.* ¶¶ 10 & 38-39.  Put simply, Apollo

wears a variety of different "hats" as a result of its many, multifaceted relationships with the

Debtors.

16.    As the Debtors recognize in the DIP Financing Motion, the prepetition

intercreditor agreements are highly relevant to the relief requested in that motion and to the

provisions of the Final Order.  *See* DIP Financing Motion ¶¶ 7, 30, 58-61 & 72.  For example,

the Second Lien Intercreditor – in sharp contrast to the First Lien Intercreditor that the Court

examined at the first day hearing on April 14, 2014 – provides that:

> If the Company or any other Grantor shall be subject to any Insolvency or
> Liquidation Proceeding and [JPMorgan as agent] shall desire to permit the use
> of cash collateral or to permit the Company or any other Grantor to obtain
> financing under Section 363 or Section 364 of Title 11 of the United States
> Code or any similar provision in any Bankruptcy Law ("***DIP Financing***"), then
> each Second-Priority Agent, on behalf of itself and each applicable Second-
> Priority Secured Party, agrees that ***it will raise no (a) objection to (and will not***
> ***otherwise contest) such use of cash collateral or DIP Financing and will not***
> ***request adequate protection or any other relief in connection therewith***
> (except to the extent permitted by the proviso in clause (ii) of Section 3.1(a) and
> Section 6.3) and, to the extent the Liens securing the Senior Lender Claims
> under the Senior Lender Documents are subordinated or pari passu with such
> DIP Financing, will subordinate its Liens in the Common Collateral to such DIP
> Financing (and all Obligations relating thereto) on the same basis as the other
> Liens securing the Second-Priority Claims are so subordinated to Liens securing
> Senior Lender Claims under this Agreement . . . .

---

[7]    For some reason, the Debtors' Statement does not include a copy of the November 16, 2012 *Intercreditor
Agreement* pertaining to the Second Lien Notes (the "Second Lien Intercreditor").  A true and correct copy of
the publicly-available form of the Second Lien Intercreditor is attached hereto as **Exhibit B**.

Second Lien Intercreditor § 6.1 (emphasis added).[8] Likewise, the agreement further provides that the second lien parties agreed that the only relief to which they are entitled as adequate protection is a subordinated replacement lien on any additional collateral granted to senior creditors. *See id.* § 6.3. As the Debtors correctly summarize matters, the intercreditor and other agreements mean that the Prepetition Secured Parties are deemed to have consented to the priming of their liens and to the use of Cash Collateral without receiving any "adequate protection" beyond that specified in the agreements (i.e., the minimal replacement liens referenced in the applicable sections of the intercreditors). *See* DIP Financing Motion ¶ 7.

**B.      The RSA**

17.      The Debtors entered into the RSA immediately before the commencement of these cases and highlight its general terms in their DIP Financing Motion. *See* DIP Financing Motion ¶ 28. Although the RSA itself is not currently before the Court,[9] the Debtors correctly realize the interconnectedness of the RSA and several provisions of their proposed Final Order when they discuss the RSA in the DIP Financing Motion.[10]

18.      The RSA obligates the Debtors to pursue on an expedited basis the confirmation of a chapter 11 plan that would result in Apollo and the Second Lien Noteholders owning 100%

---

[8]    The Second Lien Intercreditor's blanket prohibition on any objection to the Debtors' proposed use of cash collateral and request for any other form of adequate protection applies even with respect to any adequate protection with respect to the second lien creditors themselves, which differentiates this agreement from the First Lien Intercreditor. *Cf.* Apr. 14, 2014 Hr'g Tr. [Docket No. 59] at 80:12 – 81:23.

[9]    On May 9, 2014, the Debtors filed a motion to assume the RSA and approve a related Backstop Commitment Agreement. *See* Docket No. 147. This motion is set for hearing on June 19, 2014. The Committee reserves all rights, claims, and defenses regarding this motion and will respond to this motion at the appropriate juncture.

[10]    Although the RSA is related to the proposed DIP financing, they are not bound as an inextricable "package." For example, the milestones contemplated by the DIP financing are substantially longer than the deadlines contained in the RSA. Thus, the Court could approve the DIP financing but not be compelled also to approve the RSA. Moreover, a broad array of plans could potentially fall within the definition of an "Approved Plan of Reorganization" for purposes of the DIP credit agreements (including because such plans are "otherwise reasonably satisfactory" to the DIP Agents). Likewise, the Court could modify the Final Order in the fashions proposed herein and the RSA parties could nevertheless pursue their desired plan; there is no evidence or other basis to believe that either Apollo or the Second Lien Noteholders would terminate the RSA (which appears highly favorable to them) merely because they do not get *all* of the special benefits contemplated by the Final Order. Using the RSA to justify including certain provisions in the Final Order in order to help lay the groundwork for the RSA to proceed would constitute an illogical trip through the looking glass.

of the reorganized company while enjoying the exclusive ability to participate in a rights offering. *See* RSA §§ 1.1(a) & 2.1; accompanying Term Sheet at pp. 1-2, 15-16 & 18.  The plan would release and exculpate Apollo and the Second Lien Noteholders, all while leaving the holders of hundreds of millions of dollars of unsecured claims with no recovery.  *See* RSA accompanying Term Sheet at p. 17.  Regardless whether the proposed restructuring is consummated, the RSA would further obligate the Debtors' estates to pay all of the professional fees of Apollo and the Ad Hoc Committee of Second Lien Noteholders, both prospectively and through a retrospective "Expense Reimbursement."  *See* RSA § 1.1(a) (clause (xi)); accompanying Term Sheet at pp. 4-5.

19.    The merits of the approach set forth in the RSA will be addressed in due course, but the RSA is not the only vehicle through which Apollo and the Second Lien Noteholders hope to gain an advantage – the Final Order has been crafted to achieve those same goals and to foster a creeping incrementalism that tilts the tables in favor of Apollo and the Second Lien Noteholders, and potentially against the interests of general unsecured creditors.  As detailed below, this is simply not the appropriate function of an order approving postpetition financing.

## III.    OBJECTION

20.    To obtain approval of postpetition financing under Bankruptcy Code section 364, the Debtors must prove that (i) they are unable to obtain unsecured credit; (ii) the proposed credit is necessary to preserve the assets of their estates; and, of relevance here; and (iii) the terms of the financing are fair, reasonable, and adequate under the circumstances.[11]  The Court should approve postpetition financing only to the extent its terms are "in the best interests of the general creditor body."[12]  Parties negotiating postpetition financing have unequal bargaining power, and a debtor in possession often is not the best party to ensure that postpetition financing terms are

---

[11]    *See, e.g.*, *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990).  The first two requirements are met here and the third is as well vis-à-vis the DIP Agents and the DIP Lenders.  The problem is the third requirement, which is not met as it pertains to Apollo and certain of the Prepetition Secured Parties.

[12]    *In re Roblin Indus.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985).

fair to, and in the best interest of, all parties in interest, particularly unsecured creditors.[13]

Moreover, postpetition financing should not be authorized to the extent its function is to benefit

or improve the position of a prepetition secured lender, let alone a prepetition equity sponsor.[14]

Likewise, the purpose of providing adequate protection to prepetition parties is to preserve the

status quo, not to better those parties' positions.[15]  Simply put, the Court should reject "proposed

terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers

and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the

Chapter 11 process by preventing motions by parties-in-interest from being decided on their

merits."[16]

      21.     Here, several provisions of the proposed Final Order seek to confer inappropriate

and case-shifting benefits on Apollo and the Prepetition Secured Lenders, all without statutory

---

[13]    *E.g.*, *In re Texlon Corp.*, 596 F.2d 1092, 1098 (2d Cir. 1979) ("The debtor in possession is hardly neutral. Its interest is in its own survival, even at the expense of equal treatment of creditors, and close relations with a lending institution tend to prevent the exploration of other available courses in which a more objective receiver or trustee would engage."); *In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) (noting how "the court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors").

[14]    *See, e.g.*, *RTC v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) (emphasizing that "bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender"); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (explaining that "credit should not be approved when it is sought for the primary benefit of a party other than the debtor"); *Ames Dep't Stores*, 115 B.R. at 39 (noting that "a proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate"); *In re Tenney Vill. Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (recognizing that postpetition financing arrangements must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the [secured creditor]").

[15]    *See, e.g.*, *In re 354 E. 66th St. Realty Corp.*, 177 B.R. 776, 782 (Bankr. E.D.N.Y. 1995); *In re Roe Excavating, Inc.*, 52 B.R. 439, 440 (Bankr. S.D. Ohio 1984).

[16]    *Ames Dep't Stores*, 115 B.R. at 37; *see also, e.g.*, *General Elec. Capital Corp. v. Hoerner (In re Grand Valley Sport & Marine, Inc.)*, 143 B.R. 840, 852 (Bankr. W.D. Mich. 1992) (refusing to "authorize postpetition financing pursuant to § 364 where a creditor leverages a debtor in possession into making a concession unauthorized by, or in conflict with, the Bankruptcy Code as a condition for the requested credit"); *Tenney Vill. Co.*, 104 B.R. at 568 (rejecting DIP financing structure that would "seize control of the reins of reorganization").

support in the Bankruptcy Code.[17]  The Court should require that these and other problematic

provisions be revised as a condition to granting the DIP Financing Motion on a final basis.

A.    **The Final Order Should Not be Used as a Vehicle to Advantage Apollo**

22.    The Final Order broadly defines "Apollo" as "Apollo Global Management, LLC

and certain of its affiliated funds" without specifying any of these "certain" funds or their

involvement in these Chapter 11 Case (whether as the Debtors' equity sponsor, purported

creditors, or otherwise).  *See* Final Order ¶ 2.  The Final Order then proceeds to provide

economically and legally significant benefits to Apollo.  Most notably, Paragraph 22(c) of the

Final Order provides that the Debtors shall pay "to Apollo, all reasonable, actual and

documented fees and expenses of counsel and advisors incurred pursuant to the terms of the fee

arrangement agreed between the Debtors and Apollo and such counsel and advisors."

23.    The Committee categorically objects to Apollo receiving *any* special benefits

under the Final Order.  Apollo's involvement in the affairs of the Debtors and related non-

debtors is suspect, and the Committee fully intends to investigate the conduct of Apollo and its

affiliates, subsidiaries, agents, officers, directors, employees, attorneys, and advisors with respect

to the Debtors.  Apollo is not providing new credit or any other value to the Debtors or their

estates in connection with the DIP Credit Facilities.  Rather, Apollo stands as an insider equity

sponsor supporting a plan that would ultimately leave Apollo with substantial continuing

interests in the reorganized entity while leaving certain unsecured creditors with *zero recovery*.

24.    Beyond its general opposition to Apollo receiving any benefits through the Final

Order, the Committee has several specific concerns about the Debtors' proposal to pay all of

---

[17]    *See, e.g.*, *In re Colad Grp., Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) ("The debtor and its secured
creditor do not constitute a legislature.  Thus, they have no right to implement a private agreement that
effectively changes the bankruptcy law with regard to the statutory rights of third parties.").

Apollo's professional fees on a real-time, administrative basis, particularly on top of all the other fees proposed to be paid at the estates' expense).

25.      *First*, as a threshold matter, the identities of the "counsel and advisors" to Apollo are never disclosed, and neither are their terms of engagement by Apollo.  Likewise, the terms of the "fee arrangement" between the Debtors and Apollo are never disclosed to the Court.  In effect, the Debtors ask the Court to provide a blank check for the estates to pay unspecified professionals unknown amounts for providing undefined services for the sole benefit of the Debtors' existing equity sponsor.  The complete lack of disclosure and candor about exactly what the Debtors are intending to do for the substantial benefit of an insider and at the expense of their estates is reason enough to strike this language from the Final Order.[18]

26.      *Second*, even if the Debtors had disclosed the intended scope and magnitude of these payments to or for the benefit of Apollo, such payments would be entirely inappropriate.  Apollo has no legal right to have its professional fees paid by the estates absent a demonstrated substantial contribution under Bankruptcy Code section 503(b).[19]  Indeed, depending on the outcome of the Committee's investigation, it is possible that Apollo may have affirmative liability to the estates, and there is no doubt that the Debtors' current plan proposal is being driven by Apollo.  It borders on the perverse for the Debtors to propose that their estates not only pursue but bear all the costs of a process being driven by and for the benefit of Apollo.

27.      *Third*, to the extent that the Debtors or Apollo claim that Apollo's status as a Second Lien Noteholder entitles Apollo to have its professional fees paid as a form of "adequate protection," that contention does not withstand scrutiny.  The Debtors already are proposing to

---

[18]    *See, e.g.*, *In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966) ("The reasons are plain enough.  The conduct of bankruptcy proceedings not only should be right but must seem right.").

[19]    *See, e.g.*, *In re First Baldwin Bancshares, Inc.*, 2013 Bankr. LEXIS 2200, at *3-9 (Bankr. S.D. Ala. May 30, 2013) (considering and rejecting effort of debtor's former equity security holder to have its professional fees paid as an administrative expense).

pay the professional fees of the Second Lien Indenture Trustee **and** of the Ad Hoc Committee of

Second Lien Noteholders.  *See* Final Order ¶ 22(c); *see also* Part III.B.4. *infra* (explaining that

the Committee does not object to the payment of some of these fees if certain rights are reserved).

To the extent that Apollo has any particular interests *qua* Second Lien Noteholder, the able

counsel for the Second Lien Indenture Trustee will fully protect those interests.  The only

conceivable function of paying Apollo's professional fees is to allow Apollo to protect its *other,*

*non-lender* interests at the estates' expense, which is precisely why those professional fees

should not be foisted on the estates.[20]

**B.**     **The Final Order Should Not Be Used as a Vehicle to Advantage the Second Lien**
        **Noteholders or Other Prepetition Secured Parties**

28.      As discussed in more detail below, the Final Order contains various provisions

that advantage the Second Lien Noteholders and other Prepetition Secured Parties at the expense

of unsecured creditors.  These table-tilting provisions are justified under the guise of "adequate

protection" provided by the Debtors.

29.      As a threshold matter, the various prepetition intercreditor agreements

deliberately provided that the affected lenders are deemed to consent to a DIP financing facility

of the sort at issue here.  For example, the Second Lien Intercreditor expressly provides that the

Second Lien Noteholders cannot object to DIP financing or the use of cash collateral on the

terms proposed in the DIP Financing Motion as long as they are provided with replacement liens

on certain additional collateral.  *See* Second Lien Intercreditor §§ 6.1 & 6.3.  As the Debtors

correctly observe, such contractual provisions eliminate any right of the Second Lien

---

[20]     The RSA contains a similarly extraordinary provision requiring the estates to pay Apollo's professional fees.  It
is unclear why the Debtors need to request this same relief multiple times.  In fact, no party should be
requesting such relief at all, as it should be considered post-confirmation in a properly filed and noticed
substantial contribution motion.  It suffices for present purposes that the proper point at which to address this
and other provisions contained in the RSA will be in the context of the Court's consideration of the Debtors'
motion to authorize the assumption of that agreement, not in the context of DIP financing.

Noteholders to demand any additional "adequate protection."[21]  Because of their deemed consent to use cash collateral and prime their liens, the Prepetition Secured Parties simply have no legal right to any of the various case-altering provisions that the Debtors chose to layer throughout the Final Order, whether as "adequate protection" or otherwise.

30.    In any event, the adequate protection proposed goes well beyond what is necessary and appropriate under the current circumstances of these Chapter 11 Cases.  The purpose of adequate protection is to ensure that prepetition lenders receive the security they bargained for prior to the petition date. "Neither the legislative history nor the [Bankruptcy] Code indicate that Congress intended the concept of adequate protection to go beyond the scope of protecting the secured claim holder from a diminution in the value of the collateral securing the debt."[22]  Thus, a lender's entitlement to adequate protection arises only when there is evidence establishing likely loss to its collateral position.[23]  Here, the Prepetition Secured Parties have offered no evidence of an anticipated or actual decline in value of the Prepetition Collateral. Moreover, the only evidence on this point demonstrates that the DIP financing actually *enhances* the value of the estates.  *See* First Day Declaration ¶¶ 84-88; *see also* DIP Financing Motion ¶ 68. Simply put, the proposed package of "adequate protection" and other lender concessions appear to greatly exceed the risk to the Prepetition Secured Lenders' collateral position; the package is therefore unbalanced and improper.

---

[21]    *See, e.g.*, 11 U.S.C. § 363(c)(2) (allowing use of cash collateral with creditor consent *or* upon provision of adequate protection); *Aurelius Capital Master, Ltd. v. TOUSA Inc.*, 2009 U.S. Dist. LEXIS 12735, *67-68 (S.D. Fla. Feb. 5, 2009) (citing cases establishing "that where there is consent to use the cash collateral, conditioning its use as is necessary to provide adequate protection of such interest is not *required* under § 363").

[22]    *In re Pine Lake Vill. Apartment Co.*, 19 B.R. 819, 824 (Bankr. S.D.N.Y. 1982).

[23]    *See, e.g.*, *RTC v. Swedeland Dev. Grp. (In re Swedeland Dev. Grp.)*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Stoney Creek Techs., LLC*, 364 B.R. 882, 890 (Bankr. E.D. Pa. 2007).  *Accord In re Saypol*, 31 B.R. 796, 800 (Bankr. S.D.N.Y. 1983) ("In the context of the automatic stay, Congress believed the existence *vel non* of such a decline [in the value of the secured creditor's interest] to be almost decisive in determining the need for adequate protection.").

1.     **Avoidance Actions and Other Significant Unencumbered Assets Should Be Preserved for Unsecured Creditors If at All Possible**

31.     Because of their inclusion in the "DIP Collateral" specified in paragraph 8(a) of the Final Order, the Prepetition Secured Parties are granted replacement liens on valuable assets that otherwise are free of their liens, including any proceeds or property recovered in respect of any Avoidance Actions.  *See* Final Order ¶¶ 16(a), 18(a), 20(a) & 22(a).  In addition, the Final Order exposes other unencumbered assets[24] to the repayment of 507(b) Claims without restriction.  *See id.* ¶¶ 16(b), 18(b), 20(b) & 22(b).

32.     It is unnecessary and unduly punitive to the Debtors' unsecured creditors for the Court to expand the Prepetition Secured Parties' prepetition collateral package by granting the Prepetition Secured Parties liens on previously unencumbered assets or on rights that are uniquely created under the Bankruptcy Code.[25]  Such a step should be taken only as a last resort, and only to the extent that assets in other collateral categories ultimately are insufficient to repay the Prepetition Secured Parties for any diminution they can prove after an appropriate hearing.

33.     Avoidance Actions in particular are a distinct creature of bankruptcy law designed to facilitate equality of distribution among a debtor's general unsecured creditors, and thus are not truly property of a debtor's estate.  Instead, Avoidance Actions are statutory rights that the

---

[24]  The Committee is in the process of investigating the universe of assets that are unencumbered by any prepetition lien.  At a minimum, however, those assets include 35% of the Debtors' stock in numerous foreign subsidiaries (except with respect to the obligations of the foreign obligors under the DIP facility and the Cash Flow Facility) and four notes issued by Momentive Performance Materials Japan LLC to four of the Debtors in the aggregate principal amount of $840,000,000.  *See* Final Order ¶ 8(a) n.6.  The Committee's ability to investigate and value these and other assets has been limited by the fact that the Debtors sought an extension of the deadline for filing their schedules and statements of financial affairs through June 12, 2014, *see* Docket No. 35, and have not yet provided the Committee with regional or entity-by-entity financial information (although the Committee understands that such information is being prepared by the Debtors and their advisors).

[25]  *See, e.g.*, *In re Four Seasons Marine & Cycle, Inc.*, 263 B.R. 764, 771 (Bankr. E.D. Tex. 2001) (describing fundamental unfairness that could be imposed on unsecured creditors by granting of a replacement lien on unencumbered assets of the estate); *In re Integrated Testing Prods. Corp.*, 69 B.R. 901, 905 (D.N.J. 1987) (holding that prepetition secured creditor was not entitled to proceeds of sale of collateral recovered as preference because to allow the secured creditor to "claim these preferences would frustrate the policy of equal treatment of creditors under the Code").

estates hold in trust for the benefit of creditors.[26]  As an important potential source of recovery for general unsecured creditors, these assets should remain free of any encumbrance that could cause these assets to benefit only the Prepetition Secured Lenders.[27]

34.     Given the current posture of this case, granting all of the Prepetition Secured Lenders replacement liens on, or superpriority claims with recourse to, all estate property including Avoidance Action proceeds and other unencumbered property should not be necessary to adequately protect their prepetition interests in the Debtors' property.  At a minimum, however, the Final Order should provide that the Avoidance Actions, any proceeds or property recovered in respect of any Avoidance Actions, all assets of the estates unencumbered by any prepetition lien, and any proceeds or property recovered in respect of any unencumbered assets shall not be used to pay or otherwise satisfy any Superpriority Claims or any 507(b) Claims unless and to the extent (and only to the extent) that no other property of the Debtors' estates remains for the payment or satisfaction of such Superpriority Claims and 507(b) Claims.[28]  The Committee's proposed clarifying language appears on page 34 of **Exhibit A**.

---

[26]    *See, e.g.*, *Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 567-69 (3d Cir. 2003) (explaining how the underlying intent of the avoidance powers is the recovery of valuable assets for the benefit of a debtor's estate); *Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.)*, 390 B.R. 784, 786-87 (Bankr. S.D.N.Y. 2008) ("Avoidance actions . . . never belonged to the Debtor, but rather were creditor claims that could only be brought by a trustee or debtor in possession . . . ."); *In re Sweetwater*, 55 B.R. 724, 731 (D. Utah 1985) ("The avoiding powers are not 'property' but a statutorily created power to recover property."), *rev'd on other grounds*, 884 F.2d 1323 (10th Cir. 1989); *In re Sapolin Paints, Inc.*, 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) (reciting "the well-settled principle that neither a trustee . . . nor a debtor-in-possession, can assign, sell, *or otherwise transfer* the right to maintain a suit to avoid preference" (emphasis added)).

[27]    *See, e.g.*, *In re Excel Maritime Carriers, Ltd.*, Case No. 13-23060-RDD, ECF No. 133 at p. 14 & p. 16 (Bankr. S.D.N.Y. Aug. 6, 2013) (excluding avoidance actions and proceeds thereof from property that could be used to pay superpriority claims under section 507(b) and similarly excluding avoidance actions and proceeds from the scope of adequate protection liens); *In re Hostess Brands, Inc.*, Case No. 12-22052-RDD, ECF No. 254 at p. 17, p. 20 & pp. 28-29 (Bankr. S.D.N.Y. Feb. 3, 2012) (same).

[28]    The Committee understands that the DIP Agents are prepared to consent to this construct with respect to proceeds of Avoidance Actions and certain Japanese notes, provided that the Prepetition Secured Parties are also subject to similar restrictions.

**2.      The Debtors' 506(c) Waiver Should Not Apply to the Prepetition Secured
Parties**

35.      Paragraph 10 of the Final Order contains an expansive prohibition on ***any***
"expenses of administration of the Cases" being "charged against or recovered from the DIP
Collateral or the Prepetition Collateral, as the case may be, pursuant to section 506(c) of the
Bankruptcy Code or any similar principle of law," without the written consent of the DIP Agents
and all of the Prepetition Agents.

36.      The practical effect of a section 506(c) waiver as to the Prepetition Secured
Parties is to eliminate a further avenue of recovery for the Debtors' estates and to materially
increase the prospect that the costs of the Debtors' reorganization will be borne by the unsecured
creditors alone.  A section 506(c) surcharge may be particularly necessary if the RSA plan fails.
Yet, the very parties seeking to extract this boundless waiver are the parties who have crafted
that plan and tell us that it will be confirmed.  This may turn out to be wrong.  As such, any such
waiver here contravenes the intent behind Congress's inclusion of section 506(c) in the
Bankruptcy Code.  *See, e.g.*, *In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The
underlying rationale for charging a lienholder with the costs and expenses of preserving or
disposing of the secured collateral is that the general estate and unsecured creditors should not be
required to bear the cost of protecting what is not theirs.").[29]

37.      To be clear, since the DIP Lenders are providing new credit and value to the
Debtors' estates, the Committee does not object to a waiver of the right to surcharge against *the
DIP Collateral* prior to the repayment in full of the DIP Obligations.  But there is no basis for

---

[29]      Courts often reject attempted waivers of surcharge rights under section 506(c).  *See, e.g.*, *Hartford Fire Ins. Co.
v. Norwest Bank Minnesota, N.A. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (B.A.P. 8th Cir. 1998) (holding
that provision in DIP financing order purporting to immunize lender from Bankruptcy Code section 506(c)
surcharges was unenforceable and would create an improper windfall); *In re Colad Grp.*, 324 B.R. at 224
(refusing to approve DIP financing with a section 506(c) waiver intact); *In re Brown Bros., Inc.*, 136 B.R. 470,
474 (W.D. Mich. 1991) (concluding that a Bankruptcy Code section 506(c) waiver "is not enforceable in light
of the congressional mandate that a trustee have the authority to use a portion of secured collateral for its
preservation or proper disposal").

any waiver of the estates' rights *after* the DIP Obligations have been repaid, and the inclusion of

a continuing waiver in the Final Order only provides unwarranted benefits for the Prepetition

Secured Parties at the expense of unsecured creditors.  The Committee's proposed clarifying

language appears on pages 34-35 of **Exhibit A**.

### 3.    The Estates' Marshaling and 552(b) Rights Should Remain Effective Vis-à-Vis the Prepetition Secured Parties

38.    The Final Order contains blanket waivers of the estates' rights under Bankruptcy

Code section 552(b) and the common law doctrine of marshaling.  *See* Final Order ¶¶ 9 & 11.

There is no reason why the Prepetition Secured Parties should benefit from the Debtors'

gratuitous waiver of these important rights, particularly at unsecured creditors' expense.

### a.    Section 552(b) Waiver

39.    The equities of the case exception contained in Bankruptcy Code section 552(b)

allows the Debtors, the Committee, and other parties in interest to argue that equitable

considerations justify the exclusion of postpetition proceeds from a secured creditor's collateral

package.  As explained above, the Prepetition Secured Parties and Apollo are the intended

primary beneficiaries of these Chapter 11 Cases and the Debtors' RSA.  Waiving the equities of

the case exception is inappropriate, particularly since that waiver will be relevant in precisely

circumstance that the RSA parties tell us should not happen, i.e., their plan fails.  The Court

cannot possibly determine the "equities of the case" only weeks after the Petition Date, or order

the elimination today of a remedy that could be based on the "equities of the case" tomorrow.

Any finding of fact that prospectively waives the "equities of the case" exception set forth in

section 552(b) is premature.[30]  Instead, the Committee believes that the rights of all parties to

---

[30]    *See, e.g.*, *Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re TerreStar Networks, Inc.)*, 457 B.R. 254, 272-73
(Bankr. S.D.N.Y. 2011) (denying request for 552(b) waiver as premature because factual record was not fully
developed); *In re Metaldyne Corp.*, No. 09-13412, 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009)
(declining to waive equities of the case exception in connection with approval of debtor's use of cash collateral).

argue that the equities of the case exception applies should be preserved and that the proposed
waiver should simply be deleted from the Final Order.[31]

### b.   Marshaling Waiver[32]

40.     The equitable doctrine of marshaling requires a secured creditor first to seek
recovery from assets against which other creditors do not have a claim before looking to
common assets.[33]   Marshaling "prevent[s] the arbitrary action of a senior lienor from destroying
the rights of a junior lienor or a creditor having less security."[34]

41.     In the context of a bankruptcy case, the representative of a bankruptcy estate can
assert equitable marshaling rights against secured creditors by virtue of the powers given to the
trustee by Bankruptcy Code section 544(a).[35]   In fact, the case law is clear that an official
committee can stand in the shoes of the debtor in possession to pursue marshaling rights on
behalf of the bankruptcy estate and all general unsecured creditors.[36]   Thus, the Debtors'

---

[31]   At a minimum, the order should be without prejudice to any party's rights to seek relief under section 552(b)
based on any facts that arise after the date of the Final Order.  *See, e.g.*, *In re Excel Maritime Carriers, Ltd.*,
Case No. 13-23060-RDD, ECF No. 133 at p. 13 (Bankr. S.D.N.Y. Aug. 6, 2013) (containing such a reservation).

[32]   Although the Interim Order included a marshaling waiver that was not expressly subject to entry of the Final
Order, the Interim Order itself is clear that nothing had been approved on a final basis when it describes the
final hearing at which the Court will "consider entry of [the Final Order] authorizing and approving on a final
basis the relief requested in the [DIP Financing] Motion."  Interim Order at p. 7.  Indeed, a complete elimination
of marshaling at the interim stage would be inconsistent with the provisions of Local Rule 4001-2(k) that limit
the conclusions of law permitted in interim financing orders and also would be fundamentally unfair to the
Committee (which did not exist prior to, and thus had no notice or opportunity to object at, the interim hearing)
and, more importantly, its constituency.

[33]   *See In re Advanced Marketing Servs., Inc.*, 360 B.R. 421, 427 n.8 (Bankr. D. Del. 2007) ("[Marshaling] requires
the senior secured creditor to first collect its debt against the collateral other than that in which the junior
secured creditor holds an interest, thereby leaving that collateral for the junior secured creditor's benefit."
(citation omitted)).

