Hearing Date: May 23, 2014 at 10:00 a.m.

Steven Fuhrman
Kathrine A. McLendon
Nicholas E. Baker
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone:    (212) 455-2000
Facsimile:    (212) 455-2502

*Counsel to JPMorgan Chase Bank, N.A., as DIP Agent*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
|  | ) | Chapter 11 |
| *In re:* | ) |  |
|  | ) |  |
| MPM Silicones, LLC., *et al.*[1] | ) | Case No. 14-22503 (RDD) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

---

### REPLY OF THE DIP AGENT TO THE OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTION TO OBTAIN POSTPETITION FINANCING, USE CASH COLLATERAL, AND GRANT ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDERS

JPMorgan Chase Bank, N.A. ("**JPMorgan**"), in its capacities as the DIP Term Loan Agent[2] and the DIP ABL Agent (collectively in such capacities, the "**DIP Agent**") hereby submits this reply (this "**Reply**") to the objection of the Committee (the "**Objection**") to the Debtors' motion [docket no. 13] (the "**DIP Motion**") to obtain postpetition financing, use cash collateral and grant adequate protection

---

[1] The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) Juniper Bond Holdings I LLC (9631); (ii) Juniper Bond Holdings II LLC(9692); (iii) Juniper Bond Holdings III LLC (9765); (iv) Juniper Bond Holdings IV LLC (9836); (v) Momentive Performance Materials China SPV Inc. (8469); (vi) Momentive Performance Materials Holdings Inc. (8246); (vii) Momentive Performance Materials Inc. (8297); (viii) Momentive Performance Materials Quartz, Inc. (9929); (ix) Momentive Performance Materials South America Inc. (4895); Momentive Performance Materials USA Inc. (8388); (xi) Momentive Performance Materials Worldwide Inc. (8357); and (xii); MPM Silicones LLC (5481).

[2] Capitalized terms used but not defined in this Reply have the meanings ascribed to such terms in the DIP Motion or in the Final Order, as applicable.

and to the proposed final order filed with respect to the DIP Motion on May 15, 2014 [docket no. 198, Exhibit A] (the "**Final Order**").[3] In support of this Reply, JPMorgan respectfully states as follows:

## PRELIMINARY STATEMENT

1.  JPMorgan is the administrative agent for both the $270 million DIP ABL Facility and the $300 million DIP Term Loan Facility. The DIP Credit Facilities closed on April 15, 2014, and as of the date of this Reply, the Debtors have borrowed the full $300 million of the DIP Term Loan Facility and approximately $66 million of the DIP ABL Facility, inclusive of letters of credit. Together, the DIP Credit Facilities provide the Debtors with the liquidity necessary to continue as a going concern and to implement a restructuring as contemplated by chapter 11. The DIP Credit Facilities are the product of a highly competitive process conducted by the Debtors and their professionals, reflect arm's-length and extensive good faith negotiations among the DIP Arrangers[4] and the Debtors, and represent the sound exercise of the Debtors' business judgment.[5] In addition, as part of the negotiation and structuring of the DIP Credit Facilities the Debtors now also have the option, subject to the terms of the DIP Credit Facilities and the Commitment/Fee Letters, to utilize exit financing committed by the DIP Arrangers. This potential exit financing consists of conversion of the DIP ABL Facility into a $270 million five-year asset-backed revolving loan facility and a separate $1 billion seven-year term loan facility. Having in place the DIP Credit Facilities and committed exit financing from the outset of the Cases, together with $600 million from a proposed backstopped rights offering, provide the Debtors with the financing necessary to implement their pre-negotiated restructuring and serve to assure the Debtors' vendors, employees and creditors that there is a clear path to emergence.

---

[3] This Reply is also filed in response to the joinder to the Objection filed on May 15, 2014 by the Indenture Trustee for the Subordinated Notes.

[4] The DIP Arrangers are JPMorgan's affiliate, J.P. Morgan Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities, Inc., Goldman Sacks Bank USA and UBS Securities LLC.

[5] *See* Declaration of William Q. Derrough in support of entry of the DIP Motion [Docket No. 14] at ¶¶ 12-15.

