**Hearing Date: May 23, 2014 at 10:00 a.m. (prevailing Eastern time)**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Philip C. Dublin

1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4000 (Telephone)
(202) 887-4288 (Facsimile)
Ashleigh L. Blaylock

*Counsel to Apollo Global Management, LLC
and certain of its affiliated funds*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MPM Silicones, LLC, et al.,[1] | ) Case No. 14-22503 (RDD) |
| | ) |
| | ) Jointly Administered |
| | ) |

**REPLY OF APOLLO GLOBAL MANAGEMENT, LLC IN SUPPORT OF DEBTORS'
DIP MOTION AND IN RESPONSE TO COMMITTEE OBJECTION TO DIP MOTION**

Apollo Global Management, LLC, on behalf of itself and certain of its affiliated funds

(collectively, "Apollo"), by and through its undersigned counsel, respectfully submits this reply

(the "Reply") in support of the *Debtors' Motion for Interim and Final Orders Under 11 U.S.C.*

---

[1] The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) Juniper Bond Holdings I LLC (9631); (ii) Juniper Bond Holdings II LLC (9692); (iii) Juniper Bond Holdings III LLC (9765); (iv) Juniper Bond Holdings IV LLC (9836); (v) Momentive Performance Materials China SPV Inc. (8469); (vi) Momentive Performance Materials Holdings Inc. (8246); (vii) Momentive Performance Materials Inc. (8297); (viii) Momentive Performance Materials Quartz, Inc. (9929); (ix) Momentive Performance Materials South America Inc. (4895); (x) Momentive Performance Materials USA Inc. (8388); (xi) Momentive Performance Materials Worldwide Inc. (8357); and (xii) MPM Silicones, LLC (5481). The Debtors' executive headquarters are located at 260 Hudson River Road, Waterford, NY 12188.

*§§ 105, 361, 362, 363(c), 363(d), 364(c), 364(d), 364(e) and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing Debtors to Use Cash Collateral; (III) Granting Adequate Protection to Prepetition Secured Lenders; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 2002, 4001 and 9014* [ECF No. 13] (the "DIP Motion")[2] and in response to the *Objection of the Official Committee of Unsecured Creditors* (the "Committee") *to the Debtors' Motion to Obtain Postpetition Financing, Use Cash Collateral, and Grant Adequate Protection to the Prepetition Secured Lenders*, dated May 15, 2014 [ECF No. 204] (the "Committee Objection").[3]  In support of this Reply, Apollo respectfully represents as follows:

## REPLY

1.      By the Committee Objection, and despite its acknowledgement of the Debtors' need for the DIP Credit Facilities,[4] the Committee makes baseless allegations against Apollo and the Debtors in an effort to "poison the well" and obtain material modifications to provisions of the Proposed Final Order that are neither prejudicial to unsecured creditors nor necessary to preserve unsecured creditor rights.  Specifically, the Committee objects to entry of the Proposed Final Order on the grounds that, *inter alia*, (i) the proposed payment of fees and expenses as part

---

[2] On May 15, 2014, the Debtors filed the *Notice of Filing of Proposed Final Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 363(d), 364(c), 364(d), 364(e) and 507 and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral and (III) Granting Adequate Protection to Prepetition Secured Lenders* [ECF No. 198] (the "Proposed Final Order"), which sets forth certain revisions to the proposed form of order approving the DIP Credit Facilities (as defined below) initially filed with the DIP Motion.  Capitalized terms used and not otherwise defined herein shall have the meaning(s) ascribed to such terms in the Proposed Final Order.

[3] Also on May 15, 2014, U.S. Bank National Association, in its capacity as Indenture Trustee for the 11.5% Senior Subordinated Notes due 2016 (the "Senior Subordinated Indenture Trustee" and such notes, the "Senior Subordinated Notes") issued pursuant to that certain Indenture, dated as of December 4, 2006 (as amended, modified or supplemented from time to time), between Momentive Performance Materials, Inc., as issuer, and the Senior Subordinated Indenture Trustee (the "Senior Subordinated Indenture") filed a joinder to the Committee Objection [ECF No. 205] (the "Senior Subordinated Joinder").  This Reply responds equally to the Senior Subordinated Joinder.

[4] "DIP Credit Facilities" means that certain term loan facility in the aggregate principal amount of $300,000,000 (the "DIP Term Loan Facility") and the asset-based revolving facility in the aggregate principal amount of $270,000,000 (the "DIP ABL Facility").

of the Second Lien Adequate Protection[5] is inappropriate and part of a deliberate attempt by

Apollo and the Ad Hoc Committee of Second Lien Noteholders (the "Ad Hoc Committee") to

obtain an economic advantage over unsecured creditors; (ii) the provisions of the Proposed Final

Order are designed to advance Apollo's agenda in its multiple capacities,[6] as reflected in the

RSA[7] and Plan;[8] and (iii) certain provisions of the Proposed Final Order prejudice unsecured

creditors such that entry of an order approving the DIP Credit Facilities should be conditioned

upon their removal or modification.  The Committee Objection is rife with misstatements of law

and fact and should be overruled.

        2.        Rather than advantage one constituency to the detriment of another as the

Committee would have the Court believe, the DIP Credit Facilities and the adequate protection

to be provided in connection therewith aid the Debtors' restructuring in conjunction with the

RSA and Plan, which restructuring is designed to preserve and maximize the value of the

Debtors' estates for the benefit of their creditors.  Contrary to the Committee's assertions, none

of the RSA, the Plan or the DIP Credit Facilities provides Apollo—or any other stakeholder—

---

[5] "Second Lien Adequate Protection" means the adequate protection provided under the Proposed Final Order to the Second Lien Indenture Trustee (as defined below) and Second Lien Noteholders to protect their interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in value of their valid, perfected and enforceable interests in the Prepetition Collateral (such diminution in value, the "Second Lien Adequate Protection Obligations"), consisting of (i) valid, perfected replacement security interests in and liens on all of the DIP Collateral (the "Second Lien Adequate Protection Liens"), subject to the terms set forth in the Proposed Final Order, (ii) superpriority status for the Second Lien Adequate Protection Obligations pursuant to Bankruptcy Code section 507(b) (the "Second Lien 507(b) Claims") and (iii) payment, subject to the standard set forth in Bankruptcy Code section 506(b), of all reasonable fees and expenses of (a) the Second Lien Indenture Trustee and its counsel (but excluding any fees and expenses of counsel to the Second Lien Indenture Trustee related to any dispute over the payment of any prepayment or "make-whole" premium), (b) the Ad Hoc Committee of Second Lien Noteholders and its counsel and advisors and (c) Apollo and its counsel and advisors (collectively, the "Second Lien Fees and Expenses").

[6] Apollo holds (i) approximately $526 million, or approximately 39% of the Second Lien Notes (as defined below), (ii) approximately $124 million, or approximately 33% of the Senior Subordinated Notes and (iii) over 90% of the equity of Momentive Performance Materials Holdings, LLC, the Debtors' ultimate parent company, which is not a Debtor in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

[7] "RSA" means that certain Restructuring Support Agreement dated as of April 13, 2014, inclusive of all exhibits thereto, by and among the Debtors, Apollo and the members of the Ad Hoc Committee of Second Lien Noteholders.

[8] "Plan" means that certain *Joint Chapter 11 Plan of Reorganization for Momentive Performance Materials Holdings Inc. and its Affiliated Debtors*, dated May 12, 2014 [ECF No. 172].

with undue leverage in the Chapter 11 Cases.  The argument that the Proposed Final Order or the

DIP Credit Facilities themselves afford Apollo or any of the Prepetition Secured Parties with

such economic advantages as to stack the deck against unsecured creditors or are intended to

further some ulterior agenda is nothing short of reckless.  Instead, the DIP Credit Facilities and

Proposed Final Order facilitate the Debtors' efforts to consummate a restructuring that, among

other things, proposes to pay all unsecured creditors in full, in cash—other than (x) holders of

Senior Subordinated Notes, which notes (i) are contractually subordinated to the Second Lien

Notes[9] and (ii) Apollo is the largest holder of, and (y) holders of PIK Note Claims,[10] which are

structurally subordinated to all other claims against the Debtors.[11]  Indeed, the provision of the

Second Lien Adequate Protection to which the Committee objects is part and parcel of the

Debtors' entire restructuring.  It should not be lost on the Court, the Committee or any other

party that, without the commitments provided by Apollo and the other Second Lien Noteholders

party to the RSA and the Backstop Commitment Agreement[12] to, *inter alia*, support the Debtors'

restructuring and provide a $600 million backstop to the rights offering contemplated by the Plan

(the "Rights Offering"), the DIP Credit Facilities, which the Committee acknowledges the

Debtors require, would not have been provided.

