Matthew A. Feldman
Paul V. Shalhoub
Jennifer J. Hardy
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------x
|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| MPM Silicones, LLC, <u>et al.</u>,[1] | : | Case No. 14-22503 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |

----------------------------------------------------x

### DEBTORS' REPLY TO OBJECTIONS TO FINAL ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363(c), 363(d), 364(d), 364(e), 364(e) AND 507 AND BANKRUPTCY RULES 2002, 4001 AND 9014 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL AND (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS

The debtors and debtors in possession in the above-captioned cases

(collectively, the "**Debtors**"), by and through their undersigned proposed counsel, submit this

reply (the "**Reply**") to the objection of the Official Committee of Unsecured Creditors (the

"**Committee**") [Docket No. 204], and the joinder filed by U.S. Bank National Association as

---

[1]     The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) Juniper Bond Holdings I LLC (9631); (ii) Juniper Bond Holdings II LLC (9692); (iii) Juniper Bond Holdings III LLC (9765); (iv) Juniper Bond Holdings IV LLC (9836); (v) Momentive Performance Materials China SPV Inc. (8469); (vi) Momentive Performance Materials Holdings Inc. (8246); (vii) Momentive Performance Materials Inc. (8297); (viii) Momentive Performance Materials Quartz, Inc. (9929); (ix) Momentive Performance Materials South America Inc. (4895); (x) Momentive Performance Materials USA Inc. (8388); (xi) Momentive Performance Materials Worldwide Inc. (8357); and (xii) MPM Silicones, LLC (5481).  The Debtors' executive headquarters are located at 260 Hudson River Road, Waterford, NY 12188.

Indenture Trustee [Docket No. 205] (collectively, the "**Objection**"), to the Debtors' Motion for

Entry of a Final Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 363(d), 364(d), 364(e) and

507 and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing the Debtors to Obtain

Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, and (III) Granting

Adequate Protection to Prepetition Secured Lenders (the "**Motion**") [Docket No. 13].[2] [3]  In

support of the Motion and this Reply, the Debtors rely upon and incorporate by reference the

Declaration of William Q. Derrough in support of the Motion [Docket No. 14] (the "**Derrough**

**Declaration**") and the Declaration of William H. Carter, Chief Financial Officer of Momentive

Performance Materials Inc., in Support of Chapter 11 Petitions and First Day Pleadings

[Docket No. 16] (the "**First Day Declaration**"), which were filed with the Court on April 13,

2014.  In further support of this Reply, the Debtors respectfully state as follows:

## BACKGROUND

1.    On April 13, 2014 (the "**Petition Date**"), MPM Silicones, LLC ("**MPM**") and

each of the other Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy

Code.  The Debtors are continuing in the possession of their respective properties and the

management of their respective businesses as debtors in possession pursuant to sections 1107

and 1108 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural

purposes only.  On April 22, 2014, the Committee was appointed in these cases.  As of the date

hereof, no trustee or examiner has been appointed in any of the Debtors' cases.

---

[2]        Capitalized terms not defined herein have the meanings given them in the Motion or the Proposed Final
DIP Order (as defined herein), as applicable.

[3]        GE Capital Equity Investments, Inc. ("**GE**") also filed a limited objection to the Motion [Docket No. 162].
However, GE's objection has been  resolved by modifications included in the Proposed Final DIP Order
and therefore is not addressed herein.  A version reflecting such modifications was filed on May 22, 2014
[Docket No. 241].

2.      The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration and the Derrough Declaration.

3.      On April 14, 2014, the Debtors filed the Motion and the Court entered an order granting the relief requested in the Motion on an interim basis (the "**Interim DIP Order**") [Docket No. 27].  Pursuant to the Interim DIP Order, the Debtors filed and served notice of the final hearing on the Motion [Docket No. 102] (the "**Notice**").  The Interim Order required that Objections, if any, to the Motion be filed and served no later than 4:00 p.m. (prevailing Eastern Time) on Thursday, May 8, 2014.  Certain entities requested and received extensions of such objection deadline to Thursday, May 15, 2014 at 4:00 p.m. (prevailing Eastern Time).  On May 15, 2014, the Debtors filed a proposed final order granting the Motion (the "**Proposed Final DIP Order**") and a blackline of the Proposed Final DIP Order showing changes from the Interim Order (the "**DIP Blackline**") [Docket No. 198].  A further revised version of the Proposed Final DIP Order and related blacklines were filed on May 22, 2014 [Docket No. 241].

## PRELIMINARY STATEMENT

4.      The Debtors and their professionals designed a highly competitive, multi-week process to obtain the best possible DIP financing facilities to address the Debtors' deteriorating financial situation, and were successful in achieving favorable terms for both a DIP financing facility and exit facilities to finance these cases and the Debtors' emergence from chapter 11 under their proposed plan.  Given this context, the Debtors' decision to enter into the DIP Credit Facilities is clearly a sound exercise of business judgment.  Indeed, this Court's interim approval of the DIP Credit Facilities not only allowed the Debtors to avert an imminent liquidity crisis,

but has buoyed the Debtors' operations by allowing for a smooth transition into chapter 11 and

setting the stage for the Debtors to execute a comprehensive restructuring.

5.        Since the formation of the Committee, the Debtors have worked to make all

relevant information regarding the Debtors and the DIP Credit Facilities available to the

Committee's professionals – among other things, providing access to a comprehensive data room

with hundreds of documents related to the Debtors' businesses and operations and meeting with

the Committee and its professionals.[4]  In an effort to promote consensus and collaboration at the

early stages of these cases, the Debtors, DIP Lenders, and the Plan Support Parties (as defined

herein) also spent over two weeks negotiating and working to address issues raised by the

Committee.  Many of the Committee's concerns were resolved as evidenced by the DIP

Blackline filed on May 15, 2014.  Despite their best efforts to reach a consensual resolution on

all issues, however, the Debtors and their prepetition and postpetition lenders have been unable

to resolve the Objection.

6.        It is important to note that the Objection does not allege that the economic terms

of the DIP Credit Facilities are unreasonable, that the amount of the DIP financing is not

necessary, or even that the covenants unduly burden the Debtors and prevent them from being

able to operate their businesses.  Rather, the Objection demands concessions from the DIP

Lenders, the Prepetition Secured Parties, and the Debtors that they are not obligated to provide,

under the law or facts of these cases, and that the Committee is not entitled to receive.

---

[4]        The Committee also served the Debtors with discovery requests in connection with the Debtors' Motion to
enter into the Restructuring Support Agreement and the Backstop Commitment Agreement.  The Debtors
and their professionals are doing their best to respond to these requests, and are reviewing thousands of
pages of emails and other documents in connection with these requests.  Despite the Committee's
implications to the contrary, the Debtors are being completely transparent regarding the Debtors'
restructuring efforts.

7.      Furthermore, the Objection is rife with unsubstantiated assertions that the

Proposed Final DIP Order contains provisions that provide significant legal and economic

advantages to the Plan Support Parties, and stacks the deck against the Committee.  There is no

stacking of the deck here.  Under the Plan,[5] all general unsecured creditors are to be paid in full

except (i) the holders of the Subordinated Notes, who the Debtors believe are not entitled to a

recovery under the Plan because of the allocable value available in these cases and the

subordination provisions in the Indenture governing the Subordinated Notes, and (ii) holders of

the Holdings PIK Notes issued by Holdings, the parent Debtor, who are structurally subordinate

to creditors of its subsidiaries.  The usual and customary provisions of the Proposed Final DIP

Order to which the Committee objects in no way impacts the Committee's, or any other party's,

ability to contest this Plan treatment, nor do they unfairly slant or skew the reorganization

process in any way.  Indeed, as the Committee acknowledges in its Objection, the DIP Credit

Facilities allow for alternative plans of reorganization than the one contemplated in the RSA and

filed on May 12, 2014.

8.      In any case, the Committee's Objection is not, and should not be, an analysis of

and objection to the RSA and treatment of certain unsecured creditors under the Plan.  Those are

issues for another day, which the Committee recognizes, but then spends a number of pages

discussing and setting the agenda for its potential objections to the RSA and the Plan.  The DIP

Credit Facilities exist for only one purpose — to provide the Debtors with necessary funding in

---

[5]      The Debtors filed their proposed Plan and related Disclosure Statement on May 12, 2014 [Docket Nos. 172
and 173].  A hearing to consider the adequacy of the information contained in the Disclosure Statement is
scheduled to take place on June 19, 2014.

these chapter 11 cases.  It cannot credibly be argued that the purpose of the DIP Credit Facilities is to unfairly benefit the Plan Support Parties.

9.      With this backdrop, the Committee seeks to cherrypick particular provisions of the Proposed Final DIP Order and argue that they fall short of the Committee's perception of an ideal order.  But, the Committee's wish list of improvements is no substitute for the Debtors' sound business judgment — the applicable legal standard here for a clear arm's-length deal.  The DIP Credit Facilities, including the terms of the Proposed Final DIP Order, are a unified whole containing terms that were heavily negotiated.  While the Debtors may not have achieved all the terms which they, or the Committee, may have desired, there was a give and take involved that resulted in the comprehensive agreement before the Court.

10.     The Committee's points of contention with the Proposed Final DIP Order do not come close to challenging the Debtors' sound business judgment.  For example, several of the Committee's arguments relate to provisions that are appropriate and customary for DIP facilities of this type, including waivers of section 552(b)'s "equities of the case" exception, section 506(c) surcharge rights, the doctrine of marshaling, and provision of customary adequate protection (e.g. professional fees).  Similarly, although the Committee argues otherwise, there is nothing improper with providing new postpetition creditors and existing prepetition lenders who are being primed priority with respect to previously unencumbered property and the proceeds of avoidance actions in order to secure financing and provide adequate protection.  In addition, the proposed investigation time and budget for the Committee to determine the validity and priority of prepetition secured debt and pursue Claims and Defenses is more than adequate given the circumstances.

11.      In sum, the Debtors have determined within the exercise of their reasonable

business judgment that the terms of the DIP Credit Facilities are fair, reasonable, and adequate.

As set forth in more detail below, the Debtors respectfully submit that the Committee's

Objection should be overruled and the Motion be granted.

## REPLY TO OBJECTION

**I.      The Debtors' Agreement to the Terms of the DIP Credit Facilities Represents an Exercise of the Debtors' Business Judgment and is in the Best Interests of their Estates**

12.      A debtor's decision to enter into a postpetition financing agreement is governed

by the business judgment standard, which will not be disturbed except where the debtor's

decision is clearly erroneous or is made arbitrarily, in bad faith, with fraudulent intent, on the

basis of inadequate information, in violation of fiduciary duties or in violation of the Bankruptcy

Code.  In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (holding that court

should defer to debtor's "reasonable business judgment"); In re Barbara K. Enters., Inc., No. 08-

11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008).

13.      Here, the Debtors exercised their reasonable business judgment in entering into

the DIP Credit Facilities and it is without doubt that the success of these chapter 11 cases hinges

on the Debtors' continued access to the DIP Credit Facilities.  As described more fully in the

Motion, the DIP Lenders' proposal was the best option available.  The Debtors negotiated with

the DIP Lenders in good faith to provide financing on the best and most reasonable terms, and as

reflected in the Proposed Final DIP Order, the Debtors, the DIP Lenders and the Prepetition

Secured Parties agreed to certain concessions after approval of the Interim Order to

accommodate legitimate concerns raised by the Committee.  While the Committee seeks to

rewrite or eliminate other provisions of the Proposed Final DIP Order in its objection, the DIP

Credit Facilities and Proposed Final DIP Order must be viewed as they were negotiated – as a whole. Without those provisions to which the Committee objects, certain other provisions, or possibly the financing itself, would not have been available and without the DIP Credit Facilities, the Debtors lack the liquidity necessary to continue operating.

II.    **Payment of Professional Fees of the Ad Hoc Committee of Second Lien Noteholders and Apollo is Appropriate**

14.    The Committee challenges the adequate protection package the Debtors negotiated with the Ad Hoc Committee of Second Lien Noteholders and Apollo (combined, the "**Plan Support Parties**"), arguing that it is not appropriate for the Debtors to pay the fees and expenses of the counsel and advisors of these constituencies.

15.    As explained in the Motion and wholly ignored by the Committee, adequate protection is evaluated on a case-by-case basis and may be provided in many forms. See Motion, ¶ 63 (citing In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) and In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996)). And, notwithstanding the Committee's assertions to the contrary, nothing in the Bankruptcy Code or case law requires that the Plan Support Parties be oversecured or demonstrate a diminution in value in order to be provided with adequate protection.

16.    Here, the circumstances clearly support payment of the fees and expenses of the counsel and advisors of the Plan Support Parties.[6] First, the Plan Support Parties consented to the use of Cash Collateral, priming of their liens, and to the Debtors' entry into the DIP Credit

---

[6]    The Debtors understand that both Apollo and the Ad Hoc Committee of Second Lien Noteholders have or intend to file their own replies to the Committee Objection which further address, in detail, why it is appropriate for the Debtors to have agreed to the payment of the professional fees and expenses of the Plan Support Parties. Accordingly, the Debtors focus herein on factors of importance to them in having agreed to the payment of such amounts and respectfully refer the Court to the Plan Support Parties' respective replies for a more detailed discussion of these issues.

Facilities.   This consent was important to the Debtors notwithstanding that the provisions respecting deemed consent to the debtor in possession financing and use of cash collateral in the intercreditor agreement to which second lien creditors are party may be broader than those governing first lien creditors.   Here, the Plan Support Parties committed to support the Plan and to backstop a $600 million rights offering, the proceeds of which will allow the Debtors to reorganize if the Plan is confirmed.   Without such commitments, the Debtors would not have been able to obtain the DIP Credit Facilities (or the contemplated exit financing facilities) on the terms provided as the DIP and Exit Lenders would not have agreed to lend on such favorable terms without a prior deal such as the RSA in place.   Simply put, the consent and agreements of the Plan Support Parties have permitted the Debtors to move to effectuate a speedy and comprehensive restructuring and, as a result, it is appropriate to provide for the payment of the fees and expenses of the counsel and advisors of the Plan Support Parties as part of their adequate protection package.[7]

17.    Furthermore, the Proposed Final DIP Order expressly provides that adequate protection is granted to the Prepetition Secured Parties, including the Plan Support Parties, only to the extent of any diminution in value in the applicable Prepetition Secured Party's interest in the Prepetition Collateral (Proposed Final DIP Order, ¶ 22), and further provides that the payment of adequate protection in the form of fees and expenses to the Prepetition Secured

---

[7]    In addition, the Debtors submit they can agree to pay such fees and expenses under section 503(b)(1)(A) of the Bankruptcy Code, as the payment of such fees directly benefits the estates.  See, e.g., In re Tyson, No. 03-41900, 2005 WL 3789356, at *9 (Bankr. S.D.N.Y. June 3, 2005) (approving payment of section 503(b)(1)(A) administrative expenses for attorney fees of unsuccessful bidder because work of unsuccessful bidder benefited the estate).  Moreover, even if payment of such fees and expenses is not required as part of adequate protection, as this Court recognized at the hearing on the Interim Order, it is customary for debtors to pay such fees to ensure that their key constituencies have professionals engaged so their cases will proceed in an efficient and orderly manner.  See 4/14/14 Hr'g Tr. at 86: 20-22.

