**Hearing Date: May 23, 2014 at 10:00 a.m. (prevailing Eastern time)**

Dennis F. Dunne
Samuel A. Khalil
Eric K. Stodola
MILBANK, TWEED, HADLEY & McCLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
Telephone: (212) 530-5000

*Attorneys for Ad Hoc Committee*
*of Second Lien Noteholders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re                                          :    Chapter 11
                                               :
MPM Silicones, LLC, *et al.*,                  :    Case No. 14-22503 (RDD)
                                               :
                          Debtors.             :    Jointly Administered
-------------------------------------------------------x

### REPLY OF AD HOC COMMITTEE OF SECOND LIEN NOTEHOLDERS TO (I) OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION TO OBTAIN POSTPETITION FINANCING, USE CASH COLLATERAL, AND GRANT ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDERS AND (II) JOINDER OF U.S. BANK NATIONAL ASSOCIATION AS INDENTURE TRUSTEE

The Ad Hoc Committee of Second Lien Noteholders (the "Ad Hoc Committee"),[1]

by and through its undersigned counsel, files this reply to the (i) Objection of the Official

Committee of Unsecured Creditors to the Debtors' Motion to Obtain Postpetition Financing, Use

Cash Collateral, and Grant Adequate Protection to the Prepetition Secured Lenders [Docket No.

204] (the "Objection"); [2] and (ii) Joinder of U.S. Bank National Association as Indenture Trustee

in the Objection [Docket No. 205], and respectfully represents as follows:

---

[1]     The composition of the Ad Hoc Committee is set forth in Verified Statement Pursuant to Bankruptcy Rule 2019 filed on May 13, 2014 by Milbank, Tweed, Hadley & McCloy LLP [Docket No. 179].

[2]     Capitalized terms not defined herein have the definitions ascribed to such terms in the Objection or the Final Order.

## PRELIMINARY STATEMENT

1.        The issues before the Court on the DIP Financing Motion could have been very different than they, in fact, are.  The Second Lien Noteholders are owed $1.3 billion by the Debtors and are projected to be under water by not less than $991 million.  In other cases, out-of-the-money lenders, confronted with uncertain returns on their secured claims, priming of their liens, and non-consensual use of their cash collateral, have sometimes turned to scorched-earth litigation.  In such a scenario, all issues—however material or immaterial—become litigation issues, and it is the debtor, its estates, and its stakeholders that pay the price.

2.        The Second Lien Noteholders elected not to take this path.  Instead, they worked together with the Debtors to reach consensus on a restructuring plan that maximizes returns for all the Debtors' stakeholders in accordance with the absolute priority rule.  On the Petition Date, the Debtors were levered at approximately 16 times their 2013 EBITDA and faced an impending maturity on the Cash Flow Facility as well as potential defaults with respect to interest payments due on the First Lien Notes and the 1.5 Lien Notes.  As a result of these and other factors, there was a dire need to delever the Debtors' balance sheets and obtain additional funding.  After months of good-faith negotiations, the Debtors and the Second Lien Noteholders reached agreement on a global settlement, the terms of which were reflected in the RSA, the Backstop Commitment Agreement, and the DIP Credit Facilities.  This global settlement permitted the Debtors to address the foregoing concerns in the following ways.

3.        *First*, the DIP Credit Facilities made $570 million available to the Debtors to fund their reorganization efforts and eventual exit from bankruptcy.  Importantly, (i) the DIP ABL Lenders agreed to convert the DIP ABL Facility into a $270 million asset-based revolving exit facility; and (ii) the DIP Arrangers committed to provide a new $1 billion exit term loan facility, in each case subject to certain closing conditions.  The exit facilities, which must close

within six months, are key to the Debtors' ultimate reorganization because their proceeds, along with an incremental facility, will allow the Debtors to repay the amounts outstanding under the DIP Credit Facilities, the Cash Flow Facility, and (under certain circumstances) the First Lien Notes and 1.5 Lien Notes, as well as provide working capital upon emergence.

4.       *Second*, the RSA ensured that the Debtors' stay in chapter 11 would be short (consistent with agreed-upon milestones) and their exit complication-free.  The RSA provides that the Debtors will propose, and Apollo and the members of the Ad Hoc Committee will vote in favor of, a plan of reorganization that incorporates the terms set forth in the RSA. The Debtors filed a plan of reorganization (the "Plan") on May 10, 2014.  The Plan provides for payment in full in cash of all general unsecured claims, except for those claims held by the Second Lien Noteholders, on account of their sizable deficiency claims, and by the holders of the entirely out-of-the-money Subordinated Notes and PIK Notes.  Further, the Plan contemplates the assumption of the Debtors' pension plans and collective bargaining agreements.

5.       *Finally*, all of the foregoing was made possible by the fact that Apollo and the members of the Ad Hoc Committee committed to backstop an up to $600 million rights offering, pursuant to the Backstop Commitment Agreement filed on May 9, 2014.  Without both the RSA and the Backstop Commitment Agreement, there would be no DIP Credit Facilities or exit facilities (at least not on such favorable terms) and no clear path to emergence for the Debtors.

6.       The Second Lien Noteholders' willingness to work together with the Debtors and their creditors did not end on the Petition Date.  Under the Interim Order, for example, the Second Lien Noteholders made available to the Debtors—well before the Committee's formation— a generous $3 million Carve-Out to cushion the Debtors' estates and stakeholders against the consequences of a DIP Credit Facilities default.  At the first day hearing,

the Second Lien Noteholders took further steps to keep the Debtors' business up and running by consenting to the payment of more than $31 million to trade creditors in connection with critical vendor and foreign creditor motions—effectively gifting yet another portion of their secured recovery for the benefit of the Debtors' unsecured creditors.

