STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen
Jonathan D. Canfield
Joshua M. Siegel
180 Maiden Lane
New York, New York 10038-4982
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*Counsel to Fortress Investment Group LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
                                                         :

In re:                                           :         Chapter 11

MPM Silicones, LLC, *et al.*,[1]          :         Case No. 14-22503 (RDD)

                     Debtors.         :         (Jointly Administered)

------------------------------------------------------------ x

**OBJECTION OF FORTRESS INVESTMENT GROUP LLC TO
DEBTORS' MOTION FOR ORDERS (I) AUTHORIZING THE DEBTORS
TO ASSUME THE RESTRUCTURING SUPPORT AGREEMENT AND
(II) AUTHORIZING AND APPROVING THE DEBTORS' (A) ENTRY INTO
AND PERFORMANCE UNDER THE BACKSTOP COMMITMENT
AGREEMENT, (B) PAYMENT OF RELATED FEES AND EXPENSES,
AND (C) INCURRENCE OF CERTAIN INDEMNIFICATION OBLIGATIONS**

Fortress Investment Group LLC ("Fortress"), on behalf of its and its affiliates' managed funds and/or accounts that own or hold the Debtors' 9.0% Second-Priority Springing Lien Dollar Notes due 2021 (the "USD Notes") and 9.5% Second-Priority Springing Lien Euro Dollar Notes due 2021 (the "Euro Notes" and, together with the USD Notes, the "Second Lien Notes") issued

---

[1] The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) Juniper Bond Holdings I LLC (9631); (ii) Juniper Bond Holdings II LLC (9692); (iii) Juniper Bond Holdings III LLC (9765); (iv) Juniper Bond Holdings IV LLC (9836); (v) Momentive Performance Materials China SPV Inc. (8469); (vi) Momentive Performance Materials Holdings Inc. ("Holdings") (8246); (vii) Momentive Performance Materials Inc. (8297); (viii) Momentive Performance Materials Quartz, Inc. (9929); (ix) Momentive Performance Materials South America Inc. (4895); (x) Momentive Performance Materials USA Inc. (8388); (xi) Momentive Performance Materials Worldwide Inc. (8357); and (xii) MPM Silicones, LLC (5481). The Debtors' executive headquarters are located at 260 Hudson River Road, Waterford, NY 12188.

pursuant to that certain Indenture dated as of November 5, 2010 (as amended, supplemented or modified from time to time) among Momentive Performance Materials Inc. ("MPM" and, together with the above-captioned debtors and debtors-in-possession, the "Debtors"), each of the guarantors party thereto, and the Bank of New York Mellon Trust Company, N.A., as indenture trustee and collateral agent, by and through the undersigned counsel, hereby submits this objection (the "Objection") to the *Debtors' Motion for Orders (I) Authorizing the Debtors to Assume the Restructuring Support Agreement and (II) Authorizing and Approving the Debtors' (A) Entry into and Performance under the Backstop Commitment Agreement, (B) Payment of Related Fees and Expenses, and (C) Incurrence of Certain Indemnification Obligations* [Dkt. No. 147] (the "RSA Motion").[2] In support of the Objection, Fortress respectfully represents as follows:

**PRELIMINARY STATEMENT**

1. Fortress objects to the Court's authorization and approval of the Backstop Commitment Agreement because the Debtors have not and cannot carry their burden of demonstrating that the Backstop Commitment Agreement will maximize the value of their estates and creditor recoveries and that it is in the best interests of their estates.

2. The Debtors and the Backstop Parties have intentionally and unfairly excluded other Second Lien Noteholders, including Fortress, from participating in a backstop of the Rights Offering so that the Backstop Parties can extract for themselves what amounts to a 33% "backstop fee" on the unsubscribed portion of the Rights Offering Amount. Worse, the Backstop Commitment Agreement doesn't even represent a real commitment, in the sense that if any Backstop Party fails to fulfill its commitment, the remaining Backstop Parties have the right, but

---

[2] Capitalized terms used but not defined in this Objection shall have the meanings ascribed to such terms in the RSA Motion.

