**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
Philip D. Anker
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800 (Telephone)
(212) 230-8888 (Facsimile)

**DECHERT LLP**
Michael J. Sage
1095 Avenue of the Americas
New York, NY 10036-6797
(212) 698-3500 (Telephone)
(212) 698-3599 (Facsimile)

*Counsel for BOKF, NA as First Lien Trustee*

**ROPES & GRAY LLP**
Mark R. Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9000 (Telephone)
(212) 596-9090 (Facsimile)

Andrew G. Devore
William L. Roberts
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
(617) 951-7000 (Telephone)
(617) 951 7050 (Facsimile)

*Counsel to Wilmington Trust, NA, as 1.5 Lien
Trustee*

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | ) Chapter 11 |
| **MPM Silicones, LLC,** *et al.,*[1] | ) Case No. 14-22503 (RDD) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |

## JOINT MOTION IN LIMINE OF BOKF, N.A., AS INDENTURE TRUSTEE, AND
## WILMINGTON TRUST, N.A., AS INDENTURE TRUSTEE,
## TO EXCLUDE THE EXPERT TESTIMONY OF DAVID C. SMITH, Ph.D.

---

[1] The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) Juniper Bond Holdings I LLC (9631); (ii) Juniper Bond Holdings II LLC (9692); (iii) Juniper Bond Holdings III LLC (9765); (iv) Juniper Bond Holdings IV LLC (9836); (v) Momentive Performance Materials China SPV Inc. (8469); (vi) Momentive Performance Materials Holdings Inc. (8246); (vii) Momentive Performance Materials Inc. (8297); (viii) Momentive Performance Materials Quartz, Inc. (9929); (ix) Momentive Performance Materials South America Inc. (4895); (x) Momentive Performance Materials USA Inc. (8388); (xi) Momentive Performance Materials Worldwide Inc. (8357); and (xii) MPM Silicones, LLC (5481). The Debtors' executive headquarters are located at 260 Hudson River Road, Waterford, NY 12188.

Pursuant to Rule 702 of the Federal Rules of Evidence, as made applicable by Rule 9017 of the Federal Rules of Bankruptcy Procedure, BOKF, N.A., as First Lien Trustee (the "First Lien Trustee"), and Wilmington Trust, National Association, as 1.5 Lien Indenture Trustee (the "1.5 Lien Trustee," and together with the First Lien Trustee, the "Trustees"), hereby move to exclude the expert testimony of Professor David C. Smith, Ph.D:

## PRELIMINARY STATEMENT

The Court should exclude the Debtors' proffered expert on market efficiency, Professor Smith, because his opinions are not based on the applicable legal standard of market efficiency set forth by the Second Circuit in its decision remanding this case and are instead based on academic theory irrelevant to this matter.  Professor Smith's opinions are therefore unreliable and unhelpful to the Court in determining whether an efficient market for financing existed.

The Second Circuit's opinion remanding this matter instructed that the "market rate should be applied in Chapter 11 cases where there exists an efficient market." *In re MPM Silicones, L.L.C.*, 874 F.3d 787, 800 (2d Cir. 2017).  It explained that, "[i]n applying this rule, courts have held that markets for financing are 'efficient' where, for example, 'they offer a loan with a term, size, and collateral comparable to the forced loan contemplated under the cramdown plan.'"  *Id.* (quoting *In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 337 (5th Cir. 2013)).

Professor Smith does not opine that the market for financing available to Momentive was inefficient under this legal standard.  *See, e.g.*, Rebuttal Expert Report of David C. Smith Ph.D ¶¶ 15-18 & n.12 (attached to the Declaration of Philip D. Anker in Support of Joint Motion in Limine being filed contemporaneously herewith (the "Anker Declaration") as Ex. A) (hereinafter

2

the "Smith Rebuttal Report").[2] To the contrary, Professor Smith acknowledges that the back-up

exit financing that Momentive obtained—in undisputedly arms'-length, competitive, multi-track

negotiations with three market-leading banks—offered loans with term, size, and collateral

comparable to the Replacement Notes. *See* Transcript of Deposition of Professor David C.

Smith, Ph.D, taken July 20, 2018, at 77:15-77:21, 78:5-79:2 (attached to the Anker Declaration

as Ex. B, hereinafter the "Smith Tr.").

But, according to Professor Smith, the legal test for market efficiency set forth by the

Second Circuit is "irrelevant to [his] opinions as an economist." Smith Tr. at 53:18-54:2; *id.* at

54:14-15. Professor Smith posits a *different* standard of market efficiency—one he concedes

"does not accord" with the test cited by the Second Circuit (Smith Rebuttal Report ¶¶ 16-18 &

n.12)—and then proceeds to offer an opinion as to whether the market was efficient under that

other, inapplicable standard. He rejects the standard cited by the Second Circuit because, in his

view, it "does not accord with the commonly accepted definition of market efficiency applied by

economists, namely that a market is efficient if prices fully reflect all available information." *Id.*

¶ 4; *see also* Expert Report of David C. Smith, Ph.D ¶ 30 ("If a market is efficient, prices will

react quickly and in a direction consistent with new information that is relevant to the

instrument's cash flows, . . . .") (attached to the Anker Declaration as Ex. C, hereinafter the

"Smith Report").

Professor Smith's opinions on that question simply are not relevant here. It is not merely

that Professor Smith applies the wrong standard; he asks the wrong question. The issue under

Section 1129(b) of the Bankruptcy Code is not whether there was an efficient securities market

---

[2] For the convenience of the Court, the Anker Declaration filed herewith attaches copies of all
eight expert reports served on remand in this matter, as well as excerpts from certain depositions
and documents cited herein.

such that all available information would have been fully reflected in the trading price of the Replacement Notes.  The question is whether the "*markets for financing*" to obtain a "*loan*" comparable to the Replacement Notes were efficient, for purposes of ascertaining an available market rate to use in setting the Replacement Notes' interest rates.  *MPM Silicones*, 874 F.3d at 800 (emphasis added).

