UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

In re:                                              Chapter 11
                                                    Case No. 14-22503 (RDD)
MPM Silicones, LLC, *et al.*,[1]

                          Debtors.                    (Jointly Administered)

----------------------------------------------------------------x

## STATEMENT OF STIPULATED FACTS

---

[1] The last four digits of the taxpayer identification numbers of the reorganized Debtors follow in parentheses: (i) Juniper Bond Holdings I LLC (9631); (ii) Juniper Bond Holdings II LLC (9692); (iii) Juniper Bond Holdings III LLC (9765); (iv) Juniper Bond Holdings IV LLC (9836); (v) Momentive Performance Materials China SPV Inc. (8469); (vi) Momentive Performance Materials Holdings Inc. (8246); (vii) Momentive Performance Materials Inc. (8297); (viii) Momentive Performance Materials Quartz, Inc. (9929); (ix) Momentive Performance Materials South America Inc. (4895); (x) Momentive Performance Materials USA Inc. (8388); (xi) Momentive Performance Materials Worldwide Inc. (8357); and (xii) MPM Silicones, LLC (5481). The Reorganized Debtors' executive headquarters are located at 260 Hudson River Road, Waterford, NY 12188.

1

Momentive Performance Materials, Inc. and its affiliated reorganized Debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases") (the "Debtors," "Reorganized Debtors," "MPM" or the "Company"), together with BOKF, NA ("BOKF"), as indenture trustee of MPM's prepetition 8.875% First-Priority Senior Secured Notes due 2020 (the "Prepetition 1L Notes"); and Wilmington Trust, N.A. ("Wilmington Trust," and together with BOKF, the "Trustees"), as indenture trustee of MPM's prepetition 10% Senior Secured Notes due 2020 (the "Prepetition 1.5L Notes") submit this Statement of Stipulated Facts.

**I.    THE PREPETITION 1L NOTES AND THE PREPETITION 1.5L NOTES**

1.    On May 25, 2012, MPM issued the "Prepetition 1.5L Notes." The Prepetition 1.5L Notes had a principal amount of $250 million, a fixed interest rate of 10%, and a maturity date of October 15, 2020. The Prepetition 1.5L Notes were secured by a lien on substantially all of the assets of the Debtors that was junior to the then-existing Senior Secured Credit Facilities (and, upon their issuance, the Prepetition 1L Notes). The Prepetition 1.5L Notes had call protection, including a "make whole"-related provision. At issuance, the Prepetition 1.5L Notes had a credit rating of B2 from Moody's Investors Service, Inc. ("Moody's").

2.    On October 25, 2012, MPM issued the "Prepetition 1L Notes." The Prepetition 1L Notes had a principal amount of $1.1 billion, a fixed interest rate of 8.875%, and a maturity date of October 15, 2020. The Prepetition 1L Notes were secured by a first-priority lien in substantially all of the assets of the Debtors, except with respect to the collateral securing the ABL facility (primarily accounts receivable and inventory), and a second-priority lien in such ABL collateral. The Prepetition 1L Notes had call protection, including a "make whole"-related provision. The Prepetition 1L Notes were issued with credit ratings of CCC+ from Standard & Poor's ("S&P") and B1 from Moody's.

## II. MPM'S BUSINESS AND PREPETITION FINANCIAL DIFFICULTIES

3. Before it filed for bankruptcy, MPM was one of the world's largest producers of silicones and silicone derivatives and a leading developer and manufacturer of quartz and specialty chemicals products.

4. The Company's industry was cyclical, and impacted by general economic and industrial conditions, such as the robustness of general industrial production, automotive builds, housing starts, construction activity, consumer spending and semiconductor capital equipment investment.

5. Beginning in 2011, MPM experienced difficulties in its financial performance due (at least in part) to a fundamental shift in industry dynamics, including industry-wide overcapacity, causing severe price pressure on the Company's basic products, and the commoditization of lower-end specialty products.