[34]   *Meyer v. United States*, 375 U.S. 233, 237 (1963).

[35]   *See, e.g.*, *United States v. Houghton (In re Szwyd)*, 408 B.R. 547, 550 (D. Mass. 2009); *Kittay v. Atl. Bank of
N.Y. (In re Global Serv. Grp. LLC)*, 316 B.R. 451, 463 (Bankr. S.D.N.Y. 2004); *Official Comm. of Unsecured
Creditors v. Lozinski (In re High Strength Steel, Inc.)*, 269 B.R. 560, 573-74 (Bankr. D. Del. 2001); *Official
Comm. of Unsecured Creditors v. Hudson United Bank (In re America's Hobby Ctr., Inc.)*, 223 B.R. 275, 287
(Bankr. S.D.N.Y. 1998); *Fundex Capital Corp. v. Balaber-Strauss (In re Tampa Chain Co. Inc.)*, 53 B.R. 772,
777-778 (Bankr. S.D.N.Y. 1985).

[36]   *See In re America's Hobby Ctr.*, 223 B.R. at 287.  *Accord In re High Strength Steel*, 269 B.R. at 573 (allowing
trustee to continue to pursue marshaling claim originally contained in complaint filed by the official committee
of unsecured creditors).

proposed categorical waiver of marshaling rights will adversely affect the Committee's rights in the Chapter 11 Cases.

42.     The Committee submits that any marshaling waiver should be limited to its logical function in the context of the Final Order – i.e., the waiver should apply only in a scenario in which, as the title of paragraph 9 itself provides, there is an Event of Default under the DIP Documents and the DIP Agents and the DIP Lenders actually proceed to exercise remedies against the Debtors.  Absent that scenario, there should not be a generalized waiver of marshaling rights, even as to the DIP Lenders, because such a waiver could lead to a situation in which the DIP Lenders are repaid with otherwise unencumbered assets – despite the absence of any default – leaving only encumbered assets in the Debtors' estates.  In any event, there is no justification whatsoever for the inclusion of the Prepetition Secured Parties or the Prepetition Collateral within the scope of the marshaling waiver; to the extent that a representative of the Debtors' estates could assert marshaling rights under Bankruptcy Code section 544(a) against the Prepetition Secured Parties on the Petition Date, nothing about the Final Order should eliminate or otherwise affect those estate rights to the detriment of unsecured creditors.  The Committee's proposed clarifying language appears on pages 33-34 of **Exhibit A**.

**4.     Payment of Second Lien Noteholder Professional Fees Should Limited, at Most, to One Set of Professionals and Subject to Recharacterization in All Events**

43.     The Final Order provides that the Debtors' estates will pay currently "to the Ad Hoc Committee of Second Lien Noteholders all reasonable, actual and documented fees and expenses of counsel and advisors" subject only to potential challenges for unreasonableness.  *See* Final Order ¶ 22(c).  These various fees are *in addition* to the separate fees payable "to the Second Lien Indenture Trustee under the Second Lien Indenture."  *See id.*

44.     As a general matter, the Committee does not believe that *any* second lien creditor has a right to receive full and current payment of its professional fees; the second lien creditors

are admittedly not oversecured,[37] and thus any claims for professional fees payable under a prepetition contract are, at most, unsecured claims[38] – i.e., claims that should be paid ratably with similarly situated claims at the end of the case, under a plan, and subject to Court approval.[39]

45.        Nevertheless, but subject to the right to seek recharacterization of any payments to the Second Lien Indenture Trustee's professionals, the Committee does not object to the payment of fees and expenses to *one set of professionals* that can represent the interests of the Second Lien Noteholders.  The Committee submits that the appropriate party is the Second Lien Indenture Trustee, which is the party charged with representing all Second Lien Noteholders under the Second Lien Indenture.[40]  In contrast, the Ad Hoc Committee of Second Lien Noteholders is a mere unidentified *subset* of the Second Lien Noteholders, a subset that has negotiated special rights for themselves under the RSA and related agreements.  The Ad Hoc Committee of Second Lien Noteholders evidently believes that its mere presence in these cases will benefit the entire class of Second Lien Noteholders and that therefore cash payments to the professionals for this group will trickle down to the entire class of Second Lien Noteholders as adequate protection.  But the Ad Hoc Committee of Second Lien Noteholders is not a fiduciary

---

[37]    It is black letter law that Bankruptcy Code section 506(b) allows payment of postpetition interest, fees, and costs *only to the extent a secured claim is oversecured.  See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 382 (1988) (denying postpetition interest sought as adequate protection by an undersecured creditor); *Baybank-Middlesex v. Ralar Distribs., Inc.*, 69 F.3d 1200, 1203 (1st Cir. 1995) ("We need not determine whether there was a failure of adequate protection because . . . Baybank, as an undersecured creditor, is not entitled to postpetition interest and fees under § 506(b) . . . .").  Even for oversecured creditors, however, there is no right to *current*, real-time payments during the pendency of the bankruptcy case. *See, e.g.*, *Orix Credit Alliance, Inc. v. Delta Res., Inc. (In re Delta Res., Inc.)*, 54 F.3d 722, 727-30 (11th Cir. 1995).

[38]    *See, e.g.*, *Ogle v. Fid. & Deposit Co.*, 586 F.3d 143, 146-47 (2d Cir. 2009).  *But see Randolph v. Scruggs*, 190 U.S. 533, 538-39 (1903) (Holmes, J.) (holding that there is no generalized right to payment of postpetition attorneys' fees for services rendered to assignee for the benefit of creditors after the filing of a bankruptcy petition).

[39]    *See, e.g.*, *Official Comm. of Equity Sec. Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir. 1987); *In re Wash. Mut., Inc.*, 442 B.R. 314, 365 (Bankr. D. Del. 2011).

[40]    The fact that the Ad Hoc Committee of Second Lien Noteholders could theoretically direct the Second Lien Indenture Trustee to retain the group's professionals as its own does not make this issue one of form over substance.  In order to give such a direction, the group may need to indemnify the Second Lien Indenture Trustee.  In addition, the subject professionals would then be working for an entity with duties to *all* Second Lien Noteholders, not merely to the selected subset that is included in the ad hoc group.

and has no obligations to any other Second Lien Noteholders.  A self-anointed entity, the Ad Hoc

Committee of Second Lien Noteholders has no right to extract payments that find no support in

the Bankruptcy Code.[41]  Rather, the sole procedure envisioned by Congress for compensation for

professional fees incurred by *a subset* of a creditor class that confers an actual benefit upon the

Debtors' estates is to seek payment under Bankruptcy Code section 503(b)(4), upon notice and a

hearing, for a proven "substantial contribution" to the case.[42]  Unless this occurs, there is no

justification for the Debtors' estates bearing the costs of expensive professionals acting on behalf

of only some of the Second Lien Noteholders.

**C.**  **Other Provisions of the Final Order Should Be Revised or Clarified**

46.    Although the provisions of the Final Order discussed above are the most troubling

aspects of the Final Order, several additional provisions should be revised or clarified.

**1.**  **The Committee Investigation Period and Budget Are Inadequate, and the Final Order Should Include a Tolling Period If the Committee Moves for Standing to Pursue Claims and Defenses on Behalf of the Estates**

47.    The Final Order contains several inappropriately restrictive limitations on the

Committee's ability to investigate and pursue Claims and Defenses.

48.    *First*, paragraph 26 of the Final Order provides that all of the varied and broadly-

drafted stipulations and admissions contained anywhere in the Final Order will be binding on all

parties in interest unless the Committee successfully seeks and obtains standing and has timely

filed an adversary proceeding or contested matter "on or before the earlier of (1) 90 days after

entry of this Order and (2) the commencement of a hearing with respect to the confirmation of a

plan of reorganization for any of the Debtors."

---

[41]    In fact, providing such unwarranted largess raises real risks that the Debtors' cases will be ones in which similarly situated creditors (i.e., Second Lien Noteholders not part of the "group") are not provided similar treatment, a result anathema to bedrock principles of U.S. bankruptcy law.  *See, e.g.*, 11 U.S.C. § 1123(a)(4).

[42]    *See, e.g.*, *In re Spansion Inc.*, Case No. 09-10690 (KJC), ECF No. 4619 (Bankr. D. Del. May 14, 2014) [copy attached hereto as **Exhibit C**] (considering requests for payment of professional fees and expenses of two different ad hoc committees under Bankruptcy Code section 503(b)(3) and (b)(4) and post-confirmation).

49.     The Committee submits that this investigation period is too short.  The Debtors'
own investment banker has observed how "the complex multi-national aspects" of these cases
and "the Debtors' complex capital structure" materially affected the Debtors' negotiation of the
DIP Loans.  *See* Derrough Declaration ¶¶ 12 & 16.  This same complexity was cited by the
Debtors' CFO as a reason why the Debtors had to delay filing their bankruptcy schedules.  *See*
First Day Declaration ¶ 71.

50.     The Debtors are correct that this is a complex case necessitating longer time-
periods.  Beyond the complex capital structure involving billions of dollars of debt layered in
multiple, inter-connected transfers and the multi-national aspects lies the need to shed light on
the layered web of transactions and relationships between the Debtors, Apollo, MSC, and other
parties in interest.  The Committee appropriately requires time in which to investigate these and
other issues, particularly if the Debtors insist on simultaneously proceeding down the plan
confirmation path.

51.     Moreover, as discussed above, the imposition of an early deadline on the
commencement of litigation is logically inconsistent with the RSA parties' proposal to confer
broad releases under their plan of reorganization.  There is no basis to require the Committee to
commence litigation regarding the scope of liens and security interests, and prepetition transfers,
when the plan of reorganization promoted by the RSA parties confers full estate releases and
pays certain unsecured creditors in full, while paying nothing to other creditors who they assert
are not entitled to anything.  If, however, the RSA parties are wrong – and their plan is not
confirmable – there will be time to sort these issues out before commencement of litigation.  As
such, the Committee submits that its investigation period should be no less than **150 days after
entry of the Final Order**, which sets a far more reasonable period in which the Committee may

do its work and more closely fits with the investigation periods in cases of comparable size or complexity.[43]

52.     *Second*, paragraph 27 of the Final Order is similarly restrictive when it limits the Committee to expending no more than $250,000 to investigate the validity, enforceability, or priority of all of the varied pieces of the prepetition secured debt *and* to investigate any Claims and Defenses against the Prepetition Secured Parties.  The Committee submits that the investigatory budget should be increased to **$500,000**, which again is more in line with the budgets in cases of comparable size or complexity.[44]

53.     *Third*, the Final Order should provide that the filing of a standing motion within the challenge period satisfies the requirement of commencing an adversary proceeding within a specified time period, which is a construct that courts frequently approve in DIP financing orders.[45]  The Committee's proposed clarifying language appears on page 60 of **Exhibit A**.

### 2.     The DIP Facility Should Not Be Subject to an Event of Default Merely as a Result of a Termination of Plan Exclusivity

54.     The credit agreements for the DIP financing provide that an Event of Default will occur if "the Bankruptcy Court shall terminate or reduce the period pursuant to Section 1121 of the Bankruptcy Code during which the Debtors have the exclusive right to file a plan of reorganization and solicit acceptances thereof."[46]

---

[43]   *See, e.g., In re Metro Affiliates, Inc.*, Case No. 13-13591, ECF No. 190 at pp. 29-30 (Bankr. S.D.N.Y. Dec. 4, 2013) (investigation period ended 120 days after entry of final order); *In re Eastman Kodak Company*, Case No. 12-10202, ECF No. 375 at pp. 50-51 (Bankr. S.D.N.Y. Feb. 16, 2012) (investigation period ended 180 days after entry of final order).  The suggested period is the mid-point between these two cases, although in size and complexity, these cases are more analogous to Kodak.

[44]   *See, e.g., In re Eastman Kodak Company*, Case No. 12-10202, ECF No. 375 at p. 54 (Bankr. S.D.N.Y. Feb. 16, 2012) (providing $250,000 for U.S. investigations and $250,000 for non-U.S. investigations).

[45]   *See, e.g., In re Lyondell Chemical Company*, Case No. 09-10023, ECF No. 1002 at p. 60 (Bankr. S.D.N.Y. Mar. 1, 2009); *In re Delta Air Lines, Inc.*, Case No. 05-17923, ECF No. 652 at p. 36 (Bankr. S.D.N.Y. Oct. 6, 2005).

[46]   *See* DIP ABL Loan Agreement § 7.01(m)(vi)(e); DIP Term Loan Agreement § 7.01(m).F.(e).

55.     The Committee submits that the Final Order should be revised to supersede this provision.  The plan contemplated by the RSA includes earmarks of a "new value" plan, which may necessitate the termination of exclusivity.[47]  Creating an Event of Default keyed to what might be legally required under the circumstances not only unduly limits this Court's ability to apply the law, but also is unnecessary insofar as the DIP Lenders are protected by other, more substantive Events of Default that could arise if the Debtors pursue a plan that is not an "Approved Plan of Reorganization."[48]  Because the potential for this Event of Default to create problems far outweighs its benefits to the DIP Lenders or any other parties in interest, the Final Order should supersede this provision.  The Committee's proposed clarifying language appears on page 26 of **Exhibit A**.

## IV.    RESERVATION OF RIGHTS

56.     The Committee expressly reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections to the DIP Financing Motion and the form of Final Order, and to introduce evidence prior to or at any hearing regarding the DIP Financing Motion in the event that the Committee's objections are not resolved prior to such hearing.  In addition, the proposed form of Final Order the Debtors filed on May 15 incorporates various drafting and other revisions requested by the Committee (including language clarifying the non-release of Apollo and various related parties). In the event that the final proposed Final Order submitted by the Debtors does not include such revisions, or include additional revisions to which the Committee has not agreed, the Committee reserves all rights to object to such aspects of the Final Order at the May 23, 2014 hearing.

---

[47]    *See, e.g.*, *H.G. Roebuck & Son, Inc. v. Alter Commc'ns, Inc.*, 2011 U.S. Dist. LEXIS 59781, at *25-27 (D. Md. June 3, 2011); *In re Euro-American Lodging Corp.*, 365 B.R. 421, 432 (Bankr. S.D.N.Y. 2007); *In re Hoffinger Indus.*, 321 B.R. 498, 511 (Bankr. E.D. Ark. 2005); *In re Situation Mgmt. Sys.*, 252 B.R. 859, 863-66 (Bankr. D. Mass. 2000); *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 49 (Bankr. D. Del. 2000).

[48]    *See, e.g.*, DIP ABL Loan Agreement § 7.01(m)(vi)(b)-(d); DIP Term Loan Agreement § 7.01(m).F.(b)-(d).

## V.    CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court modify the proposed

Final Order as set forth herein and grant such other and further relief as may be just and proper.


May 15, 2014                                                Respectfully submitted,

         /s/   Lee R. Bogdanoff
Kenneth N. Klee
Lee R. Bogdanoff (admitted *pro hac vice*)
Whitman L. Holt (admitted *pro hac vice*)
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Telephone:    (310) 407-4000
Facsimile:    (310) 407-9090
kklee@ktbslaw.com
lbogdanoff@ktbslaw.com
wholt@ktbslaw.com

*Proposed Counsel to Official Committee of
Unsecured Creditors*

# Exhibit A

**[Committee's proposed revisions to the Final Order]**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
In re:                                                            :
                                                                  :
MPM Silicones, LLC, *et al.*,[1]                                  :      Chapter 11
                                                                  :
                                                                  :
                        Debtors.                                  :      Case No. 14-22503 (RDD)
                                                                  :      Jointly Administered
---------------------------------------------------------------- x

**FINAL ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363(c), 363(d), 364(c), 364(d), 364(e)**
**AND 507 AND BANKRUPTCY RULES 2002, 4001 AND 9014 (I) AUTHORIZING THE**
**DEBTORS TO OBTAIN POSTPETITION FINANCING,**
**(II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL AND**
**(III) GRANTING ADEQUATE PROTECTION TO**
**PREPETITION SECURED LENDERS**

Upon the motion, dated April 13, 2014 (the "Motion"), of Momentive

Performance Materials Holdings Inc. ("Holdings") and certain of its subsidiaries and affiliates as

debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11

cases (the "Cases") commenced on April 13, 2014 (the "Petition Date") for interim and final

orders under sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e)

and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the

"Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure

---

[1] The last four digits of the taxpayer identification numbers of the Debtors follow in
parentheses:  (i) Juniper Bond Holdings I LLC (9631); (ii) Juniper Bond Holdings II
LLC(9692); (iii) Juniper Bond Holdings III LLC (9765); (iv) Juniper Bond Holdings IV
LLC (9836); (v) Momentive Performance Materials China SPV Inc. (8469); (vi)
Momentive Performance Materials Holdings Inc. (8246); (vii) Momentive Performance
Materials Inc. (8297); (viii) Momentive Performance Materials Quartz, Inc. (9929); (ix)
Momentive Performance Materials South America Inc. (4895); (x) Momentive Performance
Materials USA Inc. (8388); (xi) Momentive Performance Materials Worldwide Inc.
(8357); and (xii); MPM Silicones LLC (5481).  The Debtors' executive headquarters are
located at 260 Hudson River Road, Waterford, NY 12188.

(as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules for the

United States Bankruptcy Court for the Southern District of New York (this "Court") seeking:

      (I)  authorization for the Debtors to obtain debtor-in-possession financing in the

aggregate principal amount of $570,000,000 consisting of (i) an asset-based revolving

facility in the aggregate principal amount of $270,000,000 (the "DIP ABL Facility," all

extensions of credit (including the issuance of letters of credit) under the DIP ABL

Facility, the "DIP ABL Loans"), consisting of a last-in, first-out tranche in an aggregate

principal amount of $200,000,000 and a first-in, last-out tranche in an aggregate

amount of $70,000,000 and (ii) a term loan facility in the aggregate principal amount of

$300,000,000 (the "DIP Term Loan Facility"; all extensions of credit under the DIP

Term Loan Facility, the "DIP Term Loans" and, together with the DIP ABL Loans, the

"DIP Loans") on the terms and conditions set forth in:

- the Interim Order (as defined below) and this final order (this "Order");

- the Senior Secured Debtor-in-Possession and Exit Amended and Restated
  Asset Based Revolving Credit Agreement (substantially in the form annexed
  to the Motion as Exhibit B, and as amended, supplemented or otherwise
  modified, the "DIP ABL Agreement," and, together with the Commitment/Fee
  Letters (as defined below) and all other agreements, documents and
  instruments executed and delivered in connection with the DIP ABL
  Agreement, as amended, supplemented or otherwise modified, the "DIP ABL
  Documents"), among Momentive Performance Materials USA Inc. as a
  borrower (in such capacity, the "U.S. ABL Borrower"), Momentive
  Performance Materials GmbH (a non-Debtor entity) as a borrower (the
  "German Silicone Borrower"), Momentive Performance Materials Quartz
  GmbH (a non-Debtor entity) as a borrower (the "German Quartz Borrower")
  and Momentive Performance Materials Nova Scotia ULC (a non-Debtor
  entity) as a borrower (the "Canadian Borrower" and, together with the
  German Silicone Borrower and the German Quartz Borrower, the
  "Non-Debtor Borrowers," and, together with the U.S. ABL Borrower, the
  "DIP ABL Borrowers"), Holdings, Momentive Performance Materials Inc.
  ("Intermediate Holdings"), each subsidiary of Intermediate Holdings that is
  party thereto in its capacity as a guarantor (collectively, the "DIP ABL
  Facility Guarantors"), the lenders party thereto from time to time

2

(collectively, together with the other Secured Parties (as defined in the DIP ABL Agreement), the "DIP ABL Lenders"), JPMorgan Chase Bank, N.A. ("JPMorgan"), as administrative agent and collateral agent for the DIP ABL Lenders (in such capacities, the "DIP ABL Agent"), and J.P. Morgan Securities LLC, Citigroup Global Markets Inc. and Credit Suisse Securities (USA) LLC in their respective capacities as arrangers thereunder (such arrangers, the "DIP Arrangers"); and

- the Senior Secured Debtor-in-Possession Term Loan Agreement (substantially in the form annexed to the Motion as Exhibit C and as amended, supplemented or otherwise modified, the "DIP Term Loan Agreement" and, together with the DIP ABL Agreement, the "DIP Credit Agreements"; the DIP Term Loan Agreement, together with the Commitment/Fee Letters and all other agreements, documents and instruments executed and delivered in connection with the DIP Term Loan Agreement, as amended, supplemented or otherwise modified, the "DIP Term Loan Documents" and, together with the DIP ABL Documents, the "DIP Documents"), among Momentive Performance Materials USA Inc. as a borrower (in such capacity the "DIP Term Loan Borrower"), Holdings, Intermediate Holdings, each domestic subsidiary of Intermediate Holdings that is party thereto in its capacity as a guarantor (collectively, the "DIP Term Loan Facility Guarantors"), the lenders party thereto from time to time (collectively, together with the other Secured Parties (as defined in the DIP Term Loan Agreement), the "DIP Term Loan Lenders", together with the DIP ABL Lenders, the "DIP Lenders"), JPMorgan, as administrative agent and collateral agent for the DIP Term Loan Lenders (in such capacities, the "DIP Term Loan Agent" and, together with the DIP ABL Agent, the "DIP Agents"), and each of the DIP Arrangers in their respective capacities as arrangers thereunder;

(II) authorization for (a) the DIP ABL Facility Guarantors (including the U.S. ABL Borrower in its capacity as a guarantor of the obligations of the Non-Debtor Borrowers) to guarantee on a secured basis the DIP ABL Borrowers' obligations in respect of the DIP ABL Loans on a joint and several basis, including to guarantee any DIP ABL Loans advanced to the Non-Debtor Borrowers and (b) the DIP Term Loan Facility Guarantors to guarantee on a secured basis the DIP Term Loan Borrower's obligations in respect of the DIP Term Loans on a joint and several basis;

(III)  authorization for the Debtors to execute and deliver the DIP Credit Agreements and the other DIP Documents to which they are a party and to perform their

respective obligations thereunder and such other and further acts as may be necessary or appropriate in connection therewith;

(IV)  authorization for the Debtors to (a) use proceeds of the initial borrowing under the DIP ABL Facility and the DIP Term Loan Facility as required pursuant to the DIP Credit Agreements to repay in full the Prepetition ABL Obligations (as defined in paragraph 4(a) below) arising under the Asset-Based Revolving Credit Agreement, dated as of April 24, 2013 (as amended, supplemented or otherwise modified, the "Prepetition ABL Agreement", and together with all security, pledge and guaranty agreements and all other documentation executed in connection with any of the foregoing, each as amended, supplemented or otherwise modified, the "Prepetition ABL Documents"), among each of the DIP ABL Borrowers in their respective capacities as borrowers thereunder (collectively, the "Prepetition ABL Borrowers"), Holdings, Intermediate Holdings, the lenders party thereto from time to time (together with the other Secured Parties (as defined in the Prepetition ABL Credit Agreement), the "Prepetition ABL Lenders") and JPMorgan as administrative agent and collateral agent for the Prepetition ABL Lenders (in such capacities, the "Prepetition ABL Agent") and (b) issue letters of credit under the DIP ABL Facility and to deem all outstanding letters of credit issued under the Prepetition ABL Agreement (the "Prepetition Letters of Credit") as letters of credit issued under the DIP ABL Facility;

(V)  authorization for the Debtors to (a) use the Cash Collateral (as defined in paragraph 14 below) pursuant to section 363 of the Bankruptcy Code, and all other Prepetition Collateral (as defined in paragraph 4(b) below), and (b) provide adequate

protection to the following parties with respect to the applicable prepetition secured debt

obligations of:

(i)  the lenders (collectively, together with all other Secured Parties (as defined in the Cash Flow Credit Agreement referenced below), the "Cash Flow Lenders") under the Second Amended and Restated Credit Agreement, dated as of April 24, 2013 (as amended, supplemented or otherwise modified, the "Cash Flow Credit Agreement", and, together with all security, pledge and guaranty agreements and all other documentation executed in connection with any of the foregoing, each as amended, supplemented or otherwise modified, the "Cash Flow Documents"), among the U.S. ABL Borrower, the Canadian Borrower and the German Silicone Borrower in their respective capacities as borrowers thereunder, Holdings, Intermediate Holdings, the Cash Flow Lenders and JPMorgan, as administrative agent and collateral agent for the Cash Flow Lenders (in such capacities, the "Cash Flow Agent");

(ii)  the noteholders (collectively, the "First Lien Noteholders") under the Indenture, dated as of October 25, 2012 (as amended, supplemented or otherwise modified, the "First Lien Indenture", and together with all security, pledge and guaranty agreements and all other documentation executed in connection with any of the foregoing, each as amended, supplemented or otherwise modified, the "First Lien Documents"), among MPM Escrow LLC and MPM Finance Corp. as escrow issuers, and The Bank of New York Mellon Trust Company, N.A., as trustee for the First Lien Noteholders (together with the collateral agent for the First Lien Noteholders, the "First Lien Indenture Trustee");

(iii)  the noteholders (collectively, the "1.5 Lien Noteholders") under the Indenture, dated as of May 25, 2012 (as amended, supplemented or otherwise modified, the "1.5 Lien Indenture", and together with all security, pledge and guaranty agreements and all other documentation executed in connection with the foregoing, each as amended, supplemented or otherwise modified, the "1.5 Lien Documents"), among Intermediate Holdings, certain of its subsidiaries party thereto and The Bank of New York Mellon, N.A. as trustee for the 1.5 Lien Noteholders (together with the collateral agent for the 1.5 Lien Noteholders, the "1.5 Lien Indenture Trustee"); and

(iv)  the noteholders (collectively, the "Second Lien Noteholders") under the Indenture, dated as of November 5, 2010 (as amended, supplemented or otherwise modified, the "Second Lien Indenture", and together with all security, pledge and guaranty agreements and all other documentation executed in connection with the foregoing, each as amended, supplemented or otherwise modified, the "Second Lien Documents"; the Second Lien Documents collectively with the Prepetition ABL Documents, the Cash Flow Documents, the First Lien Documents and the 1.5 Lien Documents, the "Prepetition Debt Documents"), among Intermediate Holdings, certain of its subsidiaries party thereto and The Bank of New York Mellon, N.A. as trustee for the Second Lien Noteholders (together with the

collateral agent for the Second Lien Noteholders, the "Second Lien Indenture Trustee", and together with the 1.5 Lien Indenture Trustee, the First Lien Trustee, the Cash Flow Agent and the Prepetition ABL Agent, the "Prepetition Agents"); and the Prepetition Agents collectively with the Second Lien Noteholders, the 1.5 Lien Noteholders, the First Lien Noteholders, the Cash Flow Lenders and the Prepetition ABL Lenders, the "Prepetition Secured Parties");

(VI)  authorization for the DIP Agents to exercise remedies under the DIP Documents upon the occurrence and during the continuance of an Event of Default (as defined in the DIP ABL Agreement and the DIP Term Loan Agreement, as applicable);

(VII) authorization for the Debtors to perform their obligations under, and pay the fees set forth in the Commitment/Fee Letters (as defined in paragraph 6(d)(iv)), including with respect to the proposed exit financing facilities referenced in the Commitment/Fee Letters;

(VIII) ~~subject to entry of this Order, authorization to grant liens to the DIP Agents on the proceeds of the Debtors' claims and causes of action (but not on the actual claims and causes of action)~~ ~~arising under chapter 5 of the Bankruptcy Code (collectively, the "Avoidance Actions");~~ [intentionally omitted];

(IX) subject to entry of this Order, the waiver by the Debtors of any right to seek to surcharge against the DIP Collateral (as defined in paragraph 8 below) ~~or the Prepetition Collateral~~ pursuant to section 506(c) of the Bankruptcy Code, but only to the extent set forth in paragraph 10 below;

(X)  to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of an order (the "Interim Order", and, together with this Order, the "Orders") (a) authorizing (i) the U.S. ABL Borrower, on an interim basis, to borrow under the DIP ABL Facility up to $130,000,000 of DIP ABL Loans (including through the issuance or deemed issuance of

letters of credit) and (ii) the DIP Term Loan Borrower, on an interim basis, to borrow

under the DIP Term Loan Facility up to $300,000,000 of DIP Term Loans, the collective

proceeds of which shall be used for working capital and general corporate purposes of the

Debtors and their affiliates (including costs related to the Cases) and to repay in full the

Prepetition ABL Obligations, (b) authorizing the Debtors to use the Cash Collateral and

the other Prepetition Collateral, and (c) granting adequate protection to the Prepetition

Secured Parties; and

(XI)  to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final

Hearing") for this Court to consider entry of this Order authorizing and approving on a

final basis the relief requested in the Motion, including without limitation, for the DIP

Borrowers to borrow the balance of the DIP Loans, for the Debtors to continue to use the

Cash Collateral and the other Prepetition Collateral and for the Debtors to grant adequate

protection to the Prepetition Secured Parties.