2. The Debtors asked the DIP Arrangers to underwrite the combined DIP Credit Facilities/exit commitments against the backdrop of the Approved Plan of Reorganization (as defined in the DIP Credit Agreements) – a pre-negotiated plan of reorganization that incorporates the terms and conditions set forth in the plan term sheet attached to the Restructuring Support Agreement. The DIP Arrangers would not have extended this tandem commitment, and certainly not upon the favorable terms provided, in the absence of the path to emergence and terms of recapitalization contemplated by the Approved Plan of Reorganization. The terms and structure of the DIP Credit Facilities reflect this premise and include protections that are triggered if the Cases deviate too far from this intended course. In addition, the DIP Credit Facilities consist of a negotiated and customary package of priming liens on substantially all the Debtors' assets that secured the Cash Flow Obligations, the First Lien Obligations, the 1.5 Lien Obligations and the Second Lien Obligations, junior liens on other encumbered assets, first liens on unencumbered assets and superpriority administrative claims.

3. All parties in interest, including the Committee, acknowledge that the DIP Credit Facilities are critically necessary and benefit the Debtors' estates and creditors. No one has challenged the Debtors' informed business judgment in seeking and obtaining the DIP Credit Facilities or the business terms reflected in the DIP Credit Facilities. Since the Committee's formation, the DIP Agent has worked in good faith to facilitate a resolution of comments and issues pertaining directly to the DIP Credit Facilities raised by the Committee, various of the Prepetition Secured Parties and other parties in interest. With two exceptions addressed in this Reply, the DIP Agent has been able to resolve not only such comments and issues of the Committee, but also those raised formally and informally by other parties in interest. At this juncture, and as is evident from the Objection, the Committee's principal objections to the Final DIP Order pertain to the Prepetition Secured Parties and not to the actual terms of the DIP Credit Facilities.

3

4.      The Committee's two unresolved objections with respect to the DIP Credit Facilities are that (i) in the event of an exercise of rights and remedies by the DIP Agent during the continuance of an Event of Default (as defined in the DIP Credit Agreements, as applicable), that the DIP Agent be required to bypass assets that were unencumbered as of the Petition Date and first seek ("marshal") repayment from already encumbered assets and (ii) the Court should strike the Event of Default under the DIP Credit Facilities based on a reduction or termination of exclusivity.  The Committee's first objection, if granted, would materially modify the bargained-for terms of the DIP Credit Facilities to terms on which such DIP Credit Facilities would most likely not have been made available to the Debtors, and would materially alter the DIP Lenders' rights in a manner inconsistent with the priorities and protections afforded to debtor-in-possession financings under Section 364 of the Bankruptcy Code. The Committee's second objection should also be rejected because the exclusivity Event of Default is a reasonable provision included among the package of rights and remedies negotiated by the Debtors to obtain the DIP Credit Facility in the context of the Cases.

## ARGUMENT

### A.    Further "Marshaling" Would Materially Alter the Fundamental Structure of the DIP Credit Facilities

5.      The Committee requested that the Final Order prohibit the DIP Agent and DIP Lenders from satisfying their DIP Liens and Superpriority Claims from the proceeds of Avoidance Actions and any assets that were unencumbered as of the Petition Date until after the DIP Agent uses commercially reasonable efforts to recover from assets that were encumbered as of the Petition Date.  The DIP Agent has agreed, in the spirit of compromise, to the "marshaling" concept with respect to proceeds of Avoidance Actions due to their special nature under the Bankruptcy Code and the remote likelihood that any such proceeds will be generated before the DIP Credit Facilities are repaid in full.  However, the Committee's request to expand "marshaling" to all such other unencumbered assets would rewrite the

4

terms of the negotiated DIP Credit Facilities in a manner unacceptable to the DIP Lenders and inconsistent with the statutory scheme Congress established pursuant to Section 364 of the Bankruptcy Code.