---

[9] "Second Lien Notes" means those certain 9% Second-Priority Springing Lien Notes due 2021 and 9.5% Second-Priority Springing Lien Notes due 2021 issued pursuant to that certain Indenture, dated as of November 5, 2010, by and between Momentive Performance Materials, Inc., as issuer, and Wilmington Savings Fund Society, FBS, as the indenture trustee (the "Second Lien Indenture Trustee").

[10] "PIK Note Claims" means the claims and obligations arising under that certain pay-in-kind unsecured 11% Senior Discount Note (the "PIK Note"), dated December 4, 2006, with an original principal amount of $400 million.

[11] In fact, the only creditors with an unsecured claim entitled to a recovery thereon that are not receiving a recovery are the Second Lien Noteholders themselves who have agreed to forego a recovery on their deficiency claims in order to ensure that general unsecured creditors are paid in full under the Plan.  In fact, absent the largess of the Second Lien Noteholders, general unsecured creditors' recoveries in these cases would be pennies on the dollar.

[12] "Backstop Commitment Agreement" means that certain Backstop Commitment Agreement, by and among Momentive Performance Materials Holdings Inc., Momentive Performance Materials Inc. and the Commitment Parties (as defined therein), dated as of May 9, 2014.

3.      The Committee Objection, in its entirety, is without merit on the facts and the law and should be overruled.

## I.      The Second Lien Adequate Protection is Permissible as a Matter of Law

4.      The Committee challenges both the extent of the Second Lien Noteholders' entitlement to adequate protection under the Proposed Final Order and the form of such adequate protection, which includes the payment of Apollo's professionals' fees and expenses.  The Committee's arguments are misguided and inconsistent with the law.  First, the terms of the Second Lien Adequate Protection, including Apollo's entitlement to participate therein, have been agreed to by the Debtors and the Prepetition Secured Parties, which consent is sufficient for the Court to find that the adequate protection provided pursuant to the Proposed Final Order is reasonable and consistent with the Debtors' business judgment.  Second, Apollo's receipt of reimbursement of its fees and expenses as a significant secured creditor is consistent with applicable legal precedent and neither "unbalanced [nor] improper."  Committee Objection ¶ 30. For these reasons, and for the reasons stated below, the Committee's objection to the Second Lien Adequate Protection, including Apollo's receipt of the Second Lien Fees and Expenses, should be overruled.

(a)      *The Second Lien Adequate Protection is Consensual*

5.      The Committee incorrectly asserts that a debtor or its secured creditor is required to submit evidence "establishing likely loss to [the secured creditor's] collateral position" to justify the grant of adequate protection.  Committee Objection ¶ 15.  This is a blatant misstatement of the law.  The applicable provisions of the Bankruptcy Code require no such evidentiary showing and, instead, require—absent consent—that a debtor establish that a party is adequately protected to obtain postpetition financing or use a secured party's collateral.  *See* 11 U.S.C. §§ 363(e), 364(d)(1).  Even the precedent cited by the Committee makes clear that the

"debtor has the burden to establish that the holder of the lien to be subordinated has adequate protection," not that evidence must be proffered to demonstrate that there will be a loss to the creditor's collateral position absent the proposed adequate protection package. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (internal citations omitted). The Committee has cited no case law—and Apollo is aware of none—holding that an evidentiary showing is required to justify a secured creditor's receipt of adequate protection.

6.      The Committee's argument disregards the fact that the priming of the Prepetition Secured Parties' liens and use of their Cash Collateral in exchange for the adequate protection proposed under the Proposed Final Order, including the Second Lien Adequate Protection, is entirely consensual. Where a debtor seeks to use the cash collateral or prime the liens of a secured creditor, the secured creditor must consent to such use of cash collateral or priming or, in the alternative, the debtor must demonstrate that the creditor is adequately protected. *See In re Metaldyne Corp.*, 09-13412 (MG), 2009 WL 2883045, at *2 (Bankr. S.D.N.Y. June 23, 2009) ("Under [Bankruptcy Code section] 363(c)(2), the debtor may not use cash collateral unless the secured creditor consents, *or* the court authorizes such use.") (emphasis added); *In re Schaumburg Hotel Owner Ltd. P'ship*, 87 B 14301 (JBS), 1989 WL 359490, at *3 (Bankr. N.D. Ill. Jan. 12, 1989) ("[Bankruptcy Code] section 363(c)(2) prohibits a debtor from using cash collateral unless the creditor holding an interest in that cash collateral consents or the court authorizes its use in accordance with Sections 363(c)(2) or 363(e)"). Where a party has consented to the priming of its liens or use of its cash collateral, a debtor is not required to demonstrate that such creditor is adequately protected. *See Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) (stating that lenders' consent to imposition of priming

6

lien "relieved the debtor of having to demonstrate that the [lienholders] were adequately

protected").

7.        Where a secured creditor has consented to the debtor's use of its cash collateral or

priming of its liens, thereby relieving the debtor of the burden to demonstrate the secured

creditor is adequately protected, the grant of adequate protection is in the province of the

debtor's business judgment.  *See In re True Temper Sports, Inc.*, No. 09-13445 (PJW), 2009 WL

7226692, at *8 (Bankr. D. Del. Oct. 30, 2009) (approving terms of the proposed adequate

protection arrangements and use of cash collateral as fair and reasonable, reflecting the debtor's

exercise of business judgment and constituting reasonably equivalent value and fair

consideration for prepetition agents' consent thereto, noting "[e]ach of the Prepetition First Lien

Agent and the Prepetition First Lien Lenders consented to the entry of this Final Order and relief

provided herein."); *In re New World Pasta Co.*, 04-02817 (MDF), 2004 WL 5651052, at *6

(Bankr. M.D. Pa., Jul. 9, 2004) (approving a DIP facility that included a consensual adequate

protection based, in part, on the finding that "the terms of the Postpetition Credit Agreement,

Amendment, Postpetition Financing, use of Cash Collateral and provision of adequate protection,

are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent

with their fiduciary duties").  The Bankruptcy Code permits a debtor significant flexibility in

providing adequate protection to a secured creditor so long as such relief will result in the

realization of the "indubitable equivalent" of such entity's interest in the property.  11 U.S.C.

§ 361(3); *In re Timbers of Inwood Forest, Assocs. Ltd.*, 793 F.2d 1380, 1388 (5th Cir. 1998)

(describing Bankruptcy Code section 361(3) as a "catch-all" provision); *Aurelius Capital Master,

Ltd. v. TOUSA Inc.*, 08-61317-CIV (ASG), 2009 WL 6453077, at *59-63 (S.D. Fla. Feb. 6,

2009) (affirming the bankruptcy court's finding that a cash collateral order that provided for an

adequate protection payment to a prepetition lender satisfied the "business judgment" standard

and the "best interests of the estates" standard because it was consensual).  Moreover, where the

adequate protection provided to a secured creditor in exchange for the priming of its liens or use

of its collateral is consensual, such consent permits a court to find the adequate protection

reasonable.  *See In re Chrysler LLC,* No. 09-50002 (AJG), 2009 WL 1357948, at *6 (Bankr.

S.D.N.Y. May 4, 2009) ("Based upon the consent of the First Priority Agent, this Court finds that

the adequate protection provided herein is reasonable and sufficient to protect the interests of the

First Priority Secured Parties."); *In re Comfort Co., Inc.*, No. 08-12305 (MFW), 2008 WL

8191314, at *11 (Bankr. D. Del. Oct. 29, 2008) (determining "[b]ased upon the consent of the

[lenders]" that the adequate protection provided by the order was "reasonable and sufficient");

*Bland v. Farmworker Creditors*, 308 B.R. 109, 113 (S.D. Ga. 2003) (citing *Anchor* for same).

        8.      In the instant case, the Debtors' determination to provide the Prepetition Secured

Parties with adequate protection, including the Second Lien Adequate Protection, is well within

their business judgment, has been consented to by the Prepetition Secured Parties and the DIP

Lenders and should be approved as set forth in the Proposed Final Order.