Parties, including the Plan Support Parties, is subject to recharacterization to the extent that such payment is not allowed under section 506(b) of the Bankruptcy Code or on any other basis  (Id. at ¶ 25(e)).  Thus, all parties, including the Committee, may challenge whether the payment of fees and expenses to the advisors of the Plan Support Parties should be applied to reduce the secured claims of such parties, to the extent there is no diminution in value of the Prepetition Collateral.  Thus, there is no prejudice to these estates that results from such payment.[8]

18.     Lastly, considerable discretion should be afforded the Debtors' determination to provide adequate protection.  Here, the Debtors believe the package they have proposed is reasonable under the circumstances and supported by their business judgment.  It is within the Debtors' business judgment to determine what form of adequate protection should be provided. See Crocker Nat'l Bank v. American Mariner Indus., Inc. (In re American Mariner Indus., Inc.), 734 F.2d 426, 435 (9th Cir. 1984) ("Consistent with the policies behind sections 361 and 362, the debtor should be permitted maximum flexibility in structuring a proposal for adequate protection."); see also 7 COLLIER ON BANKRUPTCY ¶ 1100.01 (16th ed. Rev. 2009) ("The debtor in possession is offered considerable discretion in the operation of the business, constrained generally only by a business judgment rule. . . . The court is given considerable discretion in evaluating a debtor's proposed use of property, offer of adequate protection, proposed borrowing, and other business decisions.").

---

[8]     The Committee accuses the Debtors of a "complete lack of disclosure and candor" in not divulging the identities of the "counsel and advisors" to Apollo.  See Objection, ¶ 25.  However, the Committee fails to note that the Debtors have provided the Committee with not only the identities of the counsel and financial advisor to Apollo (Akin Gump Strauss Hauer & Feld LLP and Lazard Frères & Co. LLC, respectively) as well as counsel and financial advisors to the Ad Hoc Group of Second Lien Noteholders (Milbank, Tweed, Hadley & McCloy LLP and Houlihan Lokey Capital, Inc., respectively), but also copies of their engagement letters.  It is not the Debtors that are being less than candid here.  Copies of these engagement letters are annexed hereto as **Exhibit A**.

III.    **Avoidance Actions and Other Unencumbered Assets Do Not Have to Be Preserved for
Unsecured Creditors**

19.    The Committee next objects that DIP liens, adequate protection liens and
superpriority claims on the proceeds of avoidance actions and unencumbered assets are
inappropriate, but provides no justification for this limitation.  This is not surprising, as there is
no compelling rationale that supports the Committee's position.    As to DIP liens on
unencumbered assets and the provision of superiority DIP claims, before a court may authorize
financing under section 364(d) of the Bankruptcy Code, a debtor must demonstrate that it is
unable to obtain financing under section 364(c) simply by providing a superpriority
administrative expense claim, a lien on previously unencumbered property or a junior lien on
already encumbered property.    Thus, providing superpriority claims and DIP liens on
unencumbered property in connection with DIP financing is not only entirely appropriate but
specifically contemplated by the Bankruptcy Code before the provision of priming liens (which
also are being provided).  And with regard to the provision of adequate protection, granting
replacement liens is one of the specifically designated forms of adequate protection (see 11
U.S.C. § 361(2)), and merely granting a replacement lien on collateral already subject to a
Prepetition Secured Party's lien would be superfluous.  Further, the granting of a superpriority
claim in connection with the provision of adequate protection not only is appropriate under
section 507(b) of the Bankruptcy Code, but also under section 361(3), which allows for such
other relief so as to result in the indubitable equivalent of a secured party's interest in its
collateral.  Significantly, the DIP Lenders and the Prepetition Secured Parties have agreed that
"any proceeds or property recovered in respect of any Avoidance Actions shall only be used to
pay or otherwise satisfy any DIP Liens, Adequate Protection Liens, Superpriority Claims or any

11

507(b) Claims to the extent necessary after commercially reasonable efforts have been undertaken" to first satisfy any such claims from other DIP Collateral. <u>See</u> Proposed Final Order, ¶ 9. More simply, the DIP Lenders and Prepetition Secured Parties have attempted to accommodate the Committee's concerns at least as to avoidance action proceeds, although there is nothing in the Bankruptcy Code or case law that requires this result.

20.     While the Committee does cite to certain cases addressing the purpose behind avoidance claims and who is a proper plaintiff with respect to such a claim, none of those cases stand for the proposition that proceeds of avoidance actions cannot secure a DIP financing loan, provide for adequate protection, or that unsecured creditors have some unalienable rights to avoidance actions.  The proceeds from those actions are unencumbered collateral that the Debtors have decided, in their business judgment, to pledge to the DIP Lenders and Prepetition Secured Parties in order to reorganize for the benefit of all constituents.  Stated differently, the proceeds of avoidance actions are estate property, and the Committee has not provided any persuasive reason why that property cannot be used to secure financing if a debtor decides that using avoidance actions in that manner is in the estate's best interests.

**IV.     A Waiver of Section 506(c) as to the Prepetition Secured Parties is Appropriate**

21.     The Committee's objection to the waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code also is without merit and should be overruled.  Section 506(c) gives a debtor the right to surcharge a secured creditor for the reasonable and necessary costs of maintaining the creditor's collateral. <u>See</u> 11 U.S.C. §506(c).

22.     It is well established that waivers of section 506(c) claims are standard with respect to postpetition financings between sophisticated parties. <u>See In re Old HB, Inc. (f/k/a Hostess Brands, Inc.)</u>, No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2012); <u>In re Metaldyne</u>

Corp., No. 09-13412 (MG) (Bankr. S.D.N.Y. June 23, 2009); In re Rotech Healthcare, Inc., No. 13-10741 (PJW) (Bankr. D. Del. May 14, 2013); In re Namco, LLC, No. 13-10610 (PJW) (Bankr. D. Del. May 7, 2013); In re School Specialty, Inc., No. 13-10125 (KJC) (Bankr. D. Del. Feb. 26, 2013); see also In re Film Equip. Rental Co., No. 91 Civ. 3476, 1991 WL 274464 (Bankr. S.D.N.Y. Dec. 12, 1991) (affirming cash collateral order waiving 506(c) claims). In addition, this Court has approved final DIP orders providing for such waivers where, as in the instance case, an appropriate professional fee carve-out has been provided, and the DIP lenders and other secured parties have agreed to subordinate their claims to that carve-out. See In re Borders Grp., Inc., No. 11-10614 (MG) (Bankr. S.D.N.Y. Mar. 16, 2011); In re Uno Rest. Holdings. Corp., No. 10-10209 (MG) (Bankr. S.D.N.Y. Feb. 18, 2010). Contrary to the Committee's assertions, section 506(c) waivers may be fair and reasonable under appropriate circumstances.

23.    In this case, the section 506(c) waiver was negotiated together with a $3,000,000 carve-out for post-default fees and expenses of professionals retained by order of this Court (in addition to all accrued and unpaid allowed fees and expenses incurred pre-default), up to $200,000 in fees for a chapter 7 trustee, and all fees required to be paid to the Clerk of the Bankruptcy Court and the United States Trustee. Therefore, while there is no *additional* surcharge on the collateral of the Prepetition Secured Parties, such parties' claims are effectively subordinated to a substantial amount of fees and expenses of the estate, in essence accomplishing the same purpose, providing for a source of funds to administer the estates in the event of liquidation. Accordingly, the Debtors believe, in their business judgment, that the waiver is appropriate given the benefits of securing the DIP Credit Facilities. See In re Antico Mfg. Co., 31 B.R. 103, 106 n.1 (Bankr. E.D.N.Y. 1983) (regarding an objection to a 506(c) waiver, the

court noted that "[c]ertainly, the paragraph in question is not so detrimental or improper as to jeopardize the loss of the entire financing package.").[9]

## V.    A Waiver of the "Equities of the Case" Exception Under Section 552(b) is Justified

24.    The Committee also argues that a waiver of section 552(b)'s "equities of the case" doctrine should not be approved by the Proposed Final DIP Order.  The Committee, however, has no basis for this argument and has failed to articulate how the "equities of the case" exception applies (i.e, how waiving the "equities of the case" exception would prejudice the Debtors or their proposed restructuring).

25.    Section 552(b) of the Bankruptcy Code provides that a perfected lien on prepetition collateral extends to the postpetition proceeds of such collateral unless the court orders otherwise based on the "equities of the case."  11 U.S.C. § 552(b).  Courts have routinely held that a waiver of the "equities of the case" exception is appropriate where lenders agree to subordinate their claims to a carve-out, as the Prepetition Secured Parties have done in these cases.  See 2/6/12 Hr'g Tr. at 58:23 - 59:3, 56:25 – 57:25, 78:20 -79:10, In re Old HB, Inc. (f/k/a Hostess Brands, Inc.), Case No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 6, 2012) ("It seems to me their willingness to provide for a carve-out upfront as opposed to letting the professionals hang on that point is sufficient under the facts of this case [to waive the "equities of the case" exception]…");[10] In re Am. Media, Inc., No. 10-16149, 2010 WL 5141244, at *4 (Bankr. S.D.N.Y. Dec. 6, 2010) (holding that "[i]n light of the Prepetition Agent's and Prepetition's

---

[9]    Only the Debtors have the right to assert a section 506(c) surcharge, not any other party in interest, including the Committee.  See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 5 (2000) ( "([T]he trustee is the only party empowered to invoke section 506(c)); see also In re Smart World Techs., LLC, 423 F.3d 166, 181-82 (2d Cir. 2005) ("Section 506(c) . . . allows only the 'trustee,' or debtor-in-possession, to take advantage of this exception…").

[10]    Excerpts of the transcript in In re Old HB, Inc. are attached hereto as **Exhibit B**.

Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out…the

Prepetition Agent and Prepetition Lenders are entitled to a waiver of … any 'equities of the case'

claims under section 552(b) of the Bankruptcy Code …"); In re Blockbuster Inc., No. 10-14997,

2010 WL 4873646, at *18 (Bankr. S.D.N.Y. Sept. 24, 2010) (holding that, because the

prepetition lenders had agreed that their claims were subordinate to a carve-out, the 'equities of

the case' exception under sections 552(b) would not apply); In re General Growth Props., Inc.,

412 B.R. 122, 127 (Bankr. S.D.N.Y. 2009) (holding same).[11]

26.      In addition, courts have generally precluded the application of the "equities of the

case" exception where a lender's cash collateral (or postpetition financing) is required to

preserve the value of the debtors' assets. See In re Muma Servs. Inc., 322 B.R. 541, 549 (Bankr.

D. Del. 2005) ("equities of the case" exception did not apply where, among other things, the

debtor was only able to operate through the use of a lender's cash collateral plus additional

postpetition financing).  Accordingly, because the Debtors require the use of Cash Collateral and

financing from the DIP Lenders to continue their businesses, a waiver of the "equities of the

case" exception is appropriate.

## VI.      The Committee Has No Standing to Object to the Marshaling Waiver

27.      The Committee's objection that the Court should not approve a provision in the

Proposed Final DIP Order which provides that the equitable doctrine of marshaling will not

apply to the DIP Lenders or the Prepetition Secured Parties also fails.  Marshaling is an equitable

---

[11]      The Committee cites to Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re Terrestar Networks, Inc).
which did not concern a waiver of the "equities of the case" exception in the context of postpetition
financing or use of cash collateral context and, therefore provides no support for the Committee's position.
457 B.R. 254, 272-73 (Bankr. S.D.N.Y. 2011) (declining to rule on the applicability of the "equities of the
case" exception on motions for summary judgment in an adversary proceeding concerning the
subordination of notes where there was an undeveloped factual record).

doctrine which provides that where a senior secured creditor has two funds from which to satisfy

its debt, it may not defeat a junior secured creditor who may resort to only one of the funds.  See

Simon v. Schuster, Inc. v. Advanced Mktg. Servs. (In re Advanced Mktg. Servs.), 360 B.R. 421,

427 n.8 (Bankr. D. Del. 2007).

28.    Despite the Committee's assertions to the contrary, marshaling only applies to the

collateral that a secured creditor may turn to in order to satisfy its claims vis-a-vis other secured

creditors, and therefore is a doctrine that can only be invoked by a secured creditor.  Thus, as the

cases have consistently held, the Committee has no ability to seek to invoke such a doctrine on

behalf of unsecured creditors.  Galey & Lord, Inc. v. Arley Corp. (In re Arlco, Inc.), 239 B.R.

261, 274 (Bankr. S.D.N.Y. 1999) (holding that unsecured creditors have no right to invoke the

doctrine of marshaling) (citing Herkimer Cnty. Tr. Co. v. Swimelar (In re Prichard), 170 B.R. 41,

45 (Bankr. N.D.N.Y. 1994)); Official Comm. Of Unsecured Creditors of America's Hobby Ctr.

v. Hudson United Bank (In re America's Hobby Ctr.), 223 B.R. 275, 288 n.6 (Bankr. S.D.N.Y.

1998) (stating that an unsecured creditor has no standing to bring a marshaling claim); In re

Advanced Mktg. Servs., 360 B.R. at 427 (stating that "unsecured creditors cannot invoke the

equitable doctrine of marshaling.").[12]

29.    Because the Committee has no ability to invoke such a doctrine, it lacks standing

to object to the marshaling waiver in the Proposed Final DIP Order, and such objection should be

overruled.

---

[12]    This Court recognized this at the Interim Hearing, when it noted that the doctrine of marshaling is "not for
the benefit of unsecured creditors."  See 4/14/14 Hr'g Tr. at 111:15-17.  The Debtors are aware of only one
case that has allowed marshaling for the benefit of unsecured creditors (Berman v. Green (In re Jack
Green's Fashions for Men Big and Tall, Inc.), 597 F.2d 130 (8th Cir. 1979)), and such case has been widely
criticized.

**VII.**      **The Committee Has Adequate Resources and Time to Investigate and Pursue Claims and Defenses**

30.      Notwithstanding the Committee's assertions, the Debtors submit that the Proposed Final DIP Order as currently drafted provides the Committee with a more than adequate period and budget to investigate and pursue Claims and Defenses, if appropriate.