7.    Even where the Second Lien Noteholders have been granted the protections they requested, they have been willing to leave behind value for the Debtors' other stakeholders. The Final Order, for example, grants the Second Lien Noteholders a lien on Unencumbered Property, but this grant is qualified by (i) material carveouts with respect to 35% of the stock of the Debtors' foreign subsidiaries and certain notes issued by the Debtors' Japanese affiliates; and (ii) a requirement that the proceeds of Avoidance Actions only be used to satisfy the Second Lien Noteholders' secured claims if no other property is available for this purpose.

8.    The Second Lien Noteholders have approached the terms of the Final Order in the same spirit. The protections afforded to the Second Lien Noteholders under the Final Order are, from their perspective, an integral and indispensable component of the "global settlement" with the Debtors. However, these protections have not been the product of a one-sided process and have reflected, in all cases, the exercise of the Debtors' sound business judgment in the course of reaching the requisite consensus.

9.    Indeed, despite the Committee's assertions to the contrary and as the blackline of the Final Order filed by the Debtors on May 15, 2014 shows, the Second Lien Noteholders have already acceded to a number of the Committee's demands, such as: (i) increases in the Committee's (A) investigation period from 60 days after entry of the Final Order to the earlier of (x) the date of the confirmation hearing or (y) 90 days after entry of the Final Order and (B) investigation budget from $50,000 to $250,000; (ii) relinquishment by the

Second Lien Noteholders of liens on Avoidance Actions (but not the proceeds thereof);

(iii) agreement by the Second Lien Noteholders to marshal their liens as to the proceeds of

successful Avoidance Actions; and (iv) agreement by the Second Lien Noteholders that adequate

protection payments may be recharacterized as principal payments in the event that diminution in

the value of their collateral cannot be established.

10.     The Committee acknowledges that the Debtors have a legitimate need to

obtain postpetition financing and has not objected to the business terms of the DIP Credit

Facilities.  (Objection ¶ 2.)  Nevertheless, the Committee has filed the Objection, which appears

specifically designed to (i) frustrate the legitimate expectations of the very parties that have made

both the DIP Credit Facilities and the Plan possible by challenging numerous customary

provisions in the Second Lien Noteholders' adequate protection package; and (ii) impede

progress towards a quick emergence by insisting that a lengthy investigation period and a larger-

than-customary investigation budget are necessary to answer questions that successful

confirmation of the Plan will render moot.

11.     The Objection challenges the "advantages" allegedly conferred on the

Second Lien Noteholders by the Final Order, but it is silent as to three critical issues.  (Objection

¶ 3.)  *First*, it fails to acknowledge the significant benefits, summarized *supra* ¶¶ 3-8, conferred

on the Debtors and their creditors by the Second Lien Noteholders, both in connection with the

Debtors' chapter 11 cases generally and with respect to the DIP Credit Facilities.  Just as

importantly, the Committee fails to note that the acceptance of these benefits, in exchange for the

protections afforded to the Second Lien Noteholders under the Final Order, reflected the sound

exercise of business judgment by the Debtors, for which the Committee cannot belatedly and

inappropriately substitute its own business judgment.

12.    *Second*, the Objection fails to acknowledge that all of the foregoing benefits were only made available to the Debtors as part of a "package deal" that included, as a necessary precondition, approval by the Court of the DIP Credit Facilities on terms that were acceptable to the Second Lien Noteholders in every material respect.  The Second Lien Noteholders would not have agreed to invest $600 million in the Debtors or provided any of the other financial accommodations they have furnished without all of the protections afforded to them in the Final Order.  The Debtors recognized the need for such protections and exercised their business judgment to grant them to the Second Lien Noteholders in the Final Order, the Second Lien Noteholders accepted the proffered protections as commensurate with their secured status and contribution to the Debtors' reorganization efforts, and the Committee should not now be permitted to undo this bargain.

13.    *Finally*, the Objection fails to disclose, clearly and unambiguously, on whose behalf it is filed.  The Second Lien Noteholders that are signatories to the RSA, which collectively hold the largest unsecured claim against the Debtors, have committed to support the Plan.  The holders of other general unsecured claims (other than the out-of-the-money Subordinated Noteholders and the holders of the PIK Notes) will be paid in full upon consummation of the Plan.  On whose behalf, then, does the Committee speak in the Objection? In light of the Objection's tone and misdirected tenacity, the answer appears to be that it speaks solely on behalf of the Subordinated Noteholders, who now hold three of the seven seats on the Committee and who can only hope to recover anything on their out-of-the-money subordinated claims if they can derail the Plan in favor of some alternative that has yet to be identified.  Thus, no further concession, short of wholesale abandonment of the consensual restructuring transaction reflected in the Plan, would prove sufficient to satisfy the Subordinated Noteholders.

14.     The Court should give short shrift to the Objection to the extent that it is designed to advance the parochial interests of one set of unsecured creditors—*i.e.*, the Subordinated Noteholders—at the expense of other unsecured creditors, including the Second Lien Noteholders.  The Ad Hoc Committee respectfully submits that the provisions of the Final Order are more than appropriate under the circumstances, and should be approved.  The Court should defer to the Debtors' business judgment in endorsing the protections afforded to the Second Lien Noteholders in the Final Order and overrule the Objection in its entirety.

## REPLY

15.     The Committee argues that the Final Order has been crafted to provide Apollo and the Second Lien Noteholders with inappropriate "advantages" and "to foster a creeping incrementalism that tilts the tables in favor of Apollo and the Second Lien Noteholders . . . potentially against the interests of general unsecured creditors."  (Objection ¶¶ 3, 19.)  The Committee is wrong.  No tables are "tilted," and the only "advantages" conferred by the Final Order are bestowed on the Debtors and their creditors.  The provisions of the Final Order, for the reasons set forth below, are reasonable, strike an appropriate balance between the need to adequately protect the Second Lien Noteholders' interests and the Debtors' rights, and are consistent with the Bankruptcy Code and generally accepted practice.