-2-

not the obligation to fund the defaulting party's share, thus potentially leaving the Debtors with no underwritten Rights Offering and failing to accomplish the very goal of a backstop.

3. In addition, the Backstop Commitment Agreement isn't even necessary in these cases. The attractive economics of the Rights Offering and the significantly lower recovery that Second Lien Noteholders will receive if they fail to participate in the Rights Offering means that any Second Lien Noteholder that can participate in the Rights Offering will do so. When this fact is combined with the fact that the Backstop Parties account for approximately 85% of all Second Lien Notes and clearly will subscribe to the Rights Offering with or without the backstop fee, it is obvious that there is simply no reason for a backstop and there is certainly no reason to approve the fee in advance of confirmation when it will be known whether there actually is a Rights Offering shortfall. For its part, Fortress was willing to discuss a commitment to purchase its own *pro rata* amount of Rights Offering Shares without requiring a fee, and to underwrite the purchase of all Rights Offering Shares other than those allocated to it and the Backstop Parties for a fee of 3%, which amounted to approximately $2.2 million (as opposed to $30 million), but the Debtors haven't responded to Fortress' request to engage in a discussion of the same.

4. The Backstop Commitment Agreement also constitutes an impermissible *sub rosa* plan. The Backstop Commitment Agreement, if authorized and approved, will transfer plan currency – equity in the reorganized Debtors (in the form of the Backstop Commitment Premium) – to the Backstop Parties from other Second Lien Noteholders prior to the approval of a disclosure statement and solicitation of a plan of reorganization in express violation of the Bankruptcy Code.

5. Moreover, if the Court were to authorize and approve the Backstop Commitment Agreement in its current form (proceeding down the *sub rosa* plan path), the Court will be

-3-

sanctioning the disparate treatment of certain of the Second Lien Noteholders in violation of section 1123(a)(4) of the Bankruptcy Code, since the agreement locks in a distribution to the Backstop Parties of equity in the reorganized Debtors. This distribution of plan currency to some but not all of the Second Lien Noteholders equates to unfair discrimination under a plan of reorganization because all Second Lien Noteholders will be placed in the same class for plan confirmation purposes, and the non-Backstop Party Second Lien Noteholders will be treated differently (and Fortress will not consent to such unequal treatment).

6. In any event, even were the Court to find that a backstop of the Rights Offering were necessary, there is simply no justifiable reason for authorizing and approving the Backstop Commitment Agreement at this nascent stage of the chapter 11 cases. Instead, the Court should consider the merits of the agreement at confirmation. Thus, for the reasons provided herein, the Court should not enter an order authorizing and approving the Backstop Commitment Agreement.

## BACKGROUND

7. On April 13, 2014 (the "Petition Date"), the Debtors each commenced a chapter 11 case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to manage and operate their businesses as debtors in possessions pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8. On April 14, 2014, the Debtors filed the *Declaration of William H. Carter, Chief Financial Officer of Momentive Performance Materials, Inc. in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Affidavit") [Dkt. No. 16]. The Debtors attached as Appendix I to the First Day Affidavit the Restructuring Support Agreement, dated as of April 13, 2014, between Holdings, MPM, and each of their direct and indirect domestic subsidiaries that are party thereto, the affiliates of Apollo Global Management, LLC undersigned thereto

-4-

(collectively, the "Apollo Entities") and the holders of the Second Lien Notes that are not Apollo Entities that are from time to time party thereto (the "Consenting Noteholders" and, together with the Apollo Entities, the "Plan Support Parties") (as amended, supplemented or otherwise modified, the "RSA").