The Trustees recognize that courts are often reluctant to grant a motion *in limine* to exclude an expert's testimony, particularly in a bench trial.  The Trustees therefore are not moving to exclude the testimony of Mr. Derrough, Momentive's expert on the market rate for the Replacement Notes, even though they firmly believe that Mr. Derrough's opinion is fundamentally flawed (and they reserve all objections for trial with respect to Mr. Derrough's opinions).  However, Professor Smith's failure to use the correct legal standard is a fundamental error that does not merely affect the weight and credibility of his opinion, but rather renders his opinion unreliable and irrelevant.

Excluding Professor Smith's testimony in advance of trial will also substantially advance the resolution of this case.  Momentive's other expert, Mr. Derrough, offers no opinion on market efficiency; he instead assumes an efficient market existed and offers an opinion solely as to what the market rates of interest were.  Mr. Derrough admits that, unless the Court were to retroactively require a floating rate for the Replacement Notes (notwithstanding that the confirmed plan expressly provides that the notes will bear a fixed rate, consistent with the market standard for high yield notes), the market fixed rates for the Replacement Notes are within approximately 1% to 1.25% of the market rates determined by the Trustees' experts.  Excluding Professor Smith's opinion in advance of trial will narrow the main issues in dispute to one, the proper market rate of interest, for which the differences between the parties are considerably

4

narrower.  While the Trustees firmly believe that Momentive's market expert has understated the market rates, the differences between the parties, for them by agreement or the Court by decision to resolve, will be considerably smaller if the only issue is the market rate of interest.

## BACKGROUND

### A.     The Second Circuit's Remand

In its decision remanding this case, the Second Circuit adopted a two-part test for selecting an interest rate in Chapter 11 cramdowns under section 1129(b) of the Bankruptcy Code.  *In re MPM Silicones, L.L.C.*, 874 F.3d 787, 800 (2d Cir. 2017).  Under that test, "[t]he market rate should be applied in Chapter 11 cases where there exists an efficient market.  But where no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should employ the formula approach endorsed by the *Till* plurality."  *Id.* (quoting *In re Am. HomePatient, Inc.*, 420 F.3d 559, 568 (6th Cir. 2005)).

The Second Circuit provided direction not only as to how courts should resolve the initial, threshold question of whether the market is efficient, but also as to the market on which the courts should focus.  It explained that "courts have held that *markets for financing* are 'efficient' where, for example, '*they offer a loan with a term, size, and collateral comparable to the forced loan contemplated under the cramdown plan*,'" and that a market is efficient if it "generates an interest rate that is apparently acceptable to sophisticated parties dealing at arms-length."  *MPM Silicones*, 874 F.3d at 800-01 (emphasis added) (quoting *In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 337 (5th Cir. 2013)).

The Second Circuit emphasized that this approach "best aligns with the Code and relevant precedent."  *MPM Silicones*, 874 F.3d at 800.  The court observed that "disregarding available efficient market rates would be a major departure from long-standing precedent

dictating that 'the best way to determine value is exposure to a market.'" *Id.* (quoting *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St P'ship*, 526 U.S. 434, 457 (1999)). It pointed to the Supreme Court's decision in *LaSalle*, in which the Court emphasized, in construing Chapter 11's cramdown provision, that "'one of the Code's innovations [was] to narrow the occasions for courts to make valuation judgments,' and expressed a 'disfavor for decisions untested by competitive choice . . . when some form of market valuation may be available.'" *MPM Silicones*, 874 F.3d at 800 (quoting *LaSalle*, 526 U.S. at 457-58).

The Second Circuit further observed that at the confirmation trial in this case in 2014 "[t]he Senior-Lien Notes holders presented expert testimony . . . that, if credited, would have established a market rate." *MPM Silicones*, 874 F.3d at 800. And it noted "[t]his evidence showed that if the Senior-Lien Noteholders were to have approved the Plan and accepted a cash-out payment for their notes, MPM would have had to secure exit financing to cover the lump-sum payment." *Id.* "In preparation for that possible eventuality . . . , MPM went out into the market seeking lenders to provide that financing," and "[t]hose lenders quoted MPM rates of interest ranging between 5 and 6 + %." *Id.* "The Plan was objectionable to the Senior-Lien Notes holders because, in essence, it required them to lend Debtors a significant sum of money and receive a much lower rate of interest than any other lender would have received for offering the same loan to MPM on the open market." *Id.* at 800-01.

The Second Circuit concluded that "where, as here, an efficient market may exist that generates an interest rate that is apparently acceptable to sophisticated parties dealing at arms-length, . . . such a rate is preferable to a formula improvised by a court." *MPM Silicones*, 874 F.3d at 801. Accordingly, the Court of Appeals remanded "so that the bankruptcy court can

ascertain if an efficient market rate exists and, if so, apply that rate, instead of the formula rate."

*Id.*

At the status conference held in this case on March 9, 2018 following the remand, this

Court echoed these same points:

> THE COURT: . . . I'm looking at the Second Circuit opinion . . . And the court said that "In applying this rule, courts have held," – in interpreting American HomePatient – "In applying this rule, courts have held that markets for financing" – the phrase "markets for financing", not for buying claims, for financing, "are efficient where, for example, they offer a loan with a term, size, and collateral comparable to the forced loan contemplated under the cramdown plan."
> . . . .

> [BOKF'S COUNSEL]: I read this following sentence, the one you quoted: 'In applying this rule, courts have held that markets for financing are efficient where, for example, they offer a loan with a term, size, and collateral comparable to the forced loan contemplated under the cramdown plan' –

> THE COURT: Right.

> [BOKF'S COUNSEL]: -- as telling us what the legal test is for efficiency.

> THE COURT:  I agree.
> . . . .

> THE COURT: . . . And there's this thing called "efficient market theory" that's completely antithetical to what the bankruptcy judge's job is, which is to pick a rate as of a particular date.