6. While these factors gave rise to decreased profit margins industry-wide, MPM experienced particularly diminished liquidity, eventually resulting in an inability to fund its operations, due to its high net leverage.

7. The Company, facing these liquidity issues, retained Moelis & Company ("Moelis") as a financial advisor in November 2013. Moelis was engaged to, among other things, evaluate strategy alternatives and financing options.

## III. PREPETITION DIP AND EXIT FINANCING COMMITMENTS

8. In February 2014, MPM authorized Moelis to initiate the process of securing debtor-in-possession ("DIP") financing to fund a potential chapter 11 filing.

9. While this process initially was focused on obtaining DIP financing, MPM ultimately sought to obtain commitments for both DIP financing and exit financing.

10. Beginning in late February 2014, Moelis engaged in discussions with each of Credit Suisse AG ("Credit Suisse"), JP Morgan Securities LLC ("JPMorgan Securities"), JPMorgan Chase Bank, N.A. ("JPMorgan Chase Bank," together with JPMorgan Securities, "JPMorgan") and Citigroup Global Markets Inc. ("Citigroup") (collectively, the "Exit Financing Commitment Parties") regarding proposals for DIP financing for the Debtors. Moelis later engaged in discussions with each of the Exit Financing Commitment Parties regarding proposals for DIP and exit financing for the Debtors. Each of the Exit Financing Commitment Parties made proposals to underwrite, on a committed basis, both the DIP and exit financing. Moelis negotiated with each of the Exit Financing Commitment Parties. Moelis also had discussions with Apollo Global Management, LLC ("Apollo"), MPM's equity sponsor, GE Capital, and certain of MPM's second lien lenders about potentially providing DIP and exit financing. Ultimately, Moelis and MPM sought and pursued the negotiation of a joint proposal from the three Exit Financing Commitment Parties for both DIP and exit financing.

11. On or about March 20, 2014, Moelis sent an initial draft of commitment papers for the DIP and exit financing for the Debtors, consisting of a commitment letter (the "April 3, 2014 Commitment Letter"), and a fee letter (the "April 3, 2014 Fee Letter," and together with the April 3, 2014 Commitment Letter, the "DIP/Exit Financing Letters"), to the Exit Financing Commitment Parties. Thereafter, multiple drafts of the DIP/Exit Financing Letters were exchanged between Moelis and MPM, on the one hand, and the Exit Financing Commitment Parties, on the other hand, and their respective counsel.

12. On April 3, 2014 (the "Commitment Date"), the Exit Financing Commitment Parties executed the DIP / Exit Financing Letters, committing to provide MPM with DIP and exit financing.

4

13. For the DIP financing, the Exit Financing Commitment Parties agreed to provide a $270 million asset-based revolving loan (the "DIP ABL") and a $300 million term loan (the "DIP Term Loan").

14. For the exit financing, the Exit Financing Commitment Parties committed to provide, subject to certain conditions, a term loan of $1.0 billion on the effective date of MPM's future plan of reorganization under chapter 11 (the "Exit Term Loan") and a $270 million asset-based revolving loan (the "Exit ABL," and together with the Exit Term Loan, the "Exit Facilities"), which was intended to replace the DIP ABL. The Exit Term Loan contemplated in the DIP/Exit Financing Letters had a seven-year term requiring quarterly payments and an "accordion" feature allowing the Company to increase the amount of the facility by (or to add one or more additional facilities in a total amount) up to an additional $230 million (or more if certain conditions were met). The DIP/Exit Financing Letters provided that the Exit Loan would be secured by a first-priority lien in substantially all of the assets of the Debtors, except with respect to the collateral securing the Exit ABL facility (primarily accounts receivable and inventory), and a second-priority lien in such Exit ABL collateral.