The Interim Hearing having been held by this Court on April 14, 2014, and the Interim

Order granting the relief sought in the Motion having been entered by this Court on such date,

and notice of the Final Hearing having been given in the manner as set forth in the Interim

Order, and the Final Hearing having been held by this Court on May 23, 2014;

Upon the record made at the Interim Hearing and the Final Hearing, including without

limitation, the admission into evidence of the *Declaration of William H. Carter, Chief Financial

Officer of Momentive Performance Materials Inc.*, *in Support of Chapter 11 Petitions and First

Day Pleadings* and *Declaration of William Q. Derrough in Support of the Motion* filed on the

Petition Date, and the other evidence submitted or adduced and the arguments of counsel made

at the Interim Hearing and the Final Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Jurisdiction*.  This Court has core jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    *Notice*.  Notice of the Motion, the relief requested therein and the Final Hearing was served by the Debtors on (i) the United States Trustee for the Southern District of New York; (ii) the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; (iii) counsel to the DIP Agents; (iv) counsel to the Prepetition ABL Agent; (v) counsel to the Cash Flow Agent; (vi) counsel to the First Lien Indenture Trustee; (vii) counsel to the 1.5 Lien Indenture Trustee; (viii) counsel to the Second Lien Indenture Trustee; (ix) counsel to Apollo Global Management, LLC and certain of its affiliated funds (collectively, "Apollo"); (x) counsel to Momentive Performance Materials Holdings LLC; (xi) counsel to the ad hoc committee of Second Lien Noteholders represented by Milbank, Tweed, Hadley & McCloy LLP (the "Ad Hoc Committee of Second Lien Noteholders"); (xii) the United States Securities and Exchange Commission; (xiii) the Internal Revenue Service; (xiv) the Debtors' landlords; (xv) the financial institutions where the Debtors maintain deposit accounts; (xvi) the statutory committee of unsecured creditors appointed in the Cases by the U.S. Trustee on April 22, 2014, (the "Committee"); and (xvii) all other parties who requested service pursuant to Bankruptcy Rule 2002.  The notice given by the Debtors of the Motion, the relief requested therein and the Final Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules

4001(b) and (c), the local rules of the Southern District of New York, and the Interim Order, and

no further notice of the relief sought at the Final Hearing is necessary or required.

3.      *Approval of Motion*.  The relief requested in the Motion is granted as set forth

herein.  Except as otherwise expressly provided in this Order, any objection to the entry of this

Order that has not been withdrawn, waived, resolved or settled, is hereby denied and overruled

on the merits.

4.      *Debtors' Stipulations*.  Without prejudice to the rights of any other party (but

subject to the limitations thereon contained in paragraphs 26 and 27), the Debtors, for themselves

and not their estates, and subject to paragraph 26 hereof, admit, stipulate, and agree that:

(a)      as of the Petition Date, the Debtors, the Non-Debtor Borrowers and

their non-Debtor affiliates party to or otherwise obligated under the Prepetition ABL

Documents were truly and justly indebted and liable to the Prepetition ABL Lenders, without

defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than

$237 million in respect of loans and other extensions of credit made and Prepetition Letters

of Credit issued pursuant to the Prepetition ABL Documents, plus accrued and unpaid

interest thereon and any fees and expenses (including fees and expenses of attorneys) related

thereto as provided in the Prepetition ABL Documents, plus all other outstanding amounts

that would constitute Obligations under and as defined in the Prepetition ABL Agreement

(collectively, the "Prepetition ABL Obligations");

(b)      the liens and security interests granted by the Debtors to the

Prepetition ABL Agent (for the ratable benefit of the Prepetition ABL Lenders) to secure the

Prepetition ABL Obligations are (i) valid, binding, perfected, enforceable, first priority

(subject to permitted exceptions under the Prepetition ABL Agreement) liens on and security

interests in the Debtors' real and personal property constituting ABL Priority Collateral[2] (as

defined in the ABL Intercreditor Agreement referenced below), (ii) valid, binding, perfected,

enforceable, second priority (subject to permitted exceptions under the Prepetition ABL

Agreement) liens on and security interests in the Debtors' real and personal property

constituting Notes Priority Collateral[3] (as defined in the ABL Intercreditor Agreement; such

Notes Priority Collateral together with the ABL Priority Collateral of the Debtors, including

all Cash Collateral, the "Prepetition Collateral")[4], (iii) not subject to avoidance,

recharacterization or subordination (except as set forth in the ABL Intercreditor Agreement)

pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iv) subject and

subordinate only to other valid and unavoidable liens perfected prior to the Petition Date (or

perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy

Code) to the extent such liens are senior to the liens securing the Prepetition ABL

Obligations;

(c)       the liens and security interests granted to the Prepetition ABL Agent

(for the ratable benefit of the Prepetition ABL Lenders) by the Non-Debtor Borrowers and

their non-Debtor affiliates party to or otherwise obligated under the Prepetition ABL

Documents to secure the Prepetition ABL Obligations are (i) valid, binding, perfected,

enforceable, first priority (subject to permitted exceptions under the Prepetition ABL

Agreement) liens on and security interests in such Non-Debtor Borrowers' and non-Debtor

---

[2] "ABL Priority Collateral" includes, without limitation, accounts, inventory, certain payment
intangibles, accounts and the products and proceeds of the foregoing.

[3] "Notes Priority Collateral" includes, without limitation, real property, fixtures, equipment,
general intangibles (other than general intangibles that are ABL Priority Collateral),
intercompany indebtedness of Intermediate Holdings and its subsidiaries, and the products and
proceeds of the foregoing.

[4] The term "Prepetition Collateral" is defined by reference only to assets and property of the
Debtors, and therefore, the term Prepetition Collateral excludes any assets or property of any
Non-Debtor Borrower or other non-Debtor affiliate of any Debtor.

affiliates' real and personal property constituting ABL Priority Collateral (as defined in the

ABL Intercreditor Agreement), (ii) valid, binding, perfected, enforceable, second priority

(subject to permitted exceptions under the Prepetition ABL Agreement) liens on and security

interests in such Non-Debtor Borrowers' and non-Debtor affiliates' real and personal

property constituting Notes Priority Collateral, (iii) not subject to avoidance,

recharacterization or subordination (except as set forth in the ABL Intercreditor Agreement)

pursuant to any applicable law and (iv) subject and subordinate only to other valid and

unavoidable liens to the extent such liens are senior to the liens securing the Prepetition ABL

Obligations;

(d)        as of the Petition Date, the Debtors, the Non-Debtor Borrowers and

their non-Debtor affiliates party to or otherwise obligated under the Cash Flow Documents

were truly and justly indebted to the Cash Flow Lenders, without defense, counterclaim or

offset of any kind, in the aggregate principal amount of not less than $20.7 million in respect

of loans and other extensions of credit made by the Cash Flow Lenders pursuant to the Cash

Flow Documents, plus accrued and unpaid interest thereon and any fees and expenses

(including fees and expenses of attorneys and advisors) related thereto as provided in the

Cash Flow Documents, plus all other outstanding amounts that would constitute Obligations

under and as defined in the Cash Flow Credit Agreement (collectively, the "Cash Flow

Obligations");

(e)        the liens and security interests granted by the Debtors to the Cash

Flow Agent (for the ratable benefit of the Cash Flow Lenders) to secure the Cash Flow

Obligations are (i) valid, binding, perfected, enforceable, first priority (subject to permitted

exceptions under the Cash Flow Credit Agreement) liens on and security interests in the

Prepetition Collateral constituting Notes Priority Collateral (as defined in the ABL Intercreditor Agreement), (ii) valid, binding, perfected, enforceable, second priority (subject to permitted exceptions under the Cash Flow Credit Agreement) liens on and security interests in the Prepetition Collateral constituting ABL Priority Collateral (as defined in the ABL Intercreditor Agreement), in each case of (i) and (ii) *pari passu* with the liens on such collateral securing the First Lien Obligations, (iii) not subject to avoidance, recharacterization or subordination (except as set forth in the ABL Intercreditor Agreement and the First Lien Intercreditor Agreement) pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iv) subject and subordinate only to (A) the Carve-Out (as defined in paragraph 7(b) below) and the liens and security interests granted to secure the DIP Loans and the Adequate Protection Obligations (as defined in paragraph 20 below), (B) prior to repayment in full of the Prepetition ABL Obligations, the liens securing the Prepetition ABL Obligations with respect to the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) and (C) other valid and unavoidable liens perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) to the extent such liens are senior to the liens securing the Cash Flow Obligations;

(f)      the liens and security interests granted to the Cash Flow Agent (for the ratable benefit of the Cash Flow Lenders) by the Non-Debtor Borrowers and their non-Debtor affiliates party to or otherwise obligated under the Cash Flow Documents to secure the Cash Flow Obligations are (i) valid, binding, perfected, enforceable, first priority (subject to permitted exceptions under the Cash Flow Credit Agreement) liens on and security interests in such Non-Debtor Borrowers' and non-Debtor affiliates' real and personal property constituting Notes Priority Collateral (as defined in the ABL Intercreditor

12

Agreement and subject to Section 6.18 thereof), (ii) valid, binding, perfected, enforceable,

second priority (subject to permitted exceptions under the Cash Flow Credit Agreement)

liens on and security interests in such Non-Debtor Borrowers' and non-Debtor affiliates' real

and personal property constituting ABL Priority Collateral (as defined in the ABL

Intercreditor Agreement and subject to Section 6.18 thereof), (iii) not subject to avoidance,

recharacterization or subordination (except as set forth in the ABL Intercreditor Agreement

and the First Lien Intercreditor Agreement) pursuant to any applicable law and (iv) subject

and subordinate only to (A) the DIP Liens (as defined in paragraph 8 below) granted to

secure the DIP Loans, (B) prior to repayment in full of the Prepetition ABL Obligations, the

liens securing the Prepetition ABL Obligations with respect to the ABL Priority Collateral

(as defined in the ABL Intercreditor Agreement) and (C) other valid and unavoidable liens to

the extent such liens are senior to the liens securing the Cash Flow Obligations;

        (g)     as of the Petition Date, the Debtors party to or otherwise obligated

under the First Lien Documents were truly and justly indebted to the First Lien Noteholders,

without defense, counterclaim or offset  of any kind, in the aggregate principal amount of not

less than $1,100,000,000 in respect of loans and other extensions of credit made by the First

Lien Noteholders pursuant to the First Lien Documents, plus accrued and unpaid interest

thereon and fees and expenses (including fees and expenses of attorneys and advisors) as

provided in the First Lien Documents, plus all other amounts that would constitute

Obligations under and as defined in the First Lien Indenture (collectively, the "First Lien

Obligations"); provided that, as used in this Order, the term "First Lien Obligations" shall

not include any "make-whole" payment or other prepayment fees or premiums (unless and

until the Court determines that such amounts are "First Lien Obligations"), and the rights of

13

the Debtors, the First Lien Noteholders, and all other parties in interest regarding the extent,

if any, to which "First Lien Obligations" includes any "make-whole" payment or other

prepayment fees or premiums are hereby expressly reserved;

(h)    the liens and security interests granted by the Debtors to the First Lien

Indenture Trustee (for the ratable benefit of the First Lien Noteholders) to secure the First

Lien Obligations are (i) valid, binding, perfected, enforceable, first priority (subject to

permitted exceptions under the First Lien Indenture) liens on and security interests in the

Prepetition Collateral constituting Notes Priority Collateral (as defined in the ABL

Intercreditor Agreement), (ii) valid, binding, perfected, enforceable, second priority (subject

to permitted exceptions under the First Lien Indenture) liens on and security interests in the

Prepetition Collateral constituting ABL Priority Collateral (as defined in the ABL

Intercreditor Agreement), in each case of (i) and (ii), *pari passu* with the liens on such

collateral securing the Cash Flow Obligations, (iii) not subject to avoidance,

recharacterization or subordination (except as set forth in the ABL Intercreditor Agreement

and the First Lien Intercreditor Agreement) pursuant to the Bankruptcy Code or applicable

nonbankruptcy law and (iv) subject and subordinate only to (A) the Carve-Out and the liens

and security interests granted to secure the DIP Loans and the Adequate Protection

Obligations, (B) prior to repayment in full of the Prepetition ABL Obligations, the liens

securing the Prepetition ABL Obligations with respect to the ABL Priority Collateral and (C)

other valid and unavoidable liens perfected prior to the Petition Date (or perfected after the

Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) to the extent

such liens are senior to the liens securing the First Lien Obligations;

14

(i)        as of the Petition Date, the Debtors party to or otherwise obligated

under the 1.5 Lien Documents were truly and justly indebted to the 1.5 Lien Noteholders,

without defense, counterclaim or offset of any kind, in the aggregate principal amount of not

less than $250 million in respect of loans and other extensions of credit made by the 1.5 Lien

Noteholders pursuant to the 1.5 Lien Documents, plus accrued and unpaid interest thereon

and fees and expenses (including fees and expenses of attorneys and advisors) as provided in

the 1.5 Lien Documents, plus all other outstanding amounts that would constitute Obligations

under and as defined in the 1.5 Lien Indenture (collectively, the "1.5 Lien Obligations");

provided that, as used in this Order, the term "1.5 Lien Obligations" shall not include any

"make-whole" payment or other prepayment fees or premiums (unless and until the Court

determines that such amounts are "1.5 Lien Obligations"), and the rights of the Debtors, the

1.5 Lien Noteholders and all other parties in interest regarding the extent, if any, to which

"1.5 Lien Obligations" includes any "make-whole" payment or other prepayment fees or

premiums are hereby expressly reserved;

(j)        the liens and security interests granted to the 1.5 Lien Indenture

Trustee (for the ratable benefit of the 1.5 Lien Noteholders) to secure the 1.5 Lien

Obligations are (i) valid, binding, perfected, enforceable, third priority (subject to permitted

exceptions under the 1.5 Lien Indenture) liens on and security interests in the Prepetition

Collateral, (ii) not subject to avoidance, recharacterization or subordination (except as set

forth in the 1.5 Lien Intercreditor Agreement (as defined in paragraph 4(p) below)) pursuant

to the Bankruptcy Code or applicable nonbankruptcy law, and (iii) subject and subordinate

only to (A) the Carve-Out and the liens and security interests granted to secure the DIP

Loans and the Adequate Protection Obligations, (B) prior to repayment in full of the

15

Prepetition ABL Obligations, liens securing the  Prepetition ABL Obligations, (C) liens

securing the Cash Flow Obligations and the First Lien Obligations and (D) other valid and

unavoidable liens perfected prior to the Petition Date (or perfected after the Petition Date to

the extent permitted by section 546(b) of the Bankruptcy Code to the extent such liens are

senior to the liens securing the 1.5 Lien Obligations;

       (k)       as of the Petition Date, the Debtors party to or otherwise obligated

under the Second Lien Documents (as defined below) were truly and justly indebted to the

Second Lien Noteholders, without defense, counterclaim or offset of any kind, in the

aggregate principal amount of not less than $1,344,000,000 in respect of loans and other

extensions of credit made by the Second Lien Noteholders pursuant to the Second Lien

Documents, plus accrued and unpaid interest thereon and fees and expenses (including fees

and expenses of attorneys and advisors) as provided in the Second Lien Documents, plus all

other outstanding amounts that would constitute Obligations under and as defined in the

Second Lien Notes Indenture (collectively, the "Second Lien Obligations"); provided that, as

used in this Order, the term "Second Lien Obligations" shall not include any "make-whole"

payment or other prepayment fees or premiums (unless and until the Court determines that

such amounts are "Second Lien Obligations"), and the rights of the Debtors, the Second Lien

Noteholders and all other parties in interest regarding the extent, if any, to which "Second

Lien Obligations" includes any "make-whole" payment or other prepayment fees or

premiums are hereby expressly reserved;

       (l)       the liens and security interests granted to the Second Lien Indenture

Trustee (for the ratable benefit of the Second Lien Noteholders) to secure the Second Lien

Obligations are (i) valid, binding, perfected, enforceable, fourth priority (subject to permitted

exceptions under the Second Lien Indenture) liens on and security interests in the Prepetition

Collateral, (ii) not subject to avoidance, recharacterization or subordination (except as set

forth in the Second Lien Intercreditor Agreement (as defined in paragraph 4(q) below))

pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and (iii) subject and

subordinate only to (A) the Carve-Out and the liens and security interests granted to secure

the DIP Loans and the Adequate Protection Obligations, (B) prior to repayment in full of the

Prepetition ABL Obligations, liens securing the  Prepetition ABL Obligations, (C) liens

securing the Cash Flow Obligations, the First Lien Obligations and the 1.5 Lien Obligations

and (D) other valid and unavoidable liens perfected prior to the Petition Date (or perfected

after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) to

the extent such liens are senior to the liens securing the Second Lien Obligations;

(m)      (i) no portion of the Prepetition ABL Obligations, the Cash Flow

Obligations, the First Lien Obligations, the 1.5 Lien Obligations, or the Second Lien

Obligations shall be subject to avoidance, recharacterization, recovery or, except as set forth

in the Prepetition Intercreditor Agreements, subordination pursuant to the Bankruptcy Code

or applicable nonbankruptcy law and (ii) subject to (X) arguments with respect to the value

of the Prepetition Collateral (other than with respect to the stipulation set forth in

subparagraph (r) below), and (Y) any argument with respect to the applicability of any

"make-whole" premium, each of which are expressly reserved by all parties, the Debtors do

not have, and hereby forever release, any claims, counterclaims, causes of action, defenses or

setoff rights, whether arising under the Bankruptcy Code or applicable nonbankruptcy law,

against any of the Prepetition Secured Parties and each of their respective affiliates,

subsidiaries, agents, officers, directors, employees, attorneys and advisors, each in their

17

capacity as such, in each case in connection with any matter related to the Prepetition ABL

Obligations, the Prepetition ABL Documents or the financing and transactions contemplated

thereby, the Cash Flow Obligations, the Cash Flow Documents or the financing and

transactions contemplated thereby, the First Lien Obligations, the First Lien Documents or

the financing and transactions contemplated thereby, the 1.5 Lien Obligations, the 1.5 Lien

Documents or the financing and transactions contemplated thereby, the Second Lien

Obligations, the Second Lien Documents or the financing and transactions contemplated

thereby or the Prepetition Collateral.

       (n)      The Prepetition ABL Agent, the Cash Flow Agent, the First Lien

Indenture Trustee, Holdings and certain of Holdings' subsidiaries entered into the ABL

Intercreditor Agreement, dated as of April 14, 2013 (as amended, supplemented or otherwise

modified, the "ABL Intercreditor Agreement"), to set forth the relative lien priorities and

other rights and remedies of the Prepetition ABL Lenders, the Cash Flow Lenders and the

First Lien Noteholders with respect to, among other things, the Prepetition Collateral.

Pursuant to, and to the extent set forth in, the ABL Intercreditor Agreement, the Cash Flow

Lenders and First Lien Noteholders have agreed that (i) they will be deemed to have

consented and raise no objection to the Debtors' entry into and performance under the DIP

Documents or to the Debtors' use of the Cash Collateral (to the extent it constitutes "ABL

Priority Collateral" (as defined in the ABL Intercreditor Agreement)) on the terms provided

herein, (ii) they shall not object, contest, or support any other person objecting to or

contesting, any request by the Prepetition ABL Lenders for adequate protection or any

adequate protection provided to the Prepetition ABL Lenders, and (iii) they will subordinate

their liens on the Prepetition Collateral to the DIP Liens and Adequate Protection Liens as contemplated herein.

(o)       The Cash Flow Agent, the First Lien Indenture Trustee, Holdings and certain of Holdings' subsidiaries entered into that certain First Lien Intercreditor Agreement, dated as of November 26, 2012  (as amended, supplemented or otherwise modified, the "First Lien Intercreditor Agreement"), to set forth the relative lien priorities and other rights and remedies of the Cash Flow Lenders and the First Lien Noteholders with respect to, among other things, the Prepetition Collateral that constitutes Shared Collateral under and as defined in the First Lien Intercreditor Agreement.  Pursuant to, and to the extent set forth in, the First Lien Intercreditor Agreement, the First Lien Noteholders have agreed that (i) they will be deemed to have consented and raise no objection to the Debtors' entry into and performance under the DIP Documents or to the use of the Cash Collateral on the terms provided herein, (ii) they shall not object, contest, or support any other person objecting to or contesting, any request by the Cash Flow Lenders for adequate protection or any adequate protection provided to the Cash Flow Lenders, and (iii) they will subordinate their liens on the Prepetition Collateral that constitutes Shared Collateral under and as defined in the First Lien Intercreditor Agreement to the DIP Liens and Adequate Protection Liens as contemplated herein.

(p)       The First Lien Indenture Trustee, the 1.5 Lien Indenture Trustee, the Prepetition ABL Agent, the Cash Flow Agent, Holdings and certain of Holdings' subsidiaries entered into that certain Intercreditor Agreement, dated as of May 25, 2012 (as amended, supplemented or otherwise modified, the "1.5 Lien Intercreditor Agreement"), to set forth the relative lien priorities and other rights and remedies of the Prepetition ABL Lenders, the

19

Cash Flow Lenders, the First Lien Noteholders (collectively, the "First Lien Secured Parties"), on the one hand, and the 1.5 Lien Noteholders, on the other hand, with respect to, among other things, the Prepetition Collateral.  Pursuant to, and to the extent set forth in, the 1.5 Lien Intercreditor Agreement, the 1.5 Lien Indenture Trustee and the 1.5 Lien Noteholders have agreed that (i) they will be deemed to have consented and raise no objection to the Debtors' entry into and performance under the DIP Documents or to the use of the Cash Collateral on the terms provided herein, (ii) they shall not object, contest, or support any other person objecting to or contesting, any request by the First Lien Secured Parties for adequate protection or any adequate protection provided to the First Lien Secured Parties, and (iii) they will subordinate their liens on the Prepetition Collateral to the DIP Liens and Adequate Protection Liens provided to the First Lien Secured Parties as contemplated herein.

(q)    The Second Lien Indenture Trustee, the First Lien Indenture Trustee, the 1.5 Lien Indenture Trustee, the Prepetition ABL Agent, the Cash Flow Agent, Holdings and certain of Holdings' subsidiaries entered into that certain Intercreditor Agreement, dated as of November 16, 2012 (as amended, supplemented or otherwise modified, the "Second Lien Intercreditor Agreement", together with the ABL Intercreditor Agreement, the First Lien Intercreditor Agreement, and the 1.5 Lien Intercreditor Agreement, the "Prepetition Intercreditor Agreements"), to set forth the relative lien priorities and other rights and remedies of the First Lien Secured Parties and the 1.5 Lien Noteholders, on the one hand, and the Second Lien Noteholders, on the other hand, with respect to, among other things, the Prepetition Collateral.  Pursuant to, and to the extent set forth in, the Second Lien Intercreditor Agreement, the Second Lien Indenture Trustee and the Second Lien

Noteholders have agreed that (i) they will be deemed to have consented and raise no objection to the Debtors' entry into and performance under the DIP Documents or to the use of the Cash Collateral on the terms provided herein, (ii) they shall not object, contest, or support any other person objecting to or contesting, any request by the First Lien Secured Parties and the 1.5 Lien Noteholders for adequate protection or any adequate protection provided to the First Lien Secured Parties and the 1.5 Lien Noteholders, and (iii) they will subordinate their liens on the Prepetition Collateral to the DIP Liens and Adequate Protection Liens provided to the First Lien Secured Parties and 1.5 Lien Noteholders as contemplated herein.

(r)    Prior to the repayment in full of the Prepetition ABL Obligations, the aggregate value of the Prepetition Collateral securing the Prepetition ABL Obligations substantially exceeded the aggregate amount of the Prepetition ABL Obligations.

5.    *Findings Regarding the DIP Loans.*

(a)    Good cause has been shown for the entry of this Order.

(b)    The Debtors require the remainder of the DIP Loans and need to continue to use the Prepetition Collateral, including the Cash Collateral, in order to, among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors and their non-Debtor affiliates, make payroll and satisfy other working capital and general corporate purposes of the Debtors (including costs related to the Cases) In accordance with the terms of the ABL Intercreditor Agreement, the DIP ABL Facility shall constitute an "ABL Facility" as defined in, and for all purposes under, the ABL Intercreditor Agreement.

(c)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting priming liens under section 364(d)(1) of the Bankruptcy Code and the Superpriority Claims (as defined in paragraph 7(a) below) and repaying in full the Prepetition ABL Obligations, in each case on the terms and conditions set forth in this Order, the Interim Order, and the DIP Documents.

(d)     The terms of the DIP Loans and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The DIP Documents and the use of the Prepetition Collateral (including the Cash Collateral) have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors, the DIP Agents, the DIP Lenders, the DIP Arrangers, and the other Prepetition Secured Parties (other than the First Lien Indenture Trustee, First Lien Noteholders, 1.5 Lien Indenture Trustee and 1.5 Lien Noteholders), and all of the Debtors' obligations and indebtedness arising under or in connection with (i) the DIP ABL Documents, any permitted hedging or cash management agreements to which any Debtor and any DIP ABL Lender are party, this Order and the DIP ABL Loans (collectively, the "DIP ABL Obligations") and (ii) the DIP Term Loan Documents, any permitted hedging or cash management agreements to which any Debtor and any DIP Term Loan Lender are

22

party, this Order and the DIP Term Loans (collectively, the "DIP Term Loan Obligations",

and together with the DIP ABL Obligations, the "DIP Obligations") shall be deemed to have

been extended by the applicable DIP Agents and DIP Lenders in "good faith" as such term is

used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections

set forth therein, and shall be entitled to the full protection of section 364(e) of the

Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or

modified on appeal or otherwise.

(f)     Absent granting the final relief set forth in this Order, the Debtors'

estates and their business operations will be immediately and irreparably harmed.  The

borrowing of the DIP Loans and the use of the Prepetition Collateral (including the Cash

Collateral) in accordance with this Order and the DIP Documents are, therefore, in the best

interest of the Debtors' estates.

6.     *Authorization of the DIP Loans and the DIP Documents*.

(a)     The Debtors are hereby authorized (i) to continue to perform under the

DIP Documents and, (ii) in the case of the U.S. Borrower, to borrow the remainder of the

DIP ABL Loans under the DIP ABL Agreement (including issuance of letters of credit).  The

proceeds of the DIP Loans shall be used for, subject to the terms of the DIP Documents,

working capital and other general corporate purposes of the Debtors (including costs related

to the Cases), including without limitation, to pay interest, fees and expenses in connection

with the DIP Loans and the Adequate Protection Obligations (to the extent such acts were

authorized by the Interim Order and have already occurred, such acts are hereby ratified).

(b)     The DIP ABL Facility may, without any further approval of this Court,

at the option of the DIP ABL Borrowers, and with no obligations or commitments on the part

23

of the then existing DIP ABL Lenders, be increased pursuant to the terms of, and subject to

the conditions set forth in, the DIP ABL Agreement. The DIP Term Loan Facility may,

without any further approval of this Court, at the option of the DIP Term Loan Borrower, and

with no obligations or commitments on the part of the then existing DIP Term Loan Lenders,

be increased pursuant to the terms of, and subject to the conditions set forth in, the DIP Term

Loan Agreement.  Except as may be authorized by further order of the Court, the DIP ABL

Facility and the DIP Term Loan Facility shall not be increased by more than $100,000,000 in

the aggregate.

(c)     Upon the closing of the DIP ABL Facility, all Prepetition Letters of

Credit were deemed letters of credit issued and outstanding under the DIP ABL Facility.

(d)     In furtherance of the foregoing and without further approval of this

Court, each Debtor is authorized and empowered to perform all acts and to execute and

deliver all instruments and documents that each of the DIP Agents determines to be

reasonably required or necessary for the Debtors' performance of their obligations under the

applicable DIP Documents (to the extent such acts, execution, and delivery were authorized

by the Interim Order and have already occurred, such acts are hereby ratified), including

without limitation:

(i)     the execution, delivery and performance of the DIP Documents;

(ii)    the execution, delivery and performance of one or more

amendments, waivers, consents or other modifications to and under the DIP

Documents, in each case in accordance with the terms of the applicable DIP

Documents and in such form as the Debtors, the applicable DIP Agent and the

applicable DIP Lenders may agree, and no further approval of this Court shall be

24

required for any amendment, waiver, consent or other modification to and under

the DIP Documents (and any fees paid in connection therewith) that do not

materially and adversely affect the Debtors or which do not (A) shorten the

maturity of the DIP Loans, (B) increase the principal amount of, or the rate of

interest payable on, the DIP Loans (other than pursuant to any incremental facility

permitted by the DIP Documents, the incurrence of which shall not require any

further approval from the Court, subject to the borrowing limits set forth in this

Order and subject to the advance filing requirement set forth in the immediately

following proviso applicable to any amendment, waiver, consent or other

modification), or (C) change any Event of Default, add any covenants or amend

the covenants therein, in any such case to be materially more restrictive; provided,

however, that a copy of any such amendment, waiver, consent or other

modification shall be filed by the Debtors with this Court and served by the

Debtors on the U.S. Trustee, counsel to the Prepetition Agents, counsel to Apollo,

counsel to the First Lien Indenture Trustee, counsel to the 1.5 Lien Indenture

Trustee, counsel to the Ad Hoc Committee of Second Lien Noteholders and

counsel to the Committee two business days in advance of its effectiveness;

      (iii)     the non-refundable payment to the DIP Agents, the DIP Arrangers

and the DIP Lenders, as the case may be, of the commitment, underwriting,

arranger and administrative agency fees set forth in the applicable DIP

Documents as described in the Motion and/or referred to in one or more

commitment and fee letters executed among the Debtors and the respective DIP

Agents and/or DIP Arrangers (collectively, the "Commitment/Fee Letters"); and

25

(iv)    the performance of all other acts required under or in connection with the DIP Documents.