6.  Section 364 expressly provides that a secured debtor-in-possession financing will be authorized only if the debtor cannot obtain financing on an unsecured administrative expense or superpriority claim basis, and that a priming lien financing will be authorized only if the debtor cannot obtain financing secured by unencumbered assets or junior liens on encumbered assets. Congress thus clearly established an order of priority in the context of bankruptcy cases requiring debtors to first attempt to obtain financing secured by unencumbered assets (the very assets the Committee wants the DIP Lenders to bypass) before priming existing liens on encumbered assets. The DIP Credit Facilities are structured on a secured, priming lien and superpriority claim basis pursuant to Sections 364(c) and (d) because the DIP Lenders required such protections and would not otherwise have provided the DIP Credit Facilities. Consistent with section 364, the Superpriority Claims would generally have recourse against all of the Debtors' assets, including all unencumbered assets.

7.  The Committee's construct, in contrast, could result in not-bargained-for and unreasonable delays on the DIP Lenders' ability to be timely repaid in the unexpected circumstances in which the DIP Lenders are exercising rights and remedies during the continuance of an Event of Default. It would thereby undermine the relied-on protections contemplated by Sections 364(c) and 364(d) of the Bankruptcy Code, which have the DIP Credit Facilities as the most senior claims against the Debtors' estates, as well as be inconsistent with the parties' agreement and customary practice in the structuring of DIP financings. Furthermore, forcing DIP Lenders to look first to already encumbered assets (on which other Prepetition Secured Parties have existing liens) would reverse the priority scheme set by Congress in section 364 of the Bankruptcy Code. In providing for an escalating set of incentives

5

to DIP lenders, first by granting them superpriority claims and liens on unencumbered assets and only permitting priming liens if financing is otherwise not available, Congress clearly viewed priming liens as a last resort remedy. As such, it would be contrary to Congress' intent to force the DIP Lenders to exercise rights and remedies first against encumbered assets and only then against unencumbered assets. Of course, any realization by the DIP Lenders from previously unencumbered assets would reduce their claims against encumbered assets.

8. The Committee's position in respect of "marshaling" away from the proceeds of assets unencumbered as of the Petition Date is particularly problematic in relation to the equity interest in the Debtors' foreign subsidiaries. The Debtors, through their foreign subsidiaries, have substantial and valuable foreign operations, with approximately 68% of their revenue originated outside the United States.[6] In bargaining for and receiving the protection provided by section 364(c) of the Bankruptcy Code, the DIP Lenders relied on having unfettered recourse against the full value of the foreign operations through the DIP Liens and their Superpriority Claims, notwithstanding that 35% of the equity interests would potentially be unencumbered due to the tax implications of pledging 100%.[7] Impeding or delaying that recovery, as would result from the Committee's proposal, would materially change the fundamental structure of the DIP Credit Facilities and would be particularly unfair because the Non-Debtor Borrowers (i.e., the foreign entities) have directly and indirectly benefitted from the DIP Loans.

9. In addition, the unsecured creditors are clearly benefiting from the DIP Credit Facilities, which enable the Debtors to continue as a going concern and to pursue confirmation of the Approved Plan of Reorganization providing for all non-subordinated general unsecured creditors to be paid in full

---

[6] First Day Declaration at ¶ 9.

[7] Certain of the Debtors do pledge 100% of the equity interest in their first-tier foreign subsidiaries to secure their obligations with respect to the Non-Debtor Borrowers. However, if those Non-Debtor Borrowers' obligations are otherwise satisfied, 35% of any residual value in the stock of the first-tier foreign subsidiaries flowing back to the United States would become unencumbered.

(except for the deficiency claims of the Second Lien Notes and the Holdings PIK Notes).  The DIP Lenders bargained in a highly competitive process for certain protections, including unfettered Superpriority Claims and DIP Liens on virtually all assets of the Debtors, and the Debtors agreed to these terms as part of the overall structure of the DIP Credit Facilities in the exercise of their business judgment.  The DIP Lenders have already agreed to a substantial $3 million carve-out to protect the Debtors' and Committee's professionals in a default scenario.  The DIP Lenders have also agreed to use commercially reasonable efforts to look to other DIP Collateral before seeking recovery from proceeds of Avoidance Actions.  These significant benefits strike a fair balance in relation to the Committee's concerns, and the Court should not impose unwarranted burdens on the DIP Lenders, contrary to the bargained-for financing terms and customary structuring of DIP financings.  Accordingly, the Objection should be overruled with respect to the Committee's request that the DIP Lenders be forced to look first to encumbered assets prior to exercising remedies against assets that were unencumbered as of the Petition Date.