        (b)      *The Second Lien Intercreditor Agreement Does Not Limit the Extent of Adequate Protection*

        9.      The Committee's argument that the Debtors should not provide the Second Lien

Noteholders with the Second Lien Fees and Expenses because the Second Lien Noteholders are

deemed to consent to the priming of their liens and the use of their Cash Collateral pursuant to

the Second Lien Intercreditor Agreement is without merit.  *See* Committee Objection ¶ 9.  First,

the Committee does not have standing to invoke the Second Lien Intercreditor Agreement

because it is neither party to nor a third-party beneficiary of such agreement.  *Duraflex Sales &*

*Serv. Corp. v. W.H.E. Mech. Contractors*, 110 F.3d 927, 936 (2d Cir. 1997) (declining to give

priority to lienholder under subordination agreement because lienholder was not a party to the agreement); *In re Chicago, S. Shore & S. Bend R.R.*, 146 B.R. 421, 427-28 (Bankr. N.D. Ill. 1992) (holding that because "the Trustee was not a party to the Subordination Agreement . . . the Trustee has no standing pursuant to the Bankruptcy Code to enforce the Subordination Agreement"); *see also* Second Lien Intercreditor Agreement § 8.16 ("No Third Party Beneficiaries"). Second, Apollo's (or any other Second Lien Noteholder's) receipt of the Second Lien Adequate Protection, including the Second Lien Fees and Expenses, is in no way restricted by its rights or obligations under the Second Lien Intercreditor Agreement. *See generally* Second Lien Intercreditor Agreement § 2 ("Lien Priority"), § 3 ("Enforcement") and § 6.3 ("Adequate Protection").

10.    Third, the payment of fees and expenses is a standard form of adequate protection provided to junior creditors, even where such creditors are deemed to consent to the use of their cash collateral or priming of their liens pursuant to an intercreditor agreement. *See In re Sorenson Commc'ns Inc.*, No. 14-10454 (BLS) (Bankr. D. Del. March 25, 2014), ECF No. 136 (cash collateral order provided for payment of second lien noteholder fees and expenses where intercreditor agreement provided first lien noteholders could deem second lien noteholders to consent to priming of second liens); *In re NewPage Corp. et al.*, No. 11-12804 (KG) (Bankr. D. Del. Oct. 5, 2011), ECF No. 310 (DIP order provided for the payment of reasonable fees and expenses of counsel and financial advisors to a group of prepetition second lien noteholders where such noteholders were deemed to consent to priming of second liens pursuant to intercreditor agreement); *In re Indianapolis Downs, LLC*, No. 11-11046 (BLS) (Bankr. D. Del. April 26, 2011), ECF No. 139 (DIP order provided for payment of reasonable fees and expenses of counsel and financial advisors to prepetition second lien noteholders where intercreditor

9

agreement provided second lien noteholders were deemed to consent to priming of second liens). As a result of the DIP Credit Facilities, the liens granted for Apollo's (and all Second Lien Noteholders') benefit have been primed significantly.  Indeed, the liens granted in respect of the Second Lien Notes are now at least 10th in line once all priming and adequate protection liens are taken into account[13]—more than justifying the grant of adequate protection to the Second Lien Noteholders.

11.    Fourth, the Second Lien Adequate Protection was negotiated among the parties as part of the Debtors' entire restructuring, as contemplated by the RSA, and falls squarely within the Debtors' business judgment.  *See, e.g., In re New World Pasta Co.*, 2004 WL 5651052 *6; *see also In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting [Bankruptcy Code] section 364 financing."); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) ("To determine if the business judgment test is met, the court is 'required to examine whether a reasonable business person would make a similar decision under similar circumstances.'") (*quoting In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985)

---

[13] Specifically, the liens securing the Second Lien Notes are now subordinate to: (i) the DIP Liens (for both the DIP ABL Facility and the DIP Term Loan Facility), (ii) the Carve-Out, (iii) the Cash Flow Adequate Protection Liens, (iv) the First Lien Adequate Protection Liens, (v) the 1.5 Lien Adequate Protection Liens, (vi) the liens securing the Cash Flow Obligations, the First Lien Obligations, the 1.5 Lien Obligations and (vii) the Non-Primed Liens.  *See* Proposed Final Order ¶ 22(a).

("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.")) (citations omitted).

12.    For the foregoing reasons, arguments based on the terms of the Second Lien Intercreditor Agreement have no place in the Committee Objection and should be disregarded.

(c)    *Payment of Apollo's Fees and Expenses Is Reasonable and Comports with Applicable Law*

13.    The Committee further contends that "the only conceivable function of paying Apollo's professional fees is to allow Apollo to protect its other, non-lender interests at the estates' expense, which is precisely why those professional fees should not be foisted on the estates." Committee Objection ¶ 27.  This argument is unsupportable and, regardless, is now moot as modifications are being made to the Proposed Final Order that will clarify that the reimbursement of Apollo's professionals' fees as adequate protection expressly will include only fees and expenses incurred in Apollo's capacity as a Second Lien Noteholder, in which capacity, among others, Apollo has played an integral role in facilitating the Debtors' restructuring.

14.    Courts in this and other jurisdictions routinely grant adequate protection in the form of professional fees and expenses to creditors that played an integral role in the debtors' restructuring.  *See In re The Great Atlantic & Pacific Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011), ECF No. 479 (prepetition trustee, for benefit of itself and prepetition secured noteholders, was entitled to adequate protection in the form of reimbursement of fees and expenses for each month of chapter 11 cases where noteholders participated in restructuring negotiations); *In re Indianapolis Downs*, No. 11-11046 (BLS) (Bankr. D. Del. April 26, 2011), ECF No. 139 (providing for adequate protection in the form of payment of reasonable fees and expenses of counsel and financial advisors to prepetition second priority noteholders).  Indeed, the payment pursuant to a DIP order of professional fees and expenses of a debtor's prepetition

equity holder that also participated as a plan support party or equity sponsor in the debtor's cases—as Apollo is and has done here—is not proscribed, even where such party is not a DIP lender. *See Harry & David Holdings, Inc.*, No. 11-10884 (MFW), ECF No. 291 (Bankr. D. Del. May 10, 2011) (providing for payment of fees and expenses of counsel to equity sponsor that was also plan support party).

15.     In accordance with applicable law, the Proposed Final Order provides for adequate protection—on a consensual basis—to the Debtors' significant prepetition secured creditors, including Apollo, that were instrumental in negotiating the terms of the RSA and Plan. Moreover, as noted above, Apollo will only receive reimbursement of its fees and expenses as adequate protection on account of its position as a Second Lien Noteholder. Thus, the Committee's objection to the payment of such fees and expenses rings hollow.

16.     As added insurance for the Committee, however, the Proposed Final Order expressly provides that in the event the Court determines that the reimbursement of fees and expenses of the Prepetition Secured parties as adequate protection is not permitted under Bankruptcy Code section 506(b) or on any other basis, including that the restructuring contemplated by the RSA is not otherwise consummated, any party in interest, including the Committee, may argue that such reimbursements should be recharacterized and applied as payments of principal owed under the applicable Prepetition Debt Documents. *See* Proposed Final Order ¶ 25(e). Accordingly, the Second Lien Adequate Protection, including payment of the Second Lien Fees and Expenses, is consistent with applicable law and reasonable under the circumstances of these cases.

## II.    The Proposed Final Order Does Not Prejudice General Unsecured Creditors and Facilitates a Restructuring that Benefits the Debtors' Estates and Creditors

17.    Notwithstanding its assertions regarding the improprieties of the Proposed Final Order, the Committee concedes that the Debtors "have a legitimate business need to obtain postpetition financing." *See* Committee Objection ¶ 2.  In fact, securing the DIP Credit Facilities prior to the Petition Date was an essential component of the Debtors' restructuring efforts. *See* First Day Declaration ¶ 87.[14]  As discussed herein, the DIP Credit Facilities further the restructuring contemplated by the RSA and Plan, and only through concessions by Apollo and its active participation are these cases on the path to confirmation.  Despite the clear benefits of the proposed restructuring for the Debtors' creditors, however, the Committee has launched a series of ad hominem attacks on Apollo.  These attacks are both baseless and counterproductive.