31.      With respect to the length of the challenge period, the Proposed Final DIP Order provides that the Committee must successfully seek and obtain standing and timely file an adversary proceeding or contested matter "on or before the earlier of (1) 90 days after entry of [the Proposed Final DIP Order] and (2) the commencement of a hearing with respect to the confirmation of a plan of reorganization for any of the Debtors" (the "**Investigation Period**"). See Proposed Final DIP Order, ¶ 26.[13]  The Investigation Period is more than adequate to provide the Committee with enough time to investigate and pursue Claims and Defenses.  First, the Investigation Period approximates about 120 days since the Committee was appointed (and 30 days more than that reflected in Local Bankruptcy Rule 4001-2(f)) – more than enough time to give an efficient Committee an opportunity to investigate the validity of prepetition secured debt, determine which Claims and Defenses against the Prepetition Secured Parties to pursue, if any, and seek and obtain standing (if appropriate).  In addition, the Proposed Final DIP Order allows this Court to extend the Investigation Period for "cause."  See Proposed Final DIP Order, ¶ 26.  Thus, if after diligently performing its duties the Committee can establish appropriate justification as to why this period of time is insufficient, and that an extension is appropriate, the Court has the ability to provide additional time.  But there is no reason to establish an inordinately long period today, simply for the sake of having additional time that may not be

---

[13]      August 14, 2014 has tentatively been reserved with Chambers as the date to commence the hearing to consider confirmation of the Plan.

required.  Further, the Investigation Period was also purposely designed to dovetail with the plan
confirmation process.  Simply because there is a chance that the plan may not get confirmed,
does not mean the Investigation Period should be automatically extended.

32.    Lastly, the time provided for in the Investigation Period is consistent with, or
more than, those provided for in other final DIP orders approved in this District.  See In re Old
HB, Inc. (f/k/a Hostess Brands, Inc.), No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2012)
(providing for 90 days from date of entry of final DIP order); In re Borders Grp., Inc., No. 11-
10614 (MG) (Bankr. S.D.N.Y. March 16, 2011) (providing for 60 days from date of entry of
final DIP order); In re The Great Atlantic and Pacific Tea Co., No. 10-24549 (Bankr. S.D.N.Y.
Jan. 11, 2011) (providing for 90 days from date of entry of final DIP order); In re Uno Rest.
Holdings. Corp., No. 10-10209 (MG) (Bankr. S.D.N.Y. Feb. 18, 2010) (providing for 60 days
from date of entry of final DIP order);  In re The Reader's Digest Ass'n, No. 09-23529 (RDD)
(Bankr. S.D.N.Y. October 7, 2009) (providing for 75 days from the date of entry of final DIP
order).  Accordingly, the Committee's request that the period be lengthened should be rejected.

33.    Similarly, the Committee's request for a substantially increased investigation
budget also should be rejected.  The Proposed Final DIP Order provides for a $250,000
investigation budget (the "**Investigation Budget**"), which may be used by the Committee to
investigate (a) the validity, enforceability, or priority of the prepetition secured debt and (b) any
Claims and Defenses against the Prepetition Secured Parties.  See Proposed Final DIP Order, ¶
27.  The Committee requests that the Investigation Budget be doubled to $500,000.  The
Investigation Budget has already increased from $50,000 under the Interim Order to $250,000
under the Proposed Final DIP Order.  The Debtors submit that a $250,000 Investigation Budget
is more than reasonable under the circumstances and will allow the Committee to fully

investigate the validity of prepetition secured debt and any Claims and Defenses.  Furthermore,

the Investigation Budget is in line with — if not on the high side of — investigation budgets

provided for in other final DIP orders approved in this District.  See In re Old HB, Inc. (f/k/a

Hostess Brands, Inc.), No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2012) (providing for

$75,000 investigation budget); In re Borders Grp., Inc., No. 11-10614 (MG) (Bankr. S.D.N.Y.

March 16, 2011) (providing for $125,000 investigation budget); In re The Great Atlantic and

Pacific Tea Co., No. 10-24549 (Bankr. S.D.N.Y. Jan. 11, 2011) (providing for $250,000

investigation budget); In re Uno Rest. Holdings. Corp., No. 10-10209 (MG) (Bankr. S.D.N.Y.

Feb. 18, 2010) (providing for $50,000 investigation budget); In re The Reader's Digest Ass'n,

No. 09-23529 (RDD) (Bankr. S.D.N.Y. October 7, 2009) (providing for $250,000 investigation

budget).

**VIII.   The Proposed Final DIP Order Should Not to Include a Tolling Period if the Committee Files a Standing Motion to Prosecute Claims Against the Debtors' Estate**

34.     The Committee argues that the Proposed Final DIP Order be revised so that the

filing of a standing motion within the Investigation Period satisfy the requirement of

commencing an adversary proceeding within the specified time period.  Given the lengthy 90-

day investigation challenge period to which the Prepetition Secured Parties have agreed, and for

the reasons set forth below, the Debtors respectfully submit that the grant of automatic standing

upon the mere filing of a motion for standing is inappropriate under the facts and circumstances

of these cases.

35.     The Second Circuit requires a committee to satisfy certain requirements in order

to obtain standing to pursue estate causes of action — the committee must show the debtor has

"unjustifiably failed to bring suit or abused its discretion in not suing" by demonstrating that the

committee "present[ed] a colorable claim" and that the action "is likely to benefit the

reorganization estate." In re STN Enters, Inc., 779 F.2d 901, 905 (2d Cir. 1985).  Even with the

consent of the debtor, the court must still find that the "suit by the committee is (a) in the best

interest of the bankruptcy estate, and (b) is 'necessary and beneficial' to the fair and efficient

resolution of the bankruptcy proceedings." Commodore Int'l Ltd. v. Gould (In re Commodore

Int'l Ltd.), 262 F.3d 96, 100 (2d Cir. 2001).  This procedure prevents reorganizations from

"spin[ning] out of control," and "[r]equiring bankruptcy court approval conditioned upon the

litigation's effect on the estate helps prevent committees and individual creditors from pursuing

adversary proceedings that may provide them with private benefits but result in a net loss to the

entire estate." In re AppliedTheory Corp., 493 F.3d 82, 86 (2d Cir. 2007) (affirming lower

court's decision to deny committee authorization to assert claim of equitable subordination

against certain lenders).

36.      The Committee, if it acts efficiently, has adequate time to investigate any Claims

and Defenses, file a standing motion, and obtain standing within the Investigation Period.  Thus,

there is no reason for the Proposed Final DIP Order to include a tolling period.  Although the

Committee purports in the Objection to be a balanced committee representing all unsecured

creditors, three of its seven members (US Bank National Association, as Indenture Trustee for

the Subordinated Notes, BlueMountain Credit Alternatives Master Fund L.P. and Aurelius

Capital Partners, LP) are representatives of holders of the Subordinated Notes, and the

Committee's motivations therefore must be viewed with this in mind when it seeks automatic

standing and complains about a Plan that provides for payment in full of all unsecured creditors

other than structurally subordinated Holdings PIK Note creditors at Holdings and Subordinated

Noteholders who are required to turnover their distributions under the governing documents.

Requiring the Committee to establish within the Investigation Period that (a) there are colorable claims, (b) the action is likely to benefit the estate, and (c) it is in the best interest of the estate as a prerequisite to the grant of standing is appropriate, will protect the Debtors' limited resources and ensure there is proper court review and oversight prior to allowing the Committee to delay these cases, for no reason other than for leverage purposes, through litigation.

## IX.    An Event of Default as a Result of a Termination of Plan Exclusivity is Appropriate

37.    Finally, the Committee's objection that it is inappropriate for an Event of Default to occur under the DIP Credit Facilities if plan exclusivity is terminated also is without merit. As explained above, the DIP Credit Facilities and the Proposed Final DIP Order were heavily negotiated by the Debtors and other parties-in-interest, and the Debtors agreed to these terms in their exercise of their reasonable business judgment. The Committee should not be permitted to blue pencil the provisions of the DIP Credit Facilities and retain all of the favorable terms it likes while rejecting those it does not. From the Debtors' perspective, it is reasonable for the DIP Lenders to insist that they have the ability to call an Event of Default upon termination of exclusivity. Typically, a termination of exclusivity has a negative effect upon a debtor's reorganization proceedings so it is not surprising that the DIP Lenders require the ability to determine whether or not to call a default. And, in the event they do, nothing prevents the Debtors from seeking, or other lenders from providing, replacement funding.

*Remainder of Page Intentionally Left Blank*

21

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that

the Court approve the Proposed Final DIP Order and overrule the Objection.

Dated:  May 22, 2014
         New York, New York

                         WILLKIE FARR & GALLAGHER LLP
                         *Proposed Counsel for the Debtors and*
                         *Debtors in Possession*


                         By:  /s/ Paul V. Shalhoub
                              Matthew A. Feldman
                              Paul V. Shalhoub
                              Jennifer J. Hardy

                              787 Seventh Avenue
                              New York, New York 10019
                              Telephone: (212) 728-8000
                              Facsimile: (212) 728-8111

**EXHIBIT A**



**IRA S. DIZENGOFF**
+1 212.872.1096/fax: +1 212.872.1002
idizengoff@akingump.com

March 18, 2014

Momentive Performance Materials Holdings Inc.
180 East Broad Street
Columbus, OH 43215
Attn:   Craig O. Morrison
        President and Chief Executive Officer

                    Re: Terms of Engagement

Dear Craig:

        Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") has been requested by Apollo
Global Management, LLC (collectively with its affiliated funds that are creditors or equity
holders of the Company (as defined below), "Apollo") to act as its legal counsel in connection
with a potential financial restructuring (the "Restructuring") of Momentive Performance
Materials Holdings Inc. (collectively with its subsidiaries, "Momentive" or the "Company").

        Akin Gump has agreed to this retention, on the following terms and conditions:

**1.      SCOPE AND REPRESENTATION OF AKIN GUMP**

        Subject to paragraph 3 below, Akin Gump will provide advisory services to Apollo with
respect to the negotiation, structuring, planning, documentation and implementation of a
restructuring, recapitalization, reorganization or sale of all or a portion of the assets and/or
liabilities of the Company and perform any and all other legal services as may be reasonably
requested by Apollo in connection with the Restructuring.

**2.      PAYMENT OF PROFESSIONAL AND ANCILLARY SERVICES RENDERED**

        We refer matters to those lawyers in this firm who in our judgment can perform the
highest quality work, in a timely and efficient manner, and at the lowest cost. We also employ
non-lawyer assistants in tasks where lawyers are not necessary to facilitate the rapid and efficient
performance of services. We envision that I will have primary responsibility for this
engagement. I will be assisted by, among others, Philip Dublin, a partner in Akin Gump's



# Akin Gump
### Strauss Hauer & Feld LLP

Momentive Performance Materials Holdings Inc.
March 18, 2014
Page 2

financial restructuring group, and Dan Fisher, a partner in Akin Gump's corporate group. My hourly rate is $1,150, Philip Dublin's hourly rate is $950 and Dan Fisher's hourly rate is $875. Additional attorneys will also work on the engagement as and when appropriate. The hourly rates for other lawyers in the firm range from $355 to $1,220 per hour. Hourly rates for paralegals range from $155 to $345. The firm may change these rates in the future, in which case the new rates will apply to work done after the implementation of those rate changes. In addition, reasonable expenses that are incurred in connection with the Restructuring and advanced on behalf of Apollo or internal charges for administrative services (which may exceed our direct costs) are added to the statement rendered for the month in which such expenses or charges are recorded in our billing system.

Our standard practice is to bill on a monthly basis, but we may, at our discretion, render bills on a weekly or bi-weekly basis. This allows our clients to monitor both current and cumulative fees and expenses. We require that payment of statements be made within five (5) business days of receipt, and we may suspend or terminate any work in progress if timely payment is not made.[1] We may also withdraw from the representation in a manner consistent with applicable ethical standards.

By reason of the nature of this engagement, the Company agrees that Akin Gump shall be compensated by the Company for reasonable professional and ancillary services rendered to Apollo as follows:

In order to undertake and carry out our engagement, we have discussed and agreed that upon execution of this letter, the Company will make an advance payment to Akin Gump in the amount of $200,000. This advance payment, and all future payments as described in this letter,

---

[1] If any monthly (or weekly or bi-weekly, as indicated above) statement is not paid within 60 days after the original statement date, we reserve the right to discontinue services on all pending matters for Apollo until our account has been brought current. Additionally, if any statement is not paid within 60 days from the date of the original statement, we may, by written notice to you on a subsequent statement or otherwise, declare the overdue account to be delinquent. We have no obligation to declare any account delinquent. If we declare an account to be delinquent, the amount owing on that account will accrue interest at a rate equal to one percent (1%) per month (a 12% annual percentage rate) from the date of our delinquency notice to you until the balance is paid in full, but in no event shall such rate exceed the maximum rate permitted by applicable law. Any payments made on past due statements are applied first to interest, if any, and then to the account balance, beginning with the oldest outstanding statement. In addition, we are entitled to attorneys' fees and costs if collection activities are necessary. In the event the Company commences voluntarily or involuntarily any insolvency proceeding under the United States Code or otherwise, a notice of delinquency will be deemed to have been sent on the date immediately preceding the commencement of such insolvency proceeding with respect to any delinquent statements.



Momentive Performance Materials Holdings Inc.
March 18, 2014
Page 3

shall be made via wire transfer and become the property of Akin Gump immediately upon receipt and may be used by Akin Gump at any time without restriction. Advance payments will not be put into a trust, escrow, or other segregated account.

Akin Gump will provide the Company with monthly (or weekly or bi-weekly, as indicated above) statements of fees and expenses. Our fee statements will set forth the amount of our charges for professional and ancillary services but will not include time entry detail or descriptions. To the extent that the amount of any of our statements is less than the advance payment amount, you will pay us a further advance payment to bring your advance as of the billing date up to $200,000 within five (5) business days of receipt of the statement. To the extent that the amount of our fee statement is more than the advance payment amount, you will pay to us the excess amount and an additional advance payment of no less than $200,000. When we have completed our services to Apollo in connection with this engagement, or any successor engagement, our final statement will reflect the amount, if any, by which the accumulated advance payments have exceeded accumulated charges for all of our services, and we shall pay that amount forthwith to the Company.

In the event that the Company or any one of its subsidiaries or affiliates intends to commence a chapter 11 case or other insolvency proceeding, the Company shall, in advance of any such filing, pay Akin Gump a further advance payment to bring the total advance payment amount as of the filing date up to not less than $200,000, after deducting for accrued fees and expenses through the filing date.

The Company may terminate this agreement at any time for any reason effective upon fifteen (15) business days' prior written notice to Akin Gump. Any portion of the advance payment not used to satisfy accrued fees and expenses of Akin Gump through such effective date shall be remitted to the Company forthwith.

Notwithstanding the Company's obligations herein, Akin Gump's duties hereunder run solely to Apollo, and Akin Gump is not authorized and will not purport to be, an agent of the Company for any purpose. The Company's payment of Akin Gump's fees and expenses shall not affect any privileges that may attach to all communication and correspondence between Akin Gump and Apollo, or any work product or analyses prepared by Akin Gump for Apollo in connection with this matter.