**A.    Second Lien Noteholders Are Entitled to Adequate
        Protection and Other Rights Granted in Final Order**

**1.    Second Lien Noteholders Need Not, as Matter of Law,
        Be Oversecured to Be Entitled to Adequate Protection**

16.     The Committee contends, as a threshold matter, that the Second Lien Noteholders are not entitled to the full adequate protection package granted to them in the Final Order because they are undersecured, rather than oversecured, creditors.   (Objection ¶ 44.)   The Committee is wrong as a matter of law for the following reasons:

- The Supreme Court has conclusively determined that the right to receive adequate protection, including periodic cash payments, against the risk of diminution in value of a secured creditor's interest in its collateral exists even—and possibly especially—if the creditor is undersecured.  *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988) ("Thus, it is agreed that if the [collateral] had been declining in value [a creditor rendered undersecured by such decline] would have been entitled, under § 362(d)(1), to cash payments or additional security in the amount of the decline, as § 361 describes."); *Bank of New York v. Epic Resorts-Palm Springs Marquis Villas, LLC (In re Epic Capital Corp.)*, 290 B.R. 514, 526 (Bankr. D. Del. 2003) ("[T]he Supreme Court has held that an undersecured creditor whose collateral is decreasing in value is entitled to adequate protection payments.").

- Whether a prepetition secured creditor is or remains oversecured  postpetition is wholly irrelevant to the adequate protection determination.  The Committee improperly attempts to conflate two concepts:  the statutory absolute entitlement of a secured creditor (whether undersecured or oversecured) to adequate protection of its security interest pursuant to section 361 of the Bankruptcy Code; and the entitlement of an oversecured creditor, as determined at confirmation, to post-petition interest and fees under section 506(b).

17.    Thus, the Second Lien Noteholders are entitled to the benefits of the full adequate protection package and all other rights granted to them by the Final Order, including payment of professional fees, without regard to whether the Second Lien Noteholders are currently over- or undersecured.

### 2.    Second Lien Noteholders Cannot Be Deemed to Have Waived Adequate Protection Granted in Final Order

18.    The Committee contends that, even if the Second Lien Noteholders were otherwise entitled to adequate protection, they would still not be entitled to the adequate protection granted to them in the Final Order because, pursuant to the terms of the Second Lien Intercreditor Agreement, they have waived their right to any form of adequate protection other than subordinated replacement liens on additional collateral pledged to senior Prepetition Secured Parties.  (Objection ¶ 16.)  The Committee is wrong for the following reasons:

- As a threshold matter, both the Debtors and the other Prepetition Secured Parties—*i.e.,* all of the *actual* signatories of the Second Lien Intercreditor Agreement—have elected not to enforce the alleged waiver, and have, in fact,

- 8 -

consented to the relevant adequate protection package.  The adequate protection provisions of the Second Lien Intercreditor Agreement exist for the sole benefit of its signatories; if these parties are not insisting on compliance with the terms of the alleged waiver, it cannot and should not be enforced.

- The Committee, not having been a signatory to the Second Lien Intercreditor Agreement, lacks standing to enforce any of its provisions or claim any benefits thereunder.  *See, e.g.*, *Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery, LP)*, 171 F.3d 249, 257-58 (4th Cir. 1999) (only signatories to intercreditor agreement have standing to enforce it or benefit from its provisions); *Robinson v. Howard Bank (In re Kors, Inc.)*, 819 F.2d 19, 24 (2d Cir. 1987) ("[S]ubordination agreements will be enforced only between those parties entitled to priority who enter such an agreement."); *ITS Fin., LLC v. Advent Fin. Servs., LLC*, 823 F. Supp. 2d 758, 771 n.14 (S.D. Ohio 2011) ("Where debtors . . . attempt to enforce subordination agreements, courts have held that they lack standing to enforce the agreements.").  It would verge on perverse to permit the Committee, an outsider to the transaction in every respect, to override the considered business judgment of both the Debtors and the secured creditors for whose benefit the alleged waiver was obtained by imposing the Committee's overbroad reading of the relevant indenture provision on the Second Lien Noteholders.

- Finally, the Committee materially overstates the scope of the alleged waiver of adequate protection.  Section 6.1 only bars the Second Lien Noteholders from "requesting" adequate protection; it does not, in any way, prohibit them from "receiving" adequate protection if the Debtors, in the exercise of their business judgment, elect to furnish them with adequate protection in a form other than "additional collateral."  *See N.Y. Life Ins. Co. v. Revco D.S., Inc., (In re Revco D.S., Inc.)*, 901 F.2d 1359, 1365 (6th Cir. 1990) (even where creditor was not entitled to adequate protection payments, if the debtor determined, "as an exercise of its business judgment," to make such payments, and the court approved, such payments were permissible).  This is the business judgment that the Debtors made here—in the absence of any material "additional collateral" to grant to any of the Prepetition Secured Parties, the Debtors offered and the Second Lien Noteholders accepted the other forms of adequate protection reflected in the Final Order.  Nothing in the Second Lien Intercreditor Agreement prohibited either the Debtors or the Second Lien Noteholders from doing so.[3]

---

[3]   The Section 6.1 bar is also limited to circumstances where adequate protection is requested in connection with the "use of cash collateral" under section 363 or any "DIP Financing" under section 364 of the Bankruptcy Code.  (*Id.* § 6.1.)  However, section 361 also authorizes adequate protection to compensate a secured creditor on account of the imposition of the automatic stay under section 362 of the Bankruptcy Code.  Moreover, Section 6.1 is made expressly subject to Section 6.3, which clearly anticipates that (i) the Second Lien Noteholders may both request and receive adequate protection, (ii) acknowledges that the adequate protection granted may take the form of "additional collateral," but (iii) does not rule out the possibility that such adequate protection may take a "form" other than "additional collateral."  Thus, even if the Second Lien Noteholders could have been deemed to have waived adequate protection in connection with the DIP Financing and Cash Collateral usage, they would still be entitled to adequate protection to protect them against any diminution in the value of their collateral attributable to the automatic stay's continued operation.