9. On May 9, 2014, the Debtors filed the RSA Motion and seek authorization to assume and perform under the RSA thereunder. The RSA is signed by 85% of holders of the Second Lien Notes (the "Second Lien Noteholders") and commits the parties thereto to a pre-negotiated plan of reorganization. *See* RSA Motion, ¶ 2. Also under the RSA Motion, the Debtors seek authorization to enter into and perform under the Backstop Commitment Agreement, dated as of May 9, 2014, among Holdings, MPM and the commitment parties thereto (as amended, supplemented or otherwise modified, the "Backstop Commitment Agreement"), which the Debtors attached as Exhibit 1 to the Backstop Commitment Agreement Proposed Order.

10. The terms of the RSA and the Backstop Commitment Agreement contemplate a rights offering (the "Rights Offering") in the amount of $600 million (the "Rights Offering Amount") in which the Debtors will offer subscription rights to all Second Lien Noteholders to purchase a percentage of New Common Stock to be issued by the reorganized Debtors (the "Rights Offering Shares") at a price per share using a *pro forma* capital structure and an enterprise value of $2.2 billion and applying a 15% discount to equity value. Under the terms of the Backstop Commitment Agreement, the Plan Support Parties are obligated to fund their *pro rata* ownership share of the Second Lien Notes, which amounts to 85% of the Rights Offering Amount in the aggregate. *See* Backstop Commitment Agreement, § 2.1(b); RSA Motion, ¶ 2. The proceeds generated by the Rights Offering will fund payments required under the *Joint*

*Chapter 11 Plan of Reorganization for Momentive Performance Materials Inc. and its Affiliated Debtors* [Dkt. No. 172] (the "Plan"), which the Debtors filed with the Court on May 12, 2014.

11.     The Debtors seek authorization to pay the Plan Support Parties, in their capacity as commitment parties under the Backstop Commitment Agreement (the "Backstop Parties"),[3] a non-refundable $30 million backstop commitment premium equal to 5% of the Rights Offering Amount (the "Backstop Commitment Premium"). In exchange, the Backstop Parties have agreed to purchase the unsubscribed Rights Offering Shares, which actually amount to only 15% of the total Rights Offering Amount (the "Unsubscribed Shares"), to the extent that all non-Backstop Party Second Lien Noteholders fail to participate in the Rights Offering – a virtual impossibility given the consequences of non- participation. *See* Backstop Commitment Agreement, § 3.1. The Debtors propose to pay the Backstop Commitment Premium in New Common Stock of the reorganized Debtors (or in cash if the Backstop Commitment Agreement is terminated as set forth therein). *See* Backstop Commitment Agreement, § 3.2. In addition, the Debtors seek authorization to pay certain fees and expenses, including, but not limited to, those of the ad hoc committee of Consenting Noteholders (the "Ad Hoc Committee"), each member of the Ad Hoc Committee and the Apollo Entities, as set forth in the RSA Motion, and to indemnify the Backstop Parties for any liabilities arising in connection with the Backstop Commitment Agreement and the Plan. *See* RSA Motion, ¶¶ 22-23.

12.     Participation in the backstop is limited to only the Backstop Parties (not all Second Lien Noteholders).

---

[3]     For the avoidance of doubt, the Plan Support Parties and the Backstop Parties constitute the same entities. Accordingly, the terms may be used interchangeably, but have been defined separately and used as the context requires.

**OBJECTION**

**A. The Backstop Commitment Agreement is Unnecessary and Extracts an Inappropriate 33% Backstop Fee**

13.     The Court should deny authorization and approval of the Backstop Commitment Agreement because there is simply no need to backstop the Rights Offering under the facts and circumstances of these chapter 11 cases. In any event, the 33% Backstop Commitment Premium is egregious and extracted by the Backstop Parties (including the Debtors' insider) to the detriment of the estate and the non-Backstop Party Second Lien Noteholders who have been repeatedly denied the ability to participate in the Backstop Commitment Agreement.