> And efficient market theory doesn't have anything to do with that.  That's the theory that over time, the ups and downs of a market equal out efficiently.  So you . . . could go very far astream by applying efficient market theory here.  I don't think that's what the Second Circuit is talking about.  I think the Second Circuit is talking about whether at the time that – or around the time that the Court had to pick a rate for this forced loan, you look at whether there was an efficiently operating market for lending, where the lenders weren't insiders, they weren't people already in the capital structure or who had some other access to change the facts, but people who were looking to make loans to make money; and more than one of them, so that they could compete.

> So I think if the debtor is going to apply some different notion of the remand here than that, . . . we ought to hear it. . . .

. . . .

THE COURT: I don't know what you have up your sleeve . . . , in other words, so --

[MOMENTIVE'S COUNSEL]: Not some crazy, out-there, efficient market theory, Your Honor.

Mar. 9, 2018 Hr'g Tr., ECF No. 1633, at 17, 27, 29-30.

### B.    Professor Smith's Opinion

Professor Smith states that his opinion on market efficiency "us[es] the definition that is widely accepted by financial economists," under which "an efficient financial market [is] a market in which 'prices at any time 'fully reflect' all available information.'"  Smith Report ¶¶ 25-26 (quoting E. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25. J. Fin. 383, 383 (1970)).  He asserts that courts have adopted this definition "for purposes of, among other things, evaluating reliance arguments in SEC enforcement actions and federal securities litigation, and assessing fair market value calculations in state court appraisal proceedings."  Smith Report ¶ 27 (citing *Basic Inc. v. Levinson*, 485 U.S. 224 (1988); *In re IPO Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006); *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989); *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, 177 A.3d 1 (Del. Sup. Ct. 2017)). To test market efficiency, Professor Smith explains that "[a]cademic tests of market efficiency examine the speed at which the price of a financial instrument reacts to disclosures of new information, whether the price of a financial instrument fully reflects all relevant information, or whether 'mispricing' (that is, the difference between the current price of an instrument and its efficient market price) allows market participants to earn consistent economic profits by trading the instrument."  Smith Report ¶ 30.

Professor Smith then compares the market efficiency of stock markets, bond markets, and corporate loan markets. He asserts that while "[p]ublicly listed stocks in the U.S. generally trade in markets organized and regulated to promote liquidity, transparency, and competitive pricing," "U.S. corporate bond markets are relatively illiquid, less transparent, and have fewer safeguards to promote competitive pricing." Smith Report ¶¶ 32, 35. He similarly asserts that "[c]orporate loan markets in which investors buy and sell ownership or participation rights in syndicated loans also exhibit potential impediments to market efficiency." *Id.* ¶ 40. Nonetheless, Professor Smith does not go so far as to opine that the bond and loan markets are always inefficient, but rather concludes that "market efficiency . . . must be evaluated on a case-by-case basis." *Id.* ¶ 45.

To assess whether there was an efficient market for the Replacement Notes as of the Plan's Effective Date, Professor Smith proposes a three-step test: (1) identify the "key" features of the Replacement Notes that capture their risk exposure; (2) assess whether other debt instruments existed that had all the same "key" features (which Professor Smith refers to as a "reference market"); and (3) if there were such other debt instruments (or "reference market"), test the efficiency of the market for those other debt instruments (i.e., test whether the prices of those other securities fully reflected all available information). *Id.* ¶¶ 10, 46, 52, 65, 105-106. Applying that test, Professor Smith concludes that no other bonds in the market had all of the same "key" features that he deems important to capturing the risk exposure of the Replacement Notes: (1) fixed interest rate, (2) maturity of 5 to 10 years, (3) issued as high-yield bonds, (4) secured by a lien on the issuer's assets, (5) issued by an issuer in the chemicals industry, (6) issued within two years before the Effective Date, and (7) no call protection, i.e., no indenture

provision prohibiting, or compensating the noteholders, for early redemption of the notes, such as a no-call or make-whole provision.  *Id.* ¶ 67.

Moving to the second step in his three-part test, Professor Smith acknowledges that Momentive obtained commitments for (i) a $1 billion Exit Term Loan to finance the cash-out payment of the Original First Lien Notes and (ii) a $250 billion bridge facility to backstop the issuance of $250 million in Exit 2L Notes to finance the cash-out payment of the Original 1.5 Lien Notes, if the noteholders had accepted Momentive's Plan, and that these facilities had a size, term and collateral comparable to the Replacement Notes.  Smith Tr. at 76:12-77:21, 78:5-79:2.  But Professor Smith concludes that the Exit Term Loan is not a comparable "reference market" for the Replacement First Lien Notes because the Exit Term Loan (a) would have originated and traded in the loan market, which he asserts differs from the bond market, (b) had different contractual terms, such as call protection, amortization of principal, and fees (all terms the Replacement First Lien Notes lacked), and (c) would have been monitored by the lenders more closely than he believes is typical for bonds and bondholders.  Smith Report ¶¶ 13, 70-97. Similarly, Professor Smith opines that the Exit 2L Notes are not a "reference market" because (a) they had call protection, (b) were never actually marketed, and (c) the indicative term sheets were purportedly "stale" notwithstanding that JPMorgan provided updated pricing guidance two days before the 2014 confirmation hearing.  *Id.* ¶¶ 98-101.

Professor Smith also concludes that even though the Replacement Notes actively traded following their issuance, the Replacement Notes themselves (with all seven "key" features he identifies) were not a comparable "reference market" because the trading prices of the Replacement Notes likely reflected, in addition to the expected interest payments, the possibility that the Noteholders might recover additional sums as a result of the then-pending make-whole

appeal.  *Id.* ¶¶ 13, 102-04.  Professor Smith fails to explain why this potential additional value—

a pricing issue—precludes identification of a reference market and his ability to test that

reference market for efficiency.  Nevertheless, that is Professor Smith's apparent determination.