15. The April 3, 2014 Commitment Letter provided that the committed interest rate on the Exit Term Loan would be a floating interest rate of LIBOR (as defined in the DIP/Exit Financing Letters) plus 4.00% per annum, with a LIBOR floor of 1.00% per annum, subject to the provisions described in paragraphs 16, 17, and 18 below.

16. The April 3, 2014 Commitment Letter also provided for an original issue discount ("OID") of 0.50% (50 bps) for the Exit Term Loan (along with separate fees to be paid to the Exit Financing Commitment Parties), such that it would be issued at 99.5% of the stated principal balance even though it would have a face value of 100% (i.e., the lenders would lend $995 million to the Debtors but obtain a right to repayment of $1 billion in principal).

5

17. The April 3, 2014 Fee Letter provided that the Arrangers (as that term is defined in the Fee Letter) would be permitted to flex upward, meaning that they were permitted to increase the interest rate on the Exit Term Loan from LIBOR plus 4.00% by up to 125 bps (1.25%) to achieve a "successful syndication" of the Exit Term Loan. The Fee Letter defined "successful syndication" to be a syndication in which the Exit Financing Commitment Parties would "collectively hold not more than $0 of the Exit Term Loan Facility." The Exit Financing Commitment Parties had the option to employ up to 50% of this flex as additional OID in lieu of an interest rate increase.

18. The Exit Term Loan included a "Change in Interest Rate Margin" provision which provided that, after the delivery of MPM's financial statements for the first full fiscal quarter ended after the Effective Date, the interest rate margin on the Exit Term Loan was subject to a one-time reduction based upon MPM's net first lien leverage ratio, if agreed by the Exit Financing Commitment Parties. The DIP/Exit Financing Letters also specified that, if necessary for a successful syndication, the Exit Financing Commitment Parties could remove this provision.

19. The April 3, 2014 Commitment Letter allowed MPM to add additional commitment parties. On or about April 3, 2014, Moelis sent copies of the executed DIP / Exit Financing Letters to UBS Investment Bank ("UBS") and Deutsche Bank Securities Inc. ("Deutsche Bank"). On or about April 11, 2014 Moelis sent copies of the executed the DIP/Exit Financing Letters to Goldman, Sachs & Co. ("Goldman"). Goldman, Deutsche Bank, and UBS agreed to sign on to the DIP/Exit Financing Letters as additional joint commitment parties for, among other things, the Exit Term Loan.

20. The Debtors sought and obtained the approval of the Bankruptcy Court (as defined below) for the DIP financing and for the DIP /Exit Letters. In connection with their

efforts to obtain such approval, the Debtors submitted sworn declarations from William Derrough of Moelis and from their CFO William Carter (Bankr. Case Dkt. Nos. 14 and 16, respectively).

21.   In August 2014, MPM and JPMorgan drafted offering materials for the Exit Term Loan and the New HY 2L Notes (defined below) in anticipation of seeking to market the Exit Term Loan and the New HY 2L Notes for syndication and offering beginning in September 2014.  In connection with those efforts, on August 23, 2014, JPMorgan asked the Debtors to run the financial projections in the offering materials based on the debt service expense that would be incurred if the Exit Term Loan were syndicated at LIBOR + 450 bps with a 1% LIBOR floor and if the New HY 2L Notes were issued at 8.125%.

22.   The weighted average spread above LIBOR for leveraged loans issued in April 2014 was reported as 4.18%.  The weighted average spread above LIBOR for leveraged loans issued in August 2014 was reported as 4.58%.  The weighted average spread above LIBOR for leveraged loans issued in October 2014 was reported as 5.05%.

23.   The Exit Term Loan was never funded or syndicated in connection with MPM's exit from bankruptcy.

## IV.   MPM'S BANKRUPTCY FILING

24.   On April 13, 2014 (the "Petition Date"), MPM and its debtor affiliates each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  The Chapter 11 Cases were consolidated for procedural purposes.  As of that date, both the Prepetition 1L Notes and the Prepetition 1.5L Notes remained outstanding.