(e)    Each Debtor is authorized and directed to perform its respective obligations under the applicable Commitment/Fee Letters, including in connection with the commitment by the DIP Arrangers to provide up to $1,000,000,000 of proposed exit financing facilities on the terms, and subject to the conditions, set forth in the applicable Commitment/Fee Letters.

(f)    The DIP Documents constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Order and the DIP Documents.  No obligation, payment, transfer or grant of security by the Debtors under the DIP Documents, the Interim Order, or this Order shall be voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

(g)    Notwithstanding anything to the contrary in any of the DIP Documents, the mere termination or reduction of the period pursuant to Section 1121 of the Bankruptcy Code during which the Debtors have the exclusive right to file a plan of reorganization and solicit acceptances thereof shall not constitute an Event of Default under either of the DIP Credit Agreements or otherwise.

7.    *Superpriority Claims*.

(a)      Except to the extent expressly set forth in this Order in respect of the

Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations

shall constitute allowed senior administrative expense claims (the "Superpriority Claims")

against the Debtors with priority over any and all administrative expenses, adequate

protection claims and all other claims against the Debtors, now existing or hereafter arising,

of any kind whatsoever, including without limitation, all administrative expenses of the kind

specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all

administrative expenses or other claims arising under sections 105, 326, 328, 330, 331,

503(b), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such

expenses or claims may become secured by a judgment lien or other non-consensual lien,

levy or attachment.  The Superpriority Claims arising from the DIP ABL Obligations shall be

*pari passu* with the Superpriority Claims arising from the DIP Term Obligations, subject to

the terms of the DIP Intercreditor Agreement (as defined in paragraph 8(e) below).

(b)      For purposes hereof, the "Carve-Out" shall mean (i) any fees payable

to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee pursuant to section

1930(a) of title 28 of the United States Code, and any interest on such fees payable pursuant

to section 3717 of title 31 of the United States Code, (ii) the reasonable fees and expenses up

to $200,000 incurred by a trustee appointed in the Debtors' cases under section 726(b) of the

Bankruptcy Code (irrespective of whether the Carve Out Notice (as defined below) has been

delivered) and (iii) up to $3,000,000 of allowed fees, expenses and disbursements of

professionals retained by order of this Court, incurred after the occurrence of a Carve-Out

Event (defined in this paragraph 7(b) below) plus all unpaid professional fees, expenses and

disbursements allowed by this Court that were incurred prior to the occurrence of a

27

Carve-Out Event (regardless of when such fees, expenses and disbursements become allowed by order of this Court).  For the purposes hereof, a "Carve-Out Event" shall occur upon the occurrence and during the continuance of an Event of Default under either DIP Credit Agreement (i) written notice of which has been by given by either of the DIP Agents to the Debtors or (ii) in respect of which the DIP ABL Borrowers or DIP Term Loan Borrower have knowledge and fail to provide notice to the applicable DIP Agent within five (5) business days of obtaining such knowledge; provided that, no Carve-Out Event shall be deemed to have occurred for purposes of this Order if any such Event of Default is subsequently waived by the DIP Agents.  So long as no Carve-Out Event shall have occurred and be continuing, the Carve-Out shall not be reduced by the payment of fees, expenses and disbursements of professionals retained by order of this Court allowed by this Court and payable under Sections 328, 330 and 331 of the Bankruptcy Code.  Upon the occurrence of a Carve-Out Event, the right of the Debtors to pay professional fees incurred under clause (iii) above without reduction of the Carve-Out in such clause (iii) shall terminate (unless the underlying Event of Default giving rise to the Carve-Out Event is subsequently waived by the DIP Agents) and upon the occurrence of the Carve-Out Event, the Debtors shall provide immediate notice by facsimile and email to all retained professionals informing them that a Carve-Out Event has occurred and that the Debtors' ability to pay professionals is subject to the Carve-Out; provided that (A) the Carve-Out shall not be available to pay any professional fees and expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agents, the DIP Lenders or any Prepetition Secured Party and (B) nothing in this Order shall impair the right

28

of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates.

8.     *DIP Liens*.  As a result of the amendment and restatement of the Prepetition ABL Agreement, which became the DIP ABL Agreement on the DIP Closing Date (as defined in the DIP ABL Agreement), the security interests and liens granted pursuant to the Prepetition ABL Documents to secure the Prepetition ABL Obligations were reaffirmed pursuant to the DIP Documents, and all of such reaffirmed security interests and liens granted by the Debtors were deemed to be included among the DIP Liens (as defined below) on the DIP Closing Date granted pursuant to the Interim Order to secure the DIP ABL Obligations.  In addition, as security for the DIP Obligations, effective and perfected as of the date of the Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Agents of any property, the following security interests and liens are hereby granted by the Debtors to each DIP Agent, for itself and the respective benefit of the applicable DIP Lenders (all property of the Debtors identified in clauses (a), (b) and (c) of this paragraph 8 being collectively referred to as the "DIP Collateral"), subject and subordinate to the Carve-Out (all such liens and security interests granted to the DIP Agents pursuant to this Order, the "DIP Liens")[5] and having the priorities set forth in this paragraph 8:

(a)     First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first

---

[5]  The term "DIP Liens" is defined by reference only to liens and security interests granted to the DIP Agents pursuant to this Order on assets and property of the Debtors, and therefore, no DIP Liens are granted pursuant to this Order on any assets or property of any Non-Debtor Borrower or any non-Debtor affiliate of any Debtor.

29

priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to either (i) valid, perfected, non-avoidable and enforceable liens or security interests, including consignment arrangements under the Uniform Commercial Code, in existence on or as of the Petition Date, or (ii) valid liens or security interests, including consignment arrangements under the Uniform Commercial Code, perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Property");[6] provided that, notwithstanding anything to the contrary in the DIP Documents, the Unencumbered Property shall not include, and no DIP Liens, Adequate Protection Liens, or any other liens shall be granted on any, any claims and causes of action arising under chapter 5 of the Bankruptcy Code (collectively, the "Avoidance Actions but shall include") or any proceeds or property recovered in respect of any Avoidance Actions.

> (b)    Liens Junior to Certain Existing Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property of the Debtors (other than the property described in paragraph 8(c) below, as to which the DIP

---

[6]  Notwithstanding anything contained herein or in the DIP Documents to the contrary, the Debtors shall not pledge to the DIP Agents (a) in excess of 65% of the voting capital stock of their direct foreign subsidiaries (other than the pledge of an additional 35% of the stock of certain foreign subsidiaries to the extent set forth in the First-Tier Subsidiary Pledge Agreement (as defined in the DIP ABL Agreement) in respect of the obligations of Non-Debtor Borrowers) or any of the capital stock or equity interests in indirect foreign subsidiaries, or (b) (i) the note issued by Momentive Performance Materials Japan LLC to Juniper Bond Holdings I LLC in an original principal amount of $210,000,000, (ii) the note issued by Momentive Performance Materials Japan LLC to Juniper Bond Holdings II LLC in an original principal amount of $210,000,000, (iii) the note issued by Momentive Performance Materials Japan LLC to Juniper Bond Holdings III LLC in an original principal amount of $210,000,000 and (iv) the note issued by Momentive Performance Materials Japan LLC to Juniper Bond Holdings IV LLC in an original principal amount of $210,000,000.

Liens will have the priority as described in such clause), whether now existing or hereafter

acquired, that is subject to valid, perfected and unavoidable liens or security interests in

existence immediately prior to the Petition Date or to valid and unavoidable liens or security

interests in existence immediately prior to the Petition Date that are perfected after the

Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the

"Non-Primed Liens"), which security interests and liens in favor of the DIP Agents and the

DIP Lenders shall be junior to the Non-Primed Liens.

(c)      Liens Priming the Liens of the Prepetition Secured Parties.  Pursuant

to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable,

fully-perfected first priority, senior priming lien on, and security interest in, all Prepetition

Collateral.  The DIP Liens on the Prepetition Collateral shall be senior in all respects to the

security interests in, and liens on, the Prepetition Collateral of each of the Prepetition

Secured Parties (including the applicable Adequate Protection Liens granted to such

Prepetition Secured Party), but shall be junior to any Non-Primed Liens on the Prepetition

Collateral.

(d)      Liens Senior to Certain Other Liens.  No claim or lien having a

priority senior to or *pari passu* with those granted by this Order to the DIP Agents shall be

granted or allowed while any portion of the DIP Obligations remain outstanding, and the DIP

Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided

and preserved for the benefit of the Debtors and their estates under section 551 of the

Bankruptcy Code or (B) any liens arising after the Petition Date or (ii) subordinated to or

made *pari passu* with any other lien or security interest under sections 363 or 364 of the

Bankruptcy Code or otherwise.

31

(e)    <u>Priority of the DIP Liens</u>.  The DIP Liens granted to the DIP Term Loan Agent shall be immediately junior in priority and subject to the DIP Liens granted to the DIP ABL Agent in respect of the ABL DIP Collateral (as defined below), and the DIP Liens granted to the DIP ABL Agent shall be immediately junior in priority and subject to the DIP Liens granted to the DIP Term Loan Agent in respect of the Term Loan DIP Collateral (as defined below); provided that, the DIP Liens granted to the DIP Term Loan Agent and the DIP ABL Agent on the proceeds of Avoidance Actions shall be *pari passu* and any such proceed shall be shared in accordance with the terms of the DIP Intercreditor Agreement.  The "<u>ABL DIP Collateral</u>" shall consist of all the Debtors' accounts receivables, loan receivables, inventory, related books and records, cash and the proceeds of the foregoing, all as further set forth in the DIP Intercreditor Agreement.  The "<u>Term Loan DIP Collateral</u>" shall consist of all DIP Collateral except the ABL DIP Collateral, including without limitation, all of the Debtors' intellectual property, equity interests (limited to 65% of the equity interests in a foreign subsidiary), fixtures and equipment (which are not part of the ABL DIP Collateral), all general intangibles and books and records (other than those which are or are related to the ABL DIP Collateral), all intercompany indebtedness and all proceeds of the foregoing, all as further set forth in the DIP Intercreditor Agreement.  In furtherance of the foregoing priority, the DIP Liens granted herein to the DIP ABL Agent and the DIP Term Loan Agent shall be governed by the DIP Financing Intercreditor Agreement, dated April 15, 2014 (as amended, supplemented or otherwise modified, the "<u>DIP Intercreditor Agreement</u>"), among the DIP ABL Agent, the DIP Term Loan Agent and each of the Debtors.

9.    *Remedies After Event of Default.*  The automatic stay under section 362 of the

Bankruptcy Code is vacated and modified to the extent necessary to permit the DIP Agents and

the DIP Lenders to exercise, (a) immediately upon the occurrence and during the continuance of

an Event of Default, all rights and remedies under the applicable DIP Documents, other than

those rights and remedies against the applicable DIP Collateral as provided in clause (b) below,

and (b) upon the occurrence and during the continuance of an Event of Default, and the giving of

seven (7) days' prior written notice to the Debtors (with a copy to counsel to the Debtors,

counsel to the Prepetition Agents, counsel to Apollo, counsel to the First Lien Indenture Trustee,

counsel to the 1.5 Lien Indenture Trustee, counsel to the Ad Hoc Committee of Second Lien

Noteholders and counsel to the Committee and the U.S. Trustee), all rights and remedies against

the DIP Collateral provided for in the applicable DIP Documents and this Order (including,

without limitation, the right to setoff monies of the Debtors in accounts maintained with the DIP

Agents or any DIP Lender); provided that, during the foregoing seven (7) day period the only

issue that may be raised by any party in opposition to the exercise of rights and remedies shall be

whether an Event of Default has in fact occurred and is continuing, and other than as set forth in

the prior clause of this proviso, the Debtors hereby waive their right to seek any relief, whether

under section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit or

restrict, or delay the exercise or benefit of, the rights and remedies of the DIP Agents and the

DIP Lenders under the DIP Documents or this Order; provided further that, the respective rights

and remedies available to a DIP Agent with respect to the DIP Collateral shall be governed by

the DIP Intercreditor Agreement.  In connection with the exercise of their respective rights and

remedies upon the occurrence and during the continuance of an Event of Default, in no event

shall the DIP Agents or the DIP Lenders be subject to the equitable doctrine of "marshaling" or

any similar doctrine with respect to the DIP Collateral.  In no event shall the Prepetition Secured

Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral. Notwithstanding anything to the contrary contained in this Order, the Avoidance Actions and, any proceeds or property recovered in respect of any Avoidance Actions, the property described in footnote 6, any other unencumbered property of the estates, and all proceeds or property recovered in respect of any unencumbered assets shall only be used to pay or otherwise satisfy any Adequate Protection Liens, DIP Liens, Superpriority Claims, or any 507(b) Claims only to the extent necessary after commercially reasonable efforts have been undertaken by the DIP Agents and the Prepetition Secured Parties, as applicable, to pay or otherwise satisfy any Adequate Protection Liens, DIP Liens, Superpriority Claims, or any 507(b) Claims from the other DIP Collateral. available property of the Debtors' estates. Either DIP Agent's or any DIP Lender's delay or failure to exercise rights and remedies under the DIP Documents or this Order shall not constitute a waiver of such DIP Agent's or any DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Credit Agreement.  No restrictions on the exercise of remedies provided for in this Order shall apply to any exercise of remedies by the DIP ABL Agent, the DIP ABL Lenders, the Prepetition Agents or Prepetition Secured Parties against the Non-Debtor Borrowers or any other non-Debtors or their respective assets, and nothing in this Order shall be interpreted to extend the automatic stay or any other protections to the Non-Debtor Borrowers or any other non-Debtors or their respective assets.

10.     *Limitation on Charging Expenses Against Collateral*.  Except to the extent of the Carve-Out, but only prior to the repayment in full of the DIP Obligations, no expenses of administration of the Cases or any future proceeding that may result therefrom, including

liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral, as the case may be, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agents or the Prepetition Agents, as the case may be, and no such consent shall be implied from any other action or inaction by the DIP Agents, the DIP Lenders or the Prepetition Secured Parties or the DIP Lenders.  For the avoidance of doubt, no retroactive surcharge or recovery may be sought from the DIP Agent or the DIP Lenders following the repayment in full of the DIP Obligations.

11.     *Limitations under Section 552(b) of the Bankruptcy Code.  The Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the Prepetition Secured Parties with respect to (i) proceeds, products, offspring or profits of any of the Prepetition Collateral or (ii) the extension of the Adequate Protection Liens to cover proceeds of the Prepetition Collateral.*[intentionally omitted]

12.     *Payments Free and Clear.*  Any and all payments or proceeds remitted to the DIP Agents on behalf of the DIP Lenders or (except as provided in paragraph 26 of this Order) to the Prepetition Secured Parties pursuant to the provisions of the Interim Order or this Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability.

13.     *Prepetition ABL Obligations.*  a) Subject to the provisions of paragraph 13(b), the Prepetition ABL Obligations were paid in full (including all amounts that would constitute "Obligations" under and as defined in the Prepetition Credit Agreement) by the Debtors from the

proceeds of the initial borrowing of the DIP Loans and, upon such payment, the commitments of all Prepetition ABL Lenders (other than the DIP Arrangers) under the Prepetition ABL Agreement were terminated, and the commitments thereunder of the DIP Arrangers on the DIP Closing Date were increased to $270,000,000 as commitments under the DIP ABL Agreement. Upon such repayment in full of the Prepetition ABL Obligations, all security interests in, and liens on, Prepetition Collateral granted to secure the Prepetition ABL Obligations were, without the necessity of further action, deemed to be included among the DIP Liens granted pursuant to the Orders to secure the DIP ABL Obligations. Upon the closing of the DIP ABL Facility, the Prepetition Letters of Credit were deemed issued and outstanding under the DIP ABL Facility, and neither the Prepetition ABL Agent nor any Prepetition ABL Lender shall have any further obligations or liabilities with respect to such Prepetition Letters of Credit to either the Debtors or the beneficiaries thereof.

(a)    *Adequate Protection for the Prepetition ABL Agent and Prepetition ABL Lenders*.  Notwithstanding the payment of the Prepetition ABL Obligations in full by the Debtors from the proceeds of the initial borrowing of the DIP Loans, until such time as the events and conditions applicable to the Prepetition ABL Obligations, the Prepetition ABL Agent and the Prepetition ABL Lenders described in clauses (x), (y) and (z) of the third sentence of paragraph 26 shall have occurred, the Prepetition ABL Agent and the Prepetition ABL Lenders are entitled, pursuant to sections 361, 363(c)(2), 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their valid, perfected and enforceable interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in value of their interests in the Prepetition Collateral (in each case in respect of their indemnification and reimbursement claims under Section 9.05 of the Prepetition ABL

36

Agreement), including without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Cash Collateral and any other Prepetition Collateral, the priming of the Prepetition ABL Agent's liens on the Prepetition Collateral by the DIP Liens and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "Prepetition ABL Adequate Protection Obligations").  As adequate protection, the Prepetition ABL Agent and the Prepetition ABL Lenders are hereby granted the following:

(i)    Fees and Expenses.  The Debtors shall pay all reasonable fees and expenses of the Prepetition ABL Agent and Prepetition ABL Lenders payable under Section 9.05 of the Prepetition ABL Agreement (including, without limitation, reasonable fees and disbursements of counsel and financial advisors to the Prepetition ABL Agent) incurred in connection with (A) the Final Hearing, (B) the enforcement by the Prepetition ABL Agent and Prepetition ABL Lenders of the rights, benefits and privileges granted in the Interim Order or this Order in favor of the Prepetition ABL Agent and Prepetition ABL Lenders and (C) any discovery or litigation in connection with any pending or threatened "Claims and Defenses" (as defined in paragraph 26 hereof) which shall have been raised or asserted against the Prepetition ABL Lenders, Prepetition ABL Agent or the Prepetition ABL Obligations, until the resolution thereof by a final, non-appealable order.  None of the fees and expenses payable pursuant to this paragraph 13(b) shall be subject to separate approval by this Court (but the U.S. Trustee, the Debtors and the Committee may object to the reasonableness, as such standard is used in section 506(b) of the Bankruptcy Code, of such fees and

37

expenses and this Court shall resolve any dispute as to the reasonableness of any

such fees and expenses), and no recipient of any such payment shall be required

to file any interim or final fee application with respect thereto.  The Debtors shall

pay the fees and expenses provided for in this paragraph 13(b) promptly after

receipt of monthly invoices therefor (redacted to protect privileges), and the

Prepetition ABL Agent shall promptly provide copies of such invoices (redacted

to protect privileges) to the counsel to the Committee and to the U.S. Trustee.

The Debtors' obligation to pay such fees and expenses shall constitute

superpriority claims as provided in section 507(b) of the Bankruptcy Code (the

"Prepetition ABL 507(b) Claims"), with priority in payment over any and all

administrative expenses of the kinds specified or ordered pursuant to any

provision of the Bankruptcy Code, including without limitation, sections 326,

328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i)

the Carve-Out and (ii) the Superpriority Claims granted in respect of the DIP

Obligations.

(b)      Nothing in this Order or the DIP Documents shall prejudice the rights,

remedies and privileges of the Prepetition ABL Agent and the Prepetition ABL Lenders

granted in the Bankruptcy Code or as set forth in the Prepetition ABL Documents to the

extent the Prepetition ABL Obligations are, after repayment, required to be disgorged or

otherwise avoided or reinstated, and all of the Prepetition ABL Agent's and Prepetition ABL

Lenders' rights and remedies under the Bankruptcy Code and the Prepetition ABL

Documents (including the Prepetition Intercreditor Agreements) are hereby fully preserved,

including their right to seek additional or further adequate protection.

38

14.    *The Cash Collateral.*  Without prejudice to the rights of any other party (but subject to the limitations thereon contained in paragraphs 26 and 27), the Debtors, for themselves and not their estates, and subject to paragraph 26 hereof, admit, stipulate, and agree that substantially all of the Debtors' cash, including without limitation, all cash and other amounts on deposit or maintained by the Debtors in any account or accounts with any Prepetition Secured Party and any cash proceeds of the disposition of any Prepetition Collateral, constitute proceeds of the Prepetition Collateral and, therefore, are cash collateral of the Prepetition Secured Parties (subject in all cases to the Prepetition Intercreditor Agreements), within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

15.    *Use of Prepetition Collateral (Including Cash Collateral).*  The Debtors are hereby authorized to use the Prepetition Collateral, including the Cash Collateral, during the period from the Petition Date through and including the Termination Date (as defined below) for working capital and general corporate purposes (including costs related to the Cases) in accordance with the terms and conditions of this Order; provided that, (a) the Prepetition Secured Parties are granted adequate protection as set forth herein and (b) except on the terms of this Order, the Debtors are not authorized to use the Cash Collateral.  By virtue of the Cash Flow Agent's and Prepetition ABL Agent's consent to the Debtors' use of Cash Collateral as set forth in the Orders, pursuant and subject to the Prepetition Intercreditor Agreements, the First Lien Noteholders, the 1.5 Lien Noteholders and the Second Lien Noteholders are deemed to have consented to such use of the Cash Collateral.  As used herein, "Termination Date" means the earlier to occur of (a) the Maturity Date (as defined in the applicable DIP Credit Agreement) of either the DIP Term Facility or the DIP ABL Facility and (b) the acceleration of any DIP Loans and the termination of any Commitments (as defined in the DIP Credit Agreements) in

accordance with the terms of the applicable DIP Credit Agreement.

16.     *Adequate Protection for the Cash Flow Agent and Cash Flow Lenders*.  The Cash

Flow Agent and the Cash Flow Lenders are entitled, pursuant to sections 361, 363(c)(2), 363(e)

and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition

Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in

value of their valid, perfected and enforceable interests in the Prepetition Collateral, including

without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or

other decline in value) of the Cash Collateral and any other Prepetition Collateral, the priming of

the Cash Flow Agent's liens on the Prepetition Collateral by the DIP Liens and the imposition of

the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the

"Cash Flow Adequate Protection Obligations").  As adequate protection, the Cash Flow Agent

and the Cash Flow Lenders are hereby granted the following:

(a)     Cash Flow Adequate Protection Liens.  As security for the payment of

the Cash Flow Adequate Protection Obligations, the Cash Flow Agent (for itself and for the

benefit of the Cash Flow Lenders) is hereby granted (effective and perfected as of the date of

the Interim Order and without the necessity of the execution by the Debtors of security

agreements, pledge agreements, mortgages, financing statements or other agreements) a

valid, perfected replacement security interest in and lien on all of the DIP Collateral (the

"Cash Flow Adequate Protection Liens"), subject and subordinate only to (i) the DIP Liens,

(ii) the Carve-Out, and (iii) the Non-Primed Liens, and subject further to the terms of the

First Lien Intercreditor Agreement.

(b)     Cash Flow Section 507(b) Claims.  The Cash Flow Adequate

Protection Obligations shall constitute superpriority claims as provided in section 507(b) of

40

the Bankruptcy Code (the "Cash Flow 507(b) Claims"), with priority in payment over any

and all administrative expenses of the kinds specified or ordered pursuant to any provision of

the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of

the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out and (ii) the

Superpriority Claims granted in respect of the DIP Obligations.  Except to the extent

expressly set forth in this Order, the Cash Flow Agent and the Cash Flow Lenders shall not

receive or retain any payments, property or other amounts in respect of the Cash Flow 507(b)

Claims unless and until all DIP Obligations shall have indefeasibly been paid in full in cash

and the Carve-Out amount is funded.  Notwithstanding their status as Cash Flow 507(b)

Claims, the Cash Flow Adequate Protection Obligations may be satisfied in a plan of

reorganization confirmed in the Cases in the manner set forth in such plan if holders of more

than 66% (by amount) of the Cash Flow Adequate Protection Obligations consent to such

treatment.

          (c)     <u>Interest, Fees and Expenses</u>.  The Debtors are authorized and directed

to pay as adequate protection to the Cash Flow Agent all accrued and unpaid interest

(including interest accrued prior to the Petition Date) on the loans constituting Cash Flow

Obligations at the applicable non-default rate set forth in the Cash Flow Documents, and to

pay all other accrued and unpaid fees and disbursements owing to the Cash Flow Agent

under the Cash Flow Documents, as and when such interest, fees and disbursements become

due and payable (but for the commencement of the Cases) in accordance with the terms of

the Cash Flow Documents (which payments and pricing shall be without prejudice to the

rights of the Cash Flow Agent or Cash Flow Lenders to assert a claim for the payment of

additional interest calculated at any other rates applicable pursuant to the Cash Flow Credit

41

Agreement, and without prejudice to the rights of the Debtors or other party in interest to

contest any such additional claims), in each case subject to Section 506(b) of the Bankruptcy

Code.  As additional adequate protection, the Debtors shall also pay to the Cash Flow Agent

and any Cash Flow Lenders as of the Petition Date all reasonable fees and expenses of

counsel and financial advisors payable to the Cash Flow Agent and such Cash Flow Lenders

under the Cash Flow Documents.  None of the fees and expenses payable pursuant to this

paragraph 16(c) shall be subject to separate approval by this Court (but the U.S. Trustee, the

Debtors and the Committee may object to the reasonableness, as such standard is used in

section 506(b) of the Bankruptcy Code, of such fees and expenses and the Court shall resolve

any dispute as to the reasonableness of any such fees and expenses), and no recipient of any

such payment shall be required to file any interim or final fee application with respect

thereto.  The Debtors shall pay the professional fees and expenses provided for in this

paragraph 16(c) promptly after receipt of monthly invoices therefor (redacted to protect

privileges), and the Cash Flow Agent and such Cash Flow Lenders shall promptly provide

copies of such invoices (redacted to protect privileges) to the counsel to the Committee and

to the U.S. Trustee.

17. *Reservation of Rights of the Cash Flow Lenders*.  The Cash Flow Agent and Cash

Flow Lenders consent to the adequate protection provided herein.  Notwithstanding any other

provision hereof, but subject to the terms of the Prepetition Intercreditor Agreements, the grant

of adequate protection to the Cash Flow Agent and Cash Flow Lenders pursuant to the terms of

this Order is without prejudice to the right of the Cash Flow Agent and Cash Flow Lenders to

seek modification of the grant of adequate protection provided hereby so as to provide different

or additional adequate protection, and without prejudice to the right of the Debtors or any other

42

party in interest (subject to the terms of the Prepetition Intercreditor Agreements) to contest any such modification.

18.    *Adequate Protection for the First Lien Indenture Trustee and First Lien Noteholders*.  The First Lien Indenture Trustee and the First Lien Noteholders are entitled, pursuant to sections 361, 363(c)(2), 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in value of their, valid, perfected and enforceable interests in the Prepetition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Cash Collateral and any other Prepetition Collateral, the priming of the First Lien Indenture Trustee's liens on the Prepetition Collateral by the DIP Liens and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "First Lien Adequate Protection Obligations").  As adequate protection, the First Lien Indenture Trustee and the First Lien Noteholders are hereby granted the following:

(a)    First Lien Adequate Protection Liens.  As security for the payment of the First Lien Adequate Protection Obligations, the First Lien Indenture Trustee (for itself and for the benefit of the First Lien Noteholders) is hereby granted (effective and perfected as of the date of the Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "First Lien Adequate Protection Liens"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out, and (iii) the Non-Primed Liens, and subject further to the terms of the First Lien Intercreditor Agreement.

43

(b)      First Lien Section 507(b) Claims.   Subject to the terms of the First

Lien Intercreditor Agreement, the First Lien Adequate Protection Obligations shall constitute

superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "First Lien

507(b) Claims"), with priority in payment over any and all administrative expenses of the

kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including

without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and

subordinate only to (i) the Carve-Out and (ii) the Superpriority Claims granted in respect of

the DIP Obligations.  Except to the extent expressly set forth in this Order, the First Lien

Indenture Trustee and the First Lien Noteholders shall not receive or retain any payments,

property or other amounts in respect of the First Lien 507(b) Claims unless and until all DIP

Obligations shall have indefeasibly been paid in full in cash and the Carve-Out amount is

funded.  Notwithstanding their status as First Lien 507(b) Claims, the First Lien Adequate

Protection Obligations may be satisfied in a plan of reorganization confirmed in the Cases in

the manner set forth in such plan if holders of more than 66% (by amount) of the First Lien

Adequate Protection Obligations consent to such treatment.