      **B.**     **The Final Order Should Not Override the Exclusivity Event of Default**

     10.     The Court should overrule the Objection premised upon the Committee's request that the Final Order strike the Event of Default based on any reduction or termination of the Debtors' exclusive right to file and solicit acceptances of a plan of reorganization.  The Committee has isolated a single Event of Default it believes should not have been agreed to by the Debtors.  The Committee, however, ignores the highly competitive and heavily negotiated nature of the DIP Credit Facilities, and the balance achieved in the sound exercise of the Debtors' business judgment as reflected by the totality (rather than an isolated single provision) of the terms comprising the $570 million of the DIP Credit Facilities.  As made clear in this circuit and others, in approving DIP financing, courts should defer to

7

the debtor's business judgment.[8] In addition, reduction or termination of exclusivity would clearly constitute a significant and potentially adverse development in the Cases given that the DIP Credit Facilities were solicited and negotiated to support the restructuring reflected in the Approved Plan of Reorganization.

11. The DIP Agent and the DIP Arrangers, when agreeing to underwrite the full DIP Credit Facilities, reasonably determined that in the unlikely event exclusivity were reduced or terminated, an Event of Default would occur and the DIP Agent and DIP Lenders could then evaluate matters and exercise remedies if they deemed it appropriate at that time. The Debtors, in the exercise of their business judgment, agreed to the exclusivity Event of Default as part of the overall package of rights and remedies under the DIP Credit Facilities; neither the Debtors nor the DIP Lenders were able to get everything they wanted in the context of a highly competitive and heavily negotiated process. The Debtors simultaneously negotiated the terms of potential debtor-in-possession financing at arm's-length with three separate financial institutions, using that competitive dynamic to secure more favorable terms.[9] The Debtors appear to have reasonably concluded that other provisions were more important in striking an acceptable balance and outcome. In this regard, it is noteworthy that even though the DIP Credit Facilities are tied to the Approved Plan of Reorganization, the DIP Credit Facilities do not contain an Event of Default if the Restructuring Support Agreement is terminated, and the milestones in the DIP Credit Agreements are much longer than those in the Restructuring Support Agreement. Moreover, any effort to reduce or terminate exclusivity would involve a contested hearing on notice to all parties in interest. As such, the Debtors would have the opportunity to seek a waiver or amendment

---

[8] *See, e.g., In re AMR Corp.*, 485 B.R. 279, 287 (Bankr. S.D.N.Y. 2013) ("In determining whether to approve a debtor's request under Section 364, a Court must examine whether the relief requested is an appropriate exercise of the debtor's business judgment."); *In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing.").

[9] Derrough Declaration at ¶¶ 12-15.

or to replace the DIP Credit Facilities. At that time, the DIP Lenders could appropriately assess the circumstances and determine how to respond.

12. Finally, this Court should reject the Committee's argument that the exclusivity Event of Default "unduly limits this Court's ability to apply the law."[10] This argument lacks merit as many standard DIP financing Events of Default in the DIP Credit Agreements (none of which are challenged here by the Committee) are triggered by Bankruptcy Court rulings (i.e., dismissal or conversion of the Cases, appointment of a trustee or examiner with expanded powers, or lifting of the automatic stay as to material assets) precisely because such determinations indicate a potentially material and adverse development in the Cases from the perspective of the DIP Lenders.

## CONCLUSION

WHEREFORE, the DIP Agent under the DIP Credit Facilities respectfully requests that the Court defer to the Debtors' reasonable business judgment in negotiating the totality of the terms and conditions of the DIP Credit Facilities and overrule the Objection as to the two unresolved points addressed in this Reply, and grant such other and further relief as is just and proper.

Dated: May 22, 2014
    New York, New York

/s/ Steven Fuhrman

Steven Fuhrman
Kathrine A. McLendon
Nicholas E. Baker
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Counsel to JPMorgan Chase Bank, N.A., as DIP Agent*

---

[10] *See* Objection at ¶ 55.

9