18.    The Plan, as contemplated by the RSA, provides for *inter alia*, the payment of the Prepetition Secured Parties and the Debtors' general unsecured creditors in full.  Only two non-consenting unsecured creditor constituencies will receive less than payment in full in the Chapter 11 Cases.  The first is the holders of the contractually subordinated Senior Subordinated Notes. The Senior Subordinated Notes are not entitled to receive a recovery because any value otherwise available for distribution on account of such claims must be redirected to the Second Lien Noteholders pursuant to the "pay-over" provisions of the applicable indentures.  To the extent that any value was available for the Senior Subordinated Notes, Apollo, as the single largest Senior Subordinated Noteholder, would have been the first to speak up.  The second

---

[14] "First Day Declaration" means the *Declaration of William H. Carter, Chief Financial Officer of Momentive Performance Materials, Inc., in Support of Chapter 11 Petitions and First Day Pleadings*, dated April 14, 2014 [ECF No. 3].  The Debtors made clear in the First Day Declaration that "[w]ithout the immediate use of cash collateral and the funds available under the DIP Credit Facilities, the Debtors would be unable to fund their operations, which would be catastrophic for the Debtors' businesses" and that "access to cash collateral and the funds available under the DIP Credit Facilities is crucial to the Debtors' ability to maintain their businesses and to avoid immediate and irreparable harm to their estates, employees, customers, and creditors."  *See* First Day Declaration ¶ 87.

unsecured creditor constituency that will not receive payment in full is the PIK Notes. These notes are structurally subordinated to all of the other Debtors' obligations and are only entitled to the value existing at Debtor Momentive Performance Materials Holdings Inc. ("MPMI"). The Plan expressly provides that after the satisfaction of administrative expenses claims allocable to MPMI, all remaining value at MPMI will be distributed to the holders of the PIK Notes. *See* Plan § 5.9.

19.    Notwithstanding the advantages of the proposed restructuring embodied by the RSA and the Plan, the propriety of the Second Lien Adequate Protection and the express protections with respect to payment thereof set forth in the Proposed Final Order, the Committee spends the first twenty pages of the Committee Objection attacking both the DIP Credit Facilities and the proposed restructuring generally as a scheme designed to advance Apollo's private agenda. The Committee's allegations are baseless and the Court should disregard them in their entirety.

20.    As an initial matter, the Committee levels a variety of defamatory accusations against Apollo, without providing any evidentiary support whatsoever. Courts routinely disregard bald accusations unsupported by evidentiary material. *In re Old Carco LLC*, 406 B.R. 180, 198-99 (Bankr. S.D.N.Y. 2009) (granting the debtors' motion for an order authorizing rejection of certain executory contracts over objections based on assertions of "retaliatory animus" and opining that "[t]he Court does not find it necessary to elaborate at length on these assertions here because those making the assertions present no evidence connecting the Debtors' purported prepetition conduct with their rejection decisions. . . . The Court may not overturn the Debtors' business judgment based on such unsubstantiated allegations."); *In re Dune Deck Owners Corp.*, 175 B.R. 839, 845 n.11 (Bankr. S.D.N.Y. 1995) ("The allegations of [interference

and harassment] remain wholly speculative and unsupported by affidavit or other testimony based on personal knowledge. These allegations are insufficient, therefore, to justify designation of [the creditor's] vote."). The Committee's allegations are inapposite to the issue at bar and entirely unsupported. Accordingly, the Court should decline to consider such reckless assertions.

21.    Notably, the Committee accuses the Debtors of providing "significant legal and economic advantages [to] the Debtors' prepetition equity sponsor, Apollo, and for the Prepetition Secured [Parties] (particularly holders of Second Lien Notes, of which Apollo is a significant holder)." *See* Committee Objection ¶ 3. Further, the Committee argues that the restructuring contemplated by the RSA and the Plan, including the DIP Credit Facilities, is an elaborate scheme to "advance other agendas." *Id.* These contentions are patently false. As discussed above, the RSA, Plan and DIP Credit Facilities do not provide Apollo—or any other stakeholder—with undue leverage. Instead, the proposed restructuring, as facilitated by Apollo, represents a transaction that enhances the value of the Debtors' estates and recoveries for creditors throughout the Debtors' capital structure.

22.    Moreover, the Committee's implication that the Plan somehow violates the absolute priority rule is neither ripe for consideration nor accurate. Indeed, the Plan appropriately distributes available value to the Debtors' creditors in accordance with applicable law and contractual agreements. Contrary to the Committee's aspersions, the equity stake that Apollo will receive in the reorganized Debtors is not a distribution on account of Apollo's current equity holdings, but solely on account of Apollo's Second Lien Notes and the Rights Offering. In view of the significant benefits the proposed restructuring will afford the Debtors and their creditors, including the payment in full of unsecured creditors other than the contractually junior Senior Subordinated Notes and structurally subordinated PIK Notes, the

Committee—as an estate fiduciary—should be supporting the Plan and DIP Credit Facilities

rather than seeking to derail them. *See e.g.*, *In re Refco Inc.*, 336 B.R. 187, 195 (Bankr.

S.D.N.Y. 2006) ("It is well recognized that, to fulfill [its critical role in bankruptcy cases], the

members of an official committee owe a fiduciary duty to their constituents—in the case of an

official creditors' committee, to all of the debtor's unsecured creditors."); *Johns–Manville Sales

Corp. v. Doan (In re Johns–Manville Corp.)*, 26 B.R. 919, 925 (Bankr. S.D.N.Y. 1983) (same).

One must question the Committee's motivation in even filing the Committee Objection and

whether it was done solely to advance the agenda of the holders of the Senior Subordinated

Notes sitting on the Committee.

23.    The Committee also spends considerable time deprecating Apollo for alleged (and

unsupportable) bad acts that have no bearing on the DIP Credit Facilities.[15]  As further discussed

below, the Committee has been given ample time and resources to investigate potential claims

against the Prepetition Secured Parties, including Apollo and Apollo has been, and will continue

to be, forthcoming in response to the Committee's requests in connection therewith.  In fact,

Apollo has cooperated and continues to cooperate with both informal and formal document

requests propounded by the Committee.  Apollo is 100% confident that such investigation will

reveal no improprieties and, among other things, demonstrate that the Ad Hoc Committee—and

not Apollo—dictated many of the most material terms of the proposed restructuring.  The

---

[15] Among other things, the Committee asserts that the lack of transparency by Apollo with respect to the identity of its advisors or their fee arrangements is an indication of its ill intent in these Chapter 11 Cases.  A simple review of the docket would reveal that Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") serves as Apollo's counsel. *See Notice of Appearance and Request for Service of All Pleadings and Documents by Akin Gump Strauss Hauer & Feld LLP on behalf of Apollo Global Management, LLC* dated April 14, 2014 [ECF No. 20].  Moreover, the Committee was quite aware of Apollo's advisors as Akin Gump and Lazard Frères & Co. ("Lazard"), Apollo's financial advisor, made their engagement letters available to the Committee, through the Debtors, prior to the filing of the Committee Objection and have attached such letters hereto as Exhibit A.  Correspondence authorizing Debtors' counsel to share Akin Gump and Lazard's engagement letters with the Committee is attached here as Exhibit B.

provisions of the RSA itself support this conclusion.  Specifically, the RSA provides that the

members of the Ad Hoc Committee and not Apollo have consent rights over the most material

economic terms of the proposed restructuring.  For example, the Term Sheet[16] defines "Requisite

Investors" as (a) a majority of the members of the Ad Hoc Committee of Second Lien

Noteholders and (b) Apollo, but limits the definition to only a majority of the members of the Ad

Hoc Committee with respect to the "Specific Economic Terms" of the Rights Offering, such as a

change in the Enterprise Value (as defined in the RSA), the Discount to Equity Value (as defined

in the RSA) and the Backstop Commitment Premium (as defined in the RSA).

24.    In the unlikely event, however, that the Committee pursues claims against Apollo

and the even more unlikely event that such claims are successful, the Proposed Final Order

allows the Committee to seek to recharacterize the fees and expense reimbursements paid to

Apollo pursuant to the Proposed Final Order and apply such payments as principal owed under

the Second Lien Notes.  Moreover, any alternative relief—such as disgorgement—may be

ordered as the Court deems appropriate in connection with resolution of such actions.

Accordingly, the Committee's insistence that the Second Lien Fees and Expenses afforded to

Apollo be stripped from the Proposed Final Order is gratuitous, unfounded and unnecessary to

protect the interests of unsecured creditors.

**III.    The Committee's Remaining Objections Should be Overruled**

25.    In addition to the Committee's objections to the payment of the Second Lien Fees

and Expenses as adequate protection, the Committee challenges certain other provisions of the

Proposed Final Order.  As set forth below, these objections likewise should be overruled.

---

[16] *See* Exhibit A to the RSA at 2 (the "Term Sheet").