**Akin Gump**
Strauss Hauer & Feld LLP

Momentive Performance Materials Holdings Inc.
March 18, 2014
Page 4


## 3.   MISCELLANEOUS

Should the Company fail to meet the terms of this advance payment amount agreement, Akin Gump may withdraw as Apollo's legal counsel unless Apollo agrees, in writing, to assume the Company's obligations as set forth in this advance payment amount agreement. Akin Gump warrants to the Company that Apollo is aware and has agreed that, while Akin Gump is representing Apollo in connection with this matter, we may, at the same time, represent other clients with interests presently or prospectively conflicting with the Company or Apollo, although not in any matter substantially related to the transactions contemplated herein.

The Company agrees to reimburse Apollo for all documented and reasonable out-of-pocket expenses (which out-of-pocket expenses shall not include any professional or advisor fees) incurred by Apollo in connection with the Restructuring. A monthly (or weekly or bi-weekly, as indicated above) statement of Apollo's aggregate expenses shall be provided to the Company, and the Company agrees to make payment within five (5) business days of receipt of the statement.

## 4.   APPLICABLE LAW AND RULES

OUR ENGAGEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

New York State has established a Fee Dispute Resolution Program for the resolution of certain fee disputes between attorneys and clients. In some circumstances, the Company or Apollo may be eligible to participate in this program if a fee dispute should arise.

## 5.   CERTAIN UNDERSTANDINGS

The provisions of this letter agreement may be modified in a subsequent writing executed by the parties hereto. This letter agreement may be executed in counterparts, which counterparts, when fully executed and considered together, shall constitute our agreement.

If the foregoing accurately sets forth our agreement, kindly countersign and return the enclosed duplicate copy of this letter to me and wire us the initial $200,000 advance payment in accordance with the attached wire instructions. Upon such execution, this letter will supersede all prior understandings regarding the subject matter of our engagement by Apollo and will constitute the binding agreement of Akin Gump and the Company (and its subsidiaries).



Momentive Performance Materials Holdings Inc.
March 18, 2014
Page 5

Sincerely,

AKIN GUMP STRAUSS HAUER & FELD LLP

Ira S. Dizengoff

cc: Apollo

**AGREED:**

**Momentive Performance Materials Holdings Inc. and Each of Its Direct and Indirect Subsidiaries**

By: _____

Date: _____

Enclosures:    Statement of Firm Policies
              Wire Instructions



## Akin Gump
STRAUSS HAUER & FELD LLP

 

 

<u>**Wire Instructions for Akin Gump Strauss Hauer & Feld LLP**</u>

Citibank, NA
399 Park Avenue
New York, NY 10022
Account No. 3044-7604
ABA No. 021000089
Ref: 692835.0001

(For wires originating outside the US, please reference SWIFT ID CITIUS33)



Momentive Performance Materials Holdings Inc.
March 18, 2014
Page 5

Sincerely,

AKIN GUMP STRAUSS HAUER & FELD LLP

Ira S. Dizengoff

cc: Apollo

**AGREED:**

**Momentive Performance Materials Holdings Inc. and Each of Its Direct and Indirect Subsidiaries**

By:_____

Date:_____

Enclosures:    Statement of Firm Policies
               Wire Instructions

# LAZARD

As of February 13, 2014

To:     Akin Gump Strauss Hauer & Feld, LLP
        One Bryant Park
        Bank of America Tower
        New York, NY 10036

        Momentive Performance Materials Holdings, Inc.
        180 East Broad Street
        Columbus, OH 43215

        Apollo Global Management
        9 West 57th Street, 43rd Floor
        New York, New York 10019

Ladies and Gentlemen:

This letter and the accompanying exhibit (the "Agreement") confirm the terms of the agreement among Lazard Frères & Co. LLC ("Lazard"), Akin Gump Strauss Hauer & Feld, LLP ("Counsel"), Apollo Global Management, LLC, on behalf of itself and its managed funds that are creditors of the Company (as defined below) or equity holders in Momentive Performance Materials Holdings, LLC (collectively, "Apollo"), regarding the retention of Lazard on an exclusive basis by Counsel, acting in its capacity as counsel to Apollo, effective as of the date indicated above, as Apollo's financial advisor to provide financial advisory and investment banking services with respect to a Restructuring[1] of Momentive Performance Materials Holdings, Inc., together with its domestic subsidiaries (collectively, "Momentive" or the

---

[1] As used in this Agreement, the term "Restructuring" shall mean, collectively, any restructuring, reorganization (whether or not pursuant to Chapter 11 of the United States Bankruptcy Code) and/or recapitalization of all or a significant portion of the Company's outstanding indebtedness (including bank debt, bond debt, and other on and off balance sheet indebtedness), trade claims, leases (both on and off balance sheet), asbestos and other litigation-related claims and obligations, unfunded pension and retiree medical liabilities, or other liabilities (collectively, the "Existing Obligations") that is achieved, without limitation, through a solicitation of waivers and consents from the holders of Existing Obligations (collectively, the "Stakeholders"); rescheduling of the maturities of Existing Obligations; a change in interest rates, repurchase, settlement or forgiveness of Existing Obligations; conversion of Existing Obligations into equity; an exchange offer involving the issuance of new securities in exchange for Existing Obligations; the issuance of new securities, sale or disposition of assets, sale of debt or equity securities or other interests or other similar transaction or series of transactions.

Lazard Frères & Co. LLC
30 Rockefeller Plaza
New York, NY 10112

"Company"), as further described below.

I.    Scope of Services. Lazard shall, in each case as necessary and if requested by Counsel or Apollo, assist Apollo with respect to any Restructuring:

    a.    to analyze the Company's long-term business plan, operations, and related financial projections;

    b.    to analyze the Company's debt capacity and proposed capital structure;

    c.    to review and analyze any valuation of the Company or its assets;

    d.    to review and analyze any restructuring alternatives proposed by any party;

    e.    to evaluate the financial aspects of any potential DIP loan, rights offering, exit financing or other financing by the Company;

    f.    in connection with the financial aspects of negotiations with the Company;

    g.    in connection with preparing financial aspects of any potential bid, offer or proposal for all or a significant portion of the Company's assets or provision of financing (including through a rights offering) by Apollo;

    h.    in meetings with the Company or other third parties as appropriate in connection with the matters set forth herein;

    i.    in providing in-court testimony, including expert testimony and related expert reports; and

    j.    with such other financial advisory services as Counsel or Apollo may from time to time reasonably request and which are customarily provided by financial advisors acting in similar situations.

II.   Nature of Services and Attorney-Client Privilege. It is expressly understood that Lazard is hereby engaged by Counsel on behalf of Apollo. Because Counsel is retaining Lazard, Lazard's work for Counsel will be covered by the attorney work-product doctrine and other applicable privileges.

III.  Compensation. Lazard's compensation for services rendered under this Agreement shall be paid by the Company, and not be an obligation of Apollo, and will consist of the following cash fees:

A.   Monthly Fee.  A monthly fee of $150,000 (the "Monthly Fee"), accrued and payable on execution of this Agreement and on the first day of each month thereafter until the earlier of the completion of the Restructuring or the termination of Lazard's engagement pursuant to paragraph VII.

B.   Restructuring Fee.  An additional fee equal to $2,000,000, accrued and payable upon the consummation of a Restructuring; provided, however, that if a Restructuring is to be completed pursuant to a "pre-packaged" or "pre-arranged" plan of reorganization, the fee shall be $3,000,000 and shall accrue and be payable upon the execution of definitive agreements with respect to such plan; provided, further, that in the event that Lazard is paid a fee in connection with a "pre-packaged" or "pre-arranged" plan and a Restructuring is not consummated, Lazard shall return such fee to the Company (less any Monthly Fees that have accrued).  The fee set forth in this section III.B., the "Restructuring Fee."

C.   Incentive Fee:  An additional fee equal to $500,000 (the "Incentive Fee") if a Restructuring is consummated within 5 months of the effective date of this Agreement. The Incentive Fee shall be payable upon the consummation of a Restructuring within such 5 month period.

D.   Expense Reimbursement.  In addition to any fees that may be payable to Lazard, the Company shall promptly reimburse Lazard for all reasonable expenses (including expenses of counsel, if any), travel and lodging, data processing and communications charges, courier services and other expenditures incurred in connection with, or arising out of Lazard's activities under or contemplated by, this engagement.

E.   No fee payable to any other person, by Counsel, Apollo, the Company or any other person or entity, shall reduce or otherwise affect any fee payable hereunder.

F.   All amounts referenced hereunder reflect United States currency and shall be paid promptly in cash after such amounts accrue hereunder.

IV.   Indemnification.  As a material part of the consideration for Lazard to furnish its services under this Agreement, Lazard requires that the Company indemnify, reimburse and provide contribution to Lazard and certain other persons in accordance with the provisions attached hereto as Exhibit A. The provisions of Exhibit A are an integral part of this Agreement, and the terms thereof are incorporated in entirety by reference herein. The terms of Exhibit A shall survive any termination or expiration of Lazard's engagement.

V.   Information.  The Company shall provide Lazard with all information concerning the
     business, assets, liabilities, operations, cash flows, properties, financial condition and
     prospects of the Company that Lazard reasonably requests in connection with the services
     to be performed hereunder.  At all times during Lazard's engagement Lazard will be
     assuming that all information furnished to Lazard (i) is accurate and complete in all
     material respects and (ii) does not contain any untrue statement of a material fact or omit
     to state a material fact necessary in order to make the statements therein not misleading in
     light of the circumstances under which such statements are made.  In advising pursuant to
     our engagement hereunder, Lazard will be using and relying on publicly available
     information and on data, material and other information furnished to Lazard by the
     Company, Apollo, Counsel and other parties.  Lazard does not assume and shall not have
     any responsibility for independent verification of such information.  Lazard will not, as
     part of its engagement, undertake any independent valuation or appraisal of any of the
     assets or liabilities of the Company or of any third party, or opine or give advice to
     Apollo, Counsel or any other person or entity with respect thereto or with respect to any
     issues of solvency.

VI.  Limitations on Services as Advisor.  In rendering its services, Lazard is not assuming any
     responsibility for Counsel's, Apollo's, the Company's, or any other person's underlying
     business decision to pursue (or not to pursue) any business strategy or to effect (or not to
     effect) any other transaction(s) or decision(s).  Lazard shall not have any obligation or
     responsibility to provide accounting, audit, "crisis management," or business consultant
     services for the Company, Counsel, Apollo or any other person or entity and shall have
     no responsibility for designing or implementing operating, organizational, administrative,
     cash management or liquidity improvements.  Nothing in this Agreement is intended to
     obligate or commit Lazard or any of its affiliates to provide any services other than those
     set forth above.  Lazard will not be responsible for and will not be deemed to have
     provided any tax, accounting, actuarial, legal or other specialist advice.

VII. Termination.  Lazard's engagement hereunder may be terminated in writing by either
     Apollo or Counsel, acting on behalf of Apollo, or Lazard at any time, without continuing
     liability to the Company, Counsel, Apollo or Lazard; provided, however, that (i)
     termination or expiration of Lazard's engagement hereunder shall not affect the
     Company's obligations pursuant to Exhibit A, and Apollo's, Counsel's and the
     Company's continuing obligations and agreements under paragraphs IV, VI, this
     paragraph VII, VIII, IX, X, XI, XII, XIII, XIV and XV hereof, each of which shall
     continue, (ii) notwithstanding any such termination or expiration, Lazard shall remain
     entitled to any fees accrued pursuant to paragraph III but not yet paid prior to such
     termination or expiration and to reimbursement of expenses incurred prior to such
     termination or expiration, and (iii) in the case of termination by Counsel, acting on behalf
     of Apollo, or any expiration of Lazard's engagement, Lazard shall remain entitled to full
     payment of all fees contemplated by paragraph III hereof in respect of any Restructuring
     announced or resulting from negotiations occurring during the period from the date
     hereof until one year following such termination or expiration.

VIII.   Independent Contractor/Confidentiality of Advice.   Lazard has been retained under this Agreement by Counsel as an independent contractor for the benefit of Apollo only; nothing herein is intended to create or shall be construed as creating a fiduciary relationship between Lazard and Apollo or Counsel.  Lazard is not the trustee of, and is not authorized to bind, Counsel or Apollo in any action or decision.  The advice (oral or written) rendered by Lazard pursuant to this Agreement is intended solely for the benefit of Apollo and for the use of Apollo and Counsel in advising Apollo in considering the matters to which this Agreement relates, and, notwithstanding any termination or expiration of Lazard's engagement hereunder, such advice may not be relied upon by any other person or entity, disclosed by Apollo or Counsel to any third party, used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner for any purpose, nor shall any public references to Lazard be made by the Company, Counsel or Apollo, without the prior consent of Lazard.  Notwithstanding the foregoing, nothing herein shall prohibit any party hereto from disclosing to any and all persons the tax treatment and tax structure of any transaction and the portions of any materials that relate to such tax treatment or tax structure.

IX.     Limitation of Liability.   No Indemnified Person (as defined in Exhibit A) shall have any liability (whether direct or indirect, in contract or tort or otherwise) to Apollo or its affiliates or its or their respective members, partners, securityholders or creditors related to, arising out of or in connection with Lazard's engagement, except to the extent that any loss, claim, damage, liability or expense of Apollo is found by a court of competent jurisdiction in a judgment which has become final in that it is no longer subject to appeal or review to have resulted primarily from such Indemnified Person's bad faith or gross negligence.  No Indemnified Person  shall have any liability (whether direct or indirect, in contract or tort or otherwise) to Counsel or its affiliates or its or their respective members, partners, securityholders or creditors related to, arising out of or in connection with Lazard's engagement.

X.      Successors and Assigns.   This Agreement (including Exhibit A hereto) shall be binding upon each party hereto and their respective successors and assigns.  Lazard has been engaged by Counsel only on behalf of Apollo and Lazard's engagement is not deemed to be on behalf of and is not intended to confer any rights upon, or duties to, the Company, Counsel, any member, partner, securityholder or creditor of Counsel, any securityholder, creditor, owner or partner of the Company (other than Apollo), any member, partner, securityholder or creditor of Apollo or any other person or entity other than the Indemnified Persons (as defined in Exhibit A hereto).    The Company's obligations hereunder are joint and several.

XI.     Authority.   Each party hereto represents and warrants that it has all requisite power and authority to enter into this Agreement and the transactions contemplated hereby.  Each party hereto further represents and warrants that this Agreement has been duly and validly authorized by all necessary corporate or other action on the part of such party, has been duly executed and delivered by such party and constitutes a legal, valid and binding agreement of such party, enforceable in accordance with its terms.

XII.   Miscellaneous.  This Agreement and Exhibit A constitute the entire understanding of the parties hereto regarding the matters set forth herein and in Exhibit A, and shall supersede all prior understandings and proposals, whether written or oral, relating to any of such matters contemplated herein or in Exhibit A.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.  This Agreement may only be amended or waived by a writing signed by the party against whom enforcement is sought.