3.     **Adequate Protection Package Is Appropriate Under Section 361 of Bankruptcy Code and As Exercise of Debtors' Business Judgment**

19.     The Committee further asserts that, even if the Second Lien Noteholders had not waived their right to adequate protection, the forms of adequate protection granted to them in the Final Order are not appropriate forms of adequate protection under section 361 of the Bankruptcy Code or in the best interests of the Debtors and their estates.  (Objection ¶¶ 35-45.) Again, the Committee is wrong for the following reasons:

- The Committee's argument that the adequate protection proposed in the Final Order is not permissible under section 361 of the Bankruptcy Code ignores the well-established principle that the list of acceptable forms of adequate protection in section 361—which includes "periodic cash payments" and "replacement liens"—is not exhaustive and that courts must decide on a case-by-case basis what form of adequate protection may be appropriate in any given circumstances.  *See, e.g, Resolution Trust Corp. v. Swedeland Dev. Grp. (In re Swedeland Dev. Grp.)*, 16 F.3d 552, 564 (3d Cir. 1994) (determination of whether there is adequate protection is made on a case-by-case basis); *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir. 1987) ("[T]he courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis").  It also ignores the language of the statute itself, which allows courts, in addition to granting adequate protection in one of the forms listed therein, to grant "such other relief . . . as will result in the realization by [the secured creditor] of the indubitable equivalent of [its] interest" in its collateral.  11 U.S.C. § 361(3).  Accordingly, all of the forms of adequate protection proposed in the Final Order are entirely permissible and have been routinely granted as adequate protection in other chapter 11 cases.

- The forms of adequate protection proposed in the Final Order also reflect an appropriate exercise of the Debtors' business judgment.  While the Ad Hoc Committee recognizes that the Second Lien Noteholders have no intrinsic entitlement to any particular form of adequate protection, it is, without doubt, within the Debtors'—rather than the Committee's—business judgment to determine what form adequate protection should take in each case.  *See, e.g., Revco*, 901 F.2d at 1365 (even if undersecured creditor is not entitled to adequate protection payments, if the debtor determined, "as an exercise of its business judgment," to make such payments, and the court approved, such payments were permissible); *Aurelius Capital Master, Ltd. v. TOUSA, Inc.*, 2009 WL 6453077, at *16 (S.D. Fla. Feb. 6, 2009) (acknowledging that there is "significant case law" to support the use of the debtor's business judgment in approving an adequate protection package negotiated between debtor and secured creditor); *In re APF*

*Grp., Inc.*, No. 09-23696 (RDD) (Bankr. S.D.N.Y. Mar. 17, 2013) (approving DIP Order as reflecting debtor's "exercise of prudent business judgment"); *In re Spa Chakra, Inc.*, 2010 WL 4916564, at *3 (Bankr. S.D.N.Y. Jan. 26, 2010) (same).

20.     Under the unique circumstances of these cases, where the Debtors are in need of hundreds of millions of dollars to restructure their debt, there is little unencumbered "additional collateral," and the Ad Hoc Committee has agreed to backstop a $600 million rights offering to fund a chapter 11 plan that satisfies in full all non-subordinated unsecured creditors, the Debtors had few choices but to provide the Second Lien Noteholders with the adequate protection package set forth in the Final Order.  The Debtors recognized that access to the DIP Credit Facilities required the provision of adequate protection to the Second Lien Noteholders, evaluated the available options, and ultimately exercised their business judgment to grant the requisite protection in the form reflected in the Final Order.  The Committee has not offered any justification as to why the Court should trust the Committee's business judgment more than that of the Debtors.  It should not.

**B.      All Elements of Second Lien Noteholders' Adequate Protection
         Package Are Consistent with Bankruptcy Code and in Best
         Interests of Debtors and Their Estates and Creditors**

21.     In keeping with the flexibility that section 361 of the Bankruptcy Code affords debtors in dealing with their secured creditors, the Debtors properly exercised their business judgment to conclude, as set forth below, that all the elements of the Second Lien Noteholders' adequate protection package are consistent with the Bankruptcy Code and in the best interests of the Debtors, their estates, and their creditors.

**1.      Final Order Appropriately Provides for Payment
         of Professional Fees of Ad Hoc Committee**

22.     The Committee argues that, even if the Second Lien Noteholders were otherwise entitled to adequate protection, the Final Order could properly provide for the payment

of the fees and expenses of only one set of professionals for all of the Second Lien Noteholders,

and those professionals should be the professionals retained by the Second Lien Indenture

Trustee, not the Ad Hoc Committee.  (Objection ¶ 45.)  The Committee is wrong for the

following reasons:

- Section 361 of the Bankruptcy Code does not speak at all to the issue of professionals, "group," "individual," or otherwise.  *See* 11 U.S.C. § 361(1). Given section 361's silence on the issue and the well-established principle that the propriety of adequate protection must be assessed on a case-by-case basis, *see Swedeland*, 16 F.3d at 564, it was a reasonable exercise of the Debtors' business judgment to agree to the retention of two or more sets of professionals to represent the interests of the Second Lien Noteholders—including those retained by the Indenture Trustee and those retained by the Ad Hoc Committee— especially where the roles of these two sets of professionals were carefully circumscribed to avoid overlap by mandating that the Ad Hoc Committee's professionals would take the lead on chapter 11-related matters and the Indenture Trustee's professionals would address chiefly indenture-related matters.

- The Ad Hoc Committee could achieve the same result by "directing" the Second Lien Indenture Trustee to retain the Ad Hoc Committee's professionals as additional or alternative professionals on its own account.  Under the terms of the Second Lien Indenture, the Second Lien Indenture Trustee is required to follow direction with respect to enforcement matters from the "[h]olders of a majority in principal amount" of the Second Lien Notes.  (Second Lien Indenture § 15.)  The members of the Ad Hoc Committee comprise the requisite majority and, thus, could direct the Second Lien Indenture Trustee to retain Milbank, for example, as its additional counsel and seek its compensation under the terms of its own adequate protection grant, which the Committee concedes is appropriate.  If Milbank could be retained by the Second Lien Indenture Trustee to represent the interests of the Second Lien Noteholders without complaint from the Committee, the Committee should be precluded from objecting to the substantively indistinguishable retention of Milbank by the Ad Hoc Committee.