14.     As a threshold matter, contrary to the Debtors' assertion that the backstop is necessary because the Debtors may be unable to obtain sufficient commitments to fully subscribe the Rights Offering (*see* RSA Motion, ¶ 26),[4] full participation in the Rights Offering by all Second Lien Noteholders is virtually guaranteed for numerous reasons. First, the Backstop Parties already own 85% of the Second Lien Notes, which means they are effectively only ensuring *pro rata* participation in the Rights Offering by the remaining 15% of the notes. *See* RSA Motion, ¶ 2. Moreover, the economic terms of the Rights Offering have the practical effect of guaranteeing participation of the other Second Lien Noteholders, because the Rights Offering is being offered at an attractive 15% discount to the equity value of the reorganized Debtors. Accordingly, any Second Lien Noteholder that does not participate will find itself economically hamstrung because baseline distributions on account of the Second Lien Notes will be diluted as a result of participation in the Rights Offering by other Second Lien Noteholders. Lastly, upon

---

[4]     The Debtors' argument that the backstop is necessary is equally unavailing because the Backstop Commitment Agreement is not even a true "backstop" of the Rights Offering since the agreement does not obligate the Backstop Parties to backstop the subscription obligations of a defaulting Backstop Party. *See* Backstop Commitment Agreement, §§ 2.3(a), (c) ("Upon the occurrence of a Commitment Party Default, the Commitment Parties . . . shall have the right, **but not the obligation** . . . to purchase all or any portion of the [shares that any Commitment Party fails to purchase as a result of a Commitment Party Default by such Commitment Party] . . . .") (emphasis added).

-7-

information and belief, virtually all of the remaining 15% of the Second Lien Notes not held by the Backstop Parties are held among a concentrated group of institutional noteholders. The Debtors and Backstop Parties apparently did not discuss participation in the Rights Offering with any of these holders, because such discussions would very well have obviated the need for a backstop commitment in the first place.

15. In fact, prior to and after the Petition Date, Fortress approached the Debtors and the Backstop Parties and communicated its willingness to participate in the Rights Offering on account of its *pro rata* holdings of the Second Lien Notes, as well as participate in any backstop commitment beyond Fortress's *pro rata* allocation of Rights Offering Shares, to the extent one was necessary. However, Fortress's attempts to play any role in the restructuring discussions, including its attempts to become a Backstop Party, were summarily dismissed by the Debtors and the Backstop Parties.

16. In addition to there being no need for the Backstop Commitment Agreement at all, the fee that the Backstop Parties are attempting to extract is excessive. The Backstop Parties collectively hold 85% of the Second Lien Notes and are committed, pursuant to section 2.1(b) of the Backstop Commitment Agreement, to participate *pro rata* in the Rights Offering on account of their Second Lien Notes. *See* RSA Motion, ¶ 2; Backstop Commitment Agreement, § 2.1(b). The Backstop Commitment Agreement is simply an attempt by the Backstop Parties to extract a fee equal to 5% of the Rights Offering Amount in exchange for backstopping participation in the Rights Offering on account of the 15% of the Second Lien Notes held outside of the Backstop Parties. In other words, the Backstop Premium amounts to a $30 million fee (5% of the Rights Offering Amount of $600 million) being paid on account of backstopping $90 million of the Rights Offering (15% of the Rights Offering Amount of $600 million) – which equates to an

outlandish 33% backstop fee.[5]  Unquestionably, such an abnormally large fee for such a small backstop commitment injures Fortress and other non-Backstop Party Second Lien Noteholders while unjustly enriching the Backstop Parties.

17. In order to prevent the Non-Backstop Party Second Lien Noteholders from being universally and irreparably harmed by the unnecessarily large Backstop Commitment Premium, by a letter dated May 30, 2014 (attached as Exhibit A hereto), Fortress communicated to the Debtors its willingness to discuss purchasing its *pro rata* portion of the Unsubscribed Shares and backstopping the remaining portion of any Unsubscribed Shares on the same terms as contained in the Backstop Commitment Agreement, but for a significantly smaller and more market-based fee of 3% payable *only* on the Unsubscribed Share amount (less Fortress's committed purchase amount), resulting in approximately $28 million in cost savings to the estates.  Therefore, the Debtors would not be required to pay a backstop fee (including the Backstop Commitment Premium) to any party otherwise purchasing its *pro rata* amount of the Rights Offering Shares— the remaining portion of the Unsubscribed Shares are the only shares for which a backstop fee would be payable. Unfortunately for the estate, the Debtors never even responded to Fortress.