In the end, Professor Smith finds no securities with all the same "key" features as the

Replacement Notes he identified.  He, therefore, concludes that "there is no reference market for

which efficiency can be assessed."  *Id.* ¶ 110.  Rather than re-design his test for market

efficiency, he concludes that because he cannot assess the efficiency of the market, "no efficient

market existed for the Replacement Notes at the time that such notes were issued."  *Id.*

In the Smith Rebuttal Report, Professor Smith criticizes BOKF's expert, Professor

Bradford Cornell, for offering an opinion on market efficiency that stems from the premise that

"the debt markets available to MPM were efficient as of the Effective Date if 'Momentive could

have obtained a loan or issued bonds with a term, size, and collateral comparable to the [1L

Replacement Notes].'"  Smith Rebuttal Report ¶ 17 (quoting the Expert Report of Professor

Bradford Cornell ¶ 20, attached to the Anker Declaration as Ex. D, hereinafter the "Cornell

Expert Report").  Similarly, Professor Smith criticizes the expert for the 1.5 Lien Trustee,

Christopher J. Kearns, for "cit[ing] to a ruling by the United States Court of Appeals for the

Second Circuit in this matter to support his understanding that 'markets for financing are

'efficient' where, for example, 'they offer a loan with a term, size, and collateral comparable to

the forced loan contemplated under the cramdown plan.'"  Smith Rebuttal Report ¶ 17 (quoting

the Expert Report of Christopher J. Kearns ¶ 26, attached to the Anker Declaration as Ex. F,

hereinafter the "Kearns Expert Report").  Professor Smith asserts that "the definition of market

efficiency adopted by Professor Cornell and Mr. Kearns does not accord with the commonly

accepted definition as applied by economists—namely, that the market for an instrument is

efficient when its price fully reflects all publicly available information." Smith Rebuttal Report ¶ 15; *accord* ¶¶ 16-18. Professor Smith adds, however, that he "do[es] not express any view or opinion as to the appropriateness of using the definition of market efficiency [employed by Professor Cornell and Mr. Kearns] in this case for the purpose of making legal inferences or drawing legal opinions," and that he "only examine[s] the appropriateness of the definitions provided by Professor Cornell and Mr. Kearns in the context of market efficiency as it is understood by financial economists." *Id.* ¶ 17 n.12.

## ARGUMENT

### A.    Expert Testimony That Does Not Apply The Correct Legal Standard Should Be Excluded

Under Federal Rule of Evidence 702, expert testimony is admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. P. 702. Rule 702 requires that expert testimony "rest[] on a reliable foundation" and be "relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

As one court in this District has explained,

> One of the fundamental requirements of Rule 702 is that the proposed testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This helpfulness requirement is "akin to the relevance requirement of Rule 401, which is applicable to all proffered evidence [,][but] ... goes beyond mere relevance ... because it also requires expert testimony to have a valid connection to the pertinent inquiry." The *Daubert* Court referred to this as "'fit,'" noting that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

*In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 539-40 (S.D.N.Y. 2004).

Expert testimony that offers an opinion applying the wrong legal standard should be excluded because it is both unreliable and unhelpful to the trier of fact in understanding or determining a fact at issue. *See Olin Corp. v. Lamorak Ins. Co.*, No. 84-cv-1968 (JSR), 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018) ("Expert testimony also should be excluded when it applies the wrong legal standard." (citing cases)); *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("We take note of the extent to which the incorrect law was announced by a patent law expert witness. We encourage exercise of the trial court's gatekeeper authority when parties proffer, through purported experts, not only unproven science, [citing *Daubert*, 509 U.S. 579], but markedly incorrect law. Incorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories.").

Accordingly, courts have excluded expert testimony where it is based on the incorrect legal standard. *See, e.g.*, *Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 341 (5th Cir. 1999) (approving exclusion of expert testimony because it failed to apply correct legal standard and was therefore irrelevant).[3]

---

[3]      *See also, e.g.*, *Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1242-46 (N.D. Ala. 2000) (excluding testimony concerning the relevant market when expert based his conclusions on the plaintiff's service area and not established Eleventh Circuit case law), *aff'd*, 284 F.3d 1237 (11th Cir. 2002); *Am. Med. Sys., Inc. v. Laser Peripherals, LLC*, 712 F. Supp. 2d 885, 901 (D. Minn. 2010) ("Knox's opinions are inadmissible because they are based on incorrect legal standards."); *Neutrino Dev. Corp. v. Sonosite, Inc.*, 410 F. Supp. 2d 529, 540 (S.D. Tex. 2006) ("Because Mr. Baker's analysis is based on a standard inapplicable to the proper inquiry under [35 U.S.C.] § 112, his testimony cannot assist . . . to resolve any fact . . . . The research and development model set forth in Mr. Baker's report simply answers the wrong question and, as such, is inadmissible under Federal Rule of Civil Procedure 402."); *Noskowiak v. Bobst SA*, No. 04-C-0642, 2005 WL 2146073, at *5 (E.D. Wis. Sept. 2, 2005) (excluding expert testimony, stating that the expert's "reliance on OSHA standards is irrelevant and even casts the reliability of his opinion into doubt. The Court agrees with the Defendants that the standards articulated by OSHA are not relevant in the present case. The OSHA standards apply to employers, not to manufacturers.").