25. Throughout the course of the bankruptcy proceedings, MPM and its debtor affiliates continued to operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

26. MPM's prepetition debt obligations included: (i) an asset-based credit facility commitment in the amount of $270 million; (ii) a revolving cash flow facility commitment in the amount of $75 million; (iii) $1.1 billion of Prepetition 1L Notes; (iv) $250 million of Prepetition 1.5L Notes; (v) $1.161 billion of 9% Second-Priority Springing Lien Notes due 2021 and €133 million of 9.5% Second-Priority Springing Lien Notes due 2020 (together, the "Prepetition 2L Notes"); (vi) $382 million of 11.5% of Senior Subordinated Notes due 2016 (the "Subordinated Notes"); and (vii) $854 million outstanding in pay-in-kind 11% Senior Discount Notes due 2017.

27. The Exit Financing Commitment Parties held certain prepetition MPM debt prior to negotiating and entering into the April 3, 2014 Commitment Letter and April 3, 2014 Fee Letter. None of the Exit Financing Commitment Parties were insiders of the Debtors, pursuant to section 101(31) of the Bankruptcy Code.

28. MPM and certain affiliates of Apollo and other holders of MPM's Prepetition 2L Notes entered into a Restructuring Support Agreement (the "RSA") as of the Petition Date.

## V. ADDITIONAL EXIT FINANCING COMMITMENTS

29. After filing for bankruptcy, MPM sought to obtain additional exit financing.

30. On or about April 22, 2014, Moelis reached out to JPMorgan, Citigroup, and Credit Suisse regarding potential proposals for exit financing to refinance the Prepetition 1.5L Notes (the "Incremental Facility").

31. On or about April 25-26, 2014, each of the Exit Financing Commitment Parties sent an initial proposal for the Incremental Facility. Each bank's proposal had an option involving the issuance of high yield bonds, and Citigroup's and JPMorgan's proposals also

8

included a leveraged loan option. The pricing for the bond options in the Exit Financing Commitment Parties' initial proposals ranged from 6.75% to 7.5%. In Citigroup's proposal, Citigroup provided an update on the high yield bond market, as well as a separate update on the leveraged loan market.

32. On or about May 9, 2014, Moelis sent initial drafts of an engagement letter, fee letter, fee credit letter, and commitment letter (the "June 13, 2014 Commitment Letter") for the Incremental Facility (together, the "Incremental Facility Letters") to the Exit Financing Commitment Parties. Over the next month, drafts of the Incremental Facility Letters were exchanged between Moelis and MPM, on the one hand, and the Exit Financing Commitment Parties, on the other hand, and their respective counsel.

33. On June 13, 2014, the Exit Financing Commitment Parties committed, subject to certain terms and conditions, to provide $250,000,000 in additional funding consisting of: (i) MPM's issuance of second lien secured notes with a principal amount of $250 million (the "New HY 2L Notes") upon MPM's emergence from bankruptcy, and to the extent the Company was not able to issue the New HY 2L Notes, (ii) a senior second-priority secured bridge loan facility in the amount of $250 million (the "Exit 2L Bridge Loan"). The Incremental Facility Letters further provided that the term for the New HY 2L Notes would be at least eight years.

34. The Incremental Facility Letters provided that the interest rate on the Exit 2L Bridge Loan would have a 1% LIBOR floor and would be subject to a 9% cap. The June 13, 2014 Commitment Letter further provided that the interest rate on the Exit 2L Bridge Loan would be a ratcheting interest rate, starting at a rate of LIBOR+600 bps for the first three months, and increasing by 50 bps at the end of each three-month period thereafter through the first year of maturity. The Incremental Facility Documents also provided that after one year, any outstanding Exit 2L Bridge Loan would automatically convert to either a senior second-priority

9

secured term loan (the "2L Term Loan") or senior second-priority secured exchange notes (the "2L Exchange Notes").