(c)      Interest, Fees and Expenses.  The Debtors are authorized and directed

to pay as adequate protection to the First Lien Indenture Trustee all accrued and unpaid

interest (including interest accrued prior to the Petition Date) on the loans constituting First

Lien Obligations at the applicable non-default rate set forth in the First Lien Documents, and

to pay all other accrued and unpaid fees and disbursements owing to the First Lien Indenture

Trustee under the First Lien Documents, as and when such interest, fees and disbursements

become due and payable (but for the commencement of the Cases) in accordance with the

terms of the First Lien Documents (which payments and pricing shall be without prejudice to

44

the rights of the First Lien Indenture Trustee or First Lien Noteholders to assert a claim for

the payment of additional interest calculated at any other rates applicable pursuant to the

First Lien Indenture, and without prejudice to the rights of the Debtors or other party in

interest to contest any such additional claims), in each case subject to Section 506(b) of the

Bankruptcy Code.  As additional adequate protection, the Debtors shall also pay to the First

Lien Indenture Trustee all reasonable fees and expenses of counsel and financial advisors to

such counsel (in the form of two monthly payments of $150,000 per month in respect of such

financial advisors) payable to the First Lien Indenture Trustee under the First Lien

Documents (<u>provided</u> that (i) the Debtors shall not be required to pay as adequate protection

any fees and expenses of counsel to the First Lien Indenture Trustee related to any review,

analysis, dispute or litigation concerning whether any "make-whole" payment or other

prepayment fees or premiums are a "First Lien Obligation"; <u>provided</u> further, that to the

extent the Court determines that such amounts constitute a "First Lien Obligation", the

Debtors shall be required to pay any such fees and expenses; and (ii) the foregoing is without

prejudice to whether or not any such fees and expenses, and additional fees and expenses of a

financial advisor in excess of $300,000, are allowable under section 506(b) of the

Bankruptcy Code or any other applicable basis).  None of the fees and expenses payable

pursuant to this paragraph 18(c) shall be subject to separate approval by this Court (but the

U.S. Trustee, the Debtors and the Committee may object to the reasonableness, as such

standard is used in section 506(b) of the Bankruptcy Code, of such fees and expenses and

this Court shall resolve any dispute as to the reasonableness of any such fees and expenses),

and no recipient of any such payment shall be required to file any interim or final fee

application with respect thereto.  The Debtors shall pay the professional fees and expenses

provided for in this paragraph 18(c) promptly after receipt of monthly invoices therefor (redacted to protect privileges), and the First Lien Indenture Trustee shall promptly provide copies of such invoices (redacted to protect privileges) to the counsel to the Committee and to the U.S. Trustee.

(d)    Rights of Access and Information.  As additional adequate protection, the First Lien Indenture Trustee and its counsel and financial advisor shall be provided reasonable access to the Debtors' attorneys and advisors and to such information as may be reasonably requested.

19.    *Reservation of Rights of the First Lien Indenture Trustee and First Lien Noteholders*.  The First Lien Indenture Trustee and First Lien Noteholders consent to the adequate protection provided herein.  Notwithstanding any other provision hereof, but subject to the terms of the Prepetition Intercreditor Agreements, the grant of adequate protection to the First Lien Indenture Trustee and First Lien Noteholders pursuant to the terms of this Order is without prejudice to the right, if any, of the First Lien Indenture Trustee and First Lien Noteholders to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors or any other party in interest (subject to the terms of the Prepetition Intercreditor Agreements) to contest any such modification.

20.    *Adequate Protection for the 1.5 Lien Indenture Trustee and 1.5 Lien Noteholders*. The 1.5 Lien Indenture Trustee and the 1.5 Lien Noteholders are entitled, pursuant to sections 361, 363(c)(2), 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in value of their valid, perfected and enforceable interests in the Prepetition

Collateral, including without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Cash Collateral and any other Prepetition Collateral, the priming of the 1.5 Lien Indenture Trustee's liens on the Prepetition Collateral by the DIP Liens and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "1.5 Lien Adequate Protection Obligations").  As adequate protection, the 1.5 Lien Indenture Trustee and the 1.5 Lien Noteholders are hereby granted the following:

     (a)     1.5 Lien Adequate Protection Liens. As security for the payment of the 1.5 Lien Adequate Protection Obligations, the 1.5 Lien Indenture Trustee (for itself and for the benefit of the 1.5 Lien Noteholders) is hereby granted (effective and perfected as of the date of the Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "1.5 Lien Adequate Protection Liens"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out, (iii) the Cash Flow Adequate Protection Liens, (iv) the First Lien Adequate Protection Liens, (iv) the liens securing the Cash Flow Obligations and the First Lien Obligations and (v) the Non-Primed Liens, and subject further to the 1.5 Lien Intercreditor Agreement.

     (b)     1.5 Lien 507(b) Claims. The 1.5 Lien Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "1.5 Lien 507(b) Claims"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code,

47

subject and subordinate only to (i) the Carve-Out, (ii) the Superpriority Claims granted in respect of the DIP Obligations, (iii) the Prepetition ABL 507(b) Claims, (iv) the Cash Flow 507(b) Claims and (v) the First Lien 507(b) Claims; such subordination referenced in (iii), (iv) and (v) only to the extent set forth in the applicable Prepetition Intercreditor Agreements. The 1.5 Lien Indenture Trustee and the 1.5 Lien Noteholders shall not receive or retain any payments, property or other amounts in respect of the 1.5 Lien 507(b) Claims unless and until all DIP Obligations shall have indefeasibly been paid in full in cash and the Carve-Out amount is funded.  The order of priority of all 507(b) Claims (as defined below) shall be governed by the Prepetition Intercreditor Agreements.  In addition to, and notwithstanding anything to the contrary contained in this Order, any 1.5 Lien Adequate Protection Obligations may be satisfied in a plan of reorganization confirmed in the Cases in the manner set forth in such plan if holders of more than 66% (by amount) of the 1.5 Lien Adequate Protection Obligations consent to such treatment.

(c)    Interest, Fees and Expenses.  The Debtors are authorized and directed to pay as adequate protection to the 1.5 Lien Indenture Trustee all accrued and unpaid interest (including interest accrued prior to the Petition Date) on the loans constituting 1.5 Lien Obligations at the applicable non-default rate set forth in the 1.5 Lien Documents, and to pay all other accrued and unpaid fees and disbursements owing to the 1.5 Lien Indenture Trustee under the 1.5 Lien Documents, as and when such interest, fees and disbursements become due and payable (but for the commencement of the Cases) in accordance with the terms of the 1.5 Lien Documents (which payments and pricing shall be without prejudice to the rights of the 1.5 Lien Indenture Trustee or 1.5 Lien Noteholders to assert a claim for the payment of additional interest calculated at any other rates applicable pursuant to the 1.5

Lien Indenture, and without prejudice to the rights of the Debtors or other party in interest to

contest any such additional claims), in each case subject to Section 506(b) of the Bankruptcy

Code.   As additional adequate protection, the Debtors shall also pay to the 1.5 Lien

Indenture Trustee all reasonable fees and expenses of counsel payable to the 1.5 Lien

Indenture Trustee under the 1.5 Lien Indenture (provided that (i) the Debtors shall not be

required to pay as adequate protection any fees and expenses of counsel to the 1.5 Lien

Indenture Trustee related to any review, analysis, dispute or litigation concerning whether

any "make-whole" payment or other prepayment fees or premiums are a "1.5 Lien

Obligation"; provided further, that to the extent the Court determines that such amounts

constitute a "1.5 Lien Obligation", the Debtors shall be required to pay any such fees and

expenses of counsel and (ii) the foregoing is without prejudice to whether or not any such

fees and expenses are allowable under section 506(b) of the Bankruptcy Code or any other

applicable basis).   None of the fees and expenses payable pursuant to this paragraph 20(c)

shall be subject to separate approval by this Court (but this Court shall resolve any dispute as

to the reasonableness, as such standard is used in section 506(b) of the Bankruptcy Code, of

any such fees and expenses), and no recipient of any such payment shall be required to file

any interim or final fee application with respect thereto.   The Debtors shall pay the

professional fees and expenses provided for in this paragraph 20(c) promptly after receipt of

monthly invoices therefor (redacted to protect privileges), and the 1.5 Lien Indenture Trustee

shall promptly provide copies of such invoices (redacted to protect privileges) to the counsel

to the Committee and to the U.S. Trustee.

(d)     Rights of Access and Information.   As additional adequate protection,

the 1.5 Lien Indenture Trustee and its counsel and financial advisor shall be provided

reasonable access to the Debtors' attorneys and advisors and to such information as may be reasonably requested.

21.    *Reservation of Rights of the 1.5 Lien Indenture Trustee and 1.5 Lien Noteholders*. The 1.5 Lien Indenture Trustee and 1.5 Lien Noteholders consent to the adequate protection provided herein.  Notwithstanding any other provision hereof, but subject to the terms of the Prepetition Intercreditor Agreements, the grant of adequate protection to the 1.5 Lien Indenture Trustee and 1.5 Lien Noteholders pursuant to the terms of this Order is without prejudice to the right, if any, of the 1.5 Lien Indenture Trustee and 1.5 Lien Noteholders to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors or any other party in interest (subject to the terms of the Prepetition Intercreditor Agreements) to contest any such modification.

22.    *Adequate Protection for the Second Lien Indenture Trustee and Second Lien Noteholders.*  The Second Lien Indenture Trustee and the Second Lien Noteholders are entitled, pursuant to sections 361, 363(c)(2), 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in value of their valid, perfected and enforceable interests in the Prepetition Collateral, including without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Cash Collateral and any other Prepetition Collateral, the priming of the Second Lien Indenture Trustee's liens on the Prepetition Collateral by the DIP Liens and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "Second Lien Adequate Protection Obligations", and together with the Prepetition ABL Adequate Protection Obligations, Cash Flow Adequate Protection Obligations, First Lien Adequate Protection Obligations, the

"Adequate Protection Obligations"). As adequate protection, the Second Lien Indenture Trustee

and the Second Lien Noteholders are hereby granted the following:

(a)      Second Lien Adequate Protection Liens. As security for the payment

of the Second Lien Adequate Protection Obligations, the Second Lien Indenture Trustee (for

itself and for the benefit of the Second Lien Noteholders) is hereby granted (effective and

perfected as of the date of the Interim Order and without the necessity of the execution by the

Debtors of security agreements, pledge agreements, mortgages, financing statements or other

agreements) a valid, perfected replacement security interest in and lien on all of the DIP

Collateral (the "Second Lien Adequate Protection Liens" and, together with the Cash Flow

Adequate Protection Liens, the First Lien Adequate Protection Liens, and the 1.5 Lien

Adequate Protection Liens, the "Adequate Protection Liens")[7], subject and subordinate only

to (i) the DIP Liens, (ii) the Carve-Out, (iii) the Cash Flow Adequate Protection Liens, (iv)

the First Lien Adequate Protection Liens, (v) 1.5 Lien Adequate Protection Liens, (iv) the

liens securing the Cash Flow Obligations, the First Lien Obligations, the 1.5 Lien

Obligations and (vii) the Non-Primed Liens, and subject further to the Second Lien

Intercreditor Agreement.

(b)      Second Lien 507(b) Claims. The Second Lien Adequate Protection

Obligations shall constitute superpriority claims as provided in section 507(b) of the

Bankruptcy Code (the "Second Lien 507(b) Claims", together with the Prepetition ABL

507(b) Claims, Cash Flow 507(b) Claims, the First Lien 507(b) Claims and the 1.5 Lien

507(b) Claims, the "507(b) Claims"), with priority in payment over any and all

---

[7] The term "Adequate Protection Liens" is defined by reference only to liens and security
interests granted pursuant to this Order on assets and property of the Debtors, and therefore, no
Adequate Protection Liens are granted pursuant to this Order on any assets or property of any N
on-Debtor Borrower or any non-Debtor affiliate of any Debtor.

administrative expenses of the kinds specified or ordered pursuant to any provision of the

Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the

Bankruptcy Code, subject and subordinate only to (i) the Carve-Out, (ii) the Superpriority

Claims granted in respect of the DIP Obligations, (iii) the Prepetition ABL 507(b) Claims,

(iv) the Cash Flow 507(b) Claims, (v) the First Lien 507(b) Claims and (vi) the 1.5 Lien

507(b) Claims, such subordination referenced in (iii), (iv), (v), and (vi) only to the extent set

forth in the applicable Prepetition Intercreditor Agreements.  The Second Lien Indenture

Trustee and the Second Lien Noteholders shall not receive or retain any payments, property

or other amounts in respect of the Second Lien 507(b) Claims unless and until all DIP

Obligations shall have indefeasibly been paid in full in cash and the Carve-Out amount is

funded.  The order of priority of all 507(b) Claims shall be governed by the Prepetition

Intercreditor Agreements. In addition to, and notwithstanding anything to the contrary

contained in this Order, any Second Lien Adequate Protection Obligations may be satisfied

in a plan of reorganization confirmed in the Cases in such plan if holders of more than 66%

(by amount) of the Second Lien Adequate Protection Obligations consent to such treatment.

      (c)    <u>Fees and Expenses</u>.  As additional adequate protection to the Second

Lien Indenture Trustee and the Second Lien Noteholders, the Debtors shall pay, subject to

the standard set forth in section 506(b) of the Bankruptcy Code, (i) to the Second Lien

Indenture Trustee all reasonable fees and expenses of the Second Lien Indenture Trustee and

its counsel payable to the Second Lien Indenture Trustee under the Second Lien Indenture

(provided that the Debtors shall not be required to pay as adequate protection any fees and

expenses of counsel to the Second Lien Indenture Trustee related to any review, analysis,

dispute or litigation concerning whether any "make-whole" payment or other prepayment

52

fees or premiums are a "Second Lien Obligation"), ~~(ii) to the Ad Hoc Committee of Second Lien Noteholders all reasonable, actual and documented fees and expenses of counsel and advisors incurred pursuant to the terms of the fee arrangement agreed between the Debtors and the Ad Hoc Committee of Second Lien Noteholders and such counsel and advisors, and (iii) to Apollo, all reasonable, actual and documented fees and expenses of counsel and advisors incurred pursuant to the terms of the fee arrangement agreed between the Debtors and Apollo and such counsel and advisors~~.  None of the fees and expenses payable pursuant to this paragraph 22(c) shall be subject to separate approval by this Court (but the U.S. Trustee, the Debtors and the Committee may object to the reasonableness, as such standard is used in section 506(b) of the Bankruptcy Code, of such fees and expenses and this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.  The Debtors shall pay the fees and expenses provided for in this paragraph 22(c) promptly after receipt of monthly invoices therefor (redacted to protect privileges), and the Second Lien Indenture Trustee shall promptly provide copies of such invoices (redacted to protect privileges) to the counsel to the Committee and to the U.S. Trustee.

23.      *Reservation of Rights of the Second Lien Indenture Trustee, Second Lien Noteholders, Ad Hoc Committee of Second Lien Noteholders and Apollo*.  The Second Lien Indenture Trustee, the Second Lien Noteholders, the Ad Hoc Committee of Second Lien Noteholders and Apollo consent to the adequate protection provided herein.  Notwithstanding any other provision hereof, but subject to the terms of the Prepetition Intercreditor Agreements, the grant of adequate protection to the Second Lien Indenture Trustee, the Second Lien

53

Noteholders, the Ad Hoc Committee of Second Lien Noteholders and Apollo pursuant to the terms of this Order is without prejudice to the right, if any, of the Second Lien Indenture Trustee, the Second Lien Noteholders, the Ad Hoc Committee of Second Lien Noteholders and Apollo to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors or any other party in interest (subject to the terms of the Prepetition Intercreditor Agreements) to contest any such modification.

24.     *Perfection of DIP Liens and Adequate Protection Liens*.

(a)     The DIP Agents and each of the Prepetition Agents, as applicable, are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the DIP Liens or the applicable Adequate Protection Liens granted to them hereunder or under the Interim Order, subject to the terms of the Prepetition Intercreditor Agreements and the DIP Intercreditor Agreement. Whether or not the DIP Agents or any of the Prepetition Agents, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the DIP Liens and the applicable Adequate Protection Liens, such DIP Liens and such Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or, other than as set forth in the Prepetition Intercreditor Agreements or the DIP Intercreditor Agreement, subordination as of the date of entry of the Interim Order.

(b)      A certified copy of the Interim Order or this Order may, in the

discretion of the applicable DIP Agent or Prepetition Agent, as the case may be, be filed with

or recorded in filing or recording offices in addition to or in lieu of such financing

statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby

authorized to accept such certified copy of the Interim Order or this Order for filing and

recording.

(c)      The Debtors shall execute and deliver to the DIP Agents or the

applicable Prepetition Agent, as the case may be, all such agreements, financing statements,

instruments and other documents as the applicable DIP Agent or Prepetition Agent, as the

case may be, may reasonably request to evidence, confirm, validate or perfect the DIP Liens

and the applicable Adequate Protection Liens.  The Debtors shall cause each of the

Non-Debtor Borrowers to use commercially reasonable efforts to take such actions necessary

to grant and perfect or otherwise reaffirm the perfection of the liens contemplated in the DIP

Documents to be granted or so reaffirmed by such Non-Debtor Borrowers.

(d)      Any provision of any lease or other license, contract or other

agreement that requires (i) the consent or approval of one or more landlords or other parties

or (ii) the payment of any fees or obligations to any governmental entity, in order for any

Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the

proceeds thereof, or other DIP Collateral related thereto, is hereby deemed to be inconsistent

with the applicable provisions of the Bankruptcy Code, and any such provision shall have no

force and effect with respect to the granting of the DIP Liens or the Adequate Protection

Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any

Debtor in favor of the DIP Lenders or Prepetition Secured Party in accordance with the terms of the DIP Documents or this Order.

25.    *Preservation of Rights Granted Under the Order*.

(a)    Other than the DIP Liens and the Superpriority Claims, and subject to the terms of the Prepetition Intercreditor Agreements, no claim or lien having a priority senior to or *pari passu* with those granted by the Interim Order or this Order to the Prepetition Agents shall be granted or allowed while any portion of the Adequate Protection Obligations remain outstanding, and the Adequate Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or, except as set forth in the Prepetition Intercreditor Agreements, subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)    Unless all DIP Obligations shall have been indefeasibly paid in full in cash, it shall constitute an Event of Default under the DIP Credit Agreements and a termination of the right to use the Cash Collateral if any of the Debtors seeks, or if there is entered, any modification of this Order without the prior written consent of the DIP Agents, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agents or an order is entered converting or dismissing any of the Cases.  The Debtors' right to use Prepetition Collateral (including Cash Collateral) shall terminate if any of the Debtors seeks, or if there is entered, any modification of this Order that adversely affects any lien, claim, right, or other protection (including without limitation Adequate Protection) granted to or for the benefit of any Prepetition Agent or Prepetition Secured Party without the prior written consent of such Prepetition Agent or Prepetition Secured Party, and no such

consent shall be implied by any other action, inaction, or acquiescence by any Prepetition

Agents or Prepetition Secured Party, or an order is entered converting or dismissing any of

the cases.

(c)     If any or all of the provisions of this Order are hereafter reversed,

modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i)

the validity, priority or enforceability of any DIP Obligations or the Adequate Protection

Obligations incurred prior to the effective date of such reversal, stay, modification or vacatur

or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection

Liens.  Notwithstanding any such reversal, stay, modification or vacatur, any use of the Cash

Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the

Debtors to the DIP Agents, the DIP Lenders or to the Prepetition Secured Parties, as the case

may be, prior to the effective date of such reversal, stay, modification or vacatur shall be

governed in all respects by the original provisions of this Order, and the DIP Agent, the DIP

Lenders, and the Prepetition Secured Parties shall be entitled to all of the rights, remedies,

privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Order, the DIP

Documents (with respect to all DIP Obligations), the Adequate Protection Obligations and

uses of the Cash Collateral.

(d)     Except as expressly provided in this Order or in the DIP Documents,

the DIP Liens, the Superpriority Claims, the Adequate Protection Liens, the 507(b) Claims

and all other rights and remedies of the DIP Agents, the DIP Lenders, and the Prepetition

Secured Parties granted by the Interim Order, this Order, and the DIP Documents shall

survive, and shall not be modified, impaired or discharged by (i) the entry of an order

converting any of the Cases to a case under chapter 7 of the Bankruptcy Code or dismissing

any of the Cases, or (ii) the entry of an order confirming a plan of reorganization in any of

the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have

waived any discharge as to any remaining DIP Obligations or Adequate Protection

Obligations.  The terms and provisions of this Order and the DIP Documents shall continue

in the Cases, in any successor cases if the Cases cease to be jointly administered, or in any

superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Adequate

Protection Liens, the DIP Obligations, the Adequate Protection Obligations, the

Superpriority Claims, the 507(b) Claims, and the other administrative claims granted

pursuant to the Orders, and all other rights and remedies of the DIP Agents, the DIP Lenders

and the Prepetition Secured Parties granted by the Orders and the DIP Documents shall

continue in full force and effect until all DIP Obligations are indefeasibly paid in full in cash

and all Adequate Protection Obligations are indefeasibly paid in full in cash or otherwise

satisfied in accordance with paragraph 13(b), 16(b), 18(b), 20(b) or 22(b), as applicable.

   (e)  Subject to the applicable Prepetition Intercreditor Agreements, all

parties reserve their rights to argue that, to the extent that any cash payment of  interest, fees

and expenses as adequate protection to the Prepetition Secured Parties is not allowed under

section 506(b) of the Bankruptcy Code or on any other basis (including, without limitation,

on account of such Prepetition Secured Parties consenting to the Debtors' entry into and

performance under the DIP Documents or to the Debtors' use of Prepetition Collateral,

including Cash Collateral, the imposition of the automatic stay, such Prepetition Secured

Parties being party to that certain Restructuring Support Agreement dated as of April 13,

2014, to which the Debtors are party and such Prepetition Secured Parties being party to that

certain Backstop Commitment Agreement dated as of May 9, 2014, to which the Debtors are

~~party)~~is not allowed under section 506(b) of the Bankruptcy Code or on any other basis, such payments should be recharacterized and applied as payments of principal owed under the applicable Prepetition Debt Documents; <u>provided</u>, however, that the Prepetition Secured Parties reserve their rights to assert defenses to any such arguments and to otherwise oppose any such recharacterization or application.

(f)    Notwithstanding anything to the contrary contained in this Order, (x) the First Lien Adequate Protection Liens, the 1.5 Lien Adequate Protection Liens and the Second Lien Adequate Protection Liens shall only encumber the assets of Holdings, and the First Lien 507(b) Claims, the 1.5 Lien 507(b) Claims and the Second Lien 507(b) Claims shall only be asserted against Holdings or satisfied by any of its assets, to the extent any DIP Collateral, Prepetition Collateral or DIP Loans, or the proceeds of any of the foregoing, are transferred to Holdings (without limiting the restrictions on such transfers contained in the DIP Documents), and (y) any cash held by Holdings as of the Petition Date (or the equivalent amount thereof) shall only be used to pay or otherwise satisfy the DIP Obligations to the extent necessary after commercially reasonable efforts have been undertaken by the DIP Agents to pay or otherwise satisfy the DIP Obligations from other DIP Collateral (provided that any cash held by Holdings in excess of such amount held on the Petition Date shall not be subject to the foregoing limitation)].

26.    *Effect of Stipulations on Third Parties.*  The stipulations and admissions contained in this Order, including without limitation, in paragraphs 4 and 14 of this Order, shall be binding upon the Debtors under all circumstances. The stipulations and admissions contained in this Order, including without limitation, in paragraphs 4 and 14 of this Order, shall be binding upon all parties in interest unless (a) any party-in-interest (including the Committee) that successfully

seeks and obtains standing to do so has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including without limitation, in this paragraph 26) on or before ~~the earlier of (1) 90~~150 days after entry of this Order ~~and (2) the commencement of a hearing with respect to the confirmation of a plan of reorganization for any of the Debtors (such earlier date,~~ (the "Objection Deadline"); provided that (1) if the Committee files a motion seeking standing to assert any Claims and Defenses, which motion attaches as an exhibit thereto a copy of the proposed objection or complaint to be filed upon the Court's approval of the standing motion (which objection or complaint cannot thereafter be amended or supplemented to add any additional Claim or Defense), prior to the Objection Deadline, then the Committee shall have three (3) days from the date on which the Court enters an order approving the standing motion to file such objection or complaint and the Objection Deadline shall be extended accordingly; and (2) the Objection Deadline is subject to extension as may be specified by this Court for cause shown or if the applicable Prepetition Agent agrees to such an extension with respect to any Claims and Defenses in respect of the Prepetition ABL Obligations, the Cash Flow Obligations, the First Lien Obligations, the 1.5 Lien Obligations or the Second Lien Obligations, as applicable, (i) challenging the validity, enforceability, priority or extent of (A) the Prepetition ABL Obligations or the liens on Prepetition Collateral securing the Prepetition ABL Obligations, (B) the Cash Flow Obligations or the liens on the Prepetition Collateral securing the Cash Flow Obligations, (C) the First Lien Obligations or the liens on the Prepetition Collateral securing the First Lien Obligations, (D) the 1.5 Lien Obligations or the liens on Prepetition Collateral securing the 1.5 Lien Obligations or (E) the Second Lien Obligations or the liens on Prepetition Collateral securing the Second Lien Obligations or (ii) otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of

action, objections, contests or defenses (collectively, the "Claims and Defenses") against any of

the Prepetition Secured Parties or their respective agents, affiliates, subsidiaries, directors,

officers, representatives, attorneys or advisors, each in their capacity as such, in connection with

any matter related to the Prepetition ABL Obligations, the Cash Flow Obligations, the First Lien

Obligations, the 1.5 Lien Obligations, the Second Lien Obligations or the Prepetition Collateral

and (b) an order is entered and becomes final in favor of the plaintiff sustaining any such

challenge or claim in any such timely filed adversary proceeding or contested matter; provided

that, as to the Debtors, all such Claims and Defenses, except with respect to the value of

Prepetition Collateral other than in respect of the Prepetition ABL Obligations, are hereby

irrevocably waived, released and relinquished as of the Petition Date. If no such adversary

proceeding or contested matter is timely filed in respect of the  Prepetition ABL Obligations, the

Cash Flow Obligations, the First Lien Obligations, the 1.5 Lien Obligations or the Second Lien

Obligations, as the case may be, (x) the  Prepetition ABL Obligations, the Cash Flow

Obligations, the First Lien Obligations, the 1.5 Lien Obligations and the Second Lien

Obligations, as the case may be, shall constitute allowed claims, not subject to counterclaim,

setoff, subordination (except as set forth in the applicable Prepetition Intercreditor Agreement),

recharacterization, defense or avoidance, for all purposes in the Cases and any subsequent

chapter 7 case, (y) the liens on the Prepetition Collateral securing the Prepetition ABL

Obligations, the Cash Flow Obligations, the First Lien Obligations, the 1.5 Lien Obligations and

the Second Lien Obligations, as the case may be, shall be deemed to have been, as of the Petition

Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraphs 4(b),

4(h), 4(j), and 4(l) as applicable, not subject to defense, counterclaim, recharacterization,

subordination (except as set forth in the applicable Prepetition Intercreditor Agreement) or

avoidance and (z) the Prepetition ABL Obligations, the Prepetition ABL Lenders, the Prepetition

ABL Agent, the Cash Flow Obligations, the Cash Flow Lenders, the Cash Flow Agent, the First

Lien Obligations, the First Lien Indenture Trustee, the First Lien Noteholders, the 1.5 Lien

Obligations, the 1.5 Lien Indenture Trustee, the 1.5 Lien Noteholders, the Second Lien

Obligations, the Second Lien Indenture Trustee and the Second Lien Noteholders, each in their

capacity as such, as the case may be, and the liens on the Prepetition Collateral granted to secure

the Prepetition ABL Obligations, the Cash Flow Obligations, the First Lien Obligations, the 1.5

Lien Obligations and the Second Lien Obligations, as the case may be, shall not be subject to

any other or further challenge, except with respect to the value of the Prepetition Collateral

(other than in respect of the Prepetition ABL Obligations), by any party-in-interest (including the

Committee), and such party-in-interest shall be enjoined from seeking to exercise the rights of

the Debtors' estates, including without limitation, any successor thereto (including, without

limitation, any estate representative or a chapter 7 or 11 trustee appointed or elected for any of

the Debtors).  If any such adversary proceeding or contested matter is timely filed, the

stipulations and admissions contained in paragraphs 4 and 14 of this Order shall nonetheless

remain binding and preclusive (as provided in the third sentence of this paragraph) on all

parties-in-interest (including the Committee), except as to any such findings and admissions that

were expressly and successfully challenged in such adversary proceeding or contested matter.  In

the event that there is a timely successful challenge by a final non-appealable order, pursuant and

subject to the limitations contained in this paragraph 26, to the repayment of the Prepetition ABL

Obligations pursuant to this Order based upon a successful challenge to the validity,

enforceability, extent, perfection or priority of the Prepetition ABL Obligations or the liens

securing the same, the Court shall have the power to unwind or otherwise modify (which might

include the disgorgement or reallocation of interest, fees, principal or other incremental

consideration paid in respect of the Prepetition ABL Obligations or the avoidance of liens and/or

guarantees with respect to the Debtors), as the Court shall determine; <u>provided</u> that the proceeds

of any disgorgement or unwinding of the repayment of the Prepetition ABL Obligations shall be

paid directly to the DIP Term Loan Agent and promptly applied to prepay the DIP Term Loans

then outstanding in accordance with the terms of the DIP Term Loan Agreement.  For the

avoidance of doubt, (x) any stipulations and admissions contained in this Order, including

without limitation, in paragraphs 4 and 14 of this Order, shall be operative with respect to Apollo

and its respective agents, officers, directors, employees, attorneys, and advisors solely to the

extent that Apollo is one of the Prepetition Secured Parties, solely in that specific capacity (and

as to agents, officers, directors, employees, attorneys, and advisors of Apollo, solely as such with

respect to Apollo in that specific capacity), and solely with respect to Claims and Defenses that

would apply equally to all other holders of Second Lien Notes and thus are not unique vis-à-vis

Apollo (collectively, "<u>Generalized Second Lien Claims and Defenses</u>"); and (y) nothing in this

Order shall operate to waive, release, or otherwise affect any Claims and Defenses that may exist

with respect to Apollo or its respective affiliates, subsidiaries, agents, officers, directors,

employees, attorneys, and advisors other than, subject to the provisions and limitations contained

in this Order, including without limitation, in this paragraph 26, Generalized Second Lien Claims

and Defenses.