- **506(c) Waiver:** Bankruptcy courts frequently recognize that a waiver of the right to surcharge collateral under Bankruptcy Code section 506(c) is appropriate when offered as currency in exchange for a secured creditor's agreement to carve out from its collateral funds to pay certain estate administrative costs. *In re Bedford Commc'ns, Inc.*, No. 10-10902 (SMB), 2010 WL 2881417, at *4 (Bankr. S.D.N.Y. Apr. 19, 2010) (approving a 506(c) waiver by the debtors and creditors' committee with respect to DIP and prepetition collateral in consideration for a carve-out for unpaid professional fees and expenses); Mark G. Douglas, The Year in Bankruptcy, 5 PRATT'S J. BANKR. L. 113 (2009) ("The *quid pro quo* for an administrative carve-out in a post-petition financing . . . is commonly waiver of the ability to surcharge under Section 506(c)."); *see also In re Metaldyne Corp.*, 2009 WL 2883045 at *5 (noting that "in this instance [a 506(c) waiver] is appropriate" where the secured lenders were funding the cases and the cost of preserving and disposing of the assets is minimal).[17] In the instant case, the Prepetition Secured Parties have agreed to a carve-out of their collateral to pay certain administrative costs in these cases, including certain funds to pay the professional fees of the Committee and as such, the waiver of Bankruptcy Code section 506(c) is appropriate.

- **552(b) Waiver:** As with waivers of Bankruptcy Code 506(c), waivers of the "equities of the case" exception set forth in Bankruptcy Code section 552(b) are not unusual in DIP financing and cash collateral agreements and courts consistently acknowledge the value of such a waiver as currency when offered, as it is in this case, in exchange for an administrative fee carve-out. *See, e.g.*, *In re Blockbuster Inc.*, No. 10-14997 (BRL) (Bankr. S.D.N.Y. Oct. 27, 2010), ECF No. 432 ("In light of the [pre- and post-petition secured lenders'] agreement to subordinate their [liens] to the Carve-Out Expenses, . . . the 'equities of the case' exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds . . . of any of their collateral."); *In re Saint Vincents Catholic Medical Centers of New York*, No. 10-11963 (CGM) (Bankr. S.D.N.Y. May 17, 2010), ECF No. 285 ("In light of the consent of the [DIP lenders] to the current payment of administrative expenses . . . in accordance with the DIP Budget and [] the agreement of the [DIP lenders] to subordinate their [claims and liens] to the Carve-Out . . ., [DIP lenders and prepetition lenders] are each entitled to a waiver of . . . any equities of the case claims or other claims under sections 105(a) or 552(b) of the Bankruptcy Code").[18] As the Prepetition Secured Parties have agreed to subordinate their liens

---

[17] *See also In re Hostess Brands, Inc.*, No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2012), ECF No. 254 (providing for waiver of 506(c) with respect to all DIP and prepetition collateral); *In re Blockbuster Inc.*, No. 10-14997 (BRL) (Bankr. S.D.N.Y. Oct. 27, 2010), ECF No. 432 (same); *In re Chemtura Corp.*, No. 09-11233 (REG) (Bankr. S.D.N.Y. Apr. 29, 2009), ECF No. 281 (same); *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Mar. 1, 2009), ECF No. 1002 (same); *In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. Feb. 6, 2009), ECF No. 148 (same); *In re Lenox Sales, Inc.*, No. 08-14679 (ALG) (Bankr. S.D.N.Y. Dec. 16, 2008), ECF No. 129 (same); *In re Ormet*, No. 13-10334 (MFW) (Bankr. D. Del. Mar. 22, 2013), ECF No. 147 (same).

[18] Moreover, courts in this and other Districts frequently enter orders approving a debtor's exercise of its business judgment to grant 552(b) waivers in connection with DIP financing. *See, e.g.*, *In re Hostess Brands, Inc.*, No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2012), ECF No. 254 ("In no event shall the DIP Agent, the DIP Lenders, or the Pre-Petition Secured Parties be subject to (i) the "equities of the case" exception contained in section 552(b) of

and claims to those granted to the DIP Lenders and to the Carve-Out in this case, a waiver of Bankruptcy Code section 552(b) is likewise appropriate in the Chapter 11 Cases.

- **Marshaling:** The Committee asserts that the marshaling waiver under the Proposed Final Order will adversely affect the Committee's rights in the Chapter 11 Cases. The Committee, however, is the representative of the Debtors' unsecured creditors and as such, has no standing to invoke the doctrine of marshaling. Indeed, "'[a]n unsecured creditor has no standing to invoke the [marshaling] doctrine.'" *In re Arlco, Inc.*, 239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999) (holding that "[a]s a threshold matter, marshaling is not applicable in this case because the first requirement for its application is not met in that [plaintiff] is not a secured creditor") (quoting *Herkimer County Trust Co. v. Swimelar (In re Prichard)*, 170 B.R. 41, 45 (Bankr. N.D.N.Y. 1994)); *see also* Apr. 14, 2014 Hr'g Tr. 111:15-17 (stating that the doctrine of marshaling is a doctrine for secured creditors and "is not for the benefit of unsecured creditors."). Accordingly, the Committee's concerns need not be addressed here. Nevertheless, as noted below, the Second Lien Noteholders have agreed to marshal in respect of Avoidance Action proceeds.

- **Avoidance Actions:** The Committee asserts that the replacement liens granted to the Prepetition Secured Parties should not extend to Avoidance Actions and the proceeds of Avoidance Actions should not be used to satisfy any Superpriority Claims or 507(b) Claims granted in favor of the Prepetition Secured Parties. The Proposed Final Order includes language clarifying that the DIP Liens, Adequate Protection Liens and any other liens granted under the Proposed Final Order shall not be granted on Avoidance Actions. *See* Proposed Final Order ¶ 8(a). Moreover, the Proposed Final Order provides that "the Avoidance Actions and any proceeds or property recovered in respect of any Avoidance Actions shall only be used to pay or otherwise satisfy any Adequate Protection Liens, DIP Liens, Superpriority Claims or any 507(b) Claims to the extent necessary after commercially reasonable efforts have been undertaken by the DIP Agents and the Prepetition Secured Parties, as applicable, to pay or otherwise satisfy any Adequate Protection Liens, DIP Liens, Superpriority Claims or any 507(b) Claims from the other DIP Collateral." *See* Proposed Final Order ¶ 9. Accordingly, the Committee Objection with respect to this aspect of the Proposed Final Order has been addressed and should be overruled.

- **Investigation:** The Committee argues that the time and funding available for its investigation as to the estates' rights against the Prepetition Secured Parties and Apollo is inadequate. The Proposed Final Order provides that parties in interest, including the Committee, have until the earlier of (i) 90 days after entry of the

---

the Bankruptcy Code. . . ."); *In re Frontier Airlines Holdings, Inc.*, No. 08-11298 (RDD) (Bankr. S.D.N.Y. Sept. 3, 2008), ECF No. 490 (final order approving debtor-in-possession financing and approving a waiver of the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code); *In re Ormet*, No. 13-10334 (MFW) (Bankr. D. Del. Mar. 22, 2013), ECF No. 147 ("the 'equities of the case' exception under Section 552(b) of the Bankruptcy Code shall not apply to either Agent or any Secured Party with respect to proceeds, products, offspring or profits of any of the Revolving Loan Collateral or Term Loan Collateral, as applicable.").

Proposed Final Order and (ii) the commencement of a hearing with respect to the confirmation of a plan of reorganization of any of the Debtors (the "Objection Deadline") to file an adversary proceeding or contested matter with respect to any of the Prepetition Secured Parties, including Apollo.  *See* Proposed Final Order ¶ 26. The time provided in the Proposed Final Order is ample for the Committee to conduct its investigation and, importantly, the proposed timing provides the Committee with maximum flexibility, while still ensuring the Debtors are able to reorganize expeditiously.  Importantly, the Objection Deadline may be extended by the Court for cause based on appropriate showing at the time of any requested extension. Accordingly, the Objection Deadline and proposed funding for the Committee's investigation should be approved as set forth in the Proposed Final Order and the Committee's objections thereto overruled.

- **Releases:**  The Committee Objection focuses on the releases being granted to Apollo in the Plan and also notes that the Committee requested clarification with respect to the stipulations and admissions in the Proposed Final Order with respect to Apollo. The releases contemplated by the Plan are not before the Court in connection with the approval of the DIP Credit Facilities.  Apollo maintains that the Committee will have ample time (as discussed above) to conduct an investigation into the facts and circumstances surrounding these cases, which investigation will reveal nothing "suspect" despite baseless assertions to the contrary in the Committee Objection. That notwithstanding, the Debtors and Apollo agreed to include, wholesale and without modification, the Committee's clarifying language to the stipulations and admissions with respect to Apollo in the Proposed Final Order.  *See* Proposed Final Order ¶ 26.  Accordingly, Apollo respectfully submits that this aspect of the Committee Objection has been addressed.