XIII.  Bankruptcy Proceedings.  If all or a portion of the Company files or becomes subject to a case under chapter 11 of the Bankruptcy Code, each party hereto shall use its commercially reasonable efforts to ensure that any order approving the use of cash collateral, post-petition financing and/or any plan of reorganization involving the Company provides for the Company's payment of amounts due and payable hereunder and the Company's agreement and continuing performance with respect to all provisions of this Agreement (including, without limitation, the provisions of Exhibit A).

XIV.   Lazard Group.  If appropriate in connection with performing its services hereunder, Lazard may utilize the services of one or more of its affiliates and its and their related entities, in which case references herein to Lazard shall include such affiliates and entities.  Any such affiliate or entity so employed shall be entitled to all of the benefits afforded to Lazard hereunder and shall be entitled to be reimbursed for its costs and expenses on the same basis as Lazard.

XV.   Choice of Law.  This Agreement and any claim related directly or indirectly to this Agreement (including any claim concerning advice provided pursuant to this Agreement) shall be governed by and construed in accordance with the laws of the State of New York without regard to the principle of conflicts of law.  No such claim shall be commenced, prosecuted or continued in any forum other than the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York, and each of the parties hereby submits to the jurisdiction of such courts.  Each party hereto hereby waives on behalf of itself and its successors and assigns any and all right to argue that the choice of forum provision is or has become unreasonable in any legal proceeding.  ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR CONDUCT IN CONNECTION WITH THIS ENGAGEMENT IS HEREBY WAIVED BY EACH PARTY HERETO.

If the foregoing agreement is in accordance with your understanding of the terms of our engagement, please sign and return to us the enclosed duplicate of this Agreement and the indemnification agreement attached hereto as Exhibit A.

Very truly yours,

LAZARD FRERES & CO. LLC

By: _____
Daniel Aronson
Managing Director

AGREED TO AND ACCEPTED
as of the date first
above written:

MOMENTIVE PERFORMANCE MATERIALS HOLDINGS, INC.,
on behalf of itself and its domestic subsidiaries

By._____
Name:
Title:

AKIN GUMP STRAUSS HAUER & FELD, LLP

By._____
Name: Philip Dublin
Title: TC Adm

APOLLO GLOBAL MANAGEMENT, LLC

By._____
Name:
Title:

**<u>EXHIBIT A</u>**

As of February 13 2014

Momentive Performance Materials Holdings, Inc.
180 East Broad Street
Columbus, OH 43215

Ladies and Gentlemen:

   In connection with the engagement among Akin Gump Strauss Hauer & Feld, LLP ("Counsel"), Apollo Global Management, LLC on behalf of itself and its managed funds that are creditors of the Company (as defined in the attached Engagement Letter) or equity holders in Momentive Performance Materials Holdings, LLC (collectively, "Apollo"), Lazard Frères & Co. LLC and Momentive Performance Materials Holdings, Inc., on behalf of itself and its domestic subsidiaries (Momentive Performance Materials Holdings, Inc. and such subsidiaries, collectively, "you") of even date herewith (the "Engagement Letter"), you and we are entering into this letter agreement.   Capitalized terms used herein without definition shall have the meanings assigned to them in the Engagement Letter. It is understood and agreed that in the event that Lazard Frères & Co. LLC or any of our affiliates, or any of our or their respective directors, officers, members, employees, agents or controlling persons, if any (each of the foregoing, including Lazard Frères & Co. LLC, being an "Indemnified Person"), become involved in any capacity in any action, claim, proceeding or investigation brought or threatened by or against any person, including your securityholders or creditors, related to, arising out of or in connection with our engagement, you will promptly reimburse each such Indemnified Person for its legal and other expenses (including the cost of any investigation and preparation) as and when they are incurred in connection therewith.   You will indemnify and hold harmless each Indemnified Person from and against any losses, claims, damages, liabilities or expenses to which any Indemnified Person may become subject under any applicable federal or state law, or otherwise, related to, arising out of or in connection with our engagement, whether or not any pending or threatened action, claim, proceeding or investigation giving rise to such losses, claims, damages, liabilities or expenses is initiated or brought by you or on your behalf and whether or not in connection with any action, claim, proceeding or investigation in which you or any such Indemnified Person are a party, except to the extent that any such loss, claim, damage, liability or expense is found by a court of competent jurisdiction in a judgment which has become final in that it is no longer subject to appeal or review to have resulted primarily from such Indemnified Person's bad faith or gross negligence.   You also agree that no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your securityholders or creditors related to, arising out of or in connection with our engagement except to the extent that any loss, claim, damage or liability is found by a court of competent jurisdiction in a judgment which has become final in that it is no longer subject to appeal or review to have resulted primarily from such Indemnified Person's bad faith or gross negligence.   If multiple claims are brought against any Indemnified Person in an arbitration related to, arising out of or in connection with our engagement, and indemnification is permitted under applicable law with respect to at least one such claim, you agree that any arbitration award shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for hereunder, except to the extent the arbitration award expressly states that the award,

or any portion thereof, is based solely on a claim as to which indemnification is not available.

If for any reason the foregoing indemnification is held unenforceable (other than due to a failure to meet the standard of care set forth above), then you shall contribute to the loss, claim, damage, liability or expense for which such indemnification is held unenforceable in such proportion as is appropriate to reflect the relative benefits received, or sought to be received, by you and your securityholders and creditors on the one hand and the Indemnified Persons on the other hand in the matters contemplated by our engagement as well as the relative fault of yourselves and such persons with respect to such loss, claim, damage, liability or expense and any other relevant equitable considerations. You agree that for the purposes hereof the relative benefits received, or sought to be received, by you and your securityholders and creditors and the Indemnified Persons shall be deemed to be in the same proportion as (i) the total value paid or proposed to be paid by or to you and your securityholders and creditors, as the case may be, pursuant to any transaction (whether or not consummated) in connection with which we have been engaged to perform investment banking services bears to (ii) the fees paid or proposed to be paid to us in connection with such engagement; provided, however, that, to the extent permitted by applicable law, in no event shall we or any other Indemnified Person be required to contribute an aggregate amount in excess of the aggregate fees actually paid to us for such investment banking services.   Your reimbursement, indemnity and contribution obligations under this agreement shall be joint and several, shall be in addition to any liability which you may otherwise have, shall not be limited by any rights we or any other Indemnified Person may otherwise have and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of yourselves, ourselves, and any other Indemnified Persons.

You agree that, without our prior written consent (which will not be unreasonably withheld), you will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action, proceeding or investigation in respect of which indemnification or contribution could be sought hereunder (whether or not we or any other Indemnified Persons are an actual or potential party to such claim, action, proceeding or investigation), unless such settlement, compromise or consent includes an unconditional release of each Indemnified Person from all liability arising out of such claim, action, proceeding or investigation. No waiver, amendment or other modification of this agreement shall be effective unless in writing and signed by each party to be bound thereby. This agreement and any claim related directly or indirectly to this agreement shall be governed and construed in accordance with the laws of the State of New York (without giving regard to the conflicts of law provisions thereof). No such claim shall be commenced, prosecuted or continued in any forum other than the courts of the State of New York located in the City and County of New York or the United States District Court for the Southern District of New York, and each of us hereby submits to the jurisdiction of such courts. You hereby waive on behalf of yourself and your successors and assigns any and all right to argue that the choice of forum provision is or has become unreasonable. You (on your own behalf and, to the extent permitted by applicable law, on behalf of your securityholders and creditors) waive all right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to, arising out of or in

Momentive Performance Materials Holdings, Inc.
As of February 13 2014
Page 3

connection with this agreement or our engagement.    This agreement shall remain in effect indefinitely, notwithstanding any termination or expiration of our engagement.

Very truly yours,

LAZARD FRERES & CO. LLC

By _____
Daniel Aronson
Managing Director

AGREED TO AND ACCEPTED
as of the date first
above written:

MOMENTIVE PERFORMANCE MATERIALS HOLDINGS, INC.,
on behalf of itself and its domestic subsidiaries

By. _____
Name:
Title:

# MILBANK, TWEED, HADLEY & McCLOY LLP

### 1 CHASE MANHATTAN PLAZA

### NEW YORK, N.Y. 10005-1413

———

212-530-5000

FAX: 212-530-5219

DENNIS F. DUNNE
PARTNER
DIRECT DIAL NUMBER
212-530-5770

As of January 15, 2014

**LOS ANGELES**
213-892-4000
FAX: 213-629-5063

**WASHINGTON, D.C.**
202-835-7500
FAX: 202-835-7586

**LONDON**
44-20-7615-3000
FAX: 44-20-7615-3100

**FRANKFURT**
49-69-71914-3400
FAX: 49-69-71914-3500

**MUNICH**
49-89-25559-3600
FAX: 49-89-25559-3700

**BEIJING**
8610-5969-2700
FAX: 8610-5969-2707

**HONG KONG**
852-2971-4888
FAX: 852-2840-0792

**SINGAPORE**
65-6428-2400
FAX: 65-6428-2500

**TOKYO**
813-5410-2801
FAX: 813-5410-2891

**SÃO PAULO**
55-11-3927-7700
FAX: 55-11-3927-7777

Douglas A. Johns
Executive Vice President, General Counsel & Secretary
Momentive Performance Materials Inc.
180 E. Broad St. | Columbus, OH 43215 USA
260 Hudson River Road | Waterford, NY 12188-2631

Re:   Momentive Performance Materials Inc. – Fees and Expenses of Milbank, Tweed,
<u>Hadley & M<sup>c</sup>Cloy LLP as Counsel to the Momentive Second Lien Group</u>

Dear Mr. Johns:

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP ("<u>Milbank</u>") has been retained as
counsel to an *ad hoc* group of certain holders (each, a "<u>Member</u>" and collectively, the "<u>Second
Lien Group</u>") of notes issued under the Indenture, dated as of November 5, 2010 (the "<u>Notes</u>"),
to which Momentive Performance Materials Inc. (together with its wholly-owned direct and
indirect subsidiaries, the "<u>Company</u>") is a party.  Milbank has agreed to represent the Second
Lien Group in connection with any proposed restructuring of the Company or any material
subsidiary's capital structure or principal debt instruments, or sale of some or all of the
Company's assets out of the ordinary course of business (a "<u>Transaction</u>").

This letter agreement (this "<u>Agreement</u>") contains the basic terms and conditions
relating to the agreement of the Company to pay Milbank's reasonable and documented fees and
expenses in connection therewith, as described below.

1.   For the period commencing as of January 15, 2014, and through the date of any
     termination of this Agreement pursuant to paragraph 6 hereof, the Company shall pay by
     wire transfer Milbank's reasonable and documented fees and expenses incurred in
     connection with its representation of the Second Lien Group.  We hereby advise you that
     our wire transfer instructions are as follows:

                         Chase Manhattan Bank
                         1 Chase Manhattan Plaza
                         New York, N.Y. 10005
                         ABA No. 021000021
                         For Credit to Milbank
                         Account No. 9101073923

2.   Within three business days after the execution of this Agreement, the Company shall pay,
     via wire transfer, to Milbank (a) the fees on account of services already rendered to, and
     expenses incurred on behalf of, the Second Lien Group from January 15, 2014 through
     the date of execution of this Agreement by the Company, and (b) $200,000 as a retainer
     (the "Retainer"), which amount may be increased from time to time following
     consultation between Milbank and the Company.  The Company shall not deduct the
     Retainer from fees and expenses payable pursuant to paragraph 3 below.  Any portion of
     the Retainer remaining after termination and satisfaction of all of the Company's
     obligations to pay the fees and expenses of Milbank, as outlined below, will be returned
     to the Company.

3.   Milbank shall provide summary statements to the Company for services rendered to, and
     expenses incurred on behalf of, the Second Lien Group every two-weeks or as more
     frequently as Milbank determines, in its sole discretion.  Such summary statements to the
     Company will set forth the number of hours and the applicable rates for the professionals
     and the paraprofessionals during the relevant period, and provide generalized summaries
     containing a reasonable amount of detail regarding the services rendered by Milbank and
     the expenses incurred in connection with such services; provided, that under no
     circumstances shall Milbank be required to include any information in such summaries
     that is protected by the attorney-client privilege.  The Company hereby authorizes
     Milbank to debit the Retainer upon delivery of a statement to the Company.  To the
     extent that the amount of any of our statements is less than the Retainer balance, within
     three (3) business days of receipt of the statement, the Company shall pay such amounts
     necessary to bring the Retainer amount as of the billing date up to $200,000.  To the
     extent that the amount of our statement is more than the Retainer balance, within three (3)
     business days of receipt of the statement, the Company shall pay the excess amount plus
     such additional amounts necessary to bring the Retainer amount as of the billing date up
     to $200,000.  In the event that the Company or any one of its subsidiaries or affiliates
     intends to commence a chapter 11 case or other insolvency proceeding, the Company
     shall, in advance of any such filing, pay all of Milbank's outstanding fee statements.  Our
     fees for legal services are based on the time and expense which we devote to our clients'
     matters and will be based on our normal and customary hourly billing rates that we
     charge our other clients, which currently range from $925 to $1220 for Partners, $885 to
     $1085 for Counsel, $385 to $820 for Associates, and $180 to $325 for Legal Assistants.
     Our hourly rates are normally revised annually, but can also be adjusted more frequently.

2

Milbank shall notify the Company of changes in billing rates within a reasonable period of time thereafter. Milbank's statements will cover, in addition to fees for legal services, office charges and expenses in connection with the provision of legal services, such as telephone charges, duplicating, travel, document preparation and secretarial charges, messenger and courier services, expenses associated with required overtime assistance and other similar charges. Milbank's charges for these services reflect Milbank's costs, including administrative expenses. Although word processing, photocopying and other services are generally performed in Milbank's offices, in some circumstances Milbank will outsource such work to a third party vendor; in those circumstances, Milbank will bill the invoiced amount.

4.      The Members of the Second Lien Group have informed Milbank that they currently hold or manage at least 29% of the outstanding face amount of the Notes. The current Members of the Second Lien Group are listed on Annex A to this letter. Milbank will provide the Company with periodic updates of the identity of the Members of the Second Lien Group during the term of this Agreement.

5.      The Company acknowledges that nothing in this letter or the transactions contemplated hereby or any other fact relating to this Agreement (i) creates an express or implied attorney-client or agency relationship between Milbank and the Company or any of its affiliates, employees or agents, (ii) except as expressly set forth in paragraph 3 herein, otherwise imposes an obligation or duty upon Milbank in favor of the Company or any of its affiliates or agents, and (iii) constitutes a waiver of any privilege including, without limitation, the attorney-client privilege and the attorney work-product privilege that may otherwise exist. Notwithstanding the Company's obligations herein, Milbank's duties run solely to the Second Lien Group. Our client for the purpose of this engagement is the Second Lien Group, a group, rather than any individual lender. Our representation of the Second Lien Group in this matter will constitute a joint representation.