- Multiple professionals have routinely been retained and compensated by the estate to represent the interests of key creditor constituencies in other large chapter 11 cases.  *See, e.g.*, *In re Energy Future Holdings Inc.*, No. 14-10979 (CSS) (Bankr. D. Del. May 2, 2014) (professionals retained for agent/indenture trustee and ad hoc group); *In re Cengage Learning Inc.*, No. 13-44106 (ESS) (Bankr. E.D.N.Y. Aug. 20, 2013) (same); *In re Residential Capital, LLC*, No. 12-12020-MG (Bankr. S.D.N.Y. June 25, 2012) (same); *In re RDA Holding Co.*, No. 13-2223 (RDD) (Bankr. S.D.N.Y. Mar. 25, 2013) (same); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 16, 2012) (same); *In re Newpage Corp.*, No. 11-12804 (KG) (Bankr. D. Del. Oct. 6, 2011) (same).

23.     Thus, as much as the Committee strains credulity to establish that the proposed retention of professionals for the Second Lien Indenture Trustee, the Ad Hoc Committee and Apollo is in some way unusual, extraordinary, or untoward, this is simply not the case. Similar arrangements have been approved in many cases, and should also be approved here, particularly in light of the material contribution the Ad Hoc Committee and Apollo have made to the Debtors' reorganization efforts.

**2.      Final Order Appropriately Grants Second Lien Noteholders Replacement Liens on Unencumbered Assets and Avoidance Action Proceeds**

24.     Without citing any compelling legal authority, the Committee argues that the Court should not permit the Debtors to grant liens or superpriority claims on unencumbered assets, including any proceeds or property recovered in respect of any Avoidance Actions. (Objection ¶¶ 31-34.)   The Committee's argument is without merit for the following reasons:

- There is no prohibition on granting postpetition liens on previously unencumbered assets. Indeed, courts routinely authorize postpetition liens on unencumbered assets as part of adequate protection packages provided to secured creditors. *See, e.g., In re General Growth Props, Inc.,* 423 B.R. 716, 726 (S.D.N.Y. 2010) (affirming the Bankruptcy Court's approval of the debtors' grant of a lien on previously unencumbered property to DIP lenders).[4] Moreover, bankruptcy courts routinely grant superpriority administrative expense claims on unencumbered property as adequate protection. *See, e.g., In re Metro Fuel Oil Corp.,* Case No. 12-46913 (ESS) (Bankr. E.D.N.Y. Nov. 20, 2012) (approving 507(b) claims on unencumbered property as an appropriate part of an adequate protection package); *In re Global Aviation Holdings Inc.,* Case No. 12-40783 (CEC) (Bankr. E.D.N.Y. Mar. 30, 2012) (same); *In re Reader's Digest Ass'n, Inc.,* Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009) (same).

---

[4]     *In re Four Seasons Marine & Cycle, Inc.,* 263 B.R. 764, 771 (Bankr. E.D. Tex. 2001), which the Committee cites for the proposition that the granting of a replacement lien on unencumbered assets would be "fundamentally unfair," is readily distinguishable.  (Objection ¶ 32 n. 25.)  In *Four Seasons,* the court, recognizing that it had a duty to act to "rectify a debtor's misuse of cash collateral," concluded that it "would do nothing to discourage debtors-in-possession from engaging in this type of misconduct" to "punish unsecured creditors and unsuspecting administrative claimants in a liquidation case for the sins of a former debtor-in-possession through the imposition of a replacement lien or a priority administrative expense claim," and instead held that a secured creditor harmed by the misuse of cash collateral should instead look to the officers of the defunct debtor for satisfaction of its claim.  *Id.*

- Similarly, there is no prohibition on granting postpetition liens on the proceeds of avoidance actions, as they are but another species of assets that was not encumbered prepetition. Indeed, Judge Gerber expressed his "surprise" when the creditors' committee in *AppliedTheory* attempted to argue otherwise. *See In re AppliedTheory Corp.,* 2008 WL 1869770, at *1 (Bankr. S.D.N.Y. Apr. 24, 2008); *see also Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. U.S. Dept. of the Treasury (In re Motors Liquidation Co.),* 460 B.R. 603, 624 n. 101 (Bankr. S.D.N.Y. 2011). Courts have acknowledged that there is nothing "inherently wrong with permitting the proceeds of avoidance actions to be used to satisfy claims in order of priority," including the superpriority under section 507(b). *Id.* at 627.

- Liens on the proceeds of avoidance actions have been granted, where appropriate, in many cases in this District. *See, e.g., In re RDA Holding Co.,* No. 13-2223 (RDD) (Bankr. S.D.N.Y. Mar. 25, 2013) (granting replacement liens on unencumbered assets, including proceeds of and property received on account of avoidance actions); *In re The Great Atlantic & Pacific Tea Company, Inc.,* No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011) (same); *In re Hostess Brands, Inc.,* No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2012) (same); *In re Reader's Digest Ass'n Inc.,* No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2011) (same); *In re Sbarro LLC,* No. 14-10557 (MG) (Bankr. S.D.N.Y. Apr. 25, 2014) (same); *In re Patriot Coal Corp.,* No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012) (same).

25.     The only issue then is whether such a grant is appropriate under the circumstances of these cases. Here, the proposed Adequate Protection Liens are premised on the assumption that (i) the Second Lien Noteholders are undersecured by not less than approximately $991 million; (ii) there is *de minimis* "additional collateral" available to the Debtors; (iii) the Ad Hoc Committee has agreed to marshal its liens as to Avoidance Action proceeds; and (iv) the Adequate Protection Liens would attach only to the extent there is diminution in the value of the Second Lien Noteholders' collateral. Under all of these circumstances and the foregoing precedent, providing the Second Lien Noteholders with replacement liens on Unencumbered Assets, including Avoidance Actions proceeds, is an appropriate exercise of the Debtors' business judgment and consistent with applicable precedent.