18. It is for these reasons that the Backstop Commitment Agreement and the related Backstop Commitment Premium are unnecessary.

---

[5] In addition, the fees and expenses contemplated to be paid through the Expense Reimbursement have the potential to be extremely costly to the Debtors' estates and should not be approved.  For example, pursuant to the RSA Motion, the Debtors propose to pay, among other fees and expenses, the reasonable documented fees and expenses of (i) the Ad Hoc Committee's various professionals in connection with the negotiation, preparation and implementation of the Rights Offering, the Plan and any related efforts, (ii) each member of the Ad Hoc Committee, including the reasonable documented fees and expenses of their professionals, including consultants, incurred prior to April 1, 2014 in connection with performing diligence with respect to the Second Lien Notes, not to exceed $1 million in the aggregate for all such members, and (iii) the Apollo Entities related to certain of its professionals, incurred solely with respect to the Apollo Entities' capacity as Backstop Parties. See RSA Motion, ¶ 22.

**B. The Backstop Commitment Agreement Constitutes an Impermissible *Sub Rosa* Plan**

19.     The Backstop Commitment Agreement is an impermissible *sub rosa* plan that implements the terms of a future plan of reorganization before the Court has had the opportunity to approve a disclosure statement and solicit votes on a plan in violation of the protections afforded to parties-in-interest by section 1125 of the Bankruptcy Code.

20.     Courts have defined a *sub rosa* plan as a transaction that has the "practical effect of dictating some of the terms of any future reorganization plan." *See In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983). Courts have also found that *sub rosa* plans cannot be approved outside of the well-established solicitation and confirmation requirements of the Bankruptcy Code. *See id.* ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets."); *see also In re Tower Auto. Inc.*, 241 F.R.D. 162, 168-69 (S.D.N.Y. 2006); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted.").

21.     The Backstop Commitment Agreement fits squarely within the definition of a *sub rosa* plan because the agreement distributes equity in the reorganized Debtors (subject to certain limited exceptions where the Backstop Parties will be provided with cash instead of stock) in the form of the Backstop Commitment Premium (that will be fully earned, nonrefundable and non-avoidable upon the Court's entry of the order approving the Backstop Commitment Agreement) prior to the approval of a disclosure statement and solicitation of votes on a plan. *See* Backstop Commitment Agreement, § 3.2. By giving away equity in the reorganized Debtors at this time, the Debtors are seeking to "short circuit the requirements of Chapter 11." *See Braniff*, 700 F.2d at 940. In effect, the granting of equity in the reorganized Debtors at this early stage in the

-10-

chapter 11 cases cuts to the very core of dictating the terms of a future plan of reorganization. *Id.* The Court should not allow the Debtors and the Backstop Parties to bypass the fundamental principles of bankruptcy law and the integrity of the confirmation process at this early stage of these chapter 11 cases.

22.     Any argument from the Debtors and/or the Backstop Parties that the Backstop Commitment Premium could be paid in cash under certain scenarios does not foreclose the Court from finding that this transaction constitutes a *sub rosa* plan. The Backstop Commitment Premium, whether paid in equity or in cash, is being distributed from plan currency and thus violates section 1125 of the Bankruptcy Code. Furthermore, it is inconceivable that the Debtors can afford to pay a $30 million cash fee to the Backstop Parties when the Debtors purportedly needed debtor-in-possession financing on an emergency basis because there was no cash left on their balance sheet. *See* Transcript of First Day Hearing at 17:1-5, *In re MPM Silicones, LLC* (Bankr. S.D.N.Y. Apr. 14, 2014) (No. 14-22503-rdd) ("Your Honor, the company is out of cash and when I say out of cash, we are down to single digit millions of dollars. And the reason that we are in this position, Your Honor, is that we stretched ourselves as long as we possibly could to give the deal with the second lien noteholders time to come together . . . .").