Indeed, Professor Smith has been excluded from offering expert testimony in at least one other case on grounds that he based his opinion on the wrong legal standard.  In *S.E.C. v. Heart Tronics, Inc.*, Professor Smith sought to offer an opinion on behalf of the defendant regarding "the materiality of [the defendant] signing or certifying the third quarter 2008 10-Q."  *See* Civil Minutes, No. 8:11-cv-01962-JVS-KES, ECF No. 261 (C.D. Cal. Feb. 23, 2015), at 7 (attached to the Anker Declaration as Ex. E).  The court held that "the materiality opinion must be excluded" because "Smith put forward an incorrect legal standard for materiality."  *Id.*  The Court explained:

> The bedrock concept of material information is defined in *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) . . . : 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'  But this is not the test Smith uses.  Rather, he opines whether the absence of [the defendant's] certification would have 'altered the total mix of *value-relevant information*' given Heart Tronics' bleak financial condition.  (Smith Report, ¶ 67.)  [Defendant] offers no legal authority. . . . A failure to use the correct standard renders the opinion unreliable.  Fed. R. Evid. 702(c)–(d); *S.E.C. v. Pace*, 173 F. Supp. 2d 30, 32-33 (D.D.C. 2001).  This is not a deficiency which merely goes to the weight of Smith's opinion, but rather a fundamental disqualifying flaw."

*Id.* at 7-8.

**B.    Professor Smith's Expert Testimony Should Be Excluded Because It Does Not Apply The Correct Legal Standard.**

**1.    Under the Second Circuit's decision, the correct legal standard of market efficiency is whether the market for financing offered a loan with a term, size, and collateral comparable to the cramdown loan**

As discussed above, the Second Circuit adopted the Sixth Circuit's two-part test for determining the proper interest rate for a cramdown loan, under which "[t]he market rate should be applied . . . where there exists an efficient market."  *MPM Silicones*, 874 F.3d at 800.  In adopting this rule, the Second Circuit provided direction on how courts should determine whether "markets for financing are 'efficient.'"  *Id.*  Although it left open the possibility that

there might be other ways to do so, it made clear that one way to establish the existence of an efficient market is to show, "for example," that the market would "offer a loan with a term, size, and collateral comparable to the forced loan contemplated under the cramdown plan," which "generates an interest rate that is apparently acceptable to sophisticated parties dealing at arms-length." *Id.* at 800-01.

In so holding, the Second Circuit aligned itself with the Fifth Circuit. In *In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324 (5th Cir. 2013), the Fifth Circuit explained that "[a]mong the courts that adhere to Footnote 14 [of *Till*], most have held that markets for exit financing are 'efficient' only if they offer a loan with a term, size, and collateral comparable to the forced loan contemplated under the cramdown plan." *Id.* at 337.

As the Fifth Circuit observed in *Texas Grand Prairie*, this is the standard of market efficiency that has been widely adopted by courts when determining whether there is an efficient market rate for a cramdown loan proposed in a Chapter 11 plan. For example, in *In re 20 Bayard Views, LLC*, 445 B.R. 83 (Bankr. E.D.N.Y. 2011), cited by the Fifth Circuit in *Texas Grand Prairie*, 710 F.3d at 337 n.65 (and also cited with approval by the Second Circuit in *MPM Silicones*, 874 F.3d at 800 n.10), the court examined "actual loan offers" the debtor had obtained and concluded that "an efficient market does not exist for a loan of this size secured by collateral of this nature in the full amount of the value of the Property." *Bayard*, 445 B.R. at 109-10. While market lenders (Capital One and M & T Bank) had offered the debtor loans with the same term as the cramdown loan (five years), they were unwilling to lend against the same collateral securing the cramdown loan (a Brooklyn condominium complex) unless the size of the loan was much smaller ($13 to $15 million, rather than the cramdown loan's size of $20 million) and/or additional collateral was provided (cash collateral of $2 to $5 million). Indeed, both sides'

15

experts acknowledged that no other lender in the market would offer a loan with the same size

and collateral as the cramdown loan proposed in the plan (i.e., a loan with a 100% loan-to-value

ratio on the condominium-complex collateral). *Id.* at 90-92, 109-11.

Similarly, in *In re SW Boston Hotel Venture, LLC*, 460 B.R. 38 (Bankr. D. Mass. 2011),

*vacated on other grounds*, No. 11-087, 2012 WL 4513869 (B.A.P. 1st Cir. Oct. 1, 2012), also

cited by the Fifth Circuit in *Texas Grand Prairie*, 710 F.3d at 337 n.65, the court stated that "[i]n

determining whether there is an efficient market for a cramdown loan, a court must analyze the

terms of the restructured debt, the type of collateral, the duration of the loan, and the amount of

the loan." *Id.* at 54.  Applying that standard, the court concluded that "an efficient market does

not exist for a loan of the size required by the Debtors' Plan and secured by existing collateral."

*Id.* at 56.  The court noted that the only evidence of loans made in the market were either in a far

smaller amount—$12 million instead of the $52 million loan contemplated by the plan—or were

secured by collateral that was not comparable to the collateral securing the loan under the plan.

*Id.* at 55-56.

Other bankruptcy courts have also applied this standard of market efficiency.  In *In re

Winn-Dixie Stores, Inc.*, 356 B.R. 239 (Bankr. M.D. Fla. 2006), the court applied the *American

HomePatient* two-step approach and concluded that an efficient market existed where the debtors

had obtained 14 proposals for exit financing that resulted in a $720 million loan secured by a

junior lien on the same collateral securing the cramdown loan contemplated under the plan for

the debtors' tax creditors.  *Id.* at 254-56.  Considering whether there was a "prevailing market

rate for a loan of a term equal to the payout period [under the plan], taking into account the

quality of the security and the risk of default," the court explained that "Debtors went out into an

efficient market and shopped $720 million in post-petition financing, which is secured by all of

Debtors' assets, including the collateral, which is the collateral of the Objecting Class 10

Claimants.  Debtors' search resulted in fourteen proposals among competing lending institutions

for a loan that would be junior to the Class 10 Claimants' lien. . . . The Court finds that the

process leading to the exit facility was an efficient test of the market."  *Id.*at 255-56 (concluding

that "[t]he existence of an efficient market in this case coupled with the Class 10 Claimants'

senior lien position . . . leads the Court to conclude that the appropriate interest rate . . . is 7%,"

which was the fixed-rate equivalent of the floating interest rate of LIBOR plus 150 basis points

for the exit financing).[4]