35. As of August 2014, the Reorganized Debtors, Moelis, and JPMorgan all expected that the Reorganized Debtors would be able to issue the New HY 2L Notes and that the Reorganized Debtors would not need to draw down the Exit 2L Bridge Loan.

36. The New HY 2L Notes, Exit 2L Bridge Loan, 2L Term Loan, and 2L Exchange Notes would all have been secured by a junior priority lien in the collateral securing the Exit Term Loan.

37. On July 3, 2014, the Reorganized Debtors filed a motion seeking authority from the Court to enter into the Incremental Facility.

38. Neither the Exit 2L Bridge Loan nor the New HY 2L Notes were ultimately funded, syndicated, or issued in connection with MPM's exit from bankruptcy.

## VI. THE PLAN OF REORGANIZATION

39. On May 12, 2014, MPM filed its original *Joint Chapter 11 Plan of Reorganization for Momentive Performance Materials Inc. and Its Affiliated Debtors* (the "Original Plan"), which was subsequently amended and supplemented (as amended and supplemented, the "Plan").

40. On June 23, 2014, MPM submitted the *Disclosure Statement for Joint Chapter 11 Plan of Reorganization for Momentive Performance Materials Inc. and Its Affiliated Debtors* (the "Disclosure Statement").

### A. Treatment of the Prepetition 1L Note Claims

41. Under the Plan, the claims of the holders of the Prepetition 1L Notes (the "Prepetition 1L Noteholders") were classified into Class 4.

42. The Plan provided that the claims in Class 4 would be deemed, as of the Effective Date,

> Allowed Claims in the amount of $1,100,000,000, plus any accrued and unpaid interest from the Petition Date through the Effective Date at the non-default interest rate provided under the First Lien Indenture, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person. No Applicable Premium, prepayment penalty, "make-whole" or similar claim shall be Allowed with respect to the First Lien Note Claims pursuant to this Section 5.4(a) of the Plan.

43. If Class 4 voted to accept the Plan, or was presumed to have accepted the Plan, the Plan provided that the Prepetition 1L Noteholders would receive "Cash in an aggregate amount equal to such holder's Pro Rata portion of the First Lien Cash Pool."

44. The Plan further provided that:

> **If Class 4 vote[d] to reject the Plan**: Replacement First Lien Notes [the "1L Replacement Notes"] with a present value equal to the Allowed amount of such holder's First Lien Note Claim (which may include, in addition to the First Lien Note Claims Allowed pursuant to Section 5.4(a) hereof, any applicable make-whole claim, prepayment penalty, or Applicable Premium to the extent Allowed by the Bankruptcy Court).

45. The Plan provided that the 1L Replacement Notes would be in the principal amount of $1.1 billion, have a term of seven years, have a fixed rate of interest, and be collateralized by a first-priority lien in substantially all of the assets of the Reorganized Debtors, except with respect to the collateral securing the ABL facility (primarily accounts receivable and inventory), and a second-priority lien in such ABL collateral.

**B. Treatment of the Prepetition 1.5L Note Claims**

46. Under the Plan, the claims of the holders of the Prepetition 1.5L Notes (the "Prepetition 1.5L Noteholders") were classified into Class 5.

11

47. The Plan provided that the claims in Class 5 would be deemed, as of the Effective Date,

> Allowed Claims in the amount of $250,000,000, plus any accrued and unpaid interest from the Petition Date through the Effective Date at the non-default interest rate provided under the 1.5 Lien Indenture, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.  No Applicable Premium, prepayment penalty, "make-whole" or similar claim shall be Allowed with respect to the 1.5 Lien Note Claims pursuant to this Section 5.5(a) of the Plan.

48. If Class 5 voted to accept the Plan, or was presumed to have accepted the Plan, the Plan provided that the Prepetition 1.5L Noteholders would receive "Cash in an aggregate amount equal to such holder's Pro Rata portion of the 1.5 Lien Cash Pool."