27.     *Limitation on Use of DIP Loans, DIP Collateral and Prepetition Collateral*.  The

Debtors shall use the DIP Loans and the Prepetition Collateral (including the Cash Collateral)

solely as provided in the Orders and the DIP Documents.  Notwithstanding anything herein or in

any other order of this Court to the contrary, no DIP Loans, no DIP Collateral, no Prepetition

Collateral (including the Cash Collateral) nor the Carve-Out may be used to (a) object, contest or

raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due

under the DIP Documents, the Prepetition ABL Documents or the liens or claims granted under

the Orders, the DIP Documents or the Prepetition ABL Documents, (b) assert any Claims and

Defenses or any other causes of action against the DIP Agents, the DIP Lenders, the Prepetition

Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers,

representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the DIP Agents'

assertion, enforcement or realization on the DIP Collateral in accordance with the DIP

Documents, the DIP Intercreditor Agreement or this Order, (d) seek to modify any of the rights

granted to the DIP Agents, the DIP Lenders or the Prepetition Secured Parties under the Orders

or under the DIP Documents or the Prepetition Debt Documents, in the case of each of the

foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any

amount on account of any claims arising prior to the Petition Date unless such payments are (i)

approved by an order of this Court and (ii) permitted under the DIP Documents; provided that,

notwithstanding anything to the contrary herein, no more than an aggregate of $250,000500,000

of the Prepetition Collateral (including the Cash Collateral), the DIP Loans, the DIP Collateral or

the Carve-Out may be used by the Committee to investigate the validity, enforceability or

priority of the Prepetition ABL Obligations, the Cash Flow Obligations, the First Lien

Obligations, the 1.5 Lien Obligations, the Second Lien Obligations or the liens on the Prepetition

Collateral securing the Prepetition ABL Obligations, the Cash Flow Obligations, the First Lien

Obligations, the 1.5 Lien Obligations or the Second Lien Obligations, or investigate any Claims

and Defenses against the Prepetition Secured Parties.

28.    *Insurance*.  To the extent any Prepetition Secured Party is listed as loss payee under the Debtors' insurance policies, each of the DIP Agents is also deemed to be the loss payee under the Debtors' insurance policies and shall act in that capacity and subject to the terms of the DIP Documents, distribute any proceeds recovered or received in respect of any such insurance policies, <u>first</u>, to the payment in full of the DIP Obligations, and <u>second</u>, to the payment of the Cash Flow Obligations, First Lien Obligations, 1.5 Lien Obligations and the Second Lien Obligations, subject to and in accordance with the Prepetition Intercreditor Agreements and the DIP Intercreditor Agreement.

29.    *Order Governs*.  Except as amended, supplemented, or otherwise modified by this Order, all of the provisions of the Interim Order shall remain in full force and effect and are hereby ratified by this Order. In the event of any inconsistency among the provisions of this Order, the Interim Order, and the DIP Documents, the provisions of this Order shall govern.

30.    *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of the Orders, including all findings in the Orders, shall be binding upon all parties-in-interest in the Cases, including without limitation, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors, an examiner with expanded powers appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents, the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; <u>provided</u> that, except to the extent expressly set forth in this Order, the DIP Documents, the Prepetition Intercreditor Agreements or the DIP Intercreditor Agreement, the

65

DIP Agents, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the DIP Loans or the Cash Collateral or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

31.    *Limitation of Liability*.  In determining to make any loan under the DIP Credit Agreements, permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Order or the DIP Documents, the DIP Agents, the DIP Lenders and the Prepetition Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Subject to paragraph 26, nothing in the Orders or in the DIP Documents shall in any way be construed or interpreted to impose upon the DIP Agents, the DIP Lenders or any Prepetition Secured Party any liability for any claims arising from the pre-petition or post-petition activities of any of the Debtors.

32.    *Prepetition Intercreditor Agreements*.  Nothing in this Order shall amend or otherwise modify the terms or enforceability of the Prepetition Intercreditor Agreements, including without limitation, the turnover provisions contained therein, and the Prepetition Intercreditor Agreements shall each remain in full force and effect.  The rights of the Prepetition Secured Parties shall at all times remain subject to the applicable Prepetition Intercreditor Agreement.

33.    *Commitment/Fee Letters.*  The Commitment/Fee Letters were authorized by the Interim Order to be filed and were filed in redacted form satisfactory to the DIP Agents and unredacted copies shall be provided solely to (i) the U.S. Trustee, (ii) counsel to the Committee,

(iii) this Court and (iv) any other party as may be ordered by this Court after notice and a hearing, or agreed by the Debtors and the DIP Agents (collectively, the "Limited Notice Parties").  The Limited Notice Parties shall at all times keep the Commitment/Fee Letters strictly confidential and shall not disclose the contents of the Commitment/Fee Letters to any party whatsoever, including but not limited to their respective clients.  Any pleadings filed in these Cases that reference or disclose information that is redacted from the Commitment/Fee Letters shall be filed under seal or redacted accordingly.

34.    *Proofs of Claim.*  The Prepetition Agents and other Prepetition Secured Parties will not be required to file proofs of claim in any of the Cases for any claim as to which the Debtors have stipulated in paragraph 4 of this Order.

35.    *Effectiveness.*  This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon entry hereof, and there shall be no stay of effectiveness of this Order.

Dated:    May __, 2014
         White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE

67

# <u>Exhibit B</u>

**[Second Lien Intercreditor]**

Exhibit 4.4

EXECUTION VERSION

## INTERCREDITOR AGREEMENT

INTERCREDITOR AGREEMENT dated as of November 16, 2012, among JPMORGAN CHASE BANK, N.A. ("*JPMCB*"), as (i) Intercreditor Agent and (ii) Senior-Priority Agent for the Senior Lender Claims under the Credit Agreement, THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Senior-Priority Agent for the Senior Lender Claims under the First Lien Notes Indenture, THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Senior-Priority Agent for the Senior Lender Claims under the 1-1/2 Lien Notes Indenture, THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A. as Trustee, Collateral Agent and Second-Priority Designated Agent, MOMENTIVE PERFORMANCE MATERIALS INC. a Delaware corporation (the "*Company*") MOMENTIVE PERFORMANCE MATERIALS USA INC., a Delaware corporation (the "*U.S. Borrower*"), and each Subsidiary of the Company listed on Schedule I hereto.

A. Momentive Performance Materials Holdings Inc., a Delaware corporation, the Company, the U.S. Borrower, Momentive Performance Materials GmbH (f/k/a Blitz 06-103 GmbH), a company organized under the laws of Germany (together with the U.S. Borrower, the " *Borrowers*"), the lenders party thereto from time to time, JPMCB, as administrative agent, and J.P. Morgan Securities LLC, Citigroup Global Markets Inc. and Morgan Joseph Triartisan Finance LLC, as joint lead arrangers, are party to the Amended and Restated Credit Agreement dated as of February 10, 2011 (as amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*").

B. The Company, certain of its Subsidiaries and The Bank of New York Mellon Trust Company, N.A., as trustee, are party to the Indenture dated as of October 25, 2012, as supplemented by the Supplemental Indenture dated as of November 16, 2012 (as further amended, restated, supplemented or otherwise modified from time to time, the "*First Lien Notes Indenture*") pursuant to which $1,100,000,000 in aggregate principal amount of 8.875% First-Priority Senior Secured Notes due 2020 are governed.

C. The Company, certain of its Subsidiaries and The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent, are party to the Indenture dated as of May 25, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the " *1-1/2 Lien Notes Indenture*") pursuant to which $250,000,000 in aggregate principal amount of 10% senior secured notes due 2020 are governed.

D. Each of the Credit Agreement, First Lien Notes Indenture and 1-1/2 Lien Notes Indenture is included in the definition of "Credit Agreement" under the Second Lien Notes Indenture (as defined below), and the Obligations of the Borrowers, the Company and certain of the Company's Subsidiaries under the Credit Agreement, First Lien Notes Indenture, 1-1/2 Lien Notes Indenture and the Senior Lender Documents executed or delivered pursuant thereto constitute First-Lien Indebtedness and Senior Lender Claims hereunder.

E. The Company, certain of its Subsidiaries and the Trustee are party to the Indenture dated as of November 5, 2010 (as amended, restated, supplemented or otherwise modified from time to time, the "*Second Lien Notes Indenture*"), pursuant to which the Notes are governed. The Obligations of the Company, and certain of the Company's Subsidiaries under the Second Lien Notes Indenture, the Notes, and the other Noteholder Documents constitute Noteholder Claims and Second-Priority Claims hereunder.

1

EXECUTION VERSION

Accordingly, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section I. Definitions.**

1.1. ***Defined Terms.*** As used in this Agreement, the following terms have the meanings specified below:

"***1-1/2 Lien Notes Indenture***" shall have the meaning set forth in the recitals.

"***Agreement***" shall mean this Intercreditor Agreement, as amended, renewed, extended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"***Bankruptcy Law***" shall mean Title 11 of the United States Code and any similar Federal, state or foreign law for the relief of debtors.

"***Borrowers***" shall have the meaning set forth in the recitals.

"***Business Day***" shall mean any day other than a Saturday, a Sunday or a day that is a legal holiday under the laws of the State of New York or on which banking institutions in the State of New York are required or authorized by law or other governmental action to close.

"***Cash Management Obligations***" shall mean, with respect to any Person, all obligations, whether now owing or hereafter arising, of such Person in respect of overdrafts and related liabilities owed to any other Person that arise from treasury, depositary or cash management services, including any automated clearing house transfers of funds or any similar transactions.

"***Collateral Agent***" shall mean The Bank of New York Mellon Trust Company, N.A., in its capacity as collateral agent for the holders under the Second Lien Notes Indenture.

"***Common Collateral***" shall mean all of the assets of any Grantor, whether real, personal or mixed, constituting both Senior Lender Collateral and Second-Priority Collateral.

"***Company***" shall have the meaning set forth in the preamble.

"***Comparable Second-Priority Collateral Document***" shall mean, in relation to any Common Collateral subject to any Lien created under any Senior Collateral Document, those Second-Priority Collateral Documents that create a Lien on the same Common Collateral, granted by the same Grantor.

"***Credit Agreement***" shall have the meaning set forth in the recitals.

"***Deposit Account***" shall have the meaning set forth in the Uniform Commercial Code.

"***Deposit Account Collateral***" shall mean that part of the Common Collateral (if any) comprised of or contained in Deposit Accounts or Securities Accounts.

"***DIP Financing***" shall have the meaning set forth in Section 6.1.

2

EXECUTION VERSION

"**_Discharge of Senior Lender Claims_**" shall mean, except to the extent otherwise provided in Section 5.7, payment in full in cash (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of (a) all Obligations in respect of all outstanding First-Lien Indebtedness and, with respect to letters of credit or letter of credit guaranties outstanding thereunder, delivery of cash collateral or backstop letters of credit in respect thereof in compliance with the Senior Credit Agreements, in each case after or concurrently with the termination of all commitments to extend credit thereunder and (b) any other Senior Lender Claims that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid.

"**_First-Lien Indebtedness_**" shall mean (a) any Bank Indebtedness (as defined in the Second Lien Notes Indenture on the date hereof), including all Indebtedness incurred by the Company and its Subsidiaries pursuant to the Credit Agreement, First Lien Notes Indenture, 1-1/2 Lien Notes Indenture and the other Senior Lender Documents, that is secured by a Permitted Lien (as defined in the Second Lien Notes Indenture on the date hereof and incurred or deemed incurred pursuant to clause (8) of the definition thereof), (b) all other Obligations (not constituting Indebtedness) of the Company and its Subsidiaries under the agreements governing such Bank Indebtedness and (c) all other Obligations of the Company and its Subsidiaries in respect of Hedging Obligations or Cash Management Obligations in connection with Indebtedness described in clause (a) or Obligations described in clause (b).

"**_First Lien Notes Indenture_**" shall have the meaning set forth in the recitals.

"**_Future First-Lien Indebtedness_**" shall mean any First-Lien Indebtedness other than First-Lien Indebtedness incurred pursuant to the Credit Agreement, the First Lien Notes Indenture, the 1-1/2 Lien Notes Indenture and the Senior Lender Documents entered into in connection therewith.

"**_Future Second Lien Indebtedness_**" shall mean Indebtedness or Obligations (other than Noteholder Claims) of the Company and its Subsidiaries that is to be equally and ratably secured with the Noteholder Claims and is so designated by the Company as Future Second Lien Indebtedness hereunder; provided, however, that such Future Second Lien Indebtedness is permitted to be so incurred in accordance with any Senior Lender Documents and any Second-Priority Documents, as applicable.

"**_Grantors_**" shall mean the Company and each of the Subsidiaries that has executed and delivered a Second-Priority Collateral Document or a Senior Collateral Document.

"**_Hedging Obligations_**" shall mean, with respect to any Person, the obligations of such Person under (a) currency exchange, interest rate or commodity swap agreements, currency exchange, interest rate or commodity cap agreements, and currency exchange, interest rate or commodity collar agreements and (b) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange, interest rates or commodity prices.

"**_Indebtedness_**" shall mean and include all obligations that constitute "Indebtedness" within the meaning of the Second Lien Notes Indenture or the Senior Credit Agreements.

"**_Insolvency or Liquidation Proceeding_**" shall mean (a) any voluntary or involuntary case or proceeding under any Bankruptcy Law with respect to any Grantor, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to

3

any Grantor or with respect to any of its assets, (c) any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

"*Intercreditor Agent*" shall mean JPMCB, in its capacity as administrative agent for the Senior Lenders under the Senior Lender Documents, together with its successors (or if there is more than one Senior Credit Agreement, such agent or trustee as is designated "Intercreditor Agent" by Senior Lenders pursuant to the terms of the Senior Lender Documents) and permitted assigns under the Senior Credit Agreements exercising substantially the same rights and powers.

"*JPMCB*" shall have the meaning set forth in the preamble.

"*Lien*" shall mean, with respect to any asset, any mortgage, deed of trust,, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset.

"*Noteholder Claims*" shall mean all Obligations in respect of the Notes or arising under the Noteholder Documents or any of them, including all fees and expenses of the Trustee thereunder.

"*Noteholder Collateral*" shall mean all of the assets of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Noteholder Claim.

"*Noteholder Collateral Agreement*" shall mean the Collateral Agreement dated as of November 16, 2012, among the Company, certain other domestic Grantors and the Collateral Agent in respect of the Second Lien Notes Indenture.

"*Noteholder Collateral Documents*" shall mean the Noteholder Collateral Agreement and any other document or instrument pursuant to which a Lien is granted by any Grantor to secure any Noteholder Claims or under which rights or remedies with respect to any such Lien are governed.

"*Noteholder Documents*" shall mean (a) the Second Lien Notes Indenture, the Notes, the Noteholder Collateral Documents and (b) any other related document or instrument executed and delivered pursuant to any Noteholder Document described in clause (a) above evidencing or governing any Obligations thereunder.

"*Notes*" shall mean (a) the initial $1,160,687,000 in aggregate principal amount of 9.0% Second-Priority Springing Lien Notes due 2021 issued pursuant to the Second Lien Notes Indenture, (b) the initial €150,000,000 in aggregate principal amount of 9.5% Second-Priority Springing Lien Notes due 2021 issued pursuant to the Second Lien Notes Indenture, and (c) any additional notes issued under the Second Lien Notes Indenture by the Company, to the extent permitted by the Second Lien Notes Indenture, any other Second-Priority Document and the Senior Lender Documents, as applicable.

"*Obligations*" shall mean, with respect to any Indebtedness, any and all obligations, whether now owing or hereafter arising, with respect to the payment of (a) any principal of or interest (including interest accrued on or accruing after the commencement of any Insolvency or Liquidation Proceeding, whether or not a claim for post-filing interest is allowed in such proceeding) or premium on any Indebtedness, including any reimbursement obligation in respect of any letter of credit or letter of credit guaranty, (b) any fees, indemnification obligations, expense reimbursement obligations or other liabilities payable under the documentation governing such Indebtedness, (c) any obligation to post cash collateral in respect

4

EXECUTION VERSION

of letters of credit or letter of credit guaranties and any other obligations and (d) with respect to any Indebtedness constituting Senior Lender Claims, any Cash Management Obligations or Hedging Obligations owing to any of the Senior Lenders holding such Senior Lender Claims or any affiliates thereof.

"*Officers' Certificate*" shall have the meaning set forth in the Second Lien Notes Indenture.

"*Person*" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, entity or other party, including any government and any political subdivision, agency or instrumentality thereof.

"*Pledged Collateral*" shall mean the Common Collateral in the possession of the Intercreditor Agent (or its agents or bailees), to the extent that possession thereof is necessary to perfect a Lien thereon under the Uniform Commercial Code.

"*Recovery*" shall have the meaning set forth in Section 6.4.

"*Required Lenders*" shall mean, with respect to any Senior Credit Agreement, those Senior Lenders the approval of which is required to approve an amendment or modification of, termination or waiver of any provision of or consent to any departure from such Senior Credit Agreement (or would be required to effect such consent under this Agreement if such consent were treated as an amendment of such Senior Credit Agreement).

"*Second Lien Indenture Secured Parties*" shall mean the Persons holding Noteholder Claims, including the Trustee.

"*Second Lien Notes Indenture*" shall have the meaning set forth in the recitals.

"*Second-Priority Agents*" shall mean (a) the Collateral Agent as agent for the Second Lien Indenture Secured Parties and (b) the collateral agent for any Future Second Lien Indebtedness.

"*Second-Priority Claims*" shall mean the Noteholder Claims and all other Obligations in respect of, or arising under, the Second-Priority Documents, including all fees and expenses of the collateral agent for any Future Second Lien Indebtedness.

"*Second-Priority Collateral*" shall mean the Noteholder Collateral and all of the assets of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Future Second Lien Indebtedness.

"*Second-Priority Collateral Agreements*" shall mean the Noteholder Collateral Agreement and any comparable agreement with respect to any Future Second Lien Indebtedness.

"*Second-Priority Collateral Documents*" shall mean the Noteholder Collateral Documents and any other agreement, document or instrument pursuant to which a Lien is now or hereafter granted securing any Second-Priority Claims or under which rights or remedies with respect to such Liens are at any time governed.

"*Second-Priority Documents*" shall mean the Noteholder Documents and any other document or instrument evidencing or governing any Future Second Lien Indebtedness.

"*Second-Priority Designated Agent*" shall mean such agent or trustee as is designated "Second-Priority Designated Agent" by Second-Priority Secured Parties holding a

5

EXECUTION VERSION

majority in principal amount of the Second-Priority Claims then outstanding; it being understood that as of the date of this agreement, the Collateral Agent shall be so designated Second-Priority Designated Agent.

"**Second-Priority Lien**" shall mean any Lien on any assets of the Company or any other Grantor securing any Second-Priority Claims.

"**Second-Priority Secured Parties**" shall mean the Second Lien Indenture Secured Parties and all other Persons holding any Second-Priority Claims, including the collateral agent for any Future Second Lien Indebtedness.

"**Securities Account**" shall have the meaning set forth in the Uniform Commercial Code.

"**Senior Collateral Documents**" shall mean any agreement, document or instrument pursuant to which a Lien is now or hereafter granted securing any Senior Lender Claims or under which rights or remedies with respect to such Liens are at any time governed.

"**Senior Credit Agreements**" shall mean the Credit Agreement, the First Lien Notes Indenture, the 1-1/2 Lien Notes Indenture and any other agreement governing any Future First-Lien Indebtedness.

"**Senior Lender Cash Management Obligations**" shall mean any Cash Management Obligations secured by any Common Collateral under the Senior Collateral Documents.

"**Senior Lender Claims**" shall mean (a) all First-Lien Indebtedness outstanding, including any Future First-Lien Indebtedness, and (b) all other Obligations (not constituting Indebtedness under any such First-Lien Indebtedness) with respect to First-Lien Indebtedness, including all Senior Lender Hedging Obligations and Senior Lender Cash Management Obligations. Senior Lender Claims shall include all interest and expenses accrued or accruing (or that would, absent the commencement of an Insolvency or Liquidation Proceeding, accrue) after the commencement of an Insolvency or Liquidation Proceeding in accordance with and at the rate specified in the relevant Senior Lender Document whether or not the claim for such interest or expenses is allowed or allowable as a claim in such Insolvency or Liquidation Proceeding.

"**Senior Lender Collateral**" shall mean all of the assets of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Senior Lender Claim.

"**Senior Lender Documents**" shall mean the Senior Credit Agreements, the Senior Collateral Documents and each of the other agreements, documents and instruments (including each agreement, document or instrument providing for or evidencing a Senior Lender Hedging Obligation or Senior Lender Cash Management Obligation) providing for, evidencing or securing any Obligation under any Senior Credit Agreement or any Future First-Lien Indebtedness and any other related document or instrument executed or delivered pursuant to any Senior Lender Document at any time or otherwise evidencing or securing any Indebtedness arising under any Senior Lender Document.

"**Senior Lender Hedging Obligations**" shall mean any Hedging Obligations secured by any Common Collateral under the Senior Collateral Documents.

"**Senior Lenders**" shall mean the Persons holding Senior Lender Claims, including the Senior-Priority Agents.

6

"**Senior-Priority Agents**" shall mean (a) JPMCB, as administrative agent under the Credit Agreement, (b) The Bank of New York Mellon Trust Company, N.A., as trustee under the First Lien Notes Indenture, (c) The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent under the 1-1/2 Lien Notes Indenture and (d) the collateral agent for any other First-Lien Indebtedness, in each case together with its permitted successors.

"**Subsidiary**" shall mean any "Subsidiary" of the Company as defined in the Second Lien Notes Indenture.

"**Trustee**" shall mean The Bank of New York Mellon Trust Company, N.A., in its capacity as trustee under the Second Lien Notes Indenture and collateral agent under the Noteholder Collateral Documents, and its permitted successors.

"**Uniform Commercial Code**" or "**UCC**" shall mean the Uniform Commercial Code as from time to time in effect in the State of New York.

"**U.S. Borrower**" shall have the meaning set forth in the recitals.

1.2. **Terms Generally.** The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified in accordance with this Agreement, (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections shall be construed to refer to Sections of this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**Section 2. Lien Priorities.**

2.1. **Subordination of Liens.** Notwithstanding the date, time, manner or order of filing or recordation of any document or instrument or grant, attachment or perfection of any Liens granted to the Second-Priority Secured Parties on the Common Collateral or of any Liens granted to the Intercreditor Agent or the Senior Lenders on the Common Collateral and notwithstanding any provision of the UCC, or any applicable law or the Second-Priority Documents or the Senior Lender Documents or any other circumstance whatsoever, each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, hereby agrees that: (a) any Lien on the Common Collateral securing any Senior Lender Claims now or hereafter held by or on behalf of the Intercreditor Agent or any Senior Lenders or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall have priority over and be senior in all respects and prior to any Lien on the Common Collateral securing any Second-Priority Claims, (b) any Lien on the Common Collateral securing any Second-Priority Claims now or hereafter held by or on behalf of the Trustee, the Collateral Agent or any Second-Priority Secured Parties or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law,

7

EXECUTION VERSION

subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Common Collateral securing any Senior Lender Claims and (c) with respect to any Second-Priority Claims (and as between the Second-Priority Agents and the Second-Priority Secured Parties), the Liens on the Common Collateral securing any Second-Priority Claims now or hereafter held by or on behalf of the Trustee, the Collateral Agent or any Second-Priority Secured Party or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall rank equally and ratably in all respects. All Liens on the Common Collateral securing any Senior Lender Claims shall be and remain senior in all respects and prior to all Liens on the Common Collateral securing any Second-Priority Claims for all purposes, whether or not such Liens securing any Senior Lender Claims are subordinated to any Lien securing any other obligation of the Company, any other Grantor or any other Person.

2.2. ***Prohibition on Contesting Liens.*** Each Second-Priority Agent, for itself and on behalf of each applicable Second-Priority Secured Party, and the Senior-Priority Agents, for itself and on behalf of each applicable Senior Lender, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, perfection, priority, validity or enforceability of (a) a Lien securing any Senior Lender Claims held (or purported to be held) by or on behalf of the Intercreditor Agent or any of the Senior Lenders or any agent or trustee therefor in any Senior Lender Collateral or (b) a Lien securing any Second-Priority Claims held (or purported to be held) by or on behalf of any Second-Priority Secured Party in the Common Collateral, as the case may be; provided, however, that nothing in this Agreement shall be construed to prevent or impair the rights of the Intercreditor Agent or any Senior Lender to enforce this Agreement (including the priority of the Liens securing the Senior Lender Claims as provided in Section 2.1) or any of the Senior Lender Documents.

2.3. ***No New Liens.*** Subject to Section 11.04 of the Second Lien Notes Indenture and the corresponding provision of any Second-Priority Document relating to Future Second Lien Indebtedness, so long as the Discharge of Senior Lender Claims has not occurred, the parties hereto agree that, after the date hereof, if any Second-Priority Agent shall hold any Lien on any assets of the Company or any other Grantor securing any Second-Priority Claims that are not also subject to the first-priority Lien in respect of the Senior Lender Claims under the Senior Lender Documents, such Second-Priority Agent shall notify the Intercreditor Agent promptly upon becoming aware thereof and, upon demand by the Intercreditor Agent or the Company, will assign or release such Lien to the Intercreditor Agent (and/or its designee) as security for the applicable Senior Lender Claims (in the case of an assignment, each Second-Priority Agent may retain a junior lien on such assets subject to the terms hereof). Subject to Section 11.04 of the Second Lien Notes Indenture and the corresponding provision of any Second-Priority Document relating to Future Second Lien Indebtedness, each Second-Priority Agent agrees that, after the date hereof, if it shall hold any Lien on any assets of the Company or any other Grantor securing any Second-Priority Claims that are not also subject to the Lien in favor of each other Second-Priority Agent such Second-Priority Agent shall notify any other Second-Priority Agent promptly upon becoming aware thereof.

2.4. ***Perfection of Liens.*** Neither the Intercreditor Agent nor the Senior Lenders shall be responsible for perfecting and maintaining the perfection of Liens with respect to the Common Collateral for the benefit of the Second-Priority Agents and the Second-Priority Secured Parties. The provisions of this Intercreditor Agreement are intended solely to govern the respective Lien priorities as between the Senior Lenders and the Second-Priority Secured Parties and shall not impose on the Intercreditor Agent, the Second-Priority Agents, the Second-Priority Secured Parties or the Senior Lenders or any agent or trustee therefor any obligations in respect of the disposition of proceeds of any Common Collateral which would conflict with prior perfected claims therein in favor of any other Person or any order or decree of any court or governmental authority or any applicable law.

8

EXECUTION VERSION

## Section 3. Enforcement.

### 3.1. *Exercise of Remedies.*

(a) So long as the Discharge of Senior Lender Claims has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, (i) no Second-Priority Agent or any Second-Priority Secured Party will (x) exercise or seek to exercise any rights or remedies (including setoff) with respect to any Common Collateral in respect of any applicable Second-Priority Claims, institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), (y) contest, protest or object to any foreclosure proceeding or action brought with respect to the Common Collateral by the Intercreditor Agent or any Senior Lender in respect of the Senior Lender Claims, the exercise of any right by the Intercreditor Agent or any Senior Lender (or any agent or sub-agent on their behalf) in respect of the Senior Lender Claims under any lockbox agreement, control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which any Second-Priority Agent or any Second-Priority Secured Party either is a party or may have rights as a third party beneficiary, or any other exercise by any such party, of any rights and remedies relating to the Common Collateral under the Senior Lender Documents or otherwise in respect of Senior Lender Claims, or (z) object to the forbearance by the Senior Lenders from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Common Collateral in respect of Senior Lender Claims and (ii) except as otherwise provided herein, the Intercreditor Agent and the Senior Lenders shall have the exclusive right to enforce rights, exercise remedies (including setoff and the right to credit bid their debt) and make determinations regarding the release, disposition or restrictions with respect to the Common Collateral without any consultation with or the consent of any Second-Priority Agent or any Second-Priority Secured Party; provided, however, that (A) in any Insolvency or Liquidation Proceeding commenced by or against the Company or any other Grantor, each Second-Priority Agent may file a claim or statement of interest with respect to the applicable Second-Priority Claims and (B) each Second-Priority Agent may take any action (not adverse to the prior Liens on the Common Collateral securing the Senior Lender Claims, or the rights of the Intercreditor Agent or the Senior Lenders to exercise remedies in respect thereof) in order to create, prove, perfect, preserve or protect (but not enforce) its rights in, and perfection and priority of its Lien on, the Common Collateral. In exercising rights and remedies with respect to the Senior Lender Collateral, the Intercreditor Agent and the Senior Lenders may enforce the provisions of the Senior Lender Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Common Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(b) So long as the Discharge of Senior Lender Claims has not occurred, each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, agrees that it will not, in the context of its role as secured creditor, take or receive any Common Collateral or any proceeds of Common Collateral in connection with the exercise of any right or remedy (including setoff) with respect to any Common Collateral in respect of the applicable Second-Priority Claims. Without limiting the generality of the foregoing, unless and until the Discharge of Senior Lender Claims has occurred, except as expressly provided in the proviso in clause (ii) of Section 3.1(a), the sole right of the Second-Priority Agents and the Second-Priority

9

Secured Parties with respect to the Common Collateral is to hold a Lien on the Common Collateral in respect of the applicable Second-Priority Claims pursuant to the Second-Priority Documents, as applicable, for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of Senior Lender Claims has occurred.