*[The remainder of this page has been left blank intentionally]*

## **CONCLUSION**

**WHEREFORE**, Apollo requests that the Court (i) overrule the Committee Objection in its entirety, (ii) enter the Proposed Final Order and (iii) provide Apollo with such other and further relief as the Court may deem just, proper and equitable.

Dated: May 22, 2014
New York, New York

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By: _/s/ Ira S. Dizengoff_ _____

Ira S. Dizengoff
Philip C. Dublin
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: idizengoff@akingump.com
Email: pdublin@akingump.com

Ashleigh L. Blaylock
1333 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
Email: blaylocka@akingump.com

_Counsel to Apollo Global Management, LLC_
_and certain of its affiliated funds_

**Exhibit A**

(Engagement Letters)

# Akin Gump

**STRAUSS HAUER & FELD LLP**

IRA S. DIZENGOFF
+1 212.872.1096/fax: +1 212.872.1002
idizengoff@akingump.com

March 18, 2014

Momentive Performance Materials Holdings Inc.
180 East Broad Street
Columbus, OH 43215
Attn:   Craig O. Morrison
        President and Chief Executive Officer

Re: Terms of Engagement

Dear Craig:

Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") has been requested by Apollo Global Management, LLC (collectively with its affiliated funds that are creditors or equity holders of the Company (as defined below), "Apollo") to act as its legal counsel in connection with a potential financial restructuring (the "Restructuring") of Momentive Performance Materials Holdings Inc. (collectively with its subsidiaries, "Momentive" or the "Company").

Akin Gump has agreed to this retention, on the following terms and conditions:

1.    **SCOPE AND REPRESENTATION OF AKIN GUMP**

Subject to paragraph 3 below, Akin Gump will provide advisory services to Apollo with respect to the negotiation, structuring, planning, documentation and implementation of a restructuring, recapitalization, reorganization or sale of all or a portion of the assets and/or liabilities of the Company and perform any and all other legal services as may be reasonably requested by Apollo in connection with the Restructuring.

2.    **PAYMENT OF PROFESSIONAL AND ANCILLARY SERVICES RENDERED**

We refer matters to those lawyers in this firm who in our judgment can perform the highest quality work, in a timely and efficient manner, and at the lowest cost. We also employ non-lawyer assistants in tasks where lawyers are not necessary to facilitate the rapid and efficient performance of services. We envision that I will have primary responsibility for this engagement. I will be assisted by, among others, Philip Dublin, a partner in Akin Gump's



Momentive Performance Materials Holdings Inc.
March 18, 2014
Page 2

financial restructuring group, and Dan Fisher, a partner in Akin Gump's corporate group. My hourly rate is $1,150, Philip Dublin's hourly rate is $950 and Dan Fisher's hourly rate is $875. Additional attorneys will also work on the engagement as and when appropriate. The hourly rates for other lawyers in the firm range from $355 to $1,220 per hour. Hourly rates for paralegals range from $155 to $345. The firm may change these rates in the future, in which case the new rates will apply to work done after the implementation of those rate changes. In addition, reasonable expenses that are incurred in connection with the Restructuring and advanced on behalf of Apollo or internal charges for administrative services (which may exceed our direct costs) are added to the statement rendered for the month in which such expenses or charges are recorded in our billing system.

Our standard practice is to bill on a monthly basis, but we may, at our discretion, render bills on a weekly or bi-weekly basis. This allows our clients to monitor both current and cumulative fees and expenses. We require that payment of statements be made within five (5) business days of receipt, and we may suspend or terminate any work in progress if timely payment is not made.[1] We may also withdraw from the representation in a manner consistent with applicable ethical standards.

By reason of the nature of this engagement, the Company agrees that Akin Gump shall be compensated by the Company for reasonable professional and ancillary services rendered to Apollo as follows:

In order to undertake and carry out our engagement, we have discussed and agreed that upon execution of this letter, the Company will make an advance payment to Akin Gump in the amount of $200,000. This advance payment, and all future payments as described in this letter,

---

[1] If any monthly (or weekly or bi-weekly, as indicated above) statement is not paid within 60 days after the original statement date, we reserve the right to discontinue services on all pending matters for Apollo until our account has been brought current. Additionally, if any statement is not paid within 60 days from the date of the original statement, we may, by written notice to you on a subsequent statement or otherwise, declare the overdue account to be delinquent. We have no obligation to declare any account delinquent. If we declare an account to be delinquent, the amount owing on that account will accrue interest at a rate equal to one percent (1%) per month (a 12% annual percentage rate) from the date of our delinquency notice to you until the balance is paid in full, but in no event shall such rate exceed the maximum rate permitted by applicable law. Any payments made on past due statements are applied first to interest, if any, and then to the account balance, beginning with the oldest outstanding statement. In addition, we are entitled to attorneys' fees and costs if collection activities are necessary. In the event the Company commences voluntarily or involuntarily any insolvency proceeding under the United States Code or otherwise, a notice of delinquency will be deemed to have been sent on the date immediately preceding the commencement of such insolvency proceeding with respect to any delinquent statements.

105990506 v3



Momentive Performance Materials Holdings Inc.
March 18, 2014
Page 3

shall be made via wire transfer and become the property of Akin Gump immediately upon receipt and may be used by Akin Gump at any time without restriction. Advance payments will not be put into a trust, escrow, or other segregated account.

Akin Gump will provide the Company with monthly (or weekly or bi-weekly, as indicated above) statements of fees and expenses. Our fee statements will set forth the amount of our charges for professional and ancillary services but will not include time entry detail or descriptions. To the extent that the amount of any of our statements is less than the advance payment amount, you will pay us a further advance payment to bring your advance as of the billing date up to $200,000 within five (5) business days of receipt of the statement. To the extent that the amount of our fee statement is more than the advance payment amount, you will pay to us the excess amount and an additional advance payment of no less than $200,000. When we have completed our services to Apollo in connection with this engagement, or any successor engagement, our final statement will reflect the amount, if any, by which the accumulated advance payments have exceeded accumulated charges for all of our services, and we shall pay that amount forthwith to the Company.

In the event that the Company or any one of its subsidiaries or affiliates intends to commence a chapter 11 case or other insolvency proceeding, the Company shall, in advance of any such filing, pay Akin Gump a further advance payment to bring the total advance payment amount as of the filing date up to not less than $200,000, after deducting for accrued fees and expenses through the filing date.

The Company may terminate this agreement at any time for any reason effective upon fifteen (15) business days' prior written notice to Akin Gump. Any portion of the advance payment not used to satisfy accrued fees and expenses of Akin Gump through such effective date shall be remitted to the Company forthwith.

Notwithstanding the Company's obligations herein, Akin Gump's duties hereunder run solely to Apollo, and Akin Gump is not authorized and will not purport to be, an agent of the Company for any purpose. The Company's payment of Akin Gump's fees and expenses shall not affect any privileges that may attach to all communication and correspondence between Akin Gump and Apollo, or any work product or analyses prepared by Akin Gump for Apollo in connection with this matter.



**Akin Gump**
Strauss Hauer & Feld LLP

Momentive Performance Materials Holdings Inc.
March 18, 2014
Page 4

3.    **MISCELLANEOUS**

Should the Company fail to meet the terms of this advance payment amount agreement, Akin Gump may withdraw as Apollo's legal counsel unless Apollo agrees, in writing, to assume the Company's obligations as set forth in this advance payment amount agreement. Akin Gump warrants to the Company that Apollo is aware and has agreed that, while Akin Gump is representing Apollo in connection with this matter, we may, at the same time, represent other clients with interests presently or prospectively conflicting with the Company or Apollo, although not in any matter substantially related to the transactions contemplated herein.

The Company agrees to reimburse Apollo for all documented and reasonable out-of-pocket expenses (which out-of-pocket expenses shall not include any professional or advisor fees) incurred by Apollo in connection with the Restructuring. A monthly (or weekly or bi-weekly, as indicated above) statement of Apollo's aggregate expenses shall be provided to the Company, and the Company agrees to make payment within five (5) business days of receipt of the statement.