6.      This Agreement is terminable by the Second Lien Group or Milbank at any time upon written notice to the Company or by the Company at any time upon at least one business day's written notice to Milbank. If this Agreement is terminated for any reason, Milbank shall (i) deliver to the Company on or before the thirtieth day after the date of such termination a full and final statement of (the "Final Statement") of services rendered and expenses incurred on behalf of the Second Lien Group through the date of termination, and (ii) on or before the third business day after the date of the Final Statement, return the balance (if any) of the Retainer, after deducting an amount necessary to pay the fees and expenses due and owing under the Final Statement. If the Retainer is insufficient to pay the Final Statement in full, the Company shall pay the difference to Milbank by wire transfer within five (5) calendar days of the date of the Final Statement. In no event shall the Company be liable for any fees or expenses incurred after the date of termination.

7.      The Company hereby agrees to reimburse the Second Lien Group for all reasonable out-of-pocket expenses incurred, on or before the date of the termination of this Agreement, by each member of the Second Lien Group in connection with in-person meetings with the Company or any other expense pre-approved by the Company. Milbank shall include a statement of such member's expenses in connection with its summary statements to the Company (including an explanation of the nature of such expenses), and the Company

3

agrees to make payment for such expenses concurrently with the payment of Milbank's fees, charges, and expenses in accordance with paragraph 3 above.

8.    No agreement providing for any Transaction will be deemed to exist unless and until a definitive agreement has been executed and delivered, and then only in accordance with the terms thereof and under applicable law.  We agree that unless and until a definitive agreement regarding a Transaction between the Company and the Second Lien Group has been executed, the Company will not be under any legal obligation of any kind whatsoever with respect to a Transaction by virtue of this Agreement, except for the matters specifically agreed herein.

9.    The laws of the State of New York shall govern the validity, construction, enforcement, and interpretation of this Agreement, without giving effect to the principles of conflict of laws that would require or permit the application of the laws of any other jurisdiction. This Agreement (i) contains the entire agreement between the Company and Milbank regarding the matters described herein and the fees, charges, and expenses to be paid relative thereto and (ii) supersedes all prior oral or written agreements in respect thereof. This Agreement may only be amended in writing by the Company and Milbank.

10.    This Agreement may be executed on facsimile copies and in counterparts, and such counterparts and this letter shall constitute one agreement upon delivery of the executed signature pages to the parties hereto.

        If the terms of the agreement outlined in this letter meet with your approval, we would appreciate your indicating agreement on behalf of the Company by countersigning below and returning the executed signature page to us.  Kindly call us if you have any questions or comments regarding this matter.

                                Sincerely,

                                Dennis F. Dunne

Accepted and agreed:

MOMENTIVE PERFORMANCE MATERIALS INC.

By:_____
Name:  Douglas A. Johns
Title:  Executive Vice President, General Counsel



# HOULIHAN LOKEY

*__Personal and Confidential__*

As of January 27, 2014

To:       Milbank, Tweed, Hadley & McCloy LLP, in its capacity as counsel ("Counsel") to an ad hoc group of noteholders, the members of which are signatories hereto (each a "Member" and collectively the "Ad Hoc Noteholder Group" and, together with Counsel, the "Working Group") and holders of those certain Second-Priority Springing Lien Notes due 2021 issued under the Indenture, dated as of November 5, 2010, among Momentive Performance Materials Inc. (collectively with its U.S. subsidiaries, the "Company"), the holders from time to time party thereto, and The Bank of New York Mellon Trust Company, N.A., as indenture trustee and collateral agent for such holders (as amended, supplemented or otherwise modified from time to time, the "Indenture") , in care of:

Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, New York 10005-1413
Attn: Dennis F. Dunne, Partner

Dear Ladies and Gentlemen:

This letter agreement (this "Agreement") confirms the terms of the agreement among Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), Counsel, the Ad Hoc Noteholder Group and the Company, pursuant to which Counsel has engaged Houlihan Lokey, effective as of the date indicated above (the "Effective Date"), as its exclusive financial advisor to provide financial advisory and investment banking services, as further described below.

1.       **Scope of Engagement**.  Pursuant to its engagement by Counsel, Houlihan Lokey's services will consist of, if appropriate and if requested by Counsel, assisting Counsel in, and advising Counsel in connection with:

(a)     Reviewing and analyzing the financial and operating statements of the Company;

(b)     Analyzing the Company's corporate and capital structure and evaluating the assets and liabilities of the Company;

(c)     Analyzing business plans, forecasts, and related financial projections for the Company;

(d)     Evaluating significant aspects of the Company's near- and medium-term cash flow and liquidity;

(e)     Evaluating financing and capital raising alternatives available to the Company;

(f)     Assessing the financial issues relating to a restructuring, in- or out-of-court, of all, or a portion, of the Company's obligations, and other restructuring and strategic transactions

involving the Company, including, among other things, a sale of the Company, or its assets, in whole, or in part;

(g)     Developing and evaluating options and implementing strategies for a financial restructuring, in- or out-of-court, reorganization and/or other strategic alternatives for the Company, including participation in the negotiations among the Ad Hoc Noteholder Group, the Company and the Company's other creditors and parties-in-interest; and

(h)     Such other financial advisory and investment banking services as may be agreed upon by Houlihan Lokey and Counsel.

As used herein, the term "Transaction" means the consummation of any of the following, whether through one transaction or a series of transactions:

(i)     Any merger, consolidation, reorganization, recapitalization, business combination or other transaction pursuant to which all or substantially all of the Company is acquired by, or combined with, any person, group of persons, partnership, corporation or other entity (including, without limitation, existing creditors, employees, affiliates, and/or shareholders of the Company) (collectively, a "Purchaser"), including through a sale pursuant to section 363 of Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code");

(ii)    The acquisition, directly or indirectly, by a Purchaser (or by one or more persons acting together with a Purchaser pursuant to a written agreement or otherwise) in a single transaction or a series of transactions, of (x) all or substantially all of the assets or operations of the Company; or (y) all or substantially all of the outstanding or newly-issued shares or units of equity securities of the Company (or any securities convertible into, or options, warrants or other rights to acquire such equity securities), including through a sale pursuant to section 363 of the Bankruptcy Code;

(iii)   Any other sale, transfer or assumption of all or substantially all of the assets or liabilities of the Company (including, without limitation, any consolidation or merger involving the Company), including through a sale pursuant to section 363 of the Bankruptcy Code;

(iv)    The issuance, whether public or private, of debt and/or equity securities of the Company (including through a rights offering) or such other financing of any type (other than debtor-in-possession financing);

(v)     An out-of-court restructuring or recapitalization (including, without limitation, a "pre-packaged" or "pre-arranged" plan of reorganization or liquidation under the Bankruptcy Code (as defined below)), through a tender offer, exchange offer, refinancing, consent solicitation or other process to which the majority in dollar amount of the members of the Ad Hoc Noteholder Group have agreed or consented;

(vi)    The confirmation of any other Chapter 11 plan of reorganization of the Company; or

(vii)   The reinstatement, credit enhancement, satisfaction or repayment of the obligations under the Indenture in conjunction with any other transaction involving the Company.

2.     **Fees.**  In consideration of Houlihan Lokey's acceptance of this engagement, the Company shall pay the following:

(i) *Monthly Fees*: In addition to the other fees provided for herein, upon the execution of this Agreement, and on the 27th day of each month after the Effective Date commencing with February 27, 2014 during the term of this Agreement, the Company shall pay Houlihan Lokey in advance, upon receipt of an invoice, a nonrefundable cash fee of $150,000 ("Monthly Fee") for a minimum of three (3) months from the Effective Date (collectively, the "Minimum Monthly Fees"). Each Monthly Fee shall be earned upon Houlihan Lokey's receipt thereof in consideration of Houlihan Lokey accepting this engagement and performing services as described herein. If this Agreement is terminated before the end of three (3) months from the Effective Date, the Company hereby agrees to pay to Houlihan Lokey, on the effective date of such termination, the unpaid amount of the Minimum Monthly Fees.

Fifty percent (50%) of all Monthly Fees after the sixth Monthly Fee previously paid on a timely basis to Houlihan Lokey shall be credited against a subsequent Deferred Fee (as defined below), if any, to which Houlihan Lokey becomes entitled hereunder (it being understood and agreed that no Monthly Fee shall be credited more than once), except that, in no event, shall such Deferred Fee be reduced below zero.

(ii) *Deferred Fee*: In addition to the other fees provided for herein, the Company shall pay Houlihan Lokey a fee (the "Deferred Fee") equal to the sum of (A) $3,250,000 in cash; plus (B) in the case of a chapter 11 plan of reorganization which is confirmed no later than six (6) months after the chapter 11 petition date, $500,000 in cash. The Deferred Fee shall be earned and payable upon the consummation of a Transaction. The Deferred Fee shall be subject to the crediting of the Monthly Fee as set forth herein.

(iii)*Financing Fee*:  In addition to the other fees provided for herein, if Houlihan Lokey assists in the raising or structuring of debtor-in-possession financing provided by members of the Ad Hoc Noteholder Group in connection with its engagement which is accepted by the Company, the Company shall pay Houlihan Lokey a fee of one-percent (1%) of the capital committed, in cash subject to a maximum fee of $1,500,000 ("Financing Fee").

The Company has the obligation to pay the fees and expenses provided for in this Agreement. Counsel shall have no obligation to pay any or all of the fees and expenses provided for in this Agreement or any other amount in connection with this Agreement.

3.     **Bankruptcy Court Approval.**  In the event that the Company is, or becomes, a debtor under the Bankruptcy Code, whether voluntarily or involuntarily, the Company shall seek the authorization of the Bankruptcy Court (the "Bankruptcy Court") having jurisdiction of the bankruptcy case involving the Company (the "Bankruptcy Case") for the Company to fulfill its obligations under this Agreement in a manner mutually agreeable to Counsel, the Company and Houlihan Lokey; provided, however, that the form of documentation submitted to the Bankruptcy Court by the Company in seeking such authorization shall be reasonably acceptable to Counsel and Houlihan Lokey.

To the extent that, at any time during the Bankruptcy Case, the Bankruptcy Court reviews any of the terms of this Agreement, such review shall be subject to the standard of review of Section 328(a) of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and applicable local rules and orders, and not subject to any other standard of review under Section 330 of the Bankruptcy Code.

In agreeing to the provisions of this Section, each of the Working Group and the Company acknowledges that it believes that Houlihan Lokey's general restructuring experience and expertise, its knowledge of the capital markets and its merger and acquisition capabilities will inure to the benefit of

the Working Group in pursuing any Transaction, that the value to the Working Group of Houlihan Lokey's services derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the contingent Deferred Fee(s) is reasonable, regardless of the number of hours to be expended by Houlihan Lokey's professionals in the performance of the services to be provided hereunder. The Company shall seek the foregoing authorization from the Bankruptcy Court as soon as reasonably practicable following the Company's filing of a voluntary Chapter 11 case, or the entry of an order for relief in any involuntary case filed against the Company. The request for such authorization, and the proposed order to be submitted in connection therewith, shall be provided to Houlihan Lokey as much in advance of their submission to the Bankruptcy Court as is reasonably practicable, and must be acceptable to Houlihan Lokey and Counsel in their reasonable discretion. Following entry of the order granting the authorization described above, the Company shall pay all then accrued and all future fees and expenses due pursuant to this Agreement, as approved by the Bankruptcy Court, as promptly as reasonably practicable in accordance with the terms of this Agreement and the order of the Bankruptcy Court.

Houlihan Lokey shall have no obligation to provide services under this Agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless the foregoing authorization is granted by final order of the Bankruptcy Court that is no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which is reasonably acceptable to Houlihan Lokey in all respects. If such an order is not obtained, or is later reversed or set aside for any reason, Houlihan Lokey may terminate this Agreement, and the Company shall reimburse Houlihan Lokey for all fees and expenses reasonably incurred prior to the date of expiration or termination, subject to any requirements imposed by the Bankruptcy Court. Prior to the commencement of the Bankruptcy Case, the Company shall pay all amounts due and payable to Houlihan Lokey in cash.

Upon the commencement of the Bankruptcy Case, Houlihan Lokey's obligations to provide services under this Agreement may, at Houlihan Lokey's exclusive option, cease until such time as the authorization described in the immediately preceding paragraph has been granted by the Bankruptcy Court.

4.      **Term and Termination**. This Agreement may be terminated at any time by Houlihan Lokey or Counsel upon thirty days prior written notice to the other party. The expiration or termination of this Agreement shall not affect (i) any provision of this Agreement other than Sections 1 and 2 and (ii) Houlihan Lokey's right to receive, and the Company's obligation to pay, any and all fees, expenses and other amounts due, whether or not any Transaction shall be consummated prior to or subsequent to the effective date of expiration or termination, as more fully set forth in this Agreement.

In addition, notwithstanding the expiration or termination of this Agreement (other than a termination of this Agreement by Houlihan Lokey), Houlihan Lokey shall be entitled to full payment by the Company of the Deferred Fee described in this Agreement: (i) so long as a Transaction is consummated during the term of this Agreement, or within 12 months after the date of expiration or termination of this Agreement ("Tail Period"), and/or (ii) if an agreement in principle to consummate a Transaction is executed by the Company during the term of this Agreement, or within the Tail Period, and such Transaction is consummated at any time following such execution with the counterparty named in such agreement, or with any affiliate or employee of, or investor in, such counterparty, or any affiliate of any of the foregoing.

5.      **Reasonableness of Fees.** The parties acknowledge that a substantial professional commitment of time and effort will be required of Houlihan Lokey and its professionals hereunder, and that such commitment may foreclose other opportunities for Houlihan Lokey. Moreover, the actual time and commitment required for the engagement may vary substantially, creating "peak load" issues for Houlihan Lokey. Given the numerous issues which may arise in engagements such as this, Houlihan

Lokey's commitment to the variable level of time and effort necessary to address such issues, the expertise and capabilities of Houlihan Lokey that will be required in this engagement, and the market rate for Houlihan Lokey's services of this nature, whether in-court or out-of-court, the parties agree that the fee arrangement provided for herein is reasonable, fairly compensates Houlihan Lokey, and provides the requisite certainty to the Company and the Working Group.

6.       **Expenses.** In addition to all of the other fees and expenses described in this Agreement and regardless of whether any Transaction is consummated, the Company shall, upon Houlihan Lokey's request, reimburse Houlihan Lokey for its reasonable out-of-pocket expenses incurred from time to time in connection with its services hereunder (excluding any in-house counsel fees). Houlihan Lokey bills its clients for its reasonable out-of-pocket expenses including, but not limited to (i) travel-related and certain other expenses, without regard to volume-based or similar credits or rebates Houlihan Lokey may receive from, or fixed fee arrangements made with, travel agents, airlines or other vendors; and (ii) research, database and similar information charges paid to third party vendors, and postage, telecommunication and duplicating expenses, to perform client-related services that are not capable of being identified with, or charged to, a particular client or engagement in a reasonably practicable manner, based upon a uniformly applied monthly assessment or percentage of the fees due to Houlihan Lokey, such research, database and similar charges not to exceed $5,000 without the Company's prior written consent, which consent shall not be unreasonably withheld.