**3.     Final Order Appropriately Waives Section 506(c) Rights
With Respect to Second Lien Noteholders' Collateral**

26.     Many courts in this and other districts have routinely endorsed section

506(c) waivers in final financing and cash collateral orders, using virtually the same formulation

as the Final Order.  Without citing any compelling legal authority, the Committee objects to this

relatively standard provision.  Its objection should be overruled for the following reasons:

- Section 506(c) claims are available to, and are an asset of, solely the debtor, and not any creditor or other party in interest.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("[T]he trustee is the only party empowered to invoke section 506(c)"); *see also In re Smart World Techs., LLC*, 423 F.3d 166, 181-82 (2d Cir. 2005) ("Section 506(c) . . . allows only the 'trustee,' or debtor-in-possession, to take advantage of this exception."); *Debbie Reynolds Resorts, Inc. v. Calstar Corp., Inc. (In re Debbie Reynolds Hotel & Casino, Inc.)*, 255 F.3d 1061, 1065 (9th Cir. 2001) ("Following *Hartford Underwriters*, we hold that [administrative claimant] had no standing to seek surcharge pursuant to § 506(c)."); *In re River Ctr. Holdings, LLC*, 394 B.R. 704, 717 (Bankr. S.D.N.Y. 2008) ("The Supreme Court has made clear that only the trustee has the power, under the plain language of the Code, to assert a section 506(c) claim.").

- Courts have consistently found that a section 506(c) waiver constitutes appropriate consideration for prepetition lenders' agreement to (i) remain subject to the automatic stay; (ii) be primed; (iii) allow the debtor to use their cash collateral; and (iv) subordinate their superpriority claims to the carve-out.[5]  *See e.g., In re Residential Capital, Inc.,* 501 B.R. 549, 572 (Bankr. S.D.N.Y. 2013) (waiver of rights under section 506(c) approved); *In re American Media, Inc.,* 2010 WL 5141244, at *4 (Bankr. S.D.N.Y. Dec. 6, 2010) (same); *In re Global Container Lines, Ltd.,* 2010 WL 5053965, at *5 (Bankr. E.D.N.Y. Mar. 3, 2010) (same); *In re General Growth Properties, Inc.,* 412 B.R. 122, 127 (Bankr. S.D.N.Y. 2009) (same).[6]

---

[5]     The cases on which the Committee relies to oppose the section 506(c) waiver do not supply a sufficiently compelling rationale.  In fact, the court in the only appellate level decision the Committee cites, *Hartford Fire Ins. Co. v. Norwest Bank Minnesota, N.A. (In re Lockwood Corp.)*, 223 B.R. 170, 176 n.7 (B.A.P. 8th Cir. 1998), noted that it was "constrained to follow the Eighth Circuit's expansive holding on this issue as binding precedent," but expressed its own misgivings on the question, observing that (i) "these immunizing clauses are not only common in postpetition lending agreements, they are also common in cash collateral agreements" and (ii) their excision would "not only raise[] new and significant obstacles for debtors in obtaining postpetition lending, but also [would] make[] it difficult for debtors in possession to negotiate cash collateral agreements with their prepetition lenders."

[6]     *See also In re Sbarro LLC*, No. 14-10557 (MG) (Bankr. S.D.N.Y. Apr. 25, 2014) (approving final DIP order that waived debtors' right to surcharge collateral under section 506(c)); *In re RDA Holding Co.,* No. 13-22233

27.     Thus, the Debtors appropriately elected, as an exercise of their sound business judgment, to include the section 506(c) waiver as part of the adequate protection package granted to the Second Lien Noteholders in the Final Order.

**4.     Final Order Appropriately Waives Section 552(b) and Marshaling Rights With Respect to Prepetition Secured Parties**

48.     The Committee also objects to the waivers (applicable to all Prepetition Secured Parties) as to the Debtors' rights under both section 552(b) of the Bankruptcy Code and the common law doctrine of marshaling.  (Objection ¶¶ 38-42.)

**(a)     Section 552(b) Waivers are Common and Appropriate**

49.     The Committee asserts that granting a waiver of the section 552(b) "equities of the case" exception is inappropriate because "[t]he Court cannot possibly determine the 'equities of the case' only weeks after the Petition Date, or order the elimination today of a remedy that could be based on the 'equities of the case' tomorrow."  (Objection ¶ 39.)  The Committee's argument is without merit for the following reasons:

- Other than unsubstantiated allusions to the possibility that the Plan might fail to be confirmed, the Committee fails to explain how the "equities of the case" exception might apply here.  Moreover, the Committee's logic is flawed.  To approve the waiver of the "equities of the case" exception, this Court need not determine today what the "equities of the case" will dictate tomorrow.  If this were the case, no court could ever approve a section 552(b) waiver because the very point of the waiver is that it will foreclose any such possibility in the future. Instead, what the Court must determine is whether the grant of the section 552(b) waiver is an appropriate exercise of the Debtors' business judgment in the context of these chapter 11 cases.

---

(RDD) (Bankr. S.D.N.Y. Mar. 25, 2013) (same); *In re Hostess Brands, Inc.*, No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2012) (same); *In re Patriot Coal Corp.*, No. 12-1900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012) (same); *In re Lightsquared Inc.,* No. 12-12080 (SCC) (Bankr. S.D.N.Y. July 17, 2012) (same); *In re Residential Capital LLC*, No. 12-12020-mg (Bankr. S.D.N.Y. June 25, 2012) (same); *In re Hawker Beechcraft, Inc.*, 12-11873(SMB) (Bankr. S.D.N.Y. June 4, 2012) (same); *In re United Retail Inc.*, No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 23, 2012) (same); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 16, 2012) (same); *In re The Great Atlantic & Pacific Tea Co.*, Inc., No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011) (same); *In re Lyondell Chemical Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Mar. 1, 2009) (same).