23.     The Debtors argue in the RSA Motion that the effectiveness of the Backstop Commitment Agreement is conditioned on the confirmation and consummation of the Plan. *See* RSA Motion, ¶ 6. This argument fails, however, because approving the Backstop Commitment Agreement will set the Debtors down a one-way path whereby the Court will not have an opportunity to consider any transaction other than the Plan. Indeed, the express terms of the Backstop Commitment Agreement cut off the Debtors from pursuing any transaction other than the transaction outlined in the RSA Motion:

> From the date of this Agreement until the earlier of the termination of this Agreement in accordance with its terms and the Closing Date (i) the Company and its Subsidiaries shall, and shall instruct and direct their respective Representatives to, immediately cease and terminate any ongoing solicitation, discussions, and negotiations with any Person (including any Commitment Party) with respect to an Alternative Transaction, and (ii) the Company and its Subsidiaries shall not, and the Company and its Subsidiaries shall instruct and direct their Respective Representatives not to, initiate or solicit any inquiries or the making of any proposal or offer relating to an Alternative Transaction, engage or participate or participate in any discussion or negotiations….

*See* Backstop Commitment Agreement, § 6.18(a).

24. The inclusion of a "no shop" provision in the Backstop Commitment Agreement quashes any hope that the Debtors can ever market their assets. In fact, the Debtors only engaged with the Second Lien Noteholders that now constitute the Backstop Parties. Thus, without a breach of the RSA by the Debtors, it seems overwhelmingly likely that no alternatives to the Plan will be proposed. Although the Debtors may point to the fiduciary out provided within the RSA in claiming that they are not bound by the terms of the Backstop Commitment Agreement, such a fiduciary out is illusory because the Debtors will almost certainly have no meaningful ability to exercise it.

### C. Certain Second Lien Noteholders Are Being Disparately Treated Under the Proposed Reorganization

25. Certain of the Second Lien Noteholders are being disparately treated under the terms of the proposed restructuring because the Backstop Commitment Premium provides a distribution of equity in the reorganized Debtors to some Second Lien Noteholders (*i.e.*, the Backstop Parties), at the expense of other Second Lien Noteholders, including Fortress, who have not been given an equal opportunity to participate. As a result, the Court should not authorize the Backstop Commitment Agreement.

26. Section 1123(a)(4) of the Bankruptcy Code and supporting case law require that the "same treatment for each claim or interest of a particular class [be provided], unless the

-12-

holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4); *see also In re Quigley Co., Inc.*, 437 B.R. 102, 146 (Bankr. S.D.N.Y. 2010); *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 363 (S.D.N.Y. 2007); *In re Washington Mut., Inc.*, 442 B.R. 314, 360-61 (Bankr. D. Del. 2011). Both the term sheet attached as Exhibit A to the RSA, and the conforming Plan, provide for the treatment of all Second Lien Noteholders in the same class (Class 6) under the Plan. *See* Term Sheet, p. 16-17; Plan, § 5.6. This single class thus includes both the Backstop Parties, in their capacity as Second Lien Noteholders, and those Second Lien Noteholders who are not Backstop Parties. However, the members of Class 6 will not be receiving equal distributions under the terms set forth in the RSA and Backstop Commitment Agreement.

27.     Instead, the distribution of equity in the reorganized Debtors that will be given to the Backstop Parties upon the authorization by the Court of the Backstop Commitment Agreement ensures that the Debtors' proposed Plan violates section 1123(a)(4) of the Bankruptcy Code. Specifically, the Debtors seek to have the Backstop Commitment Premium – plan currency usually reserved for distribution under a plan – handed out to some, but not all, of the Second Lien Noteholders. Accordingly, the excluded Second Lien Noteholders, including Fortress, are being unfairly treated by not being entitled to the Backstop Commitment Premium that other members of the same class are receiving. Fortress, as a Second Lien Noteholder, will not consent to such unequal treatment.