> ### 2.    Professor Smith instead offers an opinion using an inapplicable standard of market efficiency that he acknowledges does not accord with the standard cited by the Second Circuit

Professor Smith does not offer any opinion on whether the market for financing available

to Momentive on the Effective Date was efficient under the standard of market efficiency

articulated by the Second Circuit.  In his report, Professor Smith expressly declined to "express

---

[4]    *See also, e.g.*, *In re K & K Holdings, LLC*, No. 12 B 23916, 2014 WL 585953, at *13 (Bankr. N.D. Ill. Feb. 13, 2014) (concluding no efficient market existed where evidence showed the cramdown loan "could not be refinanced on the open market" and "there was no identifiable market for a loan with these characteristics," i.e., "a loan of this size, length, amortization schedule or extreme loan-to-value ratio"); *In re LMR, LLC*, 496 B.R. 410, 429 (Bankr. W.D. Tex. 2013); *In re SCC Kyle Partners, Ltd.*, No. 12-11978-HCM, 2013 WL 2903453, at *20 (Bankr. W.D. Tex. 2013); *In re Pamplico Highway Dev., LLC*, 468 B.R. 783, 793 (Bankr. D.S.C. 2012) (concluding no efficient market existed under the *American HomePatient* two-step approach because "[t]here was no testimony showing that Debtor had been offered or could obtain financing from another lender under similar terms"; in particular, the testimony "indicated that such financing would be unavailable to Debtor because the loan proposed under the Plan has a loan to value ratio of 100%"); *In re La Guardia Assocs., L.P.*, 2006 WL 6601650, at *44-45 (Bankr. E.D. Pa. Sept. 13, 2006) (concluding efficient market existed where evidence showed available market rates for commercial mortgage loans of comparable maturity, collateral and loan-to-value ratio, i.e., size); *In re Northwest Timberline Enters., Inc.*, 348 B.R. 412, 431-434 (Bankr. N.D. Tex. 2006) (granting relief from stay for inability to reorganize because plan proposed a cramdown interest rate that was too low; concluding there was no efficient market that would offer a loan with same size and collateral as that proposed in plan—a $940,000 loan secured by a third-priority lien on collateral valued at $940,000, i.e., a 100% loan-to-value).

any view or opinion as to the appropriateness of using [that] definition of market efficiency in this case." Smith Report ¶ 17 n.12. At deposition, Professor Smith explained that he is an economist, not a lawyer, and that the legal standard is "irrelevant" to his opinions:

> Q. . . . In forming your opinion in this case, did you or did you not consider whether courts in 1129(b) cramdown cases had applied the standard of market efficiency that you set forth in your reports?
> . . . .
> A. The short answer is it's irrelevant to my opinion.

Smith Tr. at 53:18-54:2; *id.* at 54:14 -15 ("Those are legal concepts. It's irrelevant to my opinions as an economist."); *id.* at 82:2-8 ("[T]he Second Circuit opinion is a legal opinion. As an economist, I don't spend time thinking about the legal opinion. I think about how I would define a market for the purpose of assessing efficiency for the replacement notes as an economist.").

Indeed, while he does not formally offer an opinion on the question, Professor Smith admits that independent lenders competing in the market did offer Momentive arm's length loans with term, size and collateral comparable to the Replacement Notes, namely, the Exit Term Loan and the Bridge Financing/Exit 2L Notes. Smith Tr. at 77:15-21, 78:5-79:2. The Exit Term Loan and the Replacement First Lien Notes had the same term (7 years), virtually the same size ($1 billion versus $1.1 billion), and substantially the same collateral (i.e., a first-priority lien on substantially all assets of Momentive and its domestic subsidiaries other than those assets securing the asset-based loan facility, and a second-priority lien on those assets).[5] Similarly, the

---

[5]    *See* Transcript of Deposition of Zul Jamal taken on May 22, 2018 at 169:19-170:24, 179:12-184:16 (attached to the Anker Declaration as Ex. H, hereinafter the "Jamal 2018 Tr.").

Bridge Financing/Exit 2L Notes had a nearly identical term (8 years versus 7.5 years), the same size of $250 million, and the same collateral (a junior lien on substantially all assets).[6]

Moreover, as Momentive's investment bankers at Moelis who led the negotiations to obtain exit financing have testified, the exit financings were the result of a "competitive process."[7] The exit financings were not deals negotiated with "insiders," but the result of "hard bargaining" in "extensive, virtually non-stop, multi-track negotiations" at "arms' length" with each of three market-leading providers of exit financing—J.P. Morgan, Citibank and Credit Suisse—who competed intensely with each other to lead the exit financing, resulting in more favorable terms from Momentive's perspective than proposed in any of the banks' initial, stand-alone proposals.[8] The result, was the "best financing possible" on the "best terms" available for the company.[9]

Professor Smith does not dispute any of that. He simply asserts that, in his view as an economist, this should not be the standard:

---

[6]     *See* Momentive Performance Materials, Inc. 2014 10-K, at 66-68 (attached to the Anker Declaration as Ex. J); Bridge Commitment Letter, at Annex A-II, 2-7 (MPMR_AGSHF_0004443, at 0004474-79) (attached to the Anker Declaration as Ex. K).

[7]     *See* Declaration of William Q. Derrough in Support of Debtors' Motion for DIP Financing, ECF No. 14 ("Derrough Declaration"), ¶¶ 12-18; Jamal 2018 Tr. at 57:11-58:22, 59:6-17, 86:11-89:10, 300:18-301:5 (Moelis expected they could successfully syndicate the bonds); Transcript of Deposition of William Q. Derrough taken on May 24, 2018 at 27:20-28:11 (attached to Anker Declaration as Ex. L, hereinafter the "Derrough Tr."); Declaration of William Q. Derrough in Support of Debtors' Motion for an Order Authorizing the Debtors to (A) Enter into a Bridge Facility Commitment Letter and Related Commitment Documents, (B) Enter into an Engagement Letter Related to a Second Lien Notes Offering, and (C) Pay Fees, Costs and Expenses in Connection Therewith, ECF No. 606 ("Derrough Bridge Declaration"), ¶¶ 11-12.