49. The Plan further provided that:

> **If Class 5 vote[d] to reject the Plan**:  Replacement 1.5 Lien Notes [the "1.5L Replacement Notes"] with a present value equal to the Allowed amount of such holder's First Lien Note Claim (which may include, in addition to the First Lien Note Claims Allowed pursuant to Section 5.5(a) hereof, any applicable make-whole claim, prepayment penalty, or Applicable Premium to the extent Allowed by the Bankruptcy Court)."

50. The Plan provided that the 1.5L Replacement Notes would be in the principal amount of $250 million, have a term of 7.5 years, have a fixed rate of interest, and be secured by a junior lien on the collateral securing the 1L Replacement Notes.

12

### C. The Rights Offering and Backstop Commitment Agreement

51. The Plan also contemplated a rights offering under which all holders of Prepetition 2L Notes had the opportunity to purchase shares of MPM common stock issued by the reorganized Company in an aggregate amount of $600 million at a price per share of $17.28 (the "Rights Offering"). This share price amounted to a 15% discount to the implied per share value based on a projected enterprise value for the Debtors, provided by MPM in its Disclosure Statement, of a range between $2.0 billion to $2.45 billion, with a midpoint of $2.2 billion, calculated as of the Effective Date (as defined below).

52. On June 23, 2014, MPM and certain entities entered into an agreement requiring those entities to subscribe their pro rata portion of the $600 million Rights Offering and purchase any Rights Offering stock to which the Second Lien Noteholders did not subscribe (the "Backstop Commitment Agreement").

### D. Plan Solicitation and Voting

53. On July 18, 2014, MPM filed the *Plan Supplement Relating to Joint Chapter 11 Plan of Reorganization for Momentive Performance Materials Inc. and Its Affiliated Debtors*. That filing included a form of indenture for the 1L Replacement Notes and the 1.5L Replacement Notes (collectively, the "Replacement Notes"). The indentures provided that the Replacement Notes would have no call protection.

54. MPM distributed solicitation packages containing the Disclosure Statement, the Plan, and ballots to holders of claims entitled to vote to accept or reject the Plan. As classes entitled to vote to accept or reject the Plan, the Prepetition 1L Noteholders and the Prepetition 1.5L Noteholders received those solicitation packages.

55. On July 28, 2014, the holders of the Prepetition 1L Notes and the Prepetition 1.5L Notes voted to reject the Plan.

13

56. Specifically, the final voting results on the Plan are set forth in the chart below.

| Accept | | Reject | |
|---|---|---|---|
| Number | Amount | Number | Amount |
| Class 4 – First Lien Note Claims | | | |
| 23 (11.44%) | $84,663,000.00 (8.09%) | 178 (88.56%) | $961,706,000.00 (91.91%) |
| Class 5 – 1.5 Lien Note Claims | | | |
| 17 (19.32%) | $42,582,000.00 (19.88%) | 71 (80.68%) | $171,574,000.00 (80.12%) |

57. Subsequently, on August 27, 2014, the Prepetition 1L Noteholders filed a motion pursuant to Bankruptcy Rule 3018(a) seeking to change their votes to the Plan and on August 28, 2014, the Prepetition 1.5L Noteholders filed a similar motion (together with the Prepetition 1L Noteholders' motion, the "3018 Motion"). MPM objected to the 3018 Motion.

58. The Bankruptcy Court held a hearing on the 3018 Motion on September 9, 2014, and subsequently denied the 3018 Motion based upon a finding that "cause" for the relief requested had not been established.

## VII.   CONFIRMATION OF THE PLAN

59. BOKF and Wilmington Trust, on behalf of the Prepetition 1L Notes and the Prepetition 1.5L Notes, respectively, filed objections to the Plan.

60. On August 18-19, 21-22 and 25-26, 2014, the Bankruptcy Court conducted an evidentiary hearing to resolve the objections to the Plan and determine whether the Plan should be confirmed under the Bankruptcy Code.