(c) Subject to the proviso in clause (ii) of Section 3.1(a), (i) each Second-Priority Agent, for itself and on behalf of each applicable Second-Priority Secured Party, agrees that no Second-Priority Agent or Second-Priority Secured Party will take any action that would hinder any exercise of remedies undertaken by the Intercreditor Agent or the Senior Lenders with respect to the Common Collateral under the Senior Lender Documents, including any sale, lease, exchange, transfer or other disposition of the Common Collateral, whether by foreclosure or otherwise, and (ii) each Second-Priority Agent, for itself and on behalf of each applicable Second-Priority Secured Party, hereby waives any and all rights it or any Second-Priority Secured Party may have as a junior lien creditor or otherwise to object to the manner in which the Intercreditor Agent or the Senior Lenders seek to enforce or collect the Senior Lender Claims or the Liens granted in any of the Senior Lender Documents, regardless of whether any action or failure to act by or on behalf of the Intercreditor Agent or Senior Lenders is adverse to the interests of the Second-Priority Secured Parties.

(d) Each Second-Priority Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in any applicable Second-Priority Document shall be deemed to restrict in any way the rights and remedies of the Intercreditor Agent or the Senior Lenders with respect to the Senior Lender Collateral as set forth in this Agreement and the Senior Lender Documents.

3.2. **Cooperation.**  Subject to the proviso in clause (ii) of Section 3.1(a), each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, agrees that, unless and until the Discharge of Senior Lender Claims has occurred, it will not commence, or join with any Person (other than the Senior Lenders and the Intercreditor Agent upon the request thereof) in commencing, any enforcement, collection, execution, levy or foreclosure action or proceeding with respect to any Lien held by it in the Common Collateral under any of the applicable Second-Priority Documents or otherwise in respect of the applicable Second-Priority Claims.

### Section 4. Payments.

4.1. **Application of Proceeds.**  After an event of default under any First-Lien Indebtedness has occurred with respect to which the Intercreditor Agent has provided written notice to each Second-Priority Agent, and until such event of default is cured or waived, so long as the Discharge of Senior Lender Claims has not occurred, the Common Collateral or proceeds thereof received in connection with the sale or other disposition of, or collection on, such Common Collateral upon the exercise of remedies, shall be applied by the Intercreditor Agent to the Senior Lender Claims in such order as specified in the relevant Senior Lender Documents until the Discharge of Senior Lender Claims has occurred. Upon the Discharge of Senior Lender Claims, the Intercreditor Agent shall deliver promptly to the Second-Priority Designated Agent any Common Collateral or proceeds thereof held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct to be applied by the Second-Priority Designated Agent ratably to the Second-Priority Claims and, with respect to each class of Second-Priority Claims, in such order as specified in the relevant Second-Priority Documents.

4.2. **Payments Over.**  Any Common Collateral or proceeds thereof received by any Second-Priority Agent or any Second-Priority Secured Party in connection with the exercise

10

EXECUTION VERSION

of any right or remedy (including setoff) relating to the Common Collateral in contravention of this Agreement shall be segregated and held in trust for the benefit of and forthwith paid over to the Intercreditor Agent (and/or its designees) for the benefit of the applicable Senior Lenders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The Intercreditor Agent is hereby authorized to make any such endorsements as agent for any Second-Priority Agent or any such Second-Priority Secured Party. This authorization is coupled with an interest and is irrevocable.

### Section 5. Other Agreements.

5.1. ***Releases.***

(a) If, at any time any Grantor or the holder of any Senior Lender Claim delivers notice to each Second-Priority Agent that any specified Common Collateral (including all or substantially all of the equity interests of a Grantor or any of its Subsidiaries) is sold, transferred or otherwise disposed of:

(i) by the owner of such Common Collateral in a transaction permitted under the Senior Credit Agreements, the Second Lien Notes Indenture and each other Second-Priority Document (if any); or

(ii) during the existence of any Event of Default under (and as defined in) the Senior Credit Agreements to the extent the Intercreditor Agent has consented to such sale, transfer or disposition:

then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of the Second-Priority Secured Parties upon such Common Collateral will automatically be released and discharged as and when, but only to the extent, such Liens on such Common Collateral securing Senior Lender Claims are released and discharged. Upon delivery to each Second-Priority Agent of a notice from the Intercreditor Agent stating that any release of Liens securing or supporting the Senior Lender Claims has become effective (or shall become effective upon each Second-Priority Agent's release), each Second-Priority Agent will promptly execute and deliver such instruments, releases, termination statements or other documents confirming such release on customary terms. In the case of the sale of all or substantially all of the equity interests of a Grantor or any of its Subsidiaries, the guarantee in favor of the Second-Priority Secured Parties, if any, made by such Grantor or Subsidiary will automatically be released and discharged as and when, but only to the extent, the guarantee by such Grantor or Subsidiary of Senior Lender Claims is released and discharged.

(b) Each Second-Priority Agent, for itself and on behalf of each applicable Second-Priority Secured Party, hereby irrevocably constitutes and appoints the Intercreditor Agent and any officer or agent of the Intercreditor Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of each Second-Priority Agent or such holder or in the Intercreditor Agent's own name, from time to time in the Intercreditor Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Section 5.1, including any termination statements, endorsements or other instruments of transfer or release.

(c) Unless and until the Discharge of Senior Lender Claims has occurred, each Second-Priority Agent, for itself and on behalf of each applicable Second-Priority Secured Party, hereby consents to the application, whether prior to or after a default, of Deposit Account Collateral or proceeds of Common Collateral to the repayment of Senior Lender Claims pursuant to the Senior Credit Agreements; provided that nothing in this Section 5.1(c) shall be construed to

11

EXECUTION VERSION

prevent or impair the rights of the Second-Priority Agents or the Second-Priority Secured Parties to receive proceeds in connection with the Second-Priority Claims not otherwise in contravention of this Agreement.

       5.2. **Insurance.** Unless and until the Discharge of Senior Lender Claims has occurred, the Intercreditor Agent and the Senior Lenders shall have the sole and exclusive right, subject to the rights of the Grantors under the Senior Lender Documents, to adjust settlement for any insurance policy covering the Common Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Common Collateral. Unless and until the Discharge of Senior Lender Claims has occurred, all proceeds of any such policy and any such award if in respect of the Common Collateral shall be paid (a) first, prior to the occurrence of the Discharge of Senior Lender Claims, to the Intercreditor Agent for the benefit of Senior Lenders pursuant to the terms of the Senior Lender Documents, (b) second, after the occurrence of the Discharge of Senior Lender Claims, to the Second-Priority Agents for the benefit of the Second-Priority Secured Parties pursuant to the terms of the applicable Second-Priority Documents and (c) third, if no Second-Priority Obligations are outstanding, to the owner of the subject property, such other person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct. If any Second-Priority Agent or any Second-Priority Secured Party shall, at any time, receive any proceeds of any such insurance policy or any such award in contravention of this Agreement, it shall pay such proceeds over to the Intercreditor Agent in accordance with the terms of Section 4.2.

       5.3. **_Amendments to Second-Priority Collateral Documents._**

       (a) Without the prior written consent of the Intercreditor Agent and the Required Lenders, no Second-Priority Collateral Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Second-Priority Collateral Document, would be prohibited by or inconsistent with any of the terms of this Agreement. Each Second-Priority Agent agrees that each applicable Second-Priority Collateral Document shall include the following language (or language to similar effect approved by the Intercreditor Agent):

       "Notwithstanding anything herein to the contrary, (i) the liens and security interests granted to the [applicable Second-Priority Agent] pursuant to this Agreement are expressly subject and subordinate to the liens and security interests granted to (a) JPMorgan Chase Bank, N.A., as Applicable First Lien Representative (and its permitted successors) pursuant to the Amended and Restated U.S. Collateral Agreement dated as of November 16, 2012 (as amended, restated, supplemented or otherwise modified from time to time), by and among Momentive Performance Holdings Inc., Momentive Performance Materials Inc., Momentive Performance Materials USA, Inc., JPMorgan Chase Bank, N.A., as Applicable First Lien Representative and the other parties party thereto, or (b) any agent or trustee for any other Senior Lenders (as defined in the Intercreditor Agreement referred to below) and (ii) the exercise of any right or remedy by the [applicable Second-Priority Agent] hereunder is subject to the limitations and provisions of, the Intercreditor Agreement dated as of November 16, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), by and among JPMorgan Chase Bank, N.A., as Intercreditor Agent, The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent, Momentive Performance Materials Inc., Momentive Performance Materials USA, Inc., and the other parties party thereto. In the event of any conflict between the terms of the Intercreditor Agreement and the terms of this Agreement, the terms of the Intercreditor Agreement shall govern."

12

EXECUTION VERSION

(b) In the event that the Intercreditor Agent or the Senior Lenders enter into any amendment, waiver or consent in respect of or replace any of the Senior Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any Senior Collateral Document or changing in any manner the rights of the Intercreditor Agent, the Senior Lenders, the Company or any other Grantor thereunder (including the release of any Liens in Senior Lender Collateral), then such amendment, waiver or consent shall apply automatically to any comparable provision of each Comparable Second-Priority Collateral Document without the consent of any Second-Priority Agent or any Second-Priority Secured Party and without any action by any Second-Priority Agent, Second-Priority Secured Party, the Company or any other Grantor; provided, however, that (A) such amendment, waiver or consent does not materially adversely affect the rights of the Second-Priority Secured Parties or the interests of the Second-Priority Secured Parties in the Second-Priority Collateral and not the Intercreditor Agent or the Senior Lenders, as the case may be, that have a security interest in the affected collateral in a like or similar manner, and (B) written notice of such amendment, waiver or consent shall have been given to each Second-Priority Agent.

5.4. **Rights As Unsecured Creditors.** Notwithstanding anything to the contrary in this Agreement, the Second-Priority Agents and the Second-Priority Secured Parties may exercise rights and remedies as an unsecured creditor against the Company or any Subsidiary that has guaranteed the Second-Priority Claims in accordance with the terms of the applicable Second-Priority Documents and applicable law. Nothing in this Agreement shall prohibit the receipt by any Second-Priority Agent or any Second-Priority Secured Party of the required payments of interest and principal so long as such receipt is not the direct or indirect result of the exercise by any Second-Priority Agent or any Second-Priority Secured Party of rights or remedies as a secured creditor in respect of Common Collateral or enforcement in contravention of this Agreement of any Lien in respect of Second-Priority Claims held by any of them. In the event any Second-Priority Agent or any Second-Priority Secured Party becomes a judgment lien creditor in respect of Common Collateral as a result of its enforcement of its rights as an unsecured creditor in respect of Second-Priority Claims, such judgment lien shall be subordinated to the Liens securing Senior Lender Claims on the same basis as the other Liens securing the Second-Priority Claims are so subordinated to such Liens securing Senior Lender Claims under this Agreement. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the Intercreditor Agent or the Senior Lenders may have with respect to the Senior Lender Collateral.

5.5. **Intercreditor Agent as Gratuitous Bailee for Perfection.**

(a) The Intercreditor Agent agrees to hold the Pledged Collateral that is part of the Common Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for each Second-Priority Agent and any assignee solely for the purpose of perfecting the security interest granted in such Pledged Collateral pursuant to the Second-Priority Collateral Agreements, subject to the terms and conditions of this Section 5.5.

(b) The Intercreditor Agent agrees to hold the Deposit Account Collateral (if any) that is part of the Common Collateral and controlled by the Intercreditor Agent as gratuitous bailee for each Second-Priority Agent and any assignee solely for the purpose of perfecting the security interest granted in such Deposit Account Collateral pursuant to the Second-Priority Collateral Agreements, subject to the terms and conditions of this Section 5.5.

(c) In the event that the Intercreditor Agent (or its agent -or bailees) has Lien filings against Intellectual Property (as defined in the Noteholder Collateral Agreement) that is part of the Common Collateral that are necessary for the perfection of Liens in such Common Collateral, the Intercreditor Agent agrees to hold such Liens as gratuitous bailee for each

13

EXECUTION VERSION

Second-Priority Agent and any assignee solely for the purpose of perfecting the security interest granted in such Liens pursuant to the Second-Priority Collateral Agreements, subject to the terms and conditions of this Section 5.5.

(d) Except as otherwise specifically provided herein (including Sections 3.1 and 4.1), until the Discharge of Senior Lender Claims has occurred, the Intercreditor Agent shall be entitled to deal with the Pledged Collateral in accordance with the terms of the Senior Lender Documents as if the Liens under the Second-Priority Collateral Documents did not exist. The rights of the Second-Priority Agents and the Second-Priority Secured Parties with respect to such Pledged Collateral shall at all times be subject to the terms of this Agreement.

(e) The Intercreditor Agent shall have no obligation whatsoever to any Second-Priority Agent or any Second-Priority Secured Party to assure that the Pledged Collateral is genuine or owned by the Grantors or to protect or preserve rights or benefits of any Person or any rights pertaining to the Common Collateral except as expressly set forth in this Section 5.5. The duties or responsibilities of the Intercreditor Agent under this Section 5.5 shall be limited solely to holding the Pledged Collateral as gratuitous bailee for each Second-Priority Agent for purposes of perfecting the Lien held by the Second-Priority Secured Parties.

(f) The Intercreditor Agent shall not have by reason of the Second-Priority Collateral Documents or this Agreement or any other document a fiduciary relationship in respect of any Second-Priority Agent or any Second-Priority Secured Party and the Second-Priority Agents and the Second-Priority Secured Parties hereby waive and release the Intercreditor Agent from all claims and liabilities arising pursuant to the Intercreditor Agent's role under this Section 5.5, as agent and gratuitous bailee with respect to the Common Collateral.

(g) Upon the Discharge of Senior Lender Claims, the Intercreditor Agent shall deliver to the Second-Priority Designated Agent, to the extent that it is legally permitted to do so, the remaining Pledged Collateral (if any) and the Deposit Account Collateral (if any) together with any necessary endorsements (or otherwise allow the Second-Priority Designated Agent to obtain control of such Pledged Collateral and Deposit Account Collateral) or as a court of competent jurisdiction may otherwise direct. The Company shall take such further action as is required to effectuate the transfer contemplated hereby and shall indemnify the Intercreditor Agent for loss or damage suffered by the Intercreditor Agent as a result of such transfer except for loss or damage suffered by the Intercreditor Agent as a result of its own willful misconduct, gross negligence or bad faith. The Intercreditor Agent has no obligation to follow instructions from any Second-Priority Agent in contravention of this Agreement.

(h) Neither the Intercreditor Agent nor the Senior Lenders shall be required to marshal any present or future collateral security for the Company's or its Subsidiaries' obligations to the Intercreditor Agent or the Senior Lenders under the Senior Credit Agreements or the Senior Collateral Documents or any assurance of payment in respect thereof or to resort to such collateral security or other assurances of payment in any particular order, and all of their rights in respect of such collateral security or any assurance of payment in respect thereof shall be cumulative and in addition to all other rights, however existing or arising.

5.6. *Second-Priority Designated Agent as Gratuitous Bailee for Perfection.*

(a) Upon the Discharge of Senior Lender Claims, the Second-Priority Designated Agent agrees to hold the Pledged Collateral that is part of the Common Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for the other Second-Priority Agents and any assignee solely for the purpose of perfecting the security interest granted in such Pledged Collateral pursuant to the applicable Second-Priority Collateral Agreement, subject to the terms and conditions of this Section 5.6.

14

EXECUTION VERSION

(b) Upon the Discharge of Senior Lender Claims, the Second-Priority Designated Agent agrees to hold the Deposit Account Collateral (if any) that is part of the Common Collateral and controlled by the Second-Priority Designated Agent as gratuitous bailee for the other Second-Priority Agents and any assignee solely for the purpose of perfecting the security interest granted in such Deposit Account Collateral pursuant to the applicable Second-Priority Collateral Agreement, subject to the terms and conditions of this Section 5.6.

(c) In the event that the Second-Priority Designated Agent (or its agent or bailees) has Lien filings against Intellectual Property (as defined in the Noteholder Collateral Agreement) that is part of the Common Collateral that are necessary for the perfection of Liens in such Common Collateral, upon the Discharge of Senior Lender Claims, the Second-Priority Designated Agent agrees to hold such Liens as gratuitous bailee for the other Second-Priority Agents and any assignee solely for the purpose of perfecting the security interest granted in such Liens pursuant to the applicable Second-Priority Collateral Agreement, subject to the terms and conditions of this Section 5.6.

(d) The Second-Priority Designated Agent, in its capacity as gratuitous bailee, shall have no obligation whatsoever to the other Second-Priority Agents to assure that the Pledged Collateral is genuine or owned by the Grantors or to protect or preserve rights or benefits of any Person or any rights pertaining to the Common Collateral except as expressly set forth in this Section 5.6. The duties or responsibilities of the Second-Priority Designated Agent under this Section 5.6 upon the Discharge of Senior Lender Claims shall be limited solely to holding the Pledged Collateral as gratuitous bailee for the other Second-Priority Agents for purposes of perfecting the Lien held by the applicable Second-Priority Secured Parties.

(e) The Second-Priority Designated Agent shall not have by reason of the Second-Priority Collateral Documents or this Agreement or any other document a fiduciary relationship in respect of the other Second-Priority Agents (or the Second-Priority Secured Parties for which such other Second-Priority Agents is agent) and the other Second-Priority Agents hereby waive and release the Second-Priority Designated Agent from all claims and liabilities arising pursuant to the Second-Priority Designated Agent's role under this Section 5.6, as agent and gratuitous bailee with respect to the Common Collateral.

(f) In the event that the Second-Priority Designated Agent shall cease to be so designated the Second-Priority Designated Agent pursuant to the definition of such term, the then Second-Priority Designated Agent shall deliver to the successor Second-Priority Designated Agent, to the extent that it is legally permitted to do so, the remaining Pledged Collateral (if any) and the Deposit Account Collateral (if any) together with any necessary endorsements (or otherwise allow the successor Second-Priority Designated Agent to obtain control of such Pledged Collateral and Deposit Account Collateral) or as a court of competent jurisdiction may otherwise direct, and such successor Second-Priority Designated Agent shall perform all duties of the Second-Priority Designated Agent as set forth herein. The Company shall take such further action as is required to effectuate the transfer contemplated hereby and shall indemnify the Second-Priority Designated Agent for loss or damage suffered by the Second-Priority Designated Agent as a result of such transfer except for loss or damage suffered by the Second-Priority Designated Agent as a result of its own wilful misconduct, gross negligence or bad faith. The Second-Priority Designated Agent has no obligation to follow instructions from the successor Second-Priority Designated Agent in contravention of this Agreement.

5.7. ***When Discharge of Senior Lender Claims Deemed to Not Have Occurred*** If, at any time after the Discharge of Senior Lender Claims has occurred, the Company incurs

15

EXECUTION VERSION

and designates any Future First-Lien Indebtedness, then such Discharge of Senior Lender Claims shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Discharge of Senior Lender Claims), and the applicable agreement governing such Future First-Lien Indebtedness shall automatically be treated as a Senior Credit Agreement for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Common Collateral set forth herein and the granting by the Intercreditor Agent of amendments, waivers and consents hereunder. Upon receipt of notice of such designation (including the identity of the new Intercreditor Agent), each Second-Priority Agent shall promptly (i) enter into such documents and agreements (at the expense of the Company), including amendments or supplements to this Agreement, as the Company or such new Intercreditor Agent shall reasonably request in writing in order to provide the new Intercreditor Agent the rights of the Intercreditor Agent contemplated hereby and (ii) to the extent then held by any Second-Priority Agent, deliver to the Intercreditor Agent the Pledged Collateral that is Common Collateral together with any necessary endorsements (or otherwise allow such Intercreditor Agent to obtain possession or control of such Pledged Collateral).

5.8. ***No Release If Event of Default.*** Notwithstanding any other provisions contained in this Agreement, if an Event of Default (as defined in the Second Lien Notes Indenture or any other Second-Priority Document, as applicable) exists on the date on which all First-Lien Indebtedness is repaid in full and terminated (including all commitments and letters of credit thereunder), the second-priority Liens on the Second-Priority Collateral securing the Second-Priority Claims relating to such Event of Default will not be released, except to the extent such Second-Priority Collateral or any portion thereof was disposed of in order to repay the First-Lien Indebtedness secured by such Second-Priority Collateral, and thereafter the applicable Second-Priority Agent will have the right to direct the Intercreditor Agent to foreclose upon such Second-Priority Collateral (but in any such event, the Liens on such Second-Priority Collateral securing the applicable Second-Priority Claims will be released when such Event of Default and all other Events of Default under the Second Lien Notes Indenture or any other Second-Priority Document, as applicable, cease to exist).

**Section 6. Insolvency or Liquidation Proceedings.**

6.1. ***Financing Issues.*** If the Company or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the Intercreditor Agent shall desire to permit the use of cash collateral or to permit the Company or any other Grantor to obtain financing under Section 363 or Section 364 of Title 11 of the United States Code or any similar provision in any Bankruptcy Law (" **DIP Financing** "), then each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, agrees that it will raise no (a) objection to (and will not otherwise contest) such use of cash collateral or DIP Financing and will not request adequate protection or any other relief in connection therewith (except to the extent permitted by the proviso in clause (ii) of Section 3.1(a) and Section 6.3) and, to the extent the Liens securing the Senior Lender Claims under the Senior Lender Documents are subordinated or pari passu with such DIP Financing, will subordinate its Liens in the Common Collateral to such DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second-Priority Claims are so subordinated to Liens securing Senior Lender Claims under this Agreement, (b) objection to (and will not otherwise contest) any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of Senior Lender Claims made by the Intercreditor Agent or any holder of Senior Lender Claims, (c) objection to (and will not otherwise contest) any lawful exercise by any holder of Senior Lender Claims of the right to credit bid Senior Lender Claims at any sale in foreclosure of Senior Lender Collateral, (d) objection to (and will not otherwise contest) any other request for judicial

16

EXECUTION VERSION

relief made in any court by any holder of Senior Lender Claims relating to the lawful enforcement of any Lien on Senior Lender Collateral or (e) objection to (and will not otherwise contest) any order relating to a sale of assets of any Grantor for which the Intercreditor Agent has consented that provides, to the extent the sale is to be free and clear of Liens, that the Liens securing the Senior Lender Claims and the Second-Priority Claims will attach to the proceeds of the sale on the same basis of priority as the Liens securing the Senior Lender Collateral rank to the Liens securing the Second-Priority Collateral in accordance with this Agreement.

6.2. ***Relief from the Automatic Stay.*** Until the Discharge of Senior Lender Claims has occurred, each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, agrees that none of them shall seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Common Collateral, without the prior written consent of the Intercreditor Agent and the Required Lenders.

6.3. ***Adequate Protection.*** Each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, agrees that none of them shall contest (or support any other Person contesting) (a) any request by the Intercreditor Agent or the Senior Lenders for adequate protection or (b) any objection by the Intercreditor Agent or the Senior Lenders to any motion, relief, action or proceeding based on the Intercreditor Agent's or the Senior Lenders' claiming a lack of adequate protection. Notwithstanding the foregoing, in any Insolvency or Liquidation Proceeding, (i) if the Senior Lenders (or any subset thereof) are granted adequate protection in the form of additional collateral in connection with any DIP Financing or use of cash collateral under Section 363 or Section 364 of Title 11 of the United States Code or any similar Bankruptcy Law, then each Second-Priority Agent, on behalf of itself and any applicable Second-Priority Secured Party, may seek or request adequate protection in the form of a replacement Lien on such additional collateral, which Lien is subordinated to the Liens securing the Senior Lender Claims and such DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second-Priority Claims are so subordinated to the Liens securing Senior Lender Claims under this Agreement and (ii) in the event any Second-Priority Agent, on behalf of itself or any applicable Second-Priority Secured Party, seeks or requests adequate protection and such adequate protection is granted in the form of additional collateral, then such Second-Priority Agent, on behalf of itself or each such Second-Priority Secured Party, agrees that the Senior-Priority Agents shall also be granted a senior Lien on such additional collateral as security for the applicable Senior Lender Claims and any such DIP Financing and that any Lien on such additional collateral securing the Second-Priority Claims shall be subordinated to the Liens on such collateral securing the Senior Lender Claims and any such DIP Financing (and all Obligations relating thereto) and any other Liens granted to the Senior Lenders as adequate protection on the same basis as the other Liens securing the Second-Priority Claims are so subordinated to such Liens securing Senior Lender Claims under this Agreement.

6.4. ***Preference Issues.*** If any Senior Lender is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the Company or any other Grantor (or any trustee, receiver or similar person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (a "***Recovery***"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, then the Senior Lender Claims shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the Senior Lenders shall be entitled to a Discharge of Senior Lender Claims with respect to all such recovered amounts. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.

17

6.5. *Application.* This Agreement shall be applicable prior to and after the commencement of any Insolvency or Liquidation Proceeding. All references herein to any Grantor shall apply to any trustee for such Person and such Person as debtor in possession. The relative rights as to the Common Collateral and proceeds thereof shall continue after the filing thereof on the same basis as prior to the date of the petition, subject to any court order approving the financing of, or use of cash collateral by, any Grantor.

6.6. *506(c) Claims.* Until the Discharge of Senior Lender Claims has occurred, each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, will not assert or enforce any claim under Section 506(c) of the United States Bankruptcy Code senior to or on a parity with the Liens securing the Senior Lender Claims for costs or expenses of preserving or disposing of any Common Collateral.

**Section 7. Reliance; Waivers; etc.**

7.1. *Reliance.* The consent by the Senior Lenders to the execution and delivery of the Second-Priority Documents to which the Senior Lenders have consented and all loans and other extensions of credit made or deemed made on and after the date hereof by the Senior Lenders to the Company or any Subsidiary shall be deemed to have been given and made in reliance upon this Agreement. Each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, acknowledges that it and the applicable Second-Priority Secured Parties have, independently and without reliance on the Intercreditor Agent or any Senior Lender, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the applicable Second-Priority Documents, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decision in taking or not taking any action under the applicable Second-Priority Documents or this Agreement.

7.2. *No Warranties or Liability.* Each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, acknowledges and agrees that neither the Intercreditor Agent nor any Senior Lender has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Senior Lender Documents, the ownership of any Common Collateral or the perfection or priority of any Liens thereon. The Senior Lenders will be entitled to manage and supervise their respective loans and extensions of credit under the Senior Lender Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate, and the Senior Lenders may manage their loans and extensions of credit without regard to any rights or interests that any Second-Priority Agent or any of the Second-Priority Secured Parties have in the Common Collateral or otherwise, except as otherwise provided in this Agreement. Neither the Intercreditor Agent nor any Senior Lender shall have any duty to any Second-Priority Agent or any Second-Priority Secured Party to act or refrain from acting in a manner that allows, or results in, the occurrence or continuance of an event of default or default under any agreements with the Company or any Subsidiary thereof (including the Second-Priority Documents), regardless of any knowledge thereof that they may have or be charged with. Except as expressly set forth in this Intercreditor Agreement, the Intercreditor Agent, the Senior Lenders, the Second-Priority Agents and the Second-Priority Secured Parties have not otherwise made to each other, nor do they hereby make to each other, any warranties, express or implied, nor do they assume any liability to each other with respect to (a) the enforceability, validity, value or collectibility of any of the Second-Priority Claims, the Senior Lender Claims or any guarantee or security which may have been granted to any of them in connection therewith, (b) the Company's or any other Grantor's title to or right to transfer any of the Common Collateral or (c) any other matter except as expressly set forth in this Intercreditor Agreement.

18

EXECUTION VERSION

7.3. **Obligations Unconditional.** All rights, interests, agreements and obligations of the Intercreditor Agent and the Senior Lenders, and the Second-Priority Agents and the Second-Priority Secured Parties, respectively, hereunder shall remain in full force and effect irrespective of:

(a) any lack of validity or enforceability of any Senior Lender Documents or any Second-Priority Documents;

(b) any change in the time, manner or place of payment of, or in any other terms of, all or any of the Senior Lender Claims or Second-Priority Claims, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of the Senior Credit Agreements or any other Senior Lender Document or of the terms of the Second Lien Notes Indenture or any other Second-Priority Document;

(c) any exchange of any security interest in any Common Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the Senior Lender Claims or Second-Priority Claims or any guarantee thereof;

(d) the commencement of any Insolvency or Liquidation Proceeding in respect of the Company or any other Grantor; or

(e) any other circumstances that otherwise might constitute a defense available to, or a discharge of, the Company or any other Grantor in respect of the Senior Lender Claims, or of any Second-Priority Agent or any Second-Priority Secured Party in respect of this Agreement.

**Section 8. Miscellaneous.**

8.1. **Conflicts.** Subject to Section 8.19, in the event of any conflict between the terms of this Agreement and the terms of any Senior Lender Document or any Second-Priority Document, the terms of this Agreement shall govern.