4.    **APPLICABLE LAW AND RULES**

OUR ENGAGEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

New York State has established a Fee Dispute Resolution Program for the resolution of certain fee disputes between attorneys and clients. In some circumstances, the Company or Apollo may be eligible to participate in this program if a fee dispute should arise.

5.    **CERTAIN UNDERSTANDINGS**

The provisions of this letter agreement may be modified in a subsequent writing executed by the parties hereto. This letter agreement may be executed in counterparts, which counterparts, when fully executed and considered together, shall constitute our agreement.

If the foregoing accurately sets forth our agreement, kindly countersign and return the enclosed duplicate copy of this letter to me and wire us the initial $200,000 advance payment in accordance with the attached wire instructions. Upon such execution, this letter will supersede all prior understandings regarding the subject matter of our engagement by Apollo and will constitute the binding agreement of Akin Gump and the Company (and its subsidiaries).

105990506 v3



Momentive Performance Materials Holdings Inc.
March 18, 2014
Page 5

Sincerely,

AKIN GUMP STRAUSS HAUER & FELD LLP

Ira S. Dizengoff

cc: Apollo

**AGREED:**

**Momentive Performance Materials Holdings Inc. and Each of Its Direct and Indirect Subsidiaries**

By: _____

Date: _____

Enclosures:    Statement of Firm Policies
               Wire Instructions



## Akin Gump
### STRAUSS HAUER & FELD LLP

**Wire Instructions for Akin Gump Strauss Hauer & Feld LLP**

Citibank, NA
399 Park Avenue
New York, NY 10022
Account No. 3044-7604
ABA No. 021000089
Ref: 692835.0001

(For wires originating outside the US, please reference SWIFT ID CITIUS33)



Momentive Performance Materials Holdings Inc.
March 18, 2014
Page 5

Sincerely,

AKIN GUMP STRAUSS HAUER & FELD LLP

Ira S. Dizengoff

cc: Apollo

**AGREED:**

**Momentive Performance Materials Holdings Inc. and Each of Its Direct and Indirect
Subsidiaries**

By: _____

Date: _____

Enclosures:   Statement of Firm Policies
              Wire Instructions

105990506 v3

# LAZARD

As of February 13, 2014

To:    Akin Gump Strauss Hauer & Feld, LLP
       One Bryant Park
       Bank of America Tower
       New York, NY 10036

       Momentive Performance Materials Holdings, Inc.
       180 East Broad Street
       Columbus, OH  43215

       Apollo Global Management
       9 West 57th Street, 43rd Floor
       New York, New York 10019

Ladies and Gentlemen:

    This letter and the accompanying exhibit (the "Agreement") confirm the terms of the agreement among Lazard Frères & Co. LLC ("Lazard"), Akin Gump Strauss Hauer & Feld, LLP ("Counsel"), Apollo Global Management, LLC, on behalf of itself and its managed funds that are creditors of the Company (as defined below) or equity holders in Momentive Performance Materials Holdings, LLC (collectively, "Apollo"), regarding the retention of Lazard on an exclusive basis by Counsel, acting in its capacity as counsel to Apollo, effective as of the date indicated above, as Apollo's financial advisor to provide financial advisory and investment banking services with respect to a Restructuring[1] of Momentive Performance Materials Holdings, Inc., together with its domestic subsidiaries (collectively, "Momentive" or the

---

[1] As used in this Agreement, the term "Restructuring" shall mean, collectively, any restructuring, reorganization (whether or not pursuant to Chapter 11 of the United States Bankruptcy Code) and/or recapitalization of all or a significant portion of the Company's outstanding indebtedness (including bank debt, bond debt, and other on and off balance sheet indebtedness), trade claims, leases (both on and off balance sheet), asbestos and other litigation-related claims and obligations, unfunded pension and retiree medical liabilities, or other liabilities (collectively, the "Existing Obligations") that is achieved, without limitation, through a solicitation of waivers and consents from the holders of Existing Obligations (collectively, the "Stakeholders"); rescheduling of the maturities of Existing Obligations; a change in interest rates, repurchase, settlement or forgiveness of Existing Obligations; conversion of Existing Obligations into equity; an exchange offer involving the issuance of new securities in exchange for Existing Obligations; the issuance of new securities, sale or disposition of assets, sale of debt or equity securities or other interests or other similar transaction or series of transactions.

Lazard Frères & Co. LLC
30 Rockefeller Plaza
New York, NY 10112

As of February 13, 2014
Page 2

"Company"), as further described below.

I.    <u>Scope of Services</u>.  Lazard shall, in each case as necessary and if requested by Counsel or Apollo, assist Apollo with respect to any Restructuring:

    a.    to analyze the Company's long-term business plan, operations, and related financial projections;

    b.    to analyze the Company's debt capacity and proposed capital structure;

    c.    to review and analyze any valuation of the Company or its assets;

    d.    to review and analyze any restructuring alternatives proposed by any party;

    e.    to evaluate the financial aspects of any potential DIP loan, rights offering, exit financing or other financing by the Company;

    f.    in connection with the financial aspects of negotiations with the Company;

    g.    in connection with preparing financial aspects of any potential bid, offer or proposal for all or a significant portion of the Company's assets or provision of financing (including through a rights offering) by Apollo;

    h.    in meetings with the Company or other third parties as appropriate in connection with the matters set forth herein;

    i.    in providing in-court testimony, including expert testimony and related expert reports; and

    j.    with such other financial advisory services as Counsel or Apollo may from time to time reasonably request and which are customarily provided by financial advisors acting in similar situations.

II.    <u>Nature of Services and Attorney-Client Privilege</u>.  It is expressly understood that Lazard is hereby engaged by Counsel on behalf of Apollo.  Because Counsel is retaining Lazard, Lazard's work for Counsel will be covered by the attorney work-product doctrine and other applicable privileges.

III.    <u>Compensation</u>.  Lazard's compensation for services rendered under this Agreement shall be paid by the Company, and not be an obligation of Apollo, and will consist of the following cash fees:

A.  Monthly Fee.  A monthly fee of $150,000 (the "Monthly Fee"), accrued and payable on execution of this Agreement and on the first day of each month thereafter until the earlier of the completion of the Restructuring or the termination of Lazard's engagement pursuant to paragraph VII.

B.  Restructuring Fee.  An additional fee equal to $2,000,000, accrued and payable upon the consummation of a Restructuring; provided, however, that if a Restructuring is to be completed pursuant to a "pre-packaged" or "pre-arranged" plan of reorganization, the fee shall be $3,000,000 and shall accrue and be payable upon the execution of definitive agreements with respect to such plan; provided, further, that in the event that Lazard is paid a fee in connection with a "pre-packaged" or "pre-arranged" plan and a Restructuring is not consummated, Lazard shall return such fee to the Company (less any Monthly Fees that have accrued).  The fee set forth in this section III.B., the "Restructuring Fee."

C.  Incentive Fee:  An additional fee equal to $500,000 (the "Incentive Fee") if a Restructuring is consummated within 5 months of the effective date of this Agreement.  The Incentive Fee shall be payable upon the consummation of a Restructuring within such 5 month period.

D.  Expense Reimbursement.  In addition to any fees that may be payable to Lazard, the Company shall promptly reimburse Lazard for all reasonable expenses (including expenses of counsel, if any), travel and lodging, data processing and communications charges, courier services and other expenditures incurred in connection with, or arising out of Lazard's activities under or contemplated by, this engagement.

E.  No fee payable to any other person, by Counsel, Apollo, the Company or any other person or entity, shall reduce or otherwise affect any fee payable hereunder.

F.  All amounts referenced hereunder reflect United States currency and shall be paid promptly in cash after such amounts accrue hereunder.

IV.  Indemnification.  As a material part of the consideration for Lazard to furnish its services under this Agreement, Lazard requires that the Company indemnify, reimburse and provide contribution to Lazard and certain other persons in accordance with the provisions attached hereto as Exhibit A.  The provisions of Exhibit A are an integral part of this Agreement, and the terms thereof are incorporated in entirety by reference herein.  The terms of Exhibit A shall survive any termination or expiration of Lazard's engagement.

V.    <u>Information</u>.  The Company shall provide Lazard with all information concerning the business, assets, liabilities, operations, cash flows, properties, financial condition and prospects of the Company that Lazard reasonably requests in connection with the services to be performed hereunder.  At all times during Lazard's engagement Lazard will be assuming that all information furnished to Lazard (i) is accurate and complete in all material respects and (ii) does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are made.  In advising pursuant to our engagement hereunder, Lazard will be using and relying on publicly available information and on data, material and other information furnished to Lazard by the Company, Apollo, Counsel and other parties.  Lazard does not assume and shall not have any responsibility for independent verification of such information.  Lazard will not, as part of its engagement, undertake any independent valuation or appraisal of any of the assets or liabilities of the Company or of any third party, or opine or give advice to Apollo, Counsel or any other person or entity with respect thereto or with respect to any issues of solvency.