Houlihan Lokey shall, in addition, be reimbursed by the Company for the fees and expenses of Houlihan Lokey's outside legal counsel incurred in connection with (i) the negotiation and performance of this Agreement and the matters contemplated hereby, but in no event greater than $20,000 without the Company's prior approval, which approval shall not be unreasonably withheld (provided that such limitation shall not affect the Company's obligations to otherwise pay any such legal fees and other expenses under this Agreement) and (ii) the payment of all fees and expenses due to Houlihan Lokey hereunder, including, without limitation, in connection with any fee dispute.

7.       **Invoicing and Payment.** All amounts payable to Houlihan Lokey shall, unless otherwise expressly permitted herein, be made in lawful money of the United States, and shall be made in accordance with the payment instructions set forth on the invoice provided with this Agreement, or to such accounts as Houlihan Lokey shall direct, and the Company shall provide contemporaneous written notice of each such payment to Houlihan Lokey.

8.       **Information.** The Company will provide Houlihan Lokey with access to management and other representatives of the Company and other participants in the Transaction, as reasonably requested by Houlihan Lokey. The Company will furnish Houlihan Lokey with such information as Houlihan Lokey may reasonably request for the purpose of carrying out its engagement hereunder, all of which will be, to the Company's best knowledge, accurate and complete at the time furnished. The Company further represents and warrants that any financial projections delivered to Houlihan Lokey have been or will be reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of the future financial results and condition of the Company. The Company will promptly notify Houlihan Lokey in writing of any material inaccuracy or misstatement in, or material omission from, any information previously delivered to, or discussed with, Houlihan Lokey, or any materials provided to any interested party. Houlihan Lokey shall rely, without independent verification, on the accuracy and completeness of all information that is publicly available and of all information furnished by or on behalf of the Company or any other potential party to any Transaction or otherwise reviewed by, or discussed with, Houlihan Lokey. The Working Group understands and agrees that Houlihan Lokey will not be responsible for the accuracy or completeness of such information, and shall not be liable for any inaccuracies or omissions therein. The Working Group acknowledges that Houlihan Lokey has no obligation to conduct any appraisal of any assets or liabilities of the Company or any other party or to evaluate the solvency of any party under any applicable laws relating to bankruptcy, insolvency or similar

matters.   The Working Group acknowledges that Houlihan Lokey's ability to render the services hereunder will depend upon the extent of cooperation that it receives from the Company and the Company's advisors. Any advice (whether written or oral) rendered by Houlihan Lokey pursuant to this Agreement is intended solely for the use of the Working Group in evaluating a Transaction, and such advice may not be relied upon by any other person or entity or used for any other purpose. Any advice rendered by, or other materials prepared by, or any communication from, Houlihan Lokey may not be disclosed, in whole or in part, to any third party, or summarized, quoted from, or otherwise referred to in any manner without the prior written consent of Houlihan Lokey.    In addition the terms of this Agreement may not otherwise be referred to without our prior written consent, except as may be reasonably necessary to obtain Bankruptcy Court authorization of the payments required herein. Notwithstanding the two immediately preceding sentences, Counsel or the Company may produce the information described therein in response to any subpoena, court order, or similar legal demand, provided that prompt written notice thereof shall be given to Houlihan Lokey so that Houlihan Lokey at its sole expense may seek a protective order or other appropriate remedy, and if Houlihan Lokey fails to obtain such remedy, Counsel or the Company, as applicable, may disclose only that information which Counsel or the Company, as applicable, reasonably believes it is legally compelled to disclose. At the direction of Counsel, certain communications and correspondence from Houlihan Lokey, and work product and analyses prepared by Houlihan Lokey in connection with this matter, will be considered in preparation for litigation relating to the restructuring of the Company and, accordingly, will be subject to the attorney-client privilege and/or the work-product doctrine.

Notwithstanding anything to the contrary contained herein, the non-disclosure agreement, dated January 31, 2014, between the Company and Houlihan Lokey (the "Confidentiality Agreement") shall remain in full force and effect, and all information provided to Houlihan Lokey in connection with its engagement hereunder shall be subject to the terms and conditions of the Confidentiality Agreement.

9.    **Limitations on Services as Advisor.**  Houlihan Lokey's services are limited to those specifically provided in this Agreement, or subsequently agreed upon in writing, by the parties hereto. Houlihan Lokey shall have no obligation or responsibility for any other services including, without limitation, any crisis management or business consulting services related to, among other things, the implementation of any operational, organizational, administrative, cash management, or similar activities. The parties understand that Houlihan Lokey is being engaged hereunder as an independent contractor to provide the services hereunder solely to Counsel, and that Houlihan Lokey is not acting as an agent or fiduciary of the Working Group, the Company or any other person or entity in connection with this engagement, and each of the Working Group and the Company agrees that it shall not make, and hereby waives, any claim based on an assertion of such an agency or fiduciary relationship. In performing its services pursuant to this Agreement, Houlihan Lokey is not assuming any responsibility for any decision by any Member or the Company on whether to pursue, endorse or support any business strategy, or to effect, or not to effect, any Transaction(s), which decision shall be made by such party in its sole discretion. Houlihan Lokey is being retained on behalf of, and will report solely to, Counsel, notwithstanding that Houlihan Lokey's fees and expenses will be paid by the Company, and that certain covenants and representations are made by the Company herein. It is understood that Houlihan Lokey is providing the services hereunder solely to, and will take direction solely from, Counsel and no other party (including, without limitation, any individual Member).

10.    **Additional Services.**  To the extent Houlihan Lokey is requested by Counsel to perform any financial advisory or investment banking services which are not within the scope of this engagement, the Company shall pay Houlihan Lokey such fees as shall be mutually agreed upon by the Working Group, Houlihan Lokey and the Company in writing, in advance, depending on the level and type of services required, and shall be in addition to the fees and expenses described hereinabove.

11.    **Post-Termination Services.**  If Houlihan Lokey is required to render services not described herein, but which relate directly or indirectly to the subject matter of this Agreement (including, but not limited to, producing documents, answering interrogatories, attending depositions, giving expert or other testimony, whether by subpoena, court process or order, or otherwise), the Company shall pay Houlihan Lokey additional fees to be mutually agreed upon for such services, plus reasonable related out-of-pocket costs and expenses, including, among other things, the reasonable legal fees and expenses of Houlihan Lokey's counsel in connection therewith.

12.    **Credit**. After the announcement or closing of any Transaction, Houlihan Lokey may, at its own expense, place announcements on its corporate website and in financial and other newspapers and periodicals (such as a customary "tombstone" advertisement, including the Company's logo or other identifying marks) describing its services in connection therewith.

13.    **Choice of Law; Jury Trial Waiver; Jurisdiction. THIS AGREEMENT SHALL BE DEEMED TO BE MADE IN NEW YORK. ALL DISPUTES ARISING OUT OF OR RELATED TO THIS AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.  EACH OF THE PARTIES (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS EQUITY HOLDERS) IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THE ENGAGEMENT OF HOULIHAN LOKEY PURSUANT TO, OR THE PERFORMANCE BY HOULIHAN LOKEY OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT.  REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN OR AMONG THE PARTIES HERETO ARISING OUT OF OR RELATED TO THIS AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) SHALL BE BROUGHT AND MAINTAINED IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, WHICH COURTS SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ADJUDICATION OF SUCH MATTERS, AND AGREES TO VENUE IN SUCH COURTS; PROVIDED THAT SUCH CONSENT AND AGREEMENT SHALL NOT BE DEEMED TO REQUIRE ANY BANKRUPTCY CASE INVOLVING THE COMPANY TO BE FILED IN SUCH COURTS, AND IF THE COMPANY BECOMES A DEBTOR UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DURING ANY SUCH CASE, ANY CLAIMS MAY ALSO BE HEARD AND DETERMINED BEFORE THE BANKRUPTCY COURT. EACH PARTY FURTHER IRREVOCABLY SUBMITS AND CONSENTS IN ADVANCE EXCLUSIVELY TO SUCH JURISDICTION AND VENUE IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURTS, AND HEREBY WAIVES IN ALL RESPECTS ANY CLAIM OR OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS.  THE COMPANY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, SUIT OR CLAIM BROUGHT IN ANY OF THE COURTS REFERRED TO ABOVE SHALL BE CONCLUSIVE AND BINDING UPON IT AND MAY BE ENFORCED IN ANY OTHER COURTS HAVING JURISDICTION OVER IT BY SUIT UPON SUCH JUDGMENT. THE COMPANY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ALL SUCH DISPUTES BY THE MAILING OF COPIES OF SUCH PROCESS TO THE COMPANY AT 260 HUDSON RIVER ROAD, WATERFORD, NEW YORK 12188.**

14.  **Indemnification and Standard of Care.**  As a material part of the consideration for the agreement of Houlihan Lokey to furnish its services under this Agreement, the Company agrees (i) to indemnify and hold harmless Houlihan Lokey and its affiliates, and their respective past, present and future directors, officers, shareholders, partners, members, employees, agents, representatives, advisors, and controlling persons (collectively, the "Indemnified Parties"), to the fullest extent lawful, from and against any and all losses, claims, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to this Agreement, Houlihan Lokey's engagement under this Agreement, any Transaction or proposed Transaction, or any actions taken or omitted to be taken by an Indemnified Party, Counsel, any Member or the Company in connection with this Agreement and (ii) to reimburse each Indemnified Party for all reasonable expenses (including, without limitation, the reasonable fees and expenses of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending, settling, compromising or otherwise becoming involved in any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person or entity (including, without limitation, any shareholder or derivative action), arising out of or relating to this Agreement, or such engagement, Transaction or actions. However, the Company shall not be liable under the foregoing indemnification provision for any loss, claim, damage or liability which is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the willful misconduct, bad faith or gross negligence of such Indemnified Party and in such case, the Company shall be entitled to recover from the applicable Indemnified Party any expenses advanced by the Company to such Indemnified Party pursuant to this Section 14 to the extent attributable to such loss, claim, damage or liability, subject to such Indemnified Party's rights of contribution.  Counsel shall have no obligation to pay any amount in connection with the foregoing indemnity and reimbursement.

If for any reason the foregoing indemnification or reimbursement is unavailable to any Indemnified Party or insufficient fully to indemnify any such party or to hold it harmless in respect of any losses, claims, damages, liabilities or expenses referred to in such indemnification or reimbursement provisions, then the Company shall contribute to the amount paid or payable by the Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received by the Ad Hoc Noteholder Group and/or the Company, on the one hand, and Houlihan Lokey, on the other hand, in connection with the matters contemplated by this Agreement. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Company shall contribute to such amount paid or payable by any Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Ad Hoc Noteholder Group and/or the Company, on the one hand, and such Indemnified Party, on the other hand, in connection therewith, as well as any other relevant equitable considerations. Notwithstanding the two immediately preceding sentences, to the extent the last sentence in the immediately preceding paragraph of this Section applies, the Company shall contribute to the amount paid or payable by the Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative fault of the Company, on the one hand, and such Indemnified Party, on the other hand, as well as any other relevant equitable considerations. Notwithstanding the foregoing, in no event shall the Indemnified Parties be required to contribute an aggregate amount in excess of the amount of fees actually received by Houlihan Lokey pursuant to this Agreement. Relative benefits received by the Ad Hoc Noteholder Group and/or the Company, on the one hand, and Houlihan Lokey, on the other hand, shall be deemed to be in the same proportion as (i) the total value paid or received or contemplated to be paid or received by the Company, and its security holders and creditors (including, without limitation, the Ad Hoc Noteholder Group), as the case may be, pursuant to the transaction(s) (whether or not consummated) contemplated by the engagement hereunder, bears to (ii) the fees received by Houlihan Lokey under this Agreement. None of Counsel, any Member or the Company may settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, suit, dispute, inquiry, investigation or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not an Indemnified Party is

an actual or potential party thereto), unless such settlement, compromise, consent or termination contains a release of the Indemnified Parties reasonably satisfactory in form and substance to Houlihan Lokey.

Neither Houlihan Lokey nor any other Indemnified Party shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to any Member or any person or entity asserting claims on behalf of or in right of any Member related to or arising out of this Agreement, Houlihan Lokey's engagement under this Agreement, any Transaction or proposed Transaction, or any actions taken or omitted to be taken by an Indemnified Party, Counsel, any Member or the Company in connection with this Agreement, except for losses, claims, damages or liabilities incurred by the Ad Hoc Noteholder Group which are finally judicially determined by a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of such Indemnified Party, and no Indemnified Party shall have any liability whatsoever to the Company, Counsel or any other person or entity.

The Company shall cause any new company that may be formed by the Company, for any purpose, to agree to all of the obligations to Houlihan Lokey in this Section in accordance with the foregoing provisions. Prior to entering into any agreement or arrangement with respect to, or effecting, any (i) merger, statutory exchange or other business combination or proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets, or (ii) significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this Agreement, the Company will notify Houlihan Lokey in writing thereof (if not previously so notified) and, if requested by Houlihan Lokey, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this Agreement, including the assumption of such obligations by another party, insurance, surety bonds, the creation of an escrow, or other credit support arrangements, in each case in an amount and upon terms and conditions satisfactory to Houlihan Lokey. The Company agrees that Houlihan Lokey would be irreparably injured by any breach of this Agreement (including, without limitation, the agreement set forth in the immediately preceding sentence), that money damages alone would not be an adequate remedy for any such breach and that, in the event of any such breach, Houlihan Lokey shall be entitled, in addition to any other remedies, to pursue injunctive relief and specific performance.

The indemnity, reimbursement, and other obligations and agreements of the Working Group and the Company set forth herein (i) shall apply to any services provided by Houlihan Lokey in connection with this engagement prior to the Effective Date and to any modifications of this Agreement, (ii) shall be in addition to any obligation or liability which such parties may otherwise have to any Indemnified Party, (iii) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of such parties or any Indemnified Party or any person controlling any of them, and (iv) shall survive the completion of the services described in, and any expiration or termination of the relationship established by, this Agreement.

15.     **Miscellaneous.**  This Agreement shall be binding upon the parties hereto and their respective successors, heirs and assigns and any successor, heir or assign of any substantial portion of such parties' respective businesses and/or assets, including any Chapter 11 or Chapter 7 trustee appointed on behalf of the Company.

Nothing in this Agreement, express or implied, is intended to confer or does confer on any person or entity, other than the parties hereto, the Indemnified Parties and each of their respective successors, heirs and assigns, any rights or remedies (directly or indirectly as a third party beneficiary or otherwise) under or by reason of this Agreement or as a result of the services to be rendered by Houlihan Lokey hereunder.

This Agreement is the complete and exclusive statement of the entire understanding of the parties regarding the subject matter hereof, and supersedes all previous agreements or understandings regarding the same, whether written or oral, other than the Confidentiality Agreement. This Agreement may not be amended, and no portion hereof may be waived, except in a writing duly executed by the parties hereto.

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect pursuant to the terms hereof.

To help the United States government fight the funding of terrorism and money laundering activities, the federal law of the United States requires all financial institutions to obtain, verify and record information that identifies each person with whom they do business as a condition to doing business with that person. Accordingly, each of the parties hereto will provide Houlihan Lokey upon request certain identifying information necessary to verify such party's identity, such as a government-issued identification number (e.g., a U.S. taxpayer identification number), certified articles of incorporation, a government-issued business license, partnership agreement or trust instrument.

This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which will constitute one and the same instrument. Such counterparts may be delivered by one party to the other by facsimile or other electronic transmission, and such counterparts shall be valid for all purposes.

The Company and each Member has the requisite power and authority to enter into this Agreement. Counsel has the requisite power and authority to enter into this Agreement in the capacity as counsel to the Ad Hoc Noteholder Group and with the consent and authorization of the Ad Hoc Noteholder Group. This Agreement has been duly and validly authorized by all necessary action on the part of Counsel, the Company and each Member and has been duly executed and delivered by the Company, each Member and Counsel and constitutes a legal, valid and binding agreement of each Member, the Company and Counsel, enforceable in accordance with its terms.

This Agreement has been reviewed by the signatories hereto and their counsel. There shall be no construction of any provision against Houlihan Lokey because this Agreement was drafted by Houlihan Lokey, and the parties waive any statute or rule of law to such effect.

The Company agrees that Houlihan Lokey is not responsible for ensuring that any Transaction complies with applicable law. Houlihan Lokey is not undertaking to provide any legal, regulatory, accounting, insurance, tax or other similar professional advice and the Working Group confirms that the Ad Hoc Noteholder Group is relying on its own counsel, accountants and similar advisors for such advice.

To the extent that the Company hereunder is comprised of more than one entity or company, the obligations of the Company under this Agreement are joint and several, and any consent, direction, approval, demand, notice or the like given by any one of such entities or companies shall be deemed given by all of them and, as such, shall be binding on the Company.

Each of the Company and the Working Group understands and acknowledges that Houlihan Lokey and its affiliates, including ORIX USA Corporation and its subsidiaries and affiliates (collectively, the "Houlihan Lokey Group"), engage in providing investment banking, securities trading, financing, and financial advisory services and other commercial and investment banking products and services to a wide range of institutions and individuals. In the ordinary course of business, the Houlihan Lokey Group and certain of its employees, as well as investment funds in which they may have financial interests or with which they may co-invest, may acquire, hold or sell, long or short positions, or trade or otherwise effect transactions, in debt, equity, and other securities and financial instruments (including bank loans and

other obligations) of, or investments in, one or more entities comprising the Company or any other party that may be involved in the matters contemplated by this Agreement or have other relationships with such parties. With respect to any such securities, financial instruments and/or investments, all rights in respect of such securities, financial instruments and investments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion. In addition, the Houlihan Lokey Group may in the past have had, and may currently or in the future have, financial advisory or other investment banking relationships with parties involved in the matters contemplated by this Agreement, including parties that may have interests with respect to one or more entities comprising the Company, a Transaction or other parties involved in a Transaction, from which conflicting interests or duties may arise. Although the Houlihan Lokey Group in the course of such other activities and relationships may acquire information about the Company, a Transaction or such other parties, or that otherwise may be of interest to Working Group, the Houlihan Lokey Group shall have no obligation to, and may not be contractually permitted to, disclose such information, or the fact that the Houlihan Lokey Group is in possession of such information, to the Working Group or to use such information on the Working Group's behalf.

The Working Group acknowledges that Houlihan Lokey and/or its affiliates have provided certain investment banking and financial advisory services to the Company, and the Working Group knowingly and voluntarily waives any actual or potential conflicts of interest which may result from Houlihan Lokey's and/or such affiliates' multiple roles as an advisor to the Company and an advisor to the Working Group pursuant to this Agreement.

Subject to the Confidentiality Agreement, in order to enable Houlihan Lokey to bring relevant resources to bear on its engagement hereunder from among its global affiliates, each of the Working Group and the Company agrees that Houlihan Lokey may share information obtained from the Company, the Working Group and other parties hereunder with other members of the Houlihan Lokey Group, and may perform the services contemplated hereby in conjunction with such other members.

Page 12

       If the foregoing correctly sets forth our agreement, please sign and return to us a copy of this Agreement.

Very truly yours,

**HOULIHAN LOKEY CAPITAL, INC.**

By: _____
     David Hilty
     Managing Director

Accepted and agreed to as of the Effective Date:

**MILBANK, TWEED, HADLEY & MCCLOY LLP**, solely in its capacity as counsel to, the Ad Hoc Noteholder Group

By: _____
     Dennis F. Dunne
     Partner

Acknowledged and agreed to as of the Effective Date:

**MOMENTIVE PERFROMANCE MATERIALS INC.**, on its own behalf, and on behalf of its U.S. subsidiaries

By: _____
     Craig O. Morrison
     President and CEO

Accepted and agreed to as of the Effective Date:

MEMBER OF THE AD HOC NOTEHOLDER GROUP, _____


By:     _____
           Name:
           Title:



# HOULIHAN LOKEY

**<u>Personal and Confidential</u>**

As of January 27, 2014

Momentive Performance Materials Inc.
260 Hudson River Road
Waterford, NY 12188
Attn: _____

First Monthly Fee                                                                 $150,000.00

PAYMENT DUE UPON RECEIPT

**Please Send Checks To:**
Houlihan Lokey Capital, Inc.
Accounts Receivable Department
10250 Constellation Blvd., 5th Floor
Los Angeles, California 90067

**Wire Transfer Instructions:**
Bank of America
Wire Transfer ABA #026009593
ACH ABA #121000358
fbo Houlihan Lokey Capital, Inc.
Account #1453120593
Swift Code (International Wires Only): BOFAUS3N

**<u>EXHIBIT B</u>**

**Page 1**

```
 1

 2   UNITED STATES BANKRUPTCY COURT

 3   SOUTHERN DISTRICT OF NEW YORK

 4   Case No. 12-22052(RDD)

 5   - - - - - - - - - - - - - - - - - - - -x

 6

 7   In the matter of:

 8

 9   HOSTESS BRANDS, INC., et al.

10

11              Debtors.

12

13   - - - - - - - - - -- - - - - - - - - - -x

14

15                United States Bankruptcy Court

16                300 Quarropas Street, Room 118

17                White Plains, New York

18

19                February 2, 2012

20                2:09 PM

21

22   B E F O R E:

23   HON. ROBERT D. DRAIN

24   U.S. BANKRUPTCY JUDGE

25
```

14-22503-rdd   Doc 242   Filed 05/22/14   Entered 05/22/14 12:12:53   Main Document
12-22052-rdd   Doc 405   Filed 02/06/14   Pg 62 of 67   Entered 02/24/12 11:09:51   Main Document
HOSTESS BRANDS, INC., et al.
Pg 56 of 86

Page 56

1          MR. MAYER:  Your Honor, I appreciate your saying that.

2     We did not understand your previous comments on 363(k) nor the

3     debtors' responses to eliminate the concern we would have that

4     in the event there is a plan of reorganization that the secured

5     creditors vote against that the Seventh Circuit's rule would

6     apply because of this order.  We're not saying it should or it

7     shouldn't apply.  We're just saying it shouldn't be determined

8     because of this order.  And if your view is that the reference

9     to 363(k) subsumes in it the issue of whether or not a plan can

10    be confirmed over the consent -- over the dissent of the

11    secured lenders notwithstanding their right to credit bid then

12    you're right.  This is a red herring and I don't need to argue

13    it any further.  But it is a slightly different issue.

14          THE COURT:  I don't see it.

15          MR. MAYER:  Well, I guess I should probably take what

16    I can get --

17          THE COURT:  Okay.

18          MR. MAYER:  -- and move on.

19          With respect to --

20          THE COURT:  I think you have more from what's in the

21    order than what you would otherwise have.

22          MR. MAYER:  That -- in which case I should definitely

23    move on.

24          THE COURT:  Okay.

25          MR. MAYER:  With respect to Section 552(b), Your

Page 57

1   Honor, we think the statute is clear on its face.  Equities of

2   the case means equities of the case.  I don't think any Court

3   can determine three weeks in what the equities of the case are

4   today or even will be in the future.

5         THE COURT:  But the Courts are very clear.  The

6   equities of the case doesn't mean you think they were bad

7   guys --

8         MR. MAYER:  No.  It means that --

9         THE COURT:  -- for 502(b) purposes.  It means that the

10  estate was incurring amounts that these people should be

11  paying.

12        MR. MAYER:  Realizing that this is not an issue that

13  gets resolved today, I just want the ability to raise it in the

14  future.

15        THE COURT:  Well, but what amounts are there going to

16  be other than professional fees?

17        MR. MAYER:  Your Honor, the issue is, in my view, and

18  perhaps I don't -- perhaps you're telling me that you don't, on

19  this record, want to go this way at all.  But I would like the

20  ability to preserve the argument.

21        THE COURT:  Well, then are you --

22        MR. MAYER:  552(b)

23        THE COURT:  -- willing not to be in part of the

24  carve-out --

25        MR. MAYER:  No.  Your Honor, this has nothing to do

Page 58

1   with the carve-out.

2          THE COURT:  -- and have the debtors' professionals be

3   part of the carve-out?

4          MR. MAYER:  No, no.  No.  This has nothing to do with

5   the carve-out.  If I may, Your Honor, may I finish my thought?

6          THE COURT:  Well, what are the other amounts that

7   should be charged to them?

8          MR. MAYER:  Your Honor, 552(b) -- the example given in

9   552(b) is when parties other than the secured creditors make

10  sacrifices that increases the secured creditors' collateral.

11  And that's the entire issue of this case --

12         THE COURT:  Well, what --

13         MR. MAYER:  -- because what is going to happen here is

14  that the debtors, who are owned by the secured creditors, are

15  seeking to get sacrifices out of the pension funds and the

16  unions for the purpose of increasing the value of collateral.

17         THE COURT:  But that's a sep -- that's a totally

18  separate determination.

19         MR. MAYER:  If this order does not foreclose that

20  argument, you are correct.  But one of the strings in that

21  violin if 552(b)'s equity of case language.  That's why it's

22  important.

23         THE COURT:  Well -- all right.  I'm going to overrule

24  you on that one.  It seems to me their willingness to provide

25  for a carve-out upfront as opposed to letting the professionals

14-22503-rdd   Doc 242   Filed 05/22/14   Entered 05/22/14 12:12:53   Main Document
12-22052-rdd   Doc 405   Filed 02/06/13 65 of 67 02/24/12 11:09:51   Main Document
HOSTESS BRANDS, INC., et al.
Pg 59 of 86

Page 59

1   hang on that point is sufficient under the facts of this case,

2   not under every case by any means, but the facts of this case

3   where it's a fair tradeoff.

4           MR. MAYER:  I hear your ruling, Your Honor.  I

5   respectfully disagree.

6           THE COURT:  Okay.

7           MR. MAYER:  And I think in the cases that they cited

8   are uncontested orders where this issue was never raised.  I

9   just think that's wrong as a matter of law.

10          THE COURT:  Okay.  All right.  But I want to repeat,

11  the determination about sacrifice is one of the key elements of

12  an 1113 and 1114 analysis.  It will come in there.  That'll be

13  a major focal point.  I'm sure the unions are prime for bear on

14  that issue.  But, frankly, as far as the other unsecured

15  creditors are concerned, yes, everyone is making a sacrifice in

16  that they probably will not be paid in full.  But that's not

17  what Congress had in mind in 552(b).

18          MR. MAYER:  Well, Your Honor, I would like the ability

19  to make that argument if, in fact, these assets are sold to a

20  third party or to the secured creditors at values that are

21  increased both because of the determination of the multi-

22  employer pension plans and because of the modifications to the

23  labor agreement.  I think I should have the ability to make the

24  agreement at that time.  And I don't like losing it here.

25          THE COURT:  But --

Page 78

1    The remaining provisions that the committee believed

2    were objectionable, I've concluded in the context of this

3    particular DIP proposal and case are, in fact, acceptable.  The

4    committee sought a waiver of the no marshaling or elimination

5    of the waiver of marshaling provision in the order.  However,

6    the secured debt in this case appears to be governed by a

7    comprehensive intercreditor agreement and the committee itself

8    ability to seek marshaling is a highly questionable status.  So

9    jeopardizing the arrangements that have been negotiated by

10   insisting upon such a waiver is not a worthwhile exercise.

11        And, of course, that's the only option here.  I cannot

12   impose terms on the DIP lenders although conceivably I could on

13   the pre-petition creditors.  If I found that they were

14   adequately protected, the alternative would therefore be

15   basically saying to the DIP lenders you should still make the

16   loan without these provisions given the limitation on the

17   committee's rights with respect to marshaling in the first

18   place.  Therefore, in that context, I don't think it's a fight

19   that's worth picking.

20        The committee has also objected to the waiver of

21   Section 552(b) of the Bankruptcy Code's potential exception to

22   a security interest based on the equities of the case.  I went

23   through my view of how far a Court may go under that section

24   with Mr. Mayer.  And again, I conclude, although the

25   opportunity to argue for such a limitation on pre-petition

14-22503-rdd   Doc 242   Filed 05/22/14   Entered 05/22/14 12:12:53   Main Document
12-22052-rdd   Doc 405   Filed 02/06/... Pg 67 of 67 ... 02/24/12 11:09:51   Main Document
HOSTESS BRANDS, INC., et al.
Pg 79 of 86

Page 79

1   liens is not as nebulous as the marshaling opportunity that'

2   jeopardizing the DIP arrangement over insisting that the waiver

3   be deleted is not, again, worth the fight, particularly given

4   that there is here, I believe, a reasonable carve-out on a

5   voluntary basis for the cost of running the case.  And I have a

6   case where the -- at least the existing unpaid debt is largely

7   a contingent pension debt and union debt which will be dealt

8   with, I believe, under a different standard which also takes

9   into account sacrifice of other parties through the collective

10  bargaining agreements modification process.

11          It also appears to me, particularly given the welcome

12  continuation of trade credit that the committee's concern about

13  a budget variance that might squeeze professional fees is not a

14  pressing concern.

15          The committee also has contended, particularly in

16  light of the second theme in its objection, that I shouldn't

17  approve the motion on a final basis and that the case can

18  afford having the existing interim facility of thirty-five

19  million without having access for several weeks to the

20  remaining forty million of the DIP facility.

21          It is true that based on the current projections, it

22  appears that at least well into April of 2012, the debtors

23  would not need to draw down on additional money under the DIP

24  facility.  On the other hand, while their cushion is

25  reasonable, it is not so high that a reasonable trade vendor,