- Courts have generally held that a waiver of the "equities of the case" exception is appropriate where lenders agree to subordinate their claims to a carve-out, as the Second Lien Noteholders have done in these cases. *See In re Hostess Brands, Inc.*, No. 13-2223 (RDD) (Hr'g Tr. 58-59, Feb. 2, 2012) (secured creditors' "willingness to provide for a carve-out upfront as opposed to letting the professionals hang on that point" was a sufficient "tradeoff" to justify section 552(b) waiver); *In re Blockbuster Inc.*, 2010 WL 4873646, at *18 (Bankr. S.D.N.Y. Sept. 24, 2010) (same); *In re General Growth Props., Inc.*, 412 B.R. 122, 127 (Bankr. S.D.N.Y. 2009) (same).

- In addition, courts have adopted a narrow interpretation of the "equities of the case" exception that precludes its application where a lender's cash collateral (or postpetition financing) is required to preserve the value of the debtor's assets. *See In re Muma Servs., Inc.*, 322 B.R. 541, 558-59 (Bankr. D. Del. 2005) ("equities of the case" exception did not apply where debtor required use of lender's cash collateral plus additional postpetition financing to operate).

50.    Here, because the Debtors require the use of the Second Lien Noteholders' cash collateral, have already been permitted to use that cash collateral for the benefit of the Debtors' unsecured creditors (*e.g.*, the $31 million to be disbursed in connection with the critical vendor and foreign creditor motions), and will require additional funding from the Second Lien Noteholders (*i.e.*, by virtue of the backstop commitment) to emerge from these cases, the waiver of the "equities of the case" exception provided for in the Final Order is more than appropriate.[7]

### (b)    Marshaling Waivers Are Routinely Granted

51.    The Committee also objects to the limitations on marshaling included in the Final Order, asserting that "there is no justification whatsoever for the inclusion of the Prepetition Secured Parties or the Prepetition Collateral within the scope of the marshaling waiver." (Objection ¶ 42.)  The Committee's objection on this point should be overruled for the following reasons:

---

[7]    Consistent with this reasoning, courts in this District have approved waivers of the "equities of the case" exception as part of adequate protection packages in numerous cases. *See, e.g.*, *In re Frontier Airlines Holdings, Inc.*, Case No. 08-11298 (RDD) (Bankr. S.D.N.Y. Sept. 3, 2008) (approving waiver of section 552(b) "equities of the case" exception); *In re Lightsquared Inc.*, No. 12-12080-SCC (Bankr. S.D.N.Y. July 17, 2012) (same); *In re Hawker Beechcraft, Inc.*, 12-11873-SMB (Bankr. S.D.N.Y. June 4, 2012) (same); *In re United Retail Inc.*, No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 23, 2012) (same).

- As explained by this Court at the interim hearing, the doctrine of equitable marshaling is one that operates only for the benefit of a debtor's secured creditors: "THE COURT:  But except for one case that's been widely criticized, the doctrine applies between two secured creditors.  It doesn't – it's not for the benefit of unsecured creditors." (H'rg Tr. 111:15-18, Apr. 14, 2014.)  Thus, whether the Final Order includes limitations on the ability to marshal should not be of consequence to unsecured creditors.  (*Id.* 111:1-2.)

- Nearly every court to address this issue has concluded that "[a]n unsecured creditor has no standing to invoke the doctrine [of marshaling]."[8]  *Herkimer County Trust Co. v. Swimelar (In re Prichard)*, 170 B.R. 41, 45 (Bankr. N.D.N.Y. 1994); *accord In re Brazier Forest Prods., Inc.*, 921 F.2d 221, 223 (9th Cir. 1990) ("Under Washington law, only secured or lien creditors can petition a court to marshal a debtor's assets."); *Galey & Lord v. Arley Corp. (In re Arleco, Inc.)*, 239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999) (holding that unsecured creditor has no standing to invoke doctrine of equitable marshaling); *In re Craner*, 110 B.R. 111, 122 (Bankr. N.D.N.Y. 1989), *rev'd in part on other grounds*, 110 B.R. 124 (N.D.N.Y. 1989) ("Under the majority view, an unsecured creditor may not avail himself of the doctrine of marshaling assets as it is basically a protection for junior secured creditors.").  One court has similarly concluded that an official committee, which acts for unsecured creditors, may not invoke marshaling.  *See In re Gibson Group, Inc.*, 151 B.R. 133, 134-35 (Bankr. S.D. Ohio 1993) (denying standing to unsecured creditors' committee to seek marshaling).

- In addition, at least two courts that have considered whether section 544 of the Bankruptcy Code enables a debtor to pursue equitable marshaling have held that it does not.  *See Fed. Land Bank of Columbia v. Tidwell (In re McElwaney)*, 40 B.R. 66 (Bankr. M.D. Ga. 1984); *In re Blagg*, 372 B.R. 502 (Bankr. D. Kan. 2007).  In addition, although not specifically discussing section 544 of the Bankruptcy Code, at least one other court has held that a trustee may not seek to employ marshaling for the benefit of the debtor's estate to the detriment of a secured and perfected junior creditor.  *Canal Nat'l Bank v. Larry's Equip. Serv., Inc. (In re Larry's Equip. Serv., Inc.)*, 23 B.R. 132, 133 (Bankr. D. Me. 1982) ("Marshaling is not equitable if applied for the benefit of a trustee to the detriment of a secured and properly perfected junior creditor.").

- Notwithstanding the foregoing, the Committee relies on several poorly reasoned cases to support the proposition that the Debtors or a representative of the

---

[8]   Like this Court, the Ad Hoc Committee is aware of only one decision, *Berman v. Green (In re Jack Green's Fashions for Men Big and Tall, Inc.)*, 597 F.2d 130 (8th Cir. 1979), where marshaling has been invoked for the benefit of unsecured creditors based on "general equity principles."  *Jack Green's*, however, relies heavily on an unpublished lower court opinion and disposes of the marshaling issue in a short paragraph.  *See DuPage Lumber and House Improvement Center Co. v. Georgia-Pacific Corp.*, 34 B.R. 737, 741 (N.D. Ill. 1983).  As a consequence, the case has been widely criticized.  *See In re Mesa Continental, Inc.*, 79 B.R. 669 (Bankr. S.D. Tex. 1987); *see also* Weintraub & Resnick, *From the Bankruptcy Courts: Compelling a Senior Lienor to Pursue Remedies Against a Guarantor—A Misapplication of the Marshaling Doctrine*, 18 UCC L.J. 178 (1985).

Debtors' estates might, absent the limitations included in the Final Order, be able to pursue equitable marshaling on behalf of unsecured creditors by application of section 544 of the Bankruptcy Code.  The better answer is, as this Court has recognized, the one provided by the court in *McElwaney* – *i.e.*, that permitting a debtor (or a representative of the debtor's estate) to pursue equitable marshaling to benefit unsecured creditors is not at all the contemplated function of section 544 and would serve to frustrate the policy underlying this provision of the Bankruptcy Code.  Indeed, of the five cases cited by the Committee to support its argument, only two resulted in the court ordering equitable marshaling and it is difficult, based on the facts of those cases, to see how either would apply here.[9]

52.     A debtor must be permitted to exercise its business judgment to waive rights and entitlements to advance its current reorganization prospects even if doing so entails a waiver of hypothetical future rights in an official creditors' committee's favor.  Here, each of the Prepetition Secured Parties, as well as the Debtors themselves, have consented to the waiver of the equitable marshaling doctrine, and the Committee has provided no support for its vague and generalized assertions that such waiver will be detrimental to unsecured creditors.  The Court should overrule the Objection and approve the waiver.

C.     **Investigation Period and Budget Are Adequate**

53.     The Committee asserts that the proposed investigation period and budget are inadequate.  (Objection ¶ 48.)  The Committee requests an investigation budget of $500,000 and an investigation period ending not less than 150 days after entry of the Final Order, on the understanding that, if the Committee files a standing motion prior to the expiration of such period, its investigation deadline will be satisfied.  (*Id.* ¶ 51, 53.)  The Committee's request for additional time and funding is unwarranted for the following reasons:

- The amount of the investigation budget and length of the investigation period proposed by the Debtors are generally consistent with (or exceed) the

---

[9]     In *United States v. Houghton (In re Szwyd)*, 408 B.R. 547 (D. Mass. 2009), a chapter 13 case, a trustee successfully petitioned the court to compel the United States to look first to its tax lien on real property that was subject to the homestead exemption and, thus, otherwise unavailable to unsecured creditors.  In *Fundex Capital Corp. v. Balaber-Strauss (In re Tampa Chain Co. Inc.)*, 53 B.R. 772 (Bankr. S.D.N.Y. 1985), a chapter 7 case, a trustee successfully petitioned the court to compel a creditor to first look to shareholders of the debtor, who were guarantors of a prepetition loan, as a consequence of fraud and inequitable conduct.

investigation periods and budgets provided for by this Court.  *See In re RDA Holding Co.*, No. 13-2223 (RDD) (Bankr. S.D.N.Y. Mar. 25, 2013) (75 days from appointment of official committee for official committee to obtain standing and file adversary proceeding; budget of $100,000); *In re Hostess Brands, Inc.*, No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2012) (90 days from final order for official committee to obtain standing and file adversary proceeding; budget of $75,000); *In re the Great Atlantic & Pacific Tea Co., Inc.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011) (90 days from entry of final order for official committee to file standing motion; budget of $250,000); *In re Reader's Digest Ass'n. Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009) (90 days from appointment of official committee for official committee to obtain standing and file adversary proceeding; budget of $250,000).

- The Committee cites *In re Eastman Kodak Co.*, Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 16, 2012) to support its request for a $500,000 budget and 150-day investigation period.  *Kodak*, however, is an outlier as to both issues.  *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Mar. 1, 2009), which the Committee cites for other purposes, is the better precedent as to the appropriate investigation period and budget in these cases.  In *Lyondell*, the investigation period was 135 days *from appointment of the official committee* and the budget was $250,000.  Like the Debtors, Lyondell was a chemicals company, but its chapter 11 cases were substantially larger, involving approximately 80 debtors, at least six secured credit facilities or issues of notes, tens of billions of dollars of indebtedness, and litigation relating to a recent and complex LBO.  While the Debtors' cases are not as large and complex as Lyondell's, the Ad Hoc Committee respectfully submits that, if a $250,000 budget was sufficient to complete the *Lyondell* investigation, it is more than sufficient to complete the investigation required in the Debtors' cases.

- The Ad Hoc Committee, however, does not believe the investigation period here needs to be as long as that authorized in *Lyondell.*  This is so both because this is a far simpler case, requiring little more than a perfection analysis, and the RSA and the Backstop Commitment Agreement include milestones that may result in the termination of both agreements if a confirmation order is not entered within 120 days, and the Effective Date of the Plan does not occur within 180 days, of the Petition Date. The Committee's proposed investigation would extend beyond these milestones and force the Debtors into a default under these agreements, thereby jeopardizing the success of the Debtors' reorganization efforts.

54.    The Ad Hoc Committee submits that the amount and length of the investigation budget and period currently proposed in the Final Order are appropriate under the circumstances, particularly because, as the Committee concedes, the sole purpose of the

investigation may be to answer questions that successful confirmation of the Plan will render

moot.

## CONCLUSION

For all of the foregoing reasons, the Ad Hoc Committee respectfully requests that

the Court (i) overrule the Objection; (ii) grant the DIP Financing Motion and enter the Final

Order; and (iii) grant the Ad Hoc Committee such other and further relief as the Court deems just

and proper.

Dated: May 22, 2014

**MILBANK, TWEED, HADLEY & McCLOY LLP**

By: _/s/ Dennis F. Dunne_____
Dennis F. Dunne
Samuel A. Khalil
Eric K. Stodola
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

*Attorneys for Ad Hoc Committee*
*of Second Lien Noteholders*