28.     Furthermore, the Backstop Parties are receiving the Backstop Commitment Premium "on account of" their claims because of their existing rights as creditors of the Debtors' estates. *See Dish Network Corp. v. DBSD North America, Inc. (In re DBSD North America, Inc.)*, 634 F.3d 79, 96 (2d. Cir. 2011). The Backstop Parties would not be proposing the Rights

Offering and the backstop in the first place without having enjoyed their status as major creditors and interest holders in these cases. Indeed, as discussed in the First Day Affidavit, the Debtors' restructuring process commenced in January 2014 with negotiations between the Debtors and "certain significant holders of Second Lien Notes and their advisors," which refers to the Backstop Parties. First Day Affidavit, ¶ 63.

29.     As set forth above, there should be no backstop fee given that the Backstop Commitment Premium is unnecessary in the first place. All Second Lien Noteholders should instead be entitled to subscribe for their *pro* rata share of this 5% in the Rights Offering, ensuring that the Debtors comply with section 1123(a)(4) of the Bankruptcy Code.

**D. At a Minimum, the Court Should Defer Approval of the Backstop Commitment Agreement Until Plan Confirmation**

30.     Even if the Court were to decide that a backstop of the Rights Offering were necessary, the Court should, at a minimum, wait until the confirmation of the Plan before authorizing equity in the reorganized Debtors to be given away to the Backstop Parties. The Debtors have failed to provide any justification whatsoever for the Court to authorize the Backstop Commitment Agreement at this early stage in the Debtors' cases. Even more to the point, given that the Backstop Commitment Agreement creates optionality for the Backstop Parties, themselves, by not requiring them to backstop a defaulting Backstop Party, there is no reason why the Debtors should not benefit from the same optionality and be able to evaluate if a backstop is necessary at the appropriate time. *See* Backstop Commitment Agreement, §§ 2.3(a), (c).

31.     Accordingly, given that the Backstop Parties are deeply entrenched in the Debtors' cases, waiting to consider granting such parties their proposed Backstop Commitment

Premium until the appropriate time would not harm or prejudice the Debtors or the Backstop Parties.

## RESERVATION OF RIGHTS

32.  Nothing contained herein shall constitute a waiver of Fortress's rights or remedies under chapter 11 of the Bankruptcy Code or applicable law, including, without limitation, the right to amend or supplement this Objection on additional grounds.

## CONCLUSION

WHEREFORE, Fortress requests the entry of an order denying authorization and approval of the Backstop Commitment Agreement, and granting such other relief as is just and proper.

Dated: June 6, 2014
New York, New York

STROOCK & STROOCK & LAVAN LLP

/s/ Kristopher M. Hansen
Kristopher M. Hansen
Jonathan D. Canfield
Joshua M. Siegel
180 Maiden Lane
New York, New York 10038-4982
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*Counsel to Fortress Investment Group LLC*

# **Exhibit A**

Backstop Letter from Fortress to the Debtors

# STROOCK

May 30, 2014

Kristopher M. Hansen
Direct Dial  212-806-6056
Direct Fax  212-806-9056
khansen@stroock.com

**VIA ELECTRONIC MAIL**

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, N.Y. 10019-6099
Attn: Matthew A. Feldman, Esq.

Re:  Proposal for Backstop of Unsubscribed Rights Offering Shares

Dear Matt:

Stroock & Stroock & Lavan LLP has been retained by Fortress Investment Group LLC ("Fortress"), on behalf of its and its affiliates' managed funds and/or accounts that own or hold $29 million of the Debtors' 9.0% Second-Priority Springing Lien Dollar Notes due 2021 (the "Second Lien Notes") issued pursuant to that certain Indenture dated as of November 5, 2010 (as amended, supplemented or modified from time to time) among Momentive Performance Materials Inc. ("MPMI"),[1] each of the guarantors party thereto, and the Bank of New York Mellon Trust Company, N.A., as indenture trustee and collateral agent.

As you are aware, holders of approximately 85% of the Second Lien Notes (collectively, the "Plan Support Parties"), including the Debtors' equity sponsor, are parties to the Restructuring Support Agreement, dated as of April 13, 2014, by the Debtors and the Plan Support Parties (as amended, supplemented or modified from time to time, the "RSA"). The RSA contains the material terms of the Debtors' plan of reorganization, including the treatment that all holders of claims and interests are to receive under the plan, which the Debtors and the Plan Support Parties are required to support. The Plan Support Parties are also party to that certain Backstop Commitment Agreement (in such capacity, the "Backstop Parties"), dated as of May 9, 2014, among MPMI,

---

[1]    MPMI, together with certain of its subsidiaries and affiliates including: (i) Juniper Bond Holdings I LLC; (ii) Juniper Bond Holdings II LLC; (iii) Juniper Bond Holdings III LLC; (iv) Juniper Bond Holdings IV LLC; (v) Momentive Performance Materials China SPV Inc.; (vi) Momentive Performance Materials Holdings Inc. ("Holdings"); (vii) Momentive Performance Materials Quartz, Inc.; (viii) Momentive Performance Materials South America Inc.; (ix) Momentive Performance Materials USA Inc.; (x) Momentive Performance Materials Worldwide Inc.; and (xi) MPM Silicones, LLC, are operating as debtors and debtors-in-possession (collectively, the "Debtors") in chapter 11 cases currently pending in the United States Bankruptcy Court for the Southern District of New York (Case No. 14-22503 (RDD)).

May 30, 2014
Page 2

Holdings and the Plan Support Parties (as amended, supplemented or modified from time to time, the "Backstop Commitment Agreement"), which obligates the Backstop Parties, pursuant to section 2.1(b) thereof, to participate *pro rata* in the $600 million rights offering (the "Rights Offering") on account of their Second Lien Notes. In addition, the Backstop Parties are obligated to purchase any unsubscribed shares in the Rights Offering, which cannot exceed $90 million of Rights Offering shares (the "Unsubscribed Shares") due to the *pro rata* participation in the Rights Offering by the Plan Support Parties. In exchange for their agreement to purchase up to $90 million of Rights Offering shares, the Backstop Parties will receive a $30 million non-refundable fee (the "Backstop Commitment Premium"), payable in stock of the reorganized Debtors unless certain events occur, in which case the fee will be payable in cash.

The Backstop Commitment Premium is abnormally large for such a small backstop commitment and injures Fortress and other non-Backstop Party holders of the Second Lien Notes, while unjustly enriching the Backstop Parties. In addition, the risk of the Rights Offering shares being undersubscribed is *de minimis* given that the Rights Offering is priced attractively and that holders of the Second Lien Notes will receive a significantly smaller recovery on their notes by not participating in the Rights Offering. Accordingly, Fortress would like to discuss committing to purchase its *pro rata* amount of shares in the Rights Offering and underwriting the purchase of the remaining portion of the Unsubscribed Shares on the same terms as contained in the Backstop Commitment Agreement, but for a significantly smaller and more market-based fee of 3% of the Unsubscribed Share amount (less Fortress's committed purchase amount), which fee equals $2,311,040. For the avoidance of doubt, the remaining portion of the Unsubscribed Shares would be the only shares for which a backstop fee would be payable, and the Debtors would therefore not be required to pay a backstop fee (including the Backstop Commitment Premium) to any party who simply agrees to purchase its *pro rata* amount of the Rights Offering shares.

Please contact me immediately to discuss.

Very truly yours,

Kristopher M. Hansen

cc: William Derrough, Moelis & Company
    Zul Jamal, Moelis & Company