[8]     *See* Derrough Declaration ¶¶ 12-18; Jamal 2018 Tr. at 65:24-66:16, 69:4-:24, 70:19-71:3; Derrough Tr. at 24:21-26:22, 27:20-28:11, 64:13-68:16.

[9]     *See* Transcript of Deposition of Zul Jamal taken on July 22, 2014 at 214:4-10 (attached to the Anker Declaration as Ex. M); Transcript of Deposition of William H. Carter taken on July 24, 2014 Tr. at 313:17-315:2 (attached to the Anker Declaration as Ex. N); Derrough Declaration ¶¶ 12-18; Jamal 2018 Tr. at 91:10-92:11, 102:7-17; Derrough Tr. at 24:21-26:22.

> "I would say the size, the term, the collateral in that exit term loan were comparable to what's discussed in the replacement notes. In my opinion, that's a wholly inadequate way to think about a market, much less test efficiency."

Smith Tr. at 77:15-:21; *see also* Smith Rebuttal Report ¶ 22 ("[T]he mere availability of exit debt financing for MPM with term, size and collateral comparable to the cramdown instrument as of the Effective Date does not mean that such financing would constitute a comparable reference market for the Replacement Notes.").

Professor Smith offers an opinion using a fundamentally different standard of market efficiency, which he asserts is "the commonly accepted definition as applied by economists—namely, that the market for an instrument is efficient when its price fully reflects all available information." Smith Rebuttal Report ¶ 15. As he acknowledges, that standard "does not accord" with the standard cited by the Second Circuit. *Id.* ¶¶ 4, 15-18. In his view, because he could not find any other security in the market that also had all the other features of the Replacement Notes that Professor Smith deems "key," including that the security have (a) a fixed interest rate, (b) be issued as a high-yield bond, and (c) have no call protection—features mentioned nowhere in the Second Circuit's discussion of market efficiency—there was no "reference market" of debt securities that could be tested to see if their trading prices reflected all available information. And, remarkably, in Professor Smith's view, where there is no ability to *test* market efficiency (because there is no "reference market" of identical securities on which to run the test), the *answer* is that the market was *not* efficient.

Professor Smith cites no case—and the Trustees are aware of none—in which any court has applied his proposed test of market efficiency (let alone has reached the conclusion that the market is inefficient simply because an expert cannot complete his or her test) for purposes of

determining a cramdown interest rate under section 1129(b) of the Bankruptcy Code.[10] But there

is an even more fundamental problem with Professor Smith's approach. Not only does he apply

the wrong standard, but he asks the wrong question. The question is not whether there was an

efficient securities market for trading the Replacement Notes after they were issued. Rather, the

question is whether there was an efficient financing market to obtain exit loans comparable to the

Replacement Notes, for purposes of ascertaining an available market rate that could be used to

ensure the Replacement Notes had a present value on the Effective Date equal to the

Noteholders' allowed secured claims ($1.1 billion and $250 million, respectively). *See MPM*

*Silicones*, 874 F.3d at 800; *id.* at 801 ("[T]he goal of the cramdown rate 'is to put the creditor in

the same economic position that it would have been in had it received the value of its allowed

claim immediately . . . .'" (quoting *In re Valenti*, 105 F.3d 55, 63 (2d Cir. 1997)).

Indeed, the analysis that Professor Smith engages in to answer the question he poses

highlights how fundamentally at odds his approach is with the Second Circuit's decision. The

Second Circuit instructed that the Bankruptcy Code expresses a strong preference for a market

test where one is available. Yet the analysis Professor Smith employs could allow the debtor to

avoid a market test in every case. As noted, Professor Smith concludes that no efficient market

existed here because he found no other security with all the same "key" features of the

Replacement Notes. But he acknowledged at his deposition that he did find other securities

(including the Original First Lien and 1.5 Lien Notes) that had all the "key" features of the

Replacement Notes except for one—the lack of call protection. Smith Tr. at 156:12-158:19.

That term, which "expose[d] the Replacement Notes to additional risk," Smith Report ¶¶ 57-58,

---

[10]    Nor does Professor Smith cite to any treatise or academic literature that applies his three-step test for market efficiency.

was, in the words of Momentive's market-rate expert, "off-market," "highly unusual" and, indeed, unprecedented in his 30-year career for a long-term fixed rate bond.  Expert Report of William Q. Derrough dated June 14, 2018 ¶¶ 34-43 (attached to the Anker Declaration as <u>Ex. G</u>, hereinafter the "<u>Derrough Report</u>").  In this case, however, in which it crammed down the Original First Lien and 1.5 Lien Notes, Momentive was able unilaterally to re-write the old indentures for the First Lien and 1.5 Lien Notes to remove all call protection when it issued the new indentures for the Replacement Notes.[11]

The upshot of this sort of analysis is that the debtor could always circumvent the market rate by simply inserting an "off-market" term into the cramdown note, thereby exempting itself from a finding of market efficiency and hence application of the market rate.  That result cannot be reconciled with the Second Circuit's admonition that cramdown interest rates in Chapter 11 should normally be set by the market, not by the *Till* formula rate, at least "when some form of market valuation may be available."  *MPM Silicones*, 874 F.3d at 800 ("disregarding available efficient market rates would be a major departure from long-standing precedent dictating that 'the best way to determine value is exposure to a market'"; "'one of the Code's innovations [was] to narrow the occasions for courts to make valuation judgments,' and expressed a 'disfavor for decisions untested by competitive choice'" (quoting *LaSalle*, 526 U.S. at 457-58)).

Rather than apply the standard of market efficiency that courts have applied under the Bankruptcy Code in Chapter 11 cramdowns, Professor Smith cites only non-bankruptcy cases

---

[11]     *Compare* Momentive Performance Materials, Inc., Indenture for 3.88% First-Priority Senior Secured Notes due 2021, dated October 24, 2014, at Exhibit A-6 (form of Notes) ¶ 5 (no call protection) (attached to the Anker Declaration as <u>Ex. I</u>) *and* Plan Supplement, ECF No. 707, Ex. M (form of indenture for proposed Replacement First Lien Notes), at Notes ¶ 5 (same) *with* Momentive Performance Materials, Inc., Indenture for 8.875% First-Priority Senior Secured Notes due 2020, dated October 25, 2012, at Exhibit A-9 (form of Notes) ¶ 5 (call protection) (attached to the Anker Declaration as <u>Ex. O</u>).

addressing fundamentally different questions in the context of federal securities litigation or shareholder appraisal cases. *See* Smith Report ¶ 27. For example, Professor Smith cites *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), a securities-fraud class action brought under Rule 10b-5. The question was whether the members of the plaintiff class could establish that they relied on the defendants' misrepresentations without having to prove individualized reliance by each investor. The Supreme Court held that the plaintiff class members could invoke a rebuttable presumption of reliance through the "fraud-on-the-market" theory—the "hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information" and hence, when an investor "buys or sells stock at the price set by the market," the "investor's reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action." *Id.* at 241, 247.[12]

These non-bankruptcy cases have nothing to do with the question at issue here. The Second Circuit's reference to an "efficient market" in its decision remanding this matter does not cite to any of the securities or appraisal cases adopting the "efficient markets hypothesis" that Professor Smith invokes. Instead, the Second Circuit cites to *Till* itself, where the plurality's opinion used the term in the very different context relevant here regarding "lenders" who provide "financing for Chapter 11 debtors." *MPM Silicones*, 874 F.3d at 799 (discussing *Till*'s "much-discussed footnote 14" where the plurality noted the availability of financing for Chapter 11 debtors and stated that "[t]hus, when picking a cramdown rate in a Chapter 11 case, it might

---

[12]    The Smith Report cites two other securities-fraud cases applying the same standard, *see In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 42-43 (2d Cir. 2006); *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989), and one stockholder appraisal case, where the court similarly invoked the "efficient market hypothesis" to conclude that the "fair value" of the stock being appraised could be determined by its market price, *see Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, 177 A.3d 1, 6, 20 (Del. 2017).

make sense to ask what rate an efficient market would produce"). The *Till* plurality contrasted Chapter 11 with Chapter 13 and disputed the dissenting opinion's assertion that "subprime lending markets are competitive and therefore largely efficient," noting that subprime loans to consumer borrowers in Chapter 13 are not "negotiated between fully informed buyers and sellers in a classic free market," and that "subprime lenders would exploit borrowers' ignorance and charge rates above what a competitive market would allow." *Till v. SCS Credit Corp.*, 541 U.S. 465, 481-82 (2004) (Stevens, J., plurality). Similarly, the Second Circuit observed that "[w]hen dealing with a sub-prime loan in the Chapter 13 context, . . . the market is not necessarily efficient and the borrower is typically unsophisticated"; "[h]owever, where, as here, an efficient market may exist that generates an interest rate that is apparently acceptable to sophisticated parties dealing at arm's length, we conclude, consistent with footnote 14, that such a rate is preferable" to the *Till* formula rate. *MPM Silicones*, 874 F.3d at 801.

Thus—as one would expect in a bankruptcy case—*Till* and the Second Circuit focused on the loan market available to a borrower/debtor to obtain financing from a lender/creditor, not the securities markets for trading between buyers and sellers. And, as noted above, this Court likewise observed at the March 9, 2018 hearing that the Second Circuit's opinion speaks to whether the "markets for financing, not for buying claims, for financing, are efficient," and that the capital-markets "efficient market theory doesn't have anything to do with that." Mar. 9, 2018 Hr'g Tr. at 17, 29.

At that same hearing, Momentive's counsel assured this Court that Momentive did not intend to submit "some crazy, out-there, efficient market theory." *Id.* at 30. Professor Smith's testimony may not be "crazy" and "out there," at least in other contexts. But, as Professor Smith admits, his testimony does not speak at all to the legal standard for market efficiency in section

24

1129(b) cramdown cases.  Because Professor Smith's opinions apply the wrong legal standard, they should be excluded as inadmissible under Rule 702.

## CONCLUSION

The Court should grant the motion to exclude Professor Smith's testimony and grant such other and further relief as the Court deems just and proper.

New York, New York
Dated July 31, 2018

  /s/ Philip D. Anker
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
Philip D. Anker
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800 (Telephone)
(212) 230-8888 (Facsimile)
philip.anker@wilmerhale.com

Joel Millar
Jonathan Seymour
1875 Pennsylvania, N.W.
Washington, D.C. 20006
(202) 663-6000 (Telephone)
(202) 663-6363 (Facsimile)
joel.millar@wilmerhale.com
jonathan.seymour@wilmerhale.com

**DECHERT LLP**
Michael J. Sage
Rebecca Waldman
1095 Avenue of the Americas
New York, NY 10036-6797
(212) 698-3500 (Telephone)
(212) 698-3599 (Facsimile)
michael.sage@dechert.com
rebecca.waldman@dechert.com

*Counsel for BOKF, NA as First Lien
Trustee*

  /s/ Andrew G. Devore
**ROPES & GRAY LLP**
Mark R. Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9000 (Telephone)
(212) 596-9090 (Facsimile)
Email:  mark.somerstein@ropesgray.com

Andrew G. Devore
William L. Roberts
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
(617) 951-7000 (Telephone)
(617) 951 7050 (Facsimile)
Email:  andrew.devore@ropesgray.com
        william.roberts@ropesgray.com

*Counsel to Wilmington Trust, NA, as 1.5
Lien Trustee*