61. On August 26, 2014, the Bankruptcy Court issued a bench ruling confirming the Plan over the objections of the dissenting classes.

62. On September 9, 2014, the Bankruptcy Court issued a corrected and modified bench ruling confirming MPM's Plan.

63. On September 11, 2014, the Bankruptcy Court subsequently issued a written order confirming the Plan (the "Confirmation Order").

64. The Plan became effective on October 24, 2014 (the "Effective Date").

65. In the Disclosure Statement, MPM had projected that the enterprise value of the Reorganized Debtors as of this Effective Date would be a range of approximately $2.0 billion to $2.45 billion, with a midpoint value of $2.2 billion.

66. MPM reported in its 10-Q for the second quarter of 2014 that its last-twelve-month EBITDA was $146 million and its last-twelve-month Adjusted EBITDA was $213 million, and in its 10-Q for the third quarter of 2014 that its last-twelve-month EBITDA was negative $33 million and its last-twelve-month Adjusted EBITDA was $217 million.

67. On the Effective Date, MPM issued the 1L Replacement Notes and the 1.5L Replacement Notes.

68. The Bankruptcy Court determined that the rates of interest for the Replacement Notes should be set employing the "formula approach" under *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). Pursuant to the Bankruptcy Court's Confirmation Order, the interest rate of the 1L Replacement Notes was fixed at 3.88% per annum and the interest rate of the 1.5L Replacement Notes was fixed at 4.69% per annum.

69. The 1L Replacement Notes consisted of $1.1 billion of principal at issuance with a first-priority lien and a maturity length of seven years.

70. The 1.5L Replacement Notes consisted of $250 million of principal at issuance with a second-priority lien and a maturity length of seven and a half years.

71. Neither the 1L nor 1.5L Replacement Notes had call protection.

15

72. Neither the 1L nor 1.5L Replacement Notes were rated by any credit rating agencies prior to or upon issuance.

73. As of the Effective Date, the 3-month LIBOR rate was 0.23% in the first period and was expected under the forward LIBOR curve to remain below 1% for the next five quarters. Further, as of the Effective Date, the 3-month LIBOR rate was expected under the forward LIBOR curve to increase to over 1% by the seventh interest payment and continue to increase thereafter to 3.21% as of three months prior to the maturity of the Exit Term Loan on October 24, 2021.

74. On December 19, 2014, the 1L Replacement Notes and 1.5L Replacement Notes were rated by Standard & Poor's ("S&P") as "B" and "B-," respectively.

75. On January 16, 2015, the 1L Replacement Notes and 1.5L Replacement Notes were rated by Moody's, as "B3" and "Caa2," respectively.

**VIII. APPEALS OF CONFIRMATION AND REMAND**

76. On September 12, 2014, BOKF and Wilmington Trust appealed the Confirmation Order to the United States District Court for the Southern District of New York (the "District Court"), which affirmed the Confirmation Order.

77. On September 30, 2014, BOKF and Wilmington Trust filed their joint appeal brief on the public docket in the United States District Court for the Southern District of New York. The appeal brief argued for reversal of the Bankruptcy Court's rulings denying the make-whole claims of the Prepetition 1L Noteholders and the Prepetition 1.5L Noteholders and the Bankruptcy Court's holding that the interest rates for the Replacement 1L Notes and the Replacement 1.5L Notes should be determined under the *Till* formula rate rather than by applying a market rate. The District Court affirmed the Bankruptcy Court's rulings.

16

78. BOKF and Wilmington Trust then appealed to the United States Court of Appeals for the Second Circuit (the "Second Circuit"). The Second Circuit affirmed the Confirmation Order in part, but remanded the issue of the appropriate interest rate for each of the 1L Replacement Notes and 1.5L Replacement Notes.

## IX. THE REORGANIZED DEBTORS' PUBLIC FILINGS WITH THE SEC

79. On November 14, 2014, MPM filed a Form 10-Q for the quarterly period ended September 30, 2014 with the United States Securities and Exchange Commission (the "SEC"). On March 30, 2015, Momentive Performance Materials Inc. filed its Form 10-K for the fiscal year ending December 31, 2014 with the SEC. In the 10-Q and the 10-K, based on valuation work that the Debtors had commissioned from Valuation Research Corporation, Momentive Performance Materials Inc. recorded the fair value of the Replacement 1L Notes in its financial statements as $957 million, or 87% of par value (*i.e.*, the $1.1 billion principal amount), and it recorded the fair value of the Replacement 1.5L Notes in its financial statements as $202 million, or 81% of par value (i.e., the $250 million principal amount).

## X. CALCULATION OF CATCH-UP PAYMENT FOR 1.5L REPLACEMENT NOTES, IF ANY

80. In his expert report, Christopher J. Kearns calculated the catch-up payment for the 1.5L Replacement Notes based on the notes' original principal amount of $250 million. In the fourth quarter of 2015 and first quarter of 2016, MPM repurchased $48,423,000 in aggregate principal amount of the 1.5L Replacement Notes for approximately $26 million (the "1.5L Replacement Note Repurchase"). The Reorganized Debtors have confirmed that the repurchased 1.5L Replacement Notes were canceled at the time of repurchase and that the current outstanding principal amount of the 1.5L Replacement Notes is $201,577,000.

81. If the Bankruptcy Court determines that the 1.5L Replacement Notes should carry an interest rate that would have resulted in the Reorganized Debtors paying more interest than they will ultimately pay on the 1.5L Replacement Notes between the Effective Date and the date of payment of such unpaid amounts (the "Catch-Up Payment"), and the Bankruptcy Court orders the Reorganized Debtors to make the Catch-Up Payment, such Catch-Up Payment shall be calculated from the Effective Date using a principal balance of $201,577,000 in light of the 1.5L Replacement Note Repurchase and the cancellation of such repurchased notes.

Dated: New York, New York
August 10, 2018

| AKIN GUMP STRAUSS HAUER & FELD LLP | ROPES & GRAY LLP |
|---|---|
| By: /s/Abid Qureshi<br>Ira S. Dizengoff<br>Abid Qureshi<br>One Bryant Park<br>New York, NY 10036<br>(212) 872-1000 (Telephone)<br>(212) 872-1002 (Facsimile)<br>idizengoff@akingump.com<br>aqureshi@akingump.com<br><br>*Counsel for the Reorganized Debtors* | By: /s/Andrew Devore<br>Mark Somerstein<br>Andrew Devore<br>1211 Avenue of the Americas<br>New York, NY 10036-8704<br>(212) 596-9000 (Telephone)<br>(212) 596-9090 (Facsimile)<br>mark.somerstein@ropesgray.com<br>andrew.devore@ropesgray.com<br><br>*Counsel to Wilmington Trust, N.A.* |
| WILMER CUTLER PICKERING HALE AND DORR LLP | DECHERT LLP |
| By: /s/Philip Anker<br>Philip D. Anker<br>Joel Millar<br>7 World Trade Center<br>250 Greenwich Street<br>New York, NY 10007<br>(212) 230-8800 (Telephone)<br>(212) 230-8888 (Facsimile)<br>philip.anker@wilmerhale.com<br>joel.millar@wilmerhale.com<br><br>*Counsel to BOKF, NA* | By: /s/Michael Sage<br>Michael Sage<br>Rebecca Waldman<br>1095 Avenue of the Americas<br>New York, NY 10036-6797<br>(212) 698-3500 (Telephone)<br>(212) 698-3599 (Facsimile)<br>michael.sage@dechert.com<br>rebecca.waldman@dechert.com<br><br>*Counsel to BOKF, NA* |