8.2. **Continuing Nature of this Agreement; Severability.** Subject to Section 5.7 and Section 6.4, this Agreement shall continue to be effective until the Discharge of Senior Lender Claims shall have occurred or such later time as all the Obligations in respect of the Second-Priority Claims shall have been paid in full. This is a continuing agreement of lien subordination and the Senior Lenders may continue, at any time and without notice to each Second-Priority Agent or any Second-Priority Secured Party, to extend credit and other financial accommodations and lend monies to or for the benefit of the Company or any other Grantor constituting Senior Lender Claims in reliance hereon. The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding, any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.3. **Amendments; Waivers.** No amendment, modification or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each Second-Priority Agent (or its authorized agent) and each Senior-Priority Agent (or its authorized agent) and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other

19

EXECUTION VERSION

time. The Company and the other Grantors shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent their rights are affected. Notwithstanding anything in this Section 8.3 to the contrary, this Agreement may be amended from time to time at the request of the Company, at the Company's expense, and without the consent of any Second-Priority Agent, any Senior-Priority Agent, any Senior Lender or any Second-Priority Secured Party to (i) add other parties holding Future Second Lien Indebtedness (or any agent or trustee therefor) and Future First-Lien Indebtedness (or any agent or trustee therefor) in each case to the extent such Indebtedness is not prohibited by the Senior Credit Agreements, the Second Lien Notes Indenture or any other Second-Priority Document governing Future Second Lien Indebtedness, (ii) in the case of Future Second Lien Indebtedness, (a) establish that the Lien on the Common Collateral securing such Future Second Lien Indebtedness shall be junior and subordinate in all respects to all Liens on the Common Collateral securing any Senior Lender Claims and shall share in the benefits of the Common Collateral equally and ratably with all Liens on the Common Collateral securing any Second-Priority Claims, and (b) provide to the holders of such Future Second Lien Indebtedness (or any agent or trustee thereof) the comparable rights and benefits (including any improved rights and benefits that have been consented to by the Intercreditor Agent) as are provided to the holders of Second-Priority Claims under this Agreement, and (iii) in the case of Future First-Lien Indebtedness, (a) establish that the Lien on the Common Collateral securing such Future First-Lien Indebtedness shall be superior in all respects to all Liens on the Common Collateral securing any Second-Priority Claims and any Future Second Lien Indebtedness and shall share in the benefits of the Common Collateral equally and ratably with all Liens on the Common Collateral securing any Senior Lender Claims (subject to the terms of the Senior Lender Documents), and (b) provide to the holders of such Future First-Lien Indebtedness (or any agent or trustee thereof) the comparable rights and benefits as are provided to the holders of Senior Lender Claims under this Agreement, in each case so long as such modifications do not expressly violate the provisions of the Senior Credit Agreements, the Second Lien Notes Indenture or any other Second-Priority Document governing Future Second Lien Indebtedness. Any such additional party and each Second-Priority Agent shall be entitled to rely on the determination of officers of the Company that such modifications do not violate the Senior Credit Agreements, the Second Lien Notes Indenture or any other Second-Priority Document governing Future Second Lien Indebtedness if such determination is set forth in an Officers' Certificate delivered to such party, the Intercreditor Agent and each Second-Priority Agent; *provided, however,* that such determination will not affect whether or not the Company has complied with its undertakings in the Senior Credit Agreements, the Senior Collateral Documents, the Second Lien Notes Indenture, any other Second-Priority Document governing Future Second Lien Indebtedness, the Second-Priority Collateral Documents or this Agreement.

8.4. ***Information Concerning Financial Condition of the Company and the Subsidiaries.*** The Intercreditor Agent, the Senior Lenders, each Second-Priority Agent and the Second-Priority Secured Parties shall each be responsible for keeping themselves informed of (a) the financial condition of the Company and the Subsidiaries and all endorsers and/or guarantors of the Second-Priority Claims or the Senior Lender Claims and (b) all other circumstances bearing upon the risk of nonpayment of the Second-Priority Claims or the Senior Lender Claims. The Intercreditor Agent, the Senior Lenders, each Second-Priority Agent and the Second-Priority Secured Parties shall have no duty to advise any other party hereunder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event that the Intercreditor Agent, any Senior Lender, any Second-Priority Agent or any Second-Priority Secured Party, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to any other party, it or they shall be under no obligation (w) to make, and the Intercreditor Agent, the Senior Lenders, the Second-Priority Agents and the Second-Priority Secured Parties shall not make, any express or implied

20

EXECUTION VERSION

representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (x) to provide any additional information or to provide any such information on any subsequent occasion, (y) to undertake any investigation or (z) to disclose any information that, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

8.5. ***Subrogation.*** Each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, hereby waives any rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of Senior Lender Claims has occurred.

8.6. ***Application of Payments.*** Except as otherwise provided herein, all payments received by the Senior Lenders may be applied, reversed and reapplied, in whole or in part, to such part of the Senior Lender Claims as the Senior Lenders, in their sole discretion, deem appropriate, consistent with the terms of the Senior Lender Documents. Except as otherwise provided herein, each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, assents to any such extension or postponement of the time of payment of the Senior Lender Claims or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security that may at any time secure any part of the Senior Lender Claims and to the addition or release of any other Person primarily or secondarily liable therefor.

8.7. ***Consent to Jurisdiction; Waivers.*** The parties hereto consent to the jurisdiction of any state or federal court located in New York County, New York, and consent that all service of process may be made by registered mail directed to such party as provided in Section 8.8 for such party. Service so made shall be deemed to be completed three days after the same shall be posted as aforesaid. The parties hereto waive any objection to any action instituted hereunder in any such court based on forum non conveniens, and any objection to the venue of any action instituted hereunder in any such court. Each of the parties hereto waives any right it may have to trial by jury in respect of any litigation based on, or arising out of, under or in connection with this Agreement, or any course of conduct, course of dealing, verbal or written statement or action of any party hereto in connection with the subject matter hereof.

8.8. ***Notices.*** All notices to the Second-Priority Secured Parties and the Senior Lenders permitted or required under this Agreement may be sent to the Trustee, the Intercreditor Agent or any Second-Priority Agent as provided in the Second Lien Notes Indenture, the relevant Senior Lender Document or the relevant Second-Priority Document, as applicable. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or electronic mail or upon receipt via U.S. mail (registered or certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties. The Senior-Priority Agents hereby agree to promptly notify each Second-Priority Agent upon payment in full in cash of all Indebtedness under the applicable Senior Lender Documents (except for contingent indemnities and cost and reimbursement obligations to the extent no claim therefor has been made).

8.9. ***Further Assurances.*** Each of the Second-Priority Agents, on behalf of itself and each applicable Second-Priority Secured Party, and the Intercreditor Agent, on behalf of

21

EXECUTION VERSION

itself and each Senior Lender, agrees that each of them shall take such further action and shall execute and deliver to the Intercreditor Agent and the Senior Lenders such additional documents and instruments (in recordable form, if requested) as the Intercreditor Agent or the Senior Lenders may reasonably request to effectuate the terms of and the lien priorities contemplated by this Agreement.

8.10. ***Governing Law.*** This Agreement has been delivered and accepted at and shall be deemed to have been made at New York, New York and shall be interpreted, and the rights and liabilities of the parties bound hereby determined, in accordance with the laws of the State of New York.

8.11. ***Binding on Successors and Assigns.*** This Agreement shall be binding upon the Intercreditor Agent, the Senior Lenders, the Second-Priority Agents, the Second-Priority Secured Parties, the Company, the Company's Subsidiaries party hereto and their respective permitted successors and assigns.

8.12. ***Specific Performance.*** The Intercreditor Agent may demand specific performance of this Agreement. Each Second-Priority Agent, on behalf of itself and each applicable Second-Priority Secured Party, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action that may be brought by the Intercreditor Agent.

8.13. ***Section Titles.*** The section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of this Agreement.

8.14. ***Counterparts.*** This Agreement may be executed in one or more counterparts, including by means of facsimile or in portable document format (pdf), each of which shall be an original and all of which shall together constitute one and the same document.

8.15. ***Authorization.*** By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement. The Intercreditor Agent represents and warrants that this Agreement is binding upon the Senior Lenders. The Collateral Agent represents and warrants that this Agreement is binding upon the Second Lien Indenture Secured Parties.

8.16. ***No Third Party Beneficiaries; Successors and Assigns.*** This Agreement and the rights and benefits hereof shall inure to the benefit of, and be binding upon, each of the parties hereto and their respective successors and assigns and shall inure to the benefit of each of, and be binding upon, the holders of Senior Lender Claims and Second-Priority Claims. No other Person shall have or be entitled to assert rights or benefits hereunder.

8.17. ***Effectiveness.*** This Agreement shall become effective when executed and delivered by the parties hereto. This Agreement shall be effective both before and after the commencement of any Insolvency or Liquidation Proceeding. All references to the Company or any other Grantor shall include the Company or any other Grantor as debtor and debtor-in-possession and any receiver or trustee for the Company or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding.

8.18. ***Intercreditor Agent, Senior-Priority Agents and Second-Priority Agents.*** It is understood and agreed that (a) JPMCB is entering into this Agreement in its capacity as administrative agent under the Credit Agreement and the provisions of Article VIII of the Credit Agreement applicable to JPMCB as administrative agent thereunder shall also apply to JPMCB as Intercreditor Agent hereunder, (b) The Bank of New York Mellon Trust Company, N.A. is

22

EXECUTION VERSION

entering into this Agreement in its capacity as Trustee and as Collateral Agent under the Second Lien Notes Indenture, and the provisions of Article 7 of the Second Lien Notes Indenture applicable to the Trustee thereunder shall also apply to it hereunder, (c) The Bank of New York Mellon Trust Company, N.A. is entering into this Agreement in its capacity as trustee under the First Lien Notes Indenture, and the provisions of Article 7 of the First Lien Notes Indenture applicable to The Bank of New York Mellon Trust Company, N.A. thereunder shall also apply to it hereunder and (d) The Bank of New York Mellon Trust Company, N.A. is entering into this Agreement in its capacity as trustee and as collateral agent under the 1-1/2 Lien Notes Indenture, and the provisions of Article 7 of the 1-1/2 Lien Notes Indenture applicable to The Bank of New York Mellon Trust Company, N.A. thereunder shall also apply to it hereunder.

8.19. **Relative Rights.** Notwithstanding anything in this Agreement to the contrary (except to the extent contemplated by Section 5.3(b)), nothing in this Agreement is intended to or will (a) amend, waive or otherwise modify the provisions of the Senior Credit Agreements, the Second Lien Notes Indenture or any other Senior Lender Documents or Second-Priority Documents entered into in connection with the Senior Credit Agreements, the Second Lien Notes Indenture or any other Senior Lender Document or Second-Priority Document or permit the Company or any Subsidiary to take any action, or fail to take any action, to the extent such action or failure would otherwise constitute a breach of, or default under, the Senior Credit Agreements or any other Senior Lender Documents entered into in connection with the Senior Credit Agreements, the Second Lien Notes Indenture or any other Second-Priority Documents, (b) change the relative priorities of the Senior Lender Claims or the Liens granted under the Senior Lender Documents on the Common Collateral (or any other assets) as among the Senior Lenders, (c) otherwise change the relative rights of the Senior Lenders in respect of the Common Collateral as among such Senior Lenders or (d) obligate the Company or any Subsidiary to take any action, or fail to take any action, that would otherwise constitute a breach of, or default under, the Senior Credit Agreements or any other Senior Lender Document entered into in connection with the Senior Credit Agreements, the Second Lien Notes Indenture or any other Second-Priority Documents.

8.20. **References.** Notwithstanding anything to the contrary in this Agreement, any references contained herein to any Section, clause, paragraph, definition or other provision of the Second Lien Notes Indenture (including any definition contained therein) shall be deemed to be a reference to such Section, clause, paragraph, definition or other provision as in effect on the date of this Agreement; provided that any reference to any such Section, clause, paragraph or other provision shall refer to such Section, clause, paragraph or other provision of the Second Lien Notes Indenture, as applicable (including any definition contained therein), as amended or modified from time to time if such amendment or modification has been (1) made in accordance with the Second Lien Notes Indenture, and (2) approved in writing by, or on behalf of, the requisite Senior Lenders as are needed under the terms of the Senior Credit Agreements to approve such amendment or modification.

8.21. **Intercreditor Agreements.** Each party hereto agrees that the Senior Lenders (as among themselves) and the Second-Priority Secured Parties (as among themselves) may each enter into intercreditor agreements (or similar arrangements) with the Intercreditor Agent governing the rights, benefits and privileges as among the Senior Lenders or the Second-Priority Secured Parties, as the case may be, in respect of the Common Collateral, this Agreement and the other Senior Collateral Documents or Second-Priority Collateral Documents, as the case may be, including as to application of proceeds of the Common Collateral, voting rights, control of the Common Collateral and waivers with respect to the Common Collateral, in each case so long as (A) the terms thereof do not violate or conflict with the provisions of this Agreement or the other Senior Collateral Documents or Second-Priority Collateral Documents, as the case may be, (B) in the case of any such intercreditor agreement (or similar arrangement)

23

EXECUTION VERSION

affecting any Senior Lenders, the Senior-Priority Agent acting on behalf of such Senior Lenders agrees in its sole discretion to enter into any such intercreditor agreement (or similar arrangement) and (C) in the case of any such intercreditor agreement (or similar arrangement) affecting the Senior Lenders holding Senior Lender Claims under any Senior Credit Agreement, the Required Lenders authorize the applicable Senior-Priority Agent to enter into any such intercreditor agreement (or similar arrangement). Notwithstanding the preceding clauses (B) and (C), to the extent that the applicable Senior-Priority Agent is not authorized by the Required Lenders to enter into any such intercreditor agreement (or similar arrangement ) or does not agree to enter into such intercreditor agreement (or similar arrangement ), such intercreditor agreement (or similar arrangement ) shall not be binding upon the applicable Senior-Priority Agent but, subject to the immediately succeeding sentence, may still bind the other parties party thereto. In any event, if a respective intercreditor agreement (or similar arrangement) exists, the provisions thereof shall not be (or be construed to be) an amendment, modification or other change to this Agreement or any other Senior Collateral Document or Second-Priority Collateral Document, and the provisions of this Agreement and the other Senior Collateral Documents and Second-Priority Collateral Documents shall remain in full force and effect in accordance with the terms hereof and thereof (as such provisions may be amended, modified or otherwise supplemented from time to time in accordance with the terms thereof, including to give effect to any intercreditor agreement (or similar arrangement)).

[Remainder of page intentionally left blank]

24

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

JPMORGAN CHASE BANK, N.A., as Intercreditor Agent
and Senior-Priority Agent for the Senior Lender Claims under
the Credit Agreement

By: /s/ Peter Predun
    Name:  Peter Predun
    Title:   Executive Director

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Senior-Priority Agent for the Senior
Lender Claims under the First Lien Notes Indenture

By: /s/ Richard Tarnas
    Name:  Richard Tarnas
    Title:   Vice President

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Senior-Priority Agent for the Senior
Lender Claims under the 1-1/2 Lien Notes Indenture

By: /s/ Richard Tarnas
    Name:  Richard Tarnas
    Title:   Vice President

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustee, Collateral Agent and Second-
Priority Designated Agent

By: /s/ Richard Tarnas
    Name:  Richard Tarnas
    Title:   Vice President

MOMENTIVE PERFORMANCE MATERIALS INC.

By: /s/ William H. Carter
    Name:  William H. Carter
    Title:   Executive Vice President and Chief Financial
            Officer

MOMENTIVE PERFORMANCE MATERIALS USA INC.

By: /s/ George F. Knight
    Name:  George F. Knight
    Title:   Senior Vice President and Treasurer

MOMENTIVE PERFORMANCE MATERIALS
WORLDWIDE INC.

By: /s/ George F. Knight
    Name:  George F. Knight
    Title:  Senior Vice President, Chief Financial Officer and
          Treasurer

JUNIPER BOND HOLDINGS I LLC

By: Momentive Performance Materials Inc., its sole member

By: /s/ William H. Carter
    Name:  William H. Carter
    Title:  Executive Vice President and Chief Financial
          Officer

JUNIPER BOND HOLDINGS II LLC

By: Momentive Performance Materials Inc., its sole member

By: /s/ William H. Carter
    Name:  William H. Carter
    Title:  Executive Vice President and Chief Financial
          Officer

JUNIPER BOND HOLDINGS III LLC

By: Momentive Performance Materials Inc., its sole member

By: /s/ William H. Carter
    Name:  William H. Carter
    Title:  Executive Vice President and Chief Financial
          Officer

JUNIPER BOND HOLDINGS IV LLC

By: Momentive Performance Materials Inc., its sole member

By: /s/ William H. Carter
    Name:  William H. Carter
    Title:  Executive Vice President and Chief Financial
          Officer

MOMENTIVE PERFORMANCE MATERIALS QUARTZ, INC.

By: /s/ George F. Knight
    Name:  George F. Knight
    Title:   Senior Vice President and Treasurer

MPM SILICONES, LLC

By: Momentive Performance Materials USA Inc., its sole member

By: /s/ George F. Knight
    Name:  George F. Knight
    Title:   Senior Vice President and Treasurer

MOMENTIVE PERFORMANCE MATERIALS SOUTH AMERICA INC.

By: /s/ George F. Knight
    Name:  George F. Knight
    Title:   Senior Vice President and Treasurer

MOMENTIVE PERFORMANCE MATERIALS CHINA SPV INC.

By: /s/ George F. Knight
    Name:  George F. Knight
    Title:   Senior Vice President, Chief Financial Officer and Treasurer

SCHEDULE I

<u>Subsidiary Parties</u>

- Momentive Performance Materials Worldwide Inc.
- Momentive Performance Materials USA Inc.
- Juniper Bond Holdings I LLC
- Juniper Bond Holdings II LLC
- Juniper Bond Holdings III LLC
- Juniper Bond Holdings IV LLC
- Momentive Performance Materials Quartz, Inc.
- MPM Silicones, LLC
- Momentive Performance Materials South America Inc.
- Momentive Performance Materials China SPV Inc.

# <u>Exhibit C</u>

**[Memorandum Order from *In re Spansion Inc.*]**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **SPANSION INC., et al.,**[1] | ) | **Case No. 09-10690 (KJC)** |
| | ) | (Jointly Administered) |
| Debtors. | ) | (Re: D.I. 3826, 3830) |

## <u>MEMORANDUM ORDER</u>[2]

**BY:    KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

On July 9, 2010, the Ad Hoc Committee of Equity Security Holders of Spansion Inc. ("Ad Hoc Equity Committee") and the Ad Hoc Committee of Convertible Noteholders (the "Ad Hoc Convert Committee") (together the "Committees") each filed a motion ("Motion" or "Motions") seeking payment for professional fees and expenses incurred by the Committees based on asserted substantial contributions made in connection with this chapter 11 proceeding. (D.I. #3826. D.I.#3830).   The Ad Hoc Equity Committee seeks payment of $1,778,700.55 and the Ad Hoc Convert Committee seeks payment of $3,456,958.40 in professional fees and expenses.[3]   The Debtors objected to the payments requested in the Motions. (D.I. #4184).   A hearing was held on

---

[1] The Reorganized Debtors in these cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, are: Spansion Inc., a Delaware corporation (8239); Spansion Technology LLC, a Delaware limited liability company (3982); Spansion LLC, a Delaware limited liability company (0482); Cerium Laboratories LLC, a Delaware limited liability company (0482), and Spansion International, Inc., a Delaware corporation (7542). The mailing address for each Reorganized Debtor is 915 DeGuigne Dr., Sunnyvale, CA 94085.   As used herein, the term "Debtors" shall mean the Reorganized Debtors prior to the effective date of the *Debtors' Second Amended Joint Plan of Reorganization Dated April 7, 2010 (as Amended)* [D.I. 3250] (the "Plan").

[2] This Memorandum Order constitutes the findings of fact and conclusions of law required by Fed. R. Bankr. P 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a).   This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 157(b)(2)(A) and (B).

[3] In its Motion, the Ad Hoc Equity Committee suggests that, even after denial of its request for the appointment of an official equity committee, it was led to believe that it would receive a substantial contribution award. Nothing in the record made then or thereafter supports such a notion.   No discussion by the Court or otherwise relieved the Ad Hoc Equity Committee from having to prove its entitlement to a substantial contribution award according to applicable standards.

the Motions. For the reasons which follow, the Ad Hoc Convert Committee's motion will be

granted in part and the Ad Hoc Equity Committee's motion will be denied.

## **FACTS**

The facts of this matter are not disputed.[4]  On March 1, 2009, the Debtors filed voluntary

petitions for relief pursuant to chapter 11 of the Bankruptcy Code.   The Debtors continued to

manage their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the

Bankruptcy Code.   An official committee of unsecured creditors was appointed in March 12,

2009.   Subsequent to the Debtors' filing the Joint Plan of Reorganization (the "First Plan") on

October 26, 2009, the ad hoc committees formed and began to take an active role in the chapter 11

cases. (D.I.#1477)   The Debtor subsequently filed the Second Amended Joint Plan of

Reorganization (the "Second Plan") on December 16, 2009. (D.I. #2032).

By Memorandum and Order dated December 19, 2009, the Court denied a request to

appoint an official equity committee, *In re Spansion, Inc.,* 421 B.R. 151, 163 (Bankr. D. Del.

2009), in which I found that the record did not support a conclusion that equity security holders

were substantially likely to receive a distribution from the Debtors.

Ultimately, after a contentious confirmation hearing, I fixed the Debtors' enterprise value

between $872 million and $944 million and overruled most of the confirmation objections. The

Debtors were then left with the relatively simple task of altering three aspects of the plan:

(1) adjusting the Equity Incentive Plan; (2) limiting the Plan's release clause; and (3) providing an

---

[4]The case history is extensive and so will not be repeated here.   A comprehensive case history, upon which I rely, in
large part, in determining whether to grant the relief requested in the Motions, is found in my decision denying
confirmation of the Second Plan.   I will quote only selectively from that opinion. *In re Spansion, Inc.,* 426 B.R. 114
(Bankr. D. Del. 2010) *appeal dismissed In re Spansion Inc.,* CIV. 10-369 RBK, 2011 WL 3420441 (D. Del. Aug. 4,
2011).

2

escrow for Tessera's administrative claim. These fixes were then embodied in a revised plan (the "Third Plan") filed by the Debtors on April 7, 2010 and confirmed on April 16, 2010. (D.I. #3252, D.I. #3334).

## DISCUSSION

All parties agree that under Sections 503(b)(3) and (4) of the Bankruptcy Code, a court is authorized to award compensation to a creditor or creditors' committee if they make a "substantial contribution" in the case.   While the term "substantial contribution" is not defined in the Bankruptcy Code, courts have narrowly tailored instances under which a creditor can be paid from the estate for assisting the overall reorganization.   The contribution must result in actual and demonstrable benefit to the debtors' estates and the creditors. *Lebron v. Mechem Fin. Inc.,* 27 F.3d 937, 944 (3d Cir. 1994). In *In re Summit Metals, Inc.,* 379 B.R. 40, 51 (Bankr. D. Del. 2007) *aff'd,* 406 F. App'x 634 (3d Cir. 2011), I described the factors and context in which a creditor could be paid when I ruled that:

> [c]ourts have examined several factors to determine whether [an] applicants' efforts have substantially contributed, including: "whether the services were provided to benefit the estate itself or all of the parties in the bankruptcy case; whether the services conferred a direct benefit upon the estate; and whether services were duplicative of services performed by others."   Additionally, courts have considered the motivation of the applicant, holding that applicants who act *"primarily* to serve their own interests and ... [who would have acted] absent an expectation of reimbursement from the estate" cannot be compensated under section 503(b)(3)(D). If the benefit received by the estate was incidental "arising from activities the applicant has pursued in protecting his or her own interests[,]" courts have found an applicant's contribution insubstantial.

*Id.* (citations omitted).

3

At a five-day hearing ("Confirmation Hearing"), a combined record was made for the

following matters:

> (i)     The request for confirmation of the Debtors' Second
> Amended Joint Plan of Reorganization (as amended);
>
> (ii)    The *Ad Hoc* Committee of Convertible Noteholders'
> Emergency Motion for Order (a) Vacating Order Approving
> Debtors' Disclosure Statement Pursuant to Fed. R. Bankr. P. 9024
> and Adjourning Confirmation Hearing and (b) Directing
> Appointment of Trustee or Examiner Pursuant to 11 U.S.C. §§
> 1104(a)(1) and (2) and 1104(c)(2) (D.I. 2391) (the "Motion to
> Vacate"); and
>
> (iii)   The Plaintiff's Motion for Summary Judgment in *U.S.
> Bank Nat'l Association, as Trustee v. Wilmington Trust Company
> et al.* (Adv. No. 09-52274) (D.I. 14) (the "Summary Judgment
> Motion").

*Spansion,* 426 B.R. at 118.

The Committees' objections to confirmation of the Second Plan included:

> (i)     whether the Plan proponents have under-valued the
> Debtors, thereby unfairly impairing unsecured creditors and
> violating  § 1129(a)(3) and § 1129(b)(1) and (2);
>
> (i)     whether the Equity Incentive Plan provides too much
> value to the management and employees of the Reorganized
> Debtors, at the expense of unsecured creditors, especially when
> the value of the Equity Incentive Plan is determined in light of a
> proper valuation of the Debtors, thereby violating § 1129(a)(3)
> and § 1129(b)(1) and (2);
>
> (ii)    whether the Debtors wrongfully refused to consider the
> Alternative Rights Offering proposed by the Convert Committee,
> which would provide greater recovery to unsecured creditors,
> thereby violating § 1129(a)(3) and § 1129(b)(1) and (2);
>
> (iii)   whether the Debtors provided false and misleading
> information in the Plan and Disclosure Statement regarding the
> Debtors' future prospects, thereby violating  § 1129(a)(2);
> [footnote omitted]

4

        (iv)      whether the proposed Plan Releases violate applicable bankruptcy law, thereby violating § 1129(a)(1).

*Spansion,* 426 B.R. at 129.

Many of the Committees' arguments "raised at the Confirmation hearing, were considered and rejected during the hearing on approval of the Disclosure Statement." *Id.* at 124. At bottom, the Committees, whose overlapping membership consisted of equity holders and/or holders of subordinated debt, engaged in conduct "unmistakably aimed at slowing down the confirmation process and gaining leverage to enhance or create recoveries" for their constituents. *Id.* at 127 n. 23 quoting *In re Erickson Retirement Communities, LLC,* 425 B.R. 309, 315 (Bankr. N.D.Tex. 2010).

Notwithstanding its litigious litigation strategy, the Ad Hoc Convert Committee did contribute benefit to the estate.   The Ad Hoc Convert Committee assisted the Court in determining the enterprise value of the Debtors: it questioned aggressively the methodology and presumptions of the Debtors' experts, while at the same time proposing its own methodology and resulting value. This alternative range of value proposed by the Ad Hoc Convert Committee was in excess of $1 billion and, at the low end of its range, was more than $200 million greater than the Debtor's highest valuation. These factors influenced, in part, the Court's determination that the enterprise value was between $872 million and $944 million. But the Ad Hoc Convert Committee's proposal was not the only one that influenced the valuation decision. The Debtors' expert and the expert offered by the ad hoc group of Senior Noteholders also provided methodologies and value ranges to the Court. The value assigned to the Debtors by the Court was derived from all three reports. For these reasons, the precise benefit to the estate that can be attributed solely to the efforts of the Ad Hoc Convert Committee is hard to determine. What is not

5

in question is that, absent the Ad Hoc Convert Committee's challenge of the Debtors' valuation, this Court might have assigned a lower value to the enterprise.

The Ad Hoc Equity Committee similarly argues that it added value to the estate by contesting the Debtors' valuation. While included in the record (imported from the record on the Ad Hoc Equity Committee's motion to appoint an official equity committee), the Ad Hoc Equity Committee's asserted valuation played virtually no role in determining the value of the assets or of the enterprise value. *Spansion,* 426 B.R. at 131 n. 27.   The Ad Hoc Equity Committee did not make a substantial contribution to the estate.

A court must also consider "whether the services were duplicative of services rendered by attorneys for the committee, the committees themselves, or the debtor and its attorneys." *In re Worldwide Direct, Inc.,* 334 B.R. 112, 122 (Bankr. D. Del. 2005) (citing *In re Buckhead Am. Corp.,* 161 B.R. 11, 15 (Bankr. D. Del.1993)).   The Ad Hoc Equity Committee's actions were almost completely duplicative of the Ad Hoc Convert Committee's efforts.[5]

## CONCLUSION

For the reasons given above, it is hereby **ORDERED** that:

(1)   the Ad Hoc Convert Committee's Motion (D.I. #3826)   is GRANTED, IN PART, to allow a substantial contribution award for its professional fees and expenses solely in connection with enterprise valuation (which it claims to be $228,142.50) in an amount to be set by further Order of this Court;

(2) The Ad Hoc Equity Committee's Motion (D.I. #3830) is DENIED;

(3) The parties are directed to confer and determine whether they can agree that

$228,142.50 is the appropriate amount of an award to the Ad Hoc Convert Committee

---

[5]Both Committees were well represented; by this ruling, the Court intends no disparagement of the quality of services provided by the Committees' respective representatives.

6

for professional fees and expenses incurred solely in connection with enterprise

valuation; if agreement is reached, the parties should submit an order under

certification consistent with this Memorandum. Otherwise, the parties should so

inform the Court, and a further hearing will be set to determine the appropriate award

to the Ad Hoc Convert Committee.


BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: May 14, 2014

cc:    Michael R. Lastowski, Esquire [6]

---

[6] Counsel shall serve a copy of this Memorandum Order upon all interested parties and file a Certificate of Service with the Court.