VI.    <u>Limitations on Services as Advisor</u>.  In rendering its services, Lazard is not assuming any responsibility for Counsel's, Apollo's, the Company's, or any other person's underlying business decision to pursue (or not to pursue) any business strategy or to effect (or not to effect) any other transaction(s) or decision(s).  Lazard shall not have any obligation or responsibility to provide accounting, audit, "crisis management," or business consultant services for the Company, Counsel, Apollo or any other person or entity and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements.  Nothing in this Agreement is intended to obligate or commit Lazard or any of its affiliates to provide any services other than those set forth above.  Lazard will not be responsible for and will not be deemed to have provided any tax, accounting, actuarial, legal or other specialist advice.

VII.    <u>Termination</u>.  Lazard's engagement hereunder may be terminated in writing by either Apollo or Counsel, acting on behalf of Apollo, or Lazard at any time, without continuing liability to the Company, Counsel, Apollo or Lazard; provided, however, that (i) termination or expiration of Lazard's engagement hereunder shall not affect the Company's obligations pursuant to Exhibit A, and Apollo's, Counsel's and the Company's continuing obligations and agreements under paragraphs IV, VI, this paragraph VII, VIII, IX, X, XI, XII, XIII, XIV and XV hereof, each of which shall continue, (ii) notwithstanding any such termination or expiration, Lazard shall remain entitled to any fees accrued pursuant to paragraph III but not yet paid prior to such termination or expiration and to reimbursement of expenses incurred prior to such termination or expiration, and (iii) in the case of termination by Counsel, acting on behalf of Apollo, or any expiration of Lazard's engagement, Lazard shall remain entitled to full payment of all fees contemplated by paragraph III hereof in respect of any Restructuring announced or resulting from negotiations occurring during the period from the date hereof until one year following such termination or expiration.

As of February 13, 2014
Page 5

VIII.  Independent Contractor/Confidentiality of Advice.  Lazard has been retained under this Agreement by Counsel as an independent contractor for the benefit of Apollo only; nothing herein is intended to create or shall be construed as creating a fiduciary relationship between Lazard and Apollo or Counsel.  Lazard is not the trustee of, and is not authorized to bind, Counsel or Apollo in any action or decision.  The advice (oral or written) rendered by Lazard pursuant to this Agreement is intended solely for the benefit of Apollo and for the use of Apollo and Counsel in advising Apollo in considering the matters to which this Agreement relates, and, notwithstanding any termination or expiration of Lazard's engagement hereunder, such advice may not be relied upon by any other person or entity, disclosed by Apollo or Counsel to any third party, used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner for any purpose, nor shall any public references to Lazard be made by the Company, Counsel or Apollo, without the prior consent of Lazard.  Notwithstanding the foregoing, nothing herein shall prohibit any party hereto from disclosing to any and all persons the tax treatment and tax structure of any transaction and the portions of any materials that relate to such tax treatment or tax structure.

IX.  Limitation of Liability.  No Indemnified Person (as defined in Exhibit A) shall have any liability (whether direct or indirect, in contract or tort or otherwise) to Apollo or its affiliates or its or their respective members, partners, securityholders or creditors related to, arising out of or in connection with Lazard's engagement, except to the extent that any loss, claim, damage, liability or expense of Apollo is found by a court of competent jurisdiction in a judgment which has become final in that it is no longer subject to appeal or review to have resulted primarily from such Indemnified Person's bad faith or gross negligence.  No Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to Counsel or its affiliates or its or their respective members, partners, securityholders or creditors related to, arising out of or in connection with Lazard's engagement.

X.  Successors and Assigns.  This Agreement (including Exhibit A hereto) shall be binding upon each party hereto and their respective successors and assigns.  Lazard has been engaged by Counsel only on behalf of Apollo and Lazard's engagement is not deemed to be on behalf of and is not intended to confer any rights upon, or duties to, the Company, Counsel, any member, partner, securityholder or creditor of Counsel, any securityholder, creditor, owner or partner of the Company (other than Apollo), any member, partner, securityholder or creditor of Apollo or any other person or entity other than the Indemnified Persons (as defined in Exhibit A hereto).   The Company's obligations hereunder are joint and several.

XI.  Authority.  Each party hereto represents and warrants that it has all requisite power and authority to enter into this Agreement and the transactions contemplated hereby.  Each party hereto further represents and warrants that this Agreement has been duly and validly authorized by all necessary corporate or other action on the part of such party, has been duly executed and delivered by such party and constitutes a legal, valid and binding agreement of such party, enforceable in accordance with its terms.

As of February 13, 2014
Page 6

XII.    Miscellaneous.  This Agreement and Exhibit A constitute the entire understanding of the parties hereto regarding the matters set forth herein and in Exhibit A, and shall supersede all prior understandings and proposals, whether written or oral, relating to any of such matters contemplated herein or in Exhibit A.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.  This Agreement may only be amended or waived by a writing signed by the party against whom enforcement is sought.

XIII.   Bankruptcy Proceedings.  If all or a portion of the Company files or becomes subject to a case under chapter 11 of the Bankruptcy Code, each party hereto shall use its commercially reasonable efforts to ensure that any order approving the use of cash collateral, post-petition financing and/or any plan of reorganization involving the Company provides for the Company's payment of amounts due and payable hereunder and the Company's agreement and continuing performance with respect to all provisions of this Agreement (including, without limitation, the provisions of Exhibit A).

XIV.    Lazard Group.  If appropriate in connection with performing its services hereunder, Lazard may utilize the services of one or more of its affiliates and its and their related entities, in which case references herein to Lazard shall include such affiliates and entities.  Any such affiliate or entity so employed shall be entitled to all of the benefits afforded to Lazard hereunder and shall be entitled to be reimbursed for its costs and expenses on the same basis as Lazard.

XV.     Choice of Law.  This Agreement and any claim related directly or indirectly to this Agreement (including any claim concerning advice provided pursuant to this Agreement) shall be governed by and construed in accordance with the laws of the State of New York without regard to the principle of conflicts of law.  No such claim shall be commenced, prosecuted or continued in any forum other than the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York, and each of the parties hereby submits to the jurisdiction of such courts. Each party hereto hereby waives on behalf of itself and its successors and assigns any and all right to argue that the choice of forum provision is or has become unreasonable in any legal proceeding.  ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR CONDUCT IN CONNECTION WITH THIS ENGAGEMENT IS HEREBY WAIVED BY EACH PARTY HERETO.

If the foregoing agreement is in accordance with your understanding of the terms of our engagement, please sign and return to us the enclosed duplicate of this Agreement and the indemnification agreement attached hereto as Exhibit A.

Very truly yours,

LAZARD FRERES & CO. LLC

By: _____
Daniel Aronson
Managing Director

AGREED TO AND ACCEPTED
as of the date first
above written:

MOMENTIVE PERFORMANCE MATERIALS HOLDINGS, INC.,
on behalf of itself and its domestic subsidiaries

By. _____
Name:
Title:

AKIN GUMP STRAUSS HAUER & FELD, LLP

By. _____
Name: Philip Dublin
Title: TC Aar

APOLLO GLOBAL MANAGEMENT, LLC

By. _____
Name: LAURIE MEDLEY
Title: ASSISTANT SECRETARY

**Exhibit B**

(Correspondence Authorizing Debtors' Counsel to Share Engagement Letters)

**From:** Dizengoff, Ira
**Sent:** Saturday, April 26, 2014 1:33 PM
**To:** Feldman, Matthew
**Cc:** Daniel M. Aronson; Hardy, Jennifer; Dublin, Philip
**Subject:** Re: UCC Fee Letters

Ok w us.

Ira Dizengoff
(O) 212.872.1096
(C) 917.570.8282

On Apr 26, 2014, at 12:53 PM, "Feldman, Matthew" <mfeldman@willkie.com> wrote:

> The UCC has requested copies of your fee letters. Given that you are currently being paid through the DIP we intend to provide.
>
> Matt
>
> Sent from my BlackBerry 10 smartphone.
>
> * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
>
> IMPORTANT NOTICE: This